DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Planet Aid, Inc. | : | |
| | : | |
| A Massachusetts corporation which | : | |
| has its principal place of business at | : | |
| 6730 Santa Barbara Ct, Elkridge, MD | : | JURY TRIAL DEMANDED |
| 21075, in Howard County, Maryland; | : | |
| | : | |
| and | : | |
| | : | |
| Lisbeth Thomsen, | : | |
| | : | |
| An alien and permanent resident of | : | |
| Chilangoma, Malawi. | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | |
| | : | |
| Reveal, Center for Investigative | : | |
| Reporting, | : | |
| | : | |
| Which lists its address as | : | |
| 1400 65th St., Suite 200 | : | |
| Emeryville, CA 94608, | : | |
| | : | |
| and | : | |
| | : | |
| Matt Smith and Amy Walters, | : | |
| | : | |
| Both of whom list their employment | : | |
| address as Reveal, 1400 65th St., Suite | : | |
| 200,  Emeryville, CA 94608 | | |
| Defendants. | | |

**COMPLAINT**

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ...................................................................1

II.  JURISDICTION AND VENUE ...............................................................5

III. THE PARTIES...........................................................................................6

    A.   The Plaintiffs.......................................................................................6

        1.   Planet Aid.....................................................................................6

        2.   Lisbeth Thomsen.........................................................................7

    B.   The Defendants, their Malawi Agent, and Their Improper Tactics.......................7

        1.   Defendant Reveal.........................................................................7

        2.   Defendant Matt Smith.................................................................8

        3.   Defendant Amy Walters ..............................................................9

        4.   Defendants' Co-Author and Felon In Malawi .............................10

IV.  THE USDA PROGRAMS BENEFITTING MALAWI ..............................11

    A.   The Food For Progress Programs Generally.....................................11

    B.   Summary of Achievements by Plaintiffs ..........................................12

V.   THE SCHEME BY DEFENDANTS TO DEFAME PLAINTIFFS, AND
    INTERFERE WITH THEIR BUSINESS OPPORTUNITIES ..................13

    A.   Use of Articles and Broadcasts in Furtherance of the Scheme By Accusing
        Plaintiffs of Having Engaged In Criminal Conduct...............................14

    B.   Conduct in Furtherance of the Scheme By Interfering With Donors,
        Business Relationships and Employees ................................................17

    C.   Additional Tactics In Furtherance of the Scheme by Defendants to Harm
        Plaintiffs...............................................................................................20

VI.  THE DEFAMATORY STATEMENTS MADE BY DEFENDANTS IN
    FURTHERANCE OF THE SCHEME TO DAMAGE PLAINTIFFS'
    REPUTATIONS.......................................................................................22

    A.   Defendants Fabricate the Voice of One Farmer and Defraud Two Others
        In Order to Claim that Plaintiffs Had Siphoned Off 50-70% of USDA
        Funds. ...................................................................................................22

    B.   Defendants Rely on A Mathematically Inconceivable and Factually
        Baseless Claim that Plaintiffs Planet Aid and Lisbeth Thomsen's
        Employer Had Siphoned off 50-70% of USDA Funds Through Employee
        Salaries ..................................................................................................25

        1.   Claims that Planet Aid and DAPP Malawi Employees Were
            Pressured to Join the Teachers Group and Contribute Money ..................27

# TABLE OF CONTENTS
(continued)

2.     Claims that Employees Were Required To Sign An Agreement to Contribute 20-100% of their Salaries, and Had In Fact Contributed Such Sums....................................................................................................27

3.     Claims that The USDA Money "Stripped from Salaries" Went "Straight to Mexico," When It Actually Stayed In Malawi, and Was Used by Those Contributing the Funds .............................................30

C.     Claims that Plaintiffs Had Siphoned off 50-70% of USDA Funds Intended for Malawi Through "Fabricated Invoices."..........................................33

D.     Claims that Other Named and Unnamed Sources Had Evidence or Information that Plaintiffs Were Stealing Money or Engaging in Money Laundering. ............................................................................................36

E.     Claimed False Reports by Planet Aid as to the Salaries for Particular Individuals....................................................................................................38

F.     Claims that Jackson Mtimbuka Was Aware of "Cheating" in the USDA Programs ....................................................................................................39

G.     Use of the Village of Njuli to Create a Totally False Picture of the Plaintiffs' Work Under the USDA Programs ...........................................42

1.     The Dead Goat and Pig...................................................................43

2.     The Njuli Water Pump That Would Take Two Years to Pay-Off, And Which Cost Enough to Educate One Child For a Year.....................45

3.     Claimed Lies By Njuli's Chief to Donors About His Tomato Crop .........46

**VII.  FALSE AND DEFAMATORY STATEMENTS ABOUT THE RELATIONSHIP BETWEEN EITHER PLANET AID AND/OR DAPP MALAWI, AND THE TEACHERS GROUP ............................................47**

A.     Defendants' Defamatory Claims that Plaintiff Planet Aid was Under Investigation While Receiving USDA Funds .........................................49

1.     The First Email: Defendants Falsely Claim that the USDA Kept the Money "Flowing" Despite Knowing of Links Between Planet Aid and the Teachers Group Members on Trial In Denmark ...................50

2.     The Second Email: Defendants Claimed Link Between Planet Aid And the Criminal Conduct Alleged In Denmark .......................................51

B.     Defendants Falsely State that the "FBI says . . . that Planet Aid is part of a fraud and global money laundering ring," and Has Issued Reports "Dating Back" Fifteen Years ...................................................................................53

**VIII.  DEFENDANTS' FAILURE TO ISSUE A RETRACTION OR CORRECT THEIR "STORYTELLING."........................................................................................55**

## TABLE OF CONTENTS
(continued)

**Page**

**IX**  **CLAIM FOR RELIEF** .......................................................................**56**

**COUNT I.  CIVIL CONSPIRACY** ..............................................**56**

**COUNTS II-XII.  DEFAMATION  (LIBEL AND SLANDER)**................................**58**

**COUNT XIII.  PLACING PLAINTIFFS IN A FALSE LIGHT** ...............................**66**

**COUNT XIV.  TORTIOUS INTERFERENCE WITH PROSPECTIVE
ECONOMIC ADVANTAGE**..............................................**67**

**COUNT XV.  UNJUST ENRICHMENT**......................................**68**

For its complaint against Defendant Reveal and the Center for Investigative Reporting ("Reveal"), Defendant Matt Smith ("Smith") and Defendant Amy Walters ("Walters"), Plaintiffs Planet Aid, Inc. ("Planet Aid") and Lisbeth Thomsen state:

## I.     PRELIMINARY STATEMENT

1.     This action is against a news reporting agency and its reporters who, contrary to their professed duty of honestly and fairly investigating and reporting events, engaged in a scheme to smear Plaintiffs' reputations, and create a false, misleading and defamatory image of both Plaintiffs.  This scheme also involved directly contacting individuals and groups and trying to convince them to stop doing business with Plaintiffs.  The goal of this scheme was ultimately to drive Planet Aid out of business, and destroy Lisbeth Thomsen's reputation – all so that Defendants could falsely claim credit for having uncovered fraud, corruption and abuse in a government foreign aid program, and thereby attract additional donors to Defendants' news organization.

2.     Plaintiff Planet Aid, a target of this scheme, is a non-profit that has been in existence for eighteen years, and has spent tens of millions of dollars of its own money for charitable purposes.  Plaintiff Planet Aid's mission is to contribute to a more healthy and sustainable global environment and serving people in impoverished parts of the world.  Another target of the scheme, Plaintiff Lisbeth Thomsen, is employed working for Planet Aid's subcontractor, non-profit Development Aid from People to People Malawi ("DAPP Malawi"), and has spent her adult life engaged in work on behalf of projects developing much needed aid in Malawi.

3.     As part of their scheme, Defendants repeatedly published stories and aired broadcasts that painted a false and misleading picture of Plaintiffs. These statements were false

and defamatory, and related to, among other subjects, the involvement of Plaintiffs Planet Aid and Lisbeth Thomsen, as well as Thomsen's employer, DAPP Malawi, in a United States Department of Agriculture ("USDA") program called Food for Progress.   That program involved a U.S. government grant to assist agriculture, teacher training, and HIV/AIDS and nutrition education and prevention, principally in Malawi, and elsewhere in southern Africa.

4.     More specifically, Defendants   – along with a co-author who was a convicted felon in Malawi – published statements that Plaintiffs had engaged in "systematic fraud," "stealing" and "siphoning off of funds" from U.S. government relief programs, and "stripping" tens of millions of dollars from employee salaries.   When they published those statements, Defendants knew, or were reckless in not knowing, that they were contrary to documents in their possession and information known by the same "sources" they had interviewed.  Defendants published statements about Plaintiffs even though some sources had flatly told Defendants that what they were publishing was not true.

5.     Other statements were elicited using various unlawful and improper tactics. Defendants Smith and Walters, for instance, impersonated U.S. governmental employees and others in an effort to convince individuals that Plaintiffs had cheated them, and had not provided them with all of the benefits to which were entitled under the USDA program so that they would make false allegations against Plaintiffs.  Further, as part of the scheme, Plaintiffs, either directly or through their agent and co-author, offered bribes and inducements to those who would assist in this scheme by similarly providing false and misleading information.

6.     Defendants also relied on sources they should have known were suspect.  Not only was Defendant's co-author a convicted felon, but two sources had themselves been the

subjects of criminal actions; one was terminated by Plaintiff Lisbeth Thomsen's employer when this source tried to divert funds from the very USDA program at the heart of the Defendants' published stories.  Another source had actually been arrested for fraud, and Plaintiff Lisbeth Thomsen's employer was pursuing legal action against him when he became a source for Defendants.

7.      Defendants published sensational allegations about Plaintiffs based on its stated mission of generating donor contributions for itself by claiming to use "innovative" techniques to "spark" investigations or other action.   Defendant Reveal repeatedly acknowledged that that its very survival was dependent on its ability to obtain contributions from donors who wanted to see more than just informative articles, but wanted to see an "impact" from what Defendant Reveal called "storytelling" on its website.   In seeking donor contributions, Defendant Reveal therefore explained that it had "already co-produced or [was] working on stories" with radio stations, which had aired the false and defamatory statements and broadcasts about Plaintiffs.

8.      Defendants then made a plea for money:

> [W]e need your support.  Investigative reporting is expensive and time consuming. . . . By supporting our campaign, you will fund freelance and partner productions . . .
>
>           *       *       *
>
> Investigative reporting isn't cheap.

9.      Ultimately, the result of tactics and "storytelling" by Defendants was to create a tale of fiction regarding Plaintiffs Planet Aid and Lisbeth Thomsen, their charitable work in Africa and elsewhere, Planet Aid's activities in the United States, and even partners with whom Planet Aid worked in order to generate contributions to keep Defendant Reveal funded and

operating and Defendants Smith and Walters employed.  As Defendant Reveal admitted, its survival depended on such "storytelling."

10.     The result has been to severely damage Plaintiffs' reputations, employment and charitable work.   Defendants have claimed, among other things, that their articles, which included false and defamatory statements, have successfully impacted the willingness of one donor to engage in projects with Lisbeth Thomsen's employer, DAPP Malawi.  According to Defendants themselves, one donor who "coordinates U.S. humanitarian programs in Malawi" has cut-off aid to Plaintiff Lisbeth Thomsen's employer based on the Defendants' "storytelling." According to the Defendants, this decision was made based, in part, on "[t]he information in the pieces you put out."

11.     The false and defamatory statements have also impacted the willingness of officials in the United States to continue funding Plaintiff Planet Aid and/or its subcontractor, DAPP Malawi.  One official reported that the USDA takes such allegations made by Defendants seriously and would investigate.  Another claimed that the allegations are deeply disturbing if the allegations were true – which of course they are not.   Defendants Smith and Walters also took direct credit for convincing a Congresswoman to call for an investigation, which was expressly based on the sensational and false allegations by Defendants.

12.     Instead of enjoying its previous reputations among donors and partners willing to engage in projects with Plaintiffs Planet Aid and Lisbeth Thomsen, Plaintiffs have now been labeled "money launderers" and parties stealing much needed money from donor projects meant for the poor.   Plaintiff Lisbeth Thomsen has also suffered the emotional distress of having been

labeled a thief, money launderer, and "schemer" trying to steal money from those she has spent

her life trying to help through donor programs.

## II.     JURISDICTION AND VENUE

13.     Jurisdiction is conferred by 28 U.S.C. § 1332. Complete diversity among the

parties exists, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

14.     Defendants caused tortious injury in the District of Maryland, where Planet Aid

has its operations.   Defendants also took steps to ensure that their conduct would cause damage

and injury to Plaintiff Planet Aid in the District of Maryland, by directing broadcasts and articles

to persons dealing with Plaintiff Planet Aid in the District of Maryland.  Similarly, Defendants'

false and defamatory statements and other acts constituting tortious conduct occurred in the

District of Maryland.  Among other things, Defendants aired radio and television shows in the

District of Maryland on WAMU, NBC Channel 4, and also published articles that were false and

defamatory on the internet.   Finally, in engaging in the foregoing actions, which damaged

Plaintiff Planet Aid in the District of Maryland, Defendants contacted various persons in

Maryland, including conducting interviews in this District.

15.     This Court has jurisdiction over each Defendant named herein because each

Defendant conducts business and activities in this District or is an individual who has sufficient

minimum contacts with this District to render the exercise of jurisdiction by the District Court

permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because a

substantial part of the events or omissions giving rise to the claim occurred in this District, or a

substantial part of property that is the subject of the action is situated; and wrongful conduct by each Defendant occurred in this District.

## III.    THE PARTIES

### A.    The Plaintiffs

#### 1.    Planet Aid

17.    Planet Aid was incorporated in 1997 in Massachusetts and has its principal place of business in Maryland.  Plaintiff Planet Aid has substantial operations in this District; and is recognized by the U.S. Internal Revenue Service ("IRS") as being a not-for-profit organization. Its dual mission is to assist in reducing the environmental impact from used clothing by finding an environmentally and socially preferable use for second-hand discarded clothing; and second, to generate funds, either through the sale of used and discarded clothing or alternatively through government and other grants, to be used to help impoverished and needy populations throughout the world.

18.    In connection with its non-profit mission, between in or about 2001 and 2015, Planet Aid has contributed $52 million of its own money to charitable purposes in 16 countries, including in Malawi.

19.    Planet Aid has worked with a variety of organizations in order to accomplish its non-profit goals, including in Malawi.  Previously, it entered into a contract with DAPP Malawi, Development Aid from People to People in Mozambique ("ADPP Mozambique"), and a variety of other organizations.  Planet Aid has entered into these and other contracts so that it can make use of organizations that have employees on the ground who are best suited to carry out the charitable mission of Plaintiff Planet Aid in needy locations.

20.     Planet Aid is also a member of the Federation Humana People to People, a non-profit organization which delivers goods and services to organizations, including Planet Aid, its subcontractor, DAPP Malawi, and ADPP Mozambique.

### 2.      Lisbeth Thomsen

21.     Plaintiff Thomsen has at all times relevant to this Complaint been employed by Planet Aid's subcontractor, DAPP Malawi, as the Country Director in Malawi. As such, all of her activities for DAPP Malawi have been in service of a not-for-profit organization.

22.     Thomsen is a permanent resident of Malawi, and has resided there for approximately 21 years.  During her tenure in Malawi, she was responsible for, among other things, supervising activities by Planet Aid's subcontractor, DAPP Malawi, pursuant to its contract with Plaintiff Planet Aid under the Food for Progress Program operated by the USDA between 2006 and 2013.

### B.      The Defendants, their Malawi Agent, and Their Improper Tactics

### 1.      Defendant Reveal

23.     Defendant Reveal, also known as the Center for Investigative Reporting, was founded in 1977.  Reveal has its headquarters in California.  It also joins together with other news reporting agencies to publish newscasts, including throughout the United States.

24.     Defendant Reveal claims that its mission is based on "investigative journalism and groundbreaking storytelling."  It further claims on its website that it is "among the most innovative, credible and relevant media organizations in the country."

25.     The tactics used by Defendant Reveal give a different view of its "storytelling," and "innovative" measures used to create their "storytelling" scripts.  Instead of engaging in

practices that would meet even minimal journalistic standards, Defendant Reveal used the services of at least one convicted felon who prior to working with Defendant Reveal had used his position as a journalist to extort money from a businessman in Malawi.  Defendant Reveal also employed two reporters in the United States who published the false and defamatory publications.  One such reporter also worked as a producer; both of the reporters, among other tactics, unlawfully impersonated U.S. government officials capable of rewarding impoverished individuals with much needed equipment if they cooperated by supplying false information about Plaintiff Planet Aid and/or its subcontractor, DAPP Malawi.

### 2.    Defendant Matt Smith

26.    Defendant Matt Smith is a reporter for Defendant Reveal.  On its website, Defendant Reveal lists Smith's most noteworthy accomplishments as including Smith's past profession of being a professional bicycle racer, which was followed by jobs in journalism at, among others, Dow Jones & Co. in Mexico, and Village Voice Media.

27.    Defendant Smith actively assisted Defendant Reveal in trying to create damaging "storytelling" about Planet Aid, notwithstanding the fact that the stories were based on "facts" known by Defendant Smith, in particular, to be false.  In some cases, Defendant Smith created such facts by lying to individuals about his employment; actually impersonating a U.S. government official and other individuals; and falsifying his reasons for asking questions, the extent of his research and facts he claimed to have uncovered.  Defendant Smith, either directly or through an agent, also utilized bribes or other inducements to potential sources to provide false information.

### 3.    Defendant Amy Walters

28.    Defendant Amy Walters reported as well for Defendant Reveal.  Defendant
Reveal states on its website that before her present position she was a reporter for Al Jazeera
English in Doha, Qatar.  Defendant Walters further alleges that she is a reporter and producer for
Defendant Reveal.  Defendant Reveal further states on its website that prior to working for Al
Jazeera, Defendant Walters worked for another news organization.

29.    In or about October 2011, Defendant Walters was responsible for a series of
articles and news stories that appeared on a news organization other than Defendant Reveal.
After a complaint was filed about the reporting in the series, an Ombudsman for that same news
organization was asked to review claims that the article was false and misleading in various
respects.  Subsequently, the Ombudsman issued an eighty-page report in which he concluded,
*inter alia,* that the "series was deeply flawed and should not have been aired as [the series]
committed five sins that violate [the new organization's] code of standards and ethics."

30.    The Ombudsman then listed the following "sins" in Walters' series:

1.    No proof for its main allegations of wrongdoing;

2.    Unfair tone in communicating these unproven allegations;

3.    Factual errors, shaky anecdotes and misleading use of data by quietly
switching what was being measured;

4.    Incomplete reporting and lack of critical context;

5.    No response from the state [involved in the reports] on many key points.

31.    Commenting again on the same series in which Defendant Walters was listed as
the "producer," the Ombudsman stated also that "[t]he reported federal reimbursement numbers
are badly inflated."   Another conclusion by the Ombudsman was that the series was loaded with

"innuendo and loaded half-truths."  And finally, in his eighty-page report, the Ombudsman concluded that "a major investigative series filled with errors and placed within a myopic framework slipped through the editorial cracks and on to the air and the Web."  The news organization, on the other hand, continued to defend the story, even after the Ombudsman's report.

32.     When it came to the Planet Aid "storytelling," in particular, Defendant Walters joined Defendant Smith in, either directly or through their Malawi agent and co-author, offering bribes and inducements to individuals to provide false statements, reporting facts known to be false, and impersonating a U.S. government official capable of supplying U.S. aid for those in desperate need of assistance if they would say negative things about Planet Aid and/or its subcontractor, DAPP Malawi.

### 4.     Defendants' Co-Author and Felon In Malawi

33.     Another tactic of Defendants was to employ the assistance of at least one local individual in Malawi, who either contacted potential witnesses along with Defendants Smith and Walters, or who was authorized by Defendants to represent to individuals that he was working for Defendants.

34.     This agent, Kandani Ngwira ("Ngwira"), lived and worked in Malawi, where he was a paid journalist.  Ngwira was previously convicted of two felonies based on his journalist activities after he tried to extract money from an individual in Malawi in return for not publishing damaging information in the local newspaper where Ngwira worked.  Both counts on which Ngwira was convicted constituted criminal felonies under Malawi's anti-corruption laws.

35.     Defendants published a May 23rd article regarding Plaintiff Planet Aid, entitled "US Taxpayers are financing alleged cult through African aid charities."  The May 23rd article contains numerous false and defamatory statements, and was co-authored by Ngwira, along with Defendants Smith and Walters.

36.     Defendants continued to promote and publish materials generated by Ngwira even while knowing that he was previously convicted of serious crimes involving his position as a journalist.

37.     Ngwira engaged in actions relevant to this Complaint while acting at the direction of all Defendants, either directly or through Defendants Smith and Walters.

## IV.     THE USDA PROGRAMS BENEFITTING MALAWI

38.     The USDA and Plaintiff Planet Aid entered into two contracts, one in June 2006 ("USDA I Contract" or "USDA I").  The second contract was executed in June 2009 (USDA II Contract" or "USDA II") (collectively "the USDA Programs").

### A.     The Food For Progress Programs Generally

39.     In or about June 2005, Planet Aid applied for a grant by the USDA to assist the poor and needy in the African country of Malawi, by obtaining wheat purchased by the U.S. Government that could then be monetized in Africa and used for various purposes in Malawi. Such purposes included assisting farmers by providing much needed education in agricultural methods; developing schools to train teachers to alleviate severe overcrowding in classrooms; educating the population through a program known as "Total Control of the Epidemic" ("TCE")

as to the HIV/AIDS epidemic; and providing nutritional information.   Ultimately, the USDA and Planet Aid entered into the USDA I and USDA II Contracts.

40.     The USDA had anticipated when it awarded the USDA I contract to Planet Aid that it would raise less than $6 million dollars through the sale of wheat, which could then be used to educate the farming community, build and enhance teachers training facilities, educate the population in Malawi about HIV/AIDS prevention and care and provide nutritional counseling and education.  Planet Aid almost doubled that amount, raising over $10 million to be used for such purposes.

41.     Similarly, the USDA had anticipated when it awarded the USDA II contract to Planet Aid that it would raise approximately $10 million dollars through the sale of wheat, which could then be used for the same purposes outlined above.  Planet Aid raised 30% more or approximately $3 million additional dollars to be used in Malawi.

**B.     Summary of Achievements by Plaintiffs**

42.     Planet Aid used the sale of wheat to generate many millions of dollars more than was originally anticipated in the USDA programs.  As a result of the Plaintiff's efforts, the following achievements were realized in Malawi.

43.     Farmers received much needed training, instruction and advice on agricultural issues as well as over 1,000 locally produced rope pumps, additional motorized water pumps, hammer mills for grinding corn, goats and pigs, hoes and seeds.   Additionally, millions of trees were planted from seedlings.

44.     The TCE program reached well over three-quarter of a million people over six years with repeated one-on-one information from field officers going house to house telling about HIV/AIDS, how to stay free of infection and how to live with AIDS and/or HIV.

45.     Over 2,000 students were trained at Teacher Training colleges, while tens of thousands of community members benefitted from outreach programs from the colleges and thousands upon thousands of primary school students were taught by student-teachers from the Teacher Training colleges.

46.     Two Teacher Training colleges were constructed, furnished and equipped, almost exclusively with USDA Program funds, with classrooms, offices and dormitories for hundreds of students as well as outdoor areas – and additional buildings were constructed at a third college, expanding capacity to accommodate an additional complement of students.

47.     Over the course of the USDA Programs more than one million people in Malawi were directly involved or touched by the program and its effect will be felt for many years.

## V.     THE SCHEME BY DEFENDANTS TO DEFAME PLAINTIFFS, AND INTERFERE WITH THEIR BUSINESS OPPORTUNITIES.

48.     Defendants, along with Ngwira, embarked on a scheme that included: (1) publishing a series of false and defamatory attacks on Plaintiffs Planet Aid and Lisbeth Thomsen;  (2) approaching potential donors or individuals and entities with whom Plaintiffs had a business relationship, or a potential future relationship, and making false and defamatory statements about, among other things, how Plaintiffs had "stolen" U.S. government funds, were "cheating" farmers, and engaging in money laundering; and (3) offering people either bribes or other substantial inducements – either directly or through their co-author and agent -- if they

would assist Defendants' scheme, and (4) appearing on occasion as either U.S. Government employees or as someone employed by Plaintiff Thomsen's employer.


**A.     Use of Articles and Broadcasts in Furtherance of the Scheme By Accusing Plaintiffs of Having Engaged In Criminal Conduct**

49.     One way in which Defendants engaged in conduct in furtherance of their scheme was by publishing highly damaging material and information about virtually every facet of Plaintiff  Planet Aid's business, and anything that they could find that was negative as to Plaintiff Lisbeth Thomsen or her employer, DAPP Malawi – without regard to the truth.   These articles appeared on the internet and were published throughout the United States, and indeed the world.

50.     Defendant published articles not only about Plaintiff Planet Aid's work in connection with the USDA grants, but also about its business of recycling used clothing, Planet Aid's donations to charitable causes unrelated to the USDA program, its operations related to governmental grants generally, and even its employer-employee relations.  Defendants even went so far as to delve into the family history of one Planet Aid employee, her political leanings, and whether she was involved in political activities in this country.

51.     The articles published by Defendants in furtherance of their scheme, include the following:

- March 19, 2016 Article entitled "Alleged cult leader plays shell game with US foreign aid" (the "March 19th Article").  Attached as Exhibit A.

- May 23, 2016 Article entitled "US taxpayers are financing alleged cult through African aid charities" (the "May 23rd Article").   Attached as Exhibit B.

- May 23, 2016 Article entitled "Planet Aid's ubiquitous clothing donation boxes aren't so charitable" (the "Third Article").  Attached as Exhibit C.

- May 23, 2016 Article entitled "The Teachers Group:  From idealistic commune to 'money making machine.' " (the "Fourth Article").

- August 1, 2016 Article entitled "Unicef cuts off funding to nonprofit linked to alleged cult."  (the "August 1st Article").  Attached as Exhibit D.

- August 8, 2016 News Alert by Defendant Reveal called The "Weekly Reveal" (the "August 8th Article").

- August 17, 2016 Article, entitled "Congresswoman calls for U.S. investigation of Planet Aid (the "August 17th Article") Attached as Exhibit E.

- August 18, 2016, Article in the MinnPost, entitled, "McCollum calls for U.S. investigation of Planet Aid," (the "August 18th Article")  Attached as Exhibit F.  (collectively the "Articles").

52.    The above articles were published on the Internet and therefore were published and accessed by individuals and entities throughout the United States, and the world.

53.    In addition to the Articles set forth above, Defendants published false and defamatory statements about Plaintiffs Planet Aid and Lisbeth Thomsen to other news media.  Defendant had no legitimate reason for spreading false and defamatory stories other than to damage and harm Plaintiffs and so that Defendants could generate donations from contributors hoping to see such results.

54.    One such news media was in Malawi, where Plaintiff Lisbeth Thomsen lives and is a permanent resident.  The Times Group in Malawi published a story named a "Wicked Scheme," in which it focused on allegations by Defendant Reveal.  The news story cited Defendant Reveal for the statement that "'up to 70 percent of the US$100 million which the US government granted to Planet Aid had been misappropriated by programme subcontractor, Dapp Malawi.'" The Times Group quoted Defendant Reveal also for the proposition that the two

organizations are "'part of a nefarious conspiracy to enrich themselves and their leaders.'"

Defendant Reveal knew when it made the foregoing statements to the Times Group that they

were false and defamatory

55.     In addition to printed articles appearing on the internet, Defendants were

responsible also for a series of broadcasts that contained numerous false and defamatory

statements, including the following:

- A 53 minute broadcast aired in the District of Maryland on March 19th, which was updated on May 28, 2016, and which accompanied the March 19th Article, "Alleged cult leader plays shell game with USDA funds;" (the "March 19th Broadcast");   Transcript attached as Exhibit G.

- March 25, 2016 interview on radio station KCRW with Amy Walters and Matt Smith (the "March 25th Broadcast").

- May 23 and 24, 2016 broadcast on radio and television broadcaster (NBC4 Washington), in what it called a "joint investigation" by that channel's I-Team and Reveal, titled "Behind the Bins:  Former Planet Aid Employees Describe Cult-Like Experience," and co-authored by Defendants Smith and Walters.   (the "NBC Broadcast").  Article attached as Exhibit H.

- May 31, 2015, 22 minute interview with Amy Walters on the Internet based newscast, Rising Up with Sonali, titled "Yellow Planet Aid boxes are front for dubious Danish organization."

- June 2, 2016 re-broadcast of March 19th Broadcast on radio station WAMU, which was aired in Maryland.   (collectively "the Broadcasts").

56.     The Broadcasts were aired throughout the United States, including in Maryland.

The March 19th Broadcast, in particular, aired on radio WAMU in Maryland where Planet Aid is

located.   Similarly, the NBC Broadcast aired in Maryland as well.

**B.      Conduct in Furtherance of the Scheme By Interfering With Donors, Business Relationships and Employees.**

57.      Another way in which Defendants engaged in their scheme was by contacting individuals or entities with whom Plaintiffs Planet Aid and/or Lisbeth Thomsen had a relationship, and telling them that Plaintiffs Planet Aid and/or Lisbeth Thomsen were engaging in criminal and fraudulent behavior, and that they should therefore stop doing business with Planet Aid and Lisbeth Thomsen.

58.      For instance, one of the ways in which Planet Aid serves poor and needy communities is by raising funds through clothes donations.  These donations also serve an important environmental need by reducing the amount of used clothing that would end up in landfills.   Planet Aid donates proceeds from these collections to poor and needy causes around the world.

59.      Defendants Matt Smith and Amy Walters used the news media not only to make a number of false and defamatory statements about Planet Aid, but also to urge the public to stop doing business with Planet Aid.   A news broadcast on NBC I-Team, which appeared in the District of Maryland on the internet and also on television, and which was co-authored by Defendants Smith and Walters, included a number of false and defamatory statements about Planet Aid.  Defendants also used this opportunity to launch a broad appeal to stop doing business with Planet Aid, as reflected in the following exchange between the newscaster and a former Planet Aid employee:

[Newscaster]  What would you tell people who are thinking about donating clothes to a Planet Aid box?

[Guest]: I have already told them to not do it.

60.     Defendants used other mechanisms to interfere with Planet Aid's business.  There are a number of charity and socially minded groups that share Planet Aid's vision and belief that used clothing collection serves an important social interest.  One such group is the Rhode Island Resource Recovery Corporation ("RIRRC"), which encourages the use of used clothing bins, and promotes not only Plaintiff Planet Aid but other not-for-profits who are engaged in the same business.

61.     On or about June 6, 2016, RIRRC used its social media to remind individuals and entities in Rhode Island to consider donating used clothing to one of the entities who have used clothing bins in the area.  The social media used by RIRRC specifically alerted readers to consider Planet Aid, as well as the other industry participants operating in that area.

62.     Notwithstanding the lack of any legitimate business or professional reason for doing so, Defendant Walters responded to this plea by RIRRC to individuals in its area to consider using, *inter alia*, Planet Aid by sending RIRRC a copy of Defendants' false and defamatory May 23rd Article.   The use of social media in this way can have had only one purpose, to encourage RIRRC and those in its area to stop doing business with Plaintiff Planet Aid.

63.     RIRRC is not the only partner or entity contacted by Defendants who either had an existing relationship with Plaintiffs, or with whom a future relationship was possible.  For instance, one of the key partners of Plaintiff Lisbeth Thomsen's current employer, DAPP Malawi, is UNICEF, which is a well-known and highly regarded charitable organization. UNICEF has been engaged in projects in Malawi, along with DAPP Malawi.  As the Country Director for DAPP Malawi, Plaintiff Lisbeth Thomsen was dependent on having a good

reputation and image with UNICEF.   As for Plaintiff Planet Aid, while it currently has no projects with UNICEF, it is one of the entities with which Plaintiff Planet Aid could partner in the future.

64.     Defendants used a variety of tactics to interfere with the current relationship between Plaintiff Lisbeth Thomsen, DAPP Malawi and UNICEF, and to make certain that UNICEF never partnered with Planet Aid in the future.   One way was to make certain that UNICEF was aware of Defendants' prior reporting on Planet Aid and DAPP Malawi.

65.     UNICEF did in fact become aware of Defendants' false and defamatory statements.  Following publication of Defendants' false and defamatory statements in May, Defendant Reveal published another story on August 1, 2016, stating that it had reported that DAPP Malawi had "diverted money intended to alleviate hunger and disease."  The Article further reported UNICEF as having stated, based on the Reveal publications:  "[w]e want to make sure there are no benefits, there are no funds going to the organization."

66.     Defendants also engaged in a pattern or practice of trying to generate adverse publicity for Plaintiffs Planet Aid and Lisbeth Thomsen which had no legitimate nexus or connection to their activities as journalists.   For example, Defendants directed false and defamatory statements regarding Plaintiffs Planet Aid and Lisbeth Thomsen to other companies that were also operating in the used clothes recycling industry.  Defendants knew, and intended, that by directing adverse information to those in that industry, these other entities could then use that adverse information for their own advantage, and not for any journalistic purpose.

- 19 -

### C.   Additional Tactics In Furtherance of the Scheme by Defendants to Harm Plaintiffs

67.     Another tactic of Defendants in furtherance of their scheme was to impersonate either U.S. Government officials or even DAPP employees, and make false promises that they had no intention of either passing on to the U.S. Government or to DAPP Malawi.  The result was to lead beneficiaries of Plaintiffs' charitable work to believe that instead of helping those in need, Plaintiffs had actually "shortchanged" or "cheated" them.

68.     More particularly, Defendants Smith and Walters posed as employees of USAID, a U.S. government agency well known in Malawi.  Defendant Smith and Walters, and their Malawi counterpart, told local villagers that they were traveling in Malawi on behalf of USAID and that they were responsible for evaluating the USDA program operated by Planet Aid and its subcontractor, DAPP Malawi.  When Defendants Smith and Walters made those statements, they had never held any position with USAID, and had no authority to make such statements or to represent that they had any connection with USAID or any official U.S. government agency.

69.     Further, Defendants Smith and Walters claimed that they could assist the village in obtaining fifty water pumps, telling the village leaders, either directly or through Ngwira or another one of the "sources" named in their article, Jackson Danger Mtimbuka, to provide negative information about the USDA Programs so that Ngwira or Mtimbuka could expose those in charge at DAPP Malawi who had allegedly stolen from them.  The result of this and other encounters was to lead many in the community served by Plaintiffs to believe that either Plaintiffs and/or those in charge at DAPP Malawi were actually stealing from them.

70.     It was therefore false and misleading to report that village leaders in Njuli had told Defendants Smith and Walters that Planet Aid and/or DAPP Malawi had deprived farmers of livestock and equipment under the USDA Program.  Defendants well knew that it was Defendants Smith and Walters, either directly or through Ngwira and Mtimbuka, who told village leaders that such conduct had supposedly occurred and that the village leaders needed to assist USAID by exposing these individuals in charge of the USDA Program.

71.     During a visit to another village, Defendants Smith and Walters again used a ruse in an effort to obtain negative statements about Planet Aid.  At this village, Defendants Smith and Walters told village leaders that they were employees of Planet Aid's subcontractor, DAPP Malawi, and were present in the village to report back on the progress of the USDA program. Defendants Smith and Walters led the village leaders to believe that Defendants Smith and Walters were responsible for assessing on behalf of DAPP Malawi the use of USDA grant money, when in fact they had no authority from either Planet Aid or its subcontractor, DAPP Malawi, and had fabricated their role in the same manner as they had done with USAID.

72.     Defendant Smith and Walters told leaders in this second village also that they would replace the existing milling machine at the village, which was not being operated due to the cost of fuel prices.  Defendant Smith and Walters told the village that DAPP Malawi would supply the village with a new machine that would instead operate on electricity.  When Defendants Smith and Walters made that promise they knew that none of the Defendants had any intention of making good on that promise, and that they had no intention of even alerting DAPP Malawi to the promise fraudulently communicated on its behalf.

73.     Further, when Defendant Smith and Walters made that promise to supply the village with a new milling machine, they knew, or were reckless in not knowing, that even if DAPP Malawi could provide the village with an electrically operated milling machine, there was no electricity in the village to operate the machine.  Accordingly, as a result of these false and fraudulent promises, this desperately poor village was left waiting for an expensive piece of equipment that would never arrive, and even if it did, would have been inoperable.

74.     Defendants' scheme of impersonating U.S. Government and DAPP workers impacted the relationship Planet Aid, Lisbeth Thomsen, and her employer, DAPP Malawi, had in the Malawi communities they were serving.   Statements made to these farmers brought Planet Aid and Lisbeth Thomsen (as her employer, and the U.S. Government) into disrepute, and undid goodwill that had been developed through the USDA Program.

## VI.     THE DEFAMATORY STATEMENTS MADE BY DEFENDANTS IN FURTHERANCE OF THE SCHEME TO DAMAGE PLAINTIFFS' REPUTATIONS

### A.     Defendants Fabricate the Voice of One Farmer and Defraud Two Others In Order to Claim that Plaintiffs Had Siphoned Off 50-70% of USDA Funds.

75.     One of the primary actions taken in furtherance of Defendants' scheme was to spread false and defamatory statements about Plaintiffs, and how they had engaged in criminal actions.

76.     One series of allegations by Defendants in the March 19th Broadcast and May 23rd Article relates to false and defamatory claims that "50-70% of the US government grant money was being siphoned away," and that Planet Aid and its subcontractor, DAPP Malawi, had engaged in "fraud" concerning the USDA Programs.  Similarly, Defendants made false and defamatory statements in the May 14th Article that Plaintiffs were "'part of a nefarious

- 22 -

conspiracy to enrich themselves and their leaders.'"  Defendants also made false and defamatory statements in the March 19th Broadcast and May 23rd Article that there was "systematic fraud" and "money laundering."

77.     Defendants claimed that they could support the foregoing allegations, *inter alia*, that "50-70%" of funds had been "siphoned away," by alleging that Defendants Smith and Walters had spoken with farmers who indicated that they had not received all of the promised aid under the USDA Programs.   More specifically, Defendants falsely reported in the August 17th Article that "[i]mpoverished farmers in Malawi, who were supposed to benefit, . . . also told Reveal they did not receive water pumps, fertilizer, and farm animals promised by Planet Aid." Defendants also falsely reported that farmers, in particular, had been "shortchanged." Defendants knew that these statements were false and defamatory.  One such source was a complete fabrication, while two others were defrauded by Defendants into making statements.

78.     More specifically, in the March 19th Broadcast, Defendants made a point of saying that Defendants Smith and Walters had "gone to Farmers' Clubs all over Malawi and they say their lives changed not at all from when [Planet Aid and DAPP Malawi] arrived and from when [they] left."  In the same broadcast, Defendants reported that they had "visited Farmers' Clubs and that at every instance the Farmers themselves told us that was a lie" to say that farmers benefitted from the USDA Program.

79.     Approximately one week later, in a broadcast aired on March 25th by KCRW (the March 25th Broadcast) Defendants Smith and Walters claimed to play a recording of two such farmers who could corroborate those statements.  Defendant Walters claimed:

The farm fields that we saw were not really fields.  I mean, we talked to the farmers there and they said that nothing really happened from the projects.  . . .

[Announcer]:  Okay, let's hear from two farmers you spoke to.  We'll hear one talking about the plants and one talking about the livestock.

[Farmer]:  It was like there are just a few plants and some maybe they are dry, and some maybe they are not there because they are not given adequate inputs.

80.     Defendants knew full well that the claimed "farmer" whose voice appeared on the March 25th Broadcast was not even one of the farmers in a Farmers' Club under the USDA Program, contrary to what listeners were led to believe.  The use of this person was a complete sham.  Defendants had simply taken an audio clip from the March 19th Broadcast and stuck it into the March 25th Broadcast, telling the listeners that it was one of the farmers in the Farmers' Club with whom they had spoken about how their farming had not changed under the USDA Program.

81.     The voice supposedly appearing as one of the "farmers" on the March 25th Broadcast, and who supposedly was "shortchanged" in USDA benefits by Planet Aid and/or DAPP Malawi, was actually Jackson Danger Mtimbuka.   This individual had actually been fired by DAPP Malawi in February, 2010 for trying to divert funds from the farmers he was – unbeknownst to him -- impersonating on the March 25th Broadcast.  It was completely false and misleading to portray Mtimbuka – presumably even without his knowledge or consent – as being one of the farmers who had supposedly been "shortchanged" by Planet Aid and its subcontractor, DAPP Malawi.

82.     Only the remaining two farmers identified by Defendants were ***real,*** but in fact they were the same ones who had been defrauded by Defendants Smith and Walters, when Smith and Walters represented in Njuli that they were employed by USAID, an official U.S.

government entity and that they were there to check on the program.  Given the fraudulent tactics

used by Defendants to elicit any statements from these individuals, it was a complete sham to

report that these two farmers, Chief Witness Chibwana and Enock Chikaonda, supported any of

the statements attributed to them in the March 19th Broadcast, or May 23rd Article where they

were mentioned by name, or the August 17th Article, where a half-page picture of the Chief was

featured on the cover of the story.

83.    Defendants were well aware therefore when they published their false and

defamatory statements about Plaintiffs that whatever statements were made by these two Malawi

farmers was a complete fraud – built on hopes by these two farmers that their village would be

receiving fifty water pumps in return for their cooperation, and built also on their anger at

learning from individuals claimed to be U.S. Government USAID employees that Plaintiff Planet

Aid and DAPP Malawi had supposedly stolen from them.

**B.     Defendants Rely on A Mathematically Inconceivable and Factually Baseless
Claim that Plaintiffs Planet Aid and Lisbeth Thomsen's Employer Had
Siphoned off 50-70% of USDA Funds Through Employee Salaries.**

84.    Defendants further claimed in the March 19th Broadcast that Defendants

"siphoned off funds" through kickbacks from employee salaries, who were forced to contribute

money to a group called The Teachers Group.  Defendants alleged in the March 19th Broadcast:

> That money from USDA grants, over $130 million, up to 70% was allegedly
> taken from the projects it was meant for and stripped from employees salaries.

85.    Defendants further claimed that this "stripping" of salaries occurred by forcing

individuals to contribute to the Teachers Group.  The Teachers Group was initially conceived by

a group of teachers who believed that by joining together they could improve their lives, as well

as the lives of those around them.  In Malawi, those individuals who have decided to join the

Teachers Group are encouraged to form small teams or "clusters" of 10 to 12 Group members.

86.     No amount of "innovative reporting" – claimed by Defendant Reveal to be the

hallmark of its "storytelling – could justify the foregoing claim regarding "stripping of salaries."

Documents in Defendants' possession reflected that Plaintiff Planet Aid and its subcontractor in

Malawi had not received anything approaching  $130 million, making it mathematically

impossible to have "stripped out" 70% of that amount.  According to Defendants' claims,

Plaintiffs would have had to "strip out" tens of millions of dollar more than the total amount ever

received by Planet Aid in the USDA grants.  Defendants were well aware of that fact, but

published their outrageous and false claim anyway.

87.     Even setting aside the patent impossibility of this claim by Defendants, it was

completely lacking in factual support for other reasons known to Defendants.   The claimed

"stripping of employee salaries" was a complete fabrication, and was dependent on three

additional false "legs" or statements, namely that (l) all, or virtually all, DAPP Malawi

employees were pressured to join the Teachers Group, (2) they contributed between 20-100% of

their salaries, and (3) the money that was contributed was not used for the benefit of those who

contributed the money but went "straight to Mexico," where the Teachers Group was allegedly

headquartered.  Defendants knew that unless they published all three statements, anyone unaware

of the mathematical impossibility of their claims would not take them seriously when they

claimed that "50-70% of USDA funds were stripped" from employee salaries.  As shown below,

all three of those statements were false, as Defendants well knew.

### 1.    Claims that Planet Aid and DAPP Malawi Employees Were Pressured to Join the Teachers Group and Contribute Money.

88.    The first "leg" of Defendants' stories was that individuals were pressured to join the Teachers Group, allowing their salaries to be siphoned off.  However, that was not enough. The only way that Defendants could even try to justify claims that tens of millions of dollars were siphoned off from employee salaries was by leading the readers to believe that all, or virtually all, employees had been defrauded of their salaries in this way.  Defendants knew that such claims were completely baseless.

89.    At Planet Aid approximately a half dozen out of roughly 300 employees are members of the Teachers Group.  At DAPP Malawi, the overwhelming majority of employees never joined the Teachers Group.

90.    Defendants' claim to have actually seen documentation as to the members of the Teachers Group who were employed at DAPP Malawi.  They therefore knew that the majority of employees are not, and never had been, members of the Teachers Group.   They or their co-author, Ngwira, had also spoken to sources who flatly denied that any such pressure existed to join the Teachers Group, which was corroborated by the fact that the majority of employees at both Planet Aid and DAPP Malawi had not joined the group.

### 2.  Claims that Employees Were Required To Sign An Agreement to Contribute 20-100% of their Salaries, and Had In Fact Contributed Such Sums.

91.    The next leg of Defendants' false claim was equally important to Defendants' story that Plaintiffs had "stripped 50-70%" of the grant money through employee salaries.   If anyone was to be convinced of this allegation, Defendants had to claim that all employees were required to contribute 20-100% of their salaries, had signed an agreement to do so, and actually

contributed such sums.  Otherwise, no one could possibly take seriously claims that 50-70% of $130 million could possibly have been stripped from employee salaries.  This claim was made in the March 19th Broadcast, the May 23 Article and the May 24th Broadcast.  Defendants, however, had seen documentation refuting that claim, and further, the very "sources" claimed to support this claimed "fact" proved that it was false.

92.     While some individuals employed by DAPP Malawi who had joined the Teachers Group had chosen to donate some amount each month to a cluster or group of ten to twelve group members which they joined, with their contributions being used by their own group each month, others joined Teachers Group and declined to contribute anything.  Instead of reporting those facts, Defendants reported in the March 19th Broadcast:

> While researching this story we spoke to about a dozen African members of the Teacher's Group.  ***All of them*** gave a portion of their salary to the group.   From 20% to 100%, everything they earned. [emphasis added]

93.     Not even that statement relating to the dozen African members of the Teacher's Group was true.  When Defendants made that statement they had interviewed one "African member of the Teachers Group," who had contributed nothing to the Teachers Group, and in fact no one in the group that he volunteered to lead had contributed anything as well.  Defendants did not "overlook" this individual when they published their stories.  This was the same individual, Jackson Danger Mtimbuka, that was actually quoted in Defendants' May 23rd Article and March 19th Broadcast, but without mentioning that both he and others in his group had contributed nothing to the Teachers Group.

94.     Nor did Defendants reveal in their "storytelling" that this same individual and his group had actually been the recipients of money ***donated to them*** by senior DAPP Malawi

employees who were Teachers Group members, the same individuals accused by Defendants of

stealing money from these individuals.  In short, while claiming that "all" of the persons

interviewed by Defendants "gave a portion of their salary to the group," namely 20-100%, they

knew that the statement in the March 19th Broadcast was not true even as to those persons who

were interviewed and quoted in their publications.

95.     Not even the individual claimed to support their story could do so.  Defendants

claimed in the March 19th Broadcast, for instance, that one individual, Marko Zebiah, was forced

to join Teachers Group, and that:

> Zebiah said he was among the Africans who upon joining the Teachers Group
> was pressured to sign a contract, often called a "deed of contribution." In it,
> members agree to donate a portion of their salary - anywhere from 20 to 100
> percent.

96.     Defendants knew that Zebiah's statement was false as they had obtained a copy of

a Deed of Contribution, and knew that it contained no such language.  All that it said was that

individuals joining Teachers Group agreed to a "common economy."  Notwithstanding clear

evidence – in black and white refuting their claims – Defendants continued to report in the

March 19th Broadcast and May 23rd Article, among other places, that in the Deed of Contribution

itself individuals had "agree[d] to donate a part of [their] salary – anywhere from 20 to 100

percent."

97.     Defendants knew also that individuals joining Teachers Group had not in fact

contributed anything approaching the amounts claimed by Defendants.   While claiming that they

had been shown documents reflecting the amounts actually contributed by individuals, they

falsely reported that it corroborated their false and defamatory statements that individuals were

contributing 20-100% of their salary.  It said no such thing.

98.     The paperwork that they claimed to have seen demonstrated that the overwhelming majority of individuals employed by DAPP Malawi had contributed nothing to the Teachers Group and had not even joined that group, and that those who had, contributed roughly $10-15 per month, nothing approaching what was alleged by Defendants.

99.     Not even Zebiah contributed the amount claimed – "20-100% of his salary."  As Defendants Smith and Walters claimed that they had seen receipts and deposit slips from Zebiah, they knew that the statement supposedly made by Zebiah could not possibly be true.  Zebiah had in fact contributed approximately 5% of his salary, and had done so voluntarily.  Nor had anyone else in his group contributed the amounts claimed by Defendants.

### 3.     Claims that The USDA Money "Stripped from Salaries" Went "Straight to Mexico," When It Actually Stayed In Malawi, and Was Used by Those Contributing the Funds

100.     The last leg of the claim by Defendants about "stripping salaries" was perhaps the most important, namely that all of the money "stripped" from employee salaries went to Mexico, where the Teachers Group was allegedly headquartered, rather than benefitting those contributing the money.  Defendants knew, or were reckless in not knowing, that the money collected from people like Zebiah, who chose to lead small groups or clusters of ten to twelve others (l) actually ended up in accounts in their own names, and (2) was used by the people who contributed the money, and (3) was supplemented each month by the people – characterized by Defendants as "overseers" -- claimed to have been stealing from Zebiah.  These additional payments allowed younger members of the Teachers Group to have enough money for excursions, social events, or other benefits.

101.    The claim about money going "straight to Mexico" appeared on the March 19th

Broadcast, where it was claimed that the "source" was Jackson Danger Mtimbuka, who "knew

where the money was going all along," namely "straight to Mexico," where it is alleged the

Teachers Group is headquartered.

102.    Similarly, the May 23rd Article alleged that moneys received by Planet Aid from

the USDA "went straight to Mexico," and falsely claimed that:

> Jackson Mtimbuka, the employee working on the Planet Aid US farmers project
> in Malawi, he was told by his Teachers Group bosses, the money from the USDA
> was going "straight to Mexico," to a facility run by the Teachers Group.

103.    Defendants were aware that these statements were not true when they published

them.  Mtimbuka had not been told by anyone, including his "bosses" that the money from the

USDA was going "straight to Mexico."  Defendants knew, or were reckless in not knowing, that

it was false and defamatory to make that statement, as Mtimbuka had never been told any such

thing.  Mtimbuka was also the individual who contributed nothing to the Teacher's Group, but

who, in fact, had been receiving funds (as was his group) from those allegedly stealing the

money and sending it to Mexico.

104.    Nor was Zebiah a reliable "source" for the allegations about money being spirited

away to Mexico by the Teachers Group leaders.  The May 23rd Article alleged that Zebiah

collected funds from his co-workers, and paid those funds into the personal account of three

representatives of DAPP Malawi.  The May 23rd Article alleged more specifically that Zebiah

was:

> one of the collectors of that salary tax. He once was a project manager for a
> USDA-funded farmers project in Dowa, in central Malawi. He still keeps a pile of

collection and deposit slips showing where the money went: to the personal bank
account of Teachers Group members who controlled DAPP Malawi.

105.    Defendants knew, or were reckless in not knowing, that it was false and

defamatory in the March 19th Broadcast and May 23rd Article to publish that after the money

went to the personal bank accounts of Plaintiff Lisbeth Thomsen's husband, Zebiah did not know

what happened to the money. The March 19th Broadcast alleged, citing Zebiah:

> Ibn [Iben] Petersen and Ula Thompson [Ole Thomsen], they are the account
> holder on behalf of Teachers Group in Malawi... We don't know what they can
> use, because we deposit the money in their accounts.

106.    Similarly, Defendants stated also in the May 23rd Article that "[o]ne group in

Africa that received U.S. government funds compelled employees to kick back portions of their

salaries to a bank account controlled by their Teachers Group overseers."  Word for word,

Defendants repeated the false and defamatory statement in the August 18th Article in the

Minnpost.

107.    When Defendants made the foregoing statement they knew, or were reckless in

not knowing, that each and every month not only had all money in the joint account referenced

by Defendants been transferred *to Zebiah* into an account *in Zebiah's own name* (as well as a

co-signatory), but in addition, that Iben Petersen, Ole Thomsen, Plaintiff Lisbeth Thomsen, or

another senior DAPP Malawi staff member personally supplemented the account in Zebiah's

name with their own personal funds so that Zebiah's group would have sufficient funds available

for excursions or other group activities that solely benefited Zebiah's group, or initiatives

sponsored by Zebiah's group, such as assisting a needy colleague or family member who had

become ill.

- 32 -

108.    It was therefore false and defamatory to state in the August 18th Article that Zebiah and others were paying kickbacks from their salaries to "Teachers Group overseers" when Zebiah and others who had volunteered to lead small groups of co-workers, were actually *receiving* funds from these "overseers" for use by those contributing the money, not "kicking back" money to these supposed "overseers."

### C.    Claims that Plaintiffs Had Siphoned off 50-70% of USDA Funds Intended for Malawi Through "Fabricated Invoices."

109.    Another way in which Defendants claimed to corroborate statements that "50-70% of the U.S. government grant money was being siphoned away," was by claiming in the August 17th and 18th Articles that Plaintiffs "fabricated invoices."  More specifically, Defendants further stated in the August 17th Article that not only were funds "misused" but that "invoices were fabricated to cover up for charity work that was never performed."  This claim was repeated in the August 18th Article in the Minnpost.  And finally, Defendant Walters confronted Lisbeth Thomsen and stated that "[t]he people in charge of your money said you're stealing money," as reported in the March 19th Broadcast.

110.    Defendants knew, or were reckless in not knowing, that the claimed support for these statements failed to offer any credible basis for such claims.   Defendants claimed that the individual supporting such statements was an "insider" at DAPP Malawi.  Defendants stated on the March 19th Broadcast:

> Harrison [Longwe] is one of several insiders who told us 50-70% of the US government grant money was being siphoned away, one transaction at a time and most of them was headed to the Teacher's Group African headquarters in Zimbabwe.

111.    Defendants knew the above statements were false and defamatory when they published them, and that it was inconceivable that any such statement by Longwe could possibly have been true.  For one thing, Defendants knew when they published this false and defamatory statement by Longwe that he was not even employed by DAPP Malawi while virtually all of the USDA Programs were in effect, having been hired only as the USDA program was ending.

112.    For another thing, Defendants knew when they published the false and defamatory statements by Longwe that he was relying on documents that did not even relate to the period during which the USDA Programs were in existence, or to transactions involving USDA funds.

113.    Finally, when Defendants published statements in the March 19th Broadcast, the May 23rd, August 1st, August 17th and August 18th Articles, about how Plaintiffs had siphoned off funds, thereby depriving farmers of livestock, seed and fertilizer, Defendants had in their possession documents showing that in fact on the USDA I Contract, Planet Aid had spent over $10 million, almost double what was in the Planet Aid proposal accepted in the USDA I Contract in 2006, and met all goals in amendments to that USDA I Contract, as well as goals in the USDA II Contract.

114.    Defendants were aware when they made the foregoing statements that not only were their statements contradicted by documents in their possession, but that there was ample visible evidence in Malawi, which they claimed to have visited, which made it impossible to conclude that 50-70% of funds had been "siphoned away" from the USDA Programs.

115.    More specifically, documents in the possession of Defendants when they published the March 19th Broadcast reflect that Planet Aid within the USDA I Contract had

expended over $2.2 million constructing a brand new school in Shire Highlands, Amalika, which was certainly still standing and visible to Defendants before the March 19th Broadcast was aired and is still standing and operational as of the filing of this Complaint.  Defendants were not only aware of the school, but had in their possession photographs of the school opening, attended by a number of government officials.   Defendants knew, or were reckless in not knowing, that if 50-70% of the USDA funds had been "siphoned away," there would have been no money to build the school in Amalika.

116.    The same documents in Defendants' possession when they published the March 19th Broadcast further stated that over $3 million had been used for teacher training in Chilangoma, which included substantially expanding the facilities there to accommodate more student teachers.  That facility is also standing and operational as of the filing of this Complaint. Again, if funds had been "siphoned away," as claimed, no funds would have been available to complete this project.

117.    Other documents in the Defendants' possession stated that by October 2011, two years before the USDA II Contract expired, Planet Aid had already expended over $2.5 million constructing yet another new teacher training college in Dowa, while additionally spending over $1.5 million on training teachers at the existing teacher training colleges.

118.    And finally, while reporting that 50-70% of funds had been "siphoned away" and that there was little evidence that USDA grant money had been seen "on the ground" in Malawi, Defendants knew that more than $2 million within the USDA I Contract had been expended on HIV/AIDS education and assistance to the Malawi population, which has been devastated by the epidemic.  Defendants were aware of such efforts, and the positive impact made by works on the

HIV/AIDS program, as they had spoken directly with individuals who had participated and explained the positive results of that program – none of which was reported.

119.    In short, even apart from the aid given to the Malawian farmers, Defendants still could not possibly have believed that 50-70% of the USDA funds were siphoned away to another country.

> **D.    Claims that Other Named and Unnamed Sources Had Evidence or Information that Plaintiffs Were Stealing Money or Engaging in Money Laundering.**

120.    Defendants knowingly relied on "sources" that they knew were unreliable and inadequate to sustain their false and defamatory claims.  Such "sources" were cited, for example, in support of claims that Plaintiffs Planet Aid and Lisbeth Thomsen had engaged in fraud and abuse.

121.    One such "source" was Chiku Malabwe, who was reported in the May 23rd Article to have told Defendants that Plaintiff Lisbeth Thomsen's employer had instructed him to purchase items outside of Malawi when those items could have been purchased more cheaply in Malawi.  According to Defendants' quoted statements, Malabwe said he was instructed to buy items that  "' would have been cheaper to buy locally.  … It would have been very much cheaper.'"  The only purchases cited in the Article were the purchase of computers, which Defendants knew, or should have known, are substantially more expensive in Malawi than in the United States, where the computers cited in the Article were purchased.

122.    Defendants also knew, or were reckless in not knowing, that Malabwe had actually been arrested and charged with criminal conduct arising out of his own actions, and that

when he was reported as a "source" for Defendants' false and defamatory statements, Lisbeth Thomsen's employer was actually pursuing Malabwe for damages to DAPP Malawi caused by his fraud.

123.    Finally, in the August 17th Article, Defendants quoted one person for the statement that "[it]s blatant to me this group is stealing, it's money laundering and they're keeping the money for themselves."   Defendants knew that the "source" for this statement had no involvement with Planet Aid or DAPP Malawi, nor any experience or expertise in the USDA Programs or criminal laws, including money laundering, to state such facts.  The person was described in the May 23rd Article by Defendants as someone who had become interested in the issue while helping her daughter with a homework assignment.  The reader would have had to go back three months, and dig out the May 23rd Article, to find out that Defendants' "source" in the August 17th Article had no credible basis for her statements.  Defendants nevertheless included this "source" as corroboration for its statements.

124.    Other statements were not based on sources, but claimed investigative action by Defendants which they could not possibly have undertaken.  For instance, in its August 8, Weekly Reveal news story, Defendant Reveal stated that money had supposedly been siphoned off, stating that Defendant Reveal had previously "followed the money from Malawi to Denmark and back to Washington – all to explain how U.S. taxpayers ended up footing the bill for an alleged cult's activities."  Defendants knew that statement was false and that they had not followed any money – particularly USDA money -- from Malawi to Denmark, and had similarly not followed any USDA money from Denmark to Washington.  This statement by Defendants was a complete fiction.

125.     Defendants further knew, when they published the foregoing false and defamatory statement that they had never traced any funds in the manner claimed, and had found no evidence or information capable of "explain[ing] how U.S. taxpayers ended up footing the bill for an alleged cults activities."

### E.     Claimed False Reports by Planet Aid as to the Salaries for Particular Individuals.

126.     Another set of false and defamatory statements relates to claims by Defendants that Planet Aid lied to the USDA about how much Planet Aid was paying certain employees. Defendants knew full well when they made these statements that no statements were made by Planet Aid – much less any statement that was false – regarding the salaries of these individuals.

127.     More specifically, Defendants claimed in the March 19th Broadcast:

> Marko Zebiah confirmed that, "funds are extracted by writing paychecks much smaller than reported to the USDA."  "It was written [salary], 350, but she's getting $100 per month in salary. It's a tricky way of doing it."

128.     The May 23rd Article similarly stated:

> Even before the Teachers Group pressured members to hand over money to their bosses, funds are extracted by writing paychecks much smaller than reported to the USDA.

129.     These statements were false and defamatory when Defendants published them. More specifically, Defendants knew, or were reckless in not knowing, that no one identified by Zebiah, or known to Defendants, had ever received only one third of what was reported to the USDA.  On an even more basic level, Defendants knew, or were reckless in not knowing, that individual salaries were never even reported to the USDA.  Accordingly, while claiming that the

USDA was told what salaries were being received by Zebiah or anyone else, no such report was ever made.  In short, Defendants made up the claim by creating an entirely fictitious report, and then claiming as well that Plaintiff Planet Aid, or its subcontractor, DAPP Malawi, had lied on that non-existent report.

### F.    Claims that Jackson Mtimbuka Was Aware of "Cheating" in the USDA Programs.

130.    Another source for Defendants about how farmers were "shortchanged" was Jackson Danger Mtimbuka.  Even before the March 25th Broadcast in which Mtimbuka's voice was used – unbeknownst to him – to impersonate a farmer "shortchanged" by Plaintiffs, Defendants had alleged in the March 19th Broadcast that Mtimbuka had intimate knowledge of the USDA Programs given his role in implementing the Farmer's Club program, and that he "took the job with Planet Aid so he could help his people . . . ."

131.    Defendants knew, or were reckless in not knowing, when they made that statement that Mtimbuka had been terminated in February 2010, halfway through the USDA Programs' for diverting funds from the USDA Programs.  Instead of correctly reporting that fact, Defendants characterized Mtimbuka's conduct and his termination by DAPP Malawi by saying that Mtimbuka "left his job in 2009 after a dispute over expenses."  Not only were Defendants incorrect about the date of his departure, but to call his termination a "dispute over expenses" was materially misleading to listeners.  `

132.    Mtimbuka was paid by Defendants for providing false and fraudulent information, and encouraging other potential sources of information to provide false statements about Planet Aid and DAPP Malawi.  Mtimbuka was present when Defendant Smith and Walters unlawfully

- 39 -

impersonated USAID officials in the village of Njuli, and obtained statements from the Chief and others there, which were known by Defendants and Ngwira to be false and defamatory.

133.   Defendants alleged in the March 19th Broadcast that they had received accounts from Mtimbuka, who was responsible for certain Farmers' Clubs within the Zomba Region of Malawi, who supported the claim that farmers in Malawi were "cheated" and "shortchanged." Defendants reported:

> Jackson [Danger Mtimbuka] told us Planet Aid was cheating the people of Malawi.
>
> Jackson:  It was cheating.  It is not the reality.
>
> Matt:  What did you think the reality was?
>
> Jackson:  The reality, it was  . . . the farmers were not benefiting from farmers' club.  That is the reality.
>
> Matt:  Jackson says cheating, it was part of his job.

134.   Similarly, the May 23rd Article also contained the false and defamatory statement attributable to former DAPP Malawi employee Mtimbuka, who stated that "[t]he money [from the USDA] was not used on the intended purpose. . . ."

135.   Defendants knew when they published the foregoing statements by Mtimbuka that such statements were either inaccurately reported, or alternatively, if Mtimbuka in fact had even said such things, he had done so only because he was destitute and in desperate need of money, having been unemployed for six years after he was fired by DAPP Malawi for diverting DAPP Malawi funds.  Mtimbuka had no information indicating that the farmers in Malawi had not received all of the livestock, seed and fertilizer materials to which they were entitled under the

programs. Mtimbuka also believed that the farmers had in fact benefitted from the USDA grant. Defendant knew, or were reckless in not knowing, such facts.

136.    When Defendants made the foregoing statements they knew that they were false and defamatory in that Defendants Smith and Walters had interviewed Mtimbuka before publishing the May 23rd Article or March 19th Broadcast, and therefore knew, or were reckless in not knowing, that Mtimbuka had no evidence or reliable information that funds were not used for the intended purpose (except when he tried, unsuccessfully, to embezzle funds from the USDA Programs, for which he was fired).

137.    When Defendants published the foregoing false and defamatory statement about "cheating" under the USDA I program, they knew not only from Mtimbuka himself that the statement was false, but they knew from other information that Malawian farmers had in fact received more than promised the USDA in the proposal accepted and adopted by the USDA when it contracted with Planet Aid in USDA I, in June, 2006.

138.    More specifically, documents in Defendants' possession when they published that May 23rd Article show that Planet Aid represented that it would spend well over $1.5 million on the Farmers' Clubs. Defendants further knew that this representation was included in, and made a part of, the USDA I contract between Planet Aid and the USDA, executed in June, 2006.

139.    Defendants further knew when they published the March 19th Broadcast, claiming that Farmers' Clubs had been deprived of promised aid, that Planet Aid had actually spent more on Farmers' Clubs than anticipated in the original USDA I Contract and had met or exceeded all goals contained not only in the original Contract, but also the goals in the Amendments to that Contract.

- 41 -

**G.     Use of the Village of Njuli to Create a Totally False Picture of the Plaintiffs'
         Work Under the USDA Programs**

140.    In addition to relying on Jackson Danger Mtimbuka, Defendants claimed another

critical source for their statement that Planet Aid had failed to deliver livestock and other

materials promised as part of the Farmers' Clubs programs undertaken in the USDA grants.   The

centerpiece of this story was the village of Njuli.  Defendants knew that at least some of the facts

alleged as to Njuli were false, and either knew or were reckless in not knowing that other facts

published in their stories were similarly false.  Njuli is located in southern Malawi, and was

mentioned prominently by Defendants in their March 19th Broadcast, and their May 23rd Article.

A half-page photo of Njuli's chief was featured also on the front page of the August 17th Article.

Defendants made Njuli into the "poster village" for their scheme, and urged readers to believe

that it was emblematic of the fraud perpetrated on farmers in Malawi.

141.    As explained above, two of the farmers who were cited most frequently as the

sources for how farmers in Malawi were "cheated" and "shortchanged" lived in Njuli, and were

themselves the subject of a fraud by Defendants.   As shown above, Chief Chibwana and Enock

Chikaonda  had themselves been defrauded by Defendants when Defendants Smith and Walters

masqueraded as USAID workers in their village, and made promises they had no intention of

keeping or delivering expensive merchandise.

142.    Given their unlawful statements that Defendants Smith and Walters were working

for USAID, farmers in Njuli had no reason to doubt statements made by Defendants Smith and

Walters, either directly or through Nwira and Mtimbuka, that farmers had been "shortchanged"

and that people at DAPP had stolen from them.  Consequently, if they made such statements

attributed to them at all – they did so because they were fraudulently induced to do so by

Defendants' requests that Chibwana and Chikaonda help expose those who had stolen from them, and could obtain much needed additional well pumps for their village.   Moreover, specific claims made by these two individuals – Chibwana and Chikaonda – or others in the community, were actually known by Defendants to be false.

### 1.    The Dead Goat and Pig.

143.    A particularly important fact, according to Defendants themselves, was that in the village of Njuli farmers had not received the livestock to which they were entitled.  The March 19th Broadcast relied on claims by one individual claimed by Defendants to be a farmer, and relating to Njuli, when it states:

> Amy Walters:  Along with vegetables, Planet Aid promised pigs and goats to breed as livestock.  He says they did get one pig and one goat.  Is the pig still alive?
>
> Speaker 9:  No.
>
> Amy:  Is the goat still alive?
>
> Speak 9:  No.
>
> Amy:  So no other animals?
>
> Speaker 9: No.  We don't have any pig or goat in our homes because of [inaudible] donation.

144.    Defendants Smith and Walters repeated the statements about a dead goat and pig and no other livestock being delivered when they made statements in the March 25th Broadcast.

145.    The above statements were palpably false, and published by Defendants knowing that they were false as they had visited Njuli and knew from their own observations that the statement was false.  Defendants Smith and Walters therefore were aware when they published such statements that numerous goats are still alive and well in Njuli village, in particular, and

- 43 -

further, Defendants either knew, or were reckless in not knowing, that villagers had either given away livestock, or in some cases profited from selling offspring to other farmers or villages, as contemplated by the USDA when they authorized Planet Aid to provide "seed livestock" for villages, such as Njuli.

146.    Defendants knew when they published this information about a lack of livestock distribution that such statements were palpably false not only as to Njuli, where Defendants Smith and Walters had personally seen goats running around the village, but the USDA Programs as a whole.

147.    More specifically, when they published such statement about livestock in Njuli and throughout Malawi, Defendants had in their possession official documents and records that showed that over 400 livestock had been distributed even as early as 2008 to farmers throughout Malawi, pursuant to the USDA grant program.

148.    Defendants knew also when they published their false and misleading story that even as early as 2009 the number of livestock had more than doubled, as intended under the USDA I Program.  When they published their story in 2016, Defendants had in their possession documents showing that in addition to the livestock distributed in 2008, approximately 600 additional offspring had been passed on to farmers participating in the USDA Programs.

149.    When they published the May 23rd Article and March 19th and 25th Broadcasts Defendants also had in their possession a draft final report for USDA II from November 2011, two years before the end of the project.  This report showed that over 5,000 livestock had been distributed by October 2011.

150.    Defendants therefore knew that by October 2011 in the USDA Programs, the Farmer Clubs had received more than 5,000 livestock.  Defendants should have known that even this number did not reflect the total number of livestock existing and given away in Malawi under USDA I and II, either as breeding animals or as pass-on grants.

151.    Ignoring documents in their possession showing that thousands of livestock had been delivered to groups of farmers and/or Farmers Clubs, and their own observations in Njuli, Defendants maliciously reported in the March 19th Broadcast that Njuli was representative of other villages, and that a single dead pig and dead goat were all that Plaintiffs could claim under the USDA Programs.

### 2.    The Njuli Water Pump That Would Take Two Years to Pay-Off, And Which Cost Enough to Educate One Child For a Year

152.    The March 19th Broadcast included statements by Defendant Walters that because they lacked sufficient water pumps the chief in the village of Njuli was required to pay for one out of his own pocket, which he "purchased" from Planet Aid, and that it took him two years to pay for the pump.  The Radio March 19th Broadcast states:

> Planet Aid promised water pumps too so farmers were no longer dependent on the seasonal rains to grow food, but in the village of Anjuli [Njuli], they only gave away one pump.  They were actually selling the rest.

153.    This statement was known by Defendants to be false when it was published, and was intended to discredit Planet Aid.  As they well knew, Planet Aid had not sold any pumps, including in the village of Njuli.  Rather, the only pumps acquired by Planet Aid were donated free of charge in Njuli and elsewhere.

154.    The Radio March 19th Broadcast contains also the following falsehoods:

- 45 -

Amy:  Out of 300 families, only the village chief bought one.
. . .
Matt:  [the chief] took out a loan to buy the hundred-dollar pump.  That money could have paid for a year of school for one of his children.  It took him two years to pay it off.

155.   The May 23rd Article repeats this false and defamatory statement:

In Njuli, Reveal reporters found the village had only two pumps. One was given to the village. The chief bought his, he said, with a $100 loan that took him two years to pay off.

. . .After five years of use, Chibwana's pump was barely functioning.

Enock Chikaonda, a village leader and Farmers' Club member, was the only villager given a pump by Planet Aid.

156.   Defendants knew, or were reckless in not knowing, when they made those statements that the village chief had not purchased a pump.  Nor had he paid anything for either of the two pumps that were located in the village, both of which were still operating in 2015 when Defendants Smith and Walters visited the village, and were not in "tatters" as alleged in the Radio March 19th Broadcast, and had been donated by Plaintiff Planet Aid.

**3.     Claimed Lies By Njuli's Chief to Donors About His Tomato Crop.**

157.   In the Reveal Radio March 19th Broadcast, Defendants falsely alleged also that farmers and villagers were told by Planet Aid and DAPP Malawi that they had to provide a positive picture to western donors.  Defendants claimed that the village chief in Njuli was "roped in too," referring to the same village chief who had supposedly purchased a pump using a loan that would have taken him two years to pay off.  The Reveal Radio March 19th Broadcast has Defendant Smith stating:

We showed the chief the video where he's saying "I grew tomatoes and raised $1,000,"
. . .

- 46 -

He says that wasn't true.  He grew the tomatoes on his own, before this Farmers' club even showed up, and he made the money on his own too. . . ."

158.    In fact, Defendants Smith and Walters extracted statements from the Njuli chief relating to his tomatoes and the pumps installed in the village knowing, or acting recklessly in not knowing, that they were false.  As shown above, Defendants used a variety of tactics to elicit such false statements, including promising the chief 50 water pumps for his village, and telling him that individuals in charge at  DAPP Malawi had stolen from him and his village.

159.    If the chief even made any of the statements attributed to him by Defendants, Defendants knew, or were reckless in not knowing, that such statements were not true. Defendants therefore knew, or were reckless in not knowing, that the statements reported in the March 19th Broadcast and May 23rd Article were false and defamatory.

## VII.    FALSE AND DEFAMATORY STATEMENTS ABOUT THE RELATIONSHIP BETWEEN EITHER PLANET AID AND/OR DAPP MALAWI, AND THE TEACHERS GROUP.

160.    Another major area of false and defamatory statements related to the Teachers Group.  Defendants alleged throughout the Articles that both Plaintiff Planet Aid and its subcontractor, DAPP Malawi, were directed in their operations by a shadowy figure who was an international fugitive and who directed the Teachers Group.

161.    More than fourteen years prior to the publication of Defendants' May 23rd Article and March 19th Broadcast, authorities in Denmark brought charges against 8 individuals, including Mogens Amdi Petersen, who they claimed had committed tax offenses in Denmark as far back as twenty-five years ago.   The case related to the use of funds donated for benevolent

- 47 -

purposes.   Planet Aid was not connected to that alleged conspiracy involving non-payment of Danish taxes.

162.    Planet Aid was formed in 1997, when it was incorporated in the State of Massachusetts.  The Teachers Group has (and has had) no role in decision-making by Planet Aid, and in no sense, "runs" or "operates" Planet Aid, and has never run or operated Planet Aid. None of the individuals charged with crimes in Denmark – including those who were acquitted -- have, or ever have had, any role in running or operating Planet Aid.

163.    Defendants ignored such facts, and instead made numerous false and defamatory statements regarding the Teachers Group, and its control and operation of Planet Aid, Lisbeth Thomsen, and/or DAPP Malawi.

164.    More specifically, Defendants claimed that Planet Aid was "a Teachers Group Company," and that it was "run" or "operated by the Teachers Group," which they claim is a cult.  These allegations are false and fraudulent, and maliciously made by Defendants for no other purpose than to damage Planet Aid, and obtain donors for Defendants' Reveal operation.

165.    In its March 19th Broadcast, Defendants alleged that:

> The Teachers Group runs dozens of organizations all around the world.  One of them is Planet Aid US.

166.    In the same March 19th Broadcast, Defendant Smith emphasized the point by stating:

> Planet Aid, a Teachers Group organization.

167.    Defendants also quoted one unnamed "source" in the March 19th Article for the claim that "[t]he Teachers Group runs Planet Aid US under various names, all over the world."

168.    Defendants knew when they made these allegations that none of them were true, and that Plaintiff Planet Aid was not run by the Teachers Group, and also, that some people accused in a Danish legal case, including Mogens Amdi Petersen, had nothing whatsoever to do with the operation of Plaintiff Planet Aid.   As shown below, Defendants manufactured these links in order to claim that somehow Petersen was running Planet Aid.

### A.    Defendants' Defamatory Claims that Plaintiff Planet Aid was Under Investigation While Receiving USDA Funds

169.    In addition to allegations that Planet Aid was controlled by the Teachers Group, Defendants wrote that Planet Aid was linked to criminal conduct prosecuted in Denmark.   The Defendants further alleged, for instance, in the March 19th Broadcast that the USDA was aware of such links, and yet "continued to keep the money flowing" to Plaintiff Planet Aid.

170.    Defendants knew that Planet Aid does not even operate in Denmark, no one charged with crimes in that case had any involvement in the operation of Planet Aid, and that Planet Aid had no role in any of the alleged crimes.   Defendants nevertheless attempted to "link" Plaintiffs to the case in Denmark through two emails – one sent by USDA officials and the other by individuals in Denmark.

171.    Based on those two emails, Defendants falsely reported to a Malawi newspaper, the Times Group, and elsewhere:  "Our investigation finds that the US government knew an international fugitive was linked to the projects, but kept the money flowing."  The statement was published in the May 14th Article.   Defendants knew that it was false and defamatory to

allege that an international fugitive was linked to the USDA projects, much less that the "US government knew an international fugitive was linked to the projects, but kept the money flowing."

172.    As explained below, Defendants' references and explanations of both emails were false and defamatory.

> **1.    The First Email: Defendants Claim that the USDA Kept the Money "Flowing" Despite Knowing of Links Between Planet Aid and the Teachers Group Members on Trial In Denmark**

173.    The first email was intended to show that the USDA knew of the link between Planet Aid and the criminal scheme in Denmark.  Defendants stated in the March 19th Broadcast that:

> [T]he USDA knew. They knew about the Danish case, they knew about the Teachers Group, they also knew about the ties between the Teachers Group and Planet Aid US, but the agency continued giving Planet Aid US grants worth tens of millions of dollars intended for projects in Malawi and Mozambique.

174.    The above statement by Defendants was supported by evidence that Defendants knew was false.  More specifically, in the May 23rd Article Defendants claimed that this U.S. government email acknowledged this link, and even actually "outlined the links between Petersen [claimed by Defendants to operate, control and dominate the Teachers Group] and a global network of charities that includes Planet Aid. . .," and that the email could therefore show that Planet Aid was involved in criminal activities inasmuch as the U.S. government email "highlighted allegations of embezzlement and tax fraud in a case brought by the Danish government."

175.    When defendants made the foregoing statement, purporting to paraphrase this U.S. government email "outlin[ing] links between Petersen and . . . Planet Aid," Defendants knew full well that their characterization of that same email was false and misleading, and that the email actually said the opposite.  The email relied upon Defendants as evidencing the USDA's awareness of the link between Planet Aid and Petersen and his alleged unlawful acts actually stated:

> We don't know how deep those ties go, or if it's the same Planet Aid, Inc. that the USDA has signed agreements with.  At this time we think Planet Aid, Inc. is a separate entity.

176.    Nor did the email claim, or even intimate, that the Teachers Group was a criminal organization.  In fact, being part of the Teachers Group is neither a crime nor appropriately the subject of public humiliation or scorn.  The Teachers Group is a loose-knit organization of individuals, many of whom are present or former teachers, who have determined that they can work together collectively to better their own lives, as well as the lives of individuals around them and their environment.  The Teachers Group attempts to instill positive values in those who have decided to join the group.

### 2.    The Second Email: Defendants Claimed Links Between Planet Aid and the Criminal Conduct Alleged In Denmark.

177.    The characterization of the second email relied upon by Defendants to link Planet Aid to criminal conduct in Denmark was similarly known to be false, or Defendants were reckless in not knowing, that it was false.

178.    Defendants attempted to link Planet Aid to the case in Denmark through an email involving the payment of $100,000 to Mogens Amdi Petersen, claimed by Defendants to be the leader of Teachers Group.   Defendants wrote in the May 23rd Article:

> And the case against Amdi Petersen reveals that a high-ranking Teachers Group member Petersen associate named Paul Jorgensen was instructed to issue orders to Maria Darsbo.  These messages were revealed in a May 14, 2000 email contained in court documents.  The mission [was] to shift $100,000 in funds meant for charity to a Copenhagen bank account designated for Amdi Petersen and his girlfriend's personal use.

179.    When defendants made that statement they knew that the court had acquitted defendants in Denmark of any criminal conduct relating to the email.  Accordingly, Defendants knew when they published the above statement that the email in question did not even establish guilt by ***anyone,*** including the defendants in the case, and certainly could  not have been used honestly or fairly to show that Planet Aid had engaged in wrongdoing.

180.    Defendants either knew, or were reckless in not knowing, that the Danish court considering the issue of the email and whether it suggested criminal behavior, had in fact rejected any such notion.  The court ruled as follows:

> It is apparent from a declaration from November 30, 2001 from the accounting firm AMG Global to the board of the Federation, and that it could be confirmed that the amount of DKK820,570 ($100,000) received in March 2001 was used during the nine month until November 30, 2001. This auditing company had attached to the declaration a detailed overview of the use of funds.  . . . **The court states that the money was transferred to an account belonging to the Federation and concludes that the money was used for the purpose, for which support had been applied.** The court finds it must be presumed that the reference, which indicated that the amount should be available to Amdi Petersen and Kirsten Larsen, in reality meant only that the amount should be used for activities, which these defendants were engaged in within the Federation. [emphasis added]

- 52 -

181.    Accordingly, when Defendants herein made the statement in the May 23rd Article linking Planet Aid to alleged criminal conduct by Mr. Petersen and others involved in the Danish case through this email they already knew, or were reckless in not knowing, that the City Court in Ringkobing, Denmark had rejected the very claim Defendants were making in their false and defamatory articles.  Defendants also knew, or were reckless in not knowing, that even though the Danish prosecutor decided to refile charges against Petersen, he declined to file any charge relating to activities described in this email.

182.    In short, in an effort to link Planet Aid to Mr. Petersen's alleged crimes, Defendants published as fact a statement which both the Danish court and prosecutor had agreed was meritless and unsustainable.   Even more fundamentally, it was pure fiction to claim – as Defendants had done – that the email somehow "linked" Planet Aid to crimes prosecuted in Denmark.

**B.    Defendants Falsely State that the "FBI says  . . . that Planet Aid is part of a fraud and global money laundering ring," and Has Issued Reports "Dating Back" Fifteen Years.**

183.    Another source of allegations about linkage between the Teachers Group and Planet Aid was a document attached as an Exhibit to the May 23rd Article, which had been released by the Federal Bureau of Investigation  Relying on a document dated June 18, 2001, the Defendants alleged that the:

> FBI says, using information from Danish investigators, that Planet Aid is part of a fraud and global money laundering ring.

184.    Similarly, Defendants falsely alleged in the March 25th Broadcast that there are "[r]eports from the FBI dating back to 2001 linking Planet Aid to this global fraud operation."

185.    In order to reinforce their false claim that Planet Aid was being investigated when the USDA grant was awarded, and was currently under investigation, and not something that had occurred fifteen years earlier, Defendants quoted a source in May 23, 2016 Article as saying "You don't give millions of dollars to a group **that is being investigated** for fraud, tax evasion and pilfering of humanitarian funds. . . . But that is precisely what the USDA did." [emphasis added].  The Defendants knew that this individual had no personal knowledge about the matter, and had become interested in the issue while helping her daughter on a homework assignment.

186.    The foregoing statements were materially false and misleading.  First, there were no reports "dating back to 2001," making it falsely appear that there were a string of FBI reports between 2001 and the present.  In fact, no documents post-dated June 18, 2001, when the above FBI document was dated.

187.    Second, while stating that the FBI "says" that Planet Aid was linked to offenses lodged against some people in Denmark, Defendants knew that this allegation was false and malicious in that the FBI was not "say[ing]" anything about Planet Aid, the Teacher Group, or Mogens Amdi Petersen.  In fact, the FBI had not "said" anything for over 15 years, since the date of the FBI Report in question.

188.    Further, Defendants knew that not only was the FBI not making any current statements about Planet Aid and the Teachers Group when the March 25th Broadcast or May 23rd Article were published, but the FBI had never even made any such statements reaching such conclusions attributed to the Bureau, even in 2001.

189.    More specifically, Defendants knew that some unnamed source, in Denmark, not connected with the FBI, was the source of that information.  The Defendants were aware, and

even had in their possession when the May 23rd Article was published, the memorandum repeating statements from an unnamed source, asking U.S. authorities to undertake an investigation of individuals – other than Planet Aid.  While this unnamed source had referenced Planet Aid, Defendants, on the other hand, put those words directly in the FBI's mouth as if the FBI itself had reached the conclusions that Planet Aid was engaged in criminal conduct, or was investigating Planet Aid.  No such conclusion had ever been reached by the FBI.

190.    Defendants wrote this statement in the present tense – giving the clear and express impression that there was a present or ongoing investigation of Planet Aid – when they knew that there was no evidence that there was any investigation of Planet Aid when the May 23rd Article was written, and the sole source of the statement was evidently the fifteen year-old FBI report, simply repeating allegations by some unnamed source.

## VIII.   DEFENDANTS' FAILURE TO ISSUE A RETRACTION OR CORRECT THEIR "STORYTELLING."

191.    Over the course of the period between March and the filing of this Complaint, Defendants have failed to correct any of the statements detailed and discussed above.

192.    On August 19, 2016, a request for a full retraction was sent to Defendants.

193.    As of the filing of this Complaint, no such retraction has occurred.

## VIII.   CLAIM FOR RELIEF

### COUNT I
### CIVIL CONSPIRACY

### (Against all Defendants)

194.    Plaintiffs Planet Aid and Lisbeth Thomsen restate and adopt paragraphs 1 through 193, above.

195.    Defendants entered into an unlawful combination, confederation or agreement in which they each agreed to participate, along with Ngwira, other claimed "news" outlets and others.  The objects of that unlawful combination, confederation or agreement were to:

(a) make false and defamatory statements directed toward Plaintiffs Planet Aid and Lisbeth Thomsen;

(b) place Plaintiffs Planet Aid and Lisbeth Thomsen in a false light that would be objectionable  and repugnant to any reasonable person;

(c) use whatever means were available to Defendants, including but not limited to the internet, radio, television, email, social media, in order to maximize the chances that the false and defamatory statements and false light in which Plaintiffs were cast by Defendants would have the maximum impact;

(c) interfere with Plaintiffs existing business relationships and any potential or future business relationships, including with respect to grants, partners, recycling projects or other activities in which Plaintiffs Planet Aid and Lisbeth Thomsen were engaged;

(d) drive Plaintiff Planet Aid out of business, and ruin Plaintiff Lisbeth Thomsen's reputation and ability to continue doing charitable work; and

(e) claim, through the foregoing, that Defendants' news story had an "impact," deserving

of additional, substantial donations so that Defendant Reveal could continue to fund its operations, and Defendants Smith and Walters could remain employed.

196.    In engaging in this combination and agreement, Defendants, along with Ngwira, certain "news" outlets and others, had a unity of purpose or a common design and understanding, or a meeting of the minds, that they would all work together and agree to execute their scheme so that they could accomplish the foregoing objectives.

197.    In order to accomplish the foregoing objects of their conspiracy, Defendants and others with whom they conspired used the following means: (l) misrepresenting their status to farmers that they were employed by the U.S. Government, namely USAID, thereby impersonating federal employees; (2) misrepresenting on other occasions that they were employees of DAPP Malawi; (3) offering substantial inducements and bribes to individuals for providing negative information about Planet Aid and/or DAPP; and (4) making false and defamatory statements to individuals in Malawi and elsewhere in order to induce them to make statements known by Defendants to be false, (5) publishing and broadcasting false and defamatory statements, including ones placing Plaintiffs in a false light; (6) causing others to republish their false and defamatory statements, as well as statements putting Defendants in a false light; and (6) tortiously interfering with Plaintiff's current and prospective business relationships.

198.    In furtherance of this conspiracy, confederation and agreement, Defendants took numerous actions, including but not limited to:  (1) traveling to Malawi; (2) publishing articles about Plaintiffs; (3) meeting with individuals in the village of Njuli in Malawi; (4) meeting with villagers in another village;  (5) distributing information to third parties, including potential donors to Plaintiff Planet Aid and Plaintiff Lisbeth's employer, as well as to potential partners or

entities with whom Planet Aid and/or DAPP Malawi had either existing or prospective business dealings; (6) transmitting information to third parties so that they would re-publish the false and defamatory statements; (7) encouraging other news sources to join with them in publishing false and defamatory statements, and statements placing Plaintiffs in a false light; and (8) placing information on social media so that it would be republished to the public at large.

199.   As a result of the conspiracy and agreement detailed above, Plaintiff Planet Aid and Lisbeth Thomsen have both suffered substantial damage.


### COUNTS II-XII
### DEFAMATION
### (Libel and Slander)

### (Against All Defendants)

200.   Plaintiffs Planet Aid and Lisbeth Thomsen restate and incorporate herein paragraphs 1 through 199, above.

201.   Defendants Reveal, Smith and Walters knowingly, intentionally and maliciously made false and defamatory statements concerning Plaintiffs Planet Aid and Lisbeth Thomsen. Each of the statements set forth below, were made by Defendants either knowing that they were false, or alternatively, while acting with reckless disregard for the truth or falsity of the statements.

202.   These false and defamatory statements form the basis for Counts II-XII, as set forth in the following chart:

| Count | Date | Story/Broadcast | False and Defamatory Statement |
|---|---|---|---|
| Count  II | 3/19/16 | Reveal, Alleged cult | "Our investigation finds that the U.S. government knew an international |

| Count | Date | Story/Broadcast | False and Defamatory Statement |
|---|---|---|---|
| (As to All Def.) | | leader plays shell game with US foreign aid | fugitive was linked to the projects, but kept the money flowing." |
| Count III<br><br>(As to All Def.) | 3/19/16;<br>3/21/16 | Reveal, Alleged cult leader plays shell game with US foreign aid | **Stealing Money from the USDA Program:**<br><br>"[M]oney from USDA grants, over $130 million, up to 70% was allegedly taken from the projects it was meant for and stripped from employees salaries."<br><br>"Jackson, the employee working on the Planet Aid farmer's project in Malawi, he was told by his teacher's Group bosses, the money from the USDA was going straight to Mexico."<br><br>"Jackson knew where the money was going all along."<br><br>"Teachers group benefited from this and not other people."<br><br>"The USDA knew about the Danish case, they knew about the Teachers Group and Planet Aid, but the agency continued giving Planet Aid grants worth tens of millions of dollars intended for projects in Malawi and Mozambique."<br><br>"Harrison [Longwe] is one of several insiders who told us 50% to 70% of the US government grant money was being siphoned away, one transaction at a time and most of them was headed to the Teacher's group African headquarters in Zimbabwe."<br><br>"Harrison, DAPP's former financial controller, was one of the people who said he also saw fraud." . . . "Now he says the money was stolen."<br><br>Telling Plaintiff, that "people inside your organization . . . say individually, one by one as we've interviewed them is that your organization is scheming US government funds.  Your own people.  The people in charge of your money said you're stealing money."<br><br>**Farmers were deprived of livestock and other goods to which they were entitled:**<br><br>"What Jackson's telling us is the farmer's didn't get enough seeds or fertilizers so the crops never took off."<br><br>"Along with vegetables, Planet Aid promised pigs and goats to breed as livestock. . .  He says they did get one pig and one goat," neither of which lived long enough to breed; and they received "no other animals."<br><br>Planet Aid only "gave away one pump" in the village of Njuli and were "actually selling the rest." |

| Count | Date | Story/Broadcast | False and Defamatory Statement |
|---|---|---|---|
| | | | The chief "took out a loan to buy the hundred-dollar pump.  That money could have paid for a year of school for one of his children.  It took him two years to pay it off."

"Jackson told us Planet Aid was cheating the people of Malawi."  " It was cheating."   "Jackson says cheating, it was part of his job."

The chief in Njuli was sorry for all of the things he said on the video, because they weren't true, and "he says the video is painful to watch. . . . He's sorry for all of the things he said before [on the video saying positive things about the USDA project and DAPP Malawi] because they weren't true."

**DAPP Malawi Employees were forced to pay "kickbacks."**

While researching this story we spoke to about a dozen African members of the Teacher's Group.   All of them gave a portion of their salary to the group.   From 20% to 100%, everything they earned.

"[T]he Malawians that the US money was suppose to help say that they were forced to hand over their salaries to the Teacher's Group."

"Money was kicked back by employees to an account of Ibn Petersen and Ula Thomsen, and those contributing the money "don't know what they can use, because we deposit in their accounts. . . . He said the money went into the personal bank accounts of two Teacher's Group bosses.  Ibn Petersen and Ula Thomsen, and Ula is the husband of Lisbeth Thomsen."

"Even those Danish they get a lot of money, but us we're getting a little then we are forced to pay contribution.  I was so sad because I was forced to sign for it."

"Donor funded salaries weren't paid in full.  One amount was written into the budget but people were paid much less.  . . ." "It was written.350, but she's getting $100 per month in salary. It's a tricky way of doing it."

**Teachers Group Control and Operation of Planet Aid:**

"The Teachers Group runs dozens of organizations all around the world.  One of them is Planet Aid."

"Planet Aid, a Teachers Group organization."

"Teachers Group benefitted themselves, they benefited from this and not other people." |
| Count IV

(As to Smith | 3/25/16 | WKRC | "The farm fields that we saw were not really fields.  I mean, we talked to the farmers there and they said that nothing really happened from the projects.  . . . |

| Count | Date | Story/Broadcast | False and Defamatory Statement |
|---|---|---|---|
| and Walters) | | | [Announcer]:  Okay, let's hear from two farmers you spoke to.  We'll hear one talking  about the plants and one talking about the livestock.<br><br>[Farmer]:  It was like there are just a few plants and some maybe they are dry, and some maybe they are not there because they are not given adequate inputs."<br><br>**The FBI Investigation**<br><br>"Well since 2001 the US Government has known about connections between Planet Aid (the name you see on the clothing boxes) and a secretive global organization that was accused by the Government of Denmark of being a charity fraud scam.  . . .  Reports from the FBI dating back to 2001 linking Planet Aid to this global fraud operation."<br><br>Announcer:  "So what does the USDA say about this?  What does the US Government say about this?  . . .<br><br>They didn't really respond to us about the links between what law enforcement said is a fraud operation and funding of the same organizations." |
| Count V<br><br>(As to All Def.) | 5/23/16 | US taxpayers are financing alleged cult through African aid charities | **Fraud by Planet Aid and DAPP Malawi:**<br><br>DAPP former employee and "others say they added up to fraud intended to reroute aid money to other purposes."<br><br>Jackson, saying the "money [from the USDA grant] was not used [for] the intended purpose."<br><br>Examples of fraud include paying money reflected on a bank account statement for the period January through May, 2014, and which reflected payment of dues for DAPP Malawi Membership Fee, "what appears to be multiple bills for the same purpose," and money to a Hong Kong-registered trading company.<br><br>The village chief in Njuli was forced to pay for a Planet Aid pump with a $100 loan which took him two years to pay off, when the village was supposed to receive pumps free of charge.<br><br>**The Claimed FBI "Investigation:"**<br><br>"In a 2001 report, the FBI concluded that Teachers Group leaders diverted funds raised by its network of organizations 'for personal use. Little, to no money goes to the charities."<br><br>"The "FBI says, using information from Danish investigators, that Planet Aid is part of a fraud and global money laundering ring."<br><br>"You don't give millions of dollars to a group that is being investigated |

| Count | Date | Story/Broadcast | False and Defamatory Statement |
|-------|------|-----------------|-------------------------------|
| | | | for fraud, tax evasion and pilfering of humanitarian funds, . . .  [b]ut that is precisely what the USDA did." <br><br> "A few years before the USDA began funding Planet Aid, another branch of the U.S. government was raising alarms about this practice of siphoning off salaries." <br><br> An employee was to be used by Planet Aid "as a cover up for ginned-up, misleading reports to the USDA." <br><br> **Employee kickbacks:** <br><br> In the "deed of contribution" signed by employees "members [of the Teachers Group] agree to donate a portion of their salary – anywhere from 20 to 100 percent." <br><br> "Even before the Teachers Group pressures members to hand over money to their bosses, funds are extracted by writing paychecks much smaller than reported to the USDA.  In this way, [one employee said] employers were siphoning $250 from her $350 per month salary, she said, and then applying pressure to kick back even more .  Zebiah said the DAPP project manager's story conforms with DAPP policy in Malawi. <br><br> **Teachers Group Links and Connections:** <br><br> Claiming that this U.S. government email "outlined the links between Petersen [claimed by Defendants to operate, control and dominate the Teachers Group] and a global network of charities that includes Planet Aid. . .," and that the email could therefore show that Planet Aid was involved in criminal activities inasmuch as the U.S. government email "highlighted allegations of embezzlement and tax fraud in a case brought by the Danish government." |
| Count VI <br><br> (As to Smith and Walters) | 5/24/16 | News 4 I-Team, "Behind the Bins: Former Planet Aid Employees Describe Cult-like Experience. | **Employee kickbacks:** <br><br> Referring to Defendant Smith, "Smith said employees paid by Planet Aid showed him 'Deeds of Contribution' and other types of contract they said they were required to sign if they wanted to keep their jobs, promising to donate 20 to 100% of their salaries to Teachers Group." |
| Count VII <br><br> (As to all) | 6/5/16 | "Planet Aid's ubiquitous clothing donation boxes aren't so charitable." | "Planet Aid is one of at least seven U.S.-based nonprofit organizations, and two or more U.S. for-profit companies, that have been linked to a secretive Danish organization known as the Teachers Group. |
| Count VIII <br><br> (As to | 8/1/16 | UNICEF cuts off funding to nonprofit linked to alleged cult | **Fraud and Diversion of funds:** <br><br> Claiming that UNICEF cut ties to DAPP Malawi "following an investigation. . . by Reveal . . . showing that the group diverted money |

| Count | Date | Story/Broadcast | False and Defamatory Statement |
|---|---|---|---|
| All) | | | intended to alleviate hunger and disease." |
| Count IX<br><br>(As to Reveal) | 8/8/16 | Reveal Weekly | Reveal "followed the money from Malawi to Denmark and back to Washington – all to explain how U.S. taxpayers ended up footing the bill for an alleged cult's activities." |
| Count X<br><br>(As to All Def.) | 5/14/16 | Malawi Nation, "Wicked Scheme" | Cited Defendant Reveal for the statement that " 'up to 70 percent of the US$100 million which the US government granted to Planet Aid had been misappropriated by programme subcontractor, Dapp Malawi.' " The Times Group quoted Defendant Reveal also for the proposition that the two organizations are " 'part of a nefarious conspiracy to enrich themselves and their leaders.' " |
| Count XI<br><br>(As to All Def.) | 8/17/16 | Congresswoman calls for U.S. investigation of Planet Aid | **Fraud and Diversion of funds:**<br><br>"A congresswoman has called for a governmental investigation . . . of Planet Aid following a Reveal investigation . . . showing that the U.S. has allocated more than $133 million in foreign relief funds to the Maryland-based charity despite evidence it is controlled by a cult-like organization and funds have been misused."<br><br>"Dubious expenses . . . for aid projects funded by the United States were paid to offshore organizations controlled by the Teachers Group."<br><br>"Accountants and managers working on those projects said these invoices were fabricated to cover up for charity work that was never performed."<br><br>"Impoverished farmers in Malawi, who were supposed to benefit, . . . also told Reveal they did not receive water pumps, fertilizer, and farm animals promised by Planet Aid."<br><br>Citing someone who was claimed to be a "whistleblower," but who in fact never worked for, or has first-hand knowledge of, Planet Aid, DAPP Malawi, USDA, the Teachers Group or even any expertise helpful to the Article: "It's blatant to me this group is stealing, it's money laundering and they're keeping the money for themselves."<br><br>**Employee kickbacks:**<br><br>"Former and current Teachers Group members in Africa told Reveal that they were forced to kick back . . . portions of their USDA-funded salaries to a bank account controlled by their Teachers Group overseers." |
| Count XII<br><br>(As to Reveal) | 8/18/16 | Minnpost, "Congresswoman | "One group in Africa that received U.S. government funds compelled employees to kick back portions of their salaries to a bank account controlled by their Teachers Group overseers."<br><br>"[Ii]voices were fabricated to cover up for charity work that was never performed." |

203.    These statements appearing in the foregoing Articles and Broadcasts, as well as in social media, were intended to, and did, have the result of holding Planet Aid and Lisbeth Thomsen up to ridicule, hatred, scorn, contempt and disgrace.   Statements by Defendants also discouraged others in the community from having a good opinion of, or associating with, or engaging in projects or business opportunities with Plaintiffs Planet Aid and Lisbeth Thomsen.

204.    In addition, Plaintiff Lisbeth Thomsen has not only been embarrassed, humiliated and ridiculed, but she has suffered emotionally as a result of having been accused of having been a money-launderer, thief, and someone abusing the employees and people of Malawi who she has faithfully attempted to assist for many years.

205.    Further, by knowingly, intentionally and maliciously publishing false and defamatory statements about Plaintiff Planet Aid, Defendants intended to, and did defame Plaintiffs Planet Aid and Lisbeth Thomsen, and caused substantial damage and harm to Planet Aid and Lisbeth Thomsen's reputation and standing in the community, particularly including government agencies, individuals and other not-for profits who might wish to participate with Planet Aid and/or Lisbeth Thomsen in programs to serve needy individuals and communities.

206.    Defendants' false and defamatory statements were made orally, in writing, and by way of electronic media, such as audio and visual recordings that were aired on public radio, and the internet.  Consistent with its stated goal of wide and even world-wide distribution of its newscasts and reports, Defendants intentionally made sure that their defamatory statements were widely and repeatedly published to third parties, including government agencies in areas in which Planet Aid and Lisbeth Thomsen have been active, including but not limited to Malawi, non-government agencies, and existing and potential partners.

- 64 -

207.    Defendants' false and defamatory statements were made knowingly, and in a calculated effort to cause harm to Plaintiffs' reputations and standing in the community, and indeed world-wide.

208.    Defendants' false and defamatory statements are libelous, slanderous and defamatory on their face.

209.    Defendants' false and defamatory statements are not privileged.

210.    Defendants' publication of knowingly, intentionally and maliciously false and defamatory statements has negatively affected, and will continue to negatively affect Plaintiffs Planet Aid and Lisbeth Thomsen in connection with their businesses and professions, including but not limited to the current and future relationships with partnerships, including the USDA and/or UNICEF and other governmental and non-governmental donors and sponsors of programs.

211.    With respect to stories about Plaintiffs Planet Aid and Lisbeth Thomsen, defendant Reveal intended that its stories would "spark action" that included trying to induce governmental agencies to cease working with Plaintiffs and/or their partners, or at least to begin investigations of Reveal's spurious allegations about Planet Aid and Lisbeth Thomsen, and eventually to drive Planet Aid out of business, and ensure that the charitable and non-profit work undertaken by both Plaintiffs would come to an abrupt end.

212.    Defendants are liable to Plaintiffs Planet Aid and Lisbeth Thomsen for defamation, including libel and slander, in an amount to be determined by the trier of fact.

## COUNT XIII
## PLACING PLAINTIFFS IN A FALSE LIGHT

### (Against all Defendants)

213.     Plaintiffs Planet Aid and Lisbeth Thomsen restate and adopt paragraphs 1 through 212, above.

214.     Defendants gave publicity to matters concerning Plaintiffs Planet Aid and Lisbeth Thomsen that placed both of them in a false light.

215.     The false light in which Plaintiffs Planet Aid and Lisbeth Thomsen was placed would be highly offensive to a reasonable person.

216.     Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which they placed Plaintiffs through the Articles and Publications, and more specifically, including but not limited to the March 19th, March 25th and May 24th Broadcast, as well as the May 14th, May 23rd, August 1st, August 8th, August 17th and August 18th Articles.

217.     As a result of the foregoing actions by Defendants placing Plaintiffs in a false light, Plaintiffs Planet Aid and Lisbeth Thomsen have both been damaged.

## COUNT XIV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

218.    Plaintiffs Planet Aid and Lisbeth Thomsen restate and adopt paragraphs 1 through 217 above.

219.    The false and defamatory statements made by Defendants, detailed above, were made for the express purpose, among other things, of inciting "action" on the part of donors, partners or businesses with whom Planet Aid and/or Lisbeth Thomsen were doing, or might do business in the future, and government agencies who had previously dealt with Plaintiffs Planet Aid and/or Lisbeth Thomsen, and who were considering, or might consider, doing business with Planet Aid and/or Lisbeth Thomsen in the future.

220.    In order to ensure that such false and defamatory action would spark adverse consequences for Plaintiff Planet Aid and Lisbeth Thomsen, Defendants sent various false and defamatory statements contained in the March 19th and 25th Broadcasts, and the May 23rd and August 1st , August 17th and August 18th Articles to business partners, donors, competitors and government agencies.

221.    Defendants took such actions for the express purpose of causing program partners and government or other donors to cease dealing with Plaintiffs Planet Aid and Lisbeth Thomsen, and in doing so, Defendants intended to, and actually did, interfere with the prospective economic advantage of Plaintiffs Planet Aid and Lisbeth Thomsen.

222.    Planet Aid intended to use those relationships and dealings and advantages with, inter alia, business partners, donors and/or government agencies for work associated with its not-

for profit activities.  As a result of Defendants' actions, Plaintiff Planet Aid and Lisbeth Thomsen have been deprived of the opportunity to engage in activities, and have been damaged by Defendants' conduct.

## COUNT XV
## UNJUST ENRICHMENT

### (Against All Defendants)

223.    Plaintiffs Planet Aid and Lisbeth Thomsen restate and adopt herein paragraphs 1 through 222, above.

224.    As a direct result of his tortious, inequitable and unlawful conduct, Defendants have been unjustly enriched at Plaintiffs Planet Aid and Lisbeth Thomsen's expense.

225.    Equity requires that Defendants make restitution to Plaintiffs Planet Aid and Lisbeth Thomsen for all property and benefits unjustly received, including but not limited to all income from the sale of the Articles and Broadcasts, including the March 19th, March 25th and May 24th Broadcasts, as well as the May 14th, May 23rd , August 1st, August 8th, August 17th and August 18th Articles, and any additional articles, broadcasts or social media subsequently published containing the false and defamatory statements detailed herein, and/or any subsidiary or ancillary rights to sales.

226.    Equity requires also that any donations received by Defendants in response to, stemming from, or generated as a result of the Articles and Broadcasts be paid to Plaintiffs as restitution.

**WHEREFORE**, the Plaintiffs Planet Aid and Lisbeth Thomsen pray that the Court:

(a) Enter judgment in Plaintiffs' favor and against Defendants Reveal, Smith and Walters in an amount in excess of $75,000, representing compensatory damages; and

(b) Enter judgment for punitive damages in Plaintiffs' favor in an amount in excess of $25 million;

(c) Enter judgment in Plaintiffs' favor and against Defendants Reveal, Smith and Walters on Count XV of the Complaint for Unjust Enrichment ordering restitution for all property and benefits unjustly received by each of them; and

(d) Award their costs and disbursements and attorney's fees incurred herein; and

(e) Award all other relief which the Court deems to be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all issues triable to a jury.

Squire Patton Boggs (U.S.) LLP
2550 M.St., N.W.
Washington, D.C. 20037
(202) 457-6321
Fax (202) 457-6315

By: _____
Samuel Rosenthal
(Bar No. 06170)
samuel.rosenthal@squirepb.com

Attorneys for Plaintiffs
Planet Aid, Inc.
Lisbeth Thomsen

Of counsel:

Clark Ervin
Aaron Knights
Stephen McHale
Mark Salzberg