IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PLANET AID, INC., et al.,      :

    Plaintiffs,          :

v.                              :

Civil Action No. GLR-16-2974

REVEAL, CENTER FOR      :
INVESTIGATIVE REPORTING, et al.,

                                  :

    Defendants.

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants', Reveal, the Center for Investigative Reporting ("Reveal"), Matt Smith, and Amy Walters, Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (ECF No. 11). Also before the Court is Plaintiffs', Planet Aid, Inc. ("Planet Aid") and Lisbeth Thomsen, Motion for Leave to File a Sur-Reply (ECF No. 15). This defamation action arises from Reveal's reporting about Planet Aid in 2016. The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2016). For the reasons outlined below, the Court will grant the Motions and transfer this case to the United States District Court for the Northern District of California.

# I.  BACKGROUND[1]

Reveal is a California-based not-for-profit news organization that conducts investigative reporting. (Pyle Decl. ¶ 8, ECF No. 11-11).[2]  Smith and Walters are Reveal staff reporters who are domiciled in California and work at Reveal's Emeryville, California offices.  (Smith Decl. ¶¶ 2-5, ECF No. 11-12; Walters Decl. ¶¶ 2-6, ECF No. 11-13).  Reveal has a website, which is supported by servers based in Emeryville.  (Pyle Decl. ¶ 7).  In the spring and summer of 2016, Reveal published on its website a series of articles and podcasts about Planet Aid; these publications are the subject of this lawsuit.  (Compl. ¶¶ 49-55, ECF No. 1).

Planet Aid is a charitable organization with operations in at least twenty-one states and affiliates in sixteen African countries.  (Id. ¶¶ 17, 19).  Planet Aid's principal place of business is Maryland.[3]  (Id.).  Planet Aid has approximately

---

[1] Unless otherwise indicated, the following facts are uncontroverted and the Court construes them in favor of jurisdiction. New Wellington Fin. Corp. v. Flagship Resort Dev. Corp., 416 F.3d 290, 294 (4th Cir. 2005) (citations omitted).

[2] A court is permitted to consider evidence outside the pleadings when resolving a Rule 12(b)(2) motion. See Section II.B.1 infra.

[3] The parties dispute where Planet Aid has its principal place of business.  The Complaint alleges Planet Aid's principal place of business is Maryland.  (Id. ¶ 17).  Defendants contend Planet Aid's principal place of business is Massachusetts.  For the purposes of Defendants' Motion, the Court infers that Planet Aid's principal place of business is Maryland.  See New Wellington, 416 F.3d at 294.

seventy-five employees between its two Maryland locations: a processing center for clothing and an office that manages partnerships and donor programs. (Neltrup Decl. ¶¶ 5, 9, 10, ECF No. 13-19).

## A.  <u>Reveal's Reporting on Planet Aid</u>

Smith and Walters investigated Planet Aid in 2015 and 2016. (<u>See</u> Walters Decl. ¶ 8; Smith Decl. ¶ 7). They traveled to New York, Washington, D.C., California, South Africa, Malawi, Mexico, and Denmark to interview people for articles they were writing about Planet Aid. (<u>Id.</u>). They also called to interview people located in other United States cities, southern and central Africa, Denmark, China, the United Kingdom, and Mexico. (<u>Id.</u>). Smith and Walters emailed two Planet Aid employees in Maryland in 2015 and 2016, requesting to set up interviews. (Lichtenberg Decl. Exs. A–C, ECF No. 13-22 through 24; Teppih Decl. ¶ 4, ECF No. 13-25). Despite these attempts, no interviews were conducted in Maryland. (Walters Decl. ¶ 8; Smith Decl. ¶ 7). Smith and Walters traveled to Maryland and photographed Planet Aid's building, but never used the photo for their stories. (<u>Id.</u>).

On March 19, 2016, Reveal published its first report on Planet Aid by posting an hour-long podcast entitled, "Alleged Cult Leader Plays Shell Game with U.S. Foreign Aid" on its website ("March 19 Podcast"). (Compl. Ex. A ["March 19

Article"], ECF No. 1-2). The March 19 Podcast stated that a Federal Bureau of Investigation report linked Planet Aid to a Danish money laundering organization called the "Teachers Group," who some describe as a cult. (Compl. Ex. G ["March 19 Podcast Transcripts"] at 8, ECF No. 1-2). The podcast described Planet Aid's activities in Africa and relationship with the Teachers Group, as well as the extent of the United States government's awareness of each. (See generally March 19 Podcast Transcripts). The March 19 Podcast asserted that Planet Aid stole money from the United States Department of Agriculture ("USDA"), directed it to other countries, and misrepresented Planet Aid employee salaries to the USDA. (Id.).

On May 28, 2016, Reveal published an update of the March 19 Podcast ("May 28 Podcast"), which included the same material as the March 19 Podcast as well as new information from an additional investigation its reporters conducted. (Compl. ¶ 55). Reveal recorded, edited, and posted the March 19 and May 28 Podcasts (collectively, the "Podcasts") in California. (Pyle Decl. ¶¶ 7, 10). The Podcasts were available for download through programs such as iTunes. (Id. ¶ 7).

On March 19, 2016 and May 23, 2016, coinciding with the release of the Podcasts, Reveal published on its website several news articles describing Planet Aid's international activities. (Compl. ¶ 51). Reveal also published other articles on its

website that mention Planet Aid (collectively, the "Articles").

(Id.). The Articles maintained that Planet Aid committed fraud and redirected to other countries 50% to 70% of the $130 million the USDA gave Planet Aid. (Id. ¶ 185). They also stated that U.S. government officials were investigating Planet Aid for fraud and tax evasion. (Id.). Smith and Walters wrote, edited, and posted the Articles in California. (Pyle Decl. ¶ 10).

**B.   NBC 4's Reporting on Planet Aid**

Apart from their own reporting for Reveal, Smith, and Walters gave an interview to a reporter with NBC's Washington D.C. affiliate ("NBC 4"), who did its own investigation into Planet Aid. (Walters Decl. ¶ 9; Smith Decl. ¶ 8). The interview took place in Reveal's Emeryville newsroom. (Id.). NBC 4 is based in Washington, D.C. (Compl. ¶ 55). The principal reporter on NBC 4's Planet Aid investigation was Tisha Thompson, a member of NBC 4's I-Team and Maryland resident. (Compl. ¶ 55; Rosenthal Decl. ¶ 28, ECF No. 13).

NBC 4 aired two television stories on Planet Aid, one on May 23, 2016 -- the same day Reveal published a series of articles on Planet Aid -- and the other on May 24, 2016 ("NBC 4 Broadcasts"). (See generally Compl. Ex. H). Also on May 24, 2016, NBC 4 published an article on its website entitled "Behind the Bins: Former Planet Aid Employees Describe 'Cult-like' Experience." (Id.). The same day, Thompson tweeted at two

Twitter users, @RoseRiverFamily and @CordellTraffic, asking where Planet Aid clothing donation boxes are located. (Rosenthal Decl. Ex. F, ECF No. 13-6). @RoseRiverFamily indicated a donation box was located in Waldorf, Maryland; @CordellPugh said there was one in Bethesda, Maryland. (Id.).

The NBC 4 Broadcasts stated that Planet Aid was a Maryland-based charity and featured a former employee who worked in one of Planet Aid's Maryland locations. (Compl. ¶ 59). The NBC 4 Broadcasts described Reveal's investigation, including Reveal's reporting that Planet Aid employees were required to contribute significant portions of their salary to the Teachers Group. (Compl. at 62). The NBC 4 Broadcasts aired a clip from Smith's interview in which she stated that Planet Aid had been putting out "fraudulent propaganda." (Pls. Opp. Mot. Dismiss at 6, ECF No. 13-27 (citing News4 at 6: Behind the Bins: What Did Planet Aid Do With Your Taxpayer Dollars?, (NBC television broadcast May 23, 2016), https://tinyurl.com/htu2lvy ["May 23 Broadcast"] at 4:11)). The NBC 4 Broadcasts asserted that Planet Aid required African villages to buy water pumps, even though the villages could not afford it. (Id. at 4:15). NBC 4 reporters encouraged viewers to stop donating clothing to Planet Aid. (Compl. ¶ 59).

C.   **Reveal's Distribution of the Reports**

In addition to posting the Podcasts on its website, Reveal syndicated the March 19 Podcast and the May 28 Podcast to more than 364 radio stations nationwide through the Public Radio Exchange ("PRX"), a distribution platform.  (Pyle Decl. ¶¶ 7, 10).  Among these radio stations were four Maryland stations that broadcasted the Podcasts: Baltimore's WYPR-FM, Frederick's W228AM, Ocean City's WRAU, and Paramount's W228AB.  (Rosenthal Decl. Ex. K, ECF No. 13-11).  Washington, D.C.'s WAMU radio station also broadcasted the Podcasts into Maryland.  (Compl. ¶ 56).  Aside from airing the March 19 Podcast and the May 28 Podcast, these five radio stations re-aired the May 28 Podcast on June 2, 2016.  (Id. ¶ 55).

Walters tweeted some of the Articles and Podcasts to Twitter users in April and June of 2016.  On April 13, 2016, American University's Career Services Twitter account tweeted a job opening for an International Development Associate position in Planet Aid's Elkridge, Maryland office.  (Rosenthal Decl. Ex. E, ECF No. 13-5).  Walters replied to the tweet on April 16, 2016 with, "@AU_SIScareers Thought you'd be interested [in] our latest podcast on @PlanetAid" and included a link to the March 19 Podcast.  (Id.).  On April 25, 2016 another Twitter user, @chipmunk07, tweeted, "Thrift shopping with me this evening at our local @planetaid!!  Come out!  #baltimore  #bmore

#baltimorecity." (Rosenthal Decl. Ex. D, ECF No. 13-4). Walters replied to the tweet similarly with, "@chipmunk07 Thought you'd be interested our latest podcast on @PlanetAid" and included a link to the March 19 Podcast.[4] (Id.). Finally, on June 12, 2016, Twitter user @LBRConsulting tweeted, "@planetaid SO IMPRESSED with store in Catonsville, MD. Clean, well[-]organized, excellent service, great deals. THANK YOU!!!!" (Rosenthal Decl. Ex. C, ECF No. 13-3). Walters replied to the tweet on June 20, 2016 with, "@LBRConsulting @planetaid Check out our Planet Aid investigation" and included a link to Reveal's website where the Articles could be found. (Id.).[5]

**D.  Procedural History**

Planet Aid and Thomsen filed the present action on August 25, 2016. (ECF No. 1). In their fifteen-count Complaint, they allege: Civil Conspiracy (Count I); Defamation (Counts II–XII); False Light (Count XIII); Tortious Interference with Prospective Economic Advantage (Count XIV); and Unjust Enrichment (Count XV). (Compl.). On October 31, 2016, Defendants moved to dismiss all Counts for lack of personal jurisdiction and improper venue. (ECF No. 11). On November 17, 2016, Plaintiffs filed an Opposition, (ECF No. 13), and on December 5, 2016, Defendants filed a Reply, (ECF No. 14). On December 7, 2016,

_____

[4] The date of this tweet is not clear from the record.
[5] It is unclear from the record which specific article or series of articles the link made available.

Plaintiffs filed a Motion for Leave to File a Sur-Reply in Opposition to the Motion to Dismiss, (ECF No. 15); it was fully briefed as of December 12, 2016. (See ECF Nos. 16, 19).

## II. DISCUSSION

### A. Motion for Leave to File Sur-Reply

"Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed." Local Rule 105.2(a) (D.Md. 2016). Typically, "[s]urreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." Khoury v. Meserve, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citing Lewis v. Rumsfeld, 154 F.Supp.2d 56, 61 (D.D.C. 2001)).

Here, the Court concludes that the moving parties, Plaintiffs, are contesting matters that Defendants presented to the Court for the first time in their Reply. Defendants, for the first time in their Reply, argue the following: (1) Walters was unaware her tweets were sent to Maryland residents; (2) PRX, rather than Defendants, distributed the Podcasts in Maryland, rendering those contacts irrelevant to the jurisdictional analysis; and (3) there should be an evidentiary hearing to resolve the state of Planet Aid's principal place of business, in the event the Court views that issue as dispositive. In their proposed Sur-Reply, Plaintiffs respond to all three of Defendants' new arguments, contending that the tweets that

Walters replied to make it clear that the Twitter users live in Maryland, PRX is Reveal's partner, and Defendants are not entitled to an evidentiary hearing. Because Plaintiffs would be unable to contest Defendants' new arguments without a Sur-Reply, the Court will grant Plaintiffs' Motion and consider the arguments in Plaintiffs' Sur-Reply when resolving Defendants' Motion to Dismiss.

## B. <u>Motion to Dismiss for Lack of Personal Jurisdiction</u>

### 1. Standard of Review

Defendants argue the Court should dismiss the Complaint because the Court lacks personal jurisdiction over them. Federal Rule of Civil Procedure 12(b)(2) governs motions to dismiss for lack of personal jurisdiction. When a non-resident defendant challenges a court's power to exercise jurisdiction, "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." <u>Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs. Inc.</u>, 334 F.3d 390, 396 (4th Cir. 2003) (citing <u>Mylan Labs., Inc. v. Akzo, N.V.</u>, 2 F.3d 56, 59-60 (4th Cir. 1993)). "Yet when, as here, the district court decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, the plaintiff need prove only a prima facie case of personal jurisdiction." <u>Mylan Labs.</u>, 2 F.3d

at 60 (citing <u>Combs v. Bakker</u>, 886 F.2d 673, 676 (4th Cir. 1989)).

In determining whether the plaintiff has proved a prima facie case of personal jurisdiction, the Court "must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." <u>Id.</u> (citing <u>Combs</u>, 886 F.2d at 676). That is, a court must draw the most favorable inferences in favor of jurisdiction. <u>New Wellington</u>, 416 F.3d at 294 (citations omitted). Additionally, a court is permitted to consider evidence outside the pleadings when resolving a Rule 12(b)(2) motion. <u>Structural Pres. Sys., LLC v. Andrews</u>, 931 F.Supp.2d 667, 671 (D.Md. 2013) (citing <u>Silo Point II LLC v. Suffolk Const. Co.</u>, 578 F.Supp.2d 807, 809 (D.Md. 2008)).

### 2. Analysis

When determining whether it has personal jurisdiction over a party, "a federal court applies the law of the state in which it sits." <u>CoStar Realty Info., Inc. v. Field</u>, 612 F.Supp.2d 660, 670 (D.Md. 2009) (citing <u>Carefirst of Md., Inc.</u>, 334 F.3d at 396). A federal district court may only exercise personal jurisdiction over a nonresident defendant when such exercise (1) is authorized under the state's long-arm statute and (2) satisfies the due process requirements of the Fourteenth Amendment to the United States Constitution. <u>Carefirst</u>, 334 F.3d at 396 (citing <u>Christian Sci. Bd. of Dirs. of the First</u>

Church of Christ v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001)).
Maryland's long-arm statute is coextensive with the limits of
personal jurisdiction set by the due process clause of the
Constitution. Mohamed v. Michael, 370 A.2d 551, 553 (Md. 1977).
But this does not mean courts may simply equate the two
analyses. Mackey v. Compass Mktg, Inc., 892 A.2d 479, 493 n.6
(Md. 2006) (holding that courts may not "dispense with analysis
under the long-arm statute."). At least one reason for this is
that there may be cases when the facts satisfy constitutional
due process but do not satisfy Maryland's long-arm statute.
Dring v. Sullivan, 423 F.Supp.2d 540, 545 (D.Md. 2006). A more
precise description of the relationship between the two
doctrines is that "to the extent that a defendant's activities
are covered by the statutory language, the reach of the statute
extends to the outermost boundaries of the due process clause."
Id. (quoting Joseph M. Coleman & Assocs., Ltd. v. Colonial
Metals, 887 F.Supp. 116, 118-19 n.2 (D.Md. 1995).

Here, the Court concludes that even if Maryland's long-arm
statute authorizes personal jurisdiction over Defendants,
exercising personal jurisdiction over Defendants does not
satisfy the due process requirements of the Fourteenth
Amendment. Under the Due Process Clause of the Fourteenth
Amendment, while a nonresident defendant's physical presence
within the forum state is not required for the court to exercise

personal jurisdiction, the defendant must generally have sufficient "minimum contacts" so that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Walden v. Fiore, 134 S.Ct. 1115, 1121 (2014) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted).

The defendant's contacts may form the basis of general or specific jurisdiction. With general jurisdiction, the defendant's contacts with the state are not the basis for the suit and the "jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state." Carefirst, 334 F.3d at 397. Conversely, with specific jurisdiction, the defendant's contacts form the basis of the suit. Id. Here, Defendants' contacts with Maryland arose from their stories about Planet Aid, and those stories form the basis of this action. Thus, the Court must determine whether Plaintiffs have proved a prima facie case of specific jurisdiction. See Mylan Labs., 2 F.3d at 60 (citing Combs, 886 F.2d at 676).

The United States Court of Appeals for the Fourth Circuit has developed a three-prong test for specific jurisdiction in which the Court considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the

plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Consulting Eng'rs, 561 F.3d at 278 (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)). The Fourth Circuit cautions courts to examine the quality and nature of the contacts rather than "merely . . . count the contacts and quantitatively compare this case to other preceding cases." Carefirst, 334 F.3d at 397 (quoting Nichols v. G.D. Searle & Co., 783 F.Supp. 233, 238 (D.Md. 1992)). When claims arise out of a single contact, that single contact may be sufficient to create jurisdiction as long as exercising jurisdiction would not offend "fair play and substantial justice." Id. (citing Nichols, 783 F.Supp. at 238).

Plaintiffs assert specific jurisdiction exists for two reasons -- first, Planet Aid suffered the most injury in Maryland, and second, Defendants and third parties had sufficient minimum contacts with Maryland. The Court considers these arguments in turn.

### a. Planet Aid's Injury in Maryland from Defendants' Allegedly Tortious Conduct

Plaintiffs argue that Maryland's interest in exercising jurisdiction over parties that commit torts within it warrants exercising jurisdiction here, relying on Keeton v. Hustler

Magazine, Inc., 465 U.S. 770 (1984). Plaintiffs misread Keeton.
The Court in Keeton found that specific jurisdiction was present
because of defendant National Inquirer's "regular circulation of
magazines in the forum State," New Hampshire. 465 U.S. at 773–
74. Keeton cited New Hampshire's "significant interest in
redressing injuries" that occurred there, but only in response
to the lower court's view that jurisdiction was not present
because of New Hampshire's "minimal" interest. Id. at 775–76.
Here, there are no allegations before the Court that Defendants
circulate their articles or podcasts in Maryland regularly.[6]
Thus, the Court will not exercise specific jurisdiction over
Defendants simply because Planet Aid allegedly suffered the most
injury in Maryland.

### b. Contacts with Maryland

Plaintiffs argue that two sets of contacts support the
exercise of specific jurisdiction. First, Plaintiffs offer
contacts made by third parties in an alleged conspiracy with
Defendants, and second, contacts made by Defendants themselves.
The Court considers these contacts in turn.

---

[6] Of course, Plaintiffs point to the five radio stations
that may broadcast Reveal's podcasts in Maryland from PRX. As
the Court will describe below, however, the Court cannot impute
PRX's contacts with Maryland to Defendants. See Section
II.B.2.b.i infra.

### i.  Conspiracy Theory of Jurisdiction

Defendants argue that because some contacts supporting jurisdiction are contacts that third parties -- PRX, NBC 4, and Thompson -- made with Maryland, they cannot support specific jurisdiction over Defendants.  Plaintiffs argue that under the "conspiracy theory" of jurisdiction, the actions of PRX, NBC 4, and Thompson may be imputed onto Defendants for the purposes of personal jurisdiction.  The Court concludes that applying the conspiracy theory of jurisdiction here does not comport with the Constitution's due process requirements.

Under Maryland law, a court may exercise personal jurisdiction over a defendant involved in a conspiracy when "a co-conspirator performs jurisdictionally sufficient acts in furtherance of the conspiracy."  Wings to Go, Inc. v. Reynolds, No. CCB-15-2556, 2016 WL 97833, at *2 (D.Md. Jan. 8, 2016) (citing Mackey v. Compass Mktg., Inc., 892 A.2d 479, 487 (2006)).  When analyzing whether exercising jurisdiction over a defendant under the conspiracy theory of jurisdiction comports with due process requirements, the "pertinent question" is whether a defendant "has fair warning that his participation could subject him to the jurisdiction of a foreign forum." Wings to Go, 2016 WL 97833, at *4 (quoting Compass Mktg., Inc. v. Schering-Plough Corp., 438 F.Supp.2d 592, 596 (D.Md. 2006)) (internal quotation marks omitted).  "[T]his question is

answered by the very nature of a conspiracy theory." Id.
(quoting Compass Mktg., 438 F.Supp.2d at 596) (internal
quotation marks omitted). For the court to exercise
jurisdiction under the conspiracy theory, a defendant must have
had a "reasonable expectation, at the time the [defendant]
agreed to participate in the conspiracy, that acts to be done in
furtherance of the conspiracy by another co-conspirator would be
sufficient" to subject the co-conspirator to personal
jurisdiction in the forum. Compass Mktg., 438 F.Supp.2d at 596
(citing Mackey, 892 A.2d at 487).

Here, the Court concludes that Defendants could not have
had a reasonable expectation that, when partnering with PRX to
air stories about Planet Aid, airing those stories would be
enough to subject PRX to personal jurisdiction in Maryland. It
is undisputed that PRX distributed the Podcasts to over 364
radio stations across the United States. (Pyle Decl. ¶¶ 7, 10).
Defendants could not have had a reasonable expectation that
PRX's nationwide distribution of the Podcasts would be
sufficient to subject PRX to personal jurisdiction in Maryland
merely because five of those 364 radio stations would broadcast
the Podcasts into Maryland.

Plaintiffs rely primarily on Calder v. Jones, 465 U.S. 783
(1984), to argue that in defamation actions, nationwide
distribution of the defamatory material still supports personal

jurisdiction in a particular forum.[7]  Plaintiffs' reliance on
Calder is misplaced.

In Calder, the Court concluded that jurisdiction over
defendants existed in California because "California [was] the
focal point both of the story and of the harm suffered."  465
U.S. at 789.  Yet unlike in Calder, where the allegedly libelous
story "concerned the California activities of a California
resident," here, the Podcasts did not focus on Maryland and
instead focused on Planet Aid's international dealings, with
only incidental concern for Planet Aid's activities in Maryland.
See 465 U.S. at 788.  The Podcasts focused on Planet Aid's
relationship with the Teachers Group -- a Danish organization --
accused Planet Aid of stealing and redirecting money from the
USDA to other countries, and described Planet Aid's activities
in Africa.  (See generally March 19 Podcast Transcripts).
Indeed, the title of the March 19 Podcast was, "Alleged Cult
Leader Plays Shell Game with U.S. Foreign Aid."  (March 19
Article at 1).  And unlike in Calder, where the allegedly
libelous story "was drawn from California sources," the Podcasts

_____

[7] Plaintiffs rely on Calder to argue generally in favor of
exercising personal jurisdiction over Defendants, rather than in
favor of exercising jurisdiction over Defendants under the
conspiracy theory of jurisdiction.  Because their argument
addresses whether Defendants could reasonably expect the Court
to exercise personal jurisdiction over PRX, the Court will
consider Plaintiffs' argument under the conspiracy theory of
jurisdiction.

were drawn from a variety of sources in addition to Maryland sources. See 465 U.S. at 788–89. Smith and Walters interviewed sources from across the United States and several countries. (See Walters Decl. ¶ 8; Smith Decl. ¶ 7). Because Defendants could not have reasonably expected that partnering with PRX would subject PRX to personal jurisdiction in Maryland, the Court will not impute PRX's contacts with Maryland to Defendants.

The Court further concludes that Defendants could not have had a reasonable expectation that, when partnering with NBC 4 to air stories about Planet Aid, airing those stories would be enough to subject NBC 4 to personal jurisdiction in Maryland. NBC 4 is a television station that is based in Washington, D.C. and aired the two NBC 4 Broadcasts from Washington, D.C. (Compl. ¶ 55). Defendants, therefore, could not have had a reasonable expectation that airing the NBC 4 Broadcasts from Washington, D.C. would subject NBC 4 to jurisdiction in Maryland simply because the two NBC 4 Broadcasts could also be viewed in Maryland.

Plaintiffs rely on Calder for the proposition that even if a party circulates allegedly defamatory statements nationwide, a court can exercise personal jurisdiction over the party as long as the party circulates the statements in the court's forum. Plaintiffs interpret Calder too broadly. In Calder, the Court

19

found that jurisdiction existed not simply because the defendants circulated the allegedly defamatory statements in California, but because "California [was] the focal point both of the story and of the harm suffered." 465 U.S. at 789. Here, like with the Podcasts, Maryland was not the focal point of the NBC 4 Broadcasts. While the NBC 4 Broadcasts acknowledge that Planet Aid is a Maryland-based charity and featured a former Maryland employee, (Compl. ¶ 59), the focus of the stories was on Reveal's investigation into Planet Aid's relationship with the Teachers Group and Reveal's allegations that Planet Aid was misusing USDA money. (See generally May 23 Broadcast). The NBC 4 Broadcasts also asserted Planet Aid was requiring African villages to buy water pumps from it that they could not afford. (May 23 Broadcast at 4:15). Because Defendants could not have reasonably expected that partnering with NBC 4 would subject NBC 4 to personal jurisdiction in Maryland, the Court will not impute NBC 4's contacts with Maryland to Defendants.[8]

In sum, the Court will not impute PRX's or NBC 4's contacts with Maryland to Defendants because applying the conspiracy theory of jurisdiction here does not comport with the

_____

[8] Defendants, moreover, could not have had a reasonable expectation that, when partnering with Thompson to report on Planet Aid, Thompson's tweets would subject Thompson to personal jurisdiction in Maryland. For reasons the Court will describe infra, even assuming that the Twitter users reside in Maryland, Thompson's tweets are insufficient minimum contacts between Defendants and Maryland.

Constitution's due process requirements. Accordingly, the Court will consider only Defendants' own contacts with Maryland.

### ii. Defendants' Contacts with Maryland under _Calder_'s "Effects Test"

Plaintiffs' remaining two arguments in favor of exercising jurisdiction are based on the "effects test" established by _Calder_ and its progeny. Under that test, the plaintiff must show that:

> (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.

_Consulting Engineers Corp. v. Geometric Ltd._, 561 F.3d 273, 280 (4th Cir. 2009) (quoting _Carefirst_, 334 F.3d at 398 n.7) (internal quotation marks omitted).

Plaintiffs make two arguments based on the effects test. First, Plaintiffs argue that Smith and Walters's virtual contact with Maryland residents is sufficient for the Court to exercise specific jurisdiction over Defendants. Plaintiffs highlight that Walters tweeted the Podcasts and the Articles at Twitter users who appear to reside in Maryland, that Walters replied to a tweet advertising a job opening in Planet Aid's Elkridge, Maryland office with a link to the March 19 Podcast, and that Walters and Smith emailed Maryland residents as part of their

investigation.  Defendants argue that the Twitter users may not be Maryland residents and that the virtual contact is insufficient for the Court to exercise specific jurisdiction. Because Plaintiffs must prove only a prima facie case of jurisdiction, requiring the Court to make all inferences in favor of jurisdiction, the Court infers that the Twitter users are Maryland residents.[9]  See Mylan Labs., 2 F.3d at 60 (citing Combs, 886 F.2d at 676); see also New Wellington, 416 F.3d at 294 (citations omitted).  The Court still concludes, however, that Smith and Walters's virtual contact with Maryland residents is insufficient for the Court to exercise specific jurisdiction.

Plaintiffs rely mostly on First American First, Inc. v. National Association of Bank Women, 802 F.2d 1511 (4th Cir. 1986), for the proposition that even when a defamatory statement is distributed nationwide, sending the statement to persons in the forum state is sufficient for that state to exercise jurisdiction under the effects test.  Plaintiffs overlook that the court in First American First found that jurisdiction existed not simply because the defendant sent the defamatory

_____

[9]  The Court makes this inference because these two tweets suggest that the Twitter user who posted the tweet was present in Maryland at the time of the post.  (See Rosenthal Decl. Ex. D-1) ("Thrift shopping with me this evening at our local @planetaid!!  Come out!  #baltimore  #bmore  #baltimorecity.") (emphasis added); Rosenthal Decl. Ex. C ("@planetaid SO IMPRESSED with store in Catonsville, MD.  Clean, well[-]organized, excellent service, great deals. THANK YOU!!!!") (emphasis added)).

statement to persons in the forum state, Virginia, but also because the plaintiff lived and worked in Virginia, and all the officers and activities of his business -- which was incorporated in Virginia -- resided and took place in Virginia, respectively. First Am. First, 802 F.2d at 1516–17.

Plaintiffs further overlook that district courts have later observed, "[s]ince New American . . . the Fourth Circuit has seemed to require more than the Calder 'effects-test' to hold exercises of jurisdiction over foreign tortfeasors constitutional." Cole-Tuve, Inc. v. Am. Mach. Tools Corp., 342 F.Supp.2d 362, 367 (D.Md. 2004); see also, e.g., Chattery Int'l, Inc. v. JoLida, Inc., No. WDQ-10-2236, 2011 WL 1230822, at *16 (D.Md. Mar. 28, 2011) ("The Fourth Circuit has interpreted the 'effects' test narrowly."). The Fourth Circuit requires that for a state to exercise jurisdiction, the plaintiff must not only feel the alleged injury there, but also those injuries "must ultimately be accompanied by the defendant's own contacts with the state." Consulting Engineers Corp., 561 F.3d at 281 (quoting ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997)) (internal quotation marks omitted). The Supreme Court later endorsed this interpretation of the effects test. See Walden, 134 S. Ct. at 1125 (". . . Calder made clear that mere injury to a forum resident is not a sufficient connection to the forum.").

The Court concludes that the Fourth Circuit's test in <u>ALS Scan, Inc. v. Digital Serv. Consultants, Inc.</u>, 293 F.3d 707 (4th Cir. 2002), is most appropriate. In <u>ALS Scan</u>, the Fourth Circuit adapted the effects test to the Internet context. <u>See Young v. New Haven Advocate</u>, 315 F.3d 256, 263 (4th Cir. 2002) ("In <u>ALS Scan</u> we went on to adapt the traditional standard . . . for establishing specific jurisdiction so that it makes sense in the Internet context."); <u>see also Zippo Mfg. Co. v. Zippo Dot Com, Inc.</u>, 952 F.Supp. 1119 (W.D.Pa. 1997) (first applying the test <u>ALS Scan</u> later adopted). In that context, the plaintiff must show that the defendant "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." <u>Carefirst</u>, 334 F.3d at 399 (quoting <u>ALS Scan</u>, 293 F.3d at 714).

Here, Walters tweeted the Podcasts and the Articles at Twitter users who reside in Maryland, and Walters replied to a tweet advertising a job opening in Planet Aid's Elkridge, Maryland office with a link to the March 19 Podcast. (Rosenthal Decl. Exs. C through E). In addition, Walters and Smith emailed two Maryland residents as part of their investigation. (Lichtenberg Decl. Exs. A–C; Teppih Decl. ¶ 4).

On one hand, this virtual contact does direct electronic activity into Maryland under <u>ALS Scan</u>'s first prong. On the other hand, it is far less clear whether the virtual contact here is enough to satisfy the first prong. Courts in the Fourth Circuit have applied <u>ALS Scan</u> and its progeny only to websites themselves -- not <u>sending</u> links to website content over the Internet and making other virtual contacts directly with residents of a forum state.[10] In fact, the Supreme Court in <u>Walden</u> left the very issue of virtual contacts open. <u>See</u> 134 S.Ct. at 1125 n.9 ("[T]his case does not present the very different questions whether and how a defendant's virtual 'presence' and conduct translate into 'contacts' with a particular State . . . We leave questions about virtual contacts for another day.").

Generally, for a court to exercise specific jurisdiction consistent with due process, "the defendant's suit-related conduct must create a <u>substantial connection</u> with the forum State." <u>Walden</u>, 134 S. Ct. at 1121 (emphasis added); <u>see also</u> <u>Young</u>, 315 F.3d at 263 (holding that when a defendant posts news

---

[10] The parties do not offer any cases where non-residents sent website content or made other virtual contacts directly to residents of a forum state. After its own exhaustive search, the most similar case the Court found was <u>Dring v. Sullivan</u>, 423 F.Supp.2d 540 (D.Md. 2006). In <u>Dring</u>, the non-resident defendant sent an allegedly defamatory email to an email listserv with several dozen members. 423 F.Supp.2d at 542-43. Only about four percent of the listserv's members were Maryland residents, however. <u>Id.</u> at 548.

articles on a website, the first and second prongs of the ALS Scan test require the plaintiff to show that the Internet newspaper purposefully directed electronic activity "in a substantial way to the forum state" (quoting Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1321 (9th Cir. 1998) (emphasis added)). The defendant's contacts "must have been so substantial that 'they amount to a surrogate for presence and thus render the exercise of sovereignty just.'" Consulting Engineers, 561 F.3d at 277-78 (quoting ESAB Group, 126 F.3d at 623). But to be sure, the connection "need not be as extensive as is necessary for general jurisdiction." ESAB Group, 126 F.3d at 625.

Because a substantial connection is required, before the advent of the Internet, courts in the Fourth Circuit held that communications made by non-residents from outside of Maryland to a Maryland resident, alone, are insufficient to exercise jurisdiction. Leather Masters (PVT), Ltd. v. Giampier Ltd., 836 F.Supp. 328, 331 (D.Md. 1993) (citing Craig v. General Fin. Corp., 504 F.Supp. 1033, 1038 (D.Md. 1980). For example, in Leather Masters, the defendant's "correspondence, telephone conversations, and [fax] communications" with the plaintiff's agent in Maryland were insufficient to establish jurisdiction consistent with due process. Id. Similarly, "occasional telephonic requests for information from Maryland-based

26

investigation services over a period of years" have been insufficient as well. Stover v. O'Connell Assocs., Inc., 84 F.3d 132, 137 (4th Cir. 1996); see also Russell v. Med. Bus. Bureau, LLC, No. RDB-12-2983, 2013 WL 3805118, at *3 (D.Md. July 19, 2013) (concluding that one telephone conversation the plaintiff initiated with the defendant was insufficient to establish jurisdiction).

The Court concludes that these pre-Internet cases involving communications made from outside Maryland to Maryland residents also apply to the virtual contacts here. Thus, Smith and Walters's virtual contact is insufficient for the Court to exercise jurisdiction consistent with due process because they do not establish a substantial connection with Maryland. Sending three tweets and four emails related to the Podcasts and the Articles over a period of a year and a half are not "so substantial that 'they amount to a surrogate'" for Smith and Walters's presence in Maryland. See Consulting Engineers, 561 F.3d at 277–78 (quoting ESAB Group, 126 F.3d at 623). In the same way that occasional telephonic requests for information, mail correspondence, or fax communication from outside of Maryland to Maryland residents, is insufficient to exercise jurisdiction, so, too, are Walters' tweets on two or three

different days[11] from California, or Smith and Walters's occasional email requests for interviews from California, to Maryland residents.  See Leather Masters, 836 F.Supp. at 331; see also Stover, 84 F.3d at 137.  Because Smith and Walters's virtual contacts are insufficient to demonstrate a substantial connection with Maryland, the Court will not exercise specific jurisdiction over Defendants on this basis.[12]

Turning to Plaintiffs' second argument based on the effects test, Plaintiffs argue that Planet Aid's principal place of business in Maryland, the Podcasts and the Articles' focus on Maryland, and their reliance on Maryland sources, together, satisfy the effects test.  The Court disagrees.

In making this second argument, Plaintiffs rely heavily on analogizing the present case to Calder to argue that Defendants' contacts satisfy the effects test.  To review, the Supreme Court in Calder held that jurisdiction over defendants existed in California because "California [was] the focal point both of the

_____

[11] Walters sent one tweet on April 16, 2016 and a second one on June 20, 2016.  (Rosenthal Decl. Exs. C, E).  It is unclear from the record when Walters sent the third tweet.  (See Rosenthal Decl. Ex. D).

[12] For the aforementioned reasons, the Court further concludes that Thompson's tweets to Maryland residents are insufficient for the Court to exercise jurisdiction consistent with due process.  On, May 24, 2016, Thompson tweeted at two Twitter users, @RoseRiverFamily and @CordellTraffic, asking where Planet Aid clothing donation boxes are located. (Rosenthal Decl. Ex. F).  Like Walters's tweets, Thompson's two tweets related to the NBC 4 Broadcasts sent on the same day do not demonstrate a substantial connection with Maryland.

story and of the harm suffered." 465 U.S. at 789. Even assuming that Planet Aid's principal place of business is in Maryland -- making Maryland arguably the focal point of the harm suffered -- as explained above, Maryland was not the focus of the Podcasts and the Articles. The focus of the Podcasts and the Articles was Planet Aid's relationship with the Teachers Group and allegations of Planet Aid defrauding the USDA, with only incidental concern for Planet Aid's activities in Maryland. And as explained above, the Podcasts and the Articles were not drawn only, or even primarily, from Maryland sources, but from a variety of sources from across the United States and several countries in addition to Maryland. Thus, the Court concludes that Plaintiffs fail to satisfy the effects test and will not exercise jurisdiction over Defendants on this basis.

In sum, the Court concludes that Plaintiffs failed to establish a prima facie case in favor of jurisdiction based on the conspiracy theory of jurisdiction or the effects test. Accordingly, the Court further concludes that exercising jurisdiction over Defendants does not comport with due process and the Court will grant Defendants' Motion.

### c. Venue

Because Plaintiffs have not made a prima facie showing that the Court possesses personal jurisdiction over Defendants, the Court must either dismiss the case so that Plaintiffs may re-

file in a more appropriate jurisdiction, or transfer the case to another district court "if it be in the interest of justice." 28 U.S.C. § 1406(a); see, e.g., Broadnax Bey v. Pedersen, No. DKC 15-3073, 2016 WL 3181763, at *4 (D.Md. June 8, 2016). The Fourth Circuit has read § 1406(a) to authorize "transfer 'for any reason which constitutes an impediment to a decision on the merits in the transferor district but would not be an impediment in the transferee district.'" Broadnax Bey, 2016 WL 3181763, at *4 (quoting Estate of Bank v. Swiss Valley Farms Co., 286 F.Supp.2d 514, 522 (D.Md. 2003)). Lack of jurisdiction is one such "impediment," and whether to dismiss or transfer an action under § 1406(a) is within the district court's discretion. Id. (citing Bank, 286 F.Supp.2d at 522).

Here, Defendants argue that the case should be transferred to the United States District Court for the Northern District of California. The Court agrees. Reveal, Smith, and Walters are California citizens. (Pyle Decl. ¶ 5, Smith Decl. ¶¶ 2-5; Walters Decl. ¶¶ 2-6). They work out of offices in Emeryville, California. (Smith Decl. ¶ 2; Walters Decl. ¶ 2). Reveal recorded the Podcasts, wrote the Articles, and edited and posted both in Emeryville. (Pyle Decl. ¶¶ 7, 10). The Podcasts and the Articles were posted on Reveal's website, which is supported by servers in Emeryville. (Pyle Decl. ¶ 7). Thus, the Court will exercise its discretion under § 1406(a) to transfer the

case to the Northern District of California, where personal
jurisdiction and venue are proper.

### III. CONCLUSION

For the foregoing reasons, the Court will GRANT Plaintiffs'
Motion for Leave to File a Sur-Reply (ECF No. 15) and GRANT
Defendants' Motion to Dismiss for Lack of Personal Jurisdiction
and Improper Venue (ECF No. 11). The Court will TRANSFER this
case to the United States District Court for the Northern
District of California. A separate Order follows.

Entered this 26th day of June, 2017

/s/
_____
George L. Russell, III
United States District Judge