# EXHIBIT A

**Pages 1 - 56**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

| | | |
|---|---|---|
| PLANET AID, INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| VS. | ) | **NO. CV 17-03695-MMC** |
| | ) | |
| REVEAL, CENTER FOR | ) | |
| INVESTIGATIVE REPORTING, ET | ) | |
| AL., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Friday, October 27, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        SQUIRE PATTON BOGGS (US) LLP
        2550 M Street, NW
        Washington, DC  20037
        **BY: SAMUEL ROSENTHAL, ESQUIRE**

        SQUIRE PATTON BOGGS (US) LLP
        275 Battery Street - Suite 2600
        San Francisco, CA  94111
        **BY: MATTHEW F. MILLER, ESQUIRE**
        **TANIA L. RICE, ESQUIRE**

For Defendants:

        DAVIS WRIGHT TREMAINE LLP
        505 Montgomery Street - Suite 800
        San Francisco, CA 94111
        **BY: THOMAS R. BURKE, ESQUIRE**

Reported By:      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporter

<u>**Friday - October 27, 2017**</u>                                    **9:00 a.m.**

                    P R O C E E D I N G S

                         ---000---

          **THE CLERK:**  Calling CV 17-3695, Planet Aid, Inc., et

al. vs. Reveal Center for Investigative Reporting, et al.

     Will counsel please step forward and state your

appearances for the record.

          **THE COURT:**  Good morning.

          **MR. ROSENTHAL:**  Good morning, Your Honor.  Sam

Rosenthal from Squire Patton Boggs for the plaintiffs.

          **THE COURT:**  Thank you.  Anyone else you want to

introduce at counsel table?

          **MR. MILLER:**  Good morning, Your Honor.  Matthew Miller

from Squire Patton Boggs for the plaintiffs.

          **MS. RICE:**  Good morning, Your Honor.  Tania Rice from

Squire Patton Boggs for the plaintiffs.

          **THE COURT:**  Thank you.

     And for the defendants.

          **MR. BURKE:**  Good morning, Your Honor.  Thomas Burke

from Davis Wright Tremaine on behalf of Reveal for the Center

for Investigative Report, Amy Walters and Matt Smith.

          **THE COURT:**  Should we refer to your clients as *Reveal*?

Or what's the easiest?

          **MR. BURKE:**  That's fine, Your Honor.

          **THE COURT:**  Okay.  All right.  So what we have here,

3

1   Counsel, as you well know, is the plaintiffs' motion to

2   re-transfer the case.  Sure, I'd love to send you back to

3   Maryland and that would be the end of my troubles with your

4   particular litigation, but there's a pretty high burden here.

5       I think that the courts really don't want to see cases

6   pinballing around the country essentially or even back and

7   forth, so there see to be two different aspects that I just

8   want to get clear at the beginning so when we're discussing it.

9       One is that I'm essentially reviewing what Judge -- I want

10  to call him Russell.

11           **MR. BURKE:**  Russell.

12           **THE COURT:**  Russell.  I was thinking wait a minute, is

13  that his first name?

14       -- Judge Russell did, and in order to really find that

15  essentially blew it, I've got to find that there's clear error

16  in what he did, not just okay, maybe somebody might do it

17  differently, a couple of courts might have done it differently,

18  but can you really say this is just totally wrong.  All right.

19  The other aspect -- which is a pretty high burden, no matter

20  how you package up everything that you've got.  This is not an

21  easy road for the plaintiff to get to the end to.

22       The other is whether irrespective of whatever

23  Judge Russell did, new information has come up, and apparently

24  because the case is here, unlike if it hadn't moved and you

25  would make a motion for reconsideration in front of

Judge Russell, you know, and say, look, new evidence has come

up that could change things; we had no way to know about it

before.  I'm not sure what the Maryland, maybe, district court

rule is.  We have one that you can't just come back and say, "I

want to do it over."  There has to be new law or new evidence

you couldn't find before or something of that nature.

But if you were still there, you'd go back to Judge

Russell, but I guess the idea is that's too cumbersome.  The

case isn't there for that purpose, so you essentially move in

front of me to reconsider what he did.  Okay.  And that's a

whole new ballgame, in effect, separate from the idea of

reviewing what he did in the first instance.  Either one could

work or both could work together; right?

**MR. ROSENTHAL:**  Yes.

**THE COURT:**  All right.  But it's still pretty hard,

and I just want to make that point because no matter how one

might want to sort of pick apart and say maybe this isn't --

maybe he didn't say this as well as he could -- and it's clear

he made an effort to do a very thorough order.  It's not

slapdash by any means, so I just wanted to say that at the

beginning and maybe to ask you, what do you think *clear error*

means?

**MR. ROSENTHAL:**  If I may go first, Your Honor?

**THE COURT:**  Sure.

**MR. ROSENTHAL:**  Thank you.

1    There really are three standards that apply.  One standard

2  is if you're simply reviewing the judge in Maryland, it would

3  be clearly erroneous standard, and clearly erroneous is a high

4  burden.  There is no question about it.  And we do think we

5  meet that standard.

6    But there are two others that apply.  Where you have new

7  evidence --

8         **THE COURT:**  Yes, I know.  I just discussed that.

9         **MR. ROSENTHAL:**  That's why I want to emphasize,

10  Your Honor, I agree with you entirely that that changes it

11  quite dramatically, and let me explain why I believe that to be

12  the case.

13         **THE COURT:**  I'm not arguing.  I've just got one

14  question.

15    By the way, Counsel, you don't have to stand through this

16  whole thing.

17         **MR. MILLER:**  Thank you, Your Honor.

18         **THE COURT:**  We will keep Mr. Rosenthal up here on his

19  feet, and then, of course, if Mr. Burke wants to rest while

20  Mr. Rosenthal -- but we may go back and forth so maybe to save

21  you travel time, if you stay right here, it's probably better.

22         **MR. BURKE:**  I'm just fine.

23         **THE COURT:**  I didn't really want to get too much into

24  the merits right away.  I recognize there are two different

25  instances in the sense that -- and you may want to combine them

1  and say well, when you get close here to being a problem and

2  then they had this new thing -- but first I just want to ask

3  you, what do you think *clearly erroneous* means?

4        **MR. ROSENTHAL:**  I think *clearly erroneous* means there

5  is a factual finding which is inconsistent with the facts that

6  are in the record and there is no contrary information.  And if

7  I could, I could give Your Honor three examples.

8        **THE COURT:**  Okay.  Are you talking about this case

9  or -- I'm only talking hypothetically.

10       **MR. ROSENTHAL:**  Oh, I was talking about this case.

11  And it does get into the merits --

12       **THE COURT:**  I'm talking hypothetically.

13       **MR. ROSENTHAL:**  But I could talk about why I think

14  there is clear error, why three factual findings are clearly

15  erroneous.

16       **THE COURT:**  First I want to find out, as I said, what

17  is the definition of *clear error*, and then you can plug in

18  whatever you've got here and say it meets that definition.

19       Now, there are certain examples where you could find if

20  clear error -- not necessarily here, but you wouldn't have any

21  problem if somebody picks the wrong statute of limitations or

22  something that you've just got a very clear law that somebody

23  has just read wrong or something.  That could easily be clear

24  error.

25       Then you could have that somebody has made a factual

1  finding that is inconsistent with what somebody said, for

2  example.  So someone says okay, I find nobody was negligent

3  because the plaintiff said the light was green for the

4  defendant when in fact if you look at the transcript, the

5  plaintiff said the light was red for the defendant.  It's an

6  intersection accident.  I want to stay away from our case for a

7  minute.

8      Then could have where you have more of a -- I guess you

9  could say toting up of facts, which is what we have here, where

10  you're building a structure, so to speak, of why -- you're kind

11  of building a house for these defendants right there in

12  Maryland and you're going to show brick by brick by brick why

13  they belong in that house and not living out here in

14  California.  And that is a little harder to do.  You may do it.

15  I'm not saying you can't.  I'm just saying it's harder.

16      Now you're on.

17      **MR. ROSENTHAL:**  Your Honor, let me do it

18  hypothetically, and then if you'd like, I can talk about this

19  case specifically.

20      **THE COURT:**  Well, yeah.  I moved from hypothetical.

21  You want to go back to hypothetical, be my guest.

22      **MR. ROSENTHAL:**  *Clear error* to me -- and I think in

23  the context of this case -- can mean two things.  One, you got

24  the facts wrong; that there facts in the record that are

25  undisputed that are contrary to the findings made by the court.

1    **THE COURT:**  Oh, ho, that's not facts wrong; that's

2    finding wrong.

3    **MR. ROSENTHAL:**  Correct, Your Honor.  Thank you for

4    that, Your Honor.  Absolutely.

5    **THE COURT:**  You don't have to thank me.  I'm just

6    saying.

7    **MR. ROSENTHAL:**  That's exactly what I meant to say.

8    **THE COURT:**  Really?  Okay.

9    **MR. ROSENTHAL:**  Two --

10   **THE COURT:**  All right.

11   **MR. ROSENTHAL:**  -- you got the law wrong and you

12   failed to follow controlling authority, and we think, for

13   example, failure to follow *Calder* by the Supreme Court, failure

14   to follow *Keeton* by the Supreme Court, failure to follow other

15   decisions would be clearly erroneous because the legal standard

16   that was applied is inconsistent with binding precedent.  That

17   would be clearly erroneous as well.

18   **THE COURT:**  Are you saying Judge Russell didn't

19   understand *Calder* or cited it for a proposition it didn't stand

20   for or *Keeton*, or just that when he applied it to the facts of

21   our case, he came up with an answer different than you wanted

22   him to?

23   **MR. ROSENTHAL:**  Yes.  I do think that he -- with all

24   due respect to Judge Russell, I think he got it wrong and that

25   is he misapplied and did not understand *Keeton* and *Calder*.

1   **THE COURT:**  They're pretty straightforward, don't you

2   think?

3   **MR. ROSENTHAL:**  I think they are.

4   **THE COURT:**  He had the ability to understand them --

5   **MR. ROSENTHAL:**  I think they are.  And what they both

6   hold is that if there is distribution in the forum, it doesn't

7   matter if there's also nationwide distribution.

8   **THE COURT:**  Well, sure.  If somebody directed their

9   tortious conduct toward the forum state and had a bunch of

10  other stuff that was floating around on the periphery and also

11  did, that doesn't cancel it out.  It's just surplusage.

12  But first you've got to have whatever that core is before

13  you can say that there's enough there, as I read the cases --

14  that you have to have targeting effectively of the forum state

15  and harm in the forum state.

16  You've got harm.  I understand that.  They described their

17  harm.

18  The real issue here and what we're focusing on is

19  targeting.  Okay.  All right.  So the plaintiffs say you guys

20  were out to get my client in Maryland.  All you wanted to do

21  was embarrass them in Maryland, and the defendant says look,

22  this national story, it's an international story, we're all

23  over the world with this, stuff scattered down into Maryland,

24  but it's not what we were trying to do specifically.  So

25  there's your case.

1          **MR. ROSENTHAL:**  So in that context, in that framework,

2     the judge makes a finding, which I believe is incorrect.  He

3     says --

4          **THE COURT:**  Hang on a minute.  Let me get his

5     decision.

6          **MR. ROSENTHAL:**  Okay.

7          **THE COURT:**  Okay.  So then I can follow you.

8          One of the problems, by the way -- and I gather this is

9     the practice in Maryland -- nobody uses numbered lines.  So now

10    you can't say "see page 3, line 24 to 26."  You're going

11    somewhere on one of these pages we've got an answer.  Okay.

12         What page are you on?

13         **MR. ROSENTHAL:**  I'm referring to the brief in which --

14         **THE COURT:**  Oh, the brief.

15         **MR. ROSENTHAL:**  The brief at page 13.

16         **THE COURT:**  Okay.  Wait, wait, wait, wait, wait.  I've

17    got that, too.

18         Ordinarily I wouldn't let you give me papers that are

19    printed double-sided, but in this instance, I did and just put

20    them in a binder so it could be read.

21         **MR. ROSENTHAL:**  Thank you.

22         **THE COURT:**  Okay.  And -- because it was pretty

23    voluminous so it just made it easier for everybody.

24         Okay.  Now we're looking at whose brief?  Opposition

25    brief?

1      **MR. ROSENTHAL:**  We're looking at the opposition brief

2  at page 13.

3      **THE COURT:**  Okay.  All right.  One second.  Let me get

4  to that.  All right.

5      This is the page that has footnote 10 at the bottom;

6  right?  Is that footnote 10 at the bottom?  I just want to make

7  sure I'm on the right page.  I'm in the opposition brief that

8  was filed November 17 of last year.  Are we talking about a

9  year ago?  Are you talking about their brief in our case?

10      **MR. ROSENTHAL:**  Yes.

11      **THE COURT:**  Oh, oh, oh, oh.  Wait, wait.  Don't say

12  anything.  I'm in the brief from Maryland.

13      **MR. ROSENTHAL:**  Line 21.  Thankfully there are lines.

14      **THE COURT:**  Just a minute, just a minute, just a

15  minute.  Okay.  So then we're going to have lined stuff.  All

16  right.  Okay.  All right.

17      So here's their opposition.  And now you said page 13?

18      **MR. ROSENTHAL:**  Page 13, line 21.

19      **THE COURT:**  All right.  Quote, "Plaintiffs overlook

20  that the transfer court correctly found there was no evidence

21  defendants directed their podcast to Maryland."

22      Is that -- did you want me to read more?

23      **MR. ROSENTHAL:**  Exactly.

24      **THE COURT:**  -- "where distribution was handled via

25  their internet site and via third parties such as PRX."

1    Okay.  So the judge did kind of divide up the context to a

2    certain extent in his analysis.  He started with the ones in

3    which there was a -- another party that essentially carried the

4    allegedly libelous material to Maryland.  The plaintiffs sit in

5    Emeryville and they write their story and then they give it to

6    this PRX, I guess, for podcasts or they throw it out on the

7    internet and it goes everywhere, but was that wrong -- a wrong

8    fact or just a wrong finding?

9         **MR. ROSENTHAL:**  It was a wrong fact and a wrong

10   finding.

11       And if I may, Your Honor, may I hand up Exhibit D.

12        **THE COURT:**  D from the --

13        **MR. ROSENTHAL:**  This is from our original submission.

14        **THE COURT:**  Okay.  You can, but I wonder if I have it.

15   If I do, you don't have to.

16        **MR. ROSENTHAL:**  It just might be easier.

17        **THE COURT:**  I think I have it.  Hold on.  This is a

18   picture?

19        **MR. ROSENTHAL:**  It's a picture of someone who likes to

20   be called Chipmunk, and she's pointing at a stop sign.

21        **THE COURT:**  Okay.  Yeah.  I have it.  Your copy may be

22   better.  I don't know.  But I do have it, and it says, "Thought

23   you'd be interested in our latest podcast."

24       Are you now doing these Tweets?  Did we move off of the

25   PRX broadcast?

1    **MR. ROSENTHAL:**  It's not a question of moving off PRX.

2   I would like to deal with both, PRX --

3       **THE COURT:**  I don't mean that each one is going to be

4   considered separately.  All right.  I'm not sure -- although

5   you seem to say that Judge Russell did that, I'm not sure that

6   he did consider each separately as opposed to collectively.

7       But, anyway, this is a Tweet.

8       **MR. ROSENTHAL:**  But, Your Honor, the statement was a

9   blanket statement.  There was no evidence defendants directed

10  their podcast to Maryland.

11      **THE COURT:**  Well, this is not -- wait a minute.  This

12  wasn't a podcast; right?

13      **MR. ROSENTHAL:**  Well, if you read it, it says,

14  "Thought you would be interested in our latest podcast."

15      **THE COURT:**  Oh, "thought you would be interested" --

16  okay.  He was just talking about the podcast went through PRX

17  or they're on the website, right -- not website.  How did you

18  get the podcast?  Some were broadcast on radio and some were,

19  what, sitting on the website, in effect?  Could you click on

20  it?  I wasn't sure how --

21      **MR. ROSENTHAL:**  You could click on it, you could

22  listen to it by tuning into your radio, or if you're Chipmunk,

23  you can get directly from Amy Walters an email that says

24  "here's the podcast."

25          **THE COURT:**  Oh, did she -- I'm sorry.  In other words,

1   was the podcast in some way an attachment?

2           **MR. ROSENTHAL:**  Yes, it was.

3           **THE COURT:**  You can stick things on Tweets?  I didn't

4   know that you can do that.

5           **MR. ROSENTHAL:**  "Thought you would be interested in

6   our latest podcast" and then there is the link you can actually

7   click on to.

8           **THE COURT:**  Isn't that maybe to their website?  Where

9   are you talking about click on the link?  It says "thought you

10  would be interested in our latest podcast on

11  @planetaidrevealnews.org/episode/alleg."

12      This looks like their website.

13          **MR. ROSENTHAL:**  And you can click on it and you would

14  get the podcast.

15          **THE COURT:**  Well,yes, but you would do that if you're

16  sitting in Zimbabwe and clicked on it and you would get it;

17  right?

18          **MR. ROSENTHAL:**  But you're not.  You're sitting in

19  Maryland.

20          **THE COURT:**  Well, yeah, one person, Chipmunk or

21  whoever she is.

22          **MR. ROSENTHAL:**  The question which the Court posed and

23  which defense counsel relies on is that it was never directed

24  to Maryland.  How could you be anymore directing it to Maryland

25  than sending it --

1          **THE COURT:**  It's a different issue.  These are -- and

2     the judge took these, along with the emails trying to see if

3     somebody would talk to them about the -- you know, the events

4     they were interested in.  And the judge did put those in a

5     separate section like Judge Russell, so he said if -- first

6     here's the stuff here where it got passed on.  We've got these

7     PRX broadcasts, the 364 stations, some of which are in

8     Maryland.  We have this, that, and the other.  The TV program

9     where they sat in Emeryville and talked, and then this woman,

10    Ms. Thompson back in Washington, D.C., interviewed them.  It

11    didn't sound like she came out, by the way, to Emeryville, but

12    I couldn't tell, you know, whether they did this by -- you

13    know, across the country just in the way you might ordinarily

14    do that rather than have to come out.

15         But anyway, they're in Emeryville, she's back there in

16    D.C., and then they do broadcast into Maryland and Virginia

17    and, I guess, Washington, D.C., and so he looked at that, and

18    then he had his oddball Maryland conspiracy jurisdictional

19    discussion, which I had to kind of figure out what the Maryland

20    law was on conspiracy jurisdiction, which that was fine.  I

21    understood that and looked at that law.  I hadn't run across it

22    here.  We may have something similar, but I don't know if it's

23    quite written that way.

24         And then he got to people like Chipmunk.  Okay.  That was

25    in the next part of his analysis, and he says okay, you got

these Tweets, you got a few of them, and you have then some

interviews, and then his idea was it was all part of a big

picture.  It wasn't just like *Calder* with Shirley Jones, who

was the sweetheart of every romantic musical comedy or musical

on -- not comedy -- *carousel* and *Oklahoma* and whatever, and all

of a sudden, she's being painted by this scandal --

scandalmongering *National Inquirer* as some kind of drunkard,

that -- and she's in California, her career is in California.

I mean, it's a different story than *Calder* or *Hustler*.

How about *Hustler* and *Keeton*?  I mean, here there appears

at least to be a fairly legitimate news source.  Maybe they got

it wrong.  But it's not quite the same as a semi-pornographic

manage, you know.

So, anyway, not to just distinguish on those grounds as

being necessarily legally significant, but partly the facts of

those cases were different than this.

Now, I did want to check to see, there is a declaration

from Ms. Walters where she says, "I Tweet back to people."  She

didn't say how many times or what, but she said, "Back then,

occasionally now or whatever, people -- I look for the hashtag,

Planet Aid and then I see what people say, and, you know, I

write back to them, and these were some people I wrote back

to."  I don't know.

But he didn't ignore it.  He just didn't put it in that

same section as the internet and the PRX which he describes as

1 | being kind of -- you know, the more indirect.  He -- the

2 | judge -- I don't really -- I'm not so concerned about what the

3 | defendant is saying.  This is their brief.  Judge Russell isn't

4 | responsible for their brief, particularly one they wrote after

5 | he heard the case.

6 |     I think the judge did look at these Tweets.

7 |         **MR. ROSENTHAL:**  If I --

8 |         **THE COURT:**  You might not like how he came out on it,

9 | but he didn't ignore them, if that's the idea.

10 |         **MR. ROSENTHAL:**  He did not ignore them, but what he

11 | did was to say that there was nothing directed to Maryland, and

12 | in fact, that finding is simply unsustainable.

13 |         **THE COURT:**  I don't know that that is what he said.

14 | Let me go back and see.  You are reading somebody's brief and

15 | attributing it to the judge.  You can't do that.

16 |         **MR. ROSENTHAL:**  If I may, Your Honor, in the context

17 | of PRX, which you're talking about as well --

18 |         **THE COURT:**  Well, you were.  Okay.  All right.

19 |         **MR. ROSENTHAL:**  If you look at the opinion at 15,

20 | "There are no allegations that defendants circulated their

21 | articles or podcasts regularly in Maryland," and I'm quoting

22 | from the opinion at 15.

23 |         **THE COURT:**  Okay.  Articles and podcasts -- you want

24 | to say that because somebody called someone's attention to a

25 | podcast, it was circulated and handed to this woman, in effect.

1  Somebody said hey, take a look at our website, it's on there.

2  You can read about these people.  They're not the great people

3  you think they are.

4         **MR. ROSENTHAL:**  Well, let me address --

5         **THE COURT:**  Okay.  I'm still trying to look here.

6  Keep going.

7         **MR. ROSENTHAL:**  Let me address PRX, and then we'll

8  talk about Chipmunk.

9      PRX had the podcast on four stations located in Maryland.

10  They were not located near.  They weren't located in

11  California.  They were located in Maryland.  And those stations

12  regularly play Reveal.

13      How could you do anything more to direct the podcast to

14  Maryland than having a station in Maryland playing to people in

15  Maryland?  People in Delaware didn't hear it.  People in

16  Virginia didn't hear it because these were local Maryland

17  stations.

18         **THE COURT:**  Maybe people did hear it in Delaware and

19  Virginia if there were stations in Delaware and Virginia.  If

20  you took the four, five stations in Maryland -- how many were

21  there?

22         **MR. ROSENTHAL:**  There were four in Maryland and one in

23  D.C. that played into Maryland.

24      So the question then is if that's the case, why isn't it

25  exactly like *Hustler* where Hustler was delivered to

1  New Hampshire and nationwide.  Why isn't it exactly like *Calder*

2  delivered to California, the *National Inquirer*, and elsewhere.

3      If there are four stations delivering it directly to

4  Maryland residents, why isn't it exactly like those cases?  And

5  so when we come back to that standard Your Honor asked me to

6  talk about, clearly erroneous, why isn't the misapplication of

7  *Calder* and Hustler clear error.

8      Your Honor, I would like to go back to the podcast and --

9      **THE COURT:**  Well, let's stop on that for a minute.

10      If one accepts your argument that by having some volume --

11  and I don't know what four stations is versus ten thousand

12  copies of something that people pay for and have to buy as

13  opposed to don't listen to at all.

14      You know, I mean, I can start distinguishing radio from

15  print media.  There's no problem doing that.

16      Mr. Burke also wants to distinguish this case or those

17  cases on a timeline in the sense that they predate the

18  internet, they predate what's going on here, and I'll let him

19  do that if he would like to do that.  But there are some

20  differences.

21      Now, we could talk about why they're the same and we could

22  talk about why they're different, but if there's, you know, a

23  sufficient difference, it's hard to say this judge, for all

24  intents and purposes, didn't know what he was doing.  Okay.

25  And that's what clearly erroneous seems to be.

1    So going back for a second, what you would like to say is

2  as long as you've got some amount of material going into a

3  state, that state's the forum.  If you took that example -- and

4  I don't know that the defendant has told us every state that

5  these other -- what do I take -- five off of or four off of

6  364, whatever, and get down to 359 or what have you -- where

7  those other ones are located, but it would mean that this

8  defendant or these two reporters could be brought into every

9  single state in which that radio broadcast occurred.

10    Now, you could say no, no, because my client is a

11  Maryland-based corporation.  That's where they got mostly hurt.

12  Okay.

13    But, again, I think you could draw some distinctions -- I

14  may not sit here and play devil's advocate fully.  I'll leave

15  that to your opposition.  But that's really the core of it.

16  That you're arguing that this judge made a major mistake

17  because there was enough going into Maryland to constitute

18  targeting.  It's got to target.

19        **MR. ROSENTHAL:**  Yes, Your Honor.  And --

20        **THE COURT:**  Okay.  So that there's enough going into

21  Maryland, whatever it is.  We got the Chipmunk thing and a

22  couple efforts to get some interviews and then we have the

23  passing on of the podcasts from the website by contract with

24  PRX that puts them on radio and -- I'm just thinking for a

25  minute.

1    Well, okay.  The -- well, of course the articles

2  themselves on the website.

3    Okay.  I understand your point, that you would like to say

4  this is just like *Calder* and *Keeton*.

5    **MR. ROSENTHAL:**  Which were nationwide distributions,

6  as well as cases in the Fourth Circuit and in the Ninth Circuit

7  in which there is nationwide distributions.

8    And so the issue is if you're sending it by social media,

9  if you're sending it by email, if you're playing it on radio

10  stations, if you're playing it on a TV station, is that not

11  directing it to Maryland --

12    **THE COURT:**  You can't use *you*.  Okay.  Now, you use

13  *you* to cover all those events.  You can use *you* for

14  Ms. Walters' contact with Chipmunk.  Okay.

15    **MR. ROSENTHAL:**  Fair enough.

16    **THE COURT:**  And whatever you -- you can use *you* for

17  whatever emails were sent trying to get an interview with a

18  couple of people in Maryland.

19    But you can't use *you* for the TV station in quite the same

20  way.  You might want to draw some analogy, but it's a little

21  different and so is the PRX, so is the website article, so --

22  okay.

23    **MR. ROSENTHAL:**  Fair point.  Let me address them.

24    **THE COURT:**  Okay.

25    **MR. ROSENTHAL:**  With respect to PRX, PRX is in a

partnership with Reveal, and they both say that over and over again.  Would the Supreme Court in *Hustler* have said you can't sue Hustler because it was an independent trucking company that delivered the magazines into New Hampshire?  Of course not. Would they have said *New York Times vs. Sullivan*, you can't sue *New York Times* because the paperboy throws the papers on someone's front porch.

In none of the cases did the courts look at was there an intermediary that actually assisted in the delivery where it was done at the direction of the defaming party.

And so PRX makes no difference.  This is, of all the cases, the strongest because PRX is not an independent third party.  It's one identified by Reveal itself as being a partner and an affiliate.  They are doing it jointly.

But I would like to go back to NBC, and I think Your Honor raised a point there.  You can't use NBC, different party.  One of the factual findings made by the Court -- and I refer to the defendants' brief at footnote 4 where they say "With regard" -- and I'm quoting, "With regard to the NBC 4 reporting, the transfer court found that the outlet did its own investigation to Planet Aid as part of which it interviewed Walters and Smith from Reveal's Emery station," quoting the order at 5.

If I may, Your Honor, that finding is simply contrary to the record, and there is just no support for it.  The NBC was a joint investigation and a joint program.

1    If I may, Your Honor, I have copies again, if it's easier

2 for you.  It's Exhibit H to the Complaint.

3         **THE COURT:**  Oh, wait a minute.  To our complaint?

4         **MR. ROSENTHAL:**  To the Complaint, yes.  Exhibit H.

5         **THE COURT:**  I probably have it.  I have it.

6         **MR. ROSENTHAL:**  You do?

7         **THE COURT:**  Yes.

8         **MR. ROSENTHAL:**  A picture, a News4 I-Team.

9         **THE COURT:**  Pardon me?

10        **MR. ROSENTHAL:**  News4 I-Team?

11        **THE COURT:**  Yes.  That's the first page of H.

12        **MR. ROSENTHAL:**  And so let's contrast what they say.

13 "The transfer court found that the outlet did its own

14 investigation full stop."

15    Let's look at the language under the picture.  "In a joint

16 investigation with Reveal at the Center for Investigative

17 Reporting."

18    There is no evidence whatsoever that NBC did its own

19 investigation or it was a separate production.  In fact, if you

20 were to listen to it, the very first thing Tisha Thompson says,

21 "In a joint program with Reveal, Center for Investigative

22 Reporting."

23    So let's go back to the issue --

24        **THE COURT:**  So that would be then an adoptive

25 admission?  Is that what you're saying?  They didn't say it

1   themselves.  Okay.

2           MR. ROSENTHAL:  Well, actually they did.

3           THE COURT:  Where?  They didn't publish this.

4           MR. ROSENTHAL:  Well, if you look at the context, it

5   says, "In a joint investigation."

6           THE COURT:  No, no.  Who said that?

7           MR. ROSENTHAL:  NBC said it.

8           THE COURT:  Yes.  All right.  That's why I'm saying to

9   you, are you saying it's an adoptive admission?  It's not their

10  statement.

11          MR. ROSENTHAL:  It would be an adoptive admission.  It

12  would be a co-conspirator statement in furtherance of the

13  conspiracy.  It would certainly be admissible against Reveal.

14          THE COURT:  I don't know about that part.  Okay.

15          MR. ROSENTHAL:  But certainly there is no --

16          THE COURT:  I want to look at footnote 4 again.

17      You know, you're singling out a footnote in a brief and

18  also saying that's what the transfer court found.

19      All I'm saying is the court isn't responsible for how

20  anybody described their opinion.

21          MR. ROSENTHAL:  Well, we --

22          THE COURT:  The court -- excuse me -- writes whatever

23  they write.  So going back to what the defendant says,

24  particularly in a footnote, particularly a footnote that

25  they're not supposed to use tiny font on and should read the

1    local rules, okay, so that people don't have to get a

2    magnifying glass out to read what they said, okay -- anyway,

3    the court isn't responsible for what Mr. Burke or someone in

4    his office may have written, but you read it very fast, so I'm

5    going to read it a little faster.  I actually put a highlight

6    by it, so let me look at it.

7               (Court reviews document.)

8          **THE COURT:**  Well, I think they did their own

9    investigation.  They may have done it jointly, but you think

10   the court found that it was totally independent.

11         **MR. ROSENTHAL:**  Well, that's --

12         **THE COURT:**  You know, they obviously were cooperating.

13   They both were doing investigation.  Whether they cooperated in

14   what way and in how it was joint, I don't know, but -- I don't

15   know what you can draw from this.

16      I think the main thing is this.  Let's go back for just a

17   second because what the judge said is if anybody in this

18   conspiracy -- and he seemed to find that they could be

19   considered conspirators.

20      Do you disagree with that or not, Mr. Burke?

21         **MR. BURKE:**  I think that's what's alleged.

22         **THE COURT:**  Right.  Okay.  In other words, I think the

23   judge accepted that these people were acting together in some

24   way.  All right.

25      And then he said look, we have to look at the law, and the

1    law says if any one of these people could have been hauled into

2    court in Maryland, then everybody can.  Okay.

3        And then he seemed, I guess, to find that nobody could.

4    In other words, if you want to consider this a direct

5    communication that it still wouldn't have been enough, is what

6    I gather -- because it was direct on the part, for example, of

7    the station.  You know, they beamed it in.  But they weren't

8    beaming it necessarily right into Maryland as opposed to

9    Virginia or D.C., and they are interested in how Congress

10   spends its money, and they are in Washington, D.C., and there's

11   this whole question about whether the USDA just gave money to

12   somebody who was squandering it on their own private

13   enterprises.

14       I wondered whether or not you could treat all those states

15   as being kind of one.  Mr. Burke has submitted some case law,

16   not necessarily precedential, but case law that suggests that

17   that wouldn't be right; that each one is kind of a separate

18   entity.

19       The judge seems to be saying none of this is targeting.  I

20   think we just get down to targeting.  Is there targeting here?

21   Did somebody target Maryland?  He seemed to say no.  Okay.

22       And then you want to argue that it doesn't matter because

23   they broadcast it, they podcasted it, and they Tweeted it.

24   Okay.

25           **MR. ROSENTHAL:**  And they specifically sent it to

1  people who expressed an interest and a positive view of Planet

2  Aid, and if that's not targeting, I don't know what is.

3      Let me ask the Court a question.  Suppose it was Anthrax

4  and they had sent the Anthrax to Maryland, they had sent it to

5  Illinois, they sent it to every single state.  Would you say

6  that somebody in Maryland wasn't targeted because they sent it

7  everywhere?  Of course not.

8          **THE COURT:**  I don't know.  I have to think about it.

9  It's not an Anthrax case.  It's a libel case.

10         **MR. ROSENTHAL:**  It's not, but there shouldn't be a

11  different test.  The Constitution does not recognize a

12  different test for defamation versus Anthrax.

13         **THE COURT:**  Well, maybe they can't be hauled into

14  every state for Anthrax.  Maybe you got to sue them where they

15  are, where they sent it from.  I'm just saying I haven't looked

16  into that.  I'm not going to.

17         **MR. ROSENTHAL:**  So Your Honor asked the question --

18         **THE COURT:**  That's a lot of Anthrax, by the way.

19         **MR. ROSENTHAL:**  Any Anthrax is a lot of Anthrax and

20  too much Anthrax.

21     But Your Honor started out by asking the question of what

22  does it mean to have clear error, and, Your Honor,

23  respectfully, I don't think that's the test here because I

24  began by saying I don't think so for this reason.

25         The Maryland court had to consider the totality of the

1    contacts.  We all agree.  Both of us agree that's the test.

2    And if it couldn't do it because of something that the

3    defendant had done, we should not hold the Maryland court to

4    that standard.

5          THE COURT:  I'm -- I'm -- I'm lost on that particular

6    argument.  What did you mean by that?

7          MR. ROSENTHAL:  The test for jurisdiction or venue is

8    what are the totality of the contacts and are they

9    sufficient --

10          THE COURT:  Yes.  I got that part.

11          MR. ROSENTHAL:  And if you don't have before you,

12   Mr. Maryland Judge, the totality of the contacts, you can't

13   make a determination.

14          THE COURT:  Are we on the new evidence now?

15          MR. ROSENTHAL:  Yes, we are.

16          THE COURT:  Well, you didn't say you are segueing from

17   how the judge messed up to how the judge, even if they didn't

18   mess up, didn't have a chance to do it absolutely right because

19   they didn't have all the evidence.  Okay.  All right.

20          MR. ROSENTHAL:  But I would like to segue --

21          THE COURT:  That's fine.  Just give me an idea you're

22   doing it.  I didn't know where you were going.

23          MR. ROSENTHAL:  So if the Maryland court didn't have

24   before it a full deck of cards, it didn't have all the

25   evidence, it couldn't consider the totality of the contacts,

1  you can't say we're nevertheless going to defer to that court

2  because that court didn't have --

3         **THE COURT:**  No, no.  Didn't you listen to what I said

4  at the beginning?  I said there are two different points here.

5  One is looking at what the judge had and ruled on and whether

6  the judge committed clear error when he made that ruling.

7  Okay.

8         The next part is even if he didn't -- if he did, okay, you

9  don't need the next part.  If he didn't, then you get to

10  nevertheless -- nevertheless, something new has cropped up.  We

11  can't give it to the judge to see how it would affect his

12  decision because we're now out here on the West Coast, so we'll

13  give it to you, and you kind of pretend you're him or however

14  you want to do it.  Look at it, see if it would change, at

15  least in your view, Judge Chesney, how the case should come

16  out, and then if so, then rule on it with all the evidence now

17  before you, as I understand it -- I'm suddenly being put into

18  the picture as opposed to just a reviewing court.

19        So, yes, if we're segueing, we are now into let's take

20  everything that was there, throw in that you've got this woman,

21  Ms. George, who has some connection, right, to the articles,

22  whatever, and she lives in Maryland, works out of Maryland from

23  her home, right, and originally Ms. Pyle, who had given a

24  declaration, said that nobody who is connected with this in any

25  way lives in Maryland and even the people who -- I guess

1    everyone is in California except for a few people and they

2    aren't in Maryland.  I think that's what she said.  And then

3    one of them turns out to be in Maryland who she says she

4    thought lived in D.C. and -- because that's where she always

5    met with her and she's sorry she said that.  Okay.

6         So I'm not finding she's lying or anything, but it's new

7    information.  And then if it, in and of itself, might not be

8    enough, you've got your discovery question, which we can get to

9    as well.  Okay.

10        **MR. ROSENTHAL:**  And I wasn't disagreeing with

11   Your Honor, but really emphasizing that I agree with the

12   framework that you're putting forth.

13        **THE COURT:**  Oh, you started with *respectfully* and that

14   always sounds like I think you're wrong, but I'm trying to be

15   polite and say it.

16        **MR. ROSENTHAL:**  I try to be respectful, even when I'm

17   agreeing.

18        **THE COURT:**  Okay.

19        **MR. ROSENTHAL:**  Your Honor, I would like to combine

20   the discovery issue with Ms. George and here's why.  At this

21   point in time, there's utterly no reason not to make sure we

22   don't have the full deck of cards, that we don't have all the

23   facts.  Ms. George filed a declaration in which she gave

24   examples of things she did.

25        **THE COURT:**  Let me stop you for a minute.  I may agree

with you on this without too much argument.  I want to hear
what Mr. Burke has to say.

I focused on also the *for example* and what are some other
examples, and we don't -- we don't really know exactly what her
role is.  Some of it was with people who weren't the reporters
themselves.  That doesn't mean that she wasn't involved in the
story.  Others were with -- it was hard to tell.  She said the
investigative team, quote/unquote, and I don't know if that was
supposed to be just be Smith and Walters, the two reporters who
published this story, or whether it was -- whether there are
more people on the team.  You know, I'm not sure.

It may be appropriate to find out a little more from her,
irrespective of some of the other things you want to look at
that I might not go along with.  But she seemed, at least in
the first blush, to be someone that might have more to say, and
I do want to see what Mr. Burke wants to say about that.

Somebody wrote this declaration for her and wrote it the
way they did for whatever reasons, and there could be more in
it.

**MR. ROSENTHAL:**  If I may, if you want to hear from
Mr. Burke, I'll stop -- but if I may, we think that discovery
is particularly appropriate here because without attributing
any mal-motives here, there have been contrary contradictions.

Walters and Smith are the investigative team.  They didn't
mention her.  Ms.  Pyle gave two different contradictory

1    declarations.

2            **THE COURT:**  Yeah.  Well, hers is easily explained,

3    though, I think, as a misunderstanding.

4            **MR. ROSENTHAL:**  Yes, except she is the editor in chief

5    and she's the one that chose to give the declaration.

6            **THE COURT:**  Yeah.  She should have looked into it a

7    little more carefully.  Okay.

8        And they say no one was siding it.  If you bothered to

9    look at something they published, they got everybody's address

10   or whatever it is, you could figure it out.

11       I'm not saying that you should have found it out earlier.

12   With a direct statement by someone else, maybe you don't sit

13   there and try and look at every place that somebody could have

14   misrepresented something.  So I'm not saying this is untimely.

15   Okay.

16           **MR. ROSENTHAL:**  And I'm not asking you to make that

17   finding, but what I am suggesting is --

18           **THE COURT:**  On your part you don't want me to find it.

19   Your request is untimely.  No.  I understand that.  Okay.

20           **MR. ROSENTHAL:**  But, Your Honor, I think it's time to

21   make sure we do have a full and robust record of not just

22   Ms. George and what did she do, but, for example, we had to

23   spend an inordinate amount of time to find Chipmunk because --

24           **THE COURT:**  How did you find her?  I was going to ask

25   you, how did you find these Tweet recipients?

1      **MR. ROSENTHAL:**  It's not easy.  And for that reason,

2  we would ask for discovery.  It should be easy for them --

3      **THE COURT:**  That's how hard was it, not how you did

4  it.

5      **MR. ROSENTHAL:**  Some of them will show up because if

6  you include Planet Aid in the Tweet, then Planet Aid will get a

7  copy of it.  Some of them, that's not the case --

8      **THE COURT:**  Some of what?

9      **MR. ROSENTHAL:**  Some of the Tweets.

10      **THE COURT:**  Which Tweets?

11      **MR. ROSENTHAL:**  From Amy Walters to people.

12      **THE COURT:**  Did you have more than the three or four

13  that --

14      **MR. ROSENTHAL:**  Oh, yes.  Oh, yes.  We actually have a

15  lot.

16      **THE COURT:**  Really?

17      **MR. ROSENTHAL:**  We, for example, have another fellow

18  named LBR Consulting, who also --

19      **THE COURT:**  Is he in Maryland?

20      **MR. ROSENTHAL:**  He is a Marylander.  He went to the

21  Planet Aid store.  He wrote a Tweet saying what a wonderful

22  store it was.  It was a pleasure shopping there.  Everything is

23  neat.  And same thing --

24      **THE COURT:**  I saw that one.  But I'm talking about

25  ones other than were identified in the order.  I thought there

1    were only about three or maybe four.

2              MR. ROSENTHAL:  If you look at Tisha Thompson, she

3    wrote a number of them --

4              THE COURT:  Well, wait.  A number of the ones we're

5    talking about or more?

6              MR. ROSENTHAL:  There are more.

7              THE COURT:  More than the ones the judge talked about?

8              MR. ROSENTHAL:  Yes.  He said there were three or

9    four, and I think -- I can't remember.  I certainly can submit

10   it, the number that are actually attached, but at some point --

11             THE COURT:  To him?  In other words, you gave them to

12   him?

13             MR. ROSENTHAL:  To the judge?

14             THE COURT:  Yes.

15             MR. ROSENTHAL:  They are included in the materials.

16             THE COURT:  No.  But, in other words, that he had all

17   of what you're saying are the Tweets?

18             MR. ROSENTHAL:  He had all of what we attached, and we

19   did say we thought there were more and these were examples.

20             THE COURT:  Yes, but you didn't -- you didn't give any

21   more; right?

22             MR. ROSENTHAL:  We gave what we could find with --

23             THE COURT:  Okay.

24             MR. ROSENTHAL:  -- a fair amount of effort.

25             THE COURT:  So what were the other Tweets?  I know

1   about the one like where somebody said it's a really clean

2   store.

3       What did they do?  Did they collect clothing and then have

4   like a consignment or -- not consignment, but secondhand store?

5   What do they do?

6           MR. ROSENTHAL:  Goodwill, for example, has stores --

7           THE COURT:  Is it like Goodwill?

8           MR. ROSENTHAL:  That store is in the sense that it is

9   a retail store that you can go into --

10          THE COURT:  That's what it sounded like, but I hadn't

11  understood they were doing, so that's why I wanted to ask you.

12  I gather they get these collection bins, right, and people put

13  donations in the bins?

14          MR. ROSENTHAL:  Yes.

15          THE COURT:  Clothing?

16          MR. ROSENTHAL:  Clothing.

17          THE COURT:  Okay.

18          MR. ROSENTHAL:  Some of it is sold and some of it is

19  sold in a retail store in Baltimore which LBR Consulting and

20  Chipmunk are referring to.

21          THE COURT:  Okay.  So when I looked here, you directed

22  me -- is that Chipmunk?  Is that who Chipmunk is?

23          MR. ROSENTHAL:  That's the Chipmunk.  That is the

24  Chipmunk herself.

25          THE COURT:  Okay.  She's kind of cute.  Okay.

1        **MR. ROSENTHAL:**  You know, it's interesting,

2   Your Honor, one of the issues is under *Burger King* --

3        **THE COURT:**  Wait.  Wait.  Don't go to *Burger King* or

4   *International Shoe* or *Butler Shoe*.  Give me a break here for a

5   minute.

6        **MR. ROSENTHAL:**  Okay.

7        **THE COURT:**  I wanted to look at the Tweets that you

8   say Judge Russell has.  So he had Chipmunk.  Okay.  What other

9   Tweets did he have?

10       **MR. ROSENTHAL:**  Okay.  If you -- if you look at

11  Exhibits C and D --

12       **THE COURT:**  Okay.  One minute.  I'm sorry.  I've got

13  to move the mic.  Okay.  One second.

14     C.  Is this a different one than the judge referred to

15  then?

16       **MR. ROSENTHAL:**  I don't think so.

17       **THE COURT:**  Okay.  The judge had this one?

18       **MR. ROSENTHAL:**  Yes.

19       **THE COURT:**  Not just had it, but talked about it?

20       **MR. ROSENTHAL:**  Well, he only -- he did not.  He

21  talked about three or four Tweets.

22       **THE COURT:**  And not --

23       **MR. ROSENTHAL:**  He doesn't deal with why this would

24  not satisfy that -- the standard.

25       **THE COURT:**  Wait.  But --

1          **MR. ROSENTHAL:**  It just says numerically there are

2    only three or four Tweets.

3          **THE COURT:**  And you say there are more?

4          **MR. ROSENTHAL:**  Yes.

5          **THE COURT:**  Which ones are they in the exhibits that

6    you gave to Judge Russell?

7          **MR. ROSENTHAL:**  C.

8          **THE COURT:**  C is not one then that was one of the

9    three or four?

10          **MR. ROSENTHAL:**  It was.  I assume it was.  He only --

11          **THE COURT:**  It was one of the three?

12          **MR. ROSENTHAL:**  He only says three or four.  I don't

13    know which he's referring to.

14          **THE COURT:**  Well, how many are there here?  He got C.

15          **MR. ROSENTHAL:**  We have D, which is Chipmunk.

16          **THE COURT:**  D we looked at.

17          **MR. ROSENTHAL:**  We have E, which is the one that's

18    sent to the American University who is posting a job.

19          **THE COURT:**  Oh, yes.  Saying here we found a job

20    opening and then they say wait a minute.

21          **MR. ROSENTHAL:**  Wait a minute.  Look at our podcast.

22    You may not --

23          **THE COURT:**  You may not want to work there.  You may

24    not want to tell people to work there.

25          And then you have --

1       **MR. ROSENTHAL:**  And then you have F.

2       **THE COURT:**  F.  Okay.  Wait a minute.  So we had --

3  I'm sorry -- C, D, E, F.

4       **MR. ROSENTHAL:**  And G.

5       **THE COURT:**  G is -- oh, Tisha Thompson is F.

6       **MR. ROSENTHAL:**  She is F, correct.

7       **THE COURT:**  So she's a different one?

8       **MR. ROSENTHAL:**  Correct.

9       **THE COURT:**  Okay.  Well, if you want to count

10  Thompson's, then I see where your other ones are coming from.

11  But the judge didn't feel that there was enough of a

12  connection, as I understand it, to tie Reveal to whatever

13  Thompson did in her Tweets.

14       **MR. ROSENTHAL:**  Because he said it was an independent

15  investigation.

16       **THE COURT:**  Well, no.  I mean, more than that.  I

17  think it's just who knows what she's doing from her own office

18  or home or wherever she Tweeted from.

19       **MR. ROSENTHAL:**  If I may --

20       **THE COURT:**  Okay.  I understand.  You were putting the

21  Thompson Tweets into there's more than three or four.

22       **MR. ROSENTHAL:**  And others from Amy.  But if I may --

23       **THE COURT:**  Wait a minute.  What others from Amy?

24       **MR. ROSENTHAL:**  For example, G.  Mary Wollstonecraft,

25  who I think is in Silver Spring, Maryland.

1          **THE COURT:**  By the way, where does Ms. George live?

2     Is she right over the border, too?

3          **MR. ROSENTHAL:**  Takoma Park.

4          **THE COURT:**  Where is that?

5          **MR. ROSENTHAL:**  It's right over the border.  It's near

6     Silver Spring.  Close to Washington, D.C.  Close to Amy

7     Walters' home in Washington, D.C., her apartment.

8          **THE COURT:**  Well, Amy Walters we can talk about then

9     her move or whether she's had it or what the story is with her

10    Washington, D.C., connection.

11         **MR. ROSENTHAL:**  If I may --

12         **THE COURT:**  That would go more to a sort of

13    convenience idea and that -- you can't -- you can't have a

14    convenient forum in which there is no personal jurisdiction

15    over the defendant, though; right?

16         **MR. ROSENTHAL:**  There has to be jurisdiction.

17         **THE COURT:**  Right.  So it could be convenient for

18    everybody but the defendant, who you don't have jurisdiction

19    over, or it could be convenient for the defendant, but you

20    don't have jurisdiction.

21        Okay.  Let me look here.  So Walters -- this was not one

22    that he mentioned?

23         **MR. ROSENTHAL:**  Well, again, he only mentioned three

24    or four.  I don't think he listed them.

25         **THE COURT:**  All right.  Well, can we count up how many

1  say *Amy Walters*?  Smith didn't know how to Tweet.  Okay.  He

2  says in his declaration, "I don't do it.  "I don't know" -- you

3  know, Tweets, Twitter, whatever.  She's the Tweeter here.

4          MR. ROSENTHAL:  Oh, no.  That's --

5          THE COURT:  That's what he said.  Do you have anything

6  from Smith that is a Tweet?

7          MR. ROSENTHAL:  Yes.

8          THE COURT:  You have a Smith Tweet?

9          MR. ROSENTHAL:  We have Smith and Walters both issuing

10 separate social media saying, "Please Tweet about it."

11         THE COURT:  Wait, wait, wait, wait, wait.  What do you

12 mean Smith -- forget Walters.  Smith.  Do you have a Tweet by

13 Smith?  He says he doesn't know how to do it.

14         MR. ROSENTHAL:  Actually, I have a Facebook --

15         THE COURT:  That's different.

16         MR. ROSENTHAL:  It is different, correct.

17     No, no.  It's a Tweet.  Exhibit B.  Tweet on May 23, 2016.

18         THE COURT:  Okay.  Just a minute.  Now we are, B, back

19 in front of Judge Russell; right?

20         MR. ROSENTHAL:  Yes.

21         THE COURT:  B.  Where is Smith here?  And where's

22 this -- this says Reveal.  I'm not sure how to read this one.

23 "Host Al_Letson had a frank conversation with

24 @RichardBSpencer, a prominent white nationalist.  Here's how it

25 went."

1      What is that?

2              **MR. ROSENTHAL:**  No.  I --

3              **THE COURT:**  That's B.

4              **MR. ROSENTHAL:**  B to my declaration?

5              **THE COURT:**  Well, this is B that we were looking at.

6      B.  I don't know if it's to your declaration or -- let's see.

7      I mean, these were all -- oh, this is different.  No.  No,

8      they're not.

9              **MR. ROSENTHAL:**  Your Honor, look at B-3.

10             **THE COURT:**  Maybe I'm looking at the wrong thing.

11     Here is -- B-1 is that odd thing.  B-2 is Amy Walters, and B-3

12     is Matthew Martin Smith.

13             **MR. ROSENTHAL:**  Yes.

14             **THE COURT:**  Is he Tweeting?

15             **MR. ROSENTHAL:**  Yes.  That's a Tweet.  You can tell by

16     in the top hand corner, the little bird.  Yes.  That's a Tweet.

17             **THE COURT:**  Who did he Tweet to?

18             **MR. ROSENTHAL:**  What he and Ms. Walters did --

19             **THE COURT:**  I don't want to hear about her for a

20     minute.  We're just talking about him.

21             **MR. ROSENTHAL:**  What he did is he sent out a blast to

22     everyone that says talk about it and --

23             **THE COURT:**  This is not a focused Tweet.

24             **MR. ROSENTHAL:**  It is not a focused Tweet, but it does

25     tie to Tisha Thompson because immediately after, Tisha Thompson

1    starts sending out this blast.  And I think a jury, a

2    reasonable jury, could find that when Tisha Thompson sent

3    directly to Maryland residents, it was because Matthew Smith

4    and Amy Walters said Tweet about it and that's what she did.

5           THE COURT:  Let's say a reasonable jury could find the

6    other way, too.

7           MR. ROSENTHAL:  Ah, and if that's the case then,

8    Your Honor, we deserve the benefit of the doubt at this

9    juncture at this motion.

10          THE COURT:  I don't know.

11       Also I -- I don't know that a reasonable jury could

12   actually make the connection, but okay.

13       Anyway, I'm still a little bit lost on the number of

14   Tweets that went to a Maryland resident directly in response to

15   a Maryland resident's comment.  The judge had mentioned three

16   or four.  You said there were more.  So far I don't see where

17   they were.  Maybe -- was there that one extra one?  Was that

18   part of the --

19          MR. ROSENTHAL:  I do know, Your Honor, that the Tweets

20   to Mary Wollstonecraft are not the only ones.  We did indicate

21   that they were examples.

22       I do know that --

23          THE COURT:  Well, yeah, when you say they're examples

24   and you think there are more but you don't have any way of

25   saying I've got 52 Tweets and here's three of them, they're all

1  like this -- okay.  You couldn't do that.  You're thinking

2  there may be more.  And the way you found this is you looked

3  for the hashtag *Planet Aid*, right, and then you saw who was

4  talking about Planet Aid?

5  　　　MR. ROSENTHAL:  That's exactly right.  Actually, we

6  looked at Amy Walters, and we couldn't tell which ones were

7  removed, we couldn't tell which ones were deleted because of

8  age --

9  　　　THE COURT:  All right.

10  　　　MR. ROSENTHAL:  -- or because they just had language

11  that we weren't picking up.  But --

12  　　　THE COURT:  It would have helped if she had put in

13  some of her Tweets to other people that she responded to.  She

14  didn't do that.  She just said, "I've got other Tweets to other

15  people."

16  　　But if I accept that -- she says, "I don't really look at

17  where people live.  If I see somebody saying something and I

18  think they ought to read our article, I say 'read our

19  article'."

20  　　　MR. ROSENTHAL:  And so the question is when she

21  originally said -- when the defendant originally said they

22  didn't reach out to any Maryland resident and then it turns out

23  that not to be true, why not at this point get discovery and

24  make sure we have them all, and we can't do that without help

25  from the defendants in discovery.

1      **THE COURT:**  Okay.  All right.

2      So why don't we go to Mr. Burke for a moment.

3      I actually have people -- we've been proceeding for an

4    hour almost.  Well, that clock is -- I can't see it from my

5    side.  I guess not quite an hour.  And I can see it, but I'm

6    looking at an angle, so it's distorted as to the time.

7      But anyway, we've been going for about an hour, not quite,

8    and I did have people who actually were going to come in for a

9    hearing at 10:00, so they're going to have to wait a bit.  And

10   then we have a ton of case management's with various things.

11     Anyway, so I want to hear from Mr. Burke on this, wherever

12   you want to start, and get to discovery at the end, but do

13   whatever you want to do first.

14     **MR. BURKE:**  Your Honor, I'll be brief.  Unless there

15   are particular questions that the Court has questions on, I

16   believe that this is essentially a rehash of the Maryland

17   motion.  And you're not Judge Russell and so the question is

18   would Judge Russell -- is this clear error, and you asked what

19   a definition of *clear error* -- I think both the *Christianson*

20   and *Ametek* case also tease that out and say that it would work

21   a manifest injustice if there was, in this case, jurisdiction

22   in California as opposed to Maryland.

23     And I think that under any test, under any application of

24   the facts without first going to them, there's no manifest

25   injustice here.

1    Planet Aid, as Judge Russell was told, operates completely

2    in California.  It operates all across the United States.  So

3    if you're looking for the effect of the clear error or what it

4    would mean, would it work a manifest injustice?  It would not.

5         **THE COURT:**  Okay.

6         **MR. BURKE:**  More importantly, I believe, as the Court

7    has gone through, Judge Russell's analysis -- it's basically

8    saying you got it wrong, Your Honor, plaintiffs' position.

9         And it would be one thing if Judge Russell had just threw

10   this order together.  I don't know how much of the eight months

11   that was spent between the submission and the closing was

12   focused on this, but it cannot be said to be a frivolous order

13   or one that did not consider all of the evidence that counsel

14   has raised.

15        The reason that he can point to these exhibits to the

16   Court is because they were also given to Judge Russell.  And

17   the fact that he didn't talk about every single Tweet -- which,

18   again, you have to ask if you're going to go to the Tweets,

19   you're going to say are you writing purposely trying to

20   communicate to Maryland versus D.C. versus Vermont versus

21   Nebraska.  And there is no evidence in that respect.  Of

22   course, Chipmunk is the focus, but Chipmunk was only one and

23   only one instance where you've got a reference to Baltimore.

24        The issue that Judge Russell grappled with was -- and he

25   applied *Calder* and he said in this era where you can have

1   internet application and you can have Tweets, you have to look
2   at the purpose, and his focus was exactly where it should be,
3   which is was this about a Maryland-focused investigation.

4       And he even, at page 27 -- 29 gave them the benefit of the
5   doubt and said they insist that their principal place of
6   business -- which we disputed, but they insist that it was
7   Maryland -- he even gave them the benefit of doubt and said
8   that's not even enough.  And it's because the focus was not on
9   Maryland.  It wasn't a focus on California either.  It wasn't a
10  focus on Illinois.  It was a focus on Malawi and it was a focus
11  on international aid to another country.

12      And I think the Court squares it up directly on the law
13  which is you would then say you would have jurisdiction under
14  this analysis in every state.

15      And what you do want to focus on is the nature of the
16  investigation, not where people happened to be when they were
17  doing that.

18      And if I could just quickly address Deborah George, I
19  think there is one critical sentence.  Not only was she not
20  involved in the writing or the editing of the scripts that are
21  the basis of the publication, but her focus -- she's in
22  Maryland, but her work is not focused on anything having to do
23  with Maryland.

24      It's kind of the whole theme here.  CIR is very
25  collaborative.  It has a lot of people in a lot of places.  A

lot of people touch things, but where they are isn't the focus.
It is what they're doing -- what's the end product focus on,
not where are they sitting, and I think Judge Russell had a
complete appreciation of that.

     **THE COURT:**  Okay.  All right.  Thank you.

    You were writing away here, Mr. Rosenthal --

     **MR. BURKE:**  It was my incredible prose that he wanted
to capture.

     **MR. ROSENTHAL:**  May I quickly respond?  I know
Your Honor is on a --

     **THE COURT:**  Yes, you may.  I want everyone to have
everyone have a full hearing here.

     **MR. ROSENTHAL:**  What's important is on discovery, if
there is a colorable basis, the Court should ordinarily grant
discovery if there is a colorable basis.  And I don't think how
we can whether Judge Russell was right or whether he was wrong,
there was a colorable basis.

    When Mr. Burke stands up and says that he considered all
the evidence, he knows that can't be true if he could not have
considered Deborah George because he didn't know about her.  He
couldn't have considered all the evidence.

    With respect to the Tweets, we appreciate Your Honor going
through which ones did we present, but why not know which ones
couldn't we find?  Why not at this point just have discovery to
flesh out what's all of the facts and so then we'll know with

certainty that all of the evidence was considered, and whether
or not the case should go to Maryland or whether it should stay
in California will be a clear decision that could be made, and
nobody will be second guessing well, there could have been this
and there could have been that.

    And we're not asking for a lot, Your Honor.  We are asking
for very little discovery.  We were very tailored in our
questions.

    I would point out why this is so important to us.  If this
case stays in California, with the exception of the defendants,
not one witness will be subject to the subpoena power.  Not the
USDA officials that granted the money to Planet Aid and
approved and audited and found it to be perfectly proper; not
the people who refused to do business with Planet Aid because
of the defamatory material; not people like Chipmunk, who, by
the way, has never again wrote about Planet Aid after getting
the defamatory article.  None of the witnesses will be
available if the case stays in California --

    **THE COURT:**  But your client will be available, and
your client can talk about whatever economic loss they
suffered, whatever tarnishing of their reputation they
suffered.  They know what they incurred as damages.  So --
okay.  So there will be critical witnesses on loss that will be
available, certainly.

    **MR. ROSENTHAL:**  But the most important thing is the

1    USDA officials who are all in Washington and Maryland and none

2    of them will be within the subpoena power.  Tisha

3    Thompson won't be --

4              THE COURT:  Why are they the most important people?

5              MR. ROSENTHAL:  Because they are the ones who did a

6    very thorough audit of the program and found that all

7    allegations about laundering money, stealing money, no program

8    benefits -- they are the ones who are independent third parties

9    that did a good, respectful job, and their testimony is

10   critical to this case.

11             THE COURT:  I'm sorry.  What did they find?

12             MR. ROSENTHAL:  They found that there was -- it met

13   all the program goals.

14        MR. BURKE:  That's not true, Your Honor.  It is not

15   before the Court.  It was not before Judge Russell.

16             MR. ROSENTHAL:  It is absolutely true.  And there's an

17   audit opinion.

18             THE COURT:  Okay.  Well, when -- wherever you're going

19   to try this case, that's something to discuss in terms of

20   whether it ought to be resolved without a trial or not.  Okay.

21   That's for you to look into later.

22        But certainly you can preserve their testimony, can't you?

23             MR. ROSENTHAL:  We can preserve their testimony, but

24   it's not the same, and that's why we say let us have limited

25   discovery --

1          **THE COURT:**  All right.  Now going back -- okay.

2      I don't think that you've exactly tailored your discovery

3   request.  You wanted all their communications with Maryland

4   residents, all the sources they ever relied on, all their

5   communications that they could have had between Thompson, and

6   then this Fritzler person who is cc'd on an email that isn't

7   even one of their emails, and then you have "any information

8   concerning any of Reveal's Maryland employees in the last

9   five" -- I mean, this is not what I call tailored.  This is --

10  I didn't even finish, I guess, with all of that.  The

11  relationship between PRX and Maryland, radio stations -- you

12  could go on at great length.  This would be full-blown

13  discovery.

14      However -- and without any particular pointing to a

15  particular piece of evidence that could simply be expanded on

16  clearly, but you do have this point about George.  And I do

17  think that it may be appropriate that she be subject to

18  deposition and say exactly what she did in connection with this

19  case and what her thoughts and hopes and fears were in trying

20  to consult with these people at all.  And that I think you

21  might be able to do.

22      Now, even if you find that she's more involved, if her

23  involvement is not of a different quality than, let's say,

24  Smith and Walters, okay, who's -- who Judge Russell found were

25  not targeting Maryland.  Okay.  Maryland got just part of the

1    scattershot here, and that's -- in Judge Russell's view, that

2    was not sufficient.  And I know you disagree that -- with his

3    analysis.

4        I'm not prepared to disagree with that particular

5    analysis.

6        As far as re-transfer, I don't know if this has to be some

7    cataclysmic, horrible disaster akin to Nagasaki or something,

8    but I would just be prepared to say you could go back if he was

9    clearly erroneous without the manifest injustice even having to

10   be shown because that's very hard to do in most cases.  But I

11   don't think that you have shown that to date.  Let me just put

12   it that way.

13       And I think it's a reasoned opinion.  You can pick any

14   opinion apart.  But the bottom line is he found that there

15   wasn't a targeting of Maryland no matter whether you wanted to

16   look at what they did directly or make them responsible for

17   what other people did that could be considered a closer

18   contact.  And I don't find that that's a clearly erroneous

19   finding.

20       But you may be able to find out more from Ms. George.  I'm

21   not -- not necessarily thinking you will, but at least it would

22   clear the air, if nothing else, and we would know.

23       So, Mr. Burke, of course you don't want to do that.

24            **MR. BURKE:**  Well --

25            **THE COURT:**  You know whatever she did or didn't do,

1    and I'm assuming that you're not worried about it.

2         **MR. BURKE:**  Well, and I'm assuming that it will not be

3    the end in the sense that whatever -- whatever she says --

4         **THE COURT:**  They'll come back.

5         **MR. BURKE:**  -- we will be back.

6         **THE COURT:**  Oh, you will be.

7         **MR. BURKE:**  There will be briefing --

8         **THE COURT:**  But it won't be super long because I'll

9    put limits on it.  Okay.

10        **MR. BURKE:**  Well, I guess my concern is -- and I think

11   the Court just touched on it -- if the quantum of her

12   involvement -- I -- the reality is they will insist that the

13   fact that she did anything that she did from Maryland,

14   presumably, as opposed to D.C., even assuming that that's the

15   case, that doesn't change the end outcome of the investigation

16   and the publication, which is what the courts do in fact focus

17   on and what Judge Russell focused on.  They are focused on

18   where the factory is located as opposed to the product produced

19   by the factory.

20        **THE COURT:**  Well, if the factory were located in

21   Maryland and they made a shoddy product there and somebody got

22   hurt --

23        **MR. BURKE:**  Exactly.  It would be a very different

24   case.

25        **THE COURT:**  All right.  If the slanderer, alleged

1    slanderer, was located in Maryland and made their statements in

2    Maryland and Maryland people read them or heard them, would

3    that be enough?

4           MR. BURKE:  If she were involved in the writing and

5    the editing, that might be an issue.  She has said under oath

6    that she is not.

7           THE COURT:  Okay.  Well, yes, but we don't know

8    exactly what she was doing, and so we could find that out.

9        Now, if the other contacts don't show targeting, then

10   really you're looking at whether this woman, who says she had a

11   peripheral part to play in all of this, targeted Maryland, and

12   if she did, what responsibility then the other people had for

13   it, which will be kind of interesting, and nobody has ever

14   distinguished Reveal from Smith and Walters.  They're all

15   different defendants.  Everyone is treating them as a package

16   deal.  I don't know whether that will always hold up.  So far

17   it has pretty much.

18       So in any event, I'm going to let you depose her.  Okay.

19   I will let you depose -- what's her first name again?

20          MR. ROSENTHAL:  Deborah.

21          MR. BURKE:  Deborah.

22          THE COURT:  Deborah George.  And then you can come

23   back and file a supplement to your motion to transfer, not to

24   exceed ten pages.  Any opposition, not to exceed ten pages.

25   Any reply, not to exceed five.  Okay.

1          **MR. BURKE:**  Are those surreplies, Your Honor?  Is that

2     the case?

3          **THE COURT:**  Surreplies?

4          **MR. BURKE:**  Well, that's exactly where we are in this

5     case.

6          **THE COURT:**  Why?

7          **MR. BURKE:**  Even the judge allowed them to file

8     multiple surreplies in Maryland.

9          **THE COURT:**  I didn't say anything about surreplies.

10    Why do they need a surreply if they have a reply?

11         **MR. BURKE:**  That was my feeling as well, Your Honor.

12         **THE COURT:**  All right.

13         **MR. ROSENTHAL:**  Your Honor, one other point.

14        I appreciate the Court's ruling and I don't want to

15    suggest otherwise.  But contact with Maryland residents, they

16    say there aren't any, then there is no burden of ordering them

17    to produce any other contact with Maryland residents.  There is

18    no burden.  They say there aren't any.

19         **THE COURT:**  I'm deeming the matter submitted, and I

20    find that the one showing that's been made sufficient for

21    discovery is Deborah George.  Okay.

22        And now you have the briefing.  Do you want to talk off

23    the record for a moment with respect to when you're going to do

24    the deposition and when would be the first brief, and then

25    we'll go on a 35-day briefing schedule.  Okay.

1        Off the record.  Just talk to each other.

2                    (Off-the-record discussion.)

3        **THE COURT:**  On the record.

4        No later than November 6, counsel are to submit to the

5   Court a proposed schedule for the supplemental briefing and

6   include a hearing date with that of a couple of weeks after the

7   last document is submitted, or if that date doesn't work, then

8   some date after two weeks, but not before two weeks after.

9        And I may or may not need a hearing in this.  Now, I'm not

10  going to write a big order.  I'm just telling you that now.

11  You've had a hearing.  You know what my thoughts were.  It took

12  poor Judge Russell, trying to deal with all this stuff that you

13  gave him, a number of months.  At this point, the case is

14  getting older and starting to get old.  I want it to move

15  along.

16       So if I do not change my ruling, at least as to this part

17  of it, the idea of clear error then -- in fact, I may even

18  issue something in advance of the discovery part.  I may say

19  that for the reasons that I've stated here, I find that you

20  haven't shown clear error, and with respect to the new

21  evidence, that I didn't find it was sufficient in and of

22  itself, but I'm giving you an opportunity to do discovery.

23       And then once that comes in, I'll look at what you've said

24  about the new discovery.  I'll either have you back.  If I can

25  avoid it, I'll try to, so you don't have to come from far and

1    wide.  But if I -- if I can't avoid it, then I'll give you an

2    order telling you what I thought about the new findings that

3    you came up with, I guess.

4           **MR. BURKE:**  Thank you for your time.

5           **THE COURT:**  I'll be away for essentially most of next

6    week, so unless I can get this out right away -- you know what

7    I'm going to do thus far.

8           **MR. ROSENTHAL:**  Thank you very much.

9           **THE COURT:**  Thank you.  Very interesting.  Very

10   interesting case.  All right.  I await the next submission.

11   Thank you.

12                  (Proceedings adjourned at 10:13 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Friday, November 3, 2017

8

9     *Pamela A. Batalo*

10    _____
      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25