1  Samuel Rosenthal (pro hac vice)
   sam.rosenthal@nelsonmullins.com
2  Nelson Mullins Riley & Scarborough LLP
   101 Constitution Ave., N.W.
3  Washington, D.C. 20001
   Telephone:    +1 202-689-2915
4  Facsimile:    +1 202-712-2860

5  Cory E. Manning (State Bar # 213120)
   cory.manning@nelsonmullins.com
6  Nelson Mullins Riley & Scarborough LLP
   1320 Main St., 17th Floor
7  Columbia, SC 29201
   Telephone:    +1 803-255-5524
8  Facsimile:    +1 803-256-7500

9  Crispin L. Collins (State Bar # 311755)
   crispin.collins@nelsonmullins.com
10 Nelson Mullins Riley & Scarborough LLP
   19191 S. Vermont Ave., Suite 301
11 Torrance, CA 90502
   Telephone:    +1 424-221-7407
12 Facsimile:    +1 424-221-7499

13 Tania L. Rice (State Bar # 294387)
   tania.rice@squirepb.com
14 SQUIRE PATTON BOGGS (US) LLP
   275 Battery Street, Suite 2600
15 San Francisco, California 94111
   Telephone:    +1 415 954 0200
16 Facsimile:    +1 415 393 9887

17 Attorneys for Plaintiffs
   Planet Aid Inc. and Lisbeth Thomsen

18

19              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**

20 PLANET AID INC.; and LISBETH          Case No. 17-cv-03695-MMC
   THOMSEN,
21                                        **FIRST AMENDED COMPLAINT FOR:**
              Plaintiffs,
22                                        **(1) Defamation;**
          v.                              **(2) Negligence;**
23                                        **(3) Tortious Interference with**
   REVEAL, CENTER FOR INVESTIGATIVE           **Prospective Economic Advantage;**
24 REPORTING; MATT SMITH; and AMY        **(4) Placing Plaintiffs In a False Light;**
   WALTERS,                                  **and**
25                                        **(5) Unjust Enrichment.**
              Defendants.
26                                        **JURY TRIAL DEMANDED**

27                                        Judge: Hon. Maxine Chesney

28

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

i

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

<u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT................................................................................1

II.   JURISDICTION AND VENUE ............................................................................3

III.  THE PARTIES .......................................................................................................4

      A.   The Plaintiffs ..............................................................................................4

           1.   Planet Aid ........................................................................................4

           2.   Lisbeth Thomsen ..............................................................................4

      B.   The Defendants, Their Malawi Agent and Their Improper Tactics ........5

           1.   Defendant CIR ..................................................................................5

           2.   Defendant Matt Smith ......................................................................5

           3.   Defendant Amy Walters ....................................................................5

           4.   Defendants Rely on a Convicted Felon Not Only as a Major Source But Also As Co-Author ....................................................................7

IV.   THE USDA PROGRAMS .....................................................................................7

      A.   The Food For Progress Programs in Malawi Generally............................8

      B.   Summary of Achievements by Plaintiffs in Malawi ................................9

      C.   The USDA Programs in Mozambique ....................................................10

V.    DEFENDANTS SCHEME TO DEFAME PLAINTIFFS AND INTERFERE WITH THEIR BUSINESS OPPORTUNITIES ................................................................11

      A.   Defendants' Use of Articles to Falsely Accuse Plaintiffs of Criminal Conduct.....12

      B.   Defendants' Use of Radio To Spread False and Defamatory Statements About Plaintiffs ...................................................................................................14

      C.   Defendants' Use of Television to Further Defame Plaintiffs and Encourage Viewers To Stop Dealing with Planet Aid ............................................14

      D.   Defendants' Use of Social Media, Including Efforts to Get Individuals and Organizations to "Spread the Word" ......................................................16

      E.   Additional Tactics Used by Defendants to Harm Plaintiffs ....................18

VI.   THE DEFAMATORY STATEMENTS MADE BY DEFENDANTS IN FURTHERANCE OF THE SCHEME TO DAMAGE PLAINTIFFS' REPUTATIONS..20

      A.   Defendants Knew that It Would Have Been Impossible for Plaintiffs to Have "Siphoned Away" or "Stolen" "50-70% of over $130 Million" Received from the USDA, as Defendants Reported.............................................................21

ii

B.    Defendants Knew That It Was False to Report that "Fabricated Invoices" Were Used to "Siphon Away" Funds ............................................................................23

C.    Defendants Fabricated the Existence of Farmers On the USDA Project in Claiming Livestock Was Never Delivered or Died ..................................................24

D.    Defendants Fabricated the Existence of Another Farmer in the USDA Program In Order to Illustrate Claims that Farmers Were Deprived of Inputs, Including Seedlings and Fertilizer ............................................................................27

E.    Defendants Fabricated Claims that Villagers Were Forced to Pay for Water Pumps that Were Supposed to Have Been Given Away Under the Food for Progress Program .......................................................................................30

F.    Defendants Falsely Accused Planet Aid/DAPP Malawi of Having "Siphoned Off 50-70% of USDA Funds" through Employee Salaries ..........................................31

1.    Defendants' False and Defamatory Claims that Employees Were Forced to Pay 20-100% of Their Salaries to the Teachers Group ..............................32

2.    Defendants' False and Defamatory Claims that USDA Money "Stripped from Salaries" Went "Straight to Mexico," When It Actually Stayed In Malawi and Was Used by Those Contributing the Funds ..........................34

G.    Claims that Other Named and Unnamed Sources Had Evidence or Information that Plaintiffs Were Stealing Money or Engaging in Money Laundering ....................36

H.    Defendants Falsely Claimed That Planet Aid Falsified Employee Paychecks .......38

I.    Defendants Falsely Reported that USDA Officials Were Aware of Fraud by Plaintiffs but Were Sidelined, and that the USDA Failed to Take Action .............38

J.    Defendants' False And Defamatory Statements That An Alleged Fugitive Was Involved With The USDA Projects ............................................................40

VII.   DEFENDANTS' FAILURE TO ISSUE RETRACTIONS OR CORRECT THEIR PERVASIVE FALSE "STORYTELLING" .................................................................44

VIII.  DAMAGES SUSTAINED BY PLAINTIFFS .............................................................44

IX.    CAUSES OF ACTION .............................................................................................45

FIRST CAUSE OF ACTION ............................................................................................47

SECOND CAUSE OF ACTION .......................................................................................55

THIRD CAUSE OF ACTION ...........................................................................................59

FOURTH CAUSE OF ACTION ........................................................................................61

FIFTH CAUSE OF ACTION ............................................................................................61

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

iii

For its First Amended Complaint ("FAC") against Defendant the Center for Investigative Reporting ("CIR"), also known as Reveal, Defendant Matt Smith ("Smith") and Defendant Amy Walters ("Walters"), Plaintiffs Planet Aid, Inc. ("Planet Aid") and Lisbeth Thomsen ("Thomsen") (collectively, "Plaintiffs") state:

## I.   PRELIMINARY STATEMENT

1. This action concerns a news reporting agency and its reporters who violated their professional duty to honestly and fairly investigate and report events, and who instead engaged in a scheme to smear Plaintiffs' reputations, and create false and misleading images of both Plaintiffs. This scheme involved directly trying to convince individuals, groups, and the public-at-large to stop doing business with Plaintiffs. The goal of this scheme was ultimately to drive Planet Aid out of its charitable businesses, and destroy Thomsen's reputation – all so that Defendants could falsely claim credit for having uncovered fraud, corruption and abuse in a government foreign aid program, and thereby attract additional donors to Defendants' news organization. Defendants Smith and Walters could also secure their jobs.

2. Planet Aid, one of the two targets of the scheme, is a non-profit that has been in existence for twenty years, and has spent tens of millions of dollars of its own money for charitable purposes. Planet Aid's mission is to contribute to a more healthy and sustainable global environment and to serve people in impoverished parts of the world. Another target of the scheme, Thomsen, is employed by Planet Aid's subcontractor, non-profit Development Aid from People to People Malawi ("DAPP Malawi"), and has spent her adult life working on projects delivering much needed aid in Malawi.

3. To further their scheme, Defendants repeatedly published stories and aired broadcasts that painted false and misleading pictures of Plaintiffs relating to, among other subjects, the involvement of Planet Aid and Thomsen, as well as Thomsen's employer, DAPP Malawi, in United States Department of Agriculture ("USDA") programs in Africa.

4. More specifically, Defendants published statements that Plaintiffs had engaged in "systematic fraud," "stealing" and "siphoning off of funds" from the USDA programs, and "stripp[ed]" tens of millions of dollars from employee salaries that were then used as part of a

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

"money laundering" scheme.  When they published those statements, Defendants knew, or were reckless in not knowing, that those statements were contrary to documents in their possession and directly misstated what they had been told by the same "sources" they had interviewed, who were falsely claimed to have verified the statements by Defendants in their false and defamatory publications.

**5.**     Defendants published stories about Plaintiffs using various unlawful and improper tactics including, among other things: (1) using a convicted felon in Malawi to offer bribes or other inducements to potential sources in return for negative information about Plaintiffs; (2) falsely identifying  two alleged "farmers" in Malawi allegedly cheated by Plaintiffs under the USDA program, when one farmer had nothing to do with the USDA Programs and the other was not even a farmer, (3) relying on other sources known to lack credibility, including those who Defendants knew, or should have known, were engaged in criminal conduct, (4) making up claims that were so preposterous that Defendants themselves could not have possibly believed them to be true;  (5) drafting their stories before even interviewing sources or obtaining credible information to support their claims;  (6) reporting as "fact" statements that directly contradicted either documents shown to them or statements provided by claimed "sources;" (7) telling employees that they could sue Thomsen's employer and make a lot of money, and then urging them to say negative things about Plaintiffs; and (7) telling readers and sources that they had engaged in a thorough investigation that had uncovered wrongdoing, when they knew that their so-called "investigation" was so inept that Defendant Walters quipped that their entire investigation of a program in Mozambique responsible for feeding tens of thousands of children per day had lasted "ten minutes," and that they had gone to Mozambique so that they could "check off another country."

**6.**     Defendants published these defamatory stories based on CIR's stated mission of generating donor contributions for itself by claiming to use "innovative" techniques to "spark" investigations or other action.  CIR repeatedly acknowledged that its very survival depended upon its ability to attract contributions from donors who wanted to see more than mere informative articles, and instead, wanted to see an "impact" from CIR's "storytelling."

7. Ultimately, Defendants' tactics and "storytelling" created a damaging tale of fiction regarding Planet Aid and Thomsen, their charitable work in Africa and elsewhere, Planet Aid's activities in the United States, and even partners of Planet Aid – all to keep CIR funded and operating and Defendants Smith and Walters employed.

8. Defendants' scheme severely damaged Plaintiffs' reputations, funding, employment relationships and charitable work.  Defendants themselves have touted that their publications, replete with false and defamatory statements, have successfully caused donors to discontinue projects or activities with Thomsen's employer, DAPP Malawi, and/or Planet Aid.

9. Instead of enjoying their previous reputations among donors and partners willing to engage in projects with them, Plaintiffs now have been labeled "money launderers" claimed to be stealing funds from donor projects meant for the poor.  Thomsen has suffered the emotional distress of having been labeled a thief, money launderer, and schemer trying to steal money from the very recipients she has spent her life aiding through development programs.

## II.     <u>JURISDICTION AND VENUE</u>

10. Jurisdiction is conferred by 28 U.S.C. § 1332. Complete diversity among the parties exists, and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

11. Both the Northern District of California and the District of Maryland have jurisdiction over each Defendant named herein because each Defendant conducts business and/or activities in those Districts or has sufficient minimum contacts to render the exercise of jurisdiction  permissible under traditional notions of fair play and substantial justice, and under Maryland's long-arm statute: Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1)(2) and (4).

12. Venue is proper in both the Northern District of California and the District of Maryland in accordance with 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claims occurred in both Districts, or a substantial part of property that is the subject of the action is situated in those Districts; and wrongful conduct by each Defendant either occurred in those Districts or each Defendant resides or is located there.

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

## III.    THE PARTIES

### A.    The Plaintiffs

#### 1.    Planet Aid

13.    Planet Aid was incorporated in 1997 in Massachusetts and has its operational headquarters in Maryland.  Planet Aid is recognized by the U.S. Internal Revenue Service ("IRS") as being a not-for-profit organization.  Its dual mission is to assist in reducing the environmental impact from discarded clothing by finding an environmentally and socially preferable use for second-hand discarded clothing; and second, to generate funds, either through the sale of used and discarded clothing, or alternatively through government and other grants, to be used to help impoverished and needy populations throughout the world.

14.    In connection with its non-profit mission, Planet Aid has contributed over $50 million of its own money since its creation to charitable purposes in 16 countries, including in Malawi and Mozambique.

15.    Planet Aid has worked with a variety of organizations in order to accomplish its non-profit goals, including in Malawi and Mozambique.  Previously, it entered into contracts with DAPP Malawi, Ajuda de Desenvolvimento de Povo para Povo ("ADPP Mozambique"), and a variety of other organizations.  Planet Aid has entered into these and other contracts so that it can make use of organizations that have employees on the ground who are best suited to carry out the charitable mission of Planet Aid in impoverished locations.

16.    Planet Aid is also a member of the Federation Humana People to People, a non-profit organization that delivers goods and services to organizations, including Planet Aid, its subcontractors, DAPP Malawi and ADPP Mozambique.

#### 2.    Lisbeth Thomsen

17.    Thomsen has at all times relevant to this FAC been employed by Planet Aid's subcontractor, DAPP Malawi, as the Country Director in Malawi. As such, all of her activities for DAPP Malawi have been in service of a not-for-profit organization.

18.    Thomsen is a permanent resident of Malawi, and has resided there for approximately 22 years.  During her tenure in Malawi, she was responsible for, among other

things, supervising activities by Planet Aid's subcontractor, DAPP Malawi, under the Food for Progress Program between 2006 and 2013.

### B.    The Defendants, Their Malawi Agent and Their Improper Tactics

#### 1.    Defendant CIR

19.    Defendant CIR was founded in 1977 and operates a website and broadcasts podcasts under the name "Reveal."  CIR has its headquarters in California.  It also joins together with other news reporting agencies to publish newscasts throughout the United States.

20.    Defendant CIR claims that its mission is based on "investigative journalism and groundbreaking storytelling."  It further claims on its website that it is "among the most innovative, credible and relevant media organizations in the country."

21.    The tactics used by Defendant CIR give a different view of its "storytelling" and "innovative" measures used to create their "storytelling" scripts.  Instead of engaging in practices that would meet even minimal journalistic standards, Defendant CIR violated journalistic standards, its own ethics policies, and resorted to a convicted felon to obtain information, even though he had previously used his position as a journalist to extort money from a businessman in Malawi.  Defendant CIR also employed Defendants Smith and Walters, two reporters in the United States who published the false and defamatory materials relating to Plaintiffs.

#### 2.    Defendant Matt Smith

22.    Defendant Matt Smith is a reporter for Defendant CIR.  Defendant Smith actively assisted Defendant CIR in creating damaging "storytelling" about Planet Aid, notwithstanding the fact that the stories were based on "facts" known by Defendant Smith to be false.  In some cases, Defendant Smith created such facts by misleading individuals about his employment, actually impersonating  those responsible for delivering aid in Africa and falsifying his reasons for asking questions about the extent of his research and facts he claimed to have uncovered.  Defendant Smith, either directly or through an agent, also utilized bribes or other inducements to potential sources in order that such sources would offer false information.

#### 3.    Defendant Amy Walters

23.    Defendant Amy Walters also reported for Defendant CIR, and as with Defendant

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

Smith, published stories that she knew, or was reckless in not knowing, were false.

24.     Defendant Walters was aware from previous criticism of a story with which she was involved that some of the tactics used in reporting on Plaintiffs were improper.  In or about October 2011, Defendant Walters was responsible for a series of articles and news stories that appeared on a news organization other than Defendant CIR.  After a complaint was filed about the reporting in the series, an Ombudsman for that same news organization issued an eighty-page report in which he concluded, inter alia, that the "series was deeply flawed and should not have been aired as [the series] committed five sins that violate [the new organization's] code of standards and ethics."  ("The Ombudsman Report").

25.     The Ombudsman Report listed the following "sins" in Walters' series:

a)  No proof for its main allegations of wrongdoing;

b)  Unfair tone in communicating these unproven allegations;

c)  Factual errors, shaky anecdotes and misleading use of data by quietly switching what was being measured;

d)  Incomplete reporting and lack of critical context;

e)  No response from the state [involved in the reports] on many key points.

26.     Commenting again on the same series in which Defendant Walters was listed as the "producer," the Ombudsman stated also that "[t]he reported federal reimbursement numbers are badly inflated."   Another conclusion by the Ombudsman was that the series was replete with "innuendo and loaded half-truths."  And finally, the eighty-page Ombudsman Report concluded that "a major investigative series filled with errors and placed within a myopic framework slipped through the editorial cracks and on to the air and the Web."

27.     Notwithstanding these criticisms of such tactics, Defendant Walters participated in stories related to Plaintiffs that repeated many of these journalistic "sins."  Further, when it came to the "storytelling" concerning Planet Aid, Defendant Walters joined Defendant Smith – either directly or through their Malawi employee, agent and co-author – in offering bribes and inducements to individuals to provide false statements, reporting facts known to be false, and impersonating those responsible for supplying U.S. aid for those in desperate need of assistance

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

in return for saying negative things, irrespective of the truth, about Planet Aid and/or its subcontractors, DAPP Malawi and ADPP Mozambique.

### 4. Defendants Rely on a Convicted Felon Not Only as a Major Source But Also As Co-Author

28. Defendants employed the assistance of a local individual in Malawi who either contacted potential witnesses along with Defendants Smith and Walters or who was authorized by Defendants to represent to individuals that he was employed by Defendants.

29. This agent, Kandani Ngwira ("Ngwira"), lived and worked in Malawi, where he was a paid journalist. Ngwira was previously convicted of two felonies based on his journalist activities after he tried to extort money from an individual in Malawi in return for not publishing damaging information in the local newspaper where Ngwira worked. Both counts on which Ngwira was convicted constituted criminal felonies under Malawi's anti-corruption laws.

30. Ngwira co-authored, along with Defendants, a May 23, 2016 article regarding Planet Aid, entitled "US Taxpayers are financing alleged cult through African aid charities," which is attached to and incorporated into this FAC as Exhibit B ("The May 23rd Article"). The May 23rd Article contains numerous false and defamatory statements, as set forth below. Defendants continued to promote and publish materials generated by Ngwira about Planet Aid even while knowing that he was previously convicted of serious crimes involving his position as a journalist. One such article, published on or about August 21, 2017 even listed Ngwira as a "contributor," knowing of his criminal history as a journalist.

31. In addition to acting as an author or contributor, Ngwira also gathered statements that could be used by Defendants in publications. In this capacity, Ngwira tried to convince DAPP Malawi employees and former employees to make false and defamatory statements about DAPP Malawi and Planet Aid.

32. Ngwira engaged in actions relevant to this FAC while acting at the direction of all Defendants, either directly or through Defendants Smith and Walters.

## IV. THE USDA PROGRAMS

33. Defendants published stories about USDA Programs in Malawi involving both

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

Plaintiffs, as well as in Mozambique involving Planet Aid. Defendants claimed that Plaintiffs had stolen what amounted to $60 to $90 million from the Programs in these two countries, despite admitting that the reporters had spent a total of ten minutes in Mozambique where the bulk of the funds were spent. Defendants also admitted that they had focused their investigation in Malawi on a small portion of the Programs in that country, even though they accused Plaintiffs of having diverted funds from all phases of the Programs.

34.     The programs discussed by Defendants in a series of Articles and Broadcasts attached to, and incorporated into this FAC, include the Food for Progress Program ("Food for Progress Program") and Food for Education Program ("Food for Education Program"), in Malawi and Mozambique (collectively "the USDA Programs"). The Food for Progress Program included two contracts relating to Malawi, the first executed in June 2006 ("USDA I Contract" or "USDA I"). The second contract was executed in June 2009 ("USDA II Contract" or "USDA II"). Additionally, the USDA has provided grants under the Food for Progress and Food for Education Programs in Mozambique in which Planet Aid has participated.

**A.     The Food For Progress Programs in Malawi Generally**

35.     In or about June 2005, Planet Aid applied for a grant by the USDA to assist the poor and needy in Malawi by obtaining wheat purchased by the U.S. Government that could then be monetized and used for various purposes in Malawi. Such purposes included assisting farmers by providing much needed education in agricultural methods (the "Farmers Club Program"); developing schools to train teachers to alleviate severe overcrowding in classrooms (the "Teacher Training College Program"); educating the population through a program known as "Total Control of the Epidemic" ("TCE") as to the HIV/AIDS epidemic; and providing nutritional information. Ultimately, the USDA and Planet Aid entered into the USDA I and USDA II Contracts.

36.     When it awarded the USDA I contract to Planet Aid, the USDA had anticipated that Planet Aid would raise less than $6 million dollars through the sale of wheat, which could then be used to educate the farming community, build and enhance teachers training facilities, educate the population in Malawi about HIV/AIDS prevention and care and provide nutritional

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

counseling and education.  Planet Aid almost doubled that amount, raising over $10 million to be used for such purposes.

37.     Similarly, when it awarded the USDA II contract to Planet Aid, the USDA had anticipated that it would raise approximately $10 million dollars through the sale of wheat, which could then be used for the same purposes outlined above.  Planet Aid raised 30% more, or approximately $3 million additional dollars to be used in Malawi.

38.     The USDA audited the Food for Progress Program in Malawi after the Program had concluded, and found no material deficiencies, weaknesses, much less any fraud, theft or money laundering.

### B.     Summary of Achievements by Plaintiffs in Malawi

39.     Planet Aid used the sale of wheat to generate many millions of dollars more than was originally anticipated in the Food for Progress Programs.  As a result of the Plaintiff's efforts, the following achievements were realized in Malawi.

40.     Farmers received much needed training, instruction and advice on agricultural issues as well as over 1,000 locally produced rope pumps, additional motorized water pumps, hammer mills for grinding corn, goats and pigs, hoes and seeds.  Additionally, millions of trees were planted from seedlings.

41.     The TCE program reached well over three-quarter of a million people over six years with repeated one-on-one information from field officers going house to house educating about HIV/AIDS, how to stay free of infection and how to live with AIDS and/or HIV.

42.     Over 2,000 students were trained at Teacher Training colleges, while tens of thousands of community members benefitted from outreach programs from the colleges and many thousands of primary school students were taught by student-teachers from the Teacher Training colleges.

43.     Two Teacher Training colleges were constructed, furnished and equipped, almost exclusively with Food for Progress Program funds, with classrooms, offices and dormitories for hundreds of students as well as outdoor areas – and additional buildings were constructed at a third college, expanding capacity to accommodate an additional complement of students.

44.     Over the course of the Food for Progress Program, more than one million people, specifically in Malawi, were directly involved or touched by the program and its effect will be felt for many years.

### C.     The USDA Programs in Mozambique

45.     Between 2004 and the present, the USDA operated two grant programs involving Planet Aid in Mozambique: the Food for Progress Program and the Food for Education Program. Planet Aid first became involved in the former program through a contract in 2004 which called for Planet Aid to work with a local organization in that country, ADPP Mozambique, to provide a variety of benefits to the local population.  The benefits under the various agreements executed between the USDA and Planet Aid included operating the TCE Program in Mozambique, constructing soy based canteens and establishing irrigated vegetable gardens, providing a teacher training program, establishing farmers clubs, constructing a university to be used for education and training, and training instructors at that university.

46.     The second program involving Planet Aid and ADPP Mozambique, the Food for Education Program, began in 2012 in Mozambique.  In that Program, Planet Aid and ADPP Mozambique committed to establishing a feeding program in which tens of thousands of children would receive a corn and soy protein meal each school day.  This program also involved training over 4,500 school teachers.

47.     Planet Aid and ADPP Mozambique have successfully accomplished the goals set forth under the Food for Progress Program and continue to meet or exceed goals set forth under the Food for Education Program, which is still operating in Mozambique.

48.     The Compliance, Security and Emergency Planning Division at USDA issued an audit report dated April 29, 2013, in which it concluded that Planet Aid had "[f]ulfilled its financial and administrative responsibilities. . . [m]onetized commodities according to the agreement. . . [p]rovided adequate support for the use of monetization funds and . . . [p]rovided adequate support for program outputs."

49.     Notwithstanding that the USDA Programs in Mozambique were fully audited and met all program goals, Defendants published Articles and issued Broadcasts complaining that 50-

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

70% of Program funds had been "siphoned away."  Defendants knew when they published that statement that they had no credible source to support the accusation, and further, that they themselves had not done even a cursory investigation as to Planet Aid or ADPP Mozambique's activities in Mozambique.

## V.  DEFENDANTS SCHEME TO DEFAME PLAINTIFFS AND INTERFERE WITH THEIR BUSINESS OPPORTUNITIES

50.    Beginning in or about 2014 or earlier, Defendants joined efforts with other co-conspirators to discredit Planet Aid and cut-off all government programs in which the nonprofit was involved.  For their part, Defendants, along with Ngwira and other news organizations, embarked on a scheme that included: (1) publishing a series of false and defamatory attacks on Planet Aid and Thomsen; (2) approaching potential donors or individuals and entities with whom Plaintiffs had a business relationship, or prospective relationship, and making false and defamatory statements that Plaintiffs had "stolen" U.S. government funds, were "cheating" farmers, and engaging in money laundering; (3) offering people either bribes or other substantial inducements – either directly or through their Malawi co-author and agent – if they would assist Defendants' scheme, and (4) appearing on occasion as being employed by the entity or organization that had funded the USDA Program.

51.    Even before publishing any of the defamatory materials directed by Defendants at Planet Aid,  Defendant Walters had been warned explicitly in the Ombudsman Report that tactics used in the publication constituted various journalistic "sins."

52.    Additionally, when it came to the Planet Aid stories, in particular, the Senior Radio Editor at CIR openly voiced concern and told CIR's Producer she was "perturbed" about the way the stories were being created.   She wrote to CIR's Producer:

> I gotta say I'm a little perturbed about a story being written before the actual reporting is done.  Is this supposed to be a blueprint for the radio piece too?  That's not the way to produce a great story.  The story should proceed from the tape not the other way around.

53.    Instead of taking those concerns seriously by investigating the facts and creating the "tape" before the story was written, the Senior Radio Producer was told that this was not only the way CIR created radio productions, but that "this is apparently how they do it here for print

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

11

pieces . . they seem to write a draft of the story before all the reporting is done." The Senior Radio Editor was told also that reporters had already collected some material partly by using "some investigative news outlet there," without telling her that the reporters were using a convicted felon who had previously used his position as a journalist to extort money.

**A.     Defendants' Use of Articles to Falsely Accuse Plaintiffs of Criminal Conduct**

54.     Notwithstanding being aware that their stories created an entirely fictitious account of operations in Malawi and Mozambique, Defendants participated in a scheme to destroy Plaintiffs' reputations by, among other actions, publishing highly damaging false material and misinformation about virtually every facet of Planet Aid's business – without regard to the truth. These Articles were sent directly to individuals, appeared on the internet and were published throughout the United States, and indeed the world.

55.     True copies of the Articles published by Defendants, or containing statements by them, in furtherance of their scheme, are attached to, and incorporate in this FAC, and include the following:

- Exhibit A:  March 19, 2016 Article entitled "Alleged cult leader plays shell game with US foreign aid" (the "March 19th Article"), available at https://www.revealnews.org/episodes/alleged-cult-leader-plays-shell-game-with-us-foreign-aid/

- Exhibit B:  May 23, 2016 Article entitled "US taxpayers are financing alleged cult through African aid charities" (the "May 23rd Article" or "May 23, 2016 Article"), available at https://www.revealnews.org/article/us-taxpayers-are-financing-alleged-cult-through-african-aid-charities/

- Exhibit C:  May 23, 2016 Article entitled "How the USDA (inefficiently) turns grain into cash for charities," available at https://www.revealnews.org/article/how-the-usda-inefficiently-turns-grain-into-cash-for-charities/

- Exhibit D:  August 1, 2016 Article entitled "UNICEF cuts off funding to nonprofit linked to alleged cult," available at https://www.revealnews.org/article/unicef-cuts-off-funding-to-nonprofit-linked-to-alleged-cult/

- Exhibit E:  August 17, 2016 Article entitled "Congresswoman calls for US investigation of Planet Aid," available at https://www.revealnews.org/blog/congresswoman-calls-for-u-s-investigation-of-planet-aid/

- Exhibit F: August 18, 2016 Article entitled "McCollum calls for U.S. investigation of Planet Aid," printed in the MINNPOST, available at https://www.minnpost.com/politics-policy/2016/08/mccollum-calls-us-investigation-planet-aid/

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

12

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

- Exhibit G:  August 30, 2016 Article entitled "Mexico won't arrest Danish fugitive wanted for fraud," available at https://www.revealnews.org/article/mexico-wont-arrest-danish-fugitive-wanted-for-fraud/

- Exhibit H:  January 31, 2017, Article entitled "USDA said it didn't know charity had problems; documents show otherwise," available at https://www.revealnews.org/article/usda-said-it-didnt-know-charity-had-problems-documents-show-otherwise/

- Exhibit I:  March 28, 2017 Article entitled "On-second thought UNESCO rescinds prize for scrutinized group," available at https://www.revealnews.org/article/on-second-thought-unesco-rescinds-prize-for-scrutinized-aid-group/

- Exhibit J:  March 28, 2017 Article entitled " "US foreign aid follows complex path to teachers group coffers," available at  https://www.revealnews.org/article/us-foreign-aid-follows-complex-path-to-teachers-groups-coffers/

- Exhibit K: April 11, 2017 Article entitled "Federal investigations launched into charity group. US funds keep following,' available at https://www.revealnews.org/blog/two-federal-investigations-launched-into-charity-group-u-s-funds-keep-flowing/

- Exhibit L:  May 11, 2017 Article entitled "Government officials warned colleagues the charity was a cult to no avail," available at https://www.revealnews.org/blog/government-officials-warned-colleagues-the-charity-was-a-cult-to-no-avail/

- Exhibit M: May 17, 2017 Article entitled "Don't be Deceived.  Planet Aid is in it for itself," available at http://www.richmond-dailynews.com/2012/04/dont-be-deceived-planet-aid-in-it-for-itself

- Exhibit N: May 23, 2016 Article entitled "Planet Aid's ubiquitous clothing donation boxes aren't so charitable," available at https://www.revealnews.org/article/planet-aids-ubiquitous-clothing-donation-boxes-arent-so-charitable/

- Exhibit O:  August 21, 2017 Article entitled "Workers at African aid program linked to alleged cult sue for back pay," available at https://www.revealnews.org/article/workers-at-african-aid-program-linked-to-alleged-cult-sue-for-back-pay/.

(collectively "the Articles").

56.     These Articles contained false and defamatory statements about Plaintiffs, failing to adhere even to minimal journalistic ethics, standards and policies, including those recognized by professional associations and organizations, and indeed, even CIR's own code of ethics. Among other flaws, these Articles were based on flawed research, lacked any investigative support, relied on anonymous sources in order to avoid exposing the lack of any support for their

conclusions, and took facts or events out of context in order to create a false and misleading picture of Plaintiffs.

**B.      Defendants' Use of Radio To Spread False and Defamatory Statements About Plaintiffs**

57.     In addition to printed Articles appearing on the internet, Defendants were also responsible for a series of Broadcasts that contained numerous false and defamatory statements about Plaintiffs, including the following:

- Exhibit P:  A 53 minute broadcast aired on March 19, 2016 which was updated and aired on May 28, 2016, and June 2, 2016, and which accompanied the March 19th Article, "Alleged cult leader plays shell game with USDA funds;"  (the "March 19th Podcast" or the "March 19, 2016 Podcast").

- Exhibit Q:  May 31, 2016, 22 minute interview with Amy Walters on the Internet based newscast, RISING UP WITH SONALI, titled "Yellow Planet Aid boxes are front for dubious Danish organization."

- Exhibit R:  March 25, 2016 interview on radio station KCRW with Amy Walters and Matt Smith (the "March 25th Broadcast").

(collectively "the Broadcasts").

58.     The above Broadcasts suffered from many of the same deficiencies as the Articles in that they failed to adhere to even minimal journalistic ethics, standards and policies, and violated standards and policies adopted by journalistic organizations or associations, and even violated CIR's own code of ethics.

**C.      Defendants' Use of Television to Further Defame Plaintiffs and Encourage Viewers To Stop Dealing with Planet Aid**

59.     Defendants also used television to falsely vilify Plaintiffs in a program that similarly failed to comply with minimal journalistic ethics, standards and policies.   Defendants knew that Planet Aid serves poor and needy communities by raising funds through clothes donations.  Defendants used the news media to disseminate their false and defamatory statements about Planet Aid and also to urge the public to stop doing business with Planet Aid.

60.     More specifically, television broadcasts in which Defendants played a significant role, either in claiming to have conducted a joint investigation or having Walters and Smith appear as "guests," include the following:

- Exhibit S: May 23 and 24, 2016 broadcasts on radio and television station (NBC4 Washington), in what it called a "joint investigation" by that channel's I TEAM AND CIR, titled "Behind the Bins: Former Planet Aid Employees Describe Cult-Like Experience," and co-authored by Defendants Smith and Walters. (the "NBC Broadcast").

- Exhibit T: August 31, 2016 broadcast in which Defendants Smith and Walters gave an interview for a television program that aired in in Denmark, titled "Where's Amdi?"

61.   Defendants used television not simply to defame Plaintiffs but also to urge the public to stop dealing with Planet Aid. Defendants' co-conspirator, Tisha Thompson ("Thompson"), hosted a news broadcast on NBC I-Team, which appeared on the internet and also on television and was co-authored by Defendants Smith and Walters. This news broadcast included multiple false and defamatory statements about Planet Aid. That I-Team program was directed, in large part, both to residents in Maryland, where Planet Aid is based, and to leaders of governmental entities with whom Planet Aid had dealings and who were living in the Washington, D.C. metropolitan area. The program aired on May 23, and 24, 2016, and during the program, Defendants Walters and Smith "reported" to viewers that Plaintiffs had siphoned off money from the USDA Programs and that employees of DAPP Malawi had forced employees to pay kickbacks from their salary. *See* Ex. S.

62.   In the same broadcast, Defendants Smith and Walters falsely stated that they had interviewed individuals previously advocating on behalf of Planet Aid who were "totally embarrassed that they had been part of a totally fraudulent piece of propaganda" by Planet Aid. Ex. S. Other false and defamatory statements included that Plaintiffs had not provided promised water pumps to villagers, but instead were selling them at prices that they could not afford, and that Planet Aid and its subcontractor, DAPP Malawi, were extracting kickbacks from employees.

63.   Thompson used the television program to join with Defendants in directly appealing to individuals to cease dealing with Planet Aid. Thompson urged one of the guests to launch a broad appeal to stop doing business with Planet Aid, as reflected in the transcript incorporated herein as Exhibit S. Exhibit S also reflects an exchange between the newscaster and this former Planet Aid employee:

[Newscaster]   What would you tell people who are thinking about

Nelson Mullins Riley & Scarborough LLP
Attorneys at Law
Los Angeles

1    donating clothes to a Planet Aid box?

2    [Guest]: I have already told them to not do it.

3    **D.    Defendants' Use of Social Media, Including Efforts to Get Individuals and Organizations to "Spread the Word"**

4    64.    Defendants further advanced their scheme by using social media to spread their false and defamatory statements.  Copies of tweets and other social media used in furtherance of the scheme are attached as Exhibit U, and incorporated by reference in this FAC.

65.    Among other social media communications, Defendant Smith tweeted that Defendant CIR and Tisha Thompson were following a "surreal criminal scheme involving used clothing," see Ex. U-2, and on the same day, wrote that the stories related to a "reputed money-laundering cult" that "raises money via @ClintonGlobal," referring to the Clinton Global Foundation. See Ex. U-3.  Defendants, either directly or through co-conspirators, also contacted individuals or entities with whom Planet Aid and/or Thomsen had a relationship, and warned that Planet Aid and/or Thomsen were engaging in criminal and fraudulent behavior, and that the public should therefore stop doing business with Planet Aid and Thomsen.  *See generally* Ex. D.

66.    In a tweet, Defendants urged readers also to "spread the word," referencing their false and defamatory Articles and Broadcasts. See Ex. U-1.  In another tweet, Defendants urged readers to: "talk about it on Twitter.  Get more people talking about it on Twitter," U-5.   In this way, Defendants maximized the number of individuals exposed to the false and defamatory statements about Plaintiffs, including those in a position to adversely impact Plaintiffs. Defendants also intentionally sent the Articles and Broadcasts to other news organizations or public interest groups, hoping to expand the negative impact to Plaintiffs from their false and defamatory stories. *See, e.g*., U-9, 12-20, 25, 26, 28, 30, 32, 33-36.

67.    Defendants guaranteed that Plaintiffs' partner organizations would receive the false and defamatory statements by including in their defamatory "tweets" a "handle" for such individuals or organizations.  By way of example, two such organizations that Planet Aid has counted on for its development program are the USDA and the Clinton Global Foundation. Instead of simply mentioning the USDA and/or the Clinton Global Foundation, Defendants made

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

1  sure to include @USDA, @Clinton Global or @CGI in the message.  *See, e.g.*, U-12, 13, 14, 16-

2  24, 26. Defendants knew that such organizations would receive a copy of any tweet in which their

3  handle appeared.

4  68.    Defendants also sent messages directly to individuals and associations having a

5  relationship with Plaintiffs. For instance, the Rhode Island Resource Recovery Corporation

6  ("RIRRC"), shares the vision of encouraging the use of discarded clothing bins, and promotes not

7  only Planet Aid, but also other not-for-profits who are engaged in the same business.

8  Notwithstanding the lack of any legitimate business or professional reason for doing so,

9  Defendant Walters responded on or about June 6, 2016 to a plea by RIRRC to use Planet Aid by

10  sending RIRRC Defendants' false and defamatory May 23, 2016 Article, in order to dissuade

11  RIRRC from dealing with Planet Aid. *See* Exhibit U-7.

12  69.    In the same way, when Defendant Walters identified individuals living in

13  Maryland who shopped at a store operated by Planet Aid in that State, she directed them

14  specifically to the defamatory material in an effort to dissuade them from patronizing Planet

15  Aid's store. For instance, one Maryland resident tweeted on June 12, 2016 about Planet Aid's

16  store: "SO IMPRESSED with store in Catonsville, MD. Clean, well-organized, excellent service,

17  great deals. THANK YOU!!!!"  Ex. U-37.  Defendant Walters responded to this Maryland

18  resident directly on June 20, 2016 by tweeting such person a link to Defendants' defamatory

19  material, writing:  "Check out our Planet Aid investigation http://CIRnews.org/planetaid/," *Id.*

20  The tweet contained a link that brought the defamatory material directly to this Maryland

21  resident.

22  70.    The same thing happened when another Maryland resident urged those following

23  her on social media to come out and shop at the Planet Aid store.  U-8.  Defendants used that as

24  an opportunity to send their defamatory March 19, 2016 Podcast directly to this Maryland

25  resident.  *Id.*

26  71.    Defendants also directed their efforts to interfere with hiring efforts at the

27  Maryland headquarters of Planet Aid.  Defendants were aware that all of Planet Aid's donor

28  programs were operated out of the Maryland headquarters.  When Planet Aid posted information

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

at a local school advertising an opening at its Maryland headquarters, Defendant Walters attempted to dissuade individuals from applying for the position by sending Defendants' false and defamatory material to those involved in distributing the solicitation. *See* Ex. U-6.

72.     Co-conspirator Thompson also joined Defendants in sending social media using her Twitter account, as reflected in the tweets incorporated herein as Exhibit U-39.  Tweeting from her own account, she wrote to others in Maryland, where Planet Aid has operations, and asked "Have you seen a Planet Aid box on government or public school property?  Tell us where. . . ." These messages were sent for the purpose of bringing pressure to bear on individuals and organizations to have those bins removed.  Not knowing of the false and deceptive practices used in creating the program hosted by Thompson, a number of Maryland residents responded to these requests and joined in Thompson's efforts.

73.     Defendants and their co-conspirators also used email and other communications in order to "spread the word," referring to their defamatory materials.   For instance, one of the key partners of Thomsen's current employer, DAPP Malawi, is UNICEF, a well-known and highly regarded charitable organization.   In 2016, after Defendants had already published false and defamatory statements about Planet Aid, a co-conspirator, Pam Fritzler ("Fritzler"), contacted UNICEF in furtherance of the Defendants' scheme, and urged that it take action against Thomsen's employer, DAPP Malawi.

74.     Following this contact by Fritzler and publication of Defendants' false and defamatory statements about Planet Aid and DAPP Malawi, UNICEF terminated the program.  A representative stated:  "[w]e want to make sure there are no benefits, there are no funds going to the organization."   Defendants took credit for UNICEF's actions in an article published on August 16, 2016.  Ex. D.

**E.     Additional Tactics Used by Defendants to Harm Plaintiffs**

75.     Defendants employed drastic tactics to obtain negative information about Plaintiffs.  Either directly, or through Ngwira, Defendants offered bribes or other inducements for negative information about Plaintiffs.  On other occasions, Defendants told employees that they could make a lot of money by suing Thomsen's employer.   When those tactics were unlikely to

18

produce results, Defendants, either directly or through Ngwira, threatened one potential source: "I hope you are not one who plays both sides.  God is unhappy with people who play double standards."

76.   Defendants also claimed to work for those who had funded the USDA Program or DAPP Malawi and made false promises that they had no intention of passing on to the U.S. Government or to DAPP Malawi.

77.   Either directly or through Ngwira, Defendants Smith and Walters told villagers that they were employed by those providing funds for the USDA Program in Malawi. Local villagers were told that Defendants were traveling in Malawi so that their employer could see how its money was spent by Planet Aid and its subcontractor, DAPP Malawi.  When Defendants Smith and Walters made those statements, they had never held any such position with any governmental or non-governmental organization or entity providing funds as part of the USDA Program, including the USDA and USAID.  Moreover, Defendants Smith and Walters had no authority to make such statements or to represent that they had any connection with any such entity or organization.

78.   Further, Defendants Smith and Walters claimed that they could assist the village in obtaining fifty water pumps, telling the village leaders, either directly or through Ngwira, that they should provide negative information about the Food for Progress Program in order to expose those in charge at DAPP Malawi who had allegedly stolen from them. After such urging, Defendant Smith claimed in a television "report" that those leaders who had appeared previously in promotional materials on behalf of Planet Aid were embarrassed and ashamed that they had participated in such fraudulent propaganda.  Ex. S.  Defendants also falsely "reported" on the March 19, 2016 Podcast that village leaders in Njuli or those nearby were the ones who had reported being deprived of livestock and equipment under the Food for Progress Program.

79.   During a visit to another village, Defendants Smith and Walters again used a ruse in an effort to obtain negative statements about Planet Aid.  At this village, Defendants Smith and Walters told village leaders that they were employees of Planet Aid's subcontractor, DAPP Malawi, and were present in the village to report back on the progress of the Food for Progress

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

19

Program.  Defendant Smith and Walters told the village, either directly or through Ngwira, that DAPP Malawi would supply the village with a new machine that would instead operate on electricity.  When Defendants Smith and Walters made that promise they knew that none of the Defendants had any intention of making good on that promise, and that they had no intention of even alerting DAPP Malawi to the promise fraudulently communicated on its behalf.

80.     Further, when Defendant Smith and Walters made that promise to supply the village with a new milling machine, they knew, or were reckless in not knowing, that even if an electrically operated milling machine could be provided to the village there was no electricity to operate the machine.  As a result of these false and fraudulent promises, this desperately poor village was left waiting for an expensive piece of equipment that would never arrive or be operable.

81.     Defendants' scheme not only brought Planet Aid and Thomsen into disrepute, but it undid goodwill that had been developed through the USDA Programs.

## VI.     THE DEFAMATORY STATEMENTS MADE BY DEFENDANTS IN FURTHERANCE OF THE SCHEME TO DAMAGE PLAINTIFFS' REPUTATIONS

82.     Defendants accused Plaintiffs in their publications of fraud, money laundering and theft on a massive scale.  For instance, referring to a former employee of DAPP Malawi, Defendants reported that "a former financial controller, was one of the people who said he also saw fraud. . . . Now he says the money was stolen."  Ex. P.  Defendants also reported that "others say they added up to fraud intended to reroute aid money to other purposes," Ex. B, that "money [from the USDA grant] was not used [for] the intended purpose," *id*., and that Plaintiffs were involved in a "surreal criminal scheme" to misuse foreign aid funds.  Ex. U-2.. Defendants also took credit for donors cutting off ties to DAPP Malawi "following an investigation. . . by CIR . . . showing that the group diverted money [intended to be used to purchase agricultural inputs] intended to alleviate hunger and disease."  Ex. D.  All such statements were false and defamatory.

83.     Similarly, Defendants cited someone characterized as a "whistleblower," but who they knew had in fact never worked for, or had first-hand knowledge of, Planet Aid, DAPP Malawi, USDA, the Teachers Group or even any expertise helpful to the Articles.  Defendants

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

1    nevertheless quoted the false and defamatory statement by this individual: "It's blatant to me this

2    group is stealing, it's money laundering and they're keeping the money for themselves."  Ex. F.

3        84.    All of the foregoing statements were false and defamatory.  As explained below,

4    Defendants either knew, or were reckless in not knowing, that the factual basis for these claims

5    could be disproven by basic math, were supported by individuals with no knowledge of relevant

6    facts, or alternatively, were actually fabricated by Defendants themselves in order to support their

7    reporting.

8        A.    **Defendants Knew that It Would Have Been Impossible for Plaintiffs to Have**
             **"Siphoned Away" or "Stolen" "50-70% of over $130 Million" Received from**
9            **the USDA, as Defendants Reported**

10       85.    A hallmark of Defendants' defamatory statements was that the stealing, fraud, and

11   money laundering by Plaintiffs had resulted in their having "siphoned away" or "stolen"  "50-

12   70% of over $130 million" received as part of the USDA Programs.  Referring to a former

13   employee of DAPP Malawi, Defendants alleged in the March 19th Podcast:

14           Harrison [Longwe] is one of several insiders who told us 50-70% of the
            US government grant money was being siphoned-away, one transaction at
15           a time and most of them was [sic] headed to the Teacher's Group African
            headquarters in Zimbabwe.  [Ex. P]
16

17       86.    Defendant also quoted Longwe as stating that "[t]o me its what I will call

18   systematic fraud."  *Id.*  Defendants not only later repeated Longwe's statement, but now

19   embellished on it by reporting that it was not just Longwe who had made that statement,  but that

20   "[c]urrent and former DAPP employees told Reveal that the U.S.-funded Planet Aid/DAPP

21   operation was part of a systematic fraud."  *See* Ex. G.

22       87.    Both statements – by Longwe and by these other unnamed "current and former

23   DAPP employees" – were false and defamatory.  Defendants knew  that Longwe had no basis for

24   his outlandish allegations.   Defendants themselves reported that Longwe worked at DAPP

25   Malawi in 2014 and 2015, and therefore had overlapped with the program in Malawi for a short

26   time.  Notwithstanding such knowledge, Defendant Walters tried to corroborate claims that he

27   was an "insider" with personal knowledge of fraud by falsely reported that Longwe had worked at

28   the Malawi USDA project for a year.  Defendants further knew that Longwe had absolutely no

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

knowledge or involvement in Mozambique where the majority of funds in the USDA Programs had been allocated.

88. Defendants also quoted another former employee, Marko Zebiah ("Zebiah"), as saying that he put the figure at 70% based on his assessment that the results from the USDA program in Malawi should have been "huge," *see* Ex. P, even though Defendants knew that Zebiah had no training, expertise or knowledge sufficient to make that statement.

89. Notwithstanding the lack of any factual basis for making such statements in the March 19, 2016 Podcast, Defendants repeated the same false and defamatory statements set forth above in social media. In a "tweet" on March 24, 2016, Defendants falsely claimed that "insiders report siphoning 50-70% of $133m in US grants." *See* Ex. U-32. Similarly, in social media published on August 18, 2016, Defendants falsely tweeted that Planet Aid was a "charity that got $133 million from the U.S. Government," knowing that such facts were false. U-4.

90. Defendants published the foregoing statements knowing their patent falsity. Defendants elsewhere stated that the total amount paid out to Planet Aid for use in the USDA Programs was "less than two-thirds of that [over $130 million] amount…" Ex. C. Thus, by immutable basic math, it would have therefore been impossible for Plaintiffs to have siphoned off or diverted 50-70% of over $130 million.

91. Reports that Plaintiffs had "siphoned away" as much as $90 million (70% of $130 million) would have exceeded the total amount claimed by Defendants to have been received by Plaintiffs in the USDA Programs. Any such claim became even more ludicrous when Defendants had in their possession documents showing that tens of millions of dollars had been spent on the USDA Programs in Malawi alone. Such documents showed, for instance, that Planet Aid had spent almost double the amount in the Planet Aid proposal accepted in the USDA I Contract in 2006, and that Planet Aid had met all goals in amendments to that USDA I Contract, as well as goals in the USDA II Contract.

92. Defendants were also aware that many millions of dollars had been expended in building facilities acknowledged by Defendants to exist. These facilities included a brand new school in Shire Highlands, Amalika, additional teaching facilities in Chilangoma, and yet another

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

teacher facility in Dowa.  Defendants knew, or were reckless in not knowing, that if $65-$90 million (50-70% of $130 million) of the USDA funds had been "siphoned away," there would have been no money to build any of these facilities, which cost of millions of dollars to construct and which were readily visible to Defendants when they reported that funds had been "siphoned away."  Defendants falsely claimed that there was little evidence that USDA grant money had been seen "on the ground" in Malawi.

93.    Defendants also knew that if 50-70% of the funds had been "siphoned away," there would have been no way to have spent millions of dollars within the USDA I Contract on HIV/AIDS education and assistance to the Malawi population, which has been devastated by the epidemic, among other projects.

94.    In short, even apart from the aid given to the Malawian farmers, Defendants were aware, or were reckless in not knowing, that they lacked any basis for alleging that 50-70% of the USDA funds had been "siphoned away" to another country.

**B.    Defendants Knew That It Was False to Report that "Fabricated Invoices" Were Used to "Siphon Away" Funds**

95.    Another false means by which Defendants claimed to corroborate statements that "50-70% of the U.S. government grant money was being siphoned away," was by claiming in the August 17 and 18, 2016 Articles that Plaintiffs "fabricated invoices." Exs. E, F.   More specifically, Defendants stated in the August 17, 2016 Article that not only were funds "misused" but that "invoices were fabricated to cover up for charity work that was never performed."  Ex. E. This false and defamatory claim was repeated in the August 18, 2016 Article in the MinnPost. Ex. F.  Defendants also made the following false and defamatory claim:  "Dubious expenses . . . for aid projects funded by the United States were paid to offshore organizations controlled by the Teachers Group."  Ex. E.

96.    Leading readers to believe that Thomsen was orchestrating this scheme, Defendant Walters confronted Thomsen and stated that "[t]he people in charge of your money said you're stealing money," as reported in the March 19, 2016 Podcast.  Ex. P.

97.    Defendants knew, or were reckless in not knowing, that the supposed source for

these statements had no credible basis for such claims. Defendants again resorted in the March 19, 2016 Podcast to Harrison Longwe, the former employee of DAPP Malawi, *see* Ex. P, who Defendants falsely reported had worked on the Malawi project for a year, knowing that his employment at DAPP Malawi overlapped the USDA Program for only a short time. Defendants knew, or were reckless in not knowing, that Longwe had absolutely no basis for alleging that the invoices identified by him were "fabricated," and further, that the invoices identified by him in order to corroborate the diversion of funds had nothing to do with the USDA Programs.

98.     Notwithstanding knowledge of these facts eviscerating all basis for the outlandish alleged theft of funds, Defendants urged readers, associates and affiliates to "spread the word," and "talk about it" on Twitter. Get more people talking about it on Twitter…" Ex. U-1, 5.

### C.   Defendants Fabricated the Existence of Farmers On the USDA Project in Claiming  Livestock Was Never Delivered or Died

99.     As Defendants were fully aware, one component of the Food for Progress Program involved distribution of pigs and goats to Farmers Clubs participating in the USDA Food for Progress Program in Malawi. Defendants supported allegations, inter alia, that "50-70%" of funds had been "siphoned away," by claiming that Defendants Smith and Walters had spoken with farmers in the Food for Progress Program who indicated that they had not received promised livestock under that Program.

100.     In order to illustrate this claim, Defendants used a tape recording of an individual complaining that he and others in his village had been deprived of promised livestock. In truth, neither this individual nor anyone in his village had anything to do with the Food for Progress Program, as Defendants well knew or were reckless in not knowing.

101.     More specifically, in the March 19, 2016 Podcast, Defendants made a point of saying that Defendants Smith and Walters had "gone to Farmers' Clubs all over Malawi and they say their lives changed not at all from when [Planet Aid and DAPP Malawi] arrived and from when [they] left." Ex. P. In the same broadcast, Defendants reported that they had "visited Farmers' Clubs and that at every instance the Farmers themselves told us that was a lie" to say that farmers benefitted from the Food for Progress Program. *Id.*

102.   Defendants also reported elsewhere that they had "visited U.S. Department of Agriculture-supported farm sites in southern and central Malawi that Planet Aid had cited as prime examples of successes. Farmers said they had not received the livestock, . . . that had been reported to the USDA."  Ex. O.  Defendants reiterated that "Impoverished farmers in Malawi, who were supposed to benefit… also told Reveal they did not receive . . .  farm animals promised by Planet Aid."  Ex. F.

103.   The only individual identified and quoted in any of the stories about the lack of livestock was a sham.  In the March 19th Podcast, the Defendants played a recording of that individual, Johnney Kamwendo.  The March 19th Podcast contained the following exchange between Defendant Walters and Kamwendo:

> Amy Walters:  Along with vegetables, Planet Aid promised pigs and goats to breed as livestock.  He says they did get one pig and one goat.  Is the pig still alive?
>
> Speaker 9:  No.
>
> Amy:  Is the goat still alive?
>
> Speaker 9:  No.
>
> Amy:  So no other animals?
>
> Speaker 9: No.  We don't have any pig or goat in our homes because of [inaudible] donation.

104.   Approximately one week later, in a broadcast aired on March 25, 2016 by KCRW (the "March 25th Broadcast") Defendants Smith and Walters played the same recording of Kamwendo, in order to yet again corroborate statements about how farmers were cheated out of livestock under the USDA Programs.  Ex. R.

105.   And then, in the I-Team Program aired on May 23, 2016, Defendant Smith reported that "what little livestock was there had died."  Ex. S.  Defendant Walters repeated this same false and malicious story about the goat and pig that died when she was interviewed on a radio station.  Ex. Q.

106.   Defendants knew that this individual, Kamwendo, lived in the village of Mataka. Defendants also knew, or were reckless in not knowing, that Mataka was not part of the Food for

Nelson Mullins Riley & Scarborough llp
Attorneys at Law
Los Angeles

Progress Program, and that Kamwendo had nothing to do with that Program.  Aware that this individual's location would have revealed that he had nothing to do with the Food for Progress Program, Defendants consciously deleted any references to Mataka from an earlier script. Defendants instead reported in the final March 19th Podcast that Kamwendo lived "nearby" in another village, Njuli, that had been part of the Food for Progress Program knowing full well that the two were not located next to each other, or even close by.

107.    By claiming that Kamwendo lived "nearby," and introducing the tape in a story that focused on Njuli,  Defendants created the false impression that Kamwendo was part of the Farmers Club in Njuli, and that farmers there had been deprived of livestock in that village. Defendants did so knowing full well from their own observations when visiting Njuli that abundant livestock was visible in that village, and that it was completely false to claim that farmers there had been deprived of such benefits under the Food for Progress Program.

108.    Defendants' false and defamatory statements not only contradicted what they had observed themselves, but it also contradicted the observations of the USDA in reports obtained later by Defendants.  Defendants had obtained a field trip report from a USDA Program Analyst, who had visited Malawi in the Spring of 2013, and reported on the livestock program.  In that report the USDA Program Analyst offered constructive criticism of certain aspects of the USDA Program in Malawi, while praising others.  One area which he complemented was the livestock pass-on program instituted by Planet Aid and DAPP Malawi as part of the Food for Progress Program.   The Analyst called the livestock program a "bright spot in DAPP's agricultural interventions," and then wrote:

> Farmers' Club member spoke highly of the scheme, and it appeared to be functioning quite well during field visits.   DAPP's impact evaluation documented a significant expansion in livestock ownership over the life of the project, mostly due to the pass-on-scheme. Ex. H.

109.    Instead of reprinting what this USDA Analyst had to say about the livestock program, Defendants instead reported in an article published on or about January 31, 2017 that his comments "related to finances track closely with Reveal's earlier stories," and included a link to the earlier May 23rd Article, *see* Ex. H, which falsely represented that money was not used for its

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

intended purpose and criticized Planet Aid and DAPP Malawi's handling, specifically, of the livestock program, among others, under the Food for Progress Program.

110.   Defendants also had the documents relating specifically to livestock distribution to which the USDA Program Analyst had been referring in his trip report.   When Defendants published false and defamatory statements about farmers having been deprived of livestock, Defendants had in their possession official documents and records showing that over 400 livestock had been distributed as early as 2008 to farmers throughout Malawi, pursuant to the Food for Progress Program.

111.   Moreover, when they published the May 23rd Article (Ex. B) and March 19th Podcast (Ex. P), Defendants also had in their possession, among other documents, a draft final report for USDA II from November 2011, two years before the end of the project.   This report showed that the number of livestock as a result of the USDA Programs, either through direct contributions or additional offspring,  had grown to over 5,000 by October 2011, and that it was wholly misleading to suggest that a single dead goat and pig claimed by someone not even involved in the Food for Progress Program were representative of livestock grants under that Program.

**D.   Defendants Fabricated the Existence of Another Farmer in the USDA Program In Order to Illustrate Claims that Farmers Were Deprived of Inputs, Including Seedlings and Fertilizer**

112.   In addition to fabricating claims by Kamwendo about cheating farmers out of livestock, Defendants falsely reported that farmers were deprived of needed inputs consisting of seedlings and fertilizer.   More specifically, Defendants reported that they had "visited U.S. Department of Agriculture-supported farm sites in southern and central Malawi that Planet Aid had cited as prime examples of successes. Farmers said they had not received the . . . fertilizer, seedlings and other benefits that had been reported to the USDA." Ex. O.   Defendants also claimed that "Impoverished farmers in Malawi, who were supposed to benefit… also told Reveal they did not receive . . . fertilizer . . .  promised by Planet Aid." Ex. F.

113.   In the March 25, 2016 Broadcast, Defendant Walters claimed to play a recording of one such farmer who had been deprived of such "inputs."   The recording contained the

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

27

following:

> [Defendant Walters]:  The farm fields that we saw were not really fields.  I mean, we talked to the farmers there and they said that nothing really happened from the projects. . . .
>
> [Announcer]:  Okay, let's hear from two farmers you spoke to.  We'll hear one talking about the plants and one talking about the livestock.
>
> [Farmer]:  It was like there are just a few plants and some maybe they are dry, and some maybe they are not there because they are not given adequate inputs.
>
> [Second Farmer]: Now we do not have any pig and goat in our homes.  Ex. R.

114.    Defendants knew that these recordings were a sheer fabrication.  The farmer talking about his dead goat and pig was Kamwendo who, as explained above, had nothing to do with the USDA Food for Progress Program.  The other individual was not even a farmer.  Defendants' literal use of the taped material was a complete sham.  The person whose voice was used, unbeknownst to him, was not a farmer shortchanged under the USDA Programs, but was actually a former employee who had been terminated by DAPP Malawi in February, 2010.  In using this individual's voice in this way, Defendants not only deceived listeners about their claimed "source" and in doing so defamed Planet Aid, but also unfairly exposed this individual to claims that he had been trying to deceive listeners as to his real identity.

115.    The same former DAPP employee whose voice was used on the March 25th Broadcast was also repeatedly cited by Defendants in other publications as a primary source capable of validating claims that farmers were "shortchanged."  Even before the March 25, 2016 Broadcast in which this same individual's voice was used – unbeknownst to him – to impersonate a farmer "shortchanged" by Plaintiffs, Defendants alleged in the March 19, 2016 Podcast that this former USDA project manager (the "Former Project Manager") had intimate knowledge of the Food for Progress Program given his role in implementing the Farmer's Club program, and that he "took the job with Planet Aid so he could help his people . . . ."  Ex. P.

116.    Defendants knew, or were reckless in not knowing, when they made these statements that this Former Project Manager had been terminated in February 2010, halfway through the Food for Progress Program, for diverting funds from that program.  Instead of

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

28

correctly reporting this actual fact, Defendants characterized this individual's conduct and his termination by DAPP Malawi by saying that he "left his job in 2009 after a dispute over expenses." Not only were Defendants incorrect about the date of his departure, but calling the termination a "dispute over expenses" materially mislead Defendants' listeners.

117. Defendants alleged in the March 19, 2016 Podcast that they had received accounts from this Former Project Manager that supported the claim that farmers in Malawi were "cheated" and "shortchanged." Ex. P. Defendants reported:

> [the Former Project Manager] told us Planet Aid was cheating the people of Malawi.
>
> [the Former Project Manager]:  It was cheating.  It is not the reality.
>
> Matt:  What did you think the reality was?
>
> [the Former Project Manager]:  The reality, it was  . . . the farmers were not benefiting from farmers' club.  That is the reality.
>
> Matt:  [the Former Project Manager] says cheating, it was part of his job. *Id.*

118. Similarly, the May 23, 2016 Article also contained the false and defamatory statement attributable to this Former Project Manager, who supposedly stated that "[t]he money [from the USDA] was not used on [sic] the intended purpose. . . ." Ex. B.

119. Defendants knew when they published the foregoing statements by this individual that they were false and defamatory.  In truth, this same source believed and had communicated to Defendants and/or their agents that the farmers had benefitted from the USDA grant, and that he was unaware of any "cheating" by either Planet Aid and/or DAPP Malawi.  Defendants also knew from other information that Malawian farmers had in fact received more than promised by Planet Aid in the proposal accepted by the USDA in June 2006.

120. More specifically, documents in Defendants' possession when they published the May 23, 2016 Article show that Planet Aid represented that it would spend well over $1.5 million on the Farmers' Clubs.  Defendants further knew when they published the March 19, 2016 Podcast, claiming that Farmers' Clubs had been deprived of promised aid, that Planet Aid had actually spent more on Farmers' Clubs than anticipated in the original USDA I Contract and had

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

29

met or exceeded all goals contained not only in the original Contract, but also the goals in the Amendments to that Contract.

### E.   Defendants Fabricated Claims that Villagers Were Forced to Pay for Water Pumps that Were Supposed to Have Been Given Away Under the Food for Progress Program

121.   Another centerpiece of Defendants' "storytelling" about Plaintiffs' supposed fraud was the notion that Plaintiffs cheated farmers out of water pumps to have been distributed in the village of Njuli, located in southern Malawi and mentioned prominently in Defendants' March 19, 2016 Podcast and May 23, 2016 Article, as well as the I-Team Programs on May 23 and 24, 2016.

122.   Defendants made Njuli the "poster village" for the scheme attributed to Planet Aid and DAPP Malawi, and urged readers to believe that it was emblematic of the fraud perpetrated on farmers in Malawi.  A half-page photo of Njuli's chief standing next to a pump was featured on the front page of the August 17, 2016 Article.  Ex. E.  As explained above, farmers from Njuli were themselves the subject of a fraud by Defendants when they were promised fifty water pumps for their village in return for assisting Defendants.

123.   Using Njuli to illustrate the depth of Plaintiffs' alleged fraud, Defendants contended, first, that Plaintiffs failed to deliver water pumps as part of the USDA Program, and were instead selling them at prices farmers could ill-afford.  Defendants knew that it was false and defamatory to report that: "Planet Aid said it installed 576 water pumps throughout Malawi," and that "the Farmers' Club manager, said he had thought 25 of those pumps were targeted for Njuli," Ex. B, but that "in the village of [Njuli], they only gave away one pump.  They were actually selling the rest."  Ex. P.  Defendants knew that the village was not supposed to have received 25 pumps, and further, that the village had in fact received – free of charge – pumps that were supposed to have been delivered there.

124.   Notwithstanding knowledge of the true facts, Defendants repeatedly published this falsehood about a pump being sold to the village chief.  Defendants  falsely claimed that in both the March 19, 2016 Podcast, and in other publications that "[t]he village chief in Njuli was forced to pay for a Planet Aid pump with a $100 loan which took him two years to pay off, when the

Nelson Mullins Riley & Scarborough LLP
Attorneys at Law
Los Angeles

village was supposed to receive pumps free of charge," and that Enock Chikaonda, a village leader and Farmers' Club member, was the only villager given a pump by Planet Aid." Ex. B; *see also* Ex. S.

125.    The March 19, 2016 Podcast dramatized this alleged fraud by contending that "[o]ut of 300 families, only the village chief bought one," and then added:

> Matt:  [the chief] took out a loan to buy the hundred-dollar pump.  That money could have paid for a year of school for one of his children.  It took him two years to pay it off.  [Ex. P]

126.    Defendants knew, or were reckless in not knowing, when they made those statements that the village chief had not purchased a pump and that Enock Chikaonda was not the only villager given a pump by Planet Aid.  Further, neither the chief nor anyone else in the village paid anything for the pumps, nor did Planet Aid sell pumps in other villages.

127.    Furthermore, given the sham tactics used by Defendants to elicit any statements from these individuals, which included promising 50 water pumps for the village and falsely misrepresenting Defendants' identities, it was reckless if not outright false to report that these two farmers supported any of the other statements attributed to them in the March 19th Podcast; the May 23rd Article, which they were mentioned by name; the August 17, 2016 Article, where a half-page picture of the chief was featured on the cover of the story; or, the May 23rd or May 24th I-Team Broadcast, which referred to these two individuals.

**F.    Defendants Falsely Accused Planet Aid/DAPP Malawi of Having "Siphoned Off 50-70% of USDA Funds" through Employee Salaries**

128.    Another way in which Defendants tried to bolster their outlandish allegations that 50-70% of over $130 million in USDA funds had been siphoned away was by alleging in the March 19th Podcast that Planet Aid/DAPP Malawi extracted kickbacks from employee salaries, and that those employees were forced to contribute 20-100% of their salaries to a group called The Teachers Group.  Defendants alleged in the March 19th Podcast:

> That money from USDA grants, over $130 million, up to 70% was allegedly taken from the projects it was meant for and stripped from employee's salaries. Ex. P.

129.    The Teachers Group was initially conceived by a group of teachers who believed

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

that by joining together they could improve their lives, as well as the lives of those around them. In Malawi, those individuals who have decided to join the Teachers Group are encouraged to form small teams or "clusters" of 10 to 15 group members. Modest amounts of money collected from those small groups or "clusters" on a voluntary basis were used for the benefit of those clusters.

130.    At Planet Aid, approximately a half dozen out of roughly 300 employees were members of the Teachers Group when Defendants' defamatory stories were published. Notably, employees at DAPP Malawi were not pressured to join the Teachers Group. Defendants' claim to have seen documentation showing the members of the Teachers Group employed at DAPP Malawi, and therefore knew, or were reckless in not knowing, that the majority of such employees were not, and had never been, members of the Teachers Group. Further, Defendants or their co-author, Ngwira, had also spoken to sources who had decided not to join the group, Defendants knew from both these individuals and documents in their possession  that it was false and defamatory to report that employees were forced to join the group.

**1.    Defendants' False and Defamatory Claims that Employees Were Forced to Pay 20-100% of Their Salaries to the Teachers Group**

131.    Defendants also contended that employees had verified the use of kickbacks from employee salaries. This claim was made in, among other places, the March 19th Podcast and the May 23 Article. More specifically, it was false and defamatory for Defendants to have stated:

- "While researching this story we spoke to about a dozen African members of the Teacher's Group. All of them gave a portion of their salary to the group. From 20% to 100%, everything they earned." Ex. P.

- In the "deed of contribution" signed by employees "members [of The Teachers Group] agree to donate a portion of their salary – anywhere from 20 to 100 percent." Ex. B.

- Referring to Defendant Smith, "Smith said employees paid by Planet Aid showed him 'Deeds of Contribution' and other types of contract they said they were required to sign if they wanted to keep their jobs, promising to donate 20 to 100% of their salaries to Teachers Group." Ex. S.

132.    Statements relating to the dozen African members of the Teacher's Group interviewed by Defendants were false. Defendants made the statement that they had interviewed an "African member of the Teachers Group" who had contributed nothing to the Teachers Group

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

while being an active member of that group.  Nor had anyone in the group that he volunteered to lead contributed anything either.  Defendants did not "overlook" this individual when they published their stories.  This was the former Farming Instructor who was actually quoted in Defendants' May 23rd Article, March 19th Podcast and March 25th Broadcast.  However, Defendants failed to mention that both he and others in his group had contributed nothing to the Teachers Group while being active members.  Defendants had also interviewed other Teachers Group members who had not contributed 20% to 100% of their salaries.

133.   Not even the individual claimed by Defendants to support their story, Zebiah, could do so.  It was false and defamatory for Defendants to claim in the March 19th Podcast that Zebiah was forced to join Teachers Group, and that:

> Zebia [sic] said he was among the Africans who upon joining the Teachers Group were pressured to sign a contract, often called a "deed of contribution." In it, members agree to donate a portion of their salary - anywhere from 20 to 100 percent. Ex. P.

134.   Further, in order to emphasize that at least some employees were forced to contribute 100% of their salaries, Defendants repeatedly in their publications characterized the forced contributions as "slavery."  *See, e.g.*, Exs. P-21, U-25, 29.

135.   Defendants knew that Zebiah's statement was false as they had obtained a copy of a Deed of Contribution, and knew that it contained no such language.  All that it said was that individuals joining the Teachers Group agreed to a "common economy."  Notwithstanding clear evidence – in black and white refuting their claims – Defendants continued to report in the March 19, 2016 Podcast and May 23, 2016 Article, among other places, that the Deed of Contribution itself contained language committing individuals to an "agree[ment] to donate a part of [their] salary – anywhere from 20 to 100 percent."

136.   Not even Zebiah contributed the amount claimed, "20-100% of his salary."  As Defendants Smith and Walters had seen receipts and deposit slips from Zebiah, they knew that the statement supposedly made by Zebiah could not possibly be true, either as to him or any member of his group.  Nor had anyone else in Zebiah's group contributed the amounts falsely claimed by Defendants.  Given the modest sums actually contributed by Zebiah and others who

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

were either in Zebiah's group or who were interviewed, Defendants knew that it was false and defamatory to claim that Plaintiffs had forced employees into "slavery" by "extracting" as much as 100% of their salaries.

>   **2.**   **Defendants' False and Defamatory Claims that USDA Money "Stripped from Salaries" Went "Straight to Mexico," When It Actually Stayed In Malawi and Was Used by Those Contributing the Funds**

137.   Defendants' fabrication about "stripping salaries" also included false and defamatory claims that the money "stripped" from employee salaries was sent to Mexico, where the Teachers Group was allegedly headquartered, rather than benefitting those contributing the money.  Neither of the two sources cited in support of this claim could validate such claims.

138.   One such source was Zebiah.  Defendants knew, or were reckless in not knowing, that the money collected by Zebiah: (1) actually ended up in an account in his own name, (2) was used by the people in his group who contributed the money, and (3) was supplemented each month by the people – characterized by Defendants as "overseers" – who supposedly were stealing from Zebiah and his group.  These additional payments allowed younger members of the Teachers Group to have enough money for excursions, social events or other benefits.

139.   More specifically, the May 23rd Article alleged that Zebiah collected funds from his co-workers and paid those funds into the personal account of three representatives of DAPP Malawi.  The May 23rd Article alleged more specifically that Zebiah was:

>   one of the collectors of that salary tax. He once was a project manager for a USDA-funded farmers project in Dowa, in central Malawi. He still keeps a pile of collection and deposit slips showing where the money went: to the personal bank account of Teachers Group members who controlled DAPP Malawi. [Ex. B].

140.   The March 19, 2016 Podcast was similarly false and defamatory in stating (citing Zebiah):

>   Ibn [Iben] Petersen and Ula Thompson [Ole Thomsen], they are the account holder on behalf of Teachers Group in Malawi... We don't know what they can use, because we deposit the money in their accounts.  [Ex. P].

141.   When Defendants made the foregoing statement they knew, or were reckless in not knowing, that each and every month not only had all money in the joint account referenced by

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

Defendants been transferred to Zebiah into an account in Zebiah's own name (as well as a co-signatory), but in addition, that Iben Petersen, Thomsen and her husband Ole, or another senior DAPP Malawi staff member personally supplemented the account in Zebiah's name with their own personal funds.  This was so that Zebiah's group would have sufficient funds available for excursions or other group activities that solely benefited Zebiah's group, or initiatives sponsored by Zebiah's group, such as assisting a needy colleague or family member who had become ill.

142.    Defendants therefore falsely stated in the August 18th Article that Zebiah and others were paying kickbacks from their salaries to "Teachers Group overseers" when in point of fact Zebiah and other group leaders, were actually receiving funds from these claimed "overseers" for use by those contributing the money, not "kicking back" money to these "overseers."

143.    A second source was the same Former Project Manager whose voice was used – unbeknownst to him -- to create the sham story on radio station KCRW. It was false and defamatory for Defendants to report that this individual "knew where the money was going all along," and that the:

> employee working on the Planet Aid US farmers project in Malawi, he was told by his Teachers Group bosses, the money from the USDA was going "straight to Mexico," to a facility run by the Teachers Group. [Ex. P].

144.    Defendants knew these statements were false when they published them.  This former employee working on the USDA Projects had not been told by anyone, including his "bosses," that the money from the USDA was going "straight to Mexico."  Defendants knew, or were reckless in not knowing, that statement's falsity as this employee had never been told any such thing.

145.    When Plaintiffs filed suit on August, 2016, they disclosed to Defendants that it was false and defamatory to assert that money had been kicked back to others in the Teachers Group, that Zebiah did not know what happened to money collected by his group, and also, that money had been moved out of the country to Mexico.  Notwithstanding having been made aware of the true facts, Defendants Walters and Smith gave an interview in Mexico, in which they again claimed to have evidence of such kickbacks.  Defendants Smith and Walters gave an interview on

35

August 31, 2016, again reiterating this false and defamatory theory of employee kickbacks:

> The techniques that they were using were all about moving money from technical services contracts to Teachers Group entities outside the country. . . . Supervisors hire them, pay them their salaries, and then somebody comes around and makes them give up a portion of their salaries and deposit it into a bank account controlled by the same teachers group. Ex. S.

146.     Similarly, even after Plaintiffs filed suit against Defendants, stating in clear and unequivocal language that money raised by individuals in Zebiah's group ended up in an account in Zebiah's own name, and had not been sent to Mexico, Defendants published yet another article, on or about August 21, 2017, continuing to make false and defamatory statements about how USDA money was going to Mexico.   Defendants quoted another individual as claiming:

> A lot of the funding ... is not used to help the livelihood of poor Malawians. Fifty to 60 percent of the benefits of the Teachers Group are for the owners who are in Mexico . . . [Ex. O].

147.     Defendants either knew, or were reckless in not knowing, that this individual allegedly making this statement was in the same group as Zebiah, and that any money contributed by him or his group therefore did not go to Mexico, as claimed, but went to an account in Zebiah's name, for use by Zebiah's group, including for use by the very same individual allegedly making these false and defamatory statements.

### G.     Claims that Other Named and Unnamed Sources Had Evidence or Information that Plaintiffs Were Stealing Money or Engaging in Money Laundering

148.     Defendants knowingly relied on additional "sources" that they knew were unreliable and inadequate to sustain their false and defamatory statements.  Such "sources" were cited, for example, as supporting  claims that Plaintiffs Planet Aid and Thomsen had engaged in fraud and abuse.

149.     Thus, Defendants reported in the May 23, 2016 Article that Chiku Malabwe told Defendants that Thomsen's employer had instructed him to purchase items outside of Malawi when those items could have been purchased more cheaply in Malawi. Ex. B.  According to Defendants' quoted statements, Malabwe said he was instructed to buy items that "'would have been cheaper to buy locally…It would have been very much cheaper.'" The only purchases cited

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

in the May 23, 2016 Article were computers, which Defendants knew, or should have known, were substantially more expensive in Malawi than in the United States, where the computers cited in the May 23, 2016 Article were purchased.

150.    Defendants also knew, or were reckless in not knowing, that Malabwe had actually been arrested and charged with criminal conduct, and that when he was reported as a "source" for Defendants' false and defamatory statements, Thomsen's employer was actually pursuing Malabwe for damages to DAPP Malawi caused by his fraud.

151.    Finally, in the August 17, 2016 Article, Defendants quoted one person for the statement that "[it]s blatant to me this group is stealing, it's money laundering and they're keeping the money for themselves."  Ex. E.  Defendants knew that the "source" for this statement had no involvement with Planet Aid or DAPP Malawi, nor any experience or expertise in any USDA Programs or criminal laws, including money laundering, to state such facts.  Defendants knew or should have known that the "source" in the August 17, 2016 Article had no credible basis for her statements, but nevertheless included this "source" as corroboration for its statements, and even though her public statements had clearly shown a bias against Planet Aid based on misinformation.  *See* Ex. M.

152.    Defendants also relied extensively on "anonymous" sources knowing that it was contrary not only to CIR's own internal policies, but also to standards in the industry.  CIR disclosed sources having no relationship with Planet Aid or DAPP Malawi.  One such source cited in an article dated May 23, 2016 had actually never even worked for either Planet Aid or DAPP Malawi, and claimed – based on her experience in some other country approximately a decade prior to the start of the USDA program – that Amdi Petersen was somehow influencing Planet Aid's operations in the United States.  *See* Ex. N.

153.    Other statements were not based on sources, but claimed investigative action by Defendants which they never undertook. For instance, in its August 8, 2016 Weekly CIR news story, Defendant CIR stated that money had supposedly been siphoned off, stating that Defendant CIR had previously "followed the money from Malawi to Denmark and back to Washington – all to explain how U.S. taxpayers ended up footing the bill for an alleged cult's activities."

FIRST AMENDED COMPLAINT
17-cv-03695-MMC

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Defendants knew that statement was false and that they had not followed any money –

2    particularly USDA money -- from Malawi to Denmark, and had similarly not followed any

3    USDA money from Denmark to Washington.  This statement by Defendants was a complete

4    fiction.

5         **H.    Defendants Falsely Claimed That Planet Aid Falsified Employee Paychecks**

6         154.    Defendants also falsely claimed that Planet Aid lied to the USDA about employee

7    paychecks.  Defendants knew when they made these false and defamatory statements that Planet

8    Aid made no such statements – much less any false statements – regarding its employees'

9    paychecks.

10        155.    More specifically, Defendants claimed in the March 19, 2016 Podcast:

11            Marko Zebiah confirmed that, "funds are extracted by writing paychecks
             much smaller than reported to the USDA."  "It was written [salary], 350,
12            but she's getting $100 per month in salary. It's a tricky way of doing it."
             Ex. P].

13        156.    The May 23, 2016 Article similarly stated:

14
             Even before the Teachers Group pressured members to hand over money to
15            their bosses, funds are extracted by writing paychecks much smaller than
             reported to the USDA.  [Ex. B].
16
         157.    These statements were false and defamatory when Defendants published them.
17
     More specifically, Defendants knew, or were reckless in not knowing, that no one identified by
18
     Zebiah, or known to Defendants, had ever received only one third of what was reported to the
19
     USDA.  On an even more basic level, Defendants knew, or were reckless in not knowing, that
20
     individual paychecks were never even reported to the USDA.  In short, Defendants made up the
21
     claim by citing an entirely fictitious report covering employee paychecks, and then claiming that
22
     Planet Aid lied on that non-existent report.
23
         **I.     Defendants Falsely Reported that USDA Officials Were Aware of Fraud by
24                Plaintiffs but Were Sidelined, and that the USDA Failed to Take Action**

25        158.    Defendants CIR and Smith published an article on or about January 31, 2017, in

26   which they represented that "[t]he USDA has been aware since 2006 of the allegations of fraud

27   involving Planet Aid and the Teachers Group.  Internal emails show that staff members

28   repeatedly warned superiors about this problem, only to be sidelined."  Ex. H.

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

38

159.    Defendants knew when they made these statements that the same author of the emails had indicated that the only "allegations" of fraud by Planet Aid and Thomsen referenced by the USDA employee were those made by the media through Defendants and/or their co-conspirators, and further that this same USDA staff employee had written:

> They continue to allege that Planet Aid is directly linked to Tvind [the Danish name for the Teachers Group]. They have also suggested that some USDA resources are being siphoned off to individuals and/or organizations affiliated with Tvind. We have received no indication that this is true, but we want to be absolutely certain.

160.    It was false and defamatory to claim that the USDA had failed to take action, and on the contrary, had instead "sidelined" those who had warned about the "problem."  Defendants were aware, or were reckless in not knowing, that a number of extensive audits had been conducted at Planet Aid's facilities.  In January 2013, the USDA had conducted an extensive audit of the Mozambique project by Planet Aid and found no fraud or illegality.   The audit found that Planet Aid had "[f]ulfilled its financial and administrative responsibilities," "[m]onetized commodities according to the agreement," "[p]rovided adequate support for the use of monetization funds;" and "[p]rovided adequate support for program outputs."

161.    Defendants also knew, or should have known, that the USDA Foreign Agricultural Service itself performed an extensive audit at Planet Aid's headquarters relating to the Food for Progress Program in Malawi.  Defendants either knew, or were reckless in not knowing, that USDA employees had performed an audit over a number of days and had not found anything illegal or improper, or even any material deficiencies.

162.    Instead of acknowledging the existence of these extensive audits in 2013 and 2015, Defendants published the article on or about January 31, 2017 in which they cited to an earlier memorandum in 2013 by a USDA staff employee who had visited sites in Malawi.  While raising questions about some specific aspects of the Food for Progress Program in Malawi and actually calling other aspects "impressive," the staff member stated his conclusion that he had not found "anything nefarious about DAPP/Malawi itself," and, in fact, "[he] found the organization to be extremely well-intentioned."  Instead of reporting these facts, Defendants instead falsely wrote that this staffer's conclusions "related to [DAPP Malawi's] finances track closely with Reveal's

earlier stories," *id.*, which included claims – over and over again – that Planet Aid had stolen, siphoned away, or diverted anywhere between $60 and $90 million from the USDA Programs. Quite obviously, "well-intentioned," the lack of "anything nefarious," and "impressive" in no way track with CIR's hit pieces and CIR falsely characterized the staffer's contrary findings.

### J. Defendants' False And Defamatory Statements That An Alleged Fugitive Was Involved With The USDA Projects

163.    Defendants alleged in their March 19, 2016 Article accompanying the March 19, 2016 Podcast: "Our investigation finds that the U.S. government knew an international fugitive was linked to the projects, but kept the money flowing." Ex. A. Defendants also alleged, referring to Amdi Mogens Petersen ("Petersen"), that an "[a]lleged cult leader plays shell game with US foreign aid," Ex. A. These statements were false and defamatory as Defendants knew, or were reckless in not knowing, that this individual had no connection with the USDA Programs.

164.    More than fourteen years prior to the publication of Defendants' May 23, 2016 Article and March 19, 2016 Podcast, authorities in Denmark brought charges against 8 individuals, including against Petersen, who they claimed to have been a leader in the Teachers Group and had committed tax offenses in Denmark dating back twenty-five years ago.

165.    Planet Aid was not connected to that alleged conspiracy involving non-payment of Danish taxes, which had absolutely nothing to do with the USDA Programs. Defendants nevertheless offered two factually baseless claims to support its claimed "link" between Petersen and the USDA Programs. Defendants attempted, first, to "link" Petersen to the USDA Programs through an email involving the payment of $100,000 to Petersen. Referring to an individual from the Humana Federation, Defendants wrote in the May 23, 2016 Article:

> And the case against Amdi Petersen reveals that a high-ranking Teachers Group member Petersen associate named Paul Jorgensen was instructed to issue orders to Maria Darsbo. These messages were revealed in a May 14, 2000 email contained in court documents. The mission [was] to shift $100,000 in funds meant for charity to a Copenhagen bank account designated for Amdi Petersen and his girlfriend's personal use. [Ex. B].

166.    Defendants also attached a link to the document itself, on which they overlayed their own editorial description of what was contained in the document, writing: "[s]eized

Nelson Mullins Riley & Scarborough LLP
Attorneys at Law
Los Angeles

Teachers Group computers contained records showing allegedly showing illicit money transfers involving Planet Aid and an anti-AIDS program that has over the years received US funds."

167.    When Defendants made those statements they knew not only that the payment had nothing to do with the USDA Programs, which were not even in existence when the email was written, but also that the court in Denmark had found that there was nothing illicit about the payment, and therefore acquitted defendants in Denmark of any criminal conduct relating to the conduct set forth in that email.  Accordingly, Defendants knew when they published the above statement that the email in question did not even establish guilt by anyone, including the defendants in that case, and certainly could not honestly or fairly establish that Planet Aid had engaged in wrongdoing or that Petersen was "linked" to the USDA Programs.

168.    Defendants knew from documents in their possession, more specifically, that the Danish court considering the issue of the email and whether it suggested criminal behavior, had in fact rejected any such notion.  The court relied on a detailed audit in finding:

> This auditing company had attached to the declaration a detailed overview of the use of funds.. . . **The court states that the money was transferred to an account belonging to the Federation and concludes that the money was used for the purpose, for which support had been applied.** The court finds it must be presumed that the reference, which indicated that the amount should be available to Amdi Petersen and Kirsten Larsen, in reality meant only that the amount should be used for activities, which these defendants were engaged in within the Federation.  [emphasis added]

169.    Accordingly, when Defendants in the May 23, 2016 Article falsely linked Planet Aid to alleged criminal conduct by Mr. Petersen and others involved in the Danish case, they already knew that the City Court in Ringkobing, Denmark had rejected the very claim. Defendants also knew, or were reckless in not knowing, that even though the Danish prosecutor had decided to request permission to refile charges against Petersen following his acquittal, he declined to request permission to file any charge relating to the subject email.

170.    Defendants also attempted to falsely link Petersen and Planet Aid through a document hyper-linked to the May 23, 2016 Article, which had been released by the Federal Bureau of Investigation ("FBI").   Citing a document that predated by several years the start of either the Food for Progress or the Food for Education Programs, Defendants alleged that the

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

41

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

"FBI says, using information from Danish investigators, that Planet Aid is part of a fraud and global money laundering ring," and also alleged in the March 19, 2016 Podcast that there are "[r]eports from the FBI dating back to 2001 linking Planet Aid to this global fraud operation." Similarly, in an article dated March 28, 2017, the Defendants wrote that the "FBI say[s]" that Petersen is "behind a network of charities in the United States and Africa that include Planet Aid, DAPP," and others.  Ex. I.

171.    Defendants knew, or were reckless in not knowing, that this FBI document could not possibly establish a link between Petersen and the USDA Programs, particularly since Petersen had no role in Planet Aid, and, as with the 2000 email, Planet Aid was not even a part of the USDA Programs when the document was created.  And finally, whatever possible theory could be dredged up by Defendants showing a "link" between Petersen's alleged misconduct and Planet Aid had been finally and firmly rejected by the Danish court when it acquitted Petersen.

172.    Defendants nevertheless continued to claim that Petersen was behind Planet Aid. They claimed, for instance, that comments by Danish prosecutors relating to alleged offenses by Petersen and having nothing to do with Planet Aid nevertheless "follow a recent investigation  . . . by Reveal from The Center for Investigative Reporting, which raised additional questions about the network's use of U.S. foreign aid funds," referring to Planet Aid.  Ex. G.

173.    Defendants also attempted to bolster their false claim that Petersen was behind the USDA Programs by creating a simple fiction:  create a non-existent investigation by the  FBI of Planet Aid, and then make it appear as if this investigation was occurring while the USDA Programs were in existence.  In order to do so, Defendants quoted a source in the May 23, 2016 Article as saying "You don't give millions of dollars to a group that is being investigated for fraud, tax evasion and pilfering of humanitarian funds.  . . . But that is precisely what the USDA did."  [emphasis added].  Kris Alonge ("Alonge") herself had falsely alleged:

> "it doesn't take too much research to discover that very little
> funding actually makes it to those charity projects. And this is not
> just my opinion, but the conclusion of the Danish government and
> our FBI."  Ex.  M.

174.    Defendants knew that this individual, Alonge, had no personal knowledge about

42

1    the matter, had become interested in the issue while helping her daughter on a homework

2    assignment, and that when she complained to the FBI about Planet Aid, she had actually been told

3    by the FBI itself that it was not taking action against Planet Aid.  Alonge had not been told that

4    Planet Aid was "under investigation," or even that the FBI had reached a "conclusion" as to

5    Planet Aid, as she falsely alleged.

6        175.    Defendants nevertheless repeated Alonge's false and defamatory statements by

7    themselves falsely claiming that the FBI itself had reached a "conclusion" about Planet Aid's

8    criminal conduct.  Defendants stated that "[i]n a 2001 report, the FBI concluded that Teachers

9    Group leaders diverted funds raised by its network of organizations 'for personal use.  Little, to

10   no money goes to the charities.'"  Ex. B.  No such conclusion had ever been reached by the FBI,

11   and Defendants statements to the contrary, were false and defamatory.

12       176.    The foregoing statements by Defendants were materially false and misleading.

13   First, there were no "reports from the FBI dating back to 2001."  This fake linkage plainly implies

14   that there were a string of FBI reports about Planet Aid between 2001 and the present.   But

15   Defendants well knew that not only was the FBI making no current statements about Planet Aid

16   and The Teachers Group when the March 25th Broadcast or May 23rd Article were published,

17   but the FBI had **never made such statements at all**, even in 2001.  Defendants knew that some

18   unnamed source, in Denmark, unconnected to the FBI, was the source of statements referencing

19   Planet Aid, and that such statements were simply part of a request for information from unnamed

20   individuals in Denmark to U.S. authorities.

21       177.    Even after being made aware in the original Complaint in this action that the

22   Danish court had removed any factual basis for Defendants' claims that Planet Aid had been

23   linked to alleged illegal conduct in Denmark, Defendants continued to falsely and maliciously

24   report that Planet Aid had been shown by Danish prosecutors to be involved in a global fraud

25   scheme, and further falsely alleged that Planet Aid had been "accused" of illegal conduct in the

26   United States.

27       178.    When Defendants made the foregoing statements, U.S. Government officials with

28   knowledge of Planet Aid's work in Africa had found that "[Planet Aid] has complied with all the

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

43

financial and logistics monitoring reports on time and in accordance with their agreements. There is no evidence of wrong-doing, fraud, or waste found in those reports." (the "USDA Compliance Audit Memorandum").  Defendants also knew from the USDA Compliance Audit Memorandum in their possession that this same individual had reported that "numerous FAS [USDA Foreign Agricultural Service] staff persons have visited the sites in Malawi and Mozambique, and no FAS staff members have reported on or seen any criminal or fraudulent activity."

## VII.   DEFENDANTS' FAILURE TO ISSUE RETRACTIONS OR CORRECT THEIR PERVASIVE FALSE "STORYTELLING"

179.   Over the course of the period between March 2016 and the filing of this FAC, Defendants have failed to correct any of the statements detailed and discussed above notwithstanding that Defendants were requested on multiple occasions to issue retractions.

180.   On August 19, 2016, a request for a full retraction was sent to Defendants. Defendants were also requested to retract the Article published on or about January 31, 2017, and the Article published on August 21, 2017.

181.   Pursuant to Defendant's own operating procedures, "[c]hallenges to published or broadcast facts should be brought to the attention of editors immediately," as well as shown to other senior staff members for appropriate review.  Two editors involved with the preparation of materials about Plaintiffs were the Senior Radio Editor and the Executive Editor.

182.   Notwithstanding the fact that both editors had been involved with the preparation of materials concerning Plaintiffs, neither the Senior Radio Editor nor the Executive Editor performed even a minimally adequate review of the defamatory materials in order to determine whether to issue a retraction regarding the defamatory publications.  No other member of the staff conducted even a minimally thorough investigation to determine whether a retraction was appropriate.

183.   As of the filing of this FAC, no retraction has been issued as to any of Defendants' defamatory publications.

## VIII.   DAMAGES SUSTAINED BY PLAINTIFFS

184.   Plaintiffs have suffered substantial damages from Defendants' actions.   As to

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

44

Thomsen, she has suffered not just the emotional distress of having been accused of criminal conduct, but also financially as a result of Defendants' actions. As to the latter, she has had her salary cut by approximately twenty-five percent as a direct and proximate result of Defendants' actions. This also resulted in programs that Thomsen was responsible for administering being terminated after donors learned of false and defamatory allegations, inter alia, that Thomsen and her employer were "stealing" program funds.

185. Planet Aid has similarly suffered substantial financial damages as a result of the false and defamatory "storytelling" of Defendants. Such damages directly and proximately caused by Defendants' actions include, for example, the loss of revenue as a result of property owners at the following locations, among others, terminating existing contracts and/or relationships with Planet Aid and ordering the removal of bins from their property: gas station owners in Baltimore, Maryland, Dale City Virginia, Woodbridge, Virginia, Falls Church, Virginia, Arlington, Virginia, Alexandria, Virginia Annandale, Virginia, Arlington, Virginia, Aspen Hill, Md., McLean, Virginia, Washington, D.C., Annapolis, Md.; a property owner in Rockville, Maryland; convenience stores in Alexandria, Virginia, Richmond, Virginia, and Springfield, Virginia; a town in Montgomery County, Maryland; large retail chain stores in Mechanicsville, Virginia, Ashburn, Virginia, Edgewater, Maryland, and Hyattsville, Maryland; schools in Washington, D.C. and Montgomery County, Maryland; a mall owner in  Alexandria, Virginia; apartment complexes in Washington, D.C.; and a charitable organization in Martinsburg, West Virginia.

186. Planet Aid's development program has also been damaged as a direct and proximate result of Defendants' actions. Among other relationships, Defendants have interfered with Planet Aid's existing and/or prospective business relationships with the Clinton Global Foundation, the USDA, and/or USAID.

## IX.    CAUSES OF ACTION

### AS TO ALL CLAIMS

187. Defendants entered into an unlawful combination, confederation or agreement in

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

which they each agreed to participate, along with Ngwira, Thompson, Fritzler and Alonge, claimed "news" outlets and others.  The objects of that unlawful combination, confederation or agreement were to:   (a) make false and defamatory statements concerning Planet Aid and Thomsen; (b) use whatever means were available to Defendants, including but not limited to the internet, radio, television, email, social media and word of mouth to maximize the negative impact to Plaintiffs of the false and defamatory statements; (c) interfere with Plaintiffs' existing business relationships and prospective business relationships, including with respect to grants, partnerships, recycling projects and other activities in which Planet Aid and Thomsen were engaged; (d) drive Planet Aid out of business, and ruin Thomsen's reputation and ability to continue doing charitable work; and (e) claim, through the foregoing, that Defendants' news story had an "impact" deserving of additional, substantial donations so that Defendant CIR could continue to fund its operations, and Defendants Smith and Walters could remain employed.

188.    In engaging in this combination and agreement, Defendants, along with Ngwira, Fritzler, Alonge, Thompson, certain "news" outlets and others, had a unity of purpose or a common design and understanding, or a meeting of the minds, that they would all work together and agree to execute their scheme so that they could accomplish the foregoing objectives.

189.    In order to accomplish the foregoing objects of their conspiracy, Defendants and others with whom they conspired used the following means: (1) misrepresenting to farmers that they were employed by the entity or organization providing funds as part of the USDA Program; (2) misrepresenting on other occasions that they were employees of DAPP Malawi; (3) offering substantial inducements and bribes to individuals for providing negative information about Planet Aid and/or DAPP; (4) making false and defamatory statements to individuals in Malawi and elsewhere in order to induce them to make statements known by Defendants to be false or misleading; (5) uttering, publishing and broadcasting the above false and defamatory statements; (6) causing others to republish their false and defamatory statements; and (7) tortiously interfering with Plaintiff's current and prospective business relationships.

190.    In furtherance of this conspiracy, confederation and agreement, Defendants and their coconspirators took numerous actions, including but not limited to:  (1) traveling to Malawi;

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

46

(2) making the above false statements about Plaintiffs, including in published articles, broadcasts, podcasts and social media; (3) meeting with individuals in the village of Njuli in Malawi; (4) meeting with villagers in another village in Malawi; (5) distributing the same false information to third parties, including potential donors to Planet Aid and Thomsen's employer, as well as to potential partners or entities with whom Planet Aid and/or DAPP Malawi had either existing or prospective business dealings; (6) transmitting the same false information to third parties so that they would re-publish the statements; (7) encouraging other news sources to join with them in publishing the false and defamatory statements; and (8) placing the same information on social media so that it would be republished to the public at large.

191.    As a result of the conspiracy and agreement detailed above, Planet Aid and Thomsen have both suffered substantial damage.

**FIRST CAUSE OF ACTION**

**DEFAMATION**

**(Against All Defendants)**

192.    Plaintiffs Planet Aid and Thomsen restate and incorporate herein paragraphs 1 through 191 above.

193.    Defendants CIR, Smith and Walters knowingly, intentionally and maliciously made false and defamatory statements concerning Plaintiffs Planet Aid and Thomsen.  Each of the statements set forth below, were made by Defendants either knowing that they were false, or alternatively, while acting with reckless disregard for the truth or falsity of the statements.

194.    The same subject false and defamatory statements were made orally, in writing, and by way of electronic and social media, such as audio and visual recordings that were aired on public radio and the internet.  Consistent with its stated goal of wide and even world-wide distribution of its newscasts and reports, Defendants intentionally made sure that their defamatory statements were widely and repeatedly published to third parties, including government agencies in areas in which Planet Aid and Thomsen have been active, including but not limited to Malawi, non-government agencies, and existing and prospective partners.

195.    Such false and defamatory statements were made knowingly, and in a calculated

47

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

effort to cause harm to Plaintiffs' reputations and standing in the community, and indeed world-wide and are not privileged.   Defendants' false and defamatory statements are libelous, slanderous and defamatory on their face.

196.   Defendants' publication of such knowingly, intentionally and maliciously false and defamatory statements has negatively affected, and will continue to negatively affect Plaintiffs Planet Aid and Thomsen in connection with their businesses and professions, including but not limited to the current and prospective relationships with partnerships, including the USDA and/or UNICEF and other governmental and non-governmental donors and sponsors of programs.

197.   False and defamatory statements by Defendants included reports that Plaintiffs had engaged in fraud, money laundering, and other criminal conduct that included diverting, siphoning away or stealing funds from USDA funded projects.   It was therefore false and defamatory for Defendants to have reported that Plaintiffs had engaged in fraud, theft and/or money laundering in connection with the USDA Programs in Africa.   These statements included the following:

- Claiming that CIR was involved in reporting on a "surreal criminal scheme involving used clothing," and a "reputed money-laundering cult" that "raises money via @Clinton Global," referring to the Clinton Global Foundation. Ex. U-2-3.

- Claiming that a part of the job of a former farming instructor was "cheating," and "that the farmers were not benefitting from farmers clubs." Ex. B.

- "Harrison, DAPP's former financial controller, was one of the people who said he also saw fraud. . . . Now he says the money was stolen." Ex. P.

- DAPP former employee and "others say they added up to fraud intended to reroute aid money to other purposes." Ex. B.

- Confronting Thomson during a public event by telling her: "people inside your organization . . . say individually, one by one as we've interviewed them is that your organization is scheming US government funds.  Your own people.  The people in charge of your money said you're stealing money." Ex. P.

- A former employee was "saying the "money [from the USDA grant] was not used [for] the intended purpose." Ex. B.

- Citing someone for the proposition: "It's blatant to me this group is stealing, it's money laundering and they're keeping the money for themselves." Ex. F.

- "[I]nvoices were fabricated to cover up for charity work that was never performed." Ex. F.

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

- "Dubious expenses . . . for aid projects funded by the United States were paid to offshore organizations controlled by the Teachers Group." Ex. E.

- "Accountants and managers working on those projects said these invoices were fabricated to cover up for charity work that was never performed." *Id.*

- Plaintiffs engaged in the diversion of funds by, among other things, paying "what appears to be multiple bills for the same purpose," and money to a Hong Kong-registered trading company. *Id.*

- "Current and former DAPP employees told Reveal that the U.S.-funded Planet Aid/DAPP operation was part of a systematic fraud." Ex. G.

- "Workers suing for back pay also bolster previous allegations of an illicit scheme to misuse foreign aid funds." Ex. O.

198.   Further, Defendants made false and defamatory statements representing that Planet Aid and its subcontractor, DAPP Malwai, stole or siphoned away 50-70% of the over $130 million received by them from the USDA Programs in Malawi and Mozambique.   In making these false and defamatory statement, Defendant repeatedly reported that:

- Planet Aid was a "charity that got $133M from the U.S. Government," Ex. U-4.

- "[I]n . . . 2004 . . . the USDA started sending multi-million dollar grants to Planet Aid, and that "now the total tops $130 million and the US government is continuing to send more money today," Ex. P, while nevertheless reporting that Planet Aid had received approximately two-thirds of that amount.

- $133m tax dollars spent on @PlanetAid.  Ex. U-5.

- "@USDA grants to @PlanetAid top $133m." Ex. U-21.

- @PlanetAid . . . Given $133m @USDA grants.  Ex. U-27.

- "over $130m that the @USDA continues to give @PlanetAid @DappMaawi." Ex. U-29.

- "@reveal investigates @PlanetAid  . . receiving $133m @USDA grants." Ex. U-30.

199.   Defendants knew that Plaintiffs had never received this amount, and that it was therefore false and defamatory to report that Plaintiffs had "diverted," "siphoned away" or "stolen" 50-70% of that amount.  It was, accordingly, false and defamatory, to report:

- "Harrison [Longwe] is one of several insiders who told us 50% to 70% of the US government grant money was being siphoned away, one transaction at a time and most of them was headed to the Teacher's group African headquarters in Zimbabwe." Ex. P.

49

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

- "[I]nsiders report siphoning 50-70% of $133m in US grants."  Ex. U-32.

- "[M]oney from USDA grants, over $130 million, up to 70% was allegedly taken from the projects it was meant for and stripped from employees' salaries."  Ex. P.

- "50-70% of the money [from the USDA Food for Progress Program] was ending up somewhere else."  Ex. Q.

200.   Further, Defendants made false and defamatory statements that Plaintiffs had engaged in illegal conduct by diverting USDA funds "straight to Mexico," rather than being used as intended for the USDA Programs.  These statements included, among others, the following:

- "[T]he employee working on the Planet Aid farmer's project in Malawi, he was told by his Teacher's Group bosses, the money from the USDA was going straight to Mexico."  Ex. P.

- "[That same employee] knew where the money was going all along."  *Id.*

- DAPP former employee and "others say they added up to fraud intended to reroute aid money to other purposes."  *Id.*

- "A lot of the funding ... is not used to help the livelihood of poor Malawians. Fifty to 60 percent of the benefits of the Teachers Group are for the owners who are in Mexico . . ."  Ex. O.

- "' The United States people, I think they should know the Teachers Group has used their money in a way that was not the intended purpose. . .  They're helping somebody who is in Mexico building mansions."  *Id.*

201.   Using fabricated farmers participating in the USDA Program, among other false sources, Defendants made false and defamatory statements that Plaintiffs had deprived farmers of promised livestock, agricultural inputs and water pumps needed to improve conditions in Malawi, in particular.  False and defamatory statements included:

- Funds were cut off to Plaintiffs "following an investigation . . .  by CIR  . . . showing that the group diverted money [intended to purchase agricultural inputs] intended to alleviate hunger and disease."  Ex. D.

- Defendants "visited Farmers Clubs and that at every instance the Farmers themselves told us that was a lie" to say that farmers benefitted from the food for Progress Program.  Ex. O.

- Fabricating the voice of one alleged "farmer" on radio station KCRW who was allegedly cheated out of  agricultural "inputs" to which he was entitled under the USDA Programs, knowing that this individual was not a "farmer," but someone who had been terminated for diverting money from farmers under the USDA Program in Malawi.  Ex. R.

- Playing a tape recording of a farmer who had nothing to do with the USDA

50

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

Farmers Club Program, while claiming that he was deprived of livestock under that Program since his village had received only one goat and one pig, which had died, and that they had no "pig or goat in [their] homes" because of any donations. *Id.*

- (Referring to the same farmer), "We spoke to the project managers, we spoke with farmers. One farmer we spoke to said he had received a goat and pig. . . . Of course they died." Ex. Q.

- "What little livestock was there had died." Ex. S.

- "Impoverished farmers in Malawi, who were supposed to benefit, . . . also told Reveal they did not receive water pumps, fertilizer, and farm animals promised by Planet Aid." Ex. F.

- "When Reveal visited USDA projects in Malawi in 2015, however, farmers still were impoverished, and project staff said the money had been misused." Ex. K.

202. Further, Defendants statements were false and defamatory in reporting that farmers had been deprived of water pumps to have been provided under the USDA Programs. Defendants knew that it was false and defamatory to report:

- "Planet Aid promised water pumps too so farmers were no longer dependent on the season rains to grow food, but in the village of [Njuli] they only gave away one pump. They were actually selling the rest." Ex. P.

- [Defendant Walters]: "Out of 300 families, only the village chief [in Njuli] bought one." *Id.*

- [Defendant Smith]: "[The Chief] took out a loan to buy the hundred-dollar pump. That money could have paid for a year of school for one of his children. It took him two years to pay it off." Ex. P.

- "Planet Aid said it installed 576 water pumps throughout Malawi. . . . [T]he Farmers' Club manager, said he had thought 25 of those pumps were targeted for Njuli," Ex. B, but that "in the village of [Njuli], they only gave away one pump. They were actually selling the rest." Ex. Q.

- "[T]he village chief [in Njuli], he was so adamant that he needed a rope pump" that he "asked DAPP Malawi for his own rope pump, and they said – fine – they would give it to him, but he had to pay $100. And it turns out, that cost him two years to pay off." Ex. Q.

- "In Njuli, Reveal reporters found the village had only two pumps. On was given to the village. The chief bought his, he said, with a $100 loan that took him two years to pay off. . . . Enock Chikaonda, a village leader and Farmers Club member, was the only villager given a pump by Planet Aid." Ex. B.

- "The village chief in Njuli was forced to pay for a Planet Aid pump with a $100 loan which took him two years to pay off, when the village was supposed to receive pumps free of charge." Ex. B.

- Planet Aid and DAPP Malawi "only provided a single substandard pump to each

51

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

community and made them buy the rest at prices they could not afford." Ex. S and television I-Team Program.

203.    Defendants also made false and fraudulent statements asserting that as part of their fraud, theft and money laundering scheme, Plaintiffs had extracted kickbacks of 20-100% from employee salaries. These statements, which were false and fraudulent, included the following:

- "While researching this story we spoke to about a dozen African members of the Teacher's Group. All of them gave a portion of their salary to the group. From 20% to 100%, everything they earned." Ex. P.

- "Zebiah said he was among the Africans who upon joining the Teachers Group were pressured to sign a contract, often called a 'deed of contribution.' In it, members agree to donate a portion of their salary - anywhere from 20 to 100 percent." Ex. B.

- Forced contributions was "slavery." Ex. P, U-13, 14, 17, 18, 19, 24, 26.

- "Money was kicked back by employees to an account of Ibn Petersen and Ula Thomsen, and those contributing the money "don't know what they can use, because we deposit in their accounts. . . . He said the money went into the personal bank accounts of two Teacher's Group bosses. Ibn Petersen and Ula Thomsen, and Ula is the husband of Lisbeth Thomsen." Ex. P.

- In the "deed of contribution" signed by employees "members [of The Teachers Group] agree to donate a portion of their salary – anywhere from 20 to 100 percent." Ex. B.

- Referring to Defendant Smith, "Smith said employees paid by Planet Aid showed him 'Deeds of Contribution' and other types of contract they said they were required to sign if they wanted to keep their jobs, promising to donate 20 to 100% of their salaries to Teachers Group." Ex. S, and television I-Team program.

- "Former and current Teachers Group members in Africa told Reveal that they were forced to kick back . . . portions of their USDA-funded salaries to a bank account controlled by their Teachers Group overseers." Ex. F.

- "One group in Africa that received U.S. government funds compelled employees to kick back portions of their salaries to a bank account controlled by their Teachers Group overseers." Ex. E.

- "The techniques that they were using were all about moving money from technical services contracts to teachers group entities outside the country. . . . Supervisors hire them, pay them their salaries, and then somebody comes around and makes them give up a portion of their salaries and deposit it into a bank account controlled by the same teachers group." Ex. T.

204.    Defendants also falsely claimed that Plaintiffs had lied to the USDA about employee salaries. Such false and defamatory statements included:

- Reporting that employees were suing over back pay, Ex. O, without telling readers that the individual contributing to the article, Ngwira, had told

1    employees that they could get a lot money by filing that suit.  Ex. __

2    • "Funds are extracted by writing purchases much smaller than reported to
3       the USDA . . ."  "It was written [salary], 350, but she's getting $100 per
        month in salary. It's a tricky way of doing it."  Ex. B.

4    • "Even before the Teachers Group pressures members to hand over money
5       to their bosses, funds are extracted by writing paychecks much smaller
        than reported to the USDA.  In this way, [one employee said] employers
6       were siphoning $250 from her $350 per month salary, she said, and then
7       applying pressure to kick back even more.  Zebiah said the DAPP project
        manager's story conforms with DAPP policy in Malawi."  Ex. B.

8        205.    Defendants falsely claimed that "You don't give millions of dollars to a group that

9    is being investigated for fraud, tax evasion and pilfering of humanitarian funds, . . .  [b]ut that is

10   precisely what the USDA did."  Ex. B.

11       206.     Defendants then went even further and claimed that government officials had

12   concluded that Planet Aid had been diverting funds, and was part of a fraudulent or global money

13   laundering operation, and that a leader of the Teachers Group had been shown to have been

14   involved with the USDA Programs.  These statements included, among others, the following:

15   • "In a 2001 report, the FBI concluded that Teachers Group leaders diverted funds
16      raised by its network of organizations 'for personal use.  Little, to no money goes
        to the charities."  Ex. B.

17   • "The FBI says, using information from Danish investigators, that Planet Aid is part
18      of a fraud and global money laundering ring."  *Id.*

19   • Planet Aid was included in a network that "was part of what prosecutors call a
        global charities fraud scheme."  Ex. O.

20   • "[S]eized Teaches Group computers contained records allegedly showing illicit
21      money transfers involving Planet Aid and an anti-AIDS program that has over the
        years received US funds."  Ex. B.

22   • "Our investigation finds that the U.S. government knew an international fugitive
23      was linked to the projects, but kept the money flowing."  Ex. A.

24   • "Alleged cult leader plays shell game with US foreign aid,"  Ex. A.

25       207.    Defendants knew, or were reckless in not knowing, that the above statements were

26   false as Defendants were aware, or were reckless in not knowing, that the "alleged cult leader"

27   had no involvement with the USDA Programs.

28       208.    These statements appearing in the Articles and Broadcasts annexed as exhibits to

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

this FAC and incorporated herein, together with radio and television programs, and in social media described above, were intended to, and did have the result of holding Planet Aid and Thomsen up to ridicule, hatred, scorn, contempt and disgrace.  Defendants' false statements discredited and disparaged Planet Aid and Thomsen in their respective business communities and discouraged others from associating with, or engaging in, projects or business opportunities with Planet Aid and Thomsen.

209.    In addition, Thomsen has not only been embarrassed, humiliated and ridiculed, but she has suffered emotionally as a result of being accused to be a money-launderer, thief, and insider abusing DAPP Malawi employees, as well as the people of Malawi whom she has faithfully attempted to assist for many years.

210.    Further, by knowingly, intentionally and maliciously publishing such false and defamatory statements about Planet Aid and Thomsen, Defendants intended to, and did defame Planet Aid and Thomsen, and caused substantial damage and harm to Planet Aid and Thomsen's reputation and standing in the community, particularly with government agencies, individuals and other not-for profits who might wish to participate with Planet Aid and/or Thomsen in programs to serve needy individuals and communities, including the USDA and/or UNICEF.

211.    Defendants' false and defamatory statements were made orally, in writing, and by way of electronic and social media, such as audio and visual recordings that were aired on public radio, and the internet.  Consistent with its stated goal of wide and even world-wide distribution of its newscasts and reports, Defendants intentionally made sure that their defamatory statements were widely and repeatedly published to third parties, including government agencies in areas in which Planet Aid and Thomsen have been active, including but not limited to within Malawi and to non-government agencies and existing and prospective partners.

212.    Defendants uttered, repeated and published these false and defamatory statements in a calculated effort to cause harm to Plaintiffs' reputations and standing in the community, and indeed world-wide, and are not privileged, and have damaged Plaintiffs.  As a result, Plaintiffs have been damaged.  Defendants' false and defamatory statements are libelous, slanderous and defamatory on their face.

54

213.    Defendants knew, or were reckless in not knowing, that the above statements were false. Further, Defendants were placed on notice that their publications contained false and defamatory statement when Defendants were sued by Plaintiffs in this action in August, 2016. Notwithstanding notice in that complaint that specific allegations in their publications were false and defamatory, Defendants failed to issue a retraction or take any action to ensure that Plaintiffs were not damaged as a result of their actions. Defendants were repeatedly requested also to issue a retraction and/or correction.  Notwithstanding a demand for either a retraction or correction, Defendants failed to issue any such retraction or correction, and instead, continued to publish false and defamatory materials.  Instead, Defendants continued to repeat false and defamatory materials, and further, to issue new stories containing new and additional false and defamatory statements.

214.    Defendants are liable to Planet Aid and Thomsen for defamation, including libel and slander, in an amount to be determined by the trier of fact.

**SECOND CAUSE OF ACTION**

**NEGLIGENCE**

**(Against all Defendants)**

215.    Planet Aid and Thomsen restate and adopt paragraphs 1 through 214 above.

216.    If it is ultimately determined that Defendants did not act with knowledge that what they were reporting was false, or alternatively did not do so with reckless disregard for the truth of the matters they were reporting, then all three Defendants were at least negligent in their researching and investigating, reporting and publishing their stories, and more specifically, the statements appearing in the First Cause of Action.  This negligence included making allegations without an adequate investigation; without proof or reliable source material; fabricating sources or the qualifications of sources to make statements reported by Defendants; utilizing an unfair tone that was accusatory in nature notwithstanding the lack of proof of allegations; making factual errors and taking events or anecdotes out of context; switching between topics and events so as to unfairly blend together facts and events; providing a lack of critical context for their stories and claims; and failing to conform their Articles, Broadcasts and social media to minimum

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

journalistic standards, including CIR's own code of ethics.

217.   With respect to their investigation, unless Defendants were actually aware of such facts and chose to intentionally disregard them, Defendants failed to conduct even the most cursory review of the bias, prejudice or ulterior motives of those who were named in the Articles, Broadcasts and social media.   As a result of this failure, Defendants reported information obtained from one source who had been arrested for fraud and was being pursued for restitution by his former employer, DAPP Malawi, as to whom he had made disparaging statements.   And if they had not acted willfully, Defendants at least acted negligently in misrepresenting the experience of Harrison Longwe in using him as a source for allegations about Plaintiff Planet Aid; in relying on another source who had been terminated as a result of his handling expenses under the Food for Progress Program; and in reporting statements from two other individuals who had made compensation demands from their former employer and had a motive for claiming that DAPP Malawi had cheated former employees.

218.   Another failure by Defendants was that they were negligent in failing to adhere to any standard of journalism by, among other things, offering bribes or other financial inducements, either directly or through their employee and agent (himself a convicted felon), to those who would provide information that could be used in their stories.   If not acting willfully in an effort to obtain false and misleading information based on financial inducements, Defendants were at least negligent in not realizing that such financial inducements would influence sources' willingness to offer false or misleading statements.   Defendants were negligent also in failing to disclose such bribes and inducements in their articles so that readers could assess for themselves the credibility of Defendants' sources.

219.   Defendants were also negligent in their reporting in that they failed to report facts in anything approaching a fair manner, instead omitting, hiding or burying, if not intentionally then at least negligently, those facts that would undercut or diminish the impact of their stories. More particularly, Defendants intentionally failed to disclose important and material facts in their stories, sometimes leaving them out completely while at other times burying them in documents that were merely hyperlinked to their stories, and which Defendants knew, or should have known,

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

1   that the average reader would not find for themselves.

2       220.    Defendants also failed to provide an opportunity for those they knew would be

3   adversely impacted to respond to serious allegations of wrongdoing and used "ambush"

4   interviewing techniques.   By way of example, instead of providing accurate information to

5   Plaintiff Thomsen as to what they intended to report, Defendants knowingly approached Plaintiff

6   Thomsen in the middle of a conference where they knew she would be unable to respond, and

7   then accosted her with allegations that "your own people say you are stealing," knowing that such

8   allegations would encourage any reasonable person to refuse to cooperate with a reporter.

9       221.    Defendants were also negligent in reporting what their investigation had allegedly

10  uncovered.  If not intentionally trying to mislead readers, Defendants were at least negligent in

11  their use of language, notwithstanding that the basic skill of a journalist is in the use of language

12  and the required skill of a journalist is in communicating facts and concepts.  By way of example,

13  by changing the verbiage from the past tense to the present tense, and  misreporting what had

14  occurred, the Defendants gave the false impression that stale or outdated facts were occurring at

15  or about the time the story was written and were indicative of current activities.   In this way,

16  Defendants reported that "Planet Aid and DAPP Malawi have been identified by the FBI . . . as

17  fronts for the Teachers Group, a Danish cult whose leaders . . . are on the run . . . from fraud and

18  tax evasion charges."  Ex. L.  Defendants also reported that Planet Aid was included in a network

19  that "was part of what prosecutors call a global charities fraud scheme."  Ex. O.  Defendants

20  should have known that it was negligent to have reported these allegations as "fact."

21      222.    Another failing was that Defendants reporting was  heavily dependent on

22  anonymous or unnamed sources, in violation of journalistic standards, including CIR's own code

23  of ethics.  While Defendants were obviously aware that no reader could assess the reliability or

24  veracity of anonymous or unnamed sources, Defendants also knew that they had failed to conduct

25  even a cursory check of the background of those sources, and therefore had no basis for

26  determining whether they were reliable.  Defendants also failed to report that sources had some

27  bias, prejudice or ulterior motive for advancing false or defamatory statements.

28      223.    Defendants were negligent also in failing to provide context for their statements, if

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

not intentionally then negligently, skipping from one topic to another in an effort to blur facts and events, and claim "links" that existed only through their failure to accurately differentiate facts, events or circumstances from each other.   This occurred, for instance, when they wrote in their article dated May 11, 2017 that Petersen, the "reputed leader of the Teachers Group," "set up a global network of fake charities and offshore shell firms as part of a fraud conspiracy," and then immediately followed that statement with one directed at Planet Aid's international partnership director, and how she was "persistent in befriending foreign aid officials, according to former USDA officials . . . "  Ex. L.

224.   Defendants also were negligent, if not acting intentionally or recklessly, in reporting claimed "facts" that were contradicted by documents, sources or information already in their possession or which they had been shown.  As a result of such actions, Defendants reported facts that they could have known with minimal effort were contrary to documents in their possession, contrary to statements made by them elsewhere in their stories, or even contrary to common sense.

225.   Further, if not done intentionally or recklessly, Defendants specifically directed tweets or other social media to individuals while knowing that these posts included inflammatory headlines or statements likely to adversely impact the recipients relationship with Plaintiffs, and knowing that the tweets or other social media would likely be misleading as to the true facts.

226.   Defendants were placed on notice that their publications contained false and defamatory statement when they were sued in this action in August, 2016.  Notwithstanding notice in that complaint that specific allegations in their publications were false and defamatory, Defendants failed to issue a retraction or take any action to ensure that Plaintiffs were not damaged as a result of their actions. Defendants were repeatedly requested also to issue a retraction and/or correction.  Notwithstanding a demand for either a retraction or correction, Defendants failed to issue any such retraction or correction, or take any other corrective action, and instead, continued to publish false and defamatory materials.  If Defendants did not act maliciously in failing to issue a retraction and/or correction, or failing to take any further curative action, then they were at least negligent in failing to take such action.

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

227.   The foregoing failures on the part of Defendants resulted in their publishing a series of false and defamatory statements set forth above in the First Cause of Action, which Plaintiffs incorporate as if set forth in full herein.

228.   Plaintiffs have suffered damages as a result of the foregoing negligence.

### THIRD CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

229.   Planet Aid and Thomsen restate and adopt paragraphs 1 through 228 above.

230.   The false and defamatory statements made by Defendants, detailed above, were made for the express purpose, among other things, of inciting "action" on the part of donors, partners or businesses with whom Planet Aid and/or Thomsen were doing or were prospectively doing business, and government agencies who had previously dealt with Planet Aid and/or Thomsen, and who were considering, or might consider, doing business with Planet Aid and/or Thomsen in the future.

231.   In order to ensure that such false and defamatory action would spark adverse consequences for Planet Aid and Thomsen, Defendants sent various false and defamatory statements contained in the Articles and Broadcasts, as well as in social media, to business partners, donors, competitors and government agencies.

232.   Defendants took such actions for the express purpose of causing program partners and government or other donors to cease dealing with Planet Aid and Thomsen, and in doing so, Defendants intended to, and actually did, interfere with the prospective economic advantage of Planet Aid and Thomsen.

233.   As a direct and proximate result of Defendants' actions, property owners at the following properties have demanded that Planet Aid remove its bins:

| | | |
|---|---|---|
| 600 Main St. | Baltimore | MD |
| 10500 Rockville Pike | Rockville | MD |
| 6545 Little River Turnpike | Alexandria | VA |
| 4600 Waverly Ave. | Garrett Park | MD |
| 7251 Bell Creek Rd. | Mechanicsville | VA |

Nelson Mullins Riley & Scarborough llp
Attorneys at Law
Los Angeles

59

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

| | | |
|---|---|---|
| 13890 Nobelwood Plaza (Minnieville Plaza) | Dale City | VA |
| 2495 Prince William Parkway | Woodbridge | VA |
| 13313 Occoquan Rd. | Woodbridge | VA |
| 2919 Gallows Rd. | Falls Church | VA |
| 3216 Jefferson Davis Hwy. | Alexandria | VA |
| 6451 Edsall Rd. | Alexandria | VA |
| 10800 Fairfax Blvd. | Fairfax | VA |
| 6546 Edsall Rd. | Alexandria | VA |
| 7206 Little River Turnpike | Annandale | VA |
| 630 W Race St. | Martinsburg | WV |
| 4109 Duke St. | Alexandria | VA |
| 4154 S. Four Mile Run Dr. | Arlington | VA |
| 13990 Georgia Ave. | Aspen Hill | MD |
| 43675 Greenway Corporate Dr | Ashburn | VA |
| 1001 G St., SE | Washington | DC |
| 5580 Backlick Rd. | Springfield | VA |
| 5671 Western Avenue., NW | Washington | DC |
| 3293 Solomans Island Rd. | Edgewater | MD |
| 3401 Idaho Ave. NW | Washington | DC |
| 8124 Old Dominion Dr. | McLean | VA |
| 6411 Riggs Rd. | Hyattsville | MD |
| 3426 Georgia Ave NW | Washington | DC |
| 6255 Little River Turn Pike | Alexandria | VA |
| 9300 Lottsford Rd. | Upper Marlboro | MD |
| 4411 Connecticut Ave. NW | Washington | DC |
| 5815 Lakeside Ave. | Richmond | VA |
| 800 Florida Ave, NE | Wash, DC | DC |
| 401 Holland Lane | Alexandria | VA |
| 1701 16th Street, NW | Wash, DC | DC |
| 9430 Annapolis Rd. | Lanham | MD |
| 6210 Coventry Way | Clinton | MD |
| 9101 Rockville Pike | Bethesda | MD |
| 6101 Uitland Rd. | Morningside | MD |
| 811 Bestgate Rd. | Annapolis | MD |

234.    Additionally, Plaintiffs have suffered the loss of prospective economic advantages relating to contracts, agreements or relationships with the DofD, Unicef, Clinton Global Foundation and/or other groups or organizations.

235.    Planet Aid intended to use those relationships and dealings and advantages with, inter alia, business partners, donors and/or government agencies for work associated with its not-

60

for profit activities.   As a result of Defendants' actions, Planet Aid and Thomsen have been deprived of the opportunity to engage in such activities, and have been damaged by Defendants' conduct.

**FOURTH CAUSE OF ACTION**

**PLACING PLAINTIFFS IN A FALSE LIGHT**

**(Against all Defendants)**

236.    Planet Aid and Thomsen restate and adopt paragraphs 1 through 235 above.

237.    Defendants gave publicity to matters concerning Planet Aid and Thomsen that placed them in a false light.

238.    The false light in which Planet Aid and Thomsen was placed would be highly offensive to a reasonable person.

239.    Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which they placed Plaintiffs through the Articles and Publications, as well as in social media.   Defendants also declined and refused to issue a retraction notwithstanding multiple requests for them to do so, thereby ensuring that the defamatory publications would continue to cast Plaintiffs in a false light.

240.    As a result of the foregoing actions by Defendants placing Plaintiffs in a false light, Planet Aid and Thomsen have both been damaged.

**FIFTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**

**(Against All Defendants)**

241.    Planet Aid and Thomsen restate and adopt herein paragraphs 1 through 240, above.

242.    As a direct result of the above detailed tortious, inequitable and unlawful conduct, Defendants have been unjustly enriched at Planet Aid and Thomsen's expense.

243.    Equity requires that Defendants make restitution to Planet Aid and Thomsen for all property and benefits unjustly received, including but not limited to all donations received as a result of the Articles and Broadcasts, or income derived from the Articles and Broadcasts, and

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

61

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

any additional articles, broadcasts or social media published containing the false and defamatory statements detailed herein, and/or any subsidiary or ancillary rights to sales.

244.   Equity requires also that any donations received by Defendants in response to, stemming from, or generated as a result of the Articles and Broadcasts be paid to Plaintiffs as restitution.

**WHEREFORE,** the Planet Aid and Thomsen pray that the Court:

(a)   Enter judgment in Plaintiffs' favor and against Defendants CIR, Smith and Walters in an amount in excess of $75,000, representing compensatory damages; and

(b)   Enter judgment for punitive damages in Plaintiffs' favor in an amount in excess of $25 million;

(c)   Enter judgment in Plaintiffs' favor and against Defendants CIR, Smith and Walters on Count V of the FAC for Unjust Enrichment and order restitution for all property and benefits unjustly received by each of them;

(d)   Award their costs and disbursements and attorney's fees incurred herein; and

(e)   Award all other relief which the Court deems to be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all issues triable to a jury.

Dated:  March 16, 2018                    Respectfully submitted,

                                          NELSON MULLINS RILEY &
                                          SCARBOROUGH LLP


                                          */s/ Cory E. Manning*
                                          CORY E. MANNING

                                          Attorneys for Plaintiffs
                                          Planet Aid Inc. and Lisbeth Thomsen

## CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the foregoing **FIRST AMENDED COMPLAINT** using the CM/ECF system and served upon counsel of record by electronic filing.

Dated:  March 16, 2018

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

*/s/ Crispin L. Collins*
Crispin L. Collins

Attorneys for Plaintiffs
Planet Aid Inc. and Lisbeth Thomsen