THOMAS R. BURKE (CA State Bar No. 141930)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
Telephone:(415) 276-6500
Facsimile: (415) 276-6599
Email:     thomasburke@dwt.com

AMBIKA K. DORAN (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone: (206) 757-8030
Facsimile: (206) 757-7030
Email:     ambikadoran@dwt.com

BRENDAN CHARNEY (CA State Bar No. 293378)
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017
Telephone:(213) 633-6800
Facsimile: (213) 633-6899
Email:     brendancharney@dwt.com

Attorneys for Defendants
REVEAL FROM THE CENTER FOR INVESTIGATIVE
REPORTING; MATT SMITH; and AMY WALTERS

# IN THE UNITED STATES DISTRICT COURT

# THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLANET AID, INC., and LISBETH THOMSEN,<br><br>           Plaintiff,<br><br>      v.<br><br>REVEAL, CENTER FOR INVESTIGATIVE REPORTING, MATT SMITH, and AMY WALTERS,<br><br>           Defendants. | Case No. 17-cv-03695-MMC<br><br>Assigned to the Hon. Maxine M. Chesney<br><br>**NOTICE OF MOTION AND SPECIAL MOTION TO STRIKE PLAINTIFFS' COMPLAINT**<br><br>[Cal. Code Civ. Proc. § 425.16]<br><br>[Supporting Declarations And Exhibits Thereto, And Request For Judicial Notice Filed Concurrently]<br><br>Judge:    Hon. Maxine Chesney<br>Date:     November 9, 2018<br>Time:     9:00 a.m.<br>Location: San Francisco Courthouse<br>          **Courtroom 7 – 19th Floor**<br>          450 Golden Gate Avenue<br>          San Francisco, CA 94102<br><br>Action Filed:        August 25, 2016<br>Action Transferred:  June 28, 2017 |

DAVIS WRIGHT TREMAINE LLP

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 9, 2018, in Courtroom 7 of the United States District Court for the Northern District of California, located on the 19th Floor in the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, defendants Reveal, the Center for Investigative Reporting, Matt Smith, and Amy Walters (collectively, "Reveal") will and do move this Court, pursuant to California Code of Civil Procedure § 425.16, for an order striking the First Amended Complaint ("FAC") filed by Plaintiffs Planet Aid, Inc. and Lisbeth Thomsen (collectively, unless otherwise specified, "Planet Aid").

As set forth in more detail in the attached Memorandum of Points and Authorities, the Court should dismiss the FAC with prejudice for the following reasons:

1.      California Code of Civil Procedure ("C.C.P.") § 425.16, the State's SLAPP statute, applies to all of Planet Aid's claims because the claims arise from Reveal's acts in furtherance of its right of free speech in connection with a public issues and because the claims arise from such statements made in a public forum.  Memorandum at III.A.

2.      Because the SLAPP statute applies to each of Planet Aid's claims, the burden shifts to Planet Aid to establish a probability that it will prevail on each claim.  C.C.P. § 425.16(b)(1); Planet Aid cannot meet its burden for the following reasons:

3.      Planet Aid has not alleged and will be unable to adduce "clear and convincing" evidence that Reveal published its statements with actual malice, *i.e.*, knowing the statements were false or with reckless regard as to whether they were false.  Memorandum at III.B.1.

4.      Planet Aid will be unable to meet its burden to prove that the statements published by Reveal are false.  Memorandum at III.B.2.  The statements are substantially true and are protected by the First Amendment because Reveal disclosed the factual basis for the conclusions.

5.      Planet Aid will be unable to prove damages.  Planet Aid cannot show special damages, and it is not entitled to any other damages because it failed to timely demand a correction, as required by California Civil Code § 48(a).  Memorandum at III.B.3.

6.      Reveal's statements linking Planet Aid to Tvind and its founder, Mogens Amdi Petersen, are absolutely privileged under California Civil Code 47(d), which protects true and fair

DAVIS WRIGHT TREMAINE LLP

reports of official records, such as court records.  Memorandum at III.B.4.

7.      Planet Aid's remaining claims for false light, unjust enrichment, and tortious interference fail for the same reasons as its defamation claim.  Memorandum at III.C.

8.      The one-year statute of limitations for defamation bars all of Planet Aid's claims based on articles published before March 16, 2017 that Planet Aid did not challenge in the original Complaint.  Memorandum at III.D.

DATED: July 2, 2018                              Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP
THOMAS R. BURKE
AMBIKA KUMAR DORAN
BRENDAN N. CHARNEY


By:   _____
        Thomas R. Burke

Attorneys for Defendants
REVEAL FROM THE CENTER FOR
INVESTIGATIVE
REPORTING; MATT SMITH; and AMY
WALTERS

DAVIS WRIGHT TREMAINE LLP

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................ 2

        A.      Reveal Investigated Planet Aid for More Than Eighteen Months. .......... 2

        B.      Planet Aid Repeatedly Refused Reveal's Requests for Comment. ........... 7

        C.      Reveal Tries Without Success To Obtain Answers From the USDA. ...... 8

        D.      Reveal Airs Its Carefully Edited Report. ................................................. 8

        E.      Planet Aid Sues. ....................................................................................... 9

III.    ARGUMENT .................................................................................................... 10

        A.      The SLAPP Statute Applies to Planet Aid's Claims. ............................ 10

        B.      Planet Aid Cannot Show It Is Likely To Prevail on Its Defamation Claim. ........... 11

                1.      Reveal Did Not Publish Any Statement With Actual Malice. .................... 11

                        a.      Plaintiffs Must Show Actual Malice Because They Are Limited Purpose Public Figures. ........... 11

                        b.      Planet Aid Fails To Allege And Cannot Show Actual Malice ........ 13

                2.      Planet Aid Cannot Meet Its Burden To Prove Falsity ................................. 19

                        a.      The Statements Are Substantially True. ........................................... 19

                        b.      The Conclusions Reveal Reported Are Opinions Based On Disclosed Facts And Protected By The First Amendment ............. 21

                3.      Planet Aid Cannot Show Special Damages. ................................................. 24

                4.      The Fair And True Report Privilege Protects Reveal's Statements About Planet Aid's Connections To Tvind And Petersen .................................... 24

        C.      Planet Aid Cannot Show a Probability of Prevailing on Its Remaining Claims for Tortious Interference, False Light, and Unjust Enrichment. .................................... 25

        D.      The Statute of Limitations Bars All of Planet Aid's Claims Based on Articles Published Before March 16, 2017 Not Challenged in the Original Complaint. ..... 25

DAVIS WRIGHT TREMAINE LLP

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Abbas v. Foreign Policy Group, LLC*,
5      975 F. Supp. 2d 1 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) ...............................23

6

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
      No. CV 10-5696 CRB, 2013 WL 3460707 (N.D. Cal. July 9, 2013) ......................................23

7

8

*Biro v. Conde Nast*,
      807 F.3d 541 (2d Cir. 2015)......................................................................................................13

9

*Blatty v. New York Times Co.*,
10      42 Cal. 3d 1033 (1986).......................................................................................................10, 25

11

*Braun v. Chronicle Publ'g Co.*,
      52 Cal. App. 4th 1036 (1997)....................................................................................................10

12

13

*Briggs v. Eden Council for Hope & Opportunity*,
      19 Cal. 4th 1106 (1999)............................................................................................................10

14

*Cabello-Rondon v. Dow Jones & Co.*,
      720 F. App'x 87 (2d Cir. 2018)................................................................................................13

15

16

*Chapin v. Knight-Ridder, Inc.*,
      993 F.2d 1087 (4th Cir. 1993)..............................................................................................12, 22

17

*Clark v. Viacom Int'l Inc.*,
18      617 F. App'x 495 (6th Cir. 2015)..............................................................................................13

19

*Colt v. Freedom Commc'n, Inc.*,
20      109 Cal. App. 4th 1551 (2003)..................................................................................................19

21

*Contemporary Servs. Corp. v. Staff Pro Inc.*,
      152 Cal. App. 4th 1043 (2007)..................................................................................................25

22

23

*Copp v. Paxton*,
      45 Cal. App. 4th 829 (1996)......................................................................................................12

24

*Crane v. Arizona Republic*,
      872 F.2d 1511 (9th Cir. 1992)...................................................................................................19

25

26

*DC Comics v. Pac. Pictures Corp.*,
      706 F.3d 1009 (9th Cir. 2013)...................................................................................................10

27

*Di Giorgio Corp. v. Valley Labor Citizen*,
28      260 Cal. App. 2d 268 (1968).....................................................................................................24

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*,
   47 Cal. App. 4th 777 (1996)..................................................................................11

*Dunn v. Gannett New York Newspapers, Inc.*,
   833 F.2d 446 (3d Cir. 1987)................................................................................22

*Eisenberg v. Alameda Newspapers, Inc.*,
   74 Cal. App. 4th 1359 (1999)........................................................................19, 25

*Fellows v. Nat'l Enquirer, Inc.*,
   42 Cal. 3d 234 (1986)...........................................................................................25

*Forsher v. Bugliosi*,
   26 Cal. 3d 792 (1980)...........................................................................................20

*Franklin v. Dynamic Details, Inc.*,
   116 Cal. App. 4th 375 (2004)...............................................................................23

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)..............................................................................................11

*Ghafur v. Bernstein*,
   131 Cal. App. 4th 1230 (2005).............................................................................13

*Gilbert v. Sykes*,
   147 Cal. App. 4th 13 (2007)...........................................................................14, 25

*Gomes v. Fried*,
   136 Cal. App. 3d 924 (1982).................................................................................24

*Handelsman v. San Francisco Chronicle*,
   11 Cal. App. 3d 381 (1970)...................................................................................20

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988)................................................................................................25

*Jennings v. Telegram-Tribune Co.*,
   164 Cal. App. 3d 119 (1985).............................................................................20, 21

*Kenne v. Stennis*,
   230 Cal. App. 4th 953 (2014)...............................................................................25

*Makaeff v. Trump Univ. LLC*,
   715 F.3d 254 (9th Cir. 2013).................................................................................11

*Masson v. New Yorker Magazine*,
   501 U.S. 496 (1991)..............................................................................................19

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
   674 F.3d 369 (4th Cir. 2012).................................................................................13

iii

*McClatchy Newspapers, Inc. v. Superior Court*,
   189 Cal. App. 3d 961 (1987) ........................................................................... 24

*McGarry v. Univ. of San Diego*,
   154 Cal. App. 4th 97 (2007) ........................................................................... 13

*Melchior v. New Line Prods., Inc.*,
   106 Cal. App. 4th 779 (2003) ......................................................................... 25

*Michel v. NYP Holdings, Inc.*,
   816 F.3d 686 (11th Cir. 2016) ........................................................................ 13

*Mullins v. Thieriot*,
   19 Cal. App. 3d 302 (1971) ............................................................................ 20

*Nat'l Found. for Cancer Research, Inc. v. Council of Better Bus. Bureaus, Inc.*,
   705 F.2d 98 (4th Cir. 1983) ............................................................................ 12

*Navellier v. Sletten*,
   29 Cal. 4th 82 (2002) ...................................................................................... 10

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................................ 19

*Nicosia v. De Rooy*,
   72 F. Supp. 2d 1093 (N.D. Cal. 1999) ...................................................... 22, 23

*Nygard v. Uusi-Kerttula*,
   159 Cal. App. 4th 1027 (2008) ....................................................................... 11

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1995) .......................................................................... 22

*Pippen v. NBC Universal Media, LLC*,
   734 F.3d 610 (7th Cir. 2013) .......................................................................... 13

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018) .......................................................................... 11

*Reader's Digest Ass'n v. Superior Court*,
   37 Cal. 3d 244 (1984) ................................................................... 11, 12, 13, 19

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*,
   302 F. Supp. 3d 1005 (N.D. Cal. Oct. 16, 2017) ............................................ 12

*Rosenaur v. Scherer*,
   88 Cal. App. 4th 260 (2001) ........................................................................... 14

*Schatz v. Republican State Leadership Comm.*,
   669 F.3d 50 (1st Cir. 2012) ............................................................................ 13

DAVIS WRIGHT TREMAINE LLP

iv

*Sipple v. Found. for Nat'l Progress*,
    71 Cal. App. 4th 226 (1999) ................................................................11, 13, 19, 24

*Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of California v.*
    *Yagman*,
    55 F.3d 1430 (9th Cir. 1995) ..................................................................................22

*Thomas v. Los Angeles Times Commc'ns LLC*,
    189 F. Supp. 2d 1005 (C.D. Cal. 2002) ..................................................................22

*Turner v. KTRK Television, Inc.*,
    38 S.W.3d 103 (Tex. 2000) .....................................................................................20

*Underwager v. Channel 9 Australia*,
    69 F.3d 361 (9th Cir. 1995) .....................................................................................23

*Vogel v. Felice*,
    127 Cal. App. 4th 1006 (2005) ...............................................................................19

*Waldbaum v. Fairchild Publ'ns, Inc.*,
    627 F.2d 1287 (D.C. Cir. 1980) .............................................................................12

**Statutes**

Fed. R. Civ. Proc. 9(b) ...................................................................................................13

Fed. R. Civ. Proc. 12(c) .................................................................................................11

Fed. R. Civ. Proc. 56 .....................................................................................................11

Cal. Civ. Code § 47(a) ...................................................................................................24

Cal. Civ. Code § 47(d) ...................................................................................................24

Cal. Civ. Code § 48(a) ...............................................................................................2, 24

Cal. Civ. Code § 340(c) .................................................................................................25

Cal. Code Civ. Proc. § 425.16 ............................................................................. *passim*

DAVIS WRIGHT TREMAINE LLP

# I.   INTRODUCTION

This lawsuit is a brazen attempt to punish award-winning Defendants Reveal from The Center for Investigative Reporting and its reporters for exposing the gross misuse of U.S. government funds awarded to Plaintiff Planet Aid, Inc.—ostensibly for aid to farmers in Malawi— and to silence Reveal's sources.  Although Planet Aid has many projects, Reveal focused on its affiliate Development Aid from People to People Malawi ("DAPP"), and its link to the alleged Danish cult Tvind.  Reveal reported that farmers in DAPP "Farmers' Clubs" did not receive promised supplies; portions of employee pay were funneled to Tvind; and DAPP transferred money to accounts to benefit Tvind, while fabricating invoices to make it appear as though it was spent on charity.  The reporting was based on extensive public records and firsthand accounts from witnesses in the United States, Malawi, and Denmark, many of whom have submitted detailed declarations and evidence to support this motion.

California's SLAPP statute was designed to dismiss lawsuits just like this one.  Because the lawsuit targets the exercise of free speech on a matter of public interest, Planet Aid and co-plaintiff Lisbeth Thomsen (DAPP Malawi country director) (collectively, "Planet Aid") must show a probability of prevailing on the merits of their claims.  They cannot do so.

***First***, Planet Aid has not sufficiently alleged and will be unable to show that Reveal acted with actual malice.  This standard applies to libel claims brought not only by public officials but also individuals who have become public figures by virtue of their prominence, self-promotion, and even involuntary presence in the spotlight.  Because Planet Aid has long been scrutinized for its suspicious practices and links to Tvind, and both it and Thomsen have widely promoted their programs, they are public figures for purposes of their charitable work.  And yet Planet Aid has not alleged and cannot provide "clear and convincing" evidence of actual malice, *i.e.*, Reveal ***knew*** or recklessly disregarded that its statements were false.  In fact, Reveal's reporters and editors rightly believed, and still believe, the veracity of the reporting.

***Second***, Planet Aid will be unable to show Reveal's statements are false.  Under settled law, a statement need not be literally true in all respects to prevent liability.  Rather, it must be substantially true.  Reveal's most consequential statements are substantially true.  **Notably, the**

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

DAVIS WRIGHT TREMAINE LLP

final amount was still substantial and the percentages reported were stated as alleged by sources. **In any event**, the precise amounts are **ultimately** irrelevant; **as *any*** funds diverted to Planet Aid (and Tvind) are enough **to meet the standard**.

*Third,* Reveal provided a balanced account of the facts surrounding DAPP's efforts in Malawi and Planet Aid's connections to Tvind, reporting (where possible) Planet Aid's side so its audience could decide whether Planet Aid had in fact engaged in fraud. Where, as here, the basis for a conclusion is reported, the First Amendment protects that conclusion.

*Fourth*, Planet Aid will be unable to prevail on its arguments that Reveal falsely stated their connections to Tvind and its leader Mogens Amdi Petersen. Among other evidence, Reveal based those statements on an FBI record stating that Tvind "derives income" from Planet Aid, and from public records showing that Petersen, who controls Tvind, is a fugitive from justice. The statements are therefore protected by the fair and true report privilege as a matter of law.

*Finally*, Planet Aid failed to comply with California's correction statute (Cal. Civ. Code § 48(a)) and the statute of limitations bars Planet Aid's claims, to the extent they rely on reports before March 17, 2016 that it did not challenge in its original complaint.

For these reasons, Reveal respectfully asks that the Court dismiss this lawsuit with prejudice and award attorneys' fees.

## II.  FACTUAL BACKGROUND

This lawsuit targets Reveal's investigation and reporting on Planet Aid and its affiliate DAPP, links between these entities and Tvind (also called the "Teachers' Group"), and Tvind's apparent use of their programs to divert aid funds. Planet Aid challenges nearly 80 statements in more than a dozen reports published or broadcast by Reveal from March 2016 to August 2017.

### A.  Reveal Investigates Planet Aid for More Than Eighteen Months.

Tvind is a global organization with links to at least 19 charities. Declaration of Poul Gade ("Gade Decl."), Ex. E. Its senior leaders control the Federation of Associations connected to the International Humana People to People Movement ("FAIHPP")—an umbrella organization that includes Planet Aid and DAPP, Declaration of Brendan Charney ("Charney Decl."), Exs. S, O-2, Gade Decl. Exs. A at §3.1, E, F. In 2001, Danish prosecutors charged several Tvind members and

2

DAVIS WRIGHT TREMAINE LLP

1   founder Mogens Amdi Petersen with money laundering and tax evasion, arguing Petersen uses

2   Tvind and its organizations to extract funds meant for charity.  Gade Decl. ¶ 1, 9, Ex. A.  Although

3   Petersen was initially acquitted, he fled the country before a retrial in which the appellate court

4   held the trial court erred, and remains a fugitive in Mexico.  Gade Decl. ¶ 10.

5       For decades, the global press has linked Tvind to FAIHPP, Planet Aid, and DAPP, and

6   described Tvind's methods to control charitable organizations and divert funds—including

7   methods like those Reveal reported.  *See, e.g.,* Charney Decl. Ex. A (1993 Edmonton Journal

8   article: profits from charities "filter into what seem less than altruistic causes" through a "complex

9   web of financial interests"); Ex. B (2000 article from Danish newspaper Berlingske: "Tvind

10  founded the Planet Aid organization"); Ex. G (2003 Boston Globe article "Planet Aid's Charity

11  Work Draws Worldwide Scrutiny" reporting that Planet Aid appeared to be misusing funds, and

12  quoting a former volunteer as saying "[t]he Teachers Group runs Planet Aid."); Exs. C-F, H-N;

13  Declaration of Matt Smith ("Smith Decl.") Ex. B.

14      Before reporter Matt Smith joined Reveal, he had already published an article on Tvind's

15  connections to a U.S. charity.  *See* Smith Decl. ¶ 4, Ex. A.  At Reveal, he began researching cult

16  and cult-like organizations.  Declaration of Amy Pyle ("Pyle Decl.") ¶ 7; Smith Decl. ¶ 7.  Of the

17  groups he identified, Reveal's now editor-in-chief, Pulitzer Prize winner Amy Pyle, suggested

18  they investigate Tvind and its links to Planet Aid, which had distributed about $100 million in

19  U.S. government funds to African aid projects.  Pyle Decl. ¶ 7.  Smith and radio reporter Amy

20  Walters obtained documents from the U.S. Department of Agriculture ("USDA") and U.S.

21  Agency for International Development, other journalists, and documents from Petersen extradition

22  proceedings.  Smith Decl. ¶¶ 8-11; Declaration of Amy Walters ("Walters Decl.") ¶ 29.  Of

23  particular interest was a 2001 FBI report stating that Tvind "derives income" from Planet Aid by

24  collecting funds for charity and "divert[ing] the money for personal use."  Smith Decl. Ex. C-1.

25  Smith discussed these documents with a Danish prosecutor, who told him the fraud was far larger

26  than what Danish prosecutors had charged, and that it reached Africa.  Gade Decl. ¶¶ 14(h), 27.

27      Reveal set out to investigate how U.S. funds had been spent, focusing in part on Planet

28  Aid's claims to have achieved "remarkable outcomes" in Africa through USDA-funded Farmers'

DAVIS WRIGHT TREMAINE LLP

3

DAVIS WRIGHT TREMAINE LLP

Club programs implemented by DAPP, Planet Aid's Malawi affiliate.  Pyle Decl. ¶ 7; Smith Decl. ¶ 7; Walters Decl. ¶ 6.  Planet Aid claimed the programs improved farming in rural areas by providing training and farming materials such as seeds, fertilizer, livestock, and rope-powered water pumps.  Smith Decl. Ex. C-3.  Smith and Walters wanted to understand whether this was true—and what happened to the U.S. government grants.  Smith Decl. ¶ 15.  To answer this question, they spent many months investigating from the U.S. and then carefully planned an on-the-ground investigation, supervised by senior editors with experience reporting in Africa and other foreign countries.  Declaration of Robert Rosenthal ¶ 5; Pyle Decl. ¶ 3.

In February 2015, Reveal enlisted veteran Malawian reporter Kandani Ngwira, who was recommended by the managing editor of Malawi's leading newspaper.  Declaration of Brian Ligomeka ¶ 10.  Under Smith's direction, Ngwira arranged interviews with sources inside DAPP and Tvind, as well as farmers, laying the groundwork for a trip by Smith and Walters in September 2015.  Declaration of Kandani Ngwira ¶ 6.  Hundreds of thousands of documents were collected during this investigation or created to document Reveal's findings.  Smith Decl. ¶ 7.  Reveal summarizes here only the facts that support the dozens of statements that Planet Aid challenges, concerning the Farmers' Clubs, money skimmed from DAPP employees' salaries, the transfer of money and fabrication of invoices to cover up unperformed charity, and the links between Tvind, Planet Aid, DAPP, and Petersen.

**Farmers' Clubs.**  No fewer than *six* witnesses from three cities—Njuli, Dowa, and Zomba—contradicted Planet Aid's grandiose claims about the Farmers' Clubs.  After Reveal discovered a video in which Njuli village chief Witness Chibwana purported to show the program's benefits, Chibwana admitted that he had lied at DAPP's behest.  Ngwira Decl. Ex. E; Charney Decl. Ex. II; *see also* Ngwira Decl. ¶¶ 18-19.  Chibwana's statements were made in anticipation of receiving help, and ultimately DAPP did not provide enough seeds or fertilizer, promised livestock, care for livestock, or rope pumps promised without charge.  Ngwira Decl. ¶ 18, Ex. E; Charney Decl. Ex. II; Walters Decl. ¶ 27.

Njuli Farmers' Club chairs Paul Molande and Enock Chikaonda independently confirmed that DAPP failed to provide promised supplies.  *See* Declaration of Paul Molande ¶¶ 9-13;

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

Declaration of Enock Chikaonda  ¶¶ 7-10; *see also* Ngwira Decl. ¶ 17.  Dowa Farmers' Club manager Marko Zebiah told Ngwira that farmers did not benefit from the program, and DAPP falsely reported providing materials to farmers.  Declaration of Marko Zebiah ("Zebiah Decl.") ¶ 25.  Zomba Farmers' Club manager Jackson Mtimbuka told Ngwira that DAPP had failed to provide sufficient seeds, veterinary care for animals, sufficient fuel for maize mills, and promised rope pumps.  Declaration of Jackson Mtimbuka ¶ 7m-7q; *see also* Ngwira Decl. ¶¶ 8-9.  He also explained how, at DAPP's behest, he showed donors' representatives only farms that had received supplies, as well as farms that had received funding from other sources.  Mtimbuka Decl. ¶ 7r; *see also* Molande Decl. ¶ 15 (DAPP showed donors "farms that…looked good…because the farmers…had already managed their farms well before…the Farmers' Clubs").

Walters and Smith also interviewed Chibwana, Chikaonda, and Mtimbuka.  *See* Walters Decl. ¶¶ 13, 15, 16, 27; Smith Decl. ¶ 28, Ex. F; Charney Decl. Ex. II; Chikaonda Decl. ¶ 2; Mtimbuka Decl. ¶ 10; Ngwira Decl. ¶ 8.  They also spoke to Harrison Longwe, DAPP Malawi's former financial controller.  Ngwira Decl. ¶ 8; Smith Decl. ¶ 28; Walters Decl. ¶ 13; Declaration of Harrison Longwe ¶¶ 10-11.  Longwe reported he did not see evidence of improvement in farmers' capital investments, yields, revenue, profits, or productivity.  Longwe Decl. ¶ 13.

***Skimming Employee Salaries.  Five*** witnesses—Zebiah, Mtimbuka, Longwe, Mbachi Munthali (a former DAPP Malawi procurement officer), and Patrick Goteka (former campus manager for DAPP Malawi's Teacher Training College, Tvind member, and former personal assistant to Petersen)—provided information to suggest DAPP Malawi extracted funds from employees in two ways: first, requiring employees to contribute portions of their pay to Tvind, and second, paying employees less than the budgeted amount.

***All five*** witnesses reported that they or employees they knew were pressured or required to contribute their pay, including by signing agreements.  *See* Zebiah Decl. ¶¶ 16-20 (he contributed his pay and collected contributions from others for deposit with Tvind leaders, attaching records); Declaration of Patrick Goteka ¶¶ 29, 32-35 (portions of his salary were taken, he was pressured to minimize personal expenses to maximize contributions, attaching contribution records for himself and others); Longwe Decl. ¶ 9r; Mtimbuka Decl. ¶ 17; Declaration of Mbachi Munthali ¶ 7b.

In addition, Zebiah and Longwe told the reporters that DAPP paid employees less than the amount budgeted.  Longwe noticed records showing DAPP's budget reflected a salary that was significantly higher than the amount paid, according to DAPP's payroll records.  Longwe Decl. ¶ 9q.  Zebiah told the reporters he had seen the budgeted salaries, spoken to employees, and discovered that employees were being paid far less than budgeted.  Zebiah Decl. ¶ 8.

*Fabricated Invoices.*  Goteka, Longwe, and Chiku Malabwe (former DAPP procurement manager for USDA programs), also reported that DAPP fabricated invoices and otherwise manipulated records to cover up the fact that grant money was diverted.  Goteka explained that he was sent by DAPP Zimbabwe and Tvind to the United States to collect and sort donated clothing ultimately sold in Canada, and told to provide customs officials a letter claiming he was in the U.S. to learn about AIDS/HIV prevention.  Goteka Decl. ¶¶ 23-25, Ex. M.  Goteka also said DAPP misused grant funds by claiming it had spent more money than it did, and told workers to create expense vouchers and fake receipts for auditors.  *Id.* ¶ 31.  Finally, Goteka explained that Petersen had personally instructed him to set up a farm using DAPP resources, even though the proceeds would ultimately go to Tvind.  *Id.* ¶¶ 37, 41-45; Exs. T-U.

Longwe, who as financial controller had access to DAPP's financial records, told the reporters he believed 50 to 70 percent of government grants was being diverted to Tvind.  Longwe Decl. ¶ 13.  Longwe based his opinion on records showing DAPP paid repeated invoices for vague or duplicate services (such as the repeated translation of the same book); his personal observations of employees who created fake invoices in response to a USDA audit; records showing the transfer of funds meant for particular aid projects to other bank accounts and then FAIHPP; the underpayment of employee salaries; forced contributions to Tvind; and the absence of benefit to farmers from millions of dollars in aid.  *Id.* ¶ 13; *see also id.* ¶¶ 6-9t.  Longwe gave the reporters documents to substantiate many of his statements.  *Id.* Exs. B-D (transfers of aid funds to FAIHPP, and a Lisbon bank controlled by FAIHPP); Ex. E (purported loan by FAIHPP to DAPP that was never paid); Ex. G (payroll records showing contributions deducted from DAPP employees).

Malabwe also said that DAPP diverts donated funds to Tvind.  Smith Decl. Ex. F; Charney Decl. Ex. HH.  Malabwe said that DAPP purchased goods at inflated prices from Tvind-controlled

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

DAVIS WRIGHT TREMAINE LLP

companies; paid invoices to FAIHPP for "management" meetings attended only by Tvind

members to discuss Tvind business; paid FAIHPP far more for travel and accommodations for

meetings than could have been spent; charged multiple donors for the same goods; and had

employees create false receipts and invoices to respond to an audit.  *Id.* at 2-6, 13-16; *see also*

Declaration of Innocent Chitosi ¶¶ 6-7 (suspicious fundraising practices).

   ***Planet Aid's connections to Amdi Petersen.***  Reveal concluded Petersen was "linked" to

the USDA projects for two reasons.  ***First***, Reveal reported the extensive links between Planet Aid

and Tvind, relying on an FBI report stating that "TVIND derives income from the creation of

Developmental Aid Organizations," including "Planet Aid," FAC Ex. B at 5, 10; Smith Decl. ¶ 8,

Ex. C-1; close relationships between Petersen and Planet Aid leaders, such as the facts that Planet

Aid Chair Mikael Norling coordinated Petersen's legal defense, Gade Decl. ¶ 22, Ex. G at 3849;

Marie Lichtenberg—the "primary liaison" between the USDA and Planet Aid—was offered as a

witness for Petersen, FAC Ex. B at 17, Charney Decl. Ex. GG at 15-16, 22-23; Danish prosecutor

statements that "Planet Aid was controlled by Tvind," Gade Decl. ¶ 23, Exs. B, C, D, E, F (charts,

briefs describing relationship, internal Tvind emails relaying instructions to divert funds with the

involvement of Planet Aid); and statements from former Tvind members and DAPP employees

who observed Tvind's control over programs funded through Planet Aid, Goteka Decl. ¶¶ 12-13,

28, 41-42, 45-46, 48-51; Munthali Decl. ¶¶ 5b, 6; Zebiah Decl. ¶¶ 5-6; Longwe Decl. ¶¶ 9a-e;

Mtimbuka Decl. ¶¶ 5, 7h-j.  ***Second***, Reveal reported that Petersen ultimately controls Tvind and

connected organizations based on Danish court records and statements from four sources: Goteka,

former Tvind member Britta Junge, Danish prosecutor Poul Gade, and Danish investigator Knud

Haargaard.  FAC Ex. B; Walters Decl. ¶¶ 37-38; Gade Decl. ¶¶ 15-26, Exs. B-F; Goteka Decl. ¶¶

41-45, 49.  When Reveal directly asked Thomsen if she knew Petersen, she ended the interview.

FAC Ex. P at 25-26; Ex. B at 27.

   **B.**  **Planet Aid Repeatedly Refuses Reveal's Requests for Comment.**

   As early as Spring 2015, Reveal tried to obtain comments from Planet Aid.  *See* Smith

Decl. ¶ 27; Pyle Decl. ¶ 21; Salladay Decl. ¶ 6.  In June, Walters tried to reach Lichtenberg;

Lichtenberg did not respond to emails, and refused an in-person interview.  Walters Decl. ¶¶ 9, 10,

DAVIS WRIGHT TREMAINE LLP

23-26; Pyle Decl. ¶ 22.  In December, 2015 Reveal emailed Lichtenberg, along with the person who contacted Smith in 2014, and Andrew Rice, who identified himself as representing Planet Aid—providing detailed findings and questions in a seven-page attachment.  Pyle Decl. ¶ 25; Smith Decl. ¶ 41, Exs. H-I.  Rice responded with three sentences that did not deny any of what Reveal had found but instead stated that Planet Aid has produced positive results after extensive financial reviews.  Pyle Decl. ¶ 25.

### C.    Reveal Tries Without Success To Obtain Answers From the USDA.

Reveal also sought to understand whether, and if so how, the USDA had looked into Planet Aid's connections to Tvind, or monitored Planet Aid's program.  Walters Decl. ¶ 11.  Reveal contacted more than nine current or former USDA employees involved with Planet Aid grants.  *Id.* ¶¶ 11, 21, 24, 26, 28.  Ron Croushorn, then head of the USDA division responsible for the grants, declined an interview about Planet Aid funding.  FAC Ex. B at 35.  Documents from Freedom of Information Act ("FOIA") requests showed that a USDA procurement officer was concerned about Planet Aid's "potential fraud and abuse."  FAC Ex. B at 34; Smith Decl. ¶ 8, Ex. C-2.  Reveal also tried to set up interviews with U.S. embassy officials and USDA staff in Africa; after being bounced among several offices, USDA officials told Reveal that they have no monitoring staff in Malawi.  FAC Ex. B at 35-36; Walters Decl. ¶¶ 11, 21.

### D.    Reveal Airs Its Carefully Edited Report.

Smith and Walters spent weeks drafting and refining a draft of the first piece.  Smith Decl. ¶ 38.  A team of editors—who have won multiple Pulitzer Prizes, and many other prominent awards, Pyle Decl. ¶ 3; Walters Decl. ¶ 4; Rosenthal Decl. ¶¶ 2-4; Salladay Decl. ¶ 4—spent weeks reviewing, revising, fact-checking, and ultimately fine-tuning the draft.  Smith Decl. ¶ 38.

Reveal aired the first radio report, "Alleged Cult Leader Plays Shell Game With US Foreign Aid," on March 19, 2016.  The report began by noting the reporters "had a lot of questions" about Planet Aid's claims in Africa; described what they saw at the Farmers' Club sites they were able to visit; aired Longwe's fraud conclusion and asked an expert for "a second opinion"; noted the expert questioned why government funds were "going to an umbrella organization" that "seems to be dispersing it all over the world to entities that are related," and

DAVIS WRIGHT TREMAINE LLP

would look at whether the services were "actually being performed"; detailed Thomsen's statement that DAPP provided the services—and her discomfort when asked about Petersen; noted Reveal tried to contact the USDA; and concluded by saying they were "going to continue to follow this story." *See* FAC Exs. A, P.

In May 2016, Reveal published an online article titled "US taxpayers are financing alleged cult through African aid charities." FAC Ex. B. The article—featuring hyperlinks to sources such as DAPP financial records and FOIA documents—reported evidence that DAPP and Planet Aid are part of Tvind's scheme and that the USDA had nonetheless continued to fund it. *Id.* The report noted "to this day, USDA officials say they see nothing wrong with Planet Aid"; Planet Aid's spokesperson said the programs were a success and had been extensively reviewed by government agencies; Planet Aid had sent a rebuttal to a charity-rating organization after it flagged Planet Aid; and Petersen and Lichtenberg had not given their side of the story. *See id.* The article also reviewed and expanded on the previous report and concluded "many questions [were left] unanswered"—including "about the recurring allegations of fraud and money laundering." *Id.*

Reveal also published articles providing background and context, *e.g.*, about the charges against Petersen, FAC Ex. G, the links connecting Planet Aid to Tvind and FAIHPP, *id.* Ex. J, and the USDA projects through which Planet Aid receives funding, *id.* Ex. C. Later reports analyzed public records about USDA and FBI concerns and investigations into Planet Aid and DAPP, *id.* Exs. H, K, L; and described Malawian court proceedings in which DAPP was accused of labor violations, *id.* Ex. O. Follow-up articles described the impact of Reveal's investigation, *i.e.*, official action to investigate or suspend payments to Planet Aid and DAPP, *id.*, Exs. D, E, F, and I.

### E.    Planet Aid Sues.

One week after first demanding a retraction, Planet Aid filed this lawsuit in Maryland on August 25, 2016. ECF No 1. That court granted Reveal's motion to dismiss for lack of jurisdiction, transferring the case to this Court, which denied Planet Aid's renewed transfer efforts. ECF Nos. 22, 75, 79. Planet Aid filed the FAC March 16, 2018, alleging claims for defamation, negligence, tortious interference, false light invasion of privacy, and unjust enrichment. *See* FAC (ECF No. 78). The FAC attacks four factual premises of the articles: 1) there were deficiencies at

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

DAVIS WRIGHT TREMAINE LLP

the Farmers' Clubs, including failing to provide promised benefits and staging fake improvements

to mislead donors, FAC at 24-30; 2) DAPP fabricated invoices and paid dubious expenses to

offshore entities to cover up for missing aid, FAC at 23-24; 3) Planet Aid siphoned USDA funds

by underpaying salaries and coercing employees to "contribute" to Tvind, FAC at 31-34; and 4)

Petersen was linked to the USDA projects, *id.* at 40-44.[1]  Planet Aid also challenges Reveal's

reporting that sources believed that these facts evidenced fraud.  *Id.* ¶ 4.

## III.    ARGUMENT

### A.    The SLAPP Statute Applies to Planet Aid's Claims.

California enacted the SLAPP law to quickly dispose of meritless claims that target free

speech.  *Braun v. Chronicle Publ'g Co.*, 52 Cal. App. 4th 1036, 1042 (1997); *see also DC Comics

v. Pac. Pictures Corp.*, 706 F.3d 1009, 1015-16 (9th Cir. 2013) ("[i]t would be difficult to find a

value of a 'high[er] order' than the constitutionally-protected rights to free speech and petition that

are at the heart of California's anti-SLAPP statute").  Under C.C.P. § 425.16(b)(1), any "cause of

action against a person arising from any act … in furtherance of the person's right of … free

speech … in connection with a public issue shall be subject to a special motion to strike, unless the

court determines that the plaintiff has established that there is a probability that the plaintiff will

prevail on the claim."  Reacting to court rulings interpreting the statute too narrowly, the

Legislature amended it to ensure that it "shall be construed broadly."  C.C.P. § 425.16(a); *Briggs

v. Eden Council for Hope & Opportunity*, 19 Cal. 4th 1106, 1119-21 (1999).

The law uses a "two-step process."  *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002).  "First,

the court decides whether the defendant has made a threshold showing that the challenged cause of

action … aris[es] from protected activity," by showing the conduct "underlying the plaintiff's

cause fits one of the categories spelled out" in Section 425.16(e).  *Id.*  This includes "conduct in

furtherance of the exercise of … the constitutional right of free speech in connection with a public

issue or an issue of public interest," C.C.P. § 425.16(e)(4).  The court "must then determine

whether the plaintiff has demonstrated a probability of prevailing."  *Navellier*, 29 Cal. 4th at 88.

---

[1] Reveal's criticisms of the USDA, FAC at 38-39, are not defamatory.  To be defamatory, a statement must be "of or concerning" the plaintiff (here, Planet Aid)—not a third party (the USDA).  *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1044 (1986).

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

DAVIS WRIGHT TREMAINE LLP

Federal courts apply Rule 56 standards to decide claims' factual sufficiency, and Rule 12(c) standards to decide their legal sufficiency. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). If a plaintiff cannot meet its burden, the claim is stricken. C.C.P. § 425.16(b)(1).

Reveal easily meets its burden under Sections 425.16(e)(4). First, "news reporting is free speech" under the SLAPP statute. *Sipple v. Found. for Nat'l Progress*, 71 Cal. App. 4th 226, 240, (1999). Second, Reveal's reporting relates to an "issue of public interest," C.C.P. §425.16(3): the misuse of millions of dollars in public funds dedicated to providing aid to an African country. *See, e.g., Makaeff v. Trump Univ. LLC*, 715 F.3d 254, 261-63 (9th Cir. 2013) (SLAPP law applies to warnings of alleged fraudulent business practices); *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman,* 47 Cal. App. 4th 777, 784 (1996) ("whether money designated for charities was being received by those charities" raised a question of public interest; SLAPP law applied).[2]

### B.  Planet Aid Cannot Show It Is Likely To Prevail on Its Defamation Claim.

#### 1.  Reveal Did Not Publish Any Statement With Actual Malice.

##### a.  Plaintiffs Must Show Actual Malice Because They Are Limited Purpose Public Figures.

A public figure alleging defamation must show the defendant acted with actual malice, *i.e.*, knew that an allegedly unlawful statement was false when it was made, or acted with reckless disregard of its truth or falsity. *Reader's Digest Ass'n v. Superior Court*, 37 Cal. 3d 244, 256 (1984). Although some individuals are always public figures, some are limited-purpose public figures, *i.e.*, someone who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Id.* at 253-54 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). Someone is a limited-purpose public figure if: (1) there is a public controversy, *i.e.*, where "the issue was being debated publicly and … had foreseeable and substantial ramifications for nonparticipants"; (2) plaintiff took "some voluntary act through which he seeks to influence the resolution of the public issues involved";

---

[2] This lawsuit also satisfies the requirements of C.C.P. § 425.16(e)(3), which protects statements "made in a … public form in connection with an issue of public interest." C.C.P. § 425.16(e)(3). *See Nygard v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1038 (2008).

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

DAVIS WRIGHT TREMAINE LLP

and (3) the alleged defamation was "germane to the plaintiff's participation in the controversy."

*Copp v. Paxton*, 45 Cal. App. 4th 829, 844-46 (1996) (plaintiff was a public figure, as his "limited

local efforts to inject himself into" a public debate surrounding earthquake disaster mitigation in

public schools) (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir.

1980) and *Reader's Digest*, 37 Cal. 3d at 253).

Applying this standard, this Court has held that a corporate entity becomes a public figure

when it makes statements about its "world-wide reach and influence" and the nature of its work is

public. *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005 at *6 (N.D. Cal.

Oct. 16, 2017). Likewise, charitable organizations are public figures for purposes of statements

about their giving activities. For example, in *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092

n.4 (4th Cir. 1993), the Fourth Circuit held that a non-profit organization and its president were

public figures for an article questioning the charity's finances and the mark-up on gift packages

sent to soldiers. Because the complaint "extol[led] [the plaintiff's] nationwide charitable

activities" and complained about injury to their "public reputation," plaintiffs had "irretractably

admitted" that they were public figures. *Id.; see also Nat'l Found. for Cancer Research, Inc. v.

Council of Better Bus. Bureaus, Inc.*, 705 F.2d 98, 101 (4th Cir. 1983) (foundation that "thrust[s]

itself into the public eye" through "massive solicitation efforts" is a public figure).

Here, Plaintiffs are public figures for purposes of statements about their use of public funds

for charitable causes. The FAC alleges Planet Aid seeks grants of public funds and has spent over

$50 million on charitable purposes in sixteen countries. FAC ¶¶ 13-14. Planet Aid publicly

promotes its charitable work. For example, it has a YouTube account with over 60 videos

(including "Farmers' Clubs in Malawi"); a Facebook page with over 6,000 "likes;" and a Twitter

account with over 2,500 followers. Charney Decl. Exs. U-1, X, Y. Its bright-yellow clothing bins

in 18 states and D.C. occupy a ubiquitous physical presence in the United States. *See id.* Ex. V-1

(touting a Planet Aid donation bin featured on Emmy award-winning TV show "The Big Bang

Theory"); *id.* Ex. V-2. As for Thomsen, she frequently is in Malawi news promoting her work,

assisted by public relations professionals. Ngwira Decl. Exs. G-P; Chitosi Decl. ¶¶ 4, 8-9. She is

routinely promoted by DAPP Malawi, which also has Twitter and a Facebook page with photos of

DAVIS WRIGHT TREMAINE LLP

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

and posts and "tweets" specifically mentioning Thomsen.  Charney Decl. Exs. AA, BB, DD.

Thomsen also appears in videos on FAIHPP's Youtube account.  *Id.* Exs. Z-1, Z-2.  Given all this,

Plaintiffs are public figures for purposes of this lawsuit about their charitable activities.[3]

### b.  Planet Aid Fails To Allege And Cannot Show Actual Malice.

Actual malice means either knowledge of falsity before publication or publication when

the defendant entertained serious doubts as to the truth of the publication.  *Sipple*, 71 Cal. App. 4th

at 248.  This "subjective test" examines "the defendant's actual belief concerning the truthfulness

of the publication."  *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 114 (2007) (quoting

*Reader's Digest*, 37 Cal. 3d at 256).

Although Rule 9(b) states that "conditions of a person's mind may be alleged generally,"

every federal appellate court to have considered the question has held a plaintiff must plead facts

sufficient to give rise to a reasonable inference of actual malice, affirming dismissal of claims on

this basis.  *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 701–02 (11th Cir. 2016); *Biro v.*

*Conde Nast*, 807 F.3d 541, 544–45 (2d Cir. 2015); *Pippen v. NBC Universal Media, LLC*, 734

F.3d 610, 614 (7th Cir. 2013); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d

369, 377-78 (4th Cir. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56 (1st

Cir. 2012); *see also Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 509 (6th Cir. 2015) (dicta);

*Cabello-Rondon v. Dow Jones & Co.*, 720 F. App'x 87, 88 (2d Cir. 2018) (summary opinion).

"Forcing publishers to defend inappropriate suits through expensive discovery proceedings in all

cases would constrict … breathing space in exactly the manner the actual malice standard was

intended to prevent. The costs and efforts required to defend a lawsuit through that stage of

litigation could chill free speech nearly as effectively as the absence of the actual malice standard

altogether."  *Michel*, 816 F.3d at 702.

On a summary judgment motion, a plaintiff must provide "evidence of actual knowledge

of the falsity or reckless disregard for its falsity must be of such a character 'as to command the

unhesitating assent of every reasonable mind.'"  *McGarry*, 154 Cal. App. 4th at 114 (quoting

---

[3] Thomsen is also a "public official" given her prominent role running numerous publicly funded
Teachers Training Colleges.  FAC ¶¶ 17, 42-43.  *See, e.g., Ghafur v. Bernstein*, 131 Cal. App. 4th
1230, 1239-40 (2005) (superintendent of private charter school system was a public official).

13

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

DAVIS WRIGHT TREMAINE LLP

*Rosenaur v. Scherer*, 88 Cal. App. 4th 260, 274 (2001)).  This must be proven by clear and convincing evidence.  *E.g, Gilbert v. Sykes,* 147 Cal. App. 4th 13, 25-26, 32 (2007).  Here, Planet Aid has not alleged and will be unable to show actual malice.

   **Farmers' Clubs**.  As to the Farmers' Clubs, Planet Aid alleges that Reveal made "false and defamatory statements that Plaintiffs had deprived farmers of promised livestock, agricultural inputs and water pumps."  FAC ¶ 201.  But that is exactly what sources told Reveal.

   At least three sources told Reveal farmers did not receive sufficient agricultural inputs, and have provided Reveal declarations for this case.  *See* FAC, Ex. P at 6 (quoting Jackson Mtimbuka, former Farmers' Club manager: farmers were not "given adequate inputs like seeds and fertilizer"); Mtimbuka Decl. ¶ 7m; Chikaonda Decl. ¶ 7 ("DAPP Malawi did not provide enough seeds or any other agricultural inputs to farmers"); Molande Decl. ¶ 9.  The same witnesses confirmed DAPP Malawi provided fewer livestock than promised or insufficient care for livestock.  Mtimbuka Decl. ¶ 7n (provided livestock died because there was no support "such as veterinary care"); Chikaonda Decl. ¶ 8 ("DAPP Malawi did not provide enough livestock they promised"); Molande Decl. ¶12 (same).  Two witnesses stated DAPP did not fulfill its promises to provide rope pumps to each Club.   Mtimbuka Decl. ¶ 7o; Chikaonda Decl. ¶ 9.

   Planet Aid's FAC says nothing about Molande or Chikaonda.  Instead, it attacks Reveal's reliance on Mtimbuka, claiming Reveal identified Mtimbuka as a farmer.  FAC ¶¶ 113-114 (citing Ex. R).  But Exhibit R to the FAC is ***not*** a Reveal publication.  Pyle Decl. ¶ 28.  Reveal accurately reported Mtimbuka was a former Farmers' Club manager.  FAC Ex. P at 5; Mtimbuka Decl. ¶ 3.  Planet Aid also claims Reveal should have known Mtimbuka's statement was false because he "believed and had communicated … that he was unaware of any 'cheating' by either Planet Aid and/or DAPP Malawi."  FAC ¶ 119.  Reveal recorded [Jackson] Mtimbuka's interview, in which he said exactly that—Planet Aid had been "cheating."  FAC Ex. P at 7.

   Finally, Planet Aid claims one of the farmers Reveal quoted, Johnny Kamwendo, "had nothing to do with the USDA Food for Progress Program."  FAC ¶ 114.  But Kamwendo intimately described his experience with the Farmers' Clubs.  Walters Decl. ¶ 14.  Planet Aid also challenges Reveal's reporting that DAPP Malawi sold pumps at inflated prices to farmers.  But

DAVIS WRIGHT TREMAINE LLP

this, too, was corroborated by sources.  *See* Mtimbuka Decl. ¶7o-p; Ngwira Decl. Ex. E.

Given that *six* witnesses contradicted Planet Aid's claims about the Farmers' Clubs, Planet Aid cannot possibly show actual malice with respect to allegations about the Farmers' Clubs.

*Skimming employees' salaries*.  Planet Aid claims Reveal falsely stated that it skimmed money from employees' salaries by (1) pressuring them to join Tvind and contribute portions of their salaries; and (2) paying employees less than the budgeted amount.

The FAC *concedes* at least some employees joined Tvind and made contributions.  FAC ¶ 129.  But it claims Reveal knew "the majority" had never been Tvind members, and thus employees were not "forced" to join.  *Id.* ¶ 130.  But Reveal never reported *all* DAPP employees were forced to join Tvind, just that two felt that way.  *See* FAC Ex. P at 20-21.  That is exactly what sources told Reveal.  Mtimbuka Decl. ¶7c-e, 7h (Thomsen told Mtimbuka to join Tvind if he wanted to advance and that Mtimbuka was pressured to "contribute as much of [his] salary as he possibly could"); Zebiah Decl. ¶ 6a-b (Zebiah told he had to join Tvind, and under a "deed of contribution," members agree to donate part of their pay).  These sources also told Reveal Tvind leaders pressured employees who joined Tvind to "upscale" their contributions, while "downscaling" money for their families, and one provided copies of "personal economy forms" used to apply this pressure.  Goteka Decl. ¶¶ 32-35, Exs. O-Q; Zebiah Decl. ¶¶ 16-20, Ex. G.

Planet Aid claims Reveal should have known Zebiah's statements were false because it had "a copy of a Deed of Contribution, and knew it contained no such language," just that individuals "agreed to a 'common economy.'"  FAC ¶ 135.  This assertion borders on frivolous.  The signed, notarized Deed states that the signatory "will from time to time transfer money" to Tvind; "reserve[s] the right to revoke" the Deed; and "acknowledges" he "cannot in any way claim the return of any money paid by me."  Zebiah Decl. Ex. E.

Planet Aid also criticizes Reveal's reliance on Zebiah by claiming the money he collected from other employees "ended up in an account in his own name."  FAC ¶ 138.  But Zebiah— whose job *required* him to track the contributions—provided evidence that the contributions were deposited into the account of Danish Tvind leaders.  Zebiah Decl. ¶10, Ex. F.  Reveal had no reason to doubt his statements.  Even if it did, Longwe's corroboration, Longwe Decl. ¶ 9r, and

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

the statements from the other sources negate any possibility that Reveal acted with actual malice.

Finally, Planet Aid claims that Reveal knew its statement that DAPP wrote paychecks "much smaller than reported to the USDA" was false—not because DAPP Malawi paid employees the budgeted amount—but because "individual paychecks were never even reported to the USDA." FAC ¶ 157. Planet Aid offers no reason to suggest Reveal doubted that the budgeted amount was shared with the USDA.

**Tvind connections to Planet Aid.** Tellingly, Planet Aid no longer alleges, as it did in its original complaint, that "[t]he Teachers Group has (and has had) no role in decision-making by Planet Aid, and in no sense, 'runs' or 'operates' Planet Aid, and has never run or operated Planet Aid," Complaint (ECF No. 1) ¶ 162. Instead, it merely claims that Teachers' Group founder and fugitive **Amdi Petersen** "had no involvement with **the USDA Programs**." FAC ¶ 207 (emphasis added). But Reveal never reported Petersen was directly involved with the USDA programs. Instead, it stated that 1) Planet Aid is "linked to the Teachers Group," FAC Ex. B at 13; Ex. P at 2-3; 2) Petersen ultimately controls Tvind, FAC Ex. B at 5; Ex. P at 8; and therefore 3) Petersen was "linked" to the projects, FAC Ex. A. Reveal's evidence amply supports these two premises.

**First**, Reveal's reporting about the links between Planet Aid and Tvind was supported by multiple sources, including an FBI report, FAC Ex. B at 5, 10; Smith Decl. ¶ 8, Ex. C-1; relationships between Petersen and Planet Aid leaders disclosed in court documents, Charney Decl. Exs. FF, GG at 15-16, 22-23; a Danish prosecutor's statements and evidence, Gade Decl. ¶ 15-26, Exs. A-F; and statements from well-placed former Tvind members and DAPP employees, Goteka Decl. ¶¶ 12-13, 28, 41-42, 45-46, 48-51; Munthali Decl. ¶¶ 5b, 6; Zebiah Decl. ¶¶ 5-6; Longwe Decl. ¶¶ 9a-e; Mtimbuka Decl. ¶¶ 5, 7h-j. **Second**, Reveal's reporting that Petersen controls Tvind was based on statements from two quoted sources, FAC Ex. B at 7-8, 15-16; Walters Decl. ¶¶ 37-38; Danish court records, *e.g.* Gade Decl. ¶ 9, Ex. A at 55; and Petersen's former assistant, Goteka Decl. ¶¶ 41-45, 49. Thomsen refused to answer whether she knows Peterson. FAC Ex. P at 25-26, Ex. B at 27. In these circumstances, Planet Aid cannot show Reveal made the statement that Petersen is "linked" to the USDA programs with actual malice.

**DAPP's accounting practices.** Planet Aid also claims Reveal falsely reported that it

16

fabricated invoices and paid dubious expenses to offshore entities to cover up for the missing aid. FAC at 23-24.  But the FAC does not seriously contest the truth of these statements, *id.* ¶¶ 95-98. Further, Reveal had ample evidence from which to conclude these statements were true.

Planet Aid does not even attempt to address the DAPP financial records—which Reveal hyperlinked—showing payments for vaguely described expenses such as "membership fees" and "collection fees"—and which also show that DAPP paid FAIHPP duplicate invoices, in the same amount, for what appear to be the same items.  FAC Ex. B at 23-27.  Longwe, ***DAPP's own financial controller***, authenticated records showing such transfers and confirmed "the same claimed services/goods were invoiced repeatedly over years" and DAPP did not follow normal accounting practices, but instead structured its finances to "obscure[ ] how DAPP Malawi transfers and uses funds."  *See* Longwe Decl. ¶¶ 6-7, 9a-9k, 9m-9p, and Exs. A-D.

Planet Aid claims Reveal knew Longwe "had no basis" for his statements because his time with DAPP "overlapped the USDA Program for only a short time."  FAC ¶¶ 87, 97.  But Longwe had access to relevant records—which he showed Reveal.  *See* FAC Ex. B at 25 ("Longwe and the ***other insiders who had access to the organization's financial information*** told Reveal that they believe at least half of the donor funds meant for humanitarian projects was shuttled out of the country.").  Nor did Walters "falsely report[] that Longwe had worked at the Malawi USDA project for a year," FAC ¶ 87—Reveal said he worked for ***DAPP Malawi*** for that period, *id.* Ex. B at 24.

Even so, Reveal also relied on procurement officers Malabwe and Munthali, who said DAPP paid inflated charges for goods and services from Tvind-connected companies, even though it would be cheaper to buy locally, FAC Ex. B at 25-26; Smith Decl. Ex. F; Charney Decl. Ex. HH at 2-6; DAPP permitted unqualified Tvind members to select suppliers and pay invoices, Munthali Decl. ¶ 5, Ex. A; Munthali was denied access to records normally available to someone in her position, was ignored when she proposed standard controls to prevent fraud, and concluded the procurement policies were "irregular and suspicious," *id.* ¶¶ 4-5.  *See also* Longwe Decl. ¶ 9c (DAPP was required to "use goods and services supplied by the Federation").  This is the same Federation—FAIHPP—to which DAPP paid "membership fees," Longwe Decl. ¶ 9f-g; which

17

gave a $500,000 loan to expand Planet Aid's U.S. clothing operation, Gade Decl. ¶ 16, Ex. C; and which is named in court records as an arm of Tvind, *e.g.*, Gade Decl. ¶¶ 18-19, 23, Exs. D-E. Reveal also relied on DAPP's own **former fundraiser**, who said that DAPP took donations for items that DAPP had obtained for free from other sources, and funded projects with multiple donors, using only one donor's funds for the project, diverting the rest.  Chitosi Decl. ¶¶ 5-7.

Planet Aid claims Reveal knew that Malabwe was lying because the items at issue—computers—were "substantially more expensive" in Malawi than the United States.  FAC ¶ 149. Malabwe, however, credibly explained that the "same computers" were available in Malawi more cheaply—and without the need to pay shipping, customs taxes, and other foreign supplier charges. Smith Decl. Ex. F; Charney Decl. Ex. HH  at 3-4.  Further, Planet Aid claims Reveal should not have relied on Malabwe because he had been charged with criminal conduct, FAC ¶ 150, but even if true, these allegations do not show actual malice.

Nor did Reveal have any reason to doubt that DAPP's employees fabricated invoices to cover up fraud.  Three sources corroborated this claim.  *See* Longwe Decl. ¶¶ 6, 9l ("[B]ackdated, fake invoices were created in a frantic effort to respond to an a [sic] third party audit sponsored by the USDA in 2015"); Goteka Decl. ¶¶ 31, 47 (to prepare for a donor, workers were instructed "to create expense vouchers and fake recipients to reflect that expenditure was as budgeted"); Smith Decl. Ex. F; Charney Decl. Ex. HH at 16 (Malabwe said DAPP sent fraudulent invoices to the USDA for employee accommodations).  Based on Reveal's sources and documents they provided, Reveal had no reason to doubt statements about DAPP's suspicious accounting and procurement.

***Fraud conclusions***.  Finally, Planet Aid cannot show that Reveal acted with actual malice when it reported statements by Longwe and others that Planet Aid had engaged in fraud, diverting 50 to 70 percent of government grant money away from African aid projects to Tvind.  At least **ten** sources supported this statement.   Longwe (1), Malabwe (2), Munthali (3) and Chitosi (4) told Reveal about DAPP's suspicious accounting and/or procurement practices; Mtimbuka (5), Molande (6), Chikaonda (7), and Chibwana (8) told Reveal the Farmers' Clubs shortchanged the farmers; Goteka (9), Zebiah (10) and Mtimbuka explained how DAPP skimmed salaries; and Goteka, Longwe, and Malabwe described specific instances in which invoices were fabricated or

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

DAPP funds were misused.  Longwe based his opinion on all the preceding statements—invoices for vague or duplicate services, his observations of faked invoices, transfers to FAIHPP, underpayment of employee salaries, forced contributions to Tvind, and the fact farmers did not benefit from the aid.  Longwe Decl. ¶ 13.  Because Reveal did not act with actual malice with respect to those statements, it also did not act with actual malice with respect to the fraud allegations.  Further, Goteka, a former DAPP employee and Tvind member who worked with Petersen, also described application of the Tvind principle of making "a 100% profit on every dollar of aid money received" to defraud DAPP teacher training program funders. Goteka Decl. ¶ 49.  *See also* Chitosi Decl. ¶ 6f. (detailing DAPP's "two dollars for every dollar spent" policy).  In view of ***all*** its sources, Reveal had no reason to doubt Planet Aid engaged in fraud.

## 2.        Planet Aid Cannot Meet Its Burden To Prove Falsity.

Because the statements Planet Aid challenges are a matter of public concern, Planet Aid bears the burden of proving each statement is false.  *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1382 (1999).  Planet Aid cannot meet this standard.

### a.        The Statements Are Substantially True.

"Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'"  *Vogel v. Felice*, 127 Cal. App. 4th 1006, 1021 (2005) (emphasis omitted) (quoting *Masson v. New Yorker Magazine*, 501 U.S. 496, 516-17 (1991)); *see also Sipple*, 71 Cal. App. 4th at 244.  Thus, the Court must consider whether any "deviation [from accuracy] is of such a 'substantial character'" that the challenged statements would have a "'different effect' on the mind of the 'reader'" absent inaccuracy; if not, the statements are not actionable.  *Colt v. Freedom Commc'n, Inc.*, 109 Cal. App. 4th 1551, 1558 (2003) (quoting *Crane v. Arizona Republic*, 872 F.2d 1511, 1519 (9th Cir. 1992)); *Masson*, 501 U.S. at 517.  This rule exists because "all publications must necessarily be permitted some degree of flexibility in their choice of the proper words and phrases to describe the subject at issue: 'Erroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'"  *Reader's Digest,* 37 Cal. 3d at 261 (alterations in original) (quoting *New York Times Co. v. Sullivan* 376 U.S. 254, 271-72 (1964)).

19

DAVIS WRIGHT TREMAINE LLP

Pertinent here, alleged inaccuracies in describing wrongdoing cannot establish falsity if the wrongful conduct occurred in substantially the manner stated.  For example, an article stating the plaintiff had been convicted of "tax fraud" and "tax evasion" was held to be a substantially true and a fair report of the proceedings, although the plaintiff actually had pleaded no contest to a misdemeanor for failing to file income tax returns for a much smaller amount than reported. *Jennings v. Telegram-Tribune Co.*, 164 Cal. App. 3d 119, 127 (1985).  The "gist or sting of the articles" was true—even though the terms "tax fraud" and "tax evasion" were "overblown or exaggerated"—because plaintiff was convicted of "serious tax crimes." *Id.* at 127; *see also, e.g., Handelsman v. San Francisco Chronicle*, 11 Cal. App. 3d 381, 386 (1970) (newspaper not liable for describing complaint for civil conversion as allegation of "outright theft"); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 123 (Tex. 2000) ("An average viewer ... would not view a 1.7 million dollar … swindle … with any less opprobrium than a 6 million dollar swindle").

Just as a plaintiff cannot show falsity by nitpicking minor alleged errors, it cannot hold a defendant liable by "scrutinizing what is not said to find 'a defamatory meaning which the article does not convey to a lay reader.'"  *Forsher v. Bugliosi*, 26 Cal. 3d 792, 803 (1980) (quoting *Mullins v. Thieriot*, 19 Cal. App. 3d 302, 304 (1971)).  Courts have recognized the grave constitutional concerns posed by such claims.  *See e.g., Forsher*, 26 Cal. 3d at 805 ("the book neither expressly nor by fair implication charges [the plaintiff] with killing or aiding or abetting the killing").

Here, Planet Aid cannot demonstrate that any of the statements Reveal actually published were materially false.  This is established by the overwhelming evidence that Reveal collected. *Supra* at III.B.1.b.  Further, any inaccuracies that do not affect the "gist" of the statement are not actionable.  This doctrine applies with particular force to several allegedly defamatory statements.

***First***, Reveal's statements about employee contributions are substantially true.  Planet Aid admits Tvind members contribute portions of their pay, but insists they contribute only "modest" amounts.  FAC ¶ 136.  Similarly, Planet Aid admits members agree to participate in the "common economy," but says this was not an agreement to provide contributions. *Id.* ¶ 135.  Even if these statements were false (they are not), this is immaterial.  That some DAPP employees were Tvind

DAVIS WRIGHT TREMAINE LLP

members, Tvind members signed a document agreeing to participate in a "common economy" that assumes contributions to that economy, and that such members contributed **any** of their pay to Tvind, is sufficient to create the same "gist" or "sting" as what Reveal reported.

**Second**, Reveal's statements about DAPP's practices of paying employees less than the budgeted amount are substantially true.  To rebut Reveal's statements, Planet Aid claims that it never falsely reported salaries to the USDA, as the USDA does not receive this information.  FAC ¶ 157.  This is immaterial.  Whether employee salaries were known to the USDA or not, Planet Aid does not deny the gist, *i.e.*, that employees were paid less than the amount budgeted.

**Third**, Reveal's statements linking Petersen to the USDA projects are substantially true.  Planet Aid does not dispute Tvind controls DAPP, or that Petersen controls Tvind.  To say Petersen is "linked" to DAPP projects is substantially true.  A reader would not have viewed the "sting" differently had Reveal omitted the statement that Petersen was "linked" to the projects.

**Fourth**, Reveal did not say, as the FAC claims, contributions went "straight to Mexico," FAC at 37.  Rather, it reported Mtimbuka "was told by his Teacher's Group bosses, the **money from the USDA** was going straight to Mexico."  FAC Ex. P at 33.  Reveal reported that DAPP Tvind members were unsure where the contributions went.  FAC Ex. P at 20.  Even so, the sting of this statement—that contributions were not used principally for the benefit of local clusters, as the FAC claims—is the same.  Tvind documents show how contributions are used on international Tvind expenses, *see* Zebiah Decl. ¶ 11, Ex. D, and sworn statements describe how only a small portion of contributions were spent on the local "clusters," *Id.* ¶ 10; Longwe Decl. ¶ 8.

**Fifth**, the statement that "[i]nsiders report siphoning 50-70% of $133m in US grants," which Planet Aid says is "mathematically impossible" and is a primary basis for the FAC, is also substantially true.  The statement's gist is that Planet Aid and DAPP fraudulently diverted public funds.  *Jennings*, 164 Cal. App. 3d at 127.

### b.   The Conclusions Reveal Reported Are Opinions Based On Disclosed Facts And Protected By The First Amendment.

Not only do multiple sworn declarations and documents confirm the substantial truth of Reveal's conclusions, these conclusions are also constitutionally protected because Reveal

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

disclosed the underlying facts to readers along with Planet Aid's insistence that all project funds had been properly spent. "[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995). "Accusations of criminal activity, like other statements, are not actionable if the underlying facts are disclosed." *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1103 (N.D. Cal. 1999) (defendant "adequately disclosed the facts underlying her conclusion" of embezzlement with hyperlinks showing its factual basis).

Emphasizing that "the First Amendment requires that the courts allow latitude for interpretation," the *Partington* Court rejected libel claims—founded on statements that a lawyer made specific errors—because the defendant "expressed his own opinion after having outlined all of the facts that serve as the basis for his conclusion." 56 F.3d at 1154, 1156. Likewise, in *Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446 (3d Cir. 1987), the Third Circuit held an embezzlement allegation protected because the writer "based his statements upon facts that were fully disclosed in the open letter," meaning "readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified." *Id.* at 454. In *Thomas v. Los Angeles Times Commc'ns LLC*, 189 F. Supp. 2d 1005 (C.D. Cal. 2002), the same principle defeated claims about an article that "compared … several … accounts of [the plaintiff's] role in historic events with other records and recollections." *Id.* at 1016 (internal quotation marks omitted). The court held "[e]ven if [the author's] opinion is that [the plaintiff] lied and that opinion comes through in the article, that opinion is clearly based on a consideration of both sides of the story. If the opinion is based on disclosed facts, it is not actionable." *Id.* at 1016; *see also Chapin*, 993 F.2d at 1093 (dismissing claims that charity charged "hefty mark ups" and asking "[w]ho will benefit more—GIs or [the] charity entrepreneur"); *Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of California v. Yagman*, 55 F.3d 1430, 1440 (9th Cir. 1995) (First Amendment protected remark that judge was anti-Semitic, where it was based on disclosed facts that judge had sanctioned several Jewish lawyers).

In deciding whether a statement is a protected conclusion based on disclosed facts, courts

first look at the broad context of the statements, to ask whether the "general tenor" of the article is such that readers are likely to understand that the statements are the author's conclusions, rather than verified facts. *Nicosia*, 72 F. Supp. 2d at 1101 (quoting *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995)).  Next, courts ask whether a reasonable reader would understand the challenged statement to be the author's interpretation of facts outlined in the article, leaving the reader free to draw his own conclusions.  *Nicosia*, 72 F. Supp. 2d at 1102.  If the answer to both questions is yes, the statement is protected.  *Id.*[4] Also relevant to the second prong is whether the publication includes source references—such as hyperlinks—that permit readers to evaluate sources.  *See, e.g., Nicosia*, 72 F. Supp. 2d at 1103 (treating hyperlinked articles as "part of the context of the embezzlement accusation"); *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 378 (2004) (opinions based on facts incorporated via hyperlinks not protected); *Abbas v. Foreign Policy Group, LLC*, 975 F. Supp. 2d 1, 16-17 (D.D.C. 2013), *aff'd*, 783 F.3d 1328 (D.C. Cir. 2015) (dismissing defamation claim based in part on facts disclosed via hyperlinks).

Here, the two principle publications chronicle an investigation.  In its online publication, Reveal included more than 70 hyperlinks to source material.  *See e.g.,* FAC Ex. B.  In contrast to traditional news articles, Reveal set forth the inquiries it pursued, the limits on its scope, the varying perspectives and knowledge of sources, their investigative methods, and questions that remained unresolved.  *See, generally*, FAC Exs. A, B, P.  Reasonable readers and listeners understand that statements that, as here, are qualified as the perspective of a particular source were one piece of the investigation among many, not necessarily a verified fact.

Reveal expressly qualified statements as the perspective of "accountants and project managers"—including Longwe.  Longwe's conclusion—that 70% was diverted—was identified as a hypothesis, not a fact, given his phrasing that the apparent lack of expected "impact" is "why I'm putting it around 70%."  Charney Decl. Ex. JJ at 14.  Reveal further qualified these statements

---

[4] In the context of a conclusion premised on disclosed facts, that the statement might be susceptible of being proven true or false does not negate a finding of opinion.  *See Nicosia*, 72 F. Supp. 2d at 1102-03; *see also Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. CV 10-5696 CRB, 2013 WL 3460707, at *4-5 (N.D. Cal. July 9, 2013) (even though statement that plaintiff "infringed on the intellectual property rights" of defendant "might be provable as true or false," all three opinion factors supported holding that it was opinion since "underlying facts are disclosed").

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC

DAVIS WRIGHT TREMAINE LLP

by noting that: it sought a "another opinion," *id.*; Planet Aid had claimed the money was spent appropriately, *id.* at 15-16; the next question was whether the claimed services were provided, *id.* at 15, FAC Ex. B at 26; and questions concerning "recurring allegations of fraud and money laundering" were left "unanswered." FAC Ex. B at 37. In these circumstances, the First Amendment protects Reveal's decision to quote sources' conclusion of fraud concerning public funds, since they were premised on disclosed facts.

### 3. Planet Aid Cannot Show Special Damages.

A plaintiff who sues the news media for libel may recover only special damages unless the "[p]laintiff … serve[s] upon the publisher ... a written notice specifying the statements claimed to be libelous and demanding that the same be corrected… *within 20 days* after knowledge of the publication or broadcast of the statements." Cal. Civ. Code § 48(a) (emphasis added). Planet Aid did not demand a correction until August 19, 2016, *five months* after the radio report and podcast and *three months* after Reveal's first major online report. Thus, Planet Aid may not recover general or punitive damages. *Di Giorgio Corp. v. Valley Labor Citizen*, 260 Cal. App. 2d 268, 274 (1968). Special damages "must be pled and proved precisely." *Gomes v. Fried*, 136 Cal. App. 3d 924, 940 (1982). Planet Aid cannot meet this burden, independently requiring dismissal.

### 4. The Fair And True Report Privilege Protects Reveal's Statements About Planet Aid's Connections To Tvind And Petersen.

Planet Aid claims Reveal falsely claimed that an "international fugitive was linked to the projects." *See* FAC ¶¶ 164-178. Because this conclusion rested on court records, it is privileged.

California law protects any "fair and true report" in a "public journal" of any "judicial," "legislative," "or [any] other public official proceeding, or ... anything said in the course thereof[.]" Civ. Code § 47(a), (d). The privilege is "absolute"—"[e]ven when the print media publish an accurate report of a statement they *know to be false*, the protective cloak … remains intact*." McClatchy Newspapers, Inc. v. Superior Court*, 189 Cal. App. 3d 961, 974 (1987). The privilege is "applied broadly," *Sipple*, 71 Cal. App. 4th at 240-41, and "carries with it a certain amount of literary license." *McClatchy*, 189 Cal. App. 3d at 976. A report is protected "if the substance, the gist, [or] the sting of the [allegedly] libelous charge be justified." *Sipple*, 71 Cal.

App. 4th at 244.  Given the FBI report about Planet Aid's links to Tvind, Smith Decl. Ex. C-1, and court records showing that Petersen controls Tvind, Gade Decl. Ex. A at 55, the privilege applies.

### C.    Planet Aid Cannot Show a Probability of Prevailing on Its Remaining Claims for Tortious Interference, False Light, and Unjust Enrichment.

If the Court dismisses Planet Aid's defamation claim, it must dismiss the remaining claims. The First Amendment limitations on defamation actions "apply to all claims whose gravamen is the alleged injurious falsehood of a statement." *Blatty,* 42 Cal. 3d at 1042.  Thus, where the First Amendment bars a defamation claim, it bars other claims that purport to arise from the same facts. *See also Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988); *see also Gilbert*, 147 Cal. App. 4th at 34 ("[T]he collapse of [the] defamation claim *spells the demise of all other causes of action … which allegedly arise from the same publication.*") (emphasis added).

Moreover, these claims fail for independent reasons.  First, where, as here, "a false light claim is coupled with a defamation claim, the false light claim is ***essentially superfluous***." *Eisenberg*, 74 Cal. App. 4th at 1385 n.13 (emphasis added).  Second, the "wrongful conduct" element of tortious interference and unjust enrichment is missing absent a viable defamation claim.  *Contemporary Servs. Corp. v. Staff Pro Inc.*, 152 Cal. App. 4th 1043, 1056, 1060 (2007). Third, California does not recognize civil conspiracy as a freestanding cause of action.  *Kenne v. Stennis*, 230 Cal. App. 4th 953, 968-69 (2014).  Finally, unjust enrichment is not an independent cause of action, *e.g., Melchior v. New Line Prods., Inc*., 106 Cal. App. 4th 779, 785, 793 (2003).

### D.    The Statute of Limitations Bars All of Planet Aid's Claims Based on Articles Published Before March 16, 2017 Not Challenged in the Original Complaint.

The FAC for the first time challenges several publications published before March 16, 2017.  *See* FAC Exs. C, G, H; *compare generally* Complaint.  Those claims are barred by California's one-year statute of limitations for defamation.  Cal. Civ. Code § 340(c).  All claims based on these articles are barred.  *See, e.g., Fellows v. Nat'l Enquirer, Inc*., 42 Cal. 3d 234, 240 (1986) (single-publication rule barred disparagement claim based on same facts as libel claim).

DATED: July 2, 2018                              Respectfully submitted,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DAVIS WRIGHT TREMAINE LLP
THOMAS R. BURKE
AMBIKA K. DORAN
BRENDAN N. CHARNEY


By: _____
     Thomas R. Burke

Attorneys for Defendants
REVEAL FROM THE CENTER FOR
INVESTIGATIVE REPORTING; MATT
SMITH; and AMY WALTERS

SPECIAL MOTION TO STRIKE
Case No. 17-cv-03695-MMC