1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Jacqueline Scott Corley, Judge

4

5  PLANET AID, INC., et al.,     )
                                 )
6          Plaintiffs,           )
                                 )
7  vs.                           )   No. C 17-03695-MMC
                                 )
8  REVEAL, CENTER FOR            )
   INVESTIGATIVE REPORTING,      )
9  et al.,                       )
                                 )
10         Defendants.           )
   _____)

11                               San Francisco, California
12                               Friday, November 9, 2018

13
     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
14             RECORDING 1:37 - 3:41 = 124 MINUTES

15  APPEARANCES:

16  For Plaintiffs:
                               Nelson, Mullins, Riley &
17                                Scarborough, LLP
                               101 Constitution Avenue NW
18                             Suite 900
                               Washington, D.C. 20001
19                       BY:   SAMUEL ROSENTHAL, ESQ.

20  For Defendants:
                               Davis, Wright, Tremaine, LLP
21                             1201 Third Avenue
                               Suite 2200
22                             Seattle, Washington 98101
                         BY:   AMBIKA K. DORAN, ESQ.
23

24

25            (APPEARANCES CONTINUED ON NEXT PAGE)

2

1   APPEARANCES:   (Cont'd.)

2   For Defendants:
                            Davis, Wright, Tremaine, LLP
3                           505 Montgomery Street
                            Suite 800
4                           San Francisco, California
                              94111
5                    BY:   THOMAS R. BURKE, ESQ.

6

    Transcribed by:         Echo Reporting, Inc.
7                           Contracted Court Reporter/
                            Transcriber
8                           echoreporting@yahoo.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Friday, November 9th, 2018</u>                                    <u>1:37 p.m.</u>

2                      P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4           THE CLERK:  Civil Action C:17-3695, Planet Aid,

5  Inc. versus Reveal.

6       Please come up to the podium and -- well, Ms. Doran

7  will --

8           THE COURT:  Go ahead and state your appearance.

9           MR. ROSENTHAL:  Sam Rosenthal from Nelson and

10  Mullins, for the Plaintiff.

11          THE COURT:  Good afternoon.

12          MR. ROSENTHAL:  Plaintiffs.

13          THE COURT:  Good afternoon, Mr. Rosenthal.

14          MR. ROSENTHAL:  Good afternoon.

15          MS. DORAN:  Ambika Doran for the Defendants.  With

16  me is my partner, Tom Burke.

17          THE COURT:  Good afternoon.

18          MR. BURKE:  Good afternoon.

19          THE COURT:  Okay.  So we're going to go through,

20  and we're going to work on a workout, and this is all about

21  getting the Plaintiffs the discovery they need to challenge

22  Defendants' anti-SLAPP motion.  We all agree they need

23  discovery, and we have the advantage of having the motion

24  sitting there and -- in front of us.  So why don't we start

25  with -- because I'm not sure I quite understand with -- what

4

1  the Defendants are producing.  So why don't you first

2  describe to me what you are producing.

3           MS. DORAN:  Yes, your Honor.  So we have provided

4  a list of what we're producing.  I believe it was in -- I

5  forget which letter it was in, but it was in one of the

6  letters, but I can tell you now what they are

7      So recordings of interviews with sources quoted or

8  mentioned in the first two reports.  That's the March 2016

9  podcast and the May 2016 written report.

10     The second is -- and I should say if there are no

11 recordings, if the interview wasn't recorded, we will

12 produce -- we are producing notes that were taken during the

13 interviews.

14          THE COURT:  So reports that were recorded or used,

15 is that what you said?

16          MS. DORAN:  I said that were -- sources that were

17 recorded or mentioned.

18          THE COURT:  Or mentioned.  Okay.

19          MS. DORAN:  By name.

20          THE COURT:  Okay.

21          MS. DORAN:  Two, we've agreed to produce outlines,

22 drafts or scripts for those first two reports.  It's the

23 fourth letter that it's in.

24          THE COURT:  Okay.

25          MS. DORAN:  Three, emails concerning those

5

1  outlines, drafts and scripts.  So if reporters are writing

2  back and forth with editors about language in a particular

3  report, that would be in those emails.

4          THE COURT:  Okay.

5          MS. DORAN:  Four, documents that Defendants

6  gathered, generated and/or relied upon.  So even if they did

7  not rely upon source material, we are, nonetheless,

8  producing the source material.

9          THE COURT:  Wait, generated, gathered or relied

10  upon?

11          MS. DORAN:  That's right.

12          THE COURT:  But is that up to a particular date?

13          MS. DORAN:  I believe it is not up to a particular

14  date.  It's within a particular time frame, a relevant time

15  period that we've defined in our discovery responses.

16          THE COURT:  Which is?

17          MS. DORAN:  It is --

18          MR. BURKE:  It's up to August 2017.

19          MS. DORAN:  It's August -- August 2017 is the --

20          MR. BURKE:  August 2017.

21          MS. DORAN:  August 2017, yeah.

22          THE COURT:  Okay.

23          MS. DORAN:  Yeah, 2017.

24          THE COURT:  Okay.

25          MS. DORAN:  The next thing is photos and video

6

1  taken during trips for the reports.

2          THE COURT:  Okay.

3          MS. DORAN:  Sixth is efforts to obtain comment

4  from the -- from Planet Aid and DAPP Malawi.

5      The seventh is documents concerning the hiring of

6  Candoni Noguera (phonetic), the reporter in Malawi.

7      The eighth is documents showing the reasons Reveal

8  focused on Planet Aid.

9          THE COURT:  I'm sorry.  What -- can you say that

10 last one again?

11         MS. DORAN:  Documents showing the reasons Reveal

12 focused on Planet Aid.

13     The ninth is accounting records for expenditures made

14 in connection with the reporting.  So that would include,

15 for example, expenses to reimburse sources for travel and

16 food.

17     The tenth is documents concerning demands for

18 retractions made by the Plaintiff.

19         THE COURT:  And not just their demands, but what

20 -- what does that mean?

21         MS. DORAN:  That means anything concerning the

22 retractions that's not privileged.

23         THE COURT:  Okay.  All right.  So that was one of

24 the issues that was raised --

25         MS. DORAN:  Correct.

7

1          THE COURT:  -- and you're actually producing

2  those?

3          MS. DORAN:  Yes.

4          THE COURT:  Okay.

5          MS. DORAN:  And the eleventh is communications

6  with specified government agencies.  It's our request for

7  production -- their request for production 15 in their -- in

8  Planet Aid's second document request.  It's like UNICEF,

9  USDA, a couple of other ones.

10          THE COURT:  Okay.

11          MS. DORAN:  And that's -- that's what we've agreed

12  to produce.

13          THE COURT:  Okay.  All right.  So now I'm going to

14  turn to you, Mr. Rosenthal.  So some of that takes care of

15  some of the things that were in the letters.

16          MR. ROSENTHAL:  Yes.  May I raise a threshold

17  issue?

18          THE COURT:  Sure.

19          MR. ROSENTHAL:  One -- one issue that's been

20  raised -- and I think your Honor's -- the way you've phrased

21  it sort of fronts that issue, and that is we believe that

22  we're entitled to have discovery and after discovery, at

23  that point we would have to show other documents that we

24  were not able to get, which are essential to responding to

25  the motion.

8

1     Our document requests were not limited to the anti-
2  SLAPP motion, and what they produced is not relevant
3  directly to the anti-SLAPP motion.  And so we think that in
4  terms of the standard, we ought to have fulsome discovery,
5  and at that point, after we've had fulsome discovery, at
6  that point we -- the essential standard would kick in, are
7  they --
8           THE COURT:  Well, the problem you have, though, is
9  the SLAPP statute itself doesn't say that, right?  If you
10  were in State Court, you'd get no discovery, but you're in
11  Federal Court, and so you have a case, the <u>Planned</u>
12  <u>Parenthood</u> case, and it says you get this -- the discovery.
13  I think this is a Rule 56 type discovery.
14     So I interpret that as first we adjudicate the anti-
15  SLAPP motion.  Now, obviously there's a lot of overlap
16  there, right?  But I'm just telling you I'm focused on
17  getting the parties -- getting you essentially what you
18  need.  It might be mutual too.  I don't know, but --
19           MR. ROSENTHAL:  Right.
20           THE COURT:  -- at least you -- Plaintiffs what
21  they need.  So Judge -- so you can file your opposition, and
22  Judge Chesney can adjudicate that motion because once that's
23  adjudicated, then we do our full-blown discovery.
24           MR. ROSENTHAL:  I understand, but I don't want the
25  misperception that our discovery requests were limited to

1  the anti-SLAPP motion.  And, indeed, their production has

2  not been limited to the anti-SLAPP motion.  We can pare down

3  substantially what's in our request, and I think we can

4  actually come to a much narrower focus.  In our mind, this

5  case --

6          THE COURT:  Oh, you don't want to be -- you don't

7  want to be barred -- assuming you survive the motion -- to

8  them saying, "Well, you already asked, and now you don't get

9  more."

10         MR. ROSENTHAL:  Exactly.

11         THE COURT:  You're not going to say that.

12         MS. DORAN:  No, your Honor.

13         THE COURT:  Ah, there.

14         MR. ROSENTHAL:  Perfect.  Perfect, your Honor.

15         THE COURT:  So we're going to focus on what you

16  need to get for the anti-SLAPP motion, and they've said on

17  the record they're not -- and they wouldn't anyway -- say

18  "Oh, no, no.  You're barred."

19         MR. ROSENTHAL:  Okay.

20         THE COURT:  With -- with this area of law, it's a

21  unique creature in which we focus on this procedure first.

22         MR. ROSENTHAL:  Okay.

23         THE COURT:  Good.  Great  Already worth your trip,

24  everybody's trip.

25         MR. ROSENTHAL:  Thank you, your Honor.

1          THE COURT:  Plus you got to be here and see all

2  the smoke.  How fun is that?

3          MR. ROSENTHAL:  Any excuse to come to San

4  Francisco, your Honor.

5          THE COURT:  Okay.

6          MR. ROSENTHAL:  Smoke or no smoke.

7          THE COURT:  All right.  So with that in mind now,

8  we're going to talk about what additional things you believe

9  you need fairly to oppose their motion.

10          MR. ROSENTHAL:  Okay.  We've submitted five

11 letters, and we can do it letter by letter or we can do it

12 category by category.

13          THE COURT:  Yeah.  I want to do it -- they've

14 listed what they're producing, and I just want to give you

15 -- I'm not so worried about -- the letters are there, and

16 there are some legal issues to resolve, but I just want you

17 more category by category.  Let's just start.

18          MR. ROSENTHAL:  The ones that they've -- or letter

19 by letter?  I'm sorry.

20          THE COURT:  No, I don't want it letter by letter.

21          MR. ROSENTHAL:  Okay.  So --

22          THE COURT:  I want it -- because it's all kind of

23 mushed together.

24          MR. ROSENTHAL:  Okay.

25          THE COURT:  I want it just -- let's just have a

11

1 conversation about what it is you want.

2         MR. ROSENTHAL:  And may I raise one other

3 threshold issue?  And that is the pace of discovery has made

4 it extremely difficult for us to basically defend ourself in

5 the -- in the court of public opinion.

6     We'd like to know -- we'd like to get some idea of

7 where are we in the discovery process.  Have they

8 produced --

9         THE COURT:  Well, that's a fair question.  You say

10 you're going to produce these things.

11         MS. DORAN:  Yes, your Honor.

12         THE COURT:  That's a fair question.

13         MS. DORAN:  So we've produced more than 120

14 recordings so far.  I believe there are a few sources whose

15 recordings we still have to produce, including Harrison

16 Longway (phonetic), which is mentioned in the letters.  He's

17 the DAPP Malawi controller that we quoted, and we have also

18 produced, my understanding is, all of the FOIA documents,

19 all of the

20 -- basically all of the documents that we relied on.  Like

21 there was a book called -- I think it's called a "Culture

22 Front" book.  We've produced that.

23     What we haven't yet produced are some of the other

24 categories that I've mentioned.  We have been making efforts

25 to isolate what those are.  So the retraction demands, for

12

1  example --

2       THE COURT:  So let's -- I hate to do this, but I

3  do think it would be helpful if we --

4       MS. DORAN:  Sure.

5       THE COURT:  -- just do this in a logical

6  organized --

7       MS. DORAN:  Sure.

8       THE COURT:  Let's just go through the nice list

9  that you gave me.

10      MS. DORAN:  Okay.

11      THE COURT:  So recordings, you've produced 120?

12      MS. DORAN:  Hundred and twenty-four I think, yeah.

13      THE COURT:  Hundred and twenty-four.

14      MS. DORAN:  Yeah.

15      THE COURT:  And so when will the -- when do you

16 believe the -- how many remaining are there approximately?

17      MS. DORAN:  I don't know the answer to that.  I

18 know there's about four or five sources, but there are

19 multiple -- there's more than one interview for each source,

20 and I know a number of sources about, you know, four or five

21 that are left.

22      THE COURT:  Okay.  So not very many sources.

23      MS. DORAN:  No.

24      THE COURT:  And when do you think those will be

25 produced?

13

1          MS. DORAN:  I don't know.  It's been -- we've been

2  producing them on a regular pace every week.

3          THE COURT:  But you have them?

4          MS. DORAN:  We have them.  But, see, here's the --

5  and --

6          THE COURT:  Yeah.

7          MS. DORAN:  And this is part of the larger

8  discovery issue, which is we can't just hand them over,

9  right.  Some of them refer to confidential sources.  And

10 although Plaintiffs believe they're entitled to that

11 information, we have been redacting it from the recordings,

12 and that's a complicated process that requires the reporter

13 to --

14         THE COURT:  Even though the source --

15         MS. DORAN:  That's right.

16         THE COURT:  -- himself may not be --

17         MS. DORAN:  Right.

18         THE COURT:  -- confidential?

19         MS. DORAN:  Right.

20         THE COURT:  He or she may share information from a

21 confidential source?

22         MS. DORAN:  Or a reporter might say "We heard from

23 Confidential Source A that this happened."

24         THE COURT:  So you have to --

25         MS. DORAN:  We have to go through them.

14

1          THE COURT:  Okay.  And the recordings that you

2   produced, do they identify where they've been redacted?

3          MS. DORAN:  Yes, they do.

4          THE COURT:  Okay.

5          MS. DORAN:  We've provided logs that show that.

6          THE COURT:  All right.  So but I am going to go

7   back and put you on the spot again.  So you have four or

8   five sources left.  You've been producing them on a weekly

9   basis, is that it?

10         MS. DORAN:  I believe so.  Yeah, in -- in -- you

11  know, this -- it's so burdensome that we have two reporters

12  and one editor working full time on this.  So we're not --

13         THE COURT:  Well, so let's just not do that

14  because what it may be is we may ask you -- we'll go through

15  all this -- where your priority is, as we often do with

16  production.  So you can focus your efforts where Mr.

17  Rosenthal's more in a hurry.

18      Okay.  How about the outlines, drafts, or scripts?

19         MS. DORAN:  Those are also not produced yet.  They

20  haven't been reviewed yet because we have been focusing on

21  the recordings and on the source material.

22         THE COURT:  Okay.  Who -- who would be doing the

23  reviewing of the -- a lawyer or --

24         MS. DORAN:  I would think it's going to be a

25  combination of lawyers and non-lawyers.

15

1          THE COURT:  Yeah.  Okay.  And what is sort of your

2 estimated time line on that?

3          MS. DORAN:  I don't have one.

4          THE COURT:  Okay.  All right.  Anyway, that's

5 helpful.

6          MS. DORAN:  Two and three are basically going to

7 come at the same time, though, because they're all going to

8 be in the same batch of documents to review.

9          THE COURT:  You mean the outlines and the emails?

10          MS. DORAN:  That's right.

11          THE COURT:  And so none of the emails as well?

12          MS. DORAN:  Correct.

13          THE COURT:  Okay.

14          MS. DORAN:  Well, there have been emails produced

15 but not concerning --

16          THE COURT:  The drafts, right.

17          MS. DORAN:  Yeah.

18          THE COURT:  Those are the same.  Okay.  How about

19 the documents generated, gathered, or relied upon?

20          MS. DORAN:  Those I think have largely been

21 produced.

22          THE COURT:  Okay.

23          MR. ROSENTHAL:  I don't think so, Ambika.

24          MS. DORAN:  Okay.  What do you think's missing?

25          MR. ROSENTHAL:  In listening to recordings,

1 there's lots of documents that are being discussed, and I

2 don't think any of them have been produced.  I can give you

3 some examples.  For example, I know Goteka (phonetic) did

4 produce a lot  of material that was attached to his

5 declaration.  But he -- for example, he's referring to a

6 bank statement.  There's no bank statement.  There's back

7 and forth about whether they can find out how much money is

8 in the account.  There are documents that are discussed with

9 various of them.  I don't -- I don't think they've been

10 produced.  Are they produced in -- you're saying attached to

11 the declarations?

12         MS. DORAN:  Some of them are attached to the

13 declarations, but others -- I don't know.  I mean, this is

14 part of -- part of my frustration with this process is I

15 don't actually know what you feel like you are missing.  So

16 if you have specific -- like a list, it would help me be

17 able to go back to the client and say this is what we need

18 to produce.

19         MR. ROSENTHAL:  Well, part of it -- part of it's

20 difficult because if you listen to a recording and you'll

21 hear someone say "And here's a document or blah, blah,

22 blah."  I don't know -- I don't have the document.  It's

23 very hard for me to describe it, but certainly whoever was

24 doing the interview is going to know what documents they

25 were talking about.

1          THE COURT:  Well, maybe like how -- like the

2  document production.  Was there like -- I mean, how was it

3  even done?  I don't even know  Like presumably because we

4  don't have file cabinets anymore.  There wasn't a file

5  cabinet we could just go to and copy it and --

6          MS. DORAN:  Right.

7          THE COURT:  -- produce it, but it -- let's just

8  figure out.  It's your understanding that you have -- you

9  say largely --

10          MS. DORAN:  Yes.

11          THE COURT:  -- produced all of them, and then

12  we'll -- we'll come back, and we'll figure out how we see if

13  there's sources that you missed or something.

14          MS. DORAN:  Yeah.  I mean, if -- if, for example,

15  in that example that you just gave me, if you just said "Mr.

16  Goteka's interview at time 5:23 there's a document

17  discussed.  We'd like a copy of that," that would make it

18  easier for us to go back and figure out what's -- what it is

19  you need.

20          THE COURT:  Well, not just what he needs.  The

21  question would be why it wasn't produced.

22          MS. DORAN:  Sure.

23          THE COURT:  And produce it.  Why it wasn't

24  produced and then to revisit your production and see if

25  there's -- you've missed something, right?  Because

18

presumably, if it's -- well, let's see, maybe -- let's see.

Documents generated, gathered or relied upon, if the record

-- if the recording reflects that it was gathered, then it

should have been produced.  So it should not just be "I'll

produce it."

        MS. DORAN:  Well --

        THE COURT:  It should be, "Well, is there

something that we've missed in our production?"

        MS. DORAN:  Let's be a little more precise I think

because I think the source -- let me find it actually.  I'm

going to look at what we promised to produce.

    So source material is defined in our general objection

22 to be documentary information that CIR gathered,

generated, and/or relied upon in publishing or broadcasting

the March 2016 broadcast attached as Exhibit P and the May

23rd article attached as Exhibit B to the -- including and

limited to recorded interviews of human sources, notes of

interviews with such sources where recordings do not exist,

and documentary evidence gathered by Reveal that does not

reveal the identity of confidential sources such as

responses to FOIA requests, third party books and articles.

        MR. ROSENTHAL:  Your Honor, one of the problems I

have raised previously, and that is they have an interview

with somebody -- they have an interview with somebody named

Marco, and Marco shows them bank records, and they say,

1  "Well, this is helpful, and this is not.  Thanks, Marco.

2  Don't need that."  They didn't gather it.  They didn't rely

3  upon it, and they didn't generate it.

4           THE COURT:  They also don't have it.

5           MR. ROSENTHAL:  Well, they may -- they may have

6  it.

7           THE COURT:  Well, if they have it, then they

8  gathered it.

9           MR. ROSENTHAL:  Okay.

10           THE COURT:  Right?

11           MR. ROSENTHAL:  Well, and I -- and I thought they

12  were agreeing to anything in their possession, custody, or

13  control, which would be the standard, but if they're saying

14  they will produce anything that they have that was discussed

15  with a source, then I'm satisfied.

16           MS. DORAN:  I don't believe that's what we're

17  saying.  What we're saying is the -- you know, while the

18  interviews and the notes are easy to understand, documentary

19  -- documentary evidence that we gathered such as FOIA

20  requests, third party books, and articles, so we have a lot

21  of material from FOIA requests that we have produced.  We

22  have books that we have produced.  I didn't -- I don't

23  understand -- I'm not sure where in the morass of discovery

24  requests you have asked for documents that were used in the

25  course of an interview.  And, again, that's -- that's part

1 of the issue is if there had been a request like that, we

2 could go back and say "Okay.  Well, he's asked for this.

3 Let's take a look at what we have."

4           MR. ROSENTHAL:  So I'm confused as to whether

5 you're producing it or not.

6           THE COURT:  So he gave you a specific example of

7 an interview.

8           MS. DORAN:  Yes.

9           THE COURT:  Where someone -- where they gathered

10 or asked them about a bank record.  Would you be withholding

11 that or not?

12           MS. DORAN:  It depends on how it came to us.  If

13 those came to us in a FOIA request or something like that,

14 we would be producing it.  If not --

15           THE COURT:  If a non-confidential source gave it

16 to you?

17           MS. DORAN:  We would -- some of it's attached --

18 some of that stuff is attached to the SLAPP motion.  Other

19 than that, it's not been my understanding that they've asked

20 for that, but if that's what they're asking for, we can

21 certainly consider that.

22           MR. ROSENTHAL:  Your Honor, I don't know if it

23 helps, but it seems like this is a new category, which is --

24 which is fine.

25           THE COURT:  Yeah, I don't know if it's new or not.

1        MR. ROSENTHAL:  I think it is new.  But -- but it

2  doesn't mean that we wouldn't produce it.

3        THE COURT:  Right.

4        MR. ROSENTHAL:  It's just that it's not something

5  that we've been focused on.  Every time the -- the audio

6  recordings are listened to, they're listening for mentions

7  of confidential sources.  There's not a logging as well of

8  -- of documents that are --

9        THE COURT:  Well, I guess maybe I don't

10 understand, but I just assume when you're doing a big

11 investigative piece like this you gather a lot of

12 documentary evidence, and you have it.

13        MR. ROSENTHAL:  They do.

14        THE COURT:  And I think they're just asking you to

15 produce it, right, because it's they don't --

16        MR. ROSENTHAL:  But it's not --

17        MR. BURKE:  It's not easy.

18        THE COURT:  No, no, I understand that.  But I

19 guess when you say they didn't ask for it, I'm just trying

20 to figure out -- I would have thought they would have asked

21 for whatever you have.

22        MS. DORAN:  Well, they've asked for everything,

23 right.

24        THE COURT:  Yeah.

25        MS. DORAN:  So -- and the way the requests are

1  worded are "Give us everything related to this individual."

2  And so, you know, we didn't take it upon ourselves to

3  identify categories within the request that we thought were

4  reasonable to produce.  We're relying on the Plaintiff to

5  specify with particularity what they want.  So, again, if

6  they had made a request that said documents discussed with

7  source -- you know, sources, then we could respond

8  intelligently, that, yes, we will produce or, no, we won't

9  produce.  I imagine we would produce things like that.

10          THE COURT:  All right.  You want those, right?

11          MR. ROSENTHAL:  We thought we asked for it in --

12          THE COURT:  Okay.  They're saying they probably

13  will produce unless, of course, it's a --

14          MS. DORAN:  Correct.

15          THE COURT:  -- confidential source.  I understand

16  that objection.  Okay.

17     Okay.  So you're going to have to go back and do this

18  as well.  I mean, essentially they're asking for --

19          MR. ROSENTHAL:  Everything.

20          THE COURT:  -- everything that the reporters

21  looked at in doing the story -- stories, right?

22          MS. DORAN:  Yes.

23          THE COURT:  All right.

24          MR. ROSENTHAL:  Your Honor, one qualification, and

25  that is we're really not asking for everything, and that is

23

1  this is about stealing money from the USDA project, and --

2           THE COURT:  Yes.

3           MR. ROSENTHAL:  -- your Honor said "Do you have

4  priorities?"  That's our priority.  That's what this whole

5  case is about, did Planet Aid steal 60 to 90 million

6  dollars.  That's our priority.

7           THE COURT:  Which is why a bank record would be

8  important.

9           MR. ROSENTHAL:  Yes, it would, your Honor.

10          THE COURT:  Okay.  All right.  That's helpful

11 because we'll go back and --

12          MS. DORAN:  It is very helpful.  It's --

13          THE COURT:  Yeah.  We'll go back and figure out

14 priority, but let's go through and see what's been produced.

15     Okay.  Photos or videos taken during trips?

16          MS. DORAN:  I believe those have been gathered and

17 are close to being produced.

18          THE COURT:  And what does close mean?

19          MS. DORAN:  I know that they have been loaded into

20 our database.  I don't know if they've been reviewed, but

21 the review would not take very long.

22          THE COURT:  All right.  So before Thanksgiving?

23          MS. DORAN:  Does that sound -- yeah, I --

24          THE COURT:  Okay.  All right.

25          MS. DORAN:  I don't want to commit without -- I

24

1 mean, that sounds reasonable.  I just don't want to commit

2 without talking to the people who would really be doing the

3 work.

4          THE COURT:  Okay.  Then we have the retraction

5 documents you said you have not yet produced?

6          MS. DORAN:  Correct.

7          THE COURT:  Okay.  But you will.  And the

8 documents related to the reporter in Malawi?

9          MS. DORAN:  We have not produced those, but we

10 will.  That includes documents that were in his custody and

11 possession.  I know that's one issue that's been --

12          THE COURT:  But you are getting those?

13          MS. DORAN:  Yes.

14          THE COURT:  Okay.  And dockets showing why Reveal

15 focused on Planet Aid?

16          MS. DORAN:  Those are also -- they have been

17 narrowed to a relevant scope of documents that need to be

18 reviewed, but they have not been produced.

19          THE COURT:  The expenditures?

20          MS. DORAN:  Same.

21          THE COURT:  Not.  Then I wrote down demands for

22 retraction.

23          MS. DORAN:  So I think what you meant before was

24 effort to obtain comment from Planet Aid and DAPP Malawi.

25 That was the sixth category.

1          THE COURT:  Yes, yes.

2          MS. DORAN:  And we have, again, isolated a

3  universe of documents.  We've really been focusing on the

4  recordings.  And, again, there's been three people working

5  full time on those.

6          THE COURT:  Okay.

7          MS. DORAN:  In addition to lawyers.

8          THE COURT:  And then the communications with the

9  government agency?

10          MS. DORAN:  Those are also things that we have

11  isolated but not reviewed yet.

12          THE COURT:  Okay.  All right.  Why don't we start

13  with Mr. Rosenthal.  Your highest priority has not been

14  produced yet.

15          MR. ROSENTHAL:  The highest priority would be the

16  outlines, drafts, and scripts.

17          THE COURT:  Okay.

18          MR. ROSENTHAL:  Because that would show how the

19  story --

20          THE COURT:  Evolved.

21          MR. ROSENTHAL:  -- evolved, progressed, and also

22  what people were saying at various times and how they

23  interpreted it.  That would be my biggest priority.

24          THE COURT:  Okay.  So would you want them to -- to

25  focus on that, say, instead of the four or five recording

26

1  sources of recordings or simultaneous or --

2        MR. ROSENTHAL:  Well, there's one that's

3  particularly important.  That's Harrison Longway.  If they

4  can just get us Harrison Longway, and then --

5        THE COURT:  Okay.

6        MR. ROSENTHAL:  -- I think the others are --

7  there's a -- I can't remember the other three names, but I

8  think they're less -- do you remember who they are, the

9  other three?

10        MS. DORAN:  I have it in my email, and I can look,

11  but I agree with you that I think Harrison Longway is what

12  you're going to want.

13        MR. ROSENTHAL:  Yeah.

14        MS. DORAN:  And those -- my understanding is

15  that's very close to being produced.

16        MR. ROSENTHAL:  Okay.  Okay.

17        THE COURT:  Okay.  So then the outline -- okay.

18  All right.

19        MR. ROSENTHAL:  The -- your Honor, the -- the

20  difficulty, though, is outlines, drafts, graphs, emails,

21  concerning those, we don't think that's enough, and I can

22  tell you why we think --

23        THE COURT:  Concerning what?  Okay.  Go ahead.

24        MR. ROSENTHAL:  So let's say with this fellow

25  named Chico Malagway (phonetic), who gave them information

1  that was false and he also had been fired for trying to

2  steal money.  He was involved in a big fraud.  Presumably,

3  there's a document there where the editors are saying

4  "Should we really be using this guy?"  It's not in that

5  line.  It's not in the draft.  It's not in the script.  It's

6  not in an email concerning them.  It's simply an email

7  concerning is this guy reliable or not, and there's a number

8  of characters who are like that.

9      We do see -- you've already gotten earlier some

10 documents that talk about sources.  Again, no script, no

11 outline, no draft, but very very valuable and very very

12 helpful.

13         THE COURT:  Okay.  So now we're talking really

14 about emails?

15         MR. ROSENTHAL:  We're talking about emails or it

16 could be a correspondence.  It could be notes.  It could be

17 a memo of a conversation.  It could be a memo from an editor

18 to a reporter.

19         THE COURT:  Okay.  And are there particular

20 sources in particular?

21         MR. ROSENTHAL:  Yes.  Your Honor, there are 15

22 sources that we had identified.  And, actually, I can even

23 drop one into a lower level, Inosin Chitozi (phonetic), who

24 I think is marginally relevant, and I don't know why they

25 submitted a declaration, but those are the individuals.

28

1  Those are ones that submitted declarations.

2          THE COURT:  In the case?

3          MR. ROSENTHAL:  In the case.

4          THE COURT:  Yeah.  Okay.  So what about that?

5          MS. DORAN:  It's not -- it's not clear to me

6  exactly what that request is for.  Is it any document that

7  mentions a name of one of these people or is it

8  communications about the reliability and credibility of a

9  particular source?

10          THE COURT:  Well, it probably is the former,

11  right, because they don't want you --

12          MS. DORAN:  Deciding.

13          THE COURT:  -- deciding if it goes to the

14  credibility or not.

15          MS. DORAN:  I think, you know, part of the problem

16  in looking at this the way that we are is that we are

17  talking about it in sort of a piecemeal way.  And the

18  reality is is that this was a very long investigation.  It

19  generated tons of documents, tons of recordings.  We have

20  offered to produce quite a bit of information, and, you

21  know, if we -- we'll go through this I know, you know, one

22  by one, but we're going to get to a point where you're

23  chipping away -- chipping away to the point that he has

24  every -- they have all of our documents, and that's --

25  again, that's incredibly burdensome for us to produce, and a

29

1   lot of it's privileged.  Some things he's asking --

2          THE COURT:  Well, we'll deal with privilege, and I

3   understand it's burdensome, and --

4          MS. DORAN:  Yeah.

5          THE COURT:  -- and that may be the case.  The

6   question is you submitted declarations from all these

7   people.  I don't know how you could then withhold --

8          MS. DORAN:  Well, we produced recordings with --

9   or notes with all of those sources -- I mean, all of

10  those --

11         THE COURT:  Right.  But a lot of it is -- and you

12  said, well, it's not really about actual knowledge, but then

13  I read your anti-SLAPP motion in which the first argument

14  was actual knowledge.

15         MS. DORAN:  Yeah.

16         THE COURT:  So you put your state of mind at issue

17  in the motion.  Now, I was going to say if you want to

18  withdraw that argument from the anti-SLAPP motion, then I

19  think that would narrow it considerably.

20         MS. DORAN:  I don't think that's something that

21  we're prepared to do.

22         THE COURT:  I get it.  So then I think -- then --

23  then you've essentially made the anti-SLAPP motion the case,

24  to a large extent the whole case.  You've really truncated

25  it and moved it up, and so there's a lot of discovery that

1  has to -- I mean, you did it.  You made that choice.  That's

2  okay, but then that's more discovery than you might

3  otherwise get on an anti-SLAPP motion because the actual

4  malice is what really opens it up.

5          MS. DORAN:  And that's why we didn't say "No,

6  we're not giving you any discovery."

7          THE COURT:  No, and why you decided to do on the

8  retraction, because that goes to -- it doesn't go to

9  falsity, but it goes to actual knowledge, right?

10          MS. DORAN:  Right.

11          THE COURT:  So now he's saying "So I want your

12  emails, your notes, anything about those 15 sources who

13  submitted declarations."

14          MS. DORAN:  I think, you know, we can go back and

15  see what we have.

16          THE COURT:  Okay.

17          MS. DORAN:  I can tell you I have a -- not right

18  in front of me, but I do have a list.  You know, he's made

19  the comments about not sharing the hit list, but the -- the

20  documents that I'm telling you that we have, the 150,000,

21  that is after the search terms were run, search terms that

22  we picked and search terms that he added.

23          THE COURT:  Yes.

24          MS. DORAN:  So it's -- it's -- I'd like to go back

25  and see the volume, for example, of like a particular

1 source's name before making a commitment, unless, of course,

2 you order us to do it regardless, in the sense that, you

3 know, if there are -- if there's a common name, for example,

4 among these sources.

5         THE COURT:  Well, sure, there might have been a --

6 you don't need to come back to me.  You can come back to Mr.

7 Rosenthal and just say, "Look, if we do it, we get all these

8 other people who aren't them."  He doesn't want those.

9         MS. DORAN:  Okay.  But --

10         THE COURT:  He wants that particular -- documents

11 as to that particular person.

12         MS. DORAN:  And --

13         THE COURT:  There may be ways you could work out

14 the search terms or something.

15         MR. ROSENTHAL:  Your Honor, I've said from the

16 beginning -- and she's absolutely right -- it's a hit list.

17 If Nikki Luca (phonetic) is such a common name that you have

18 10,000 documents, we'll talk about that, or Chitozi.

19         THE COURT:  You're saying that you know they

20 won't.

21         MR. ROSENTHAL:  They won't.  That's why it's not

22 burdensome, your Honor.

23         MS. DORAN:  So that sounds perfectly reasonable,

24 but let me just give you an example of what's happened so

25 far.

32

1        THE COURT:  Yeah.

2        MS. DORAN:  This stuff about the I-Team, right, I

3 have represented to Plaintiffs that, one, Ms. Reeber had no

4 involvement with it and, two, when we run a search for the

5 word "I-Team" in her documents, we get 17,000 documents, and

6 the reason for that is because the software that we use --

7 it's called Relativity -- treats "I" as a -- what they call

8 a noise word and only searches for team.  And I even -- we

9 even cited a website, the Relativity website saying this is

10 what Relativity is configured to do.  And here we are

11 arguing about whether we should have to search -- look

12 through all those 17,000 documents.

13        THE COURT:  And we're not actually.  We're not

14 there.

15        MS. DORAN:  Well, that's -- my point is -- your

16 Honor, my point is I have -- unfortunately, I don't have

17 confidence that if we get to a point where there are lots of

18 hits on a particular source's name or a particular term that

19 we won't end up right back here in front of you.

20        THE COURT:  Well, maybe you will.  Maybe you

21 won't.  I'm not actually as pessimistic as you are, and I'm

22 actually not sure why -- like maybe you should be using a

23 different program because if a program doesn't allow you to

24 search for I-Team and always eliminates I, it doesn't sound

25 like a very good program to me.

1          MS. DORAN:  It can be reconfigured, and we have

2   made efforts to do that.

3          THE COURT:  Okay.  All right.

4          MS. DORAN:  But I guess my point is I am not

5   accustomed to making representations and being told that

6   they must be false.

7          THE COURT:  Well, it's a new day, and I think

8   everyone is being perfectly civil here right now, and that's

9   what I'm choosing to -- is going to happen.  You should have

10  been here earlier.  I was on the bench for four and a half

11  straight hours, but I had a lawyer -- the courtroom was

12  overflowing, overflowing, and I had a -- a lawyer who had

13  some kind of brief in which he used words like "It was

14  shockingly stupid and so reckless I can't believe anyone

15  from a big firm would have done that or allowed it to

16  happen."  It was really so beyond the pale, and he was

17  actually standing in front of me and defending his language.

18      Anyway, I guess what I'm saying is there's a very low

19  bar, and you guys have -- you're way above it.

20          MR. ROSENTHAL:  Your Honor, I'll even make an

21  offer, and that is we -- we're using a database.  I've run

22  I-team, and it doesn't pull up a single one of the -- it

23  doesn't pull up a single document.

24      If you want, you can confidentially use ours, and that

25  is we won't have access to it.  You can load your 20,000

34

1  documents, search for I-team, and see what comes up.

2          MS. DORAN:  We -- as I said, we've made -- made

3  adjustments in the software that we use to make that

4  possible.  I -- I was using that as an illustration of the

5  kinds of battles that we've gotten into and the kinds of

6  battles that we're likely to get into and the kind of

7  attorneys' fees that are designed, we believe, to wear down

8  the -- wear down the Defendants.

9          THE COURT:  But this is -- this is just state law.

10  This is non-fee shifting case, right?

11          MS. DORAN:  No, there is fee shifting in this --

12  there --

13          THE COURT:  There is?

14          MS. DORAN:  Yeah.  It does apply in --

15          THE COURT:  Well, under the SLAPP motion.

16          MS. DORAN:  That's right.  That's what I mean.

17          THE COURT:  Oh.  Well, you brought the SLAPP

18  motion.

19          MR. ROSENTHAL:  Your Honor, I don't --

20          MS. DORAN:  There's no fee shifting --

21          MR. ROSENTHAL:  I don't think I've worn down the

22  Defense side.

23          THE COURT:  In any event, this is what I'm saying.

24  It's a new day.  We came here this afternoon.  Mr. Rosenthal

25  said he understood.  We're only going to now be talking

35

1  about we've got an agreement that we're only talking about

2  the evidence that we need to defeat the SLAPP motion, and

3  you've agreed you're not going to say later, "Oh, you can't

4  get more discovery because that's what you've got."  And so

5  we're working in a cooperative way.  So I would prefer that

6  we look forward as opposed to backward.

7          MS. DORAN:  I will try to adopt your optimism.

8          THE COURT:  Okay.  All right.  It's easy for me

9  because I'm not the one billing hours I know.

10     Okay.  So what we have there is for the -- so basically

11  this is what -- yeah, Mr. Rosenthal, I want you to go

12  through your list now because this is -- I want to put aside

13  those letters, and I --

14          MR. ROSENTHAL:  Okay.

15          THE COURT:  -- just want to talk about what it is

16  you need, you believe, to fairly challenge their motion.  So

17  we have the emails regarding the notes.

18          MR. ROSENTHAL:  Let me use her -- her items and

19  tell you which ones I think we --

20          THE COURT:  Okay.

21          MR. ROSENTHAL:  -- have a problem with, which ones

22  we don't.

23     Recordings, they tell us they're giving us all

24  recordings.  We know that some of them, for example, one's

25  one minute, and they say "Let's go into our office," and

1  there's no other recording.  We take it from counsel's

2  representation that there's no follow-up recordings or

3  others that they're withholding.  It appears that something

4  wasn't recorded, but if they say it wasn't recorded, it

5  wasn't recorded.

6      So we're okay on that.  We have not received any notice

7  whatsoever except for attached to the Matt Smith declaration

8  that was recently filed, and so the notes would be very

9  important to us.

10         THE COURT:  And, Ms. Doran, you're shaking your

11  head.

12         MS. DORAN:  Well --

13         THE COURT:  You're producing the notes?

14         MS. DORAN:  Yes.

15         THE COURT:  Okay.

16         MR. ROSENTHAL:  When we get to outlines, drafts

17  and scripts and documents concerning it, I think I've

18  outlined there are lots of documents.  In the core group is

19  about 15 people.  I think it's exactly 15 people.  There's

20  one we could even take off the list if we can get a

21  representation from counsel that he knows nothing about the

22  USDA, and that's Inosin Chitozi.  He -- he stopped working

23  for DAPP Malawi, which, as you know, is a subcontractor of

24  Planet Aid, five years before the USDA program.  If they

25  tell us they have nothing for Mr. Chitozi relating to the

1  USDA program, well, now we're down to 14.

2          MS. DORAN:  We're not going to make that

3  representation.

4          THE COURT:  Okay.

5          MR. ROSENTHAL:  Then give us everything relating

6  to the USDA program.  When --

7          THE COURT:  Mr. --

8          MS. DORAN:  Whoa --

9          THE COURT:  Mr. -- Mr. Chitozi --

10          MS. DORAN:  Chitozi.

11          MR. ROSENTHAL:  Chitozi.

12          THE COURT:  -- Chitozi.  That's what we're doing

13  now.  We're taking it one by one.  Okay.  All right.  So --

14          MR. ROSENTHAL:  But I will say we have a lot of

15  recordings that they produced to us, and we're not looking a

16  gift horse in the mouth, but there's a huge number that have

17  nothing to do with the USDA program.  For example, they've

18  given us 21 that post-date the two articles that they've

19  said it should be limited to and 54 that have nothing to do

20  with the USDA program whatsoever, 19 from somebody in

21  Denmark who left working for any -- anything relating to the

22  teacher's group, 20 or 30 years ago.

23      So if they could focus on the material that's related

24  to the USDA as a priority, we would very much appreciate it.

25  I'm sure it took them a long time to go through literally 19

38

1  tapes of Britta Yunga (phonetic), but it truly was

2  irrelevant to the case.  Yes, she was someone who was quoted

3  but had nothing to do with the USDA.  That's what our case

4  is about.  So I'd ask them to focus up front on the material

5  that's USDA related.

6          MS. DORAN:  Well --

7          THE COURT:  No, go --

8          MS. DORAN:  No, go ahead.

9          THE COURT:  Well --

10         MS. DORAN:  I interrupted you.  I didn't mean to.

11         THE COURT:  No, no, no, but I mean, do you have a

12 response to that?

13         MS. DORAN:  Yeah, I do, which is that we are --

14 we're operating on the scope of the complaint, not the scope

15 of what's being told to us right now, and --

16         THE COURT:  Okay.  No, no, no, but now I think

17 we're just talking about priority.

18         MS. DORAN:  Yes.

19         THE COURT:  And -- and what you're saying is what

20 you're really interested in is the USDA program and really

21 the allegation that they stole money?

22         MS. DORAN:  Yes.  That -- that is the defamation

23 is that they stole money from the USDA program, and that's

24 really what our focus is.  And -- and while I understand Ms.

25 Doran to be saying that's the focus of the complaint, the

39

1  focus of the complaint is on the USDA program and theft of

2  that.  And so that's -- that's really what we are looking

3  for.

4        THE COURT:  I mean, even the four -- in your --

5  your SLAPP motion -- anti-SLAPP motion, you -- you identify

6  four sort of areas.

7        MS. DORAN:  Premises --

8        THE COURT:  Those are all related to that premise.

9        MS. DORAN:  Well, they -- they roll up to, you

10 know, that conclusion.

11       THE COURT:  Right.

12       MS. DORAN:  But they are -- I mean, what I -- what

13 I hear -- I mean, saying anything that relates to the USDA,

14 if they're going to include all of those premises, those

15 four, you know, sets of facts, then we're talking about,

16 again, the entire thing.

17       THE COURT:  The whole thing.  Yeah.

18       MR. ROSENTHAL:  When we talk about outlines,

19 drafts and scripts, they have asked to limit it to the first

20 two publications, one in March of 2016 in the form of a

21 radio podcast, and the second was a written article in May

22 of 2016.

23    So they don't want to produce any scripts, any

24 articles, any drafts or emails after that, although --

25       THE COURT:  So but that -- we'll go through that.

40

As to what?  Right, so identify it.  Like you focus on like tweets.  Well, there aren't going to be any drafts of the tweets or those kinds of things.

MR. ROSENTHAL:  But I would think there would be some editorial comment on some of them.

THE COURT:  Well --

MR. ROSENTHAL:  And that is, the editors would be saying, "Amy, I don't think you ought to be sending this" or "Matt, this one seems to be" --

THE COURT:  But so where that -- when reading through that, what I was thinking of is identify the ones -- because you say there -- you identify some that are something more, right, than what was in there.  So --

MR. ROSENTHAL:  Yes.

THE COURT:  -- let's identify those.

MR. ROSENTHAL:  Oh, okay.  Yeah.

THE COURT:  Because a lot of them were just like, "Hey, look at our article and a link to the article."  Well, they don't -- you don't need to see anything related to that.

MR. ROSENTHAL:  So if I may, your Honor, document 7822 -- and I provided it to opposing counsel -- this is an example, but I think it's a good one.

So here's a tweet that is after the first two articles in which they quote -- and it's in quotes -- Representative

1 McCallum saying -- you can read it, Planet Aid is --

2          THE COURT:  No, I read about this one.  So what --

3 so you want to know -- what is it you want related to this

4 tweet?

5          MR. ROSENTHAL:  Did any editor review this?  Did

6 they comment on it?  Did they criticize it or did it simply

7 just get tweeted?

8          THE COURT:  Okay.

9          MS. DORAN:  This is one we're -- you know, we're

10 not going to rely on an actual malice standard for defending

11 this.  I mean, this -- he has a letter from Representative

12 McCallum that says "I want this to be investigated, and

13 here's why.  Reveal and the Center for Investigative

14 Reporting have -- based on their reports, it appears that

15 Planet Aid and its affiliates have engaged in a shell game

16 with the U.S. government funds."  Now, he can make the

17 argument that not attributing it to the -- to the

18 publications in the tweet is defamatory.  We vehemently

19 disagree with that.  But, you know, to the -- I mean, and

20 part of the problem is, again, this is -- this is just a

21 reflection, shell game with U.S. government funds.  That's

22 just a reflection of all the things that were already

23 reported in the first two reports, and I actually have a

24 chart that --

25          THE COURT:  But he's not -- he's not talking about

42

1 that.  What makes this false is that it's attributed to the

2 Representative McCallum.

3          MR. ROSENTHAL:  Exactly.

4          THE COURT:  So -- and if there is something that

5 suggests somebody knew this was misleading -- I'm not saying

6 it is, but did -- that goes to the actual knowledge not just

7 here but everywhere.  So I don't think that you can parse

8 that out.  I'm not saying as to everything.  That's why

9 we're taking -- I want him to identify whichever ones have

10 something more.  This is a something more.  I think you

11 should produce it.  I think it's relevant.

12          MS. DORAN:  Okay.  I do want to -- I mean, I'm

13 glad we're going through this exercise.  This allegation is

14 nowhere in the complaint.  So, I mean, it was something that

15 came up during the discovery letter.  So --

16          MR. ROSENTHAL:  It's attached to the complaint.

17 It's literally -- it's literally attached and incorporated

18 into the complaint.

19          THE COURT:  It's an exhibit?

20          MR. ROSENTHAL:  Yes.

21          MS. DORAN:  It's an exhibit, but the first time I

22 have heard the argument that we misled -- it was misleading

23 because of this specific reason was in the context of the

24 discovery letters.

25          THE COURT:  Okay.  But that's why we do discovery,

43

1  right?

2         MS. DORAN:  Yeah, I agree.  Yeah.

3         THE COURT:  Right.  Okay.

4         MS. DORAN:  Yeah.

5         THE COURT:  Okay.  So for this one they'll give

6  you whatever -- if they have anything, they'll give it to

7  you.

8         MR. ROSENTHAL:  And if they don't, I couldn't be

9  happier because that would certainly help my case if there

10 was no editorial review.

11        THE COURT:  Okay.

12        MR. ROSENTHAL:  Another one -- and, your Honor,

13 one point they make is that it ought to be limited to the

14 first two publications.  If they want to do that, we're okay

15 with that, but they can't have it both ways.  That is, they

16 can't say it's limited to the March and May 2016

17 publications and nothing else and then, if I may, submit

18 materials and rely on materials who were quoted in this

19 article.  If they want to say "We're not going to rely on

20 those.  They're gone.  We're not going to rely on Mr.

21 Chalamonda (phonetic).  We're not going to rely on Mr.

22 Yonabonda (phonetic).  We're not going to rely on Mr." --

23        THE COURT:  You mean sources that they didn't

24 speak to until --

25        MR. ROSENTHAL:  After.

44

1          THE COURT:  -- until after?

2          MR. ROSENTHAL:  After.  So let's make it a bright

3  line.  Either it's only the first two periodicals, in which

4  case nothing else matters after that or if you want to say

5  things matter after that, you've got to give us everything

6  after that, and I'll add one thing.

7      The anti-SLAPP motion isn't limited to the first two

8  publications.

9          THE COURT:  Well, because the complaint's not.

10          MR. ROSENTHAL:  Because the complaint's not,

11  that's right.

12          THE COURT:  Right.

13          MR. ROSENTHAL:  So -- so they have these expansive

14  declarations that talk about how careful and thorough they

15  were on everything, including right up until August of 2017,

16  the date of this article, in which case give us everything.

17  If you want to limit it to the first --

18          THE COURT:  Well, here's what I'm saying is if a

19  tweet simply says, "Hey, you should look at our article" and

20  it just -- I don't know why that you need to get anything --

21  whatever that would be about that because it's just

22  referring back to the article, right.

23          MR. ROSENTHAL:  And many, your Honor, are just

24  like that.

25          THE COURT:  Right.  Which is why what we're doing

45

1  is I'm going through and I'm saying, "Mr. Rosenthal,

2  identify to me those things post-May that there's something

3  more."

4           MR. ROSENTHAL:  Let me -- let me give another

5  example.  Harrison Longway submits a declaration in which he

6  said "I put the number at 50 to 70 percent was diverted to

7  Malawi," and they say, "Well, that's not a statement of

8  fact.  That's a statement of opinion," because he said "I

9  put the number at."  That's the justification for calling it

10 opinion.  The tweet having the exact same language doesn't

11 say "I put it at."

12          THE COURT:  Right.  No, that was in your letters.

13          MR. ROSENTHAL:  It's simply --

14          THE COURT:  So that's another one that you're --

15          MR. ROSENTHAL:  That's another one.

16          THE COURT:  So what you want to know is was there

17 any editorial review or anything about that tweet?

18          MR. ROSENTHAL:  Exactly, because that too would be

19 a statement of fact.  That would not be opinion.

20          THE COURT:  Okay.  All right.  What about that

21 one?

22          MS. DORAN:  So -- I'm sorry.  The objection to Mr.

23 Longway was that it was an opinion?

24          THE COURT:  The argument in your anti-SLAPP motion

25 is that it's opinion, and he's saying, well, if you look at

46

1  this tweet, it doesn't have the language that you're relying

2  on to make it an opinion.

3          MS. DORAN:  Which tweet are we talking about?

4          MR. ROSENTHAL:  I don't have it with me, but it's

5  the one that's --

6          THE COURT:  It was discussed in the -- in the

7  letter brief.

8          MR. ROSENTHAL:  Yes, it's in the letter brief.

9          MS. DORAN:  Okay.

10         MR. BURKE:  Which one?

11         MS. DORAN:  Is it the one that's a hundred and

12 thirty-three million --

13         MR. ROSENTHAL:  Yes, yes.

14         MS. DORAN:  -- 50 to 70 percent?

15         MR. ROSENTHAL:  Yes, yes, yes.

16         MS. DORAN:  So what I would say is that it -- it

17 seems to me that there -- I want to explain why we're at

18 this -- we're talking about the 133 and the 50 to 70

19 percent, because I think it's relevant.

20     Plaintiffs have repeatedly said that we misrepresented

21 that 60 to 90 million dollars was siphoned off, and the

22 reason they say this is this.  So the -- the USDA allocated

23 $133,000,000 to this program.  Now, that doesn't actually

24 translate into $133,000,000 being earned by the Plaintiff,

25 and the reason for that is it's $133,000,000 worth of grain,

47

and there are some inefficiencies, and so as a consequence, they get about two-thirds.

Now, the -- I don't think that there is -- there's no dispute about that, right. And we're prepared to defend the statement that 50 to 70 percent was diverted. But as to the -- as to the actual number, which seems to be what they've focused on, this 60 to 90 million dollars, our argument is not about actual malice. It's about whether that's a materially false statement.

THE COURT: No, your argument is also that there was an opinion. There's one that I read. It was an opinion. It's completely --

MS. DORAN: Right.

THE COURT: -- tied to this tweet, and he's -- he says, "Well, this one wasn't an opinion."

MS. DORAN: Then he can make that argument in -- on the SLAPP motion.

THE COURT: But he also wants to see whether an editorial review -- like whether there was a discussion about there wasn't any language cautionary. It was stated as a fact. But you're sort of assuming that you win. You're sort of assuming that you -- that you win.

MS. DORAN: But he --

THE COURT: This is why I'm taking it one at a time.

48

1           MS. DORAN:  Yeah.  Sure.

2           THE COURT:  I don't think there are that many.

3           MS. DORAN:  Okay.

4           THE COURT:  So I don't think you have a burden

5  argument, and I -- so -- right?

6           MS. DORAN:  It --

7           THE COURT:  I'm not saying everything post.  I'm

8  making Mr. Rosenthal identify for me exactly which ones

9  there's something more.  We've had two so far.

10          MS. DORAN:  Yeah.  And if there are ways to

11 reasonably isolate the documents that concern that, you

12 know, like so -- so it's one thing to say produce everything

13 that supports this statement.  It's another thing to say

14 produce the emails concerning the wording of the tweet.

15          THE COURT:  So everything about the statement,

16 your argument is that --

17          MS. DORAN:  It's already --

18          THE COURT:  -- when we do the stuff about the

19 earlier statements, that will already be there.

20          MS. DORAN:  Right.

21          THE COURT:  So that's already taken care of.  What

22 I'm making him do is identify those with something more.

23 Here's something more to this tweet.  It should be very

24 easy, this tweet.  Is there any discussion about -- not

25 easy.  I don't want to --

49

1          MR. ROSENTHAL:  Yeah.

2          THE COURT:  Right.  I know it's not -- nothing's

3   easy, but, anyway, it's about this tweet, the timing.  It's

4   a narrow time.

5          MS. DORAN:  So --

6          THE COURT:  That's it.

7          MS. DORAN:  -- what I understand you to be saying

8   is if we look at the documents that were generated around

9   the time of the tweet and produce anything that relates

10  specifically to the wording of the tweet --

11         THE COURT:  Just to the tweet.

12         MS. DORAN:  -- to the tweet, that's what --

13         THE COURT:  Yeah.

14         MS. DORAN:  That's what you're saying he's

15  entitled to, is that right?

16         THE COURT:  Yeah.

17         MR. ROSENTHAL:  And, your Honor, as you say,

18  there's no burden whatsoever, and we're only talking about a

19  limited number of documents.

20         THE COURT:  Right.  We're going to go through them

21  all right now.

22         MR. ROSENTHAL:  Happy to do it.

23         THE COURT:  We've only done two.

24         MR. ROSENTHAL:  Happy to do it.  Let me go to

25  number three.

50

1          THE COURT:  Okay.

2          MR. ROSENTHAL:  So number three is an article

3   about a USDA employee that goes down to -- to Malawi.  And

4   just to correct one thing.  About the $130,000,000, it's

5   just the number.  It's also Mozambique, that it included

6   Mozambique.  I mean, Harrison Longway knew nothing about

7   Mozambique.

8          THE COURT:  I'm not deciding the merits of the

9   case.  That's --

10         MR. ROSENTHAL:  I understand.  I understand.

11         THE COURT:  Yes.

12         MR. ROSENTHAL:  Just -- so here's a -- an article

13  about a trip.  The guy goes down, and he makes some critical

14  comments, and he makes some positive comments too, and one

15  of the positive comments is he found nothing nefarious.

16     They did, to their credit, attach a copy of his report,

17  and I think it was the draft report, somewhere in the bowels

18  of the hyperspace where you could link to it.  And we take

19  the position, "Gee, if you did that, you should have at

20  least made the article correct."  And that's a question for

21  a finder of fact at some point.  But, clearly, that has

22  nothing to do with the first two publications.

23         THE COURT:  Okay.  So what is it that you're

24  looking for with respect to this publication?

25         MR. ROSENTHAL:  Same thing.  It would be any

51

1  editorial comment, any scripts, any editorial comment,

2  anything addressing that, and I go back to my previous

3  offer.  If they want to limit it to the first two

4  publications, we can just take all this other stuff off the

5  table.

6          THE COURT:  Well, they can't do that because

7  they're moving to dismiss the whole suit.  So -- okay.

8          MS. DORAN:  Your Honor, for -- for this particular

9  article and many of the ones that post-date the first two

10 reports, there is an argument that the fair and true report

11 privilege protects the publication.  So here, for example,

12 when we're summarizing a USDA report and even linking to it,

13 our argument would be that the fair and true report

14 privilege protects that.  There's -- there's nothing about

15 state of mind that comes into that discussion.  And so, you

16 know, that is our argument on those statements.

17         THE COURT:  So there is no actual knowledge

18 argument?

19         MS. DORAN:  That is not -- here's what I would

20 say.  I would say that the Court has -- that the -- the

21 SLAPP statute dictates that the questions of law be decided

22 first.  So our primary argument on this particular article

23 and many of them, including the Senator McCallum thing, is

24 going to be the fair and true and --

25         THE COURT:  Are you withdrawing any actual malice

52

1 argument?  Are you withdrawing it from your SLAPP motion?

2          MS. DORAN:  I guess I would say we're relying on

3 both but first and --

4          THE COURT:  We're not doing discovery just on the

5 one and then if Judge Chesney rules against you on the fair,

6 then we're moving -- then we're going to do discovery on

7 actual malice.  We have to do all this discovery on your

8 motion now.  You chose to make that actual malice argument,

9 and you're not withdrawing it.

10     So then he gets to know what -- what was the -- then

11 the state is at issue.

12          MS. DORAN:  I guess I would disagree with the idea

13 that we wouldn't first see if she's going to rule on the

14 fair and true report privilege.

15          THE COURT:  Okay.  Do you have something from her

16 that says --

17          MS. DORAN:  No.

18          THE COURT:  -- the way your motion -- what is the

19 number one argument in your motion?

20          MS. DORAN:  It is the first argument.  It doesn't

21 mean it's the number one argument on --

22          THE COURT:  Well, let me tell you something, and

23 you know this, Ms. Doran.  You know how courts work and

24 judges work.  When we see a brief and we see the first

25 argument, we think you're putting forward your best

1  argument, and that's what we do.  I'm telling you that's

2  what judges are thinking.

3          MS. DORAN:  No, and I get that, and I think that

4  is true for the vast majority of the statements in the first

5  two reports, okay.  But here's the thing.  The complaint

6  contains, as we know, 18 or 20 publications, right.  And we

7  couldn't in a reasonable amount of space -- and we know

8  Judge Chesney is very strict with her page requirements --

9  we couldn't actually go allegation by allegation and say

10 "Here's our argument for this one.  Here's our argument for

11 this one," but I'm telling you that after the first two

12 reports, the vast majority of the articles are all reporting

13 on government actions, are all covered by the fair and true

14 report privilege.

15         THE COURT:  What I'm asking you is are you

16 withdrawing any actual malice argument as to this report?

17 No.  Okay.  Then they -- he gets the discovery.  That's all.

18 You can withdraw it.  I mean, you can just rely on the fair

19 and true report, but if you don't want to, you can't then

20 say he doesn't get any state of mind evidence.

21     I'm giving you a -- and you can, and I understand, but

22 you --

23         MS. DORAN:  If we decide to do that, we will --

24 you know.

25         THE COURT:  Well, I'm asking you now because we're

54

1 having the discovery here.

2          MS. DORAN:  Right.  No, we're not going to.

3          THE COURT:  Okay.  All right.  So then I want you

4 to give as to that document as well.

5          MS. DORAN:  So as to that document, what would be

6 the --

7          THE COURT:  Same thing, any editorial comment

8 about what they decided to put in and did they think it was

9 fair, did they think it was accurate, whatever.

10          MR. ROSENTHAL:  Any scripts, editorial comment,

11 anything relating to the -- to the article that talks to --

12          THE COURT:  Scripts, what ever.

13          MR. ROSENTHAL:  Yeah.  One other -- and this is a

14 bigger one -- and that is the NBC I-Team Program.  That was

15 after the first two publications they would exclude it.  For

16 us it's critically relevant for two reasons.  One is we

17 allege it was defamatory.  Matt Smith is on there and -- and

18 making statements that we believe are defamatory, and we

19 learned through the discovery that we got -- and I

20 appreciate getting it -- that he had produced to the

21 Maryland host on the program which aired in Maryland and

22 featured a Maryland resident, he had given her all of his

23 documents.  And so if -- if she said things or there were

24 things said in the program that were defamatory, it likely

25 came from Mr. Smith.  We're entitled to that material.  We

1  have now subpoenaed NBC, and they've said "Reporter's

2  privilege.  We don't have to give you anything," and they

3  haven't.

4       So we're in a position where Mr. Smith made a decision

5  to wholesale, give over everything to the NBC I-Team.  All

6  he has to do is give us what he gave her.  It's probably

7  contained in an email.

8            MS. DORAN:  So here's what I'd say about the

9  I-Team investigation.   I mean, throughout the letter

10 briefing there are misrepresentations and

11 mischaracterizations of lots of things, including the record

12 before the Courts on the jurisdictional issue.  So --

13           THE COURT:  So is the I-Team -- is the I-Team

14 report in the complaint as a defamatory statement?

15           MS. DORAN:  It is, but just like many others, it

16 contains repeat allegations, repeat statements from before.

17 So, I mean, I can -- we prepared a chart that we've given

18 opposing counsel that goes allegation by allegation and

19 tells -- cites exactly where in the first two reports each

20 statement appears, to make it easy to understand that if the

21 first two reports are found not to be defamatory, then the

22 I-Team report will be found --

23           THE COURT:  So tell me what is in the I-Team

24 report that's not in the first two reports, which is what

25 we've been doing with the other document.

1        MR. ROSENTHAL:  I think one statement was at some
2   point they go back to this village called Najoie (phonetic),
3   and they interviewed the chief, and they told him he's been
4   cheated.  This was two -- two people go back.  One is this
5   fellow, Jackson Mitambuca (phonetic), and this other is this
6   guy Candani Noguera (phonetic), go back and they tell the
7   chief, "You've been cheated.  They were supposed to give you
8   25 pumps."  And they get him, and they get another farmer,
9   Paul Malandi (phonetic), kind of worked up.
10      And I believe -- and Ms. Doran I know is going to
11  correct me if I'm wrong, but I believe that in the NBC I-
12  Team program, Matt Smith says that these villagers were
13  ashamed or embarrassed or humiliated that they had been
14  duped into providing promotional videos.
15      But -- but, your Honor, it's also relevant --
16          THE COURT:  So I'm just -- I want to know what's
17  additional.
18          MR. ROSENTHAL:  And I believe -- I believe -- and
19  I don't have it in front of me, but Matt Smith's statements
20  about statements that the chief had made about being duped
21  and being humiliated I thought were new.  But I would like
22  to -- to tell you why in my opinion it's also very important
23  in jurisdiction and venue.
24          THE COURT:  No, I'm not going to do jurisdiction.
25  So let me tell you why I'm not going to do -- I went back

57

1  and I read, by the way, everything forward, and you've done

2  jurisdiction a lot, and what Judge Chesney said, it's

3  without prejudice to what you get in -- what you find in

4  discovery.

5          MR. ROSENTHAL:  Yes.

6          THE COURT:  But she denied your motion for

7  jurisdictional discovery except for the deposition of Ms.

8  George.  She denied it.  So I'm not going to order discovery

9  that's only -- that's relevant to jurisdiction.  So you have

10 to make me an argument that's not jurisdiction.

11         MR. ROSENTHAL:  May I -- may I just take a -- a

12 moment of your time?

13         THE COURT:  You're making a record, but I'm

14 telling you I'm not going to do it.  You need to go back to

15 Judge Chesney.

16         MR. ROSENTHAL:  Okay.

17         THE COURT:  Because she denied it.

18         MR. ROSENTHAL:  Okay.  Then -- then we will do

19 that, your Honor.  If you feel like you're bound by Judge

20 Chesney's ruling, then I accept that, and I'll -- and we'll

21 make a motion to Judge Chesney.

22         THE COURT:  I mean, that's the way I prefaced it.

23 What we're doing is discovery relevant to the SLAPP motion,

24 because, frankly, that's not -- because she can decide it.

25 That has nothing to do with where trial's going to be or

1 anything.

2          MR. ROSENTHAL:  Right.

3          THE COURT:  You can raise it after that, right,

4 because the SLAPP is just doing that.  It has nothing to do

5 with getting witnesses here or anything.

6          MR. ROSENTHAL:  And, if I may, I'd like to submit

7 a letter just addressing what additional material there was

8 in the NBC I-Team program because, quite frankly, I don't

9 have it on the top of my head.  But I believe that there

10 were other statements that were in there that were not in

11 the first two articles.

12          THE COURT:  Well, let's look at your complaint.  I

13 mean, what does your complaint say about it?

14          MR. ROSENTHAL:  I think the complaint attached

15 copies of the articles, not the TV version obviously, but

16 the -- but the articles that came out and incorporated them,

17 which I thought --

18      (Pause.)

19          THE COURT:  So I'm going to actually take a break

20 because I need to go do a telephone call that I had -- did

21 you already tell them I wasn't coming?

22          THE CLERK:  I did.

23          THE COURT:  Oh.

24          THE CLERK:  I asked if I could move it to 3:30.

25          THE COURT:  Did they say okay?

1          THE CLERK:  I haven't heard back.

2      (Pause.)

3          THE COURT:  All right.  So do we have what it says

4  in the complaint about it?

5          MS. DORAN:  Sam, is it attached to the complaint?

6          MR. ROSENTHAL:  Oh, yes.

7          MS. DORAN:  Okay.

8          MR. ROSENTHAL:  If you look at -- there's a --

9          MS. DORAN:  There was an index somewhere.

10          MR. ROSENTHAL:  There's an index -- I think I --

11          MS. DORAN:  Here it is.

12          MR. ROSENTHAL:  Yeah.  And I think there's a

13  couple of paragraphs directed specifically to the --

14          MS. DORAN:  Well, if you can identify those

15  paragraphs, I think that would go a long way.

16          MR. ROSENTHAL:  Sure.  So if I may.

17          THE COURT:  Yes.

18          MR. ROSENTHAL:  So Exhibit S is the NBC program

19  and the -- do you have the complaint?

20          MS. DORAN:  It's right here.

21      (Pause.)

22          MR. ROSENTHAL:  It's paragraphs -- 61 refers to

23  the NBC I-Team.  Paragraph 62 refers to the I-Team program,

24  and paragraph 63, and so those are the -- those are three

25  paragraphs.  So paragraph 61 -- and I think all three urge

60

1  people not to deal with Planet Aid, which goes to a tortious

2  interference claim.

3          THE COURT:  Okay.  But not the --

4          MR. ROSENTHAL:  I'm sorry?

5          THE COURT:  I understand that, but how does it

6  deal with the SLAPP motion?

7          MR. ROSENTHAL:  Oh, they also have asked to

8  dismiss the tortious interference on the grounds that

9  there's nothing -- there was no interference, there was

10 nothing that was --

11         MS. DORAN:  That's not the reason in the SLAPP

12 motion.  The reason in the SLAPP motion is that if the First

13 Amendment bars the defamation claims, it bars every other

14 claim as well.  It's not -- there's nothing to my

15 recollection -- and I can go back and look at the SLAPP

16 motion.  There's no specific argument that there was --

17         MR. ROSENTHAL:  Well, the complaint clearly

18 alleges that by having a television program telling people

19 to stop giving to Planet Aid, it was tortious interference,

20 that they were encouraging people, and also --

21         THE COURT:  Okay.  But you know that.  They said

22 that, and you have that argument.  So I guess I'm -- that's

23 different than what we've been dealing with.

24         MR. ROSENTHAL:  Well, we don't know why NBC was

25 willing to put the program on except that she had gotten the

61

1  documents -- that Tisha Thompson (phonetic) had gotten the

2  documents from Matt Smith.  So he had essentially loaded the

3  -- the chamber with all of this polluting material, and NBC

4  then put on a program --

5            THE COURT:  Okay.

6            MR. ROSENTHAL:  -- that was both defamatory and --

7            THE COURT:  And repeated the allegations of the

8  first two arguments.

9            MR. ROSENTHAL:  And -- I think it went beyond

10 that, though.  It also said that the villagers who were on

11 the program were humiliated, embarrassed that they had put

12 on this false propaganda.

13           THE COURT:  And is that false?

14           MR. ROSENTHAL:  What they said in the --

15           THE COURT:  Yeah.

16           MR. ROSENTHAL:  Absolutely not.  Absolutely not.

17           THE COURT:  It was true?

18           MR. ROSENTHAL:  It was --

19           THE COURT:  They were humiliated because --

20           MR. ROSENTHAL:  No, I'm sorry.  I'm sorry.  What

21 was on the film was true.  What was -- what was false was

22 that they had been encouraged to believe they had been

23 cheated, and so --

24           THE COURT:  No, no, I understand that, but that

25 goes back to the first two articles.

1          MR. BURKE:  Right.

2          MS. DORAN:  Yes.

3          THE COURT:  That just goes back to the -- I mean,

4  I understand --

5          MR. ROSENTHAL:  No, it --

6          THE COURT:  -- relevant that it's -- how it was

7  used and the interference and damage and all that.  I get

8  that, but I guess what I'm saying is if they had -- if it

9  wasn't defamatory for them to say it in the first place --

10         MR. ROSENTHAL:  No, there's no -- there's no

11 allegation in the first two articles that Planet Aid put out

12 false propaganda.  That was -- that was not in the first two

13 articles.

14         MS. DORAN:  That's not -- that's not accurate, and

15 that's in the letter on the first two reports, which is the

16 first -- is it the first letter?  So -- so this is -- it's

17 on page eight of the first letter, which is docket 154.

18         MR. ROSENTHAL:  One fifty-four?

19         MS. DORAN:  Yes.

20         MR. ROSENTHAL:  Okay.  Page eight?

21         MS. DORAN:  Uh-huh.  And it says:

22              "Plaintiffs also claim they need

23          discovery on the statement in the NBC

24          report that Plaintiffs were forcing

25          employees to give back portions of their

1            salary and that fraudulent propaganda

2            was attributed by Plaintiffs about the

3            USDA program, but similar statements

4            appear in both the initial reports."

5            And the relevant quote is the second one, which

6   is:

7                 "Farmers say they've been short

8            changed.  Yet we're told to put a happy

9            face on their projects.  A Planet Aid

10           subcontractor controlled by teacher

11           group members was here visiting auditors

12           to village farms that look prosperous

13           that were merely for show."

14           MR. ROSENTHAL:  That's not the same as saying that

15  they were part of false propaganda, that they -- that the

16  propaganda -- that the things that were put out on the -- on

17  the Internet in the public were fraudulent.  That's a

18  different statement.

19           MS. DORAN:  What is your basis --

20           THE COURT:  Well, I guess what I'm wondering is

21  that was NBC's statement.

22           MS. DORAN:  It was -- but it was something that

23  was essentially --

24           THE COURT:  Did Mr. Smith make that statement?

25           MS. DORAN:  I think actually he did, but -- but,

64

1  again, I want to qualify that.  I don't have it in front of

2  me, but I think he -- I think that comes from him.  But,

3  your Honor, even the material that doesn't come out of his

4  mouth is -- is material that basically they've put in motion

5  by giving to Tisha Thompson material that was false and

6  encouraging her to run this story.  So whether it comes out

7  of his mouth or not, I think we're entitled to it.

8          THE COURT:  Well, I guess this is the question.

9  Are you arguing that there's anything other than what you've

10 already said with respect to the first two stories to

11 justify the statement?

12         MS. DORAN:  No, your Honor.

13         THE COURT:  So that's all they're relying on.  In

14 other words, you're not being deprived of anything because

15 there isn't any other material that they're relying on to --

16 to defend the truth of the statement.  In other words,

17 they're saying this statement about visiting auditors to

18 village farms and whatever we had to justify that statement

19 is the same -- is exactly the same information.  That's all

20 we have, nothing more.  And you may say "Okay.  Great,

21 because I don't think that justifies the statement."

22         MR. ROSENTHAL:  I do.  I do believe that that is

23 helpful to me, and I accept that representation on the

24 record

25         THE COURT:  Yeah.

1          MR. ROSENTHAL:  However, your Honor, the fact that

2   NBC put on the program was because they had been given a lot

3   of material that said this is a cult, this is an

4   organization that's stealing 60 to 90 million dollars.

5   That's what made it a sexy article, not that Matt Smith said

6   there's a villager in Njuli that felt like he got --

7          THE COURT:  Well, isn't that in the first two

8   articles?  Right.

9          MR. ROSENTHAL:  But the fact that they convinced

10  NBC to put on the program is not.  That's -- that's what

11  caused NBC to do the program was that they had gotten all

12  this material that said this is -- this is a massive fraud.

13  This is a great story.  This is a really sexy story.  We

14  want to run with it.

15          THE COURT:  Right.  From the --

16          MS. DORAN:  So --

17          THE COURT:  Go ahead.

18          MS. DORAN:  Sorry.  Two things.  We don't know

19  that that's actually true.  And, second of all, our defense

20  on the NBC stuff is not NBC did it, we didn't do it.  It's

21  we have the substantiation for these statements, and --

22  because they're in the first two reports.

23          MR. ROSENTHAL:  Your Honor, there's a disconnect

24  here.  What they gave to Tisha Thompson was not simply "Hey,

25  take a look at our March podcast and take a look at our May

1  article."  That's not what they did.  What Matt Smith says

2  is it's a full blow collaboration, and I gave her all of my

3  documents.  Some of those documents are incredibly

4  defamatory.  They didn't publish them, and so we don't take

5  the position --

6         THE COURT:  Well, do you have them?

7         MR. ROSENTHAL:  No, we have some --

8         MS. DORAN:  No.  This is all speculation.

9         MR. ROSENTHAL:  We have some.

10        THE COURT:  Well, how do you know they're

11 defamatory then?

12        MR. ROSENTHAL:  Because what we have is he writes

13 to a fellow named Stef Casselli (phonetic), Matt Smith.  And

14 he sends Matt some documents.  We believe that he gave Tisha

15 Thompson more, but we don't know that.  But we do have some

16 documents he gave to Matt Smith and said "I've shared with

17 her all the documents I have."  The implication is I've

18 shared with her what I gave you.  That's what led NBC to say

19 this is --

20        THE COURT:  But why -- why -- I mean, what is the

21 burden with producing whatever Matt Smith gave NBC?

22        MS. DORAN:  I -- I'm not prepared to answer that.

23 I'd have to go back and look.  I mean, as you know, we have

24 now gotten to a point where we can search for I-Team, and

25 maybe it will be easier.  I don't know the answer to that.

1  I do know that the investigation generated a tremendous

2  number of documents and emails, and so I don't know if I

3  search for I-Team if I'll come up with --

4          THE COURT:  Or just an email between Matt Smith

5  and NBC.

6          MS. DORAN:  I don't know how many of those there

7  are, for example, you know, between Matt Smith and

8  specifically people at --

9          THE COURT:  Well, and it's a limited time period

10 as well.

11         MS. DORAN:  I understand that.  But, your Honor, I

12 mean, again, if we continue to chip away and continue to --

13 to sort of compel Reveal to -- to disclose things that just

14 simply are not -- I mean, I don't understand why that

15 information is necessary for him if it's all based on

16 statements in the two reports.

17         MR. ROSENTHAL:  But it's not.

18         MS. DORAN:  But --

19         THE COURT:  Well, that's what we were trying to do

20 is identify what the additional statement is.

21         MR. BURKE:  Right.

22         MR. ROSENTHAL:  If you look at the emails from

23 Matt Smith to Stef Casselli, we see a lot of material that's

24 not in the first two articles.

25         MR. BURKE:  Same thing with NBC.

68

1          MS. DORAN:  Yeah --

2          MR. ROSENTHAL:  But, your Honor, in response to

3   Mr. Burke's point, what Matt Smith says is "I shared with

4   her all the documents."  And so we understand that he wasn't

5   just saying "I shared with her the podcasts and the May

6   article."  He gave her everything, including, you know,

7   material that was really quite poisonous, and that's what

8   NBC said, "This is a great story.  Let's run with it."

9          MS. DORAN:  But, again, we're not saying that was

10  NBC, not us.  We're saying what was published is defensible.

11         THE COURT:  That those poisonous documents are --

12         MS. DORAN:  That's right.

13         THE COURT:  -- true.

14         MS. DORAN:  Exactly.  And so what he gave to her

15  is not relevant insofar as it -- and he just said if it

16  wasn't published, it's not relevant.  What's relevant is

17  what was in the report.  The report largely duplicates the

18  statements from the first two reports.  It's not relevant.

19         MR. ROSENTHAL:  You know, your Honor, part of it

20  is having some knowledge of what's in the documents.  What's

21  in the documents is not true -- not defensible, and they

22  wouldn't try and defend it.  For example, saying that every

23  single member of the teachers group was told to go I think

24  every month to Mexico, I mean --

25         THE COURT:  But then you have the documents.

1          MR. ROSENTHAL:  I don't have everything that was

2  sent to Tisha Thompson.  All I have is him saying "I sent

3  her all the documents."  I assume what he sent her was what

4  he had given Stef Casselli plus some.  I don't know, your

5  Honor.  That's what discovery's all about, but --

6          THE COURT:  So I guess what I'd like you to do is

7  just look and see.  Maybe there's a single email with all

8  the documents, right.

9          MR. ROSENTHAL:  Very possible.

10         THE COURT:  I can't say --

11         MS. DORAN:  We can certainly look.

12         THE COURT:  Okay.  All right.  Because before I

13 accept some burden argument, I have to know that there is --

14         MS. DORAN:  Yeah, I know.  I do conceptually

15 understand that.  I don't think that we're talking just

16 about burden, though.  I do think that we are talking about

17 the privilege that applies under _Shone_ and _Mitchell_, which

18 is that getting discovery from a news organization, even

19 when they're the defendant in a libel lawsuit, there is a

20 test that they have to overcome, and the reason is to

21 preserve the integrity of the news gathering process.

22      So, I mean, I don't think it's just relevance and

23 burden.  It's they actually have to make a showing that they

24 need it, and I'm not sure why if there's a statement, true

25 or not, about Mexico and monthly visits, I don't know what

70

1  that has to do with any of the arguments that are being made

2  in the SLAPP motion.

3          MR. ROSENTHAL:  So this is sort of like a mirror.

4  You say that we have it all and it's only what's in the

5  first two articles.  In that case there's no problem with

6  reporter's privilege.  Turn it over.  If that's all it is is

7  what was in the first two articles and that's all they did

8  was give that information to Tisha Thompson, then it's

9  simple.  It's going to be -- it's going to be an email.

10 It's going to be there, and you can turn it over.

11         MS. DORAN:  The point is we're going to produce

12 substantiation for the statements in the two reports.  If

13 their claims based on those two reports are dismissed, the

14 claims on the NBC I-Team report will necessarily be -- be

15 dismissed.  The -- you know, Plaintiffs are not entitled to

16 material that's not relevant to their claims and is

17 unpublished and is -- it is gathered in the course of news

18 gathering.

19     Again, we -- you know, we would go look, but --

20         THE COURT:  Well, if you want, I can just take

21 that, because I know you did make that argument, and I can

22 sort of -- so I'd like you to look at it.

23         MS. DORAN:  Okay.

24         THE COURT:  Look at it and then just let me know

25 if you want to stand with "No, we're not going to produce

71

1  it" or not, and --

2          MS. DORAN:  Okay.

3          THE COURT:  -- then I'll take it under submission.

4          MR. ROSENTHAL:  Thank you, your Honor.  And one

5  last category, which is admittedly a big of an amorphous

6  category.

7          THE COURT:  But last.

8          MR. ROSENTHAL:  I think it's last, yes.

9          THE COURT:  Okay.

10          MR. ROSENTHAL:  August 2016 we filed a lawsuit.

11  The world changes.  It's no longer just a request for

12  retraction.  It's now a -- I don't know what -- maybe 80-

13  page complaint filled with lots of facts and lots of things

14  that a good conscientious reporter would say, "Well, gee, we

15  better check that one out."  And so we're entitled to know

16  what they did, and I'd like to give one example, and I

17  haven't shown counsel, but they're very familiar with it

18  because I've shown it to them a million times.

19      If you could give it --

20          MS. DORAN:  Oh, I'm sorry.  I didn't realize you

21  didn't have copies for everybody.

22          MR. ROSENTHAL:  I'm sorry.  I did not.

23      So one of the things that they get is I think the first

24  document that your Honor has, and they get this from a

25  fellow named Marco Zavilla (phonetic), and Marco says in the

72

published article "I was so sad I was forced to pay

kickbacks from my salary 20 to 100 percent, everything I

earned," and he showed them that document, that first page.

And so when we filed our complaint, we said, "What are

you talking about?  Marco Zavilla actually got the money,"

and that's the second page.  That's the bank account with

the name Marco Zavilla on it.  It actually went into his

account.  We did not attach a copy of that, but we alleged

in the complaint that Zavilla's allegation was false.  He

had actually gotten the money, and the same thing is true of

the other fellow, Patrick Goteka, that they mentioned.

A good responsible reporter would say, "My God.  Look

at this complaint.  Let's go -- we better call up Marco and

find out what is going on here."  And so we're entitled to

know did they do anything, because the world changes.  After

they get a complaint, that puts them on notice not just --

and that's a good example, but it's not the only one -- that

lots of the allegations are false, did they do any followup,

did they do any investigation, and that's why the articles

that follow are important, even if they don't specifically

-- it goes beyond retraction.  Even if they don't

specifically address that issue by Marco, should they really

be --

THE COURT:  So what is it that you're looking for,

though?

73

1          MR. ROSENTHAL:  I'm really looking for any
2  response to the allegations in the complaint that put them
3  on notice that their allegations were false.
4          THE COURT:  So any discussion of the complaint?
5  Like if there was a search --
6          MR. ROSENTHAL:  No.  I mean, I could actually --
7  if we wanted to pare it down, I could actually give them the
8  allegations that I think were -- were pinpointed as being
9  false.
10          THE COURT:  I see.
11          MR. ROSENTHAL:  And the question is what did you
12  do about it.
13          MS. DORAN:  Well, the example he just gave of
14  Marco Zavilla, those bank records aren't attached to the
15  complaint.  So --
16          MR. ROSENTHAL:  They're not.
17          MS. DORAN:  Right.  So they're not -- your
18  argument that we were then put on notice that that was false
19  because of these records doesn't follow.
20          THE COURT:  Well, he was -- so I have the
21  complaint in front of me.  He was -- he said he -- there was
22  an allegation in the complaint.
23          MR. ROSENTHAL:  Yes, I referenced -- I referenced
24  the statement even though it wasn't attached.
25          MS. DORAN:  I'm sorry.  What --

1           THE COURT:  Paragraph?

2           MR. ROSENTHAL:  Oh, if I may.

3           THE COURT:  Sure.

4           MR. BURKE:  This is the first amended, Judge, not

5  the original.

6           MR. ROSENTHAL:  No, no, it's in the original.

7           MS. DORAN:  Well --

8           THE COURT:  Yeah, it would have to be the

9  original, right?

10          MR. ROSENTHAL:  And I -- your Honor, I apologize.

11  I did not bring the original complaint.

12          THE COURT:  That's okay.

13          MR. ROSENTHAL:  But it very definitely said the

14  allegation was false and the money ended up in Marco

15  Zavilla's account.  And I think if -- if we wanted to kind

16  of streamline the discovery process, I would be happy to go

17  through the complaint and identify those which I think put

18  them on notice and therefore an obligation to -- to do some

19  truly thorough fact checking.

20          MS. DORAN:  I don't -- I mean, one issue is that I

21  don't know how we would look for things that -- I mean, we

22  -- we've already talked about producing for the sources that

23  we've -- you know, the Court has already said "I want you to

24  go back and" --

25          THE COURT:  Is he one of the 15 sources?

1          MS. DORAN:  He is.

2          THE COURT:  So that you're already going to get --

3          MS. DORAN:  I'm pretty sure he is, right?  He's

4  one of those 14 people?

5          MR. ROSENTHAL:  He is.  He is.

6          THE COURT:  So you're already going to get any

7  emails, notes, or whatever regarding him.  So that would --

8  that would sweep that up.

9          MR. ROSENTHAL:  If your Honor's ruled in favor of

10 me getting all the documents relating to the 15, then, yes,

11 I agree.

12         THE COURT:  Yeah.  Okay.

13         MR. ROSENTHAL:  And I can go through the complaint

14 and see if there's anything that would not be in competition

15 with the 15, but I think there aren't.  I think that would

16 actually --

17         THE COURT:  Okay.  So I think it's already taken

18 care of.  And, again, I think it goes to that if you wanted

19 to withdraw the actual malice, but I mean, I've done these

20 before where I brought the SLAPP motion and we -- we -- it

21 was strictly, you know --

22         MS. DORAN:  Yeah.

23         THE COURT:  -- reporter's privilege or --

24         MR. BURKE:  You know, another compromise, your

25 Honor, is if Plaintiffs' complaint is now just about the

1 USDA, everything else is out, and you want to focus only on

2 producing documents that have to do with the USDA.  That's

3 another way to go about this too because counsel has

4 represented in court that --

5          MR. ROSENTHAL:  Well, let me --

6          MR. BURKE:  -- his lawsuit, which was spanning 90

7 pages and 80 statements, the amended complaint was equally

8 broad, is just about the USDA.  This is startling headline

9 news to us, and if we want to just narrow this down to USDA

10 related documents in that statement as opposed to the 79

11 other statements, this would be a much shorter process, far

12 less discovery, and a very tiny SLAPP motion.

13          MR. ROSENTHAL:  So let me say it shouldn't come as

14 headline news because I put it in the -- one of the letters

15 that we were not asking for all this other stuff about cults

16 and, you know, all this other, you know, material.  But I've

17 offered to counsel, and they are considering it, going back

18 and trying to streamline the complaint and picking out one

19 defamatory sentence from each of the categories, and they

20 said they would consider it.  I'm happy to do that as long

21 as they don't come back and say "Now you owe us fees for" --

22          MS. DORAN:  I don't -- it's not reasonable to ask

23 us to give up our fees if you're going to take allegations

24 out of your complaint that you allege were defamatory.  But,

25 setting that aside, even if you go and take one statement

77

1  from every category, you're still going to go well beyond

2  the USDA investigation.  So, I mean, you know, we had talked

3  about this and about what you -- your clients are really

4  upset about, and this is one of the things, and if it's the

5  only thing, then, again, it would be easy to streamline this

6  entire process.

7            THE COURT:  Okay.  But if you want him to do that

8  -- to be fair to him, if you want the Plaintiffs to do that,

9  to narrow it to the discovery, then it's perfectly fair to

10 say that you're not -- they're not going to ask for your

11 fees on the other because basically it's a matter of

12 compromise in order to narrow it for you and to streamline

13 the case.  That's not an unfair -- and if I were sitting

14 here being your settlement attorney, I'd be -- I mean, you

15 know that.  Anyway, in any event, so but I'm not going to

16 get involved in that.  I think you're all here and you

17 should continue the discussion, but I have -- we have a

18 motion that's sitting in front of me.  That's certainly --

19 my goodness, Judge Chesney would love you all if you could

20 do that, right?  And you'll get a more reasoned -- you'll

21 get a better decision.  You'll get something that every --

22 you know, that makes more sense if you could really focus on

23 that.  So I would encourage you to figure out if you can do

24 that, and if you want some help in doing that, I could refer

25 -- you know, talk to Judge Chesney, get a referral on help.

78

1   But, on the other hand, I know that Plaintiffs are concerned

2   too about timing.  So none of this is going to keep moving

3   on parallel track, but we should really think about it.  It

4   enables everyone's presentation of the case to be so much

5   more understandable the more narrow it is.

6            MR. ROSENTHAL:  I'm happy to, as I said, limit it

7   to the USDA and, two, limit it to the first two articles, as

8   long as they don't come back as they have and say we've got

9   all these other things.  And if their answer is, "Well, we

10  had to because it's in the complaint," I'm happy to deal

11  with that.  Happy to work out some --

12           THE COURT:  Okay.  Well, I suggest you guys talk

13  because --

14           MS. DORAN:  Okay.

15           THE COURT:  And it may be that you can get back

16  your fees if you win in the end, but in the meantime, it

17  will save you fees, right, for your client.  So you may want

18  to think about that.

19           MS. DORAN:  Fees that we think we're ultimately

20  entitled to.

21           MR. ROSENTHAL:  So there's one -- there's one

22  category --

23           THE COURT:  It's just a matter of -- it's

24  compromise.

25           MS. DORAN:  I understand.

1          THE COURT:  It's a compromise.

2          MS. DORAN:  Understood.

3          THE COURT:  Yeah.

4          MR. ROSENTHAL:  There's one category that may not

5  be included within the 15, and that is the statement that

6  everybody was forced to make kickbacks 20 to 100 percent of

7  their salary.  What happened was -- and I think Ms. Doran

8  said "We told Mr. Rosenthal who the 12 people are."  They

9  did in the context of a settlement conference, and so I -- I

10 haven't used that unless they tell me it's perfectly okay to

11 do that.

12         MS. DORAN:  I have -- I have put it in a --

13         THE COURT:  Oh, that's right.  You already saw

14 Judge Ryu.

15         MS. DORAN:  Yes, but Judge Kim.

16         THE COURT:  Oh, Judge Kim.  You  could easily --

17 if you want help with sort of the -- not a settlement, but

18 narrowing the case, just call her up.  She'd be happy to see

19 you.

20         MR. ROSENTHAL:  I would be perfectly happy to do

21 that.  But -- but when it comes to the 12 employees -- this

22 goes to our stipulation.  It's not just confidential sources

23 -- we need to know what they are relying on when they

24 generically refer to people, and some of them may not be

25 within the 15.  Like, for example, 12 people gave 20 percent

80

1  of their salaries or -- or more.  I don't know that it's the

2  15 people that we --

3          THE COURT:  Well, they might not even know who

4  necessarily -- I don't know.  I mean, what's your response

5  to that.

6          MS. DORAN:  Well, just --

7          MR. BURKE:  What is your context too because this

8  is --

9          MS. DORAN:  Context?

10          MR. BURKE:  Context of your --

11          MR. ROSENTHAL:  I'll give a context.  So any

12  article -- they said they have spoken to 12 people and

13  everyone was forced to kick back 20 to 100 percent of their

14  salary.  So I say, "Well, okay.  Who are they," because it's

15  no secret we've been interviewing people, and nobody says "I

16  gave 20 percent of my salary, and I certainly didn't give

17  100 percent."  And so I say we need to know who they are and

18  it may not be those 15 people.  If it's the people that told

19  us in settlement conference and I can use that, then now I

20  know it's those 12 people.

21          MS. DORAN:  So here --

22          THE COURT:  Okay.

23          MS. DORAN:  Here's the thing.  Those are the 12

24  people.  I put it -- I think I put it in the discovery

25  letter.  So it's not -- you know, it wasn't in the context

1 of settlement exclusively.  But I think that the bigger

2 issue here is that Mr. Rosenthal is asking the Defendants to

3 enter into a stipulation that would bar -- that's attached

4 to the letter on sources I believe, that would have us

5 commit, you know, in -- you know, engraved in stone that

6 these are the people who are the insiders and these are the

7 people who are the former staff members.  That's what he's

8 generally talking about.

9      And at this stage of the litigation, you know, we're

10 not going to enter into something that says at trial we

11 can't say that it was, you know -- that we've learned that

12 it's -- you know, we discovered that it's one more person or

13 something like that.  So I have no problem if he propounded

14 -- and I said this I think in the briefing.  If he had

15 propounded a discovery request that said identify the 12

16 people that, you know, you're talking about, we would have

17 provided a response.  And if -- and if we learned about more

18 or we learned about something else, we would have

19 supplemented that response when the time came.

20        THE COURT:  Okay.  So -- so your answer is the 12

21 people that you've been given, those are the 12 people as we

22 sit here today?

23        MR. ROSENTHAL:  And we like that answer.  We can

24 live with that answer.  The same is true of who are the

25 accountants and insiders, who are the former staff.

1          MS. DORAN:  They're in the letter.

2          MR. ROSENTHAL:  They're not -- they're not in a

3  letter, your Honor, and that's why I proposed --

4          THE COURT:  Okay.  So let's stop.  Let's see what

5  letter and where because maybe the --

6          MS. DORAN:  This is the source letter.

7          THE COURT:  Because there's a lot of answers we've

8  gotten today.  Maybe we can get --

9          MS. DORAN:  Two I think.

10         MR. ROSENTHAL:  It's document 155, and in there --

11         MS. DORAN:  It's -- it's at the end.

12         MR. ROSENTHAL:  It's at the end.  It's the last

13  page.  It's page 10.

14         MS. DORAN:  It's the very last full paragraph.  It

15  says:

16              "Plaintiffs seek the identity of

17          dozens of African members of the

18          teachers group, yet admit that Reveal

19          has provided those names."

20         MR. ROSENTHAL:  And then -- and I'm happy with

21  that now.

22         MS. DORAN:  "Plaintiffs claim

23          Reveal has provided only one accountant.

24          In fact, Reveal has provided in

25          discovery about two accountants," and it

83

1          provides their names "and seven project

2          managers" and provides their names.

3     And then it says:

4              "Plaintiffs point to the statement

5          that insiders who asserted less than

6          half the moneys designated for

7          humanitarian aid" --

8     But, again, we're providing discovery about six

9 individuals who support that statement.  This is exactly

10 what they're asking for, but what he -- what they want is us

11 to agree that we will never add to that list ever.

12          THE COURT:  No, no, you don't have to do that.

13 You've answered.  So they've given you the answer.  Whether

14 you can add to the list or not, that's a different matter.

15          MR. ROSENTHAL:  So who's the former staff?  You

16 used that phrase in one of your articles, "The former staff

17 said."

18          MS. DORAN:  Sam -- sorry.  Mr. -- it's very

19 difficult to respond to discovery requests that are not as

20 targeted as what you just said.  Had you propounded

21 discovery requests that said "Please identify the staff

22 members mentioned at page blank of Exhibit blank to the

23 amended complaint," we could do that, you know.  But as it

24 is, I don't -- I mean, in the letters I've learned a lot

25 about what you want to know that I couldn't possibly know

84

1  from the discovery request.  So if that's the question,

2  then, yeah, we can go back and -- and take a look and give

3  you, you know, information on who we think the former staff

4  is.

5          MR. ROSENTHAL:  Well, your Honor, if it's not a

6  binding stipulation, then I'm entitled to the discovery.  I

7  think having a stipulation that says "Here's the reference.

8  Here's who we're referring to" -- and I didn't -- didn't

9  even demand that they tell us now.  I said fill in the

10 blank.

11         THE COURT:  This is for the purposes of the anti-

12 SLAPP motion, right?  So it is binding for purposes of the

13 anti-SLAPP motion, because we're doing the discovery for the

14 anti-SLAPP motion.

15         MS. DORAN:  Yes, but --

16         THE COURT:  So it is binding as for that.  It's

17 not binding as to later, and you may -- remember we're only

18 talking about discovery for the anti-SLAPP motion.

19         MR. ROSENTHAL:  And so why should I not be

20 entitled to know if an accountant said or an insider -- I've

21 heard insider several times.  Why can't I know who is the

22 insider?  If the answer is --

23         THE COURT:  They said they've identified them.

24         MR. ROSENTHAL:  No, they have not.  They -- they

25 said --

1          MS. DORAN:  That's right.

2          MR. ROSENTHAL:  No, no, no, no.  They've said

3   accountants.  They've given us two.

4          THE COURT:  Yeah.

5          MR. ROSENTHAL:  Project managers, they've given us

6   seven project managers.  And so they say "The money designed

7   for humanitarian aid used for that purpose.  Again, Reveal

8   has provided discovery about six individuals who supported

9   this statement."

10     So when they said "insiders," can I assume Ricky

11  Velholm (phonetic) is one of the insiders who supported that

12  statement where they used the term "insiders"?

13         THE COURT:  That's what they wrote.

14         MR. ROSENTHAL:  And if they're willing to live

15  with this, if this is a representation that I can use, I'm

16  happy, your Honor.  I think what they're going to say is,

17  no, they really didn't -- they didn't mean that, and I can't

18  use a representation by counsel because they know -- they

19  know that Ricky Velholm is not one of the insiders who

20  supports their statement.

21         MS. DORAN:  So I can't answer that very specific

22  question right now without looking at the record and talking

23  with the client, but I -- but I will say that if Mr.

24  Rosenthal wants a list of who we believe the insiders are,

25  we will provide him a list.  We're not refusing to do that.

86

1          THE COURT:  Okay.

2          MR. ROSENTHAL:  All right, your Honor.

3          THE COURT:  Then you'll get it.

4          MR. ROSENTHAL:  I will propound interrogatories,

5  and I'll put them at their word.

6          MS. DORAN:  You don't need to do that.  We will --

7          THE COURT:  They'll do it in a way that's

8  admissible.

9          MS. DORAN:  We will do it, and -- and we just

10  don't want to be bound by a stipulation that we can't ever

11  again --

12          THE COURT:  No, but he --

13          MS. DORAN:  -- someone on that list.

14          THE COURT:  -- but he's certainly entitled to do

15  it as an interrogatory.

16          MS. DORAN:  Sure.

17          THE COURT:  And interrogatories are supplemented

18  or whatever under the Rules.  That's what he said.  Not a

19  stipulation.  He said an interrogatory.

20          MS. DORAN:  That's fine.

21          THE COURT:  Yeah.

22          MR. ROSENTHAL:  And as long as I can use that and

23  respond to the anti-SLAPP motion that these are the people

24  who they're citing at this place and this article, that's

25  fine.

1          THE COURT:  They said yes.

2          MR. ROSENTHAL:  Okay.

3          THE COURT:  We're getting to yes.

4          MR. ROSENTHAL:  We're getting to yes.  I think we

5  went -- on emails concerning drafts, scripts, and

6  individuals, is it time to talk about confidential sources?

7          THE COURT:  Sure.

8          MR. ROSENTHAL:  So on confidential sources, I'm --

9  the less sources they have, the happier I am as a plaintiff.

10 The problem I have is that they've given the Court in their

11 anti-SLAPP motion something that suggests it's not just the

12 people that have given these declarations, but we've got all

13 these other people, because the people who have given

14 declarations are corroborating everyone else, and so they're

15 giving the judge an impression that there's a lot of

16 material out there, there's a whole body of confidential

17 sources that support what they're saying.  And we should not

18 be bound by that, which is why I thought the stipulation was

19 a good idea.

20         THE COURT:  So what is your best case for saying

21 that you get that?

22         MR. ROSENTHAL:  My best case is I don't think it's

23 made in good faith.

24         THE COURT:  No, no, legal.  Legal.  This happened

25 to me earlier today.  Case law.

1           MR. ROSENTHAL:  No, no, but let me tell you why,

2  your Honor.

3           THE COURT:  No, no, no, case law, case law.

4           MR. ROSENTHAL:  Case law is it has to be relevant,

5  and if we take a look at, for example, one of their

6  confidential sources who's no longer confidential, Mr. Peary

7  (phonetic), what could be more relevant than him saying "I

8  was offered money and told that everybody else got money

9  too"?

10          THE COURT:  But relevance isn't solely the test.

11          MR. ROSENTHAL:  No.  It's also can I obtain the

12  material through other means, do I need it from them, and

13  the answer is if there are more people like Mr. Peary who

14  immediately told DAPP Malawi that he had been contacted by

15  Matt Smith in June of 2015, then I wouldn't need it

16  because --

17          MS. DORAN:  Wouldn't you have that information if

18  someone contacted your client about that?

19          MR. ROSENTHAL:  I'm sorry?

20          MS. DORAN:  Wouldn't you already have the

21  information if a source --

22          MR. ROSENTHAL:  Yes, and I did have that

23  information Mr. Peary.  That's how I contacted him, but the

24  problem is if Mr. Schmitsak (phonetic) is contacted, how do

25  I find out about him?  How do I know about him?  You know,

89

1  do I have to --

2      THE COURT:  Well, I know that's always the problem

3  with a confidential source.  That's why I asked for what the

4  case law is, because there is --

5      MR. ROSENTHAL:  The case -- they're right, the

6  case law --

7      THE COURT:  Yeah.

8      MR. ROSENTHAL:  They're correct.  The case law is

9  I've got to show relevance, and I've got to show it can't be

10 obtained through other means, and precisely because it's

11 confidential I can't obtain it.  But, your Honor, I think

12 that this can be dealt with very simply, and that is,

13 really, as I said, I don't want their confidential sources.

14 I'm happier the fewer there are.  And so if they will simply

15 give me an identification of who got paid what and who has

16 offered what, not just the accounting statement -- so if,

17 for example, we have a transcript that's attached as Exhibit

18 J to my declaration where they say to an individual named

19 Derek Lapainta (phonetic) "If you come on strong, you can be

20 a whistle blower under the False Claims Act."  If they give

21 me those sorts of statements and they give me any payments,

22 not just what appears in an accounting statement, I don't

23 need the confidential sources because all I want to prove

24 is, yes, they were -- they were engaging in these tactics.

25      There is --

1          THE COURT:  I'm finding a disconnect between the

2   arguments that you -- so we have confidential sources that

3   they're not relying on, they've said in writing in their

4   motion, right?  So -- and then there's case law about that.

5   So that's why I keep going back to the case law, and maybe

6   in some extent a lot of this is premature because we haven't

7   done the discovery, right.  You haven't gotten it all.

8          MR. ROSENTHAL:  Yes.

9          THE COURT:  There's a lot still coming.

10          MR. ROSENTHAL:  Yes.

11          THE COURT:  There's quite a lot.  And so maybe

12   it's just premature.  I don't know how you can make your

13   showing before you get all the other stuff that you actually

14   needed.

15          MR. ROSENTHAL:  Part of my problem is the pace of

16   discovery, and things become clear, and I think my arguments

17   hopefully become clear as I get discovery.

18          THE COURT:  Yeah.

19          MR. ROSENTHAL:  But, your Honor, I think what I'm

20   suggesting is a fairly reasonable compromise.  You don't

21   have to tell us, you know, who it was who got the money.

22   All you have to say is "We offered this witness $200 for" --

23          MS. DORAN:  No one was paid.

24          THE COURT:  Okay.

25          MS. DORAN:  No one was paid.

91

1          THE COURT:  No, I understand.  I'm not even --

2          MR. ROSENTHAL:  No one was paid --

3          THE COURT:  -- quite --

4          MS. DORAN:  No one -- we have represented that.  I

5  -- in my second letter to you, I said we will amend our

6  response, and we can officially do so to say that nobody was

7  paid a bribe for information, that what people were paid for

8  was reimbursement for travel, as you saw in the Mitambuca

9  declaration, and maybe like Center for Investigative

10 Reporting paraphernalia, like T-shirts.  Mr. Peary himself

11 does not say that he was paid anything for giving

12 information to us.  So, you know, the -- and this is one of

13 the things I think that is, you know, more difficult for the

14 Defendants because that's -- this is basically a smear

15 attack, that, you know, we paid people for information.  We

16 absolutely did not do that.

17     And -- and I would also say in addition to that --

18          THE COURT:  And all subject to the litigation

19 privilege.

20          MS. DORAN:  The other thing I would say is that

21 the test he's advocating is not -- he did not complete the

22 analysis, did not give you all of the factors, and, you

23 know, just to start with the alternative sources, I just

24 want to make one thing clear because the -- the following

25 from just a couple of days ago seeking to exclude witnesses

1  from testifying at trial says that he cannot subpoena

2  witnesses in Malawi, but that's wrong.  Malawi is a

3  signatory to the Hague Convention --

4          THE COURT:  Judge Chesney didn't refer that one to

5  me.

6          MS. DORAN:  No, she didn't.

7          THE COURT:  Okay.

8          MS. DORAN:  No, she didn't.

9          THE COURT:  I just wanted to be clear.

10          MS. DORAN:  But one of the arguments is going to

11  be -- or has been that he cannot subpoena those -- the third

12  parties in Malawi, and he can, and we found a case where the

13  Court recited that somebody had done it and that, in fact,

14  the Malawi authorities did effect service of process on the

15  witness there.

16      So, you know, the fact that he contacted people and

17  they said "I don't want to talk to you" is, one, not

18  surprising and, two, not exhausting alternative sources.

19  The other thing I would say is that there is another factor

20  which has not been mentioned, which is that there has to be

21  a prima facie showing that the statements are false.  That's

22  in the Mitchell case, but it's been adopted in Federal Court

23  by the Shone case, and there hasn't even been an attempt --

24  there's a footnote that says we have made a prima facie

25  showing, but there's no reasoning as to why they have, and

93

1   then they also say it's not relevant and, most importantly,

2   it's not relevant because, as you just said, we are not

3   relying on our confidential sources to provide defense to

4   the SLAPP motion -- to the complaint in our SLAPP motion.

5   We're just not.

6           MR. ROSENTHAL:  So, your Honor, if I may, another

7   document which I've shown to counsel, which is confidential

8   -- and I don't think there's anyone in the court who is

9   not --

10          THE COURT:  Just my staff.

11          MS. DORAN:  Okay.

12          MR. ROSENTHAL:  Yeah.  So let me -- there are

13  clearly people who get paid.  This is one where somebody

14  gets paid $800.  I would argue that the $800 was not a --

15  seriously because this person needed to be in the journalist

16  witness protection program.  This is someone who says, "Oh,

17  I was contacted by someone, and they pretended to me nice to

18  me, and they asked me 'So where are you living these days,'

19  and I went into a tizzy, and they paid me $800 to relocate."

20  So these are the sort of payments that they may say are

21  legitimate.

22          THE COURT:  Yeah.

23          MR. ROSENTHAL:  I would say are not.

24          THE COURT:  Okay.

25          MR. ROSENTHAL:  But I need to know who got paid

1  what, and then I can argue --

2          THE COURT:  They are telling you who got paid

3  what.

4          MR. ROSENTHAL:  No, they're not.

5          THE COURT:  They are.  All expenditures are being

6  produced.

7          MR. ROSENTHAL:  If there's an accounting record.

8          MS. DORAN:  Hold on.  First of all, he was not

9  paid by CIR.  He was paid by a different news organization.

10 You can allege a conspiracy theory that somehow we were

11 behind that, but we did not pay that source to be relocated.

12     Second of all, there are four individuals who've

13 expressed concerns that they would be retaliated against for

14 speaking about Planet Aid.  So, you know, although you've

15 called his -- in the most recent filings which you probably

16 have not -- they're not before you, he has called Mr.

17 Goteka, he said that they're paranoid delusions.  But you

18 can't deny that several people have expressed this concern,

19 and it's not just that he saw somebody outside his house.

20 He's -- you know, he was followed by a former DAPP Malawi

21 project manager, and he was approached by someone who said,

22 "Hey, you were talking to those BBC people," and that is

23 what caused him to fear.  I mean, and you have another

24 witness who hired a security guard after he was visited by

25 Plaintiff's counsel because he was so taken aback by the --

95

1   by the -- what he felt was badgering by Plaintiff's counsel.

2   So, you know, please don't, you know, belittle the concerns

3   of these sources by saying that they are in the journalist

4   witness protection program.

5           THE COURT:  You're not talking to me.  You're

6   talking to --

7           MS. DORAN:  No, I am -- I am talking to him, yeah.

8           THE COURT:  I was going to say I'm sorry.  I

9   didn't mean to belittle anybody.

10      Okay.  But so let me just cut to something.  You are

11  producing all expenditures, right, all payments?

12          MS. DORAN:  To the -- yes.  Well, they -- all

13  expenditures will be found in our accounting records, and we

14  are producing --

15          THE COURT:  And you're not withholding any?

16          MS. DORAN:  No.

17          THE COURT:  They're not withholding any.

18          MS. DORAN:  And are they -- are they representing

19  to the Court that all payments of any amount are recorded in

20  your accounting statements?

21          MS. DORAN:  I --

22          MR. BURKE:  There were no payments, so --

23          MR. ROSENTHAL:  Oh, wait.

24          MR. BURKE:  It was a reimbursement for travel.

25          MS. DORAN:  It would be in --

96

1          THE COURT:  If there was any payment --

2          MR. BURKE:  Correct.

3          THE COURT:  -- of whatever kind --

4          MR. BURKE:  Correct.

5          THE COURT:  -- it would be in the -- in the

6   accounting records.

7          MS. DORAN:  That's right.  That's --

8          MR. BURKE:  Just to be clear, there was no

9   bribery.

10          THE COURT:  No, no.  I understand that.  And I

11   understand that a lot of this is just for the record and out

12   there, not necessarily for me.  I get it.  But -- but so the

13   representation is there are no payments -- that every

14   payment that was made by Reveal, right, that's who we're

15   talking about -- will be identified and produced, whether

16   it's in the accounting records or not, and what they're

17   saying, they're all going to be in the accounting records

18   because there were not any outside those records.

19          MR. ROSENTHAL:  And then one -- one last caveat.

20   We do know that there are statements that are made that do

21   not constitute payments.  For example, we attached one,

22   Exhibit J to the declaration, where they say to someone --

23   they're talking about they False Claims Act, and Candani

24   Noguera says, you know, "That discourages me from saying

25   this, but there's a False Claims Act, and the more you come

1   on strong, the more likely there will be an investigation."

2   And Amy says "Three hundred million dollars."  And Candani

3   says "So the more you come on strong, you can be a whistle

4   blower" or something close to that.

5           MS. DORAN:  So --

6           MR. ROSENTHAL:  So -- so -- please.  So that kind

7   of statement would be something that we appreciate they did

8   disclose, one.  But if there's anything else that

9   constitutes a promise of inducement, a discussion about

10  opportunities, we would ask to have that, and if the answer

11  is there aren't any, fine.  But as long as they'll produce

12  not just payments but also anything that constitutes an

13  offer, encouragement, inducement, that's all we ask.

14          MS. DORAN:  So, again, for the record, I want to

15  read the next part of the transcript that he just quoted.

16          THE COURT:  Well, I think you put it in your

17  letter, but for the record, go ahead.

18          MS. DORAN:  No, I'm not sure this was in any of

19  the letters, but, you know, Amy says -- Amy Walters, the

20  reporter, says "Three hundred million dollars," and then

21  he's -- you know, he's got the statement from Mr. Noguera,

22  and then Amy says "I mean there's possibilities for lawsuits

23  on both sides, which is obvious, and Matt has talked to

24  attorneys who do this kind of thing who actually are

25  hesitating to work with us possibly.  I don't know if

1  they're interested in this case already.  So I don't know.

2  We can't really, i.e., we can't tell you what you're going

3  to get out of this.  We just want to know what you have to

4  say," and this very same witness in a transcript not filed

5  with the Court went on to verify the allegations that these

6  people were forced to contribute portions of their salary.

7          THE COURT:  Is this person one of the 15?

8          MR. ROSENTHAL:  No, he's not.

9          MS. DORAN:  No, he's not.

10         MR. ROSENTHAL:  He's not.

11         MS. DORAN:  And -- and I will say to me stating

12  that there may be a claim under the False Claims Act, I'm

13  not sure how that -- how that is relevant to what -- to the

14  defenses that are being raised in the SLAPP motion.

15         THE COURT:  Well, there's an argument to be made,

16  right.  There's an argument to be made if you're a reporter

17  why you have any business whatsoever telling anyone about an

18  affirmative lawsuit that they can bring.  So they have an

19  argument.  I'm not saying they're the same.  I'm saying I

20  see the argument, which is if you go a certain way, there

21  may be a way to get money at the end.  That's an argument

22  that they're making based on that.

23      So here's the question, is this the only time -- now,

24  you produced this.  You did produce this.

25         MR. ROSENTHAL:  Yes.

99

1            THE COURT:  And so are you withholding any similar

2  communications?

3            MS. DORAN:  I have no way of answering that

4  without listening to every recording, and that's -- that's

5  part of the problem.

6            THE COURT:  Well, you're --

7            MR. ROSENTHAL:  If it's a recording --

8            THE COURT:  You've produced a lot of recordings

9  already.

10            MS. DORAN:  Yes, and he's -- and there's only a

11  couple that he's flagged as being relevant.

12            THE COURT:  Right.  So --

13            MS. DORAN:  So this is one of them.

14            MR. ROSENTHAL:  If it's a recording, I've got it.

15  If it's not a recording, I don't, and if they'll make a

16  representation that there are any other statements, they'll

17  produce it, whether it's by way of notes or alerting me to

18  it, that's fine.

19            MS. DORAN:  Again --

20            MR. ROSENTHAL:  But that's all I'm asking is that

21  discovery relating to any statement.

22            MS. DORAN:  Short of reviewing every email and

23  every document and every set of notes, there is no way I can

24  make that representation because I can't get past that

25  something like this would even, you know -- it's a -- you

100

1  asked for evidence of bribes, inducements.  This is neither

2  of those things.

3          THE COURT:  I know, but that's their argument.

4  That's their argument.

5          MS. DORAN:  But either way, I mean, the tangential

6  relevance that we're talking about here as compared to the

7  burden --

8          THE COURT:  I mean, I think what really matters is

9  -- and you're going to get everything with respect to the --

10  to the declarants, right, which is who they're relying upon

11  as their -- for the basis.  So somebody else may have said

12  something and they were induced by something, but they're

13  not relying on what they said.  So --

14          MR. ROSENTHAL:  Exactly.

15          THE COURT:  -- it doesn't -- it can't form the

16  basis for their defense.

17          MR. ROSENTHAL:  Here's the problem.  All these

18  people they're talking to are friends.  So they're all

19  talking amongst themselves, and if somebody said, "Look,

20  there's a $300,000,000 recovery out there and we may be able

21  to get a piece of that," they're telling their friend that,

22  and it's going around.

23          THE COURT:  Well, okay, but --

24          MR. ROSENTHAL:  So -- so --

25          THE COURT:  Discovery is not perfect, and you

1 can't know everything, and there does have to be some limit.

2 So I hear what you're saying, but that's pure speculation.

3          MR. ROSENTHAL:  That --

4          MS. DORAN:  Absolutely.

5          THE COURT:  It's pure speculation based on

6 something which is (a) not -- not even an offer of money.

7 It's like there may be something that -- you can make that

8 argument, but I'm not going to order them to do anything

9 further because you're getting -- with respect to the

10 declarants, you're getting anything that they have.

11          MR. ROSENTHAL:  And, your, can we just do this,

12 that if they're aware of and they have access to the

13 clients, of any other statement where somebody was told you

14 can get money, you can get anything, then they'll alert us

15 to it.  If the answer is "I don't want to ask my client,"

16 why not?

17          MS. DORAN:  It's not about asking the client.

18 It's about the tens of thousands of documents that they

19 collected during this investigation.  Nobody was paid.  He

20 would --

21          THE COURT:  No, he's not saying that.  He's not

22 saying that.

23          MS. DORAN:  Yeah.

24          THE COURT:  He's saying just ask your clients

25 because maybe they'll know of something.  That's all.

1          MS. DORAN:  But --

2          THE COURT:  And if they don't, then they don't.

3          MS. DORAN:  Well, keep in mind this investigation

4 took place a few years ago now and that their memories might

5 not be perfect.  So --

6          THE COURT:  Well, that's what I said, if they

7 don't, then they don't.

8          MS. DORAN:  Okay.  That's fine.

9          THE COURT:  That's all I'm saying.

10          MS. DORAN:  Yeah.  I mean, I -- I hesitate to put

11 anything in -- in writing in -- between us because I feel

12 like whatever it is gets picked apart eventually.

13          THE COURT:  No, we're not getting it in writing.

14 What we're doing is this is all being recorded.  The

15 transcript, for whatever it's worth --

16          MS. DORAN:  Okay.

17          THE COURT:  Don't worry.  I mean, we're going to

18 talk again soon, right.  I'm going to have to keep --

19          MR. ROSENTHAL:  Yes.

20          THE COURT:  -- working with you guys.

21          MS. DORAN:  Yeah.

22          MR. ROSENTHAL:  So the -- just the issue about me

23 in particular, I think it was by Jackson Mitambuca and

24 Harrison Longway that somehow I intimidated them so badly

25 that sources have to be confidential and that someone

1 evidently now has a guard at their -- at their place.  I was

2 not allowed to bring my silencer on the plane.  TSA refused

3 to let me do that.

4          MR. BURKE:  This is a serious --

5          MS. DORAN:  This is not a funny --

6          MR. ROSENTHAL:  Your Honor, let me -- let me

7 address it in a serious way.  Let me --

8          THE COURT:  I don't even know what this has to do

9 with discovery, because I tell you I've been on the bench

10 since 9:00 a.m., and I actually flew from --

11          MS. DORAN:  He's joking that he didn't bring his

12 silencer for his gun.

13          MR. ROSENTHAL:  Let me -- let me address it in a

14 serious way, your Honor.

15          THE COURT:  Yes.

16          MR. ROSENTHAL:  There's an allegation that sources

17 need confidentiality because a former prosecutor and I went

18 and interviewed Harrison Longway at his -- outside of his

19 office, and I think he is the person they're referring to

20 was so upset by it that he now has a guard.  Mr. Longway

21 gave us a very short interview in which he said he didn't

22 know of anything fraudulent per se, even though he was the

23 one who said 50 to 70 percent was stolen.

24          MS. DORAN:  That's --

25          MR. ROSENTHAL:  Your Honor, let me -- Ms. Doran,

104

1  let me finish.

2      The second person is Jackson Mitambuca, who said that

3  when I and another individual interviewed him in August of

4  2016, we interviewed him, and he refused to tell us what we

5  wanted to hear, and I said to him "You're going to pay for

6  this."  What we're going to do is we're going to produce a

7  copy of that transcript of that interview in which Mr.

8  Mitambuca completely, you know, with very few exceptions

9  said exactly what a plaintiff's attorney would have wanted

10 to hear.  He didn't know of any cheating.  He didn't know of

11 anybody who was deprived of seeds.  The only time anyone was

12 deprived of livestock was when he tried to steal the money.

13     And so the idea that somehow I had said to him "You're

14 going to pay for this" after he had given us a very helpful

15 interview is just really unfortunate, and it should not have

16 any place in this litigation.

17     What he then alleges is I went back in August of 2017

18 and said to him "I wanted to find Marco Zavilla, the person

19 who writes those documents" and said to him I needed to find

20 Marco because I wanted to silence him.

21     At that meeting -- and Mr. Mitambuca actually invited

22 us into his house.  He introduced us to his family.  He gave

23 us a declaration which was extremely helpful, and the idea

24 that I said I wanted to silence Marco Zavilla is really

25 unbecoming of counsel.  (a) it's not true, and if you look

105

 1 at the declaration that he signed in August 2017 and you

 2 look at the declaration he signed in November of 2017, Mr.

 3 Mitambuca has very little credibility.

 4        THE COURT:  I'm just trying to figure out what

 5 this has to do with --

 6        MS. DORAN:  What it has -- what he's saying it has

 7 to do with is that sources don't actually need to be

 8 confidential because they have no reason to fear

 9 retaliation.

10        THE COURT:  Well, I can't -- I obviously can't

11 adjudicate that.  What we have are sources that they're

12 relying upon.  They're not confidential, and so that's that.

13 And you're getting all their notes and emails or whatever as

14 to those 15 sources.

15        MS. DORAN:  And I will just say we have -- we --

16 as soon as you gave us those declarations, we asked you for

17 any recordings or transcripts --

18        MR. ROSENTHAL:  No, no.

19        MS. DORAN:  -- of the --

20        MR. ROSENTHAL:  You asked us for recordings or the

21 declaration.  I gave you the declaration.

22        THE COURT:  We're not having this colloquy --

23        MS. DORAN:  Okay.

24        THE COURT:  -- back and forth because I have to

25 tell you I'm really --

1          MS. DORAN:  Okay.

2          THE COURT:  -- running out of steam.

3          MS. DORAN:  Okay.  Fair enough.

4          THE COURT:  We're just not -- and we're done

5    making our record for whoever is here or anything like that,

6    okay.  There's a dispute here.  There's a dispute.  You

7    know, we -- and I assume actually that everybody's operating

8    in good faith.  I do.  I do.

9          MR. ROSENTHAL:  Your Honor, there are two

10   individuals who are quoted in the materials.  One is a woman

11   who said she was supposed to get $350 and they gave her

12   $250, and she's anonymous, and they said she'd be fearful of

13   losing her job and that's why she's anonymous.  There's no

14   reason why they can't give us that interview.  They've

15   already given the voice on the podcast.

16         THE COURT:  Oh, that one.

17         MR. ROSENTHAL:  Yes.  And why not just give us the

18   interview and redact her name?

19         THE COURT:  And redact her name.

20         MS. DORAN:  Because we believe that providing the

21   entire recording only increases the likelihood that the

22   Plaintiffs can discovery who -- what her identity is either

23   by what she's talking about or by having more recordings of

24   her voice.  You know, we are not willing to produce a

25   recording with a confidential source whether we aired part

1   of that or not.  We just --

2           THE COURT:  I see.  So it was -- so the name was

3   not given on the --

4           MS. DORAN:  Correct.

5           THE COURT:  So it is a confidential --

6           MS. DORAN:  Correct.

7           MR. ROSENTHAL:  But they --

8           THE COURT:  -- source.

9           MR. ROSENTHAL:  But they clearly are relying on it

10  because it's in the article.  So I don't know how -- this is

11  not one where they can say, "No, someone else told us that."

12  It's -- it's -- you have the person's voice saying "I was

13  supposed to get $350, and I only got $150."

14          MS. DORAN:  And if this case came down to just

15  that statement, it would be one thing, but the fact is that

16  many people have reported exactly the same thing.

17          THE COURT:  You're not relying --

18          MS. DORAN:  And we're not relying on her.

19          THE COURT:  You haven't pointed to it.  You won't

20  argue it.  You --

21          MS. DORAN:  Correct.

22          THE COURT:  -- haven't identified it.  It is not

23  any sort of basis for --

24          MS. DORAN:  No.

25          MR. ROSENTHAL:  So -- so if we -- if we can

1 produce a contract showing her salary and a pay stub showing

2 she got what's in her salary, they would take the position

3 that that's irrelevant?

4         THE COURT:  We -- we don't know who she is.

5         MR. ROSENTHAL:  But that's -- that's my point is

6 if they tell me who it is, I can produce, and I actually

7 think I know who it is, but if they tell us who it is, we

8 can show it's absolutely false, because you can -- you can

9 see her contract, which was given to the USDA.  You can see

10 her pay stub.  And so you can see she got -- which was in

11 her contract --

12         MS. DORAN:  This --

13         MR. ROSENTHAL:  -- and the statement that's made

14 on the air that she was supposed to get $350 and only got

15 $250 is contrary to the facts that are -- that are in the

16 documents.  How can I -- how can I be deprived of the

17 ability to prove that what that person said was false?

18         THE COURT:  Well, you can't.  That's interesting.

19 I mean, I suppose you could point to it and you could say

20 that it's false, and there's nothing they could say about

21 it.

22         MR. ROSENTHAL:  Look, if they're --

23         MS. DORAN:  Right.  As I said, if this case were

24 just about that statement, then we'd be talking about

25 something different.  What we're talking about is one of

1  many statements to support the general gist of the argument,

2  which was that people were forced to give money, parts of

3  their salary back.  We're not saying and she's one of the

4  people who told us this and that's why the Court should find

5  for us.  We're saying look at all these people.  By the way,

6  you have recordings of these people saying these exact

7  things, all these people who told us.  So, yes,

8  theoretically you could allege that that particular

9  statement was false, but what we would say is, you know, it

10  doesn't matter because look at all these other things that

11  are true that we were told and for which we have no actual

12  malice.  We're not relying on her as part of our defenses.

13          MR. ROSENTHAL:  But I am in terms of my alleging

14  that's defamatory.  So here's what I'm going to do.  In

15  responding to the anti-SLAPP motion, I'm going to have

16  someone say "I recognize that voice.  Let me tell you it's

17  Sally, and here's Sally's contract.  Here's what she's

18  supposed to get, and here's her pay stub showing she got

19  what she's supposed to get."  And I don't want to hear from

20  the Defendants, "Oh, but now we're going to tell you what

21  Sally said" or some other explanation, because --

22          THE COURT:  Well, they can tell you what Sally

23  said because it's in the -- it's in the podcast.

24          MR. ROSENTHAL:  And so they can't come back --

25          THE COURT:  In the recording.

1          MR. BURKE:  Correct.

2          MR. ROSENTHAL:  And so they can't come back and

3  decide that they're going to suddenly produce information if

4  they refused to produce it in discovery, because that's --

5  our intention is to --

6          THE COURT:  Well, you're telling them now.  So

7  that -- they're put to their decision.

8          MR. ROSENTHAL:  All right.  That's -- that -- we

9  can live with that.

10          THE COURT:  Okay.

11          MR. ROSENTHAL:  Attorney client -- and I

12  appreciate your Honor's indulgence.  There are documents

13  that were produced in the anti-SLAPP motion that talk about

14  the thoroughness of their --

15          THE COURT:  Oh, right, right, right.  And so yes.

16  So -- and -- and --

17          MR. ROSENTHAL:  So --

18          THE COURT:  And what they say is -- and what you

19  say is, well, we don't -- we refer to them in our memo, but

20  they are --

21          MS. DORAN:  Well, and we're not --

22          THE COURT:  But they are in declarations, right?

23          MS. DORAN:  But we're not -- yeah.

24          THE COURT:  Just strike the why are they there.

25          MS. DORAN:  It's just describing a part of the

1 process.  We --

2          THE COURT:  Yeah, but if it's there, then you

3 expect some inference to be drawn.

4          MS. DORAN:  But here -- here's what I would say,

5 your Honor.  It would be one thing if in the declaration

6 somebody said "We thought Planet Aid was engaging in fraud.

7 We weren't sure.  So we went to our lawyers and said 'Hey,

8 look at these documents.  Is this fraudulent,' and the

9 lawyers said 'Yes, it is fraudulent.'  And then based on

10 that advice, we decided to write that."

11      That is not what we're talking about.  We're talking

12 about vague statements that "I consulted a lawyer during

13 this process," that's all.

14          THE COURT:  And what -- and what inference is the

15 Court to draw from that statement?

16          MS. DORAN:  Just that the process of getting the

17 story was thorough, not that they relied -- not that the

18 lawyer said, "And this is okay.  Go ahead and publish it,"

19 but that that is part of the process, the very careful

20 process that they engage in when they get these types of

21 stories.  It's -- they are not saying "And we relied on --

22 on the -- on the attorney for that," and there are cases on

23 this.  I mean, the case cite he's talking about in terms of

24 the sword and the -- you know, using as a sword -- or a

25 shield, thank you -- those are all cases where somebody said

112

1  "I relied on my lawyer and, therefore, I should be off the

2  hook."  That is not what's going on here.

3          MR. ROSENTHAL:  Your Honor asked the right

4  question, what was the inference, and the answer was that it

5  was a careful thorough process.  They didn't include the

6  sound man.  They didn't tell you what the sound man did in

7  terms of producing the podcast.  They told you that there

8  were multiple levels of review, but it's also relevant to

9  another thing, and that is Pat Smith says "I and any" --

10  Walters does to -- "I never used undercover reporting.  We

11  never hid" --

12          THE COURT:  Oh, no, no, no.  I read that.  That

13  argument's no good.  It's no good.  That's not a waiver.

14  That's not even close to being a waiver.

15          MR. ROSENTHAL:  But it's a question of is he

16  telling the truth.

17          THE COURT:  No.  No.  It's privileged, and it's a

18  question of whether it's a waiver of the privilege, and I

19  actually spent an hour on a different case on that today,

20  waiver of the privilege.  That's not a good argument.  So

21  I'm going to stop you there.

22          MR. ROSENTHAL:  Because it's --

23          THE COURT:  I read it carefully.  I --

24          MR. ROSENTHAL:  Okay.  So let me go back to -- let

25  me go back to the inference.  Your Honor asked the right

1  question, and you got the right answer.  It was -- the

2  inference was there.  It wasn't just to show what the

3  process was.

4            THE COURT:  Remind me which number, what --

5            MS. DORAN:  This is the third -- four --

6            THE COURT:  Or docket number.

7            MS. DORAN:  It's docket 156.

8            MR. ROSENTHAL:  156, right.

9            MS. DORAN:  And if you look at, you know, for our

10  part the case is on page eight, the Aetna Casualty case.

11            THE COURT:  The Aetna, yes.

12            MS. DORAN:  The case that you decided in Abadara

13  (phonetic) and that one other case, Southern California Gas

14  Co.  All of these are examples where someone says some --

15  makes an illusion to the fact that they consulted an

16  attorney, and someone made this argument of "Well, then

17  everything is fair game of what you told your attorney and

18  what your attorney told us," and they were rejected.

19            THE COURT:  All right.  Let me -- I'll look at

20  that, look at those cases and do that.  But, I mean, waiver

21  is a pretty, you know, serious thing.

22            MR. ROSENTHAL:  Your Honor, I would have never

23  raised this issue if it weren't in the declarations.

24            THE COURT:  No, no, I understand.

25            MR. ROSENTHAL:  It was staring me in the face.

1    THE COURT:  That's what I have to look at and see

2 if there is -- just saying that you consulted when they're

3 not arguing that they consulted and the lawyer approved what

4 they were doing or said but just saying we consulted.

5 That's part of the process.  It's sort of a little bit about

6 background.

7    MS. DORAN:  And, your Honor, if you're inclined to

8 believe that there is some kind of waiver, you know, we are

9 willing to strike those portions of the declarations.

10    THE COURT:  Well, I don't know that there is or

11 not, but --

12    MS. DORAN:  Okay.

13    THE COURT:  Okay.

14    MR. ROSENTHAL:  I think --

15    THE COURT:  That calls my bluff so to speak.

16    MR. ROSENTHAL:  Hold that thought.

17    THE COURT:  No, I mean in the sense that I sort of

18 like if it's not a big deal, then just strike it.

19    MS. DORAN:  Right.  But we --

20    THE COURT:  But they're entitled to a ruling and

21 for me to actually look at it.

22    MR. ROSENTHAL:  Okay.

23    MS. DORAN:  Thank you.

24    MR. ROSENTHAL:  I'm trying to think if -- if

25 there's anything else, and I wasn't clear, your Honor, on

1  have you ruled on the issue of the first two publications or

2  is that something that we're to talk about and see if we can

3  narrow the --

4          THE COURT:  No, no, no.  The -- well, no, no.

5  What I did was I said go through and identify for me the

6  additional publications, that there was something more, that

7  we needed something more on, and so we got the tweet.  We

8  got the --

9          MS. DORAN:  Two tweets, right?

10         THE COURT:  Well, we got a tweet --

11         MR. ROSENTHAL:  Three, yeah.

12         THE COURT:  Yeah.  There was 78-22 something.  We

13 got the tweet and we got an additional article --

14         MS. DORAN:  Seventy-nine is what I have for that

15 one.

16         THE COURT:  Yeah.

17         MR. ROSENTHAL:  And will your Honor allow me to go

18 through the original complaint and see if there are specific

19 issues that were raised in the original complaint that I

20 would say are similar to the one I gave you today?

21         THE COURT:  We're not going to do it now all

22 together.

23         MR. ROSENTHAL:  No.

24         THE COURT:  I would say raise that with Defendants

25 if you think there are particular ones, because I think they

1  now understand that argument, which is it goes to actual

2  malice, which is if there was something in particular that

3  you identified as being false and you want to know what did

4  you do, if anything, in response to being told that that's

5  false.  It's the same as their retraction request I think.

6          MR. ROSENTHAL:  And one thing, in terms of their

7  entire search, I would again ask if they could give me a hit

8  list, I would appreciate it, but there is one word that

9  stands out that I don't think they wanted to include, and

10  that is the word "cult," because they call their stories

11  "The Cults."  So I don't know what the reluctance is to

12  putting in that search term.  They haven't told me how many

13  document it produces, but --

14          THE COURT:  You don't mean cult by itself.

15          MS. DORAN:  Yes, he does.

16          MR. ROSENTHAL:  That's how they phrased -- the re

17  line --

18          THE COURT:  Well, cult -- cult and Planet Aid.

19          MR. ROSENTHAL:  No.  They often said "The Cults."

20  That's how they called the story they were working on.

21          THE COURT:  Right, right, right, but you mean

22  their entire -- everything that they have, just put in the

23  word "cult"?

24          MR. ROSENTHAL:  I don't know how much they're

25  going to get.

117

1        MS. DORAN:  So you just -- first of all, like not

2  10 minutes ago, Mr. Rosenthal said "This isn't about cults.

3  This is something very specific."  And here we are talking

4  about using the generic term "cult" as a search term, and

5  I've said this both in the process of the Reeber production

6  and our production.  Our list of search terms is exhaustive.

7  It includes things like Planet Aid, DAPP Malawi, and all

8  sort -- and every -- every source, right.  So it is

9  unfathomable to me that there would be an email or a

10  document that has the word "cult" but not one of those many

11  other terms that would be relevant to the litigation is --

12  again, this goes to the burden.  You know, we -- you know,

13  we could search for, I mean, all sorts of -- USDA.  Are we

14  supposed to search our entire, you know, documents for USDA

15  even if they have nothing to do with this story?  It's

16  unreasonable.

17        MR. ROSENTHAL:  But, your Honor, do you know how

18  easy it is to look for the word "cult" but not something

19  that shows up in another search that you've already done?

20  That's just a -- a keystroke away.  You don't have to search

21  for these things separately.  You search for cult but not if

22  it shows up in Planet Aid documents.  You search for cult

23  but not if it shows up in DAPP Malawi documents.

24        MS. DORAN:  But why --

25        THE COURT:  What if it shows up in Jones Day

*Echo Reporting, Inc.*

1 documents or something else, right?  Because --

2          MR. ROSENTHAL:  And it's the right time period and

3 it's an email from Matt Smith to -- to an editor or --

4          THE COURT:  Well, that's limiting it then.

5          MR. ROSENTHAL:  But they can look at the

6 documents, and they can --

7          THE COURT:  Well, if you want them to look at just

8 Matt Smith's emails for the word "cult", maybe that's

9 something they can do.

10          MR. ROSENTHAL:  What about just looking for "cult"

11 and seeing how burdensome is it?

12          THE COURT:  But looking where?  Looking

13 everywhere?

14          MR. ROSENTHAL:  No, no, no.  I think we have a

15 time period, and I don't know whether they're working on

16 another article.  If Ms. Doran is going to tell me they've

17 already done it and she has a number, I'm glad to hear it.

18          MS. DORAN:  I don't know that I do.

19          MR. ROSENTHAL:  Oh, okay.  But how can you argue

20 burdensome if you won't say what the burden is?

21          THE COURT:  Well, the -- well --

22          MR. ROSENTHAL:  It may be burdensome.  I don't

23 know.  I haven't been told it is, which is why, again, if

24 you give me a hit list, I'm happy to go through it with you

25 and try and narrow it.

119

1          MS. DORAN:  I can keep looking, but here's the

2  bottom line.  I mean, it can't be the case that you need a

3  hit list for every single term imaginable to make -- to rule

4  out the possibility that, you know, there's no burden.  I

5  mean, a --

6          THE COURT:  So here.  Let's just stick to theirs.

7  You're going to get your documents.  See, part of the

8  problem -- you're going to get them.  If there's stuff

9  that's glaringly missing, like you have nothing that refers

10 to cult, then they're going to have to go back and do it

11 again, right.  And that's on them.

12         MR. ROSENTHAL:  But I'm going to have documents

13 that will refer to cult.  I know that.

14         THE COURT:  Well, then the search was good enough.

15         MS. DORAN:  Then why are we --

16         MR. ROSENTHAL:  No, no, because if they found a

17 dozen documents that refer to cult, how do I know there

18 aren't 100 others that refer to cult and refer to the

19 subject of the story?

20         THE COURT:  Well, because you're getting discovery

21 on the subject of the story.  In other words -- in other

22 words, how do you know that cult is going to get you

23 anything more?

24         MR. ROSENTHAL:  You said it before.  With

25 discovery you don't know until you get the stuff.

120

1          MS. DORAN:  It's --

2          MR. ROSENTHAL:  And that's my problem.

3          THE COURT:  Exactly.  That's what I'm saying.

4 That's what I'm saying, and what I'm saying is if you get

5 the stuff and there's glaring holes that suggest to you the

6 search that they did didn't encompass everything, then you

7 can point that out, and if it means they have to do it

8 again, then that's on them.  That's their burden, their

9 cost, whatever.  Obviously it's less expensive to do them

10 all at once, but they're willing to take that risk because

11 they believe that what -- the exhaustive list that they've

12 come up with has every -- you know, will -- will get it,

13 will get it to the extent that it's relevant to the SLAPP

14 motion.

15          MR. ROSENTHAL:  Okay.  One other thing.  They've

16 made an argument about a prima facie case, and all I said in

17 my papers is I'm happy to do that.  In fact, I'd like to do

18 that, but I just want to do it after discovery and come back

19 to your Honor and show here's why we think we have a prima

20 facie case and entitled to more discovery.

21          THE COURT:  Well --

22          MR. ROSENTHAL:  I have no problem doing that.

23          THE COURT:  -- I mean, that's backwards with

24 respect to the --

25          MS. DORAN:  The test.

1          THE COURT:  But that doesn't get you the

2  confidential source.  You mean after the other discovery?

3          MR. ROSENTHAL:  Yes.

4          THE COURT:  Well, that's fine.

5          MR. ROSENTHAL:  Yes.

6          THE COURT:  That's fine.  I mean, that's fine.

7          MR. ROSENTHAL:  Okay.

8          THE COURT:  Obviously that's fine with respect --

9          MR. ROSENTHAL:  Okay.

10          THE COURT:  Because that's actually what we're

11  talking about, because --

12          MR. ROSENTHAL:  Yes.

13          THE COURT:  -- you can't say that you need it

14  until you get the discovery, in addition to other things.

15          MS. DORAN:  You guys both lost me.

16          MR. ROSENTHAL:  We can live with that.

17          THE COURT:  What?

18          MS. DORAN:  You lost me.  So what he -- sorry.  Go

19  ahead.

20          THE COURT:  He's saying with respect to the

21  confidential source --

22          MS. DORAN:  Yes.  Yeah.

23          THE COURT:  -- what he's saying is I need the

24  discovery, and then I can make my prima facie showing --

25          MS. DORAN:  I can come back to your Honor.

122

1      THE COURT:  -- that it's defamatory and also at

2 that point he can say why he needs it.

3      MS. DORAN:  Okay.  Well, so here's what I would

4 say.  He will undoubtedly be faced with this question again.

5 I mean, that is the litigious nature of the Plaintiff and

6 the point of the Plaintiff's case is to -- is to wage a war

7 of attrition.

8      So if your Honor is -- if your Honor is saying that "He

9 hasn't shown a prima face case so I'm not going to give you

10 confidential sources," that's one thing, and maybe he could

11 come back and say "Now I have a prima facie case."  But if

12 what you're saying is they're not relying on the

13 confidential sources for purposes of their defense, then I

14 don't see how he could come back after more discovery and

15 say "Now I need the identity of the confidential sources,"

16 because the reason for the ruling is not because he didn't

17 show a prima facie case.  It's because we have represented

18 many times now that we're not going to rely on confidential

19 sources for our SLAPP motion.  So what I would hate to have

20 happen is for us to come back here and have to brief this

21 again and have to have this conversation again where we say

22 it's not relevant and we're not using them for our defenses.

23      MR. ROSENTHAL:  That's a week event.

24      THE COURT:  What?

25      MR. ROSENTHAL:  Going to be a week event.

1       THE COURT:  And, before anybody has to brief

2  anything, as you know, I'm happy to speak to the parties on

3  the phone and hear something, about whether it's even worth

4  briefing or not.  But what I don't like to do is just say

5  "I'm cutting you off forever," particularly when the vast

6  majority of the things that you say you're going to produce

7  haven't been produced yet.

8       MS. DORAN:  And I get that.  I guess what I'm

9  saying is you -- certainly, you know, I wouldn't expect you

10 to say "And you're never getting their confidential

11 sources."  What I would expect you to say is "Here's the

12 reason why you're not getting their confidential sources.

13 It's because they're not relying on them.  It's not because

14 you haven't made a prima facie case.  It's because they're

15 not relying on them for their offense."

16      THE COURT:  Well, because he hasn't shown a need

17 for them because you're not relying on them.

18      MR. ROSENTHAL:  Correct.

19      THE COURT:  But I don't know what -- discovery may

20 show something that shows that somehow it becomes relevant.

21 I don't know.

22      MS. DORAN:  Okay.

23      THE COURT:  I don't know.

24      MS. DORAN:  Okay.  So the idea would be he might

25 discover that we are, in fact, relying on them for our

124

1 defenses?  Is that the --

2           THE COURT:  Because it's connected to something

3 else.

4           MS. DORAN:  Okay.

5           THE COURT:  I don't know, because the truth of the

6 matter is there's a large swath of --

7           MS. DORAN:  Okay.

8           THE COURT:  -- discovery that he does not yet

9 have.

10          MS. DORAN:  Understood.

11          THE COURT:  Right?

12          MR. ROSENTHAL:  Your Honor, about the issue of the

13 Hague Convention, if counsel could alert me to the case,

14 and, in fact --

15          MS. DORAN:  Yes.

16          MR. ROSENTHAL:  -- if it's a member of the Hague

17 Convention, we might withdraw our motion because I -- my

18 research told me it was not, but I'm happy to find out it

19 is.

20          THE COURT:  That's a motion before Judge Chesney.

21          MS. DORAN:  Yeah.

22          MR. ROSENTHAL:  Yes.

23          THE COURT:  Let me ask -- because there was

24 another letter that I haven't read that was filed Tuesday.

25          MR. ROSENTHAL:  That was on Reeber, and I think we

125

1  discussed Reeber.

2          MS. DORAN:  Yeah.  Suzanne Reeber is the editor

3  that was moved to Maryland in the summer of 2016.

4          THE COURT:  That's the jurisdictional issue?

5          MR. BURKE:  Correct.

6          THE COURT:  Right.  So --

7          MR. ROSENTHAL:  Well, it's also --

8          MS. DORAN:  It's also the I-Team issue, but we --

9  we have talked about the I-Team issue.

10          THE COURT:  Yeah.  Okay.  All right.  So that's

11  taken care of.

12          MS. DORAN:  So, Sam, do you agree that we've

13  talked about that issue?

14          MR. ROSENTHAL:  You're going to get me documents

15  and now you can search for I-Team.

16          THE COURT:  He's being facetious.

17          MR. ROSENTHAL:  I thought that's what she said,

18  that she reconfigured her --

19          MS. DORAN:  I said we --

20          THE COURT:  Oh, for I-Team.  You --

21          MS. DORAN:  Yes.

22          THE COURT:  -- are searching for I-Team.

23          MR. ROSENTHAL:  Yes.

24          THE COURT:  That is true.

25          MR. ROSENTHAL:  Yes.

126

1        THE COURT:  Okay.  When you said getting

2  documents, I was thinking about --

3        MR. ROSENTHAL:  No, she said that -- she told me

4  -- and thank you for doing that -- that there are a lot more

5  documents they've located.  They're going through them, and

6  they're going to make another production if there are any

7  responsive.

8        MS. DORAN:  And we're talking about Reeber right

9  now, right?

10        MR. ROSENTHAL:  Yes.

11        MS. DORAN:  Yeah.  We're going to -- we have

12  reconfigured the software to search for the I-Team

13  specifically.

14        THE COURT:  Okay.

15        MR. ROSENTHAL:  And just one last question.  If

16  they could just give us some indication of when they

17  anticipate discovery will be concluded, document discovery,

18  because it involves trying to coordinate the Hague

19  Convention and other things.

20        THE COURT:  I want to have another call with the

21  parties, and I want you to tell me how much you've produced

22  and how --

23        MS. DORAN:  Sure.

24        THE COURT:  -- be able to give me a better idea of

25  when --

1          MS. DORAN:  Yes.

2          THE COURT:  -- now that we have --

3          MS. DORAN:  Now that we have the scope set out.

4          THE COURT:  Yeah.  Yeah.  Write it on my calendar

5    here.  So today is the 9th.

6          MS. DORAN:  Today's the 9th.

7          THE COURT:  How about a call the week after

8    Thanksgiving?

9          MS. DORAN:  That sounds good.

10         THE COURT:  Ms. Means will tell me when.

11         THE CLERK:  We can do Tuesday, November 27th, how

12   about at 11:00?

13         MR. ROSENTHAL:  Okay.  That would work for us

14   fine.

15         THE COURT:  All right.  Just the status.

16         MR. ROSENTHAL:  Yeah.

17         THE COURT:  Discovery status.

18         MR. ROSENTHAL:  Yeah.

19         THE COURT:  I'm happy to keep scheduling them to

20   help.

21         MS. DORAN:  The only caveat is that I have a

22   telephonic status conference in a different case.  Does that

23   work for you too?

24         MR. BURKE:  I'm gone on the 27th.

25         MS. DORAN:  Okay.  Not going to work.

128

1          THE CLERK:  How about Monday?  How about Monday,
2 the 26th?

3          THE COURT:  It's the Monday after Thanksgiving.
4 So later in the week.

5          MS. DORAN:  Are you gone that whole week?

6          MR. BURKE:  No.  I'm back later that week.

7          MS. DORAN:  So --

8          THE COURT:  How about Friday, the -- we can do
9 Friday, the 30th.

10          THE CLERK:  No, no.

11          THE COURT:  At all?

12          THE CLERK:  Well, you have Ivory coming in at
13 8:30.

14          THE COURT:  Right, right.

15          THE CLERK:  So we do -- we can do -- what time is
16 your -- oh, he's not available?

17          MR. BURKE:  I'm gone the 26th and the 27th.

18          THE COURT:  Let's look at Thursday.

19          THE CLERK:  How about -- how long would it be?

20          THE COURT:  Thirty-minutes.

21          THE CLERK:  Okay.  How about --

22          THE COURT:  Being optimistic.

23          THE CLERK:  -- 8:30?

24          MS. DORAN:  I'm sorry.  What time?

25          THE CLERK:  8:30 on Wednesday, the 28th.

1          MR. ROSENTHAL:  That's fine.

2          THE COURT:  Because I have another call at 9:00.

3  So it will have to be 30 minutes.

4          MR. ROSENTHAL:  8:30, Thursday?

5          THE COURT:  Ms. Means did that.

6          MR. ROSENTHAL:  On Wednesday, Wednesday, November

7  28th?

8          THE COURT:  Yeah.  We'll do a docket entry.

9          MR. ROSENTHAL:  Okay.

10          THE CLERK:  And I'll send you the number by email.

11          MS. DORAN:  Great.

12          THE CLERK:  Okay.

13          THE COURT:  Now, I said -- so what I said is I'm

14  going to go look at that privilege waiver issue and write

15  something out.  I'm not going to write anything else.  You

16  can get a transcript.

17          MS. DORAN:  Okay.

18          THE COURT:  That way you'll have guidance here,

19  and then I'm going to talk to you again on the 28th at 8:30,

20  and we'll continue to schedule these things --

21          MS. DORAN:  Okay.

22          THE COURT:  -- as needed be to help guide the

23  discovery.

24          MS. DORAN:  So -- just so I understand, the scope

25  is -- you know, as in the transcript, it's sort of the very

130

1  specific things that we went through?

2          THE COURT:  Well, it's the -- the 11 things that

3  you identified that you are producing.

4          MS. DORAN:  Yes, yes.

5          THE COURT:  And then, in addition, the other

6  things that we --

7          MS. DORAN:  Okay.

8          THE COURT:  -- discussed, like all the emails,

9  notes, et cetera, about the 15 --

10         MS. DORAN:  Right.

11         THE COURT:  -- declarants.

12         MR. ROSENTHAL:  And to order the transcript, we --

13         THE CLERK:  Yes, you can order it online.

14         MR. ROSENTHAL:  Thank you.

15         MS. DORAN:  There were two -- so one -- there were

16  two motions that were filed this week.  One was our motion

17  to file the Noguera and Smith declarations.

18         THE COURT:  Right.  Then as to the bribery,

19  whatever, wasn't that all just sort of taken care of?

20         MS. DORAN:  Well, I guess the question is are

21  those -- is the Court going to allow us to file those, and

22  then the second motion that's pending is the motion in

23  limine which I understand is something that's before Judge

24  Chesney, not --

25         THE COURT:  Right.

1          MS. DORAN:  -- before you.

2          THE COURT:  Right.

3          MR. ROSENTHAL:  We'll make it easy.  If you do

4  correct us and we're wrong, we'll withdraw the motion on the

5  Hague Convention.  So that one will take care of itself.

6      With respect to the two declarations, we are planning

7  on filing our objections.  They filed objections to the

8  declarations, and I think you ought to wait on that until we

9  can give you our objections.

10      Is there anything pending as to those?

11          MS. DORAN:  Well, there is a pending motion to --

12  to supplement the -- the letters on discovery with the

13  Noguera and Smith declarations which you say you -- which

14  you said was not okay unless we produced all documents,

15  particularly concerning theory, but now you say it's just

16  documents concerning theory.  So I don't -- I don't actually

17  know, but it seems to me that you filed declarations in

18  support of your letter, and we were just responding to --

19          THE COURT:  But it seems to me I sort of just

20  resolved the whole issue is that you were going to go back

21  and ask your clients if there -- you've made the

22  representation that you're producing all payments, right?

23          MS. DORAN:  I'm just trying to figure out if these

24  are going to be part of the -- I mean, if these are --

25          MR. ROSENTHAL:  We'll give them our objections,

1  but if --

2       MS. DORAN:  Okay.

3       MR. ROSENTHAL:  -- nothing -- there's no urgency.

4       THE COURT:  Why?  I mean, why are you guys just --

5  I'm just wondering why.  It's like creating work, unless --

6  and it's fair enough -- if you think you're going to appeal

7  to Judge Chesney, then you want to make your record.  Then I

8  would just say file it.

9       MR. ROSENTHAL:  I assumed we would file our

10 objections to those declarations in due course.  I wasn't

11 planning on doing anything until it came time for this SLAPP

12 motion.

13      THE COURT:  Oh, until the -- oh, these

14 declarations -- no, these are declarations submitted for the

15 discovery briefs.

16      MR. BURKE:  Correct.

17      MS. DORAN:  Correct.

18      MR. ROSENTHAL:  I'm not sure what -- what the

19 relevance is in terms of the discovery dispute that we have.

20      MS. DORAN:  Well, I didn't think --

21      THE COURT:  That's what I'm saying --

22      MS. DORAN:  I didn't think your -- the Peary

23 declaration was relevant, and yet the --

24      THE COURT:  Right.  So just put yours on the

25 record, but I think they're both irrelevant or they're moot

1  now because we've resolved the issue.

2          MS. DORAN:  Okay.

3          MR. ROSENTHAL:  And we'll file objections in due

4  course.

5          THE COURT:  Whatever.

6          MR. ROSENTHAL:  Yeah.

7          THE COURT:  I mean, because it doesn't -- if you

8  want.  That's also -- I'm not considering them.  They're not

9  -- they're not for the SLAPP motion.  They were just for the

10  discovery motions.

11          MR. ROSENTHAL:  Okay.  In that case, if they're

12  moot, I won't file objections.

13          THE COURT:  Right.  They're moot.  But --

14          MR. ROSENTHAL:  Is that right?

15          THE COURT:  So they'll just be allowed --

16          MS. DORAN:  And they're in the -- I mean, from our

17  perspective, they're in the record on the discovery stuff.

18          THE COURT:  Right.

19          MS. DORAN:  And if we intend -- if you intend to

20  use the Peary declaration in opposition to the SLAPP motion,

21  you will likely see these declarations again in reply.

22          THE COURT:  But then they'll be submitted in the

23  SLAPP and you'll have another opportunity --

24          MS. DORAN:  We're not going to tell you you've

25  waive your objections.  No.

1          THE COURT:  Right.  You will not have waived your

2  objections.

3          MR. ROSENTHAL:  That too is fine with me.  Thank

4  you.

5          THE COURT:  Perfect.  Okay.

6          MS. DORAN:  Thank you, your Honor.

7          MR. ROSENTHAL:  Thank you, your Honor, for your

8  indulgence.

9      (Proceedings concluded at 3:41 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

135

<u>CERTIFICATE OF TRANSCRIBER</u>

1

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16            Echo Reporting, Inc., Transcriber

17            Wednesday, November 14, 2018

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*