1             UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable Jacqueline S. Corley, Magistrate Judge

4

5   PLANET AID, INC., et al.,      )
                                   )
6            Plaintiffs,           )
                                   )
7   vs.                            )   No. C 17-03695-SVK
                                   )
8   REVEAL, CENTER FOR             )
    INVESTIGATIVE REPORTING,       )
9   et al.,                        )
                                   )
10           Defendants            )
    _____)

11
                                   San Francisco, California
12                                 Thursday, November 21, 2019

13
     TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
14       RECORDING 9:01 - 9:05 and 1:39 - 2:22 = 47 MINUTES

15

16  APPEARANCES:

17  For Plaintiffs:
                               Nelson, Mullins, Riley &
18                               Scarborough, LLP
                               101 Constitution Avenue NW
19                             Suite900
                               Washington, D.C. 20001
20                        BY:  SAMUEL ROSENTHAL, ESQ.

21  For Defendants:
                               Covington & Burling, LLP
22                             415 Mission Street, Suite 5400
                               San Francisco, California
23                               94105
                          BY:  ALEXA R. HANSEN, ESQ.
24                             ETHAN C. FORREST, ESQ.

25              (APPEARANCES CONTINUED ON NEXT PAGE)

2

APPEARANCES:   (Cont'd.)

For Defendants:
                          Davis, Wright, Tremaine, LLP
                          505 Montgomery Street
                          Suite 800
                          San Francisco, California
                            94111
                     BY:  THOMAS R. BURKE, ESQ.

Transcribed by:           Echo Reporting, Inc.
                          Contracted Court Reporter/
                          Transcriber
                          echoreporting@yahoo.com

3

1  <u>Thursday, November 21, 2019</u>                          <u>9:01 a.m.</u>

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4            THE CLERK:  Calling Civil Action C 17-3695, Planet

5  Aid, Inc. versus Reveal.

6            THE COURT:  Okay.  Let's make appearances.

7            MR. ROSENTHAL:  Good morning.  Sam Rosenthal from

8  Nelson Mullins representing the Plaintiffs.

9            THE COURT:  Good morning.

10           MR. FORREST:  Ethan Forrest, Covington and

11 Burling, for the Defendants.

12           THE COURT:  With some colleagues?

13           MR. FORREST:  Yes, your Honor.  Tom Burke from

14 Davis Wright Tremaine.

15           MR. BURKE:  Good morning, your Honor.

16           THE COURT:  Good morning, Mr. Burke.  Nice to see

17 you again.

18           MR. FORREST:  And Alexa Hansen also from Covington

19 and Burling.

20           THE COURT:  Good morning.

21           MS. HANSEN:  Good morning, your Honor.

22           THE COURT:  All right.  So my first question,

23 because it wasn't clear to me, so the parties have dates for

24 Mr. Smith and Ms. Walters?

25           MR. ROSENTHAL:  We do, your Honor.

4

1          THE COURT:  Okay.  Great.

2          MR. ROSENTHAL:  I might as well put them on the

3  record.  December 11th and 12th in San Francisco for Mr.

4  Smith and December 30th in D.C. for Ms. Walters.

5          THE COURT:  Somebody wants to spend New Year's Eve

6  in D.C.  Okay.

7      All right.  And the stipulation is worked out?

8          MR. ROSENTHAL:  It is not, your Honor.  We had --

9  initially we had done what I thought your Honor had

10  suggested.  We sent in a -- a proposed second amended

11  complaint that had about 20 pages taken out.  I think Mr.

12  Forrest said that's pretty much what we thought, but we

13  would now ask for costs.  So we scrapped that stipulation.

14  We then sent another stipulation and had a series of

15  conversations.

16      Finally, we sent him a proposed stipulation.  He sent

17  me a note that said he didn't -- he never received it, but I

18  do have emails transmitting it and him thanking me for

19  transmitting it.  I think he objects to it, and I'll leave

20  it to him to say why it's inadequate.

21          THE COURT:  Well, what was submitted and actually

22  was filed on the docket is missing the second page that has

23  all the substance.  In any event -- and I didn't get

24  anything from you.

25          MR. FORREST:  That's right, your Honor.  We had

5

1   worked to negotiate what would be a stipulation.  Our

2   position was that it didn't make very much sense for it to

3   be a joint stipulation because we can't really stipulate to

4   what the Plaintiffs mean in their own complaint.

5           THE COURT:  Okay.  Whatever.  This will be number

6   one on your agenda upstairs.  All right.

7           MR. FORREST:  Okay.  Yes, your Honor.

8           THE COURT:  That's not the way it was supposed to

9   be today, but that will be number one on your agenda

10  upstairs.  All right.

11          MR. ROSENTHAL:  Your Honor, may I hand up a full

12  copy of --

13          THE COURT:  No.  You can do that when we come

14  back.

15          MR. ROSENTHAL:  Okay.

16          THE COURT:  Okay.  Because I'm not -- I'm not

17  going to deal with it, because you guys are going to go meet

18  in person for a while.

19      All right.  And then you have your discovery request

20  back and forth.

21          MR. ROSENTHAL:  Yes.

22          THE COURT:  So what you need to do is you'll go to

23  the 18th floor to the attorney lounge.  You're now all in

24  one room in one place.  Start with the stipulation or in

25  whatever form it -- it's your issue.  The only reason I did

6

 1  it is because you were claiming that you weren't comfortable
 2  that what was being represented on the record was the case.
 3  So just figure it out.  Just figure it out, all right.  And
 4  then you're going to meet and confer in person on these
 5  discovery requests very precisely, right.  Don't talk about
 6  this is what the document request says.  This is what I
 7  want, how I think you can get it, and why it's not so
 8  burdensome, and none of it should be all, right?  All
 9  documents, that's not -- we're like very specific.
10       When you are done and you have something to put on the
11  record or you've reached impasse on everything else -- so I
12  expect it will be a few hours -- you can contact Ms. Means,
13  and then I'll see you again.  I'm essentially on the bench
14  all day today until 2:30.  There will be a break for lunch,
15  but -- so I'm here, but I'm not available after 3:00.  So,
16  in any event, no later than 2:30.
17       MR. FORREST:  Sounds good, your Honor.  We'll take
18  any remaining disputes upstairs, and anything we can't
19  resolve, we'll bring back down for your --
20       THE COURT:  Okay.  And then if you want to then --
21  what you can resolve, we can put it on the record at that
22  time as well.
23       MR. FORREST:  Perfect.  Thank you.
24       MR. ROSENTHAL:  Thank you, your Honor.
25       THE COURT:  All right.  Thank you.

7

1      (Portion recessed while the Court heard other matters.)

2           THE CLERK:  Recalling Civil Action C 17-3695,

3  Planet Aid versus Reveal.

4           THE COURT:  What's the good word?

5           MR. ROSENTHAL:  The good word is, your Honor, the

6  exercise upstairs did produce some agreement.  I'll wait

7  until Mr. Forrest is at the table.  Unfortunately, there are

8  some issues left to resolve.  I think what we agreed to

9  start with was the good news, and that is on the

10  stipulation, the changes that we would make to the one

11  -- and I apologize.  Page two evidently was left off the one

12  that was filed.  On page two, the first paragraph would

13  remain as is, the first whereas clause.

14      The second whereas clause, we would simply insert one

15  word on line 11, and that is "allegedly" in front of "false

16  and defamatory."

17      The next whereas clause, number three, the third one,

18  we would change to read "The parties dispute the scope of

19  the FAC as pled, and offer this stipulation in order to

20  resolve that issue."

21      The next whereas clause would stay the same.  The first

22  stipulated and agree clause would -- the first two lines

23  would read, "Stipulated and agreed that Plaintiffs take the

24  position that the allegations in the FAC relating to false

25  and defamatory" -- oh, I'm sorry -- "take the position that

8

1  the focus of the FAC is on the involvement of Planet Aid

2  and/or Lisbeth Thomsen and the USDA programs," and then

3  continue on with what we have.

4       The next and the last paragraph on that page, we would

5  change the last two lines to read "Donors or organizations,

6  who withdrew support or declined additional programs or

7  opportunities, or impacted their dealings with either

8  Plaintiff, as alleged in the FAC."

9            THE COURT:  Okay.  You --

10            MR. ROSENTHAL:  And then --

11            THE COURT:  Oh.

12            MR. ROSENTHAL:  Oh, and then the last change would

13  be to the last paragraph of the stipulation on page three,

14  line four.  We would specify the phrase in parentheses "as

15  specified in the FAC" after the first two words "Dat

16  Malawi," and we would strike "and Defendant's statements in

17  the publications referring to Ms. Thompson."

18       Otherwise, it would be a joint stipulation.

19            THE COURT:  All right.  In agreement?

20            MR. ROSENTHAL:  Yes, your Honor.

21            THE COURT:  All right.  And when will the parties

22  filed that by?  Monday?

23            MR. ROSENTHAL:  Oh, sure.

24            THE COURT:  Yeah.

25            MR. ROSENTHAL:  Monday at the latest I think, your

9

1    Honor.

2          THE COURT:  By Monday at the latest, but we have

3    it now on the record because we are recording.

4          MR. ROSENTHAL:  Yes.

5          THE COURT:  Okay.

6          MR. ROSENTHAL:  So then we have the bad news, and

7    that is we do have some agreements, but what I think might

8    make sense would be to go through the paragraphs in the

9    order in our letter rather than the ones as to which there

10   is agreement, because I think it might just be easier for

11   your Honor to follow if we're looking at the letter, and we

12   did start with Plaintiffs' requests.  We can start with

13   either Plaintiffs' or Defendants' as your Honor --

14         THE COURT:  Let's start with Plaintiffs'.

15         MR. ROSENTHAL:  Okay.  So as to the first one --

16   Mr. Forrest will correct me if I'm wrong, but what we had

17   agreed -- and it's rather long.  So I'll -- I'll read it --

18   as to the first request (a):

19                  "No interview memos, notes, or

20              other documents exist relating to Mary

21              Bacosi (phonetic) that they are

22              withholding or redacting."

23       And this will be statements by the Defendants.

24       Next:

25                  "As to villagers in Malawi visited

10

1      by Defendants and/or Kandani Nawira

2      (phonetic), Defendants have no documents

3      that have been withheld.  To the extent

4      that other documents exist or Defendants

5      learn about additional documents

6      relating to such villages or visits,

7      Defendants will produce such materials

8      subject to any privilege."

9   The next paragraph would be:

10      "To the extent that anything was

11      gathered, generated, or relied upon

12      relating to communications with the

13      USDA, Defendants will produce it.

14      Defendants have no information that

15      there was any such communications which

16      has not been produced."

17   And the final paragraph as to (a) would be:

18      "To the extent that there might

19      exist any statements that contradict or

20      undermine Defendants' statements alleged

21      to be false or defamatory in the FAC,

22      Defendants have produced all such

23      material."

24   And I think that is an agreement that would resolve our

25 first category.

11

1          MR. FORREST:  That's accurate.  I would just add

2  that we, of course, object to the Plaintiffs'

3  characterization of certain materials as undermining or

4  contradicting our reporting.  But, otherwise, that's

5  accurate as stated.

6          MR. ROSENTHAL:  But if they have something that

7  says, you know, we --

8          THE COURT:  Yeah.

9          MR. FORREST:  Correct.  We are not aware of any

10 other documents that we've not produced on this topic.  If

11 we find them, we will notify counsel, and we'll produce them

12 promptly.

13         THE COURT:  Okay.

14         MR. ROSENTHAL:  As to (b), this refers to a

15 statement by Matt Smith that we have "the files from inside

16 computers of Planet Aid and have been looking at every last

17 document again and again, and there's no smoking gun as to

18 what they're doing with the money."

19     We have asked them to give us information or documents

20 that would indicate what is he talking about.  Is he talking

21 about having copied the hard drive?  Is he talking about a

22 few pages?  Is he talking about file drawers, banker's

23 boxes?  We can't get any information whatsoever.  This is

24 relevant for two reasons --

25         THE COURT:  Did you depose him?

1          MR. ROSENTHAL:  Yes, and we are, your Honor.

2          THE COURT:  You're going to depose him?

3          MR. ROSENTHAL:  Absolutely, we're going to.

4          THE COURT:  Well, ask him.

5          MR. ROSENTHAL:  And, your Honor --

6          MR. FORREST:  That's our position, your Honor.

7          MR. ROSENTHAL:  -- that will come as no surprise

8  when we do, but if there are documents, for example, that

9  actually reflect, hey, we just got a copy of the hard drive

10 from Planet Aid's computers --

11         THE COURT:  Yeah.

12         MR. ROSENTHAL:  -- it makes it easy to show it to

13 him and say, "Well, Mr. Smith, didn't you get the" --

14         THE COURT:  Well --

15         MR. ROSENTHAL:  -- hard drive from Planet Aid's

16 computer?"

17         THE COURT:  -- if there are those documents, they

18 should have already produced them, right?

19         MR. FORREST:  That's right.

20         THE COURT:  They're saying there aren't.  So if it

21 turns out when Mr. Smith testifies that there are, then

22 you'll get them, and then you can retake his deposition.

23         MR. ROSENTHAL:  There's a difference, your Honor,

24 between documents that were in the computer and documents

25 describing what they got from their computer.  Let me give

13

1   you an example.  Suppose they may have a document from Marie

2   Lichtenberg that says, "We have a wonderful program.  We

3   expect to do many more programs like this," and they produce

4   that document.  That doesn't tell us that they actually got

5   a terabyte of documents --

6           THE COURT:  No.

7           MR. ROSENTHAL:  -- relating to all sorts of

8   things.

9           THE COURT:  Mr. Smith will tell you what he was --

10  what he meant.  He'll tell you.  I think you're -- we're

11  just --

12          MR. ROSENTHAL:  The only -- the only thing I'd

13  like is if they would give any documents that describe the

14  quantity of material, I can show it to him, and that way,

15  rather than him say, "Well, I'm really not sure how many" --

16  and he's also indicated through counsel he intends to say

17  it's confidential.  He really can't tell us anything about

18  the quantity of documents he got.

19     We understand from counsel they can't tell us, for

20  example, did he get a -- did he get the whole hard drive.

21  That has two areas where it's relevant.

22          THE COURT:  Okay.  Wait.  Wait.

23          MR. FORREST:  Your Honor, references to the files

24  obtained have been produced to the extent they weren't

25  communications with confidential sources.  Counsel has

14

1  quoted from one such document.  What we have said as

2  attorneys is we do not feel at liberty to describe how our

3  client obtained certain things to the extent that it would

4  disclose confidential sources.  So what we have suggested to

5  counsel, as your Honor just said, is that they're free to

6  ask our clients about this and what was relied upon, but I

7  as a lawyer do not feel at liberty to divulge information

8  that could disclose a confidential source that our clients

9  used.

10          MR. ROSENTHAL:  And, just to be clear, we're not

11  asking them to tell us who gave it to you.  We just want to

12  know did you actually get the hard drive, because it sounds

13  like they did.  Did you get terabytes of material?  It

14  sounds like they did.  It has two areas where it's relevant.

15  One, when he says "We couldn't find a smoking gun," it shows

16  you couldn't find one because you didn't --

17          THE COURT:  In the terabytes of --

18          MR. ROSENTHAL:  Yeah.

19          THE COURT:  -- that you got.

20          MR. ROSENTHAL:  Because it didn't exist.

21          THE COURT:  Okay.  But you can ask them.

22          MR. ROSENTHAL:  Well, I really can't, because I

23  think what I'm going to hear is he won't tell me because

24  that too would reveal a confidential source.  That --

25          THE COURT:  How much information was -- is --

1          MR. ROSENTHAL:  Yes.

2          THE COURT:  -- that true?

3          MR. FORREST:  I don't know where this terabyte

4   figure or whole hard drive figure is coming from, your

5   Honor.

6          THE COURT:  That's okay.  I think it's just -- I

7   don't -- I think we -- just you have to depose him, and

8   we'll see where we're at.

9          MR. ROSENTHAL:  As long as, your Honor, I can come

10  back to you if he won't answer the question.  If he will,

11  I'm satisfied.

12         THE COURT:  With any deposition, if there's people

13  who won't answer and there's a good faith dispute as to

14  whether they should be required to answer, then, of course,

15  you can bring it back to me.

16         MR. ROSENTHAL:  On -- on (c), Defendants are

17  willing to represent they have produced all responsive

18  documents, and if any come to light, they will produce them,

19  which I think resolves (c).

20         THE COURT:  All right.

21         MR. ROSENTHAL:  On (d), also good news.

22  Communications with a confidential source, Defendants say

23  they have no responsive documents, but if any exist in their

24  possession, custody, or control, they will produce them as

25  well.  That too is something where I will ask Mr. Smith --

16

there is a particular document where there's a reference to
a confidential source and the False Claims Act.  And so I do
intend to ask him what was it that the confidential source
was going to do to confirm that one of the witnesses was
basically compelled to cooperate with him because of the
False Claims Act.  I gather from Mr. Forrest he's not likely
to answer that question.

THE COURT:  Well, we'll have to address it at the
time.

MR. FORREST:  I think that's right, your Honor.
We're not going to divulge a source's identity to the extent
it's maintained confidentially, but counsel is free to ask
the question that he just summarized and whatever else might
be relevant.

THE COURT:  Okay.

MR. ROSENTHAL:  And -- and I -- it's really the
substance of the communication with the confidential source,
not his name.

THE COURT:  Yeah, they -- you're -- I think you're
both on the same page.  It's just a matter of how things are
going to be stated.

MR. ROSENTHAL:  Yeah.  When we come to (e), this
is one where we're at an impasse.  There is a very important
witness called Harrison Longway (phonetic).  He was a former
employee of Planet Aid, and he filed a very very lengthy

17

1   declaration.  They filed not just his declaration but a

2   declaration from an individual named Noweza Nkata

3   (phonetic), who is a lawyer, and his declaration went

4   through the discussion of how he came to get Mr. Longway to

5   sign the declaration, how careful he was, how he read it to

6   him, how they made changes.  We didn't put that in issue.

7   We didn't open the door.  They did, having asked the Court

8   to consider -- and, your Honor, if it would be of

9   assistance, I have the declaration here.

10          MR. FORREST:  Do you have a copy for me?

11          MR. ROSENTHAL:  I do have a copy for you, yes.

12          THE COURT:  Okay.

13          MR. ROSENTHAL:  So this is someone who was

14  describing what he did and why the Court should pay special

15  credence to Mr. Longway's declaration.  All we want is not

16  Mr. Nkata's communications with Matt Smith or Amy Walters or

17  CIR or Mr. Forrest.  What we want is those communications

18  he's referring to --

19          THE COURT:  With Mr. Longway?

20          MR. ROSENTHAL:  -- with Mr. Longway, who is not

21  his client.

22          MR. FORREST:  Our view is that Mr. Nkata is an

23  attorney.  He's in Malawi.  What he's explaining in his

24  declaration are the relevant Malawian laws that would make

25  his assistance in providing this declaration reliable to a

18

1  court in the United States, and we believe that

2  communications about Mr Nkata's work with Mr. Longway in

3  preparing a declaration would be work product, and we also

4  don't really understand why what Plaintiffs seek is relevant

5  to this case in any way, considering that Mr. Longway has

6  put his own declaration into the record.

7          MR. ROSENTHAL:  And let me -- let me embellish the

8  record on Mr. Longway.  He has refused to accept service of

9  a subpoena, be deposed, or even communicate with Plaintiffs'

10  counsel.  So it's not a situation where we can ask Mr.

11  Longway.

12          THE COURT:  Well, then his declaration probably

13  won't be considered.

14          MR. ROSENTHAL:  I hope so, and that would also

15  resolve Mr. Nkata, and if your Honor --

16          MR. FORREST:  Judge Chesney resolved this issue

17  actually.

18          MR. ROSENTHAL:  She did not.

19          MR. FORREST:  Counsel moved to exclude the

20  declarations of certain witnesses that Plaintiffs have not

21  subpoenaed, and Judge Chesney instructed that the Plaintiffs

22  should address any prejudice that they feel arises from that

23  decision in our opposition to our anti-SLAPP motion.  So

24  it's a --

25          THE COURT:  So we'll -- we'll resolve it.

1        MR. FORREST:  To the extent they want to brief

2    this as something that affects their positions at the anti-

3    SLAPP posture, they can do so.  But I'd also note that as

4    far as we're aware, the Plaintiffs have not undertaken any

5    procedures in terms of letters rogatory to compel the

6    testimony of anyone overseas, and because Mr. Longway is a

7    non-party to this action, he's got no obligation to assist

8    Plaintiffs in their case in any event.

9        MR. ROSENTHAL:  So -- so let me address letters

10   rogatory.  We have asked --

11       THE COURT:  No.  What I want you to address is Mr.

12   Nkata.  What is it that you want, and why do you want it?  I

13   mean, why do we just -- like why do you need this paragraph

14   five?  That has nothing to do with if it's admissible.

15   That's trying to bolster the credibility of Mr. Longway's

16   declaration.

17       MR. ROSENTHAL:  That's the whole purpose of this.

18       THE COURT:  Yeah.  So --

19       MR. FORREST:  We think Mr. Longway's declaration

20   can stand on its own, but we don't really understand why

21   Plaintiffs are seeking the communications of a Malawian

22   attorney with a witness in the case.

23       THE COURT:  Well, then why do you have paragraph

24   five?  I mean, you can't have it both ways.  You can't have

25   it both ways, right?  You can't have -- you can't have

20

1  somebody say, oh, I -- you know, multiple days and hours

2  with them line by line, but, oh, you can't have any of my

3  communications with him.  That's not fair, right?  I mean,

4  so I guess I just don't get why that's there.

5            MR. FORREST:  I think we can look into whether any

6  such communications exist that we would have been Mr. Nkata

7  and Mr. Longway.

8            THE COURT:  Yeah, what is the communications said,

9  hey, let's meet at 2:00 or you weren't there and the

10 communications showed they actually were only together for

11 two hours?  Obviously that would be relevant and not

12 privileged.

13           MR. FORREST:  Yes.  Your Honor, we can look into

14 that.  I'm not certain that we would have the communications

15 that were only between Mr. Nkata and Mr. Longway, but to the

16 extent that we do or to the extent that we have other

17 documents that would be responsive on this point, we can

18 review them for --

19           THE COURT:  Yeah, I mean, you can look and see if

20 there's anything there.

21           MR. ROSENTHAL:  Well, your Honor, if --

22           THE COURT:  If they don't, then it will just

23 bolster your argument, if you can't get him and you can't

24 get Mr. Longway, that the Court shouldn't consider it.

25           MR. FORREST:  I absolutely hope so.  I will say

21

1   that it would be helpful if they were actually ordered to

2   produce the material because it does reflect that there were

3   changes to the declaration, and we think the changes in the

4   declaration probably go to the veracity of the declaration

5   that was ultimately filed, and there are things in the

6   declaration which I don't think any -- any lawyer could have

7   advised either a client or a witness to sign.  So I think --

8   I think, having opened the door, this is very helpful

9   information for us.

10          I agree that if they don't produce anything, it

11   will bolster our argument that Mr. Longway should not -- his

12   declaration shouldn't be admitted.  I agree with that.  It

13   will bolster it even more if they're ordered to produce this

14   material and they come back and say, well, it doesn't exist

15   or we don't have it or we can't comply.

16          THE COURT:  I mean, he did testify that Mr.

17   Longway made changes.  So why isn't that -- why don't they

18   get to see what those changes are?

19          MR. ROSENTHAL:  I think the question here is

20   partly logistical, because Mr. Nkata is a lawyer in Malawi

21   who was engaged to assist in this case.  I don't know that

22   we have any of his records that weren't already shared with

23   us.  So in terms of what we can produce, that comes down to

24   our looking at what we've got and determining (a) whether it

25   exists and (b) whether we can produce it.

1      THE COURT:  All right.  Well, you might want to

2 think about withdrawing some stuff there then.  I mean,

3 right?  That's just not fair to put that there and then

4 not --

5      MR. FORREST:  Okay.

6      MR. ROSENTHAL:  The next one is Tisha Thompson,

7 the NBC I-Team.  This came up in a different context.

8      THE COURT:  Are we still on (e) or are we on a

9 different --

10      MR. ROSENTHAL:  We've moved to (f).

11      THE COURT:  Okay.

12      MR. ROSENTHAL:  So we had previously addressed

13 Tisha Thompson of the NBC I-Team, and if your Honor recalls,

14 there was a program on NBC I-Team which was a -- a local off

15 shoot of NBC in the Washington, D.C. area in which they

16 actually had Matt Smith and Amy Walters who were doing part

17 of the story.  They were appearing on the program.  They

18 also co-authored an article that went along with it.  Both

19 the article and the program were part of our FAC, and

20 they're attached and made a part -- incorporated into it.

21     When this came up previously, your Honor asked us to

22 look at the NBC I-Team program and see is there anything

23 that was said on that program or anything about it that's

24 different than statements that were made in the first two

25 stories in March, and another story was on -- in May, just

1  before the NBC I-Team program.  This actually is very

2  qualitatively different, because what happened was both the

3  Defendants and Tisha Thompson personally went about and

4  tried to send out tweets and tried to send out material and

5  information to people asking them not to use Planet Aid

6  bins.  Tisha Thompson, in particular -- and this is attached

7  to our -- to our papers.  I think it's the last exhibit,

8  Exhibit M -- she actually writes to people and says "Do you

9  know of any bins?  Tell us where there are bins on

10 property."  Amy Walters writes to someone named Fox who said

11 "I just delivered a bag of clothing to a Planet Aid bin,"

12 and she writes back to him on Twitter and says, "Oh, but

13 have you seen our story?"

14      So we think there's a coordinated approach between

15 Tisha Thompson and the Defendants.  Not only do we think

16 it --

17           THE COURT:  Why?

18           MR. ROSENTHAL:  Because Matt Smith said in an

19 email also attached to our papers "We're involved in a full-

20 blown collaboration with Tisha Thompson."  And so it's not

21 just a coincidence that you're in the very same time period.

22 That collaboration also extends to sending out

23 communications to individuals, "Don't use Planet Aid.  Let's

24 get their bins off property."  It's part of what Matt Smith

25 calls a full blown collaboration.  But it goes beyond that.

1      Other than Matt Smith and Amy Walters, there's only one

2   individual who appears on the NBC I-Team program.  And her

3   name is Meredith Crocker.  She's the only other source that

4   appears on the program, and what is she on the program to

5   say?  Tisha Thompson says to her, "What do you tell people

6   who are thinking about using Planet Aid bins?"  Meredith

7   Crocker says "I tell them not to do it."

8      Guess what?  Meredith Crocker was located by Matt

9   Smith, and according to a declaration that's been filed in

10  this case, which we cite in our papers, he was the one who

11  told Tisha Thompson about Meredith Crocker.  So Matt is

12  saying it's a full blown collaboration.  Meredith Crocker is

13  on there saying don't use Planet Aid, and she's found by

14  Matt Smith.  And guess what?  The -- the statements that are

15  going out to the public, "Don't use Planet Aid bins.  Stop

16  donating to their bins," is a coordinated approach.  They're

17  both doing it.  It can't be by coincidence.  And based on

18  Matt Smith's statement, it's not.  So we're entitled to the

19  documents between Tisha Thompson and the Defendants.

20          THE COURT:  Regarding Planet Aid?

21          MR. ROSENTHAL:  Oh, yes, yes.

22          MR. FORREST:  Counsel just described what he's

23  already got on those points, and I think it's important to

24  make a distinction here to talk about any tweets from our

25  clients, for example, Amy Walters on the one hand and then

1 the story that NBC investigated and ran on the other, and

2 we're very concerned that this is basically an attempt to

3 obtain NBC's investigative reporting documents from us.  As

4 far as we're --

5          THE COURT:  Well, what about just communications

6 between Defendants and Tisha Thompson on the NBC team about

7 Planet Aid, right?  If there were -- for example, if there

8 was a communication -- I'm not saying there is, but if

9 there's a communication that said, you know, the -- the

10 evidence is slim, but they're a terrible thing, you know,

11 blah, blah, blah, right?  That would be relevant, you'd

12 agree?

13          MR. FORREST:  To be clear, your Honor, this NBC

14 I-Team matter came up after all of our reporting and

15 investigation was done.  We had already broadcast the radio

16 story.  The publications in writing were out.  This is

17 subsequent to all of that, and so it really does concern

18 what is a distinct investigation by NBC.  Granted, they

19 talked to Matt and Amy as part of that, but this is really

20 NBC work product that Plaintiffs are asking about and

21 seeking to obtain --

22          THE COURT:  No.

23          MR. FORREST:  -- from us.

24          THE COURT:  Well, not NBC's -- well, NBC if they

25 have an objection, I suppose they could come in.  But, I

26

1  mean, have you even looked for it?  Do you even know what

2  we're talking about?

3          MR. FORREST:  There are examples of our clients

4  sending along, you know, their stories and items that they

5  used in reporting their stories to NBC.

6          THE COURT:  The stories that they had already

7  published?

8          MR. FORREST:  The ones that were already out,

9  which are specifically the subject of the Plaintiffs'

10  defamation claims.

11          THE COURT:  All right.  Well, there's no problem

12  with disclosing that, right?

13          MR. FORREST:  I think not, your Honor, but my --

14  my question would be whether Plaintiffs are actually seeking

15  something else here.

16          THE COURT:  No, they -- well, certainly they would

17  hope there was something else, but -- but a lot of what they

18  seek doesn't bear fruit, but that doesn't mean it's not

19  relevant.

20      So I think I hear what you're saying maybe.  I'm not

21  sure, but I guess I'm still not sure why just

22  communications --

23          MR. FORREST:  Well, the -- the question that we

24  have is how this could possibly bear on the truth or falsity

25  or other actionability of our clients' statements which are

27

1 already published and had already been investigated.  To

2 that extent, it seems like it goes outside what the realm of

3 appropriate discovery for this action is, and --

4          THE COURT:  Well, what he -- he said was it goes

5 to malice.  Certainly you could say things after the fact

6 that would suggest on your state of mind at the time or what

7 about this "Don't use their bins"?  What if -- I mean, could

8 be an argument.  I don't know if it would be persuasive or

9 whatever that -- you know, the fact that Matt Smith was

10 encouraging Tisha Thompson for this campaign to not -- I

11 mean, it's discovery, right, not -- you know, I don't know

12 how persuasive it would be or not.  It could be.  It's

13 evidence.

14          MR. FORREST:  Well, my point, though, is that this

15 would be legally irrelevant to malice in this context

16 because malice and defamation has a specific meaning.  If

17 you publish something with malice, you published it knowing

18 that it was false or with reckless disregard as to its

19 falsity.  So statements made after the fact don't really

20 bear on that.

21          THE COURT:  Unless there's statements about what

22 your state of knowledge was at the time, right?  So

23 statements after the fact could be relevant, could be.  I

24 hear what you're saying, that malice -- just that they don't

25 like them.  That wouldn't -- that's not enough, but it would

28

1  have to be that at the time they knew the statements were

2  false.  But, as I said, what if there was a statement that

3  said this evidence is thin but we ran with it anyway?  I

4  doubt that's there.  But, again, I could see, you know --

5          MR. FORREST:  We're not aware of anything like

6  that, your Honor.  One of our other concerns here is how

7  these discovery requests are appearing to snowball at a kind

8  of late period.  We had asked Plaintiffs back in June and

9  again in October to outline exactly what they still needed

10 and what was essential and really heard nothing until --

11         THE COURT:  Well, that's why I did my order

12 because this is --

13         MR. FORREST:  It is, but the concern here is that

14 we're heading head long toward depositions in December, and

15 this sort of takes us back into going through documents and

16 producing them, and I just don't want to be in a situation

17 where we're trying to produce many documents -- I'm not sure

18 what might remain -- at the same time that we're preparing

19 for or defending depositions and then after the fact we've

20 got to go back because we weren't quite done with the

21 document production.  I think if Plaintiffs had brought this

22 up back in the summer when we asked, it might be a little

23 bit easier, but I just want to get a better handle on timing

24 at this point.

25         THE COURT:  Well, you'd only have to go back if

1  there was something really worth questioning him about, and

2  your belief is there's not.  So --

3          MR. FORREST:  That's right.

4          THE COURT:  Yeah.

5          MR. ROSENTHAL:  So, two points.  One is Mr.

6  Forrest misspoke.  I know it wasn't intentional.  He said it

7  was a distinct investigation.  They said in black and white

8  actually in the article it was a joint investigation, Planet

9  Aid and -- about Planet Aid by the Defendants with Tisha

10 Thompson.  The second thing is it's not just going to

11 malice.  It's also going to tortious interference.  It's

12 exactly the gist of the tortious interference.

13     If you look, for example, at the very last document in

14 our submission, it's a guy who's writing.  He's so happy.

15 This is Mark Diteman (phonetic).  "I'm so impressed with the

16 store in Caitansville (phonetic).  Clean, well organized,

17 excellent service, great deals.  Thank you."  And Amy

18 Walters says "Check out our investigation."  That's tortious

19 interference because she's sending them an article that

20 contains all sorts of false and defamatory things for the

21 purpose of getting him to change his mind and don't go back

22 to that store.  Stay away from it.  They're bad news, Planet

23 Aid.

24     And if you look at the other ones that are attached --

25 and these were just a few samples -- these are around the

30

1  time that Tisha Thompson is doing the same thing.  She's

2  doing the same thing.  If you look at the very first exhibit

3  to Exhibit M --

4          THE COURT:  Well, what are you looking for?

5          MR. ROSENTHAL:  I'm looking for the collaboration

6  not just on let's put a program on TV but let's have a --

7          THE COURT:  Well, why the collaboration?  What

8  does that matter?

9          MR. ROSENTHAL:  Because we do allege there was a

10  conspiracy as to tortious interference, that they were

11  getting together with Tisha Thompson.  They were conspiring

12  with her to impact Planet Aid's business.

13          THE COURT:  Right.  But how is that really

14  relevant to the anti-SLAPP motion, because that's all based

15  on the Defendant's knowledge?  So that's what we're talking

16  about.

17          MR. ROSENTHAL:  It goes to tortious interference,

18  and they do say --

19          THE COURT:  But the -- the prerequisite to the

20  tortious interference is that they had to have known it was

21  false and defamatory.  That's what you said.

22          MR. ROSENTHAL:  Yes.

23          THE COURT:  Right.  So that's it.  So that's the

24  argument.  If it's -- if --

25          MR. ROSENTHAL:  They're going to defend on grounds

1   of malice.  Why is the reporter who is trying to educate the

2   public about USDA funding bothering with Mark Diteman who's

3   shopping at the Planet Aid Goodwill Store?

4           THE COURT:  Well, you -- there's two inferences, I

5   have to tell you.  You have your -- another inference is

6   because the reporter really believed in her reporting and

7   thought actually people really shouldn't be donating there.

8   That's an inference to be drawn too.  So --

9           MR. ROSENTHAL:  Let him argue that to the jury.

10          THE COURT:  Oh, I know.  What I'm saying -- but

11  what I'm saying is it's not -- like it's not so obvious what

12  you said at all.  In fact, you were saying it, and I was

13  thinking, oh, that seems to actually go more the other way.

14          MR. ROSENTHAL:  But if -- but if they get together

15  and they say, you know what, we have to drive these guys out

16  of business.  Let's not only write a series of articles, but

17  let's also have a Twitter campaign.  Let's use social media,

18  and there aren't documents --

19          MR. FORREST:  This is all speculation, your Honor.

20          MR. ROSENTHAL:  No, it's actually not.

21          THE COURT:  Well, even so, if -- if they believe

22  that what they're reporting was true, I don't think there

23  would be anything, you know --

24          MR. ROSENTHAL:  Your Honor --

25          THE COURT:  Right?  The prerequisite is they knew

32

1   it was false and defamatory.  So the question is, I think,

2   if there are things that are relevant to that, they should

3   have to produce.

4           MR. ROSENTHAL:  It would also go to whether they

5   acted -- whether they thought in a reckless way what they

6   were reporting wasn't sustainable.  It's not just knowledge

7   of falsity but also reckless disregard for the truth.

8           THE COURT:  Well, to their state of mind.

9           MR. ROSENTHAL:  And so this is really very good

10  evidence that they're going above and beyond what a jurist

11  should do.  Now, I understand your point.  An inference

12  could be, well, I really thought what they were doing was

13  true.  Good argument for the jury.  Let him do it.

14      Another inference is they were out to get Planet Aid.

15          THE COURT:  Why?

16          MR. ROSENTHAL:  Why?

17          THE COURT:  Yeah.

18          MR. ROSENTHAL:  I'll tell you why.  It's related

19  to the next point called the impact tracker.

20          MR. FORREST:  Hold on.  Before we move to the --

21          MR. ROSENTHAL:  No, I'm not -- I'm just using that

22  illustration in answering the Judge's question.

23          THE COURT:  I'm sorry.  I shouldn't have asked.

24  It was actually a rhetorical question.

25          MR. FORREST:  But it's a good question, your

1 Honor.  It's a very good question because one of -- one of
2 the things that they do is they track.  They pride
3 themselves on creating an impact, not just being able to
4 write good stories, not educating, but creating an impact,
5 and one of the impacts they would like to create is see
6 Planet Aid go under.
7           MR. FORREST:  This is further speculation.  I
8 think we've got to get back to what we're talking about
9 here, which is a discovery dispute.
10           MR. ROSENTHAL:  But, your Honor --
11           THE COURT:  I need you to be precise because we
12 are at the end.
13           MR. ROSENTHAL:  Okay.  Yes.
14           THE COURT:  Because discovery has been going on --
15           MR. ROSENTHAL:  Yes.
16           THE COURT:  -- forever.  Has Judge Chesney given
17 you any deadlines yet for the briefing?
18           MR. FORREST:  Not yet.  Plaintiffs represented
19 during our last hearing that discovery was basically done
20 except for the depositions.  I'm hoping that's actually the
21 case.
22           MR. ROSENTHAL:  It's -- that's in your hands, your
23 Honor.
24           THE COURT:  No, actually that's why I left you
25 guys together.  It's actually in your hands.

1         MR. ROSENTHAL:  But -- but we're -- we're looking

2   for documents that are very specific, and that is, we're not

3   looking for everything that Tisha Thompson thinks about

4   Planet Aid.  We're looking for the communications with the

5   Defendants about Planet Aid and the collaboration which Matt

6   Smith admitted in black and white and what was the extent of

7   it, because it isn't the role of a normal journalist to send

8   something to Mark Diteman and say "Don't shop at Planet Aid

9   stores."  That's not --

10        THE COURT:  So I think what you should do is look

11  and see what's there, right, and see what the -- and see

12  what's there, and then tell Mr. Rosenthal what you're

13  deciding to do.  If you think there's stuff there that's

14  just not relevant, dah, dah, dah, then you can like give it

15  to me to look at, and I can see, and if I say no, that's

16  not, then maybe that would give you some comfort as well.

17  You know, not all of it, right, but an example.  But I do

18  think some of it -- right, if they're communicating -- you

19  say they're not -- you haven't looked at them all -- from

20  Mr. Smith to Ms. Thompson could be relevant to the state of

21  mind at the time, right?  They're talking about the same

22  story.

23        MR. FORREST:  So, just so that we understand this

24  better, it sounds like what we can do is to go in and look

25  at any communications that might exist between Mr. Smith,

1 Ms. Walters, and Ms. Thompson that are discussing the actual

2 reliability or the facts underpinning the investigation that

3 was done.

4          MR. ROSENTHAL:  Your Honor, let me -- let me put

5 it in context.  There are other journalists that they worked

6 with, communicated with.  One of them was BBC.  They have

7 turned over documents involving communications between

8 themselves and BBC, a limited set, but they turned over

9 documents.  There was a Danish outfit that they also worked

10 with, actually did joint interviews.  They turned those

11 over.  Those are tremendously powerful because when they

12 speak to other journalists, they're more honest.  For

13 example, the Danish journalists --

14          THE COURT:  Okay.  What I want you to do is what

15 is the volume?  I want you to get --

16          MR. FORREST:  We'll get that first.

17          THE COURT:  I want you to tell Mr. Rosenthal, tell

18 him what you'll agree to produce.  If there's some things

19 you're not and you can't come to agreement, then set up a

20 phone call with Ms. Means and me, okay.

21          MR. FORREST:  And, Counsel, could -- if we get the

22 volume, can you give us some keywords that we might use to

23 make sure that we're in accord about what to look for?

24          MR. ROSENTHAL:  Sure.

25          THE COURT:  Thank you.

1          MR. ROSENTHAL:  Sure.  Happy to cooperate.  Impact

2  tracking, which is (g), they indicated that there is a

3  paralegal that they do have to talk to who's on vacation,

4  but I think the agreement was that if they are responsive

5  and not privileged, they will produce documents relating to

6  their impact tracking, but they will consult with a

7  paralegal.

8          THE COURT:  Okay.

9          MR. FORREST:  That's right.

10          MR. ROSENTHAL:  On (h), (h) is telephone records.

11  If your Honor recalls, there was an individual named Emanuel

12  Peery (phonetic), who's the individual who was an anonymous

13  source.  He filed a declaration saying he was offered

14  bribes.  Matt Smith filed a declaration in response saying,

15  "Oh, I telephoned him in February of 2016, and he told us

16  all these terrible things."  We've asked them to give us the

17  telephone records.  I think Mr. Forrest said he can't say

18  whether he would do that or not.  I don't know why they

19  wouldn't.

20          MR. FORREST:  That's not quite right.  I said I'm

21  not sure what exactly we have in the way of telephone

22  records from 2015.  If we've got them, we're happy to give

23  them to Plaintiffs.  Otherwise, this is -- whether or not we

24  produce those is perfectly fine to ask the witness about

25  phone calls that he had and when they happened and what the

37

1   content was.

2           MR. ROSENTHAL:  But --

3           THE COURT:  Right.  But are you saying you don't

4   have to request them from the phone company?

5           MR. FORREST:  I am not sure.  We discussed this

6   with counsel upstairs, and I believe the situation was we'll

7   address that if we come to it.  If we don't have the records

8   ourselves -- and I'm not sure whether we do either way --

9           THE COURT:  Most people don't, right?

10          MR. FORREST:  Right.

11          THE COURT:  I don't know the --

12          MR. FORREST:  But I don't think there's --

13          THE COURT:  -- last time I looked at a phone

14   record.

15          MR. FORREST:  I don't think there's any dispute,

16   though, that Mr. Smith spoke by phone with Mr. Peery.

17          MR. ROSENTHAL:  Well, there is -- there is

18   definitely a dispute.

19          THE COURT:  Okay.

20          MR. FORREST:  I don't think so.  You can ask him

21   about it, but --

22          THE COURT:  Well, Mr. Smith will say whatever he

23   says.  That doesn't mean that there's not a dispute, that

24   what he's saying is true, right?

25          MR. FORREST:  Right, but I think what we're just

38

1  talking about right now is -- is whether he walked on the
2  phone with someone, and I don't think that that particular
3  fact is disputed.

4          MR. ROSENTHAL:  It depends when he spoke.  The
5  chronology is, yes, they had a conversation in middle of
6  2015.  For whatever reason, Matt Smith never communicated
7  with him again he says until February of 2016 when all the
8  sudden Emanuel Peery opened up and told him about all this
9  growing corruption.  And so we want the proof, did he
10 actually have that conservation.

11         THE COURT:  In 2016?

12         MR. ROSENTHAL:  Yes, in February of 2016.

13         THE COURT:  That's all you're looking for?

14         MR. ROSENTHAL:  That's all we're looking for are
15 the telephone records that relate to --

16         THE COURT:  In February 2016?

17         MR. ROSENTHAL:  Correct.

18         THE COURT:  All right.  That's pretty narrow.

19         MR. FORREST:  Yes, your Honor, it is.

20         THE COURT:  Okay.  All right.

21         MR. ROSENTHAL:  And that does it for Plaintiffs'
22 requests.

23         THE COURT:  I must say you guys actually agreed
24 more than I thought you would.  So thank you.

25         MR. ROSENTHAL:  Well, we're now turning to the

39

1 Defendants' requests.

2          MR. FORREST:  Our requests are just in two

3 buckets, your Honor, and they're pretty simple.  The first

4 concerns whether Plaintiffs are limited purpose public

5 figures, for example.  Do they engage themselves in public

6 affairs and was there some preexisting controversy

7 concerning what they were doing publically before our story.

8 And so we discussed this at length upstairs, and we came to

9 a kind of narrowed subset of documents that we would

10 specifically request from the Plaintiffs, and I'll narrate

11 those here.

12      First is for Plaintiff Thompson, we would like

13 documents sufficient to show her public activities in her

14 professional capacity, for example, public appearances at

15 conferences in which she was there as a representative of

16 Dat Malawi and things of that nature.

17      Second would be documents related to the Plaintiffs'

18 responses to particular articles or other public statements

19 concerning Planet Aid or Dat Malawi's use of public funds.

20 For example, if a story was published before ours and they

21 have documents concerning what their public relations

22 strategy would be, what their government relations strategy

23 would be, we'd like those documents and anything else on

24 that topic.

25          Third, we would like documents sufficient to show

40

1  Planet Aid and Dat Malawi's lobbying expenditures.  We

2  already know from a limited set of public records we were

3  able to obtain that they spent about six figures on lobbying

4  with a firm in D.C.  We'd like to know what the extent of

5  that was, and that would include both registered and non-

6  registered lobbying activity.

7      Fourth would be documents that are related to Planet

8  Aid and Dat Malawi's public representations and preparations

9  for public facing activity regarding their use of public

10 funds, for example, planning materials related to meetings

11 with government officials if they're preparing to be able to

12 answer a tough question on whether they have misused funds

13 in the past, anything like that, talking points, post-mortem

14 discussions internally about how the meeting went, and other

15 items along those lines.

16     And, to be clear, on these points, we would be seeking

17 not just, for instance, press releases or other materials

18 that went public but also materials that are sufficient to

19 show how and to what degree Planet Aid and Dat Malawi worked

20 to engage with public affairs, which is one of the criteria

21 that the Ninth Circuit assesses in terms of deciding whether

22 a party is a limited purpose public figure.  And that's the

23 summary of the first bucket here.

24     MR. ROSENTHAL:  So, your Honor, first of all, on

25 the first -- on all five, one question is timing.  There's

1   -- there's a -- you know, a question about what time period

2   we're talking about.  It's got to be a preexisting public

3   controversy, and the point that we made in our letter brief

4   is it's very unclear what the public controversy is.  They

5   defined it only as a controversy over the -- over the use of

6   public funds for charitable purposes, and Planet Aid and

7   Lisbeth Thomsen in her individual and professional capacity

8   has been involved in charitable programs for a long long

9   time.  It would be incredibly burdensome.

10          I would suggest that, first of all, as to Lisbeth

11  Thomsen, if it was a reasonable period of time, for example,

12  if they talked about, you know, give us, you know,

13  everything she'd done in the four-year period prior to the

14  article's publication, it's got to be a preexisting public

15  controversy.  We would agree to that.  That would

16  be --

17          THE COURT:  All right.  They would agree to that

18  one.

19          MR. ROSENTHAL:  Okay.

20          MR. FORREST:  Well, what we -- what we need

21  specifically, that was -- that was actually Plaintiffs

22  narrowing what we had asked for.  So the preexisting public

23  controversy is one factor in the Ninth Circuit.

24          THE COURT:  So let me just cut through this then

25  and actually do this.

42

1            MR. FORREST:  Okay.

2            THE COURT:  Which is can you give me a case where

3  the Defendant moving -- filing the anti-SLAPP motion gets

4  discovery?  Because I couldn't find it because basically,

5  under Planned Parenthood, you do it like a summary judgment,

6  and normally Defendant can't put in new evidence on a reply,

7  which is essentially all you would be doing.  You filed --

8  this is not a summary -- if it is relevant, it's relevant,

9  and if you move to the next stage, you'll get it for summary

10 judgment, but this is an anti-SLAPP motion, which you then

11 would get your fees.  And the idea is that you have enough

12 and they don't to -- to file your motion, which you did,

13 based on them being -- so do you have a case?  Because I

14 looked.  I could not find anything.

15            MR. FORREST:  The analogous cases are in the Rule

16 56 category, your Honor, and they concern responding to

17 evidence raised in the opposition.

18            THE COURT:  Well, you haven't even seen their

19 opposition.

20            MR. FORREST:  That's true.  However --

21            THE COURT:  So that's premature then.

22            MR. FORREST:  Well --

23            THE COURT:  So but do you have an anti-SLAPP

24 motion?

25            MR. FORREST:  We do.

43

 1          THE COURT:  No, case.

 2          MR. FORREST:  I'm not aware of --

 3          THE COURT:  Yeah, me neither.  See, I just think

 4 it makes -- it just -- it doesn't make any sense because

 5 that's the whole thing with anti-SLAPP is you filed it.  I

 6 mean, this one is a factual attack.  So you use summary

 7 judgment standard.  That's for the judge.  And all the cases

 8 talk about the need to get the Plaintiff discovery to

 9 oppose.

10          MR. FORREST:  Which we have done for the last

11 year, your Honor.  And, for their credit, Plaintiffs agreed

12 to respond to our requests earlier this year and have

13 already provided some sliver of that, and so to -- to turn

14 that on a dime now seems kind of prejudicial to us.

15          THE COURT:  Well, whatever he agreed to upstairs,

16 I think he -- he agreed to it.  He should give it to you.

17          MR. FORREST:  Okay.

18          THE COURT:  But I'm not going to order any more

19 because I actually -- this is why we're cutting it.  You get

20 past this, of course, it's relevant, and the Plaintiffs are

21 going to have to produce a lot, no question about it.  And,

22 frankly, it will be more one way because you've already

23 produced everything, but -- right?

24          MR. FORREST:  Yes, your Honor.

25          THE COURT:  And they're going to have to do it.

44

1              MR. ROSENTHAL:  And thank you for making that

2   point.  I think it's absolutely right.  We --

3              THE COURT:  Don't -- don't thank me.

4              MR. ROSENTHAL:  Don't thank you yet.

5              THE COURT:  I don't -- I'm just trying to do my

6   job.  Don't thank me.  But -- and also I'm trying to bring

7   this motion to Judge -- get it to Judge Chesney.  It's

8   taking forever.

9              MR. ROSENTHAL:  We did look, and we didn't find a

10  case either.

11             THE COURT:  Either.  Okay.  So but whatever you

12  agreed to upstairs, to your credit, as Mr. Forrest said, you

13  must produce.

14             MR. ROSENTHAL:  Well, quite frankly, on the five

15  that he mentioned, we didn't have an agreement.  I'm happy

16  to --

17             THE COURT:  You said -- you just told me --

18             MR. ROSENTHAL:  On one --

19             THE COURT:  You said the pre -- for four years

20  preexisting for Ms. Thompson.

21             MR. ROSENTHAL:  I agree.  I agree I will produce

22  that.

23             THE COURT:  Okay.

24             MR. ROSENTHAL:  On the others we talked about

25  trying -- these were his put it wish list, and we talked

1   about trying to narrow it.  We did not agree.  I am willing

2   to work with him and try and get him some material, but I

3   think, your Honor, it's voluntary on our part, and we did

4   produce 10,000 pages that I think, quite frankly, went

5   beyond what we're required to do.

6            THE COURT:  Okay.  And you're right, if you see --

7   if you see something in the opposition, maybe.  I mean,

8   again, given that it's an anti-SLAPP motion and not a

9   summary judgment motion, maybe, and, you know, meet and

10  confer on that.  But whatever you agree to produce.

11           MR. ROSENTHAL:  We will do that, your Honor.

12           THE COURT:  Okay.  I think that kind of short

13  circuits a lot of it.

14           MR. ROSENTHAL:  Sure.  Thank you, your Honor.

15           THE COURT:  Okay.  All right.  I'm not going to

16  write anything.  I think we have a record, and I do

17  appreciate -- and so you have those depos scheduled.

18           MR. ROSENTHAL:  Yes.

19           THE COURT:  And when are you going back before

20  Judge Chesney?

21           MR. ROSENTHAL:  I don't think we have a date.

22           THE COURT:  All right.

23           MR. ROSENTHAL:  But we -- we would like to move

24  this along.

25           THE COURT:  Yeah.  Maybe you -- while you're here,

46

1  you should think about stipulating to a further briefing and

2  getting it before Judge Chesney, maybe.  Anyway, just a

3  suggestion.

4          MR. FORREST:  Thank you for your time, your Honor.

5          THE COURT:  All right.  Thank you.

6          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

7      (Proceedings adjourned at 2:22 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

<u>CERTIFICATE OF TRANSCRIBER</u>

     I certify that the foregoing is a true and correct
transcript, to the best of my ability, of the above pages of
the official electronic sound recording provided to me by
the U.S. District Court, Northern District of California, of
the proceedings taken on the date and time previously stated
in the above matter.

     I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this hearing was taken; and, further, that I am not
financially nor otherwise interested in the outcome of the
action.

                    Echo Reporting, Inc., Transcriber

                    Wednesday, November 27, 2019