

**NELSON MULLINS RILEY & SCARBOROUGH LLP**
ATTORNEYS AND COUNSELORS AT LAW

101 Constitution Avenue | NW Suite 900
Washington, District of Columbia
T 202.689.2800   F 202.689.2860
nelsonmullins.com

Samuel Rosenthal
T 202.689.2915
sam.rosenthal@nelsonmullins.com

February 10, 2020

***VIA E-FILING TO CM/ECF***
The Honorable Jacqueline Corley, United States Magistrate Judge
Courtroom F – 15th Floor, 450 Golden Gate Avenue
San Francisco, CA 94102

Re:   *Planet Aid, Inc. v. Center for Investigative Reporting*, Case No. 3:17-cv-03695

Dear Magistrate Judge Corley:

<u>**Plaintiffs' Position**</u>

We address herein Plaintiffs' request for documents and testimony regarding the False Claims Act ("FCA"). This issue is of critical importance to Plaintiffs; it implicates what amounted to "life-changing" financial incentives offered to sources if they would allege that there was fraud, waste or abuse in the USDA program, but also, what now appears from Defendant Smith's cryptic testimony to have been such incentives for Defendant CIR itself.

     **A.**    <u>**Reasons why the issue is being raised at this time.**</u>   Defendants argue that Plaintiffs are trying to raise a "brand new issue." *See infra.*[1] Defendants argue below that Plaintiffs have "no excuse . . . why they could not have asked for more general categories of documents or communications regarding the False Claims act at any point between 2016 and today." *See infra.* Plaintiff attempted to do exactly that through interrogatories and two prior hearings. Plaintiffs twice received assurances that the information would be forthcoming, or they could "come back" to the Court. It is flatly misleading to argue that Plaintiffs are raising a new issue because they came up empty. *See infra.*

     The issue of the FCA was first raised in November, 2018. At that time, Plaintiffs disclosed that one of the key sources was told he needed to "come on strong" in order to share in a

---

[1] Defendants argue that this letter is untimely. See *infra*. Defendants waited until Friday afternoon to send their response, and now complain that Plaintiffs should have filed their reply within the next several hours. They also neglect to mention that they themselves objected to filing since they demanded an opportunity to see the entire letter before it was filed, and make revisions to their own section. Finally, no mention is made of the fact that filing the letter was further delayed after, as a courtesy, Plaintiffs acquiesced in Defendants' request to revise their portion of the letter over a two day period, on Monday and Tuesday, even though this Court has expressly ruled that no sur-replies are permitted. Defendants' request for a hearing is designed to delay resolution until after the upcoming depositions.

SF: 319994-8

Page 2

whistleblower recovery under the FCA. Contrary to Defendants' arguments below, the Court rejected any argument that the information was irrelevant. The Court noted "[t]here's an argument to be made [by Plaintiffs that] if you're a reporter why you have any business whatsoever telling anyone about an affirmative lawsuit that they can bring." H. Tr. 11/9/18, at 98:16-18. The Court did not order production of documents specifically directed to the FCA based on its finding that such relief was unnecessary because "with respect to the declarants, you're getting anything that [Defendants] have." *Id.*, at 101:9-10. Defendants do not even mention below this colloquy, including the Court's clear direction that Plaintiffs were to receive "anything that [Defendants] have" regarding fifteen key sources discussed at the hearing, which included anything relating to the FCA. Defendants have repeatedly refused to confirm that all documents regarding those key sources have been produced. See Rosenthal Decl., Ex. F.

Defendants also distort the record when this issue again arose in response to the Court's direction in November, 2019. Contrary to the representation below, Plaintiffs hardly stated that the issue was closed. More specifically, Plaintiffs raised their request for documents relating to a specific email in which Smith and Ngwira discussed how a crucial source, Chiku Malabwe, had been motivated by the FCA to cooperate with Defendants, and more specifically, the role of a confidential source in those efforts. Defense counsel acknowledged that Smith would not answer any such questions, see H.Tr. 11/21/19 at 16:8-9. The Court responded "Well, we'll have to address it at the time." *Id.* Defendants are being less than candid below in arguing also that Plaintiffs were therefore able to question Smith about the FCA when in fact he did exactly as his counsel proffered, and refused to answer questions. He also claimed to have no recollection of discussions with *any* sources about the FCA, notwithstanding documentary evidence to the contrary, and refused to disclose the role of any confidential source in discussions about the FCA. *See infra.* We are therefore following the Court's direction to raise the issue again.

Plaintiffs were also surprised to learn for the first time at Smith's deposition that there were actual discussions at the highest level at CIR, namely with two Board members, about CIR's use of the FCA. As explained below, Smith acknowledged that such discussions existed, but refused to say whether and how they were considering action that would benefit sources and/or CIR itself. *See infra.* Contrary to the argument raised below – that Plaintiffs are asking for any attorney-client communications – Plaintiffs are arguing only that the claim of privilege was used to improperly shield all communications on this subject (including actions taken prior to soliciting such advice, as well as the approach taken afterwards.

Accordingly, any notion that Plaintiffs failed to timely raise these issues is meritless.

A. **<u>Background.</u>**  There is now a clear and unmistakable path showing that Defendants resorted to numerous tactics to threaten, pressure, persuade and even entice sources to provide information. Defendants offer a grossly misleading account of the record in asserting that no evidence exists as to such tactics.[2] Evidence that sources were offered life-changing

---

[2] Defendants write that they "never paid any source for information, and Plaintiffs offer no evidence whatsoever to support this accusation." Any such assertion ignores the record. See Rosenthal Decl., para. 14.

inducements if they would allege that there had been fraud, waste or abuse, is clearly relevant to the veracity of any such allegations.

As early as May, 2015, before travelling to Denmark or Africa to conduct interviews, Smith advised a source, Britta Junge, about how an unrelated article had led to a claim under the FCA. See Rosenthal Decl., Ex. B. While trying to persuade Junge to provide an interview in this case, Smith explained to her that as a result of a previous story the US Government had become involved in a claim for fraud, and that as a result, there was a $100 million recovery being pursued by whistleblowers. *Id.* Junge thereafter agreed to an interview; Defendants conducted a multi-day extensive interview with Junge, and featured her prominently in the Planet Aid stories.

Smith also sent his FCA article and the email about the potential for a life-changing whistleblower recovery under the FCA to the individual working with Defendants in Malawi, Kandani Ngwira. *Id.* The point was not lost on Ngwira. Shortly thereafter, Ngwira and Walters used the FCA to persuade a source to "come on strong" in order to share in any recovery. After Ngwira told the source that he needed to "come on strong" to share in any recovery, Walters chimed in: "$300 million." Rosenthal Decl. Ex. I. Ngwira added: "yeah, so as the whistleblower, that means you be entitled to one third of that money." *Id.*

The issue of the FCA came up a fourth time in a discussion about another source, Chiku Malabwe. After Smith noted that Malabwe had tried to extort money from his employer in order to keep him from talking with CIR, Smith and Ngwira exchanged thoughts about whether Malabwe was sufficiently motivated to cooperate with them, rather than DAPP Malawi. See Rosenthal Decl., Ex. C. Smith advised: "it's probably best not to rock that boat with additional encouragement—unless you obtain intelligence otherwise." *Id.* Ngwira responded that Malabwe would probably not cooperate with DAPP Malawi after being fired, and that:

> The second reason is the false claims act. [CS] being on the side of the whistleblower one stands to gain through this act. Of course, I will have to confirm with [CS] [3]

The issue arose a fifth time during an interview of an attorney appearing as a source for the stories, rather than as counsel for any of the parties. Smith again brought up the FCA, and the rewards amounting to hundreds of millions of dollars. See Rosenthal Decl., ¶ 6. Plaintiffs were unaware, however, that in addition to the foregoing five discussions, Smith had discussed with board members at CIR use of the FCA. Smith revealed for the first time at his deposition:

> We had a discussions about the False Claims Act in general with [Robert Rosenthal, who became a Board member, and who was heavily involved in the stories] and Phil Bronstein [a CIR Board member], and the decision was made not to do that.

Rosenthal Decl., Ex. A, (Smith Tr. at 151:7-10). Smith also confirmed that CIR's decision regarding use of the False Claims Act was likely not made until ***after*** the stories were published,

---

[3] "CS" denotes confidential source in Defendants' document.

Page 4

and therefore, long after the communications discussed above in which the False Claims Act had come up in discussions with at least five persons. See *id.*, at 154:4-6.

Smith then refused to elaborate on those discussions, or provide any details. He refused to explain what he meant when he said that they had decided "not to do that," *id.*, at 152:16-18. Smith also refused to say whether the "discussion about the False Claims Act potentially involve[d] CIR profiting from a claim under the False Claims Act," *id.*, at 153:16-21, or any source profiting from a claim under that Act. *Id.*, at 156:17 to 157:14. Smith also denied having any knowledge of communications with any sources discussed above notwithstanding irrefutable documentary evidence that the issue of the FCA had come up. See *id.*, at 159:19 to 160:10.

B. **The Information Is Essential to Plaintiffs**. Defendants do not address Plaintiffs concern over redactions in the email relating to Mr, Malabwe, CIR 044464-65. Nor do they object to our request that the document be reviewed in camera. As to the remaining requests, Defendants have no valid objection, arguing only that the issue was not raised previously, even though it was raised numerous times. Nor is this the proverbial "red-herring," an argument which was rejected at the earlier hearing in November, 2018. Conduct in violation of professional standards can support a claim of malice and is therefore highly relevant to the anti-SLAPP motion. See *Khawar v. Globe*, 19 Cal. 4th at 275; 965 P.2d at 709 (inferring malice where a defendant "fail[s] to adhere to professional standards" (citing *Reader's Digest Assn. v. Superior Court*, 37 Cal. 3d at 257-258)). The Society for Professional Journalists warns: "Money can corrupt almost anything it touches, and that certainly includes the news. The practice of paying for information, known as checkbook journalism, threatens to corrupt journalism. See Rosenthal Decl., Ex. E. The SPJ policy applies not only to modest payments for information, but also, applies to offers of life-changing financial rewards. As the SPJ has stated, "paying for information immediately calls into question the credibility of the information." *Id.*

Defendants argue that such evidence is irrelevant without evidence of falsity. *See infra.* But this evidence goes directly to falsity, and isn't just about violating journalistic niceties; enormous financial rewards makes it impossible to conclude that any of sources were telling the truth. *Id.* ("Readers or viewers have a legitimate right to wonder whether the source is disclosing information because the information is important or because the source is being paid for it.").

Moreover, Defendants argument suffers from two additional flaws. First, there has been no opportunity at this stage to provide evidence of a prima facie case of falsity. Second, Defendants argument is simply not true. To cite a few examples, some of the most damning admissions of falsity have come from Defendants' own mouths, or those of their key sources. Compare, e.g., Dkt. No. at 109-6, at 20 (Smith stating in the Podcast that "Jackson, the employee working on the Planet Aid farmer's project in Malawi, he was told by his Teachers' Group bosses, the money from the USDA was going straight to Mexico"), with Dkt. No. 235-5, ¶ 7 (Jackson stating after the stories were published: "I am not aware that money from the USDA was sent to Mexico" and "was never told by any boss or superior that money from the USDA was going "straight to Mexico"), and CIR-SR-000134 (Defendant Smith stating privately: "We can't actually say what happened to the money"). *Compare also* Dkt. No. 109-6, at 28-29 (Defendant Walters stating in the Podcast that "in the village of Njuli they only gave away one pump" to Enoch Chikaonda), *with* Dkt. No. 114, at 20 (Walters Dec.) (stating that Enoch

Chikaonda told us that Planet Aid had "provided seven rope pumps."), and Walters Dep. Tr. at 386:15-387-7 (Walters stating in an interview that "it turns out, no, they were only supposed to get one"). In yet another example, Walters stated in the Podcast that the "farmers we spoke with said their lives hadn't changed a bit, not from anything the Farmers' Clubs had done." Dkt. No. 109-6 at 29. In her deposition, Walters admitted describing her interview with one such person:

> "So, she couldn't stop smiling, she kept smiling the whole time, she says that they eat three times a day, that she's able to keep her baby healthy, they don't have diarrhea, they havent' had it since the pump [provided by Planet Aid] went in. I mean she literally things that . . . I don't know, it just seems like it's the best thing that's happened to this family."

Rosenthal Decl., Ex. H (Walters Dep. Tr. at 288:17-289:6). Other examples abound.

### E. No Basis Exists for Withholding Documents and Any Confidentiality Concerns can be Addressed by In Camera Review and/or Safeguards in the Protective Order.

2. <u>Documents and testimony concerning discussions with sources.</u> Defendants have not articulated any reason to withhold documents and testimony relating to the FCA. Defendants incorrectly assert that they have advised Defendants that they have completed all responsive searches. *See infra* at 9. Plaintiffs have repeatedly asked for confirmation that all documents with key sources have been provided, including those relating to the FCA. See Rosenthal Ex. F. No such confirmation was forthcoming even after the Court's rulings in November, 2018, requiring production of all documents relating to 15 key sources. Given the revelation that CIR was itself considering using the FCA, *see supra*, disclosure is appropriate not only of sources who provided declarations or were relied upon in the stories, but also, intermediaries communicating with declarants about the FCA. The Malabwe email shows that sources were in communication with Malabwe, and had direct information about how the FCA would ensure Malabwe's cooperation, notwithstanding Defendants' assertion that no documents relating to the FCA exist. See Rosenthal Decl. Ex. C.

Defendants do not contend that compliance would be burdensome. *See infra.* Nor can Defendants justify withholding documents based on confidentiality in light of Smith's refusal to answer any questions about this essential issue. First, the redactions themselves show that Defendants have not redacted simply the names of confidential sources, but have withheld all narrative essential to understanding what was being discussed. Second, the Court has ample discretion to order disclosure of confidential sources where, as here, there is a compelling need for the information. See, e.g., *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) (citations omitted). Also, Defendants themselves can protect the confidentiality of sources through the existing Protective Order, which allows documents to be produced for "attorneys eyes only." If Defendants can make a compelling case why those protections are inadequate, the Court should still order the substance of the communication. Finally, the Court should at least review in camera the email at issue involving Malabwe and the reference to the FCA.

1. <u>Documents and testimony concerning internal discussions at CIR.</u> Disclosure is also essential as to discussions within CIR about the FCA since it bears directly on Defendants'

motivations for publishing a story, but also, how CIR was motivating sources to offer allegations of fraud, waste and abuse. Defendants have improperly relied on the attorney-client privilege to shield all conversations about that subject, not simply those with attorneys.

Defendants' arguments ignore that they have the burden of establishing that any assertion of privilege is valid. See H. Tr., 1/17/19, at 9:11-14. Defendants have not even tried to articulate any basis whatsoever for that assertion of privilege regarding any decisions or actions by CIR other than that there was a discussion with counsel at some point about the FCA. There is no privilege log listing any items.[4] See Rosenthal Decl., ¶ 8. That alone requires rejecting any assertion of privilege as to documents. See, e.g., *Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*, 300 F.R.D. 152, 467 (S.D.N.Y. 2014) ("the SEC waived its privilege protections by failing to produce in a timely manner a privilege log "). Because all documents with key sources were requested, it is no answer to say that they had no obligation to produce a log.

Finally, merely consulting with an attorney does not make that entire subject "off-limits." It only protects communications seeking legal advice. See, e.g., *Fisher v. United States*, 425 U.S. 391, 403 (1976). Discussions about a subject preceding a request for legal advice are not privileged, see *D.I. Chadbourne, Inc. v. Superior Court of City & Cty. of S.F.*, 388 P.2d 700, 707 (Cal. 1964) ("that which was not privileged in the first instance may not be made so merely by subsequent delivery to the attorney." (citations omitted)). Nor does it protect a client's decisions simply because the issue had been discussed with counsel). See, e.g., *Am. Auto Ins. Co. v. First Mercury Ins. Co.*, No. 1:13-cv-00439-MCA-LF, 2016 WL 7395219, at * 4–5 (D.N.M. Oct. 22, 2016); *Burton v. R.J. Reynolds Tobacco Co., Inc.*, 170 F.R.D. 481, 486 (D. Kan. 1997).

Because evidence bearing on life-changing incentives are essential to Plaintiffs' opposition to the anti-SLAPP motion, such evidence should be produced.

### Defendants' Response

Plaintiffs' approach in this letter and their remaining untimely 2020 discovery requests constitute inappropriate gamesmanship. This case has been pending since 2016, and Defendants' anti-SLAPP motion has been pending since summer 2018. Plaintiffs' discovery was to focus solely on issues essential to its response to Defendants' pending anti-SLAPP motion. Now that the case has proceeded through *over a year of such "essential" discovery in fall 2018 and all of 2019*, overseen by this Court and argued in numerous hearings and letter briefs, Plaintiffs have resorted to making up new, spurious discovery disputes that the Court made very clear were to be raised and resolved last year—but that are, in any event, irrelevant to the merits of this case, and even less relevant to Defendants' motion.

Plaintiffs' new request for *all* documents relating to the False Claims Act is untimely, goes beyond what Plaintiffs previously identified as the essential discovery they need, and even

---

[4] Smith's claims that he was unaware of any document memorializing the discussions is hardly dispositive as he apparently lacked any recall of most subjects, including discussions with sources about the FCA evidenced in documents discussed above, anything having to do with a source alleged in his declaration to be one of his "key sources."

more troublingly, seeks attorney-client confidential communications about collateral matters. These requests, launched at the 11th hour and after depositions have commenced, seem designed merely to burden and harass Defendants.

Indeed, this *very* letter was untimely and designed to harass Defendants. By Plaintiffs' own request and the Court's order, this letter was due on Friday, February 14. *See* Dkt. 261. Defendants submitted our portion of the letter to Plaintiffs at approximately 12 p.m. PT and stood by for more than eight hours waiting to review and consent to filing. Yet Plaintiffs neither sought nor obtained an extension of time to file, nor did they give Defendants the courtesy of letting us know that they did not intend to file by the deadline. Instead, Plaintiffs unilaterally took this extension to substantially rewrite portions of their letter, while simultaneously preventing Defendants from responding to additional arguments raised for the first time in reply.

Defendants object to this process and seek the opportunity to respond to Plaintiffs' new arguments. In the interest of efficiency, Defendants propose to respond to Plaintiffs' new arguments in their response at a hearing before the Court and do not waive any arguments. Defendants dispute, among other statements, the following: (1) Plaintiffs are entitled to receive "anything that [Defendants] have" concerning fifteen individuals, including anything related to the False Claims Act; (2) information about the False Claims Act is essential to Plaintiffs's response to Defendants' anti-SLAPP motion; (3) Plaintiffs have had no opportunity to provide evidence of a prima facie case of falsity; (4) Defendants have admitted any falsity; (5) that Mr. Smith raised the confidential source and attorney-client privileges at his deposition entitles Plaintiffs to disclosure of confidential documents.

The Court should put a stop to Plaintiffs' behavior and let Defendants' anti-SLAPP motion be heard.

**I.      Plaintiffs' current "dispute" is untimely and impermissible.**

Plaintiffs' current "dispute" for *all* documents, including privileged documents, relating to the False Claims Act goes far beyond any discovery they have previously requested. Last year, the Court was abundantly clear that Plaintiffs were to tie up any loose ends: "At [the November 21, 2019 hearing] the Court intends to order the parties to immediately meet and confer in person on *all* of their discovery disputes. Once they have done so, the Court will reconvene the hearing to place any agreements on the record and to hear argument on any remaining disputes." Dkt. 241 at 1 (Court's Oct. 28, 2019 Discovery Order). The Court reiterated the Order's purpose during the parties' recent telephonic hearing on February 6, 2020. *See* Dkt. 261.

As directed by the Court's Discovery Order, Plaintiffs identified various additional discovery they wanted, including discovery related "to a confidential source using the False Claims Act to obtain helpful statements, and who is referenced in CIR 044465." Forrest Decl. Ex. 1 (Pls.' Oct. 28, 2019 letter to Defs.). Defendants responded in a meet and confer process, as summarized in a letter to Plaintiffs: "You clarified during our call that this Request is limited to further conversations with the confidential source from CIR 44464–65 about the False Claims Act. Having reviewed our files, there are no other documents to produce on that point." Forrest Decl. Ex. 2 (Defs.' Nov. 12, 2019 letter to Pls.). After that, Plaintiffs reiterated their focus on

Page 8

this narrow category of documents in their filing to the Court, seeking "[c]ommunications with the confidential source Defendant Smith discussed in connection with the False Claims Act." Dkt. 246 at 3.

At the November 21, 2019 hearing, after many hours meeting and conferring on this issue, the parties agreed on the record that there was nothing further to produce in response to Plaintiffs' requests. Nov. 21, 2019 Hr'g Tr. at 15:21–16:21. The matter was thus resolved.

Plaintiffs conveniently leave out these facts in their letter because Plaintiffs are now asking for *two* very different—and much broader—categories of information: (a) all communications with *all* sources referencing the False Claims Act, and (b) *attorney-client privileged conversations* that CIR had with its lawyers about the False Claims Act. The Court need go no further at this point, and should reject Plaintiffs' current requests because they are untimely. But if the Court is inclined to entertain Plaintiffs' requests, they are improper for the reasons explained below.

**II.     Plaintiffs' request for all documents or communications about the False Claims Act with all sources is untimely and legally irrelevant.**

Plaintiffs' letter disregards the narrowness of their prior requests and asks for all "documents and testimony relating to discussions with sources regarding the False Claims Act." *Supra*. This is a brand new request. Plaintiffs have sought—and Defendants have searched for—communications with the confidential source referenced in CIR044464–65 about the False Claims Act. Plaintiffs have also had the opportunity to question Mr. Smith extensively on this subject at his deposition. *See* Forrest Decl. Ex. 5 (Excerpts of Jan. 28, 2020 Smith Depo. Tr.) at 405:9–408:11. Coming up empty, Plaintiffs are now seeking to cast a wider net, ignoring the Court's admonition last year that they raise all discovery disputes at that time.

Plaintiffs attempt to justify their request now by pleading ignorance of these discussions until Mr. Smith's deposition, but that argument is a red herring. As explained above, last fall, Plaintiffs asked for documents concerning conversations between two individuals about the False Claims Act—they did not request, until now, *all* such documents with any individual. Nor can Plaintiffs plead ignorance of this topic more generally: As cited above, Plaintiffs had example documents mentioning the False Claims Act for months, if not years, before Mr. Smith's deposition. *See* Rosenthal Decl. Exs. B–C. Plaintiffs never explain—and have no excuse—why they could not have asked for more general categories of documents or communications regarding the False Claims Act at any point between 2016 and today, if they believed such discovery was "essential." Plaintiffs should not be permitted to ignore theories during years of discovery, spring the theory on a witness during a deposition, and then drag out discovery in this manner.

Contrary to Plaintiffs' argument, Defendants have never told Plaintiffs that these new requests are too burdensome or that they are withholding documents due to the confidential source privilege.[5] Rather, Defendants' position is that these requests are untimely and that

---

[5] Defendants have repeatedly told Plaintiffs that the current requests are untimely, vague, and overbroad, and that CIR's own conversations about the False Claims Act with its attorneys are

Defendants have already conducted the searches Plaintiffs requested last year and completed all responsive productions. Further, as shown in Plaintiffs' own example documents, Defendants narrowly redacted references to specific confidential sources but otherwise produced all responsive documents. *See* Rosenthal Decl. Exs. B–C. In any event, Plaintiffs have clearly had these example documents in their possession for some time, and never asked questions about them before now. Plaintiffs are not resolving any prior disputes. They are making up new ones. The Court should reject these requests for that reason alone.

Plaintiffs attempt to argue that these new requests are "essential" by citing cases and journalistic standards concerning why journalists should not pay sources. Plaintiffs' theory that Defendants coerced sources to talk to them with promises of remuneration from the False Claims Act is inappropriate and off base. Plaintiffs cite no authority for their unsupportable claim that merely mentioning the False Claims Act to a source constitutes financial inducement or checkbook journalism. Even if it did, nobody has brought any False Claims Act lawsuits against Plaintiffs as far as Defendants know. Fundamentally, Defendants never paid any source for information, and Plaintiffs offer no persuasive evidence to support this accusation. *See, e.g.*, Dkt. 125 ¶ 42 (Smith Decl.) ("I never offered, promised or actually paid or gave anything of value to anyone in return for their interviews or for giving me information, beyond the standard journalist practice of reimbursing travel expenses or paying for an occasional meal or beverage."). Plaintiffs' new requests are simply immaterial in the anti-SLAPP context.

The *only issue* that matters for Plaintiffs in the anti-SLAPP context is whether anything Defendants published was defamatory. The Ninth Circuit makes very clear as a matter of law that if a publication includes no actionable defamation, then the publication's target has no legal remedy even if the journalist used purportedly surreptitious, confrontational, or ungentlemanly tactics to ferret out information from reluctant sources. *See Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 982 (9th Cir. 2002) (citing *Desnick v. ABC*, 44 F.3d 1345, 1355 (7th Cir. 1995)). Plaintiffs have no proof that Defendants acted in such a manner, but even if they did, alleged conduct alone is irrelevant in this case as a matter of law.

In addition, Plaintiffs' citations to *Khawar* and *Reader's Digest* are unpersuasive. Those cases hold that circumstantial evidence, such as failure to follow professional standards, can support findings of actual malice if the plaintiff has actually identified false statements—such as the republished statements in *Khawar* that had already been proven false. *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254, 259–60, 275–76 (1998). That is not the case here, where Plaintiffs identify no statements for which their False Claims Act theory could be relevant. *Reader's Digest* is even less applicable because it merely laid out the rule on circumstantial evidence, and then held that the defendants did not act with malice because there was no direct evidence that they believed their publications were false, or that they even entertained serious doubts about their truth. 37 Cal. 3d 244, 258–59 (1984). Plaintiffs have identified no false statements in this case, much less any false statements elicited by references to the False Claims Act.

---

privileged. *E.g.*, Forrest Decl. Ex. 3 (Feb. 3, 2020 email from E. Forrest to S. Rosenthal, 1:53 p.m. PT), *id.* Ex. 4 (Feb. 4, 2020 email from E. Forrest to S. Rosenthal, 11:04 a.m. PT).

Page 10

As such, Plaintiffs have no legitimate reason to request these False Claims Act communications with sources as "essential" to responding to Defendants' anti-SLAPP motion.

### III.   It is improper and legally impermissible for Plaintiffs to seek Defendants' attorney-client privileged communications.

It is even less proper for Plaintiffs to seek CIR's own privileged conversations about the False Claims Act. Putting to one side the permissibility of seeking privileged communications, such requests touch on discovery that, until now, *Plaintiffs did not request and Defendants thought resolved.*

Plaintiffs' speculation that they could have addressed the issue of attorney-client privilege if Defendants had asserted it earlier do not remedy their untimely request. Again, Plaintiffs explicitly and repeatedly only requested a narrow category of documents on this topic—specifically, communications two people might have had about the False Claims Act. Thus, contrary to Plaintiffs' improper insinuation that Defendants inadequately logged privileged material, there was nothing for Defendants to log. There was no need to assert privilege over materials Plaintiffs did not request. In any event, as to oral communications, courts recognize that attempting to log oral communications (to the extent they exist) is "generally uninformative and logistically awkward" such that these communications need not be logged. *Johnson v. Couturier*, 261 F.R.D. 188, 191 n.5 (E.D. Cal. 2009); *see also, e.g.*, *Doyle v. City of Chicago*, 943 F. Supp. 2d 815, 827 (N.D. Ill. 2013).

Even if Plaintiffs' new requests were timely—they are not—Plaintiffs' requests as to CIR's privileged conversations about the False Claims Act are inappropriate and impermissible as a matter of law, and Plaintiffs are wrong to suggest that CIR cannot claim privilege.

As a threshold matter, none of these conversations is relevant to the issues the Court has previously proscribed. None of those communications is at issue in this case in either Defendants' anti-SLAPP motion or Plaintiffs' operative complaint. Defendants have never put these statements at issue for any claim or defense. Again, as discussed above, Plaintiffs have not identified any allegedly defamatory statements for which CIR's privileged discussions about the False Claims Act could possibly be relevant. On this point, Plaintiffs actually argue themselves out of court by noting that CIR's communications about the False Claims Act likely occurred, if at all, *after* the relevant stories were published. *Supra*. As such, these requests could not possibly reflect on Defendants' state of mind *before* publication and ultimately, on whether CIR's stories were defamatory.

Even if such communications were relevant, Plaintiffs acknowledge that the attorney-client privilege protects communications with attorneys for seeking legal advice. *Supra*. CIR's conversations with its attorneys about whether or not to pursue a False Claims Act claim were undoubtedly for seeking legal advice. During Mr. Smith's deposition, counsel repeatedly objected to this line of questioning on privilege grounds and advised Mr. Smith not to disclose the contents of any communications with attorneys. *See, e.g.*, Forrest Decl. Ex. 5 at 398:20–22 ("Mr. Forrest: If you're discussing the contents of any of CIR's attorneys' advice to CIR, then don't answer any further."). And Mr. Smith explained that the aforementioned conversation with Robert Rosenthal and Phil Bronstein indeed "involved attorneys' advice to CIR." *Id.* at 399:1–2.

Page 11

      Defendants did not and do not waive their attorney-client privilege here. That Mr. Smith mentioned the *subject* of the privileged conversations without revealing their *substance* did not waive attorney-client privilege. *See Quicksilver, Inc. v. Kymsta Corp.*, 247 F.R.D. 579, 584 (C.D. Cal. 2007) (holding that attorney-client privilege was not waived when a deponent simply noted that he received legal advice regarding brand without revealing the substance of the advice).

      For the above reasons, Defendants ask the Court to deny Plaintiffs' newly generated requests.

Respectfully submitted,

NELSON MULLINS LLP
*/s/Samuel Rosenthal*
Samuel Rosenthal

Attorney for Plaintiffs
PLANET AID, INC. and LISBETH THOMSEN