Samuel Rosenthal (pro hac vice)
sam.rosenthal@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
101 Constitution Ave., N.W.
Washington, D.C. 20001
Telephone:  +1 202-689-2915
Facsimile   +1 202-712-2860

Phil Busman (pro hac vice)
Phil.busman@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
101 Constitution Ave., N.W.
Washington, D.C. 20001
Telephone:  +1 202-689-2988

Cory E. Manning (State Bar # 213120)
cory.manning@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
1320 Main St., 17th Floor
Columbia, SC 29201
Telephone:  +1 803-255-5524
Facsimile   +1 803-256-7500

Crispin L. Collins (State Bar # 311755)
crispin.collins@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
19191 S. Vermont Ave., Suite 301
Torrance, CA 90502
Telephone:  +1 424-221-7407
Facsimile   +1 424-221-7499

Christian J. Myers (pro hac vice)
Josh.myers@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
101 Constitution Ave., N.W.
Washington, D.C. 20001
Telephone:  +1 202-689-2991

Attorneys for Plaintiffs
Planet Aid Inc. and Lisbeth Thomsen

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PLANET AID INC.; and LISBETH THOMSEN,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>REVEAL, CENTER FOR INVESTIGATIVE REPORTING; MATT SMITH; and AMY WALTERS,<br><br>　　　　　Defendants. | Case No. 17-cv-03695-JSC<br><br>**OPPOSITION TO SPECIAL MOTION BY DEFENDANTS TO STRIKE**<br><br>Judge: Hon. Maxine Chesney<br><br>**DATE:**　　　　**November 20, 2020**<br>**TIME:**　　　　**9:00 a.m.**<br>**LOCATION:　San Francisco Courthouse<br>　　　　　　　Courtroom 7- 19th Floor<br>　　　　　　　450 Golden Gate Ave.<br>　　　　　　　San Francisco, CA 94102** |

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ III

I.     INTRODUCTION ................................................................................ 1

II.    SUMMARY OF RELEVANT FACTS ............................................... 1

III.   ARGUMENT ...................................................................................... 4

    A.   Plaintiffs Need Only Establish "Minimal Evidence" for the Motion to be Denied. .............................................................................................. 4

    B.   The Motion Should be Denied Under Fed.R.Civ.P. 56(d), Inadmissible Evidence Excluded and An Adverse Inference Drawn from Withholding Evidence. ............. 5

    C.   Plaintiffs Have Established A Prima Facie Case As To Falsity of the Stories. ....... 8

        1.   Plaintiffs Properly Used Funds Obtained by the USDA, Contrary to Allegations in the Stories. ................................................................. 8

            a.   No evidence is offered by Defendants as to Mozambique .............. 10

            b.   Allegations about misuse of funds in Malawi are false ................ 11

        2.   Defendants Falsely Alleged that Funds Were Stolen by Thomsen and Were Going to Petersen. ................................................................. 12

            a.   Allegations that Thomsen was stealing the money. ..................... 12

            b.   Defendants' false allegation that USDA funds were going to satisfy Petersen's expensive tastes ................................................ 13

        3.   Defendants Falsely Alleged Farmers Received No Benefit from the Program ........................................................................................ 14

            a.   The stories falsely alleged that Farmers' Clubs failed to receive equipment. ............................................................. 14

            b.   Defendants' falsely alleged that Farmers' Clubs had not been given livestock ..................................................... 15

        4.   Defendants' Falsely Alleged that Employees Didn't Receive Salaries Reported to the USDA and that Every "African Member of the Teachers Group" Interviewed by Them was Forced to Contribute "everything they earned" to the Group. ...................................... 15

    D.   The "Substantial Truth" Defense Cannot Immunize Defendants. ....................... 17

    E.   Plaintiffs Have Established A Prima Facie Case as to Malice. .............................. 18

        1.   Malice is Only Required for Public Figure Plaintiffs, which Plaintiffs Are Not. ..................................................................................... 18

            a.   No "public controversy" existed. ........................................... 19

            b.   The defamation did not relate to Plaintiffs' participation in any controversy .................................................................... 20

            c.   Neither Plaintiff "voluntarily injected itself into any controversy, if one could be found, in order to influence the controversy's ultimate resolution." ................................... 20

        2.   There is ample evidence from which a jury could find malice. ................ 22

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

i

| | a. | Defendants' own statements are sufficient to show malice. .......... 23 |

b. Misrepresenting what sources had said, relying on others known to lack a basis for what was being published, or who were openly hostile to Plaintiffs, shows malice. ........................... 26

c. Defendants misled readers about documents which disproved their allegations, and then defended their actions by contending that they never really looked at them. ................... 31

d. Malice is shown by violations of norms, including the use of cash or other inducements.............................................. 35

e. Use of cash or other inducements, and other violations of professional norms is evidene of malice. ....................................... 37

f. Defendants intentionally misrepresented facts to sources ........... 38

g. Defendants shockingly wrote their stories before "investigating" ............................................................... 38

h. Defendants' reporting cannot be justified under the "fair and true" report privilege. ....................................................... 39

IV.     ADDITIONAL GROUNDS FOR DENYING THE MOTION......................................... 39

CONCLUSION ........................................................................................................ 40

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aghmane v. Bank of Am., N.A.,*
    696 F. App'x 175 (9th Cir. 2017) ........................................................ 37

*Anderson v. Liberty Lobby,* 477 U.S. 242, 255 (1986) .................................... 4

*Antonovich v. Superior Court,*
    285 Cal. Rptr. 863 (Cal. Ct. App. 1991) ............................................ 35

*Baral v. Schnitt,*
    1 Cal. 5th 376 (2016) .......................................................... 1, 4, 9, 12, 31, 37

*Bently Reserve LP v. Papaliolios,*
    218 Cal. App. 4th 418 (2013) ........................................................ 8, 17

*Bindrim v. Mitchell,*
    92 Cal. App. 3d 61 (2nd App. 1979) .................................................... 35

*Carver v. Bonds,*
    135 Cal. App. 4th 328 (2005) ........................................................ 17, 20

*Chapin v. Knight-Ridder, Inc.,*
    993 F. 2d 1087 (4th Cir. 1993) ......................................................... 21

*Christian Research Institute v. Alnor,*
    55 Cal. Rptr. 3d 600, 612 (Cal. Ct. App. 2007). .................................. 25

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
    173 F.3d 725 (9th Cir. 1999) ........................................................... 39

*Columbia Pictures. v. Krypton Broadcasting of Birmingham,*
    259 F.3d 1186 (9th Cir. 2001) .......................................................... 5

*Curtis Publishing Co. v. Butts,*
    388 U.S. 130 (1967) ................................................................ 22, 39

*Deppe v. United Airlines,*
    217 F.3d 1262 (9th Cir. 2000) .......................................................... 4

*Evans v. Unkow,*
    45 Cal. Rptr. 624 (1st Dept. 2019) ................................................... 31

*Fisher v. Larsen,*
    138 Cal. App. 3d 627 (1982) ........................................................... 26

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

*Flowers v. Carville*,
   310 F.3d 1118 (9th Cir. 2002)..................................................... 27, 30, 36

*Gertz v. Robert Welch*,
   418 U.S. 323 (1974) .................................................... 18, 19, 20, 40

*Gilbert v. Sykes*
   147 Cal.App.4th 13 (2007)......................................................... 17

*Goldwater v. Ginzburg*,
   414 F.2d 324 (2nd Cir. 1969).......................................... 22, 29, 39

*Grewal v. Jammu*
   (2011) 191 Cal. App. 4th 977 (2011) .................................... 26

*Harte-Hanks Communications, Inc. v. Connaughton*
   491 U.S. 657 (1989)....................................... 22, 26, 31, 36

*Hughes v. Hughes*,
   122 Cal. App. 4th 931 (2004)................................................ 17

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979).................................................. 18, 19, 21

*James v. San Jose Mercury News, Inc.*,
   17 Cal.App.4th 1 (1993) ............................................... 17

*Jankovic v. International Crisis Group*,
   822 F.3d 576 (D.C. Cir. 2016) ............................................. 19

*Khawar v. Globe*,
   19 Cal. 4th 254 (1998) ................................. 4, 18, 20, 22, 26, 28, 31, 38

*LaLiberte v. Reid.*
   966 F.3d 79 (2d Cir. July 15, 2020) ............................... 18, 40

*Leslie v. Grupo ICA*,
   198 F.3d 1152 (9th Cir. 1999)..................................................... 4

*Maheu v. Hughes Tool Co.*,
   569 F.2d 459 (9th Cir. 1977)..................................................... 17

*Makeoff v. Trump University*,
   715 F.3d 254 (9th Cir. 2013)......................................... 5, 18, 19, 20

*Masson v. New Yorker Magazine*,
   501 U.S. 496 (1991) ......................................................... 8, 17

*McGrory v. Applied Signal Technology, Inc.*,
   Cal.App.4th 1510 (2013) ......................................................... 23

iv

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

*Mindys Cosmetics, Inc. v. Dakar*,
   611 F.2d 590 (9th Cir. 2010)............................................................................................. 1, 4

*Monster Energy Co. v. Schecter*,
   7 Cal. 5th 781 (2019) ........................................................................................................ 1

*Montandon v. Triangle Publications*,
   45 Cal. App. 3d 938 (1975)............................................................................................... 9

*NACCP v. Button*,
   371 U.S. 415 (1963) ........................................................................................................ 40

*National Foundation for Cancer Research, Inc. v. Council of Better Business
   Bureaus, Inc.*,
   705 F.2d 98 (4th Cir. 1983)............................................................................................. 21

*Nationwide Life Ins. Co. v. Richards*,
   541 F.3d 903 (9th Cir. 2008)............................................................................................. 5

*Navellier v. Sletten*,
   29 Cal. 4th 82 (2002) ........................................................................................................ 4

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) .................................................................................................. 18, 31

*Overstock.com, Inc. v. Gradient Analytics*,
   151 Cal. App. 4th 688 (2007)........................................................................................ 8, 22

*Palin v. New York Times*,
   940 F.3d 804 (2nd Cir. 2019) ...................................................................................... 31, 32

*Piping Rock Partners, Inc. v. David Lerner Associates, Inc.*,
   946 F.Supp.2d 957 (N.D. Cal. 2013) .............................................................................. 29

*Planned Parenthood Fed'n of America, Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018)........................................................................................ 5, 40

*Price v. Stossel*,
   620 F.2d 992 (9th Cir. 2010) ........................................................................................... 27

*Raby v. Livingston*,
   600 F.3d 552 (5th Cir. 2000) ............................................................................................. 5

*Reader's Digest Assn. v. Superior Court*,
   37 Cal. 3d 244 (1984) ........................................................................................................ 4

*Resolute Forest Products v. Greenpeace*,
   302 F. Supp. 3d 1005 (N.D. Cal 2017) ........................................................................... 21

*Sindi v. El-Moslimany*,
   896 F.3d 1 (lst Cir. 2018) .................................................................................................. 4

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ........................................................................ 22, 37

*Time, Inc. v. Firestone*,
   424 U.S. 448 (1976) ........................................................................ 18, 20

*Vegod Corp. v. American Broadcasting*,
   25 Cal.3d 763 (1979) .......................................................................... 20

*Verizon Delaware Inc. v. Covad Comm.*,
   373 F.3d 1081 (9th Cir. 2004) ............................................................. 40

*Weller v. American Broadcasting Companies*,
   232 Cal. App. 3d 991 (1991) ................................................................. 9

*Widener v. Pacific Gas & Elec., Co.,*  75 Cal. App. 3d 415, 434 (1977) ........................................ 4

*Willis v. City of Los Angeles*,
   57 Fed.Appx. 283 (9th Cir. 2002) .......................................................... 4

*Wolston v. Reader's Digest Ass'n, Inc.*,
   443 U.S. 157 (1979) ........................................................................ 19, 20

*Wyatt v. Union Mortgage Co.*,
   24 Cal.3d 773 (1979) .......................................................................... 40

**Rules**
Fed. R. Civ. P. 15(a) ............................................................................ 40

Fed. R. Civ. P. 15(c)(2) ........................................................................ 40

Fed. R. Civ. P. 56(c)(4) ...................................................................... 5, 7

Fed. R. Civ.P. 56(d) ............................................................................. 5

Fed R. Evid. 403 .................................................................................. 5

Fed. R. Evid 1006 ................................................................................. 1

**Other Authorities**
J. Wagstaffe, *Fed. Civ. Proc. Before Trial* (LexisNexis 2020), § 43.204 ......................... 5

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

1

## I.  INTRODUCTION

2  California's anti-SLAPP statute does not protect defamation. It merely allows a court to

3  weed out claims where the plaintiff cannot establish a prima facie case.  *Baral v. Schnitt*, 1 Cal.

4  5th 376, 384 (2016).  Plaintiffs' claims here are far from meritless.  Defendants Center for

5  Investigative Reporting ("CIR"), Matt Smith, and Amy Walters knowingly published falsehoods

6  about Plaintiffs, misstated what sources told them, and ignored contrary documentation.

7  On an anti-SLAPP motion, a Plaintiff need only show a "minimum level of legal sufficiency

8  and triability." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.2d 590, 598 (9th Cir. 2010).  The Court

9  must not weigh the evidence; it accepts plaintiffs' evidence as true, and gives all inferences in

10  support thereof. *Monster Energy Co. v. Schecter*, 7 Cal. 5th 781, 788 (2019) (all claims with the

11  requisite minimal merit may proceed).  Nor are Defendants' allegations substantially true; they are

12  complete falsehoods.  Because Plaintiffs are not public figures, liability can thus be proven on a

13  showing of negligence, a factual standard Defendants do not even argue justifies dismissal.

14  Even if constitutional malice were required, it is clearly shown. Defendants made up a story

15  attacking Plaintiffs before investigating, sought out rumor and innuendo to fill in the tale they had

16  already chosen to tell, and ignored documents that did not fit their predetermined narrative.  They

17  violated journalistic ethics by paying sources for their help and promising impoverished farmers

18  much needed supplies or material.  There is more than ample evidence, even at this early stage, for

19  a jury to find that Defendants' intent was not to report facts, but to create an "impact" needed to

20  attract donors. See S. Rosenthal ("SR") Decl. Ex. 2(k). [1]  As they admitted, the "impact" they hoped

21  to create was like a "big load of bricks" falling on Plaintiffs' heads. Smith Depo. at 87:6 to 87:22.

22  ## II.  SUMMARY OF RELEVANT FACTS

23  Although ignored in Defendants' moving papers, the factual record here is robust.  In

24  addition to the detailed, 244 paragraph First Amended Complaint, Plaintiffs submit declarations

25  from 38 fact witnesses.  Evidence is discussed in the accompanying FRE 1006 Summary of Complex

26

27  ---

[1] Attached to the declaration of Sam Rosenthal are deposition transcripts ("Depo. Tr. ") and

28  exhibits, interrogatory answers (Exs. 15 and 16), and documents produced by Defendants (Ex. 17). Plaintiffs request that the Court take judicial notice of Ex. 2(f), 4(f), 4(h), 6(c), 18(a)-(f).

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

1

Evidence provided by Arthur Hayes ("Hayes, Ex. B"). Because of space limitations, only the most salient facts are set forth herein.

Between March 2016 and August, 2017, Defendants aired a radio broadcast which they continued to publish through a podcast (see ECF 109-6 at 26, "the Podcast"), which was updated in June, see ECF 78-17, a lead article on May 23, 2016, see SR Decl. Ex. 4(k) ("the May 2016 Article"),[2] interviews for other news organizations, and thirteen additional print articles. ECF 78, Exs. A-U. The gist of the stories was that Plaintiffs fraudulently siphoned-away 50-70% of over $130 million provided by the USDA for programs in Mozambique and Malawi. Podcast at 39, 44.

The program in Mozambique assisted impoverished communities there. Holm Decl. ¶ 7. Working with a local subcontractor, ADPP Mozambique, Planet Aid fed 80,000 school children a meal each day. *Id.* Defendants admitted in discovery that they were unable to say how any amount of money could have been siphoned away from programs there. *See infra* at 11.

In 2006 the USDA issued another grant, relating to Malawi. L. Thomsen Decl. ¶ 8. Planet Aid was assisted by Plaintiff Thomsen, who supervised DAPP Malawi in fulfilling that grant. *Id.* Contradicting what they wrote in the stories, Defendants Answer to the Complaint confessed to their lack of "knowledge or information" regarding accomplishments in Malawi, including whether: (l) farmers were educated about agricultural issues, and received "over 1,000 locally produced rope pumps, additional motorized water pumps, hammer mills for grinding corn, goats and pigs, hoes and seeds," ECF 34, ¶ 42-43; (2) "millions of trees were planted," *id.*; (3) "over three-quarter of a million people" were educated about HIV/AIDS, *id.* ¶ 44; (4) "over 2,000 students were trained at Teacher Training colleges, while tens of thousands of community members benefitted from outreach programs from the colleges and thousands upon thousands of primary school students were taught by student-teachers . . ." *id.* ¶ 45; and (5) "[t]wo Teacher Training Colleges were constructed, furnished and equipped," and an additional one expanded. *Id.*

Defendants also confessed prior to publication being aware that Planet Aid had never received the $130 million alleged in their stories, *see infra* at 8. They also knew that Planet Aid could not have accomplished a fraction of the above achievements if 50-70% of all funds had been

---

[2] Citations *infra* to the May 2016 Article are to the copy used in Smith's deposition. See SR Decl. Ex. 4(k).

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

fraudulently siphoned away, especially since two-thirds of the funds were directed at programs in Mozambique, a country where Defendants spent ten minutes. *See* SR Decl. Ex. 18(f).  Through FOIA, Defendants had audits, compliance reviews, trip reports, independent evaluations, and detailed reports to the USDA acknowledging that Plaintiffs had accounted for all funds.  *Infra* at 9.  None of that demonstrated one iota of fraud.  Editors responsible for fact-checking did not even look at those documents, failing to reconcile them with the stories.  *See infra* at 33-34.

Smith and Walters were assisted in reporting by a Malawi reporter, Kandani Ngwira, who had been convicted of using his position as a journalist to extort money.[3]  They relied on biased sources, two of whom had been fired by Plaintiffs for either embezzlement or fraud, and others who were involved in litigation against DAPP Malawi; all of that should have been disclosed to readers.  See Rosenthal Dep. Tr. 355:18 to 357:7.  Defendants also engaged in a blatant violation of professional norms by offering cash or other valuable inducements to sources.  *See infra* at 37-38.  At least seventeen individuals received unexplained cash, offers of money, promises of equipment, or other inducements. *Id.*  Included were individuals Ngwira said had received "nothing whatsoever" or those falsely alleged to have been reimbursed "strictly upon presentation of receipts"  *See* ECF 115, ¶ 20.

Even as their "investigation" drew to a close, Defendants admitted that they had found "no smoking gun."   Smith Depo. Tr. 176:16 to 177:11.   And after ***all*** reporting was completed, Defendants were still unable to support their main thesis: that massive sums of money had been diverted to Mexico. Indeed, they told another news source that they knew "very little" about the USDA funds.  See SR Decl. Ex. 4(e), at CIRSR-00134.

After suit was commenced, seven sources identified by Defendants disputed the truth of what was published. Declarations by three of these (see Mtimbuka, Chikaonda and Molande Decls.), have been submitted in opposition to the motion, and were identified by Defendants as

---

[3] Smith avers that Ngwira was writing a "minor story" describing workers' "complain[ts] about management" at a local entity, ECF 125 at ¶17, and that he vetted Ngwira in a google search.  See Smith Depo. Tr, at 259:6-8. The article actually involved a sex scandal. See SR Decl. 4(f).  Plaintiffs request judicial notice of the above news account, and filings disputing Ngwira's claim, ECF 115, ¶28, that he was acquitted of everything other than the first count.  See SR Decl. Ex. 4(h).

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

3

"key sources." Dkt. No. 125, ¶ 22.  Two others (see Chibwana and Kamwendo Decls.) featured prominently in the stories.  See Podcast at 28; May, 2016 Article at 26.  Defendants  were talking about another one of their sources (Chiku Malabwe), when they admitting they were "open[ing] ourselves up" by not telling readers that he was fired for fraud.  SR Decl. Ex. 4(g).

The entire foundation for Defendants' defamatory publication has thus collapsed under even the most preliminary discovery allowed to date.

## III.   ARGUMENT

### A.   Plaintiffs Need Only Establish "Minimal Evidence" for the Motion to be Denied.

The parties agree that the publications here fall within the first prong of the anti-SLAPP statute.  To avoid dismissal, Plaintiffs need only show that a *prima facie* case exists.  Only a "minimum level of legal sufficiency and triability" is required. *Mindys Cosmetics v. Dakar*, 611 F.2d at 598.  Defendants erroneously argue that the decision in *Navellier v. Sletten*, 29 Cal. 4th 82 (2002), requires a more stringent standard.  See ECF 107 at 19.  It does not. "[T]he statute poses no obstacle to suits that possess minimal merit." *Navellier*, at 93. As the California Supreme Court has recently reiterated:

> The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.

*Baral,* 1 Cal. 5th at 384-85, citations omitted.  Because "direct evidence of actual malice is rare," malice may "be proved through inference and circumstantial evidence alone."   *Sindi v. El-Moslimany*, 896 F.3d 1, 16 (lst Cir. 2018); *Khawar v. Globe*, 19 Cal. 4th 254, 275 (1998); *Reader's Digest Assn. v. Superior Court*, 37 Cal. 3d 244, 257-258 (1984).

It bears emphasis that, like summary judgment, the court must accept Plaintiffs' evidence over that of Defendants. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir. 1999).  Conflicts in the evidence merely demonstrate the unsuitability of the issues for anti-SLAPP resolution. See *Willis v. City of Los Angeles*, 57 Fed.Appx. 283, 285 (9th Cir. 2002) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Deppe v. United Airlines*, 217 F.3d 1262, 1266 (9th Cir. 2000)).  This is

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

4

as true for malice as any other issue. *See Widener v. Pacific Gas & Electric, Co.*, 75 Cal. App. 3d

415, 434 (1977).

**B. The Motion Should be Denied Under Fed.R.Civ.P. 56(d), Inadmissible Evidence Excluded and An Adverse Inference Drawn from Withholding Evidence.**

Dismissal of the motion is appropriate under Fed.R.Civ.P. 56(d). Five declarants relied upon

by Defendants possess critical information required to oppose the motion.   SR Decl., ¶¶ 26-31.

Plaintiffs have an indisputable right to such discovery, see *Planned Parenthood Fed'n of America,*

*Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), and have exhausted all possible

efforts to obtain it.  SR Decl., ¶¶ 32-39. "The Federal Rules don't contemplate that a defendant may

get a case dismissed for factual insufficiency while concealing evidence that supports plaintiff's

case."  *Makeoff v. Trump University*, 715 F.3d 254 (9th Cir. 2013).  See ECF 166, 167, 189

(incorporated by reference); *see also* J. Wagstaffe, *Fed. Civ. Proc. Before Trial* (LexisNexis 2020),

§ 43.204 (denial of Rule 56(d) request an abuse of discretion). Rule 56(d) requests are favored and

should be liberally granted. *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2000).

At a minimum, the Court should exclude declarations and other evidence resting on

witnesses who refuse to submit to discovery.  Under Fed.RCiv.P 56(c)(4), declarations must contain

information admissible at trial.  Based on their conduct to date, Goteka, Zebiah, Longwe, Munthali

and Ngwira, clearly have no intention of appearing at trial or providing otherwise admissible

evidence, especially Goteka, who is in hiding.  See ECF 126, ¶52.

Defendants also asserted privilege as to sources specifically relied upon in the motion, and

refused to answer whether any had made statements which "contradicted what was reported."  See

Pyle Depo. Tr. at 316:13 to 318:1.  Defendants cannot use statements by sources as a sword against

Plaintiffs while hiding behind the shield of privilege to withhold conflicting evidence. See

*Columbia Pictures. v. Krypton Broadcasting of Birmingham,* 259 F.3d 1186, 1196 (9th Cir. 2001);

*Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910 (9th Cir. 2008) (witness precluded from

testifying at trial after asserting privilege at deposition).

Evidence should be excluded also as irrelevant and inadmissible under Fed.R.Evid. 403.

Defamation allegations are limited in the FAC to statements that funds were fraudulently siphoned

away from the USDA Program. ECF 78, ¶¶ 197-207.  Defendants have tried to inject into this case

5

allegations about facts which are irrelevant and highly prejudicial, and do not bear the slightest relationship to the defamatory statements. Evidence having no probative value to allegations in the FAC should be excluded, including; (l) Chitosi's declaration (ECF 108), alleging events associated with construction of a vocational school five years before the start of the USDA program, *see* ECF 108, (2) Gade's declaration (ECF 127), discussing at length Amdi Petersen's trial in Denmark years before the start of the USDA programs, see, e.g., ECF 127 (Gade Decl.), which CIR's Editorial Director admitted had nothing to do with that program, s*ee* Salladay Depo. Tr. at 97:15-20, (3) Munthali's declaration (ECF 119), discussing, *inter alia*, procurement practices involving unrelated donor programs, *see* ECF 119, (4) Longwe's declaration (ECF 116) about accounting issues and donor programs other than the USDA funds, s*ee* ECF 116; (5) Goteka's allegations (ECF 126), about other donor programs or events nowhere mentioned in any of the stories, and (6) Goteka (ECF 126), Zebiah (ECF 116), and Munthali's declarations, *supra*, which are irrelevant to the only allegation at issue relating to the Teachers Group, namely that "up to 70% [of over $130 million] was allegedly taken from the projects it was meant for, and stripped from employees' salaries." Podcast at 37, 44. Declarations of Smith and Walters, recounting the same irrelevant and prejudicial facts from all of the above sources, see, e.g., ECF 125, ¶¶44, 45, 47; ECF 114, ¶¶ 34, 35, 37, should similarly be excluded.

The Court should also exclude several audio recordings offered by Defendants. See ECF 109-6 (Ex. HH (Chiku Malabwe), and ECF 115, Ex. E (Chief Chibwana and Paul Molande), and recordings attached to ECF 163-2. Defendants cannot claim to have relied on the first two recordings, which were transcribed *after* the stories were published, see ECF 109-5 at 72; 106-6 at 24; the second one was mostly in the Chichewa language, and both Smith and Walters were unable even to identify one of the speakers, Molande, or what he had to say, Smith Depo. Tr at 110:5-7, including statements in the tape recording itself. *See* Walters Depo. Tr. at 242:3-14; 246:1-4. Also, the sole declaration proffered to lay a foundation, Ngwira, is inadmissible. *See supra*. The Malabwe transcript, similarly was created after the stories were published, *see supra*, and on its face

obviously contains gaps and is incomplete.[4]   Also, no adequate foundation has been laid for Mtimbuka's recordings, particularly in light of Walters' statement that they were talking with Mtimbuka and others "on and off microphone."  Walters Depo. Tr. 278:17-21.

Declarations by non-English speakers (Molande and Chibwana) are also inadmissible. Defendants purported to translate these declarations from the Chichewa language, and had the declarants sign in English.  Molande described how he was given the last page to sign without knowing what was in his declaration.  See Molande Decl. ¶ 13.   Other declarations were offered by witnesses who later openly admitted in depositions that either their declarations were patently false, or alternatively, they could no longer recall facts contained in those declarations, rendering their declarations inadmissible under Fed.R.Civ.P. 56(c)(4).  Compare:

- Salladay (ECF 111) ¶10 with Salladay Depo.. at 79:21-80:9, 93:3-22, 99:15-100:22, 117:8-11, 119:10-120:9).  Salladay did not even know what information was being referenced in his own declaration.  *Id.* at 94:9 to 196:8.

- Sullivan (ECF 112), ¶ 6 with Sullivan Depo. at 30:9-21; 33:16 to 35:4; 61:22 to 63:15; and ECF 112 ¶5 with Sullivan Depo. Tr. at 42:19 to 44:21; 137:3-22.

- Smith (ECF 125) ¶¶ 43-47 with Smith Depo. at 108:15 to 113:15, 117:15 to 118:10;  ECF 125 ¶29 with Smith Depo. at 391:4-5; ECF 125 ¶¶31, 44-47 with Smith Depo. 105:13 to 123:5; 290:12 to 291:7; 433:1 to 435:12.  Indeed, Smith's declaration was copied word for word from Walters' declaration, explaining why Smith's declaration repeatedly referred to documents and information obtained by "Matt and I. See ECF 125, ¶ 48. Having failed to read his declaration, his signature on the document is meaningless.

- Walters (ECF 114) ¶ 14 with Walters Depo. at 393:8-17; 394:9-16; ECF 114 ¶ 14-19 with Walters Depo. Tr. at 216:1 to 218:7 232:3 to 234:7; 242:3-14; ECF 114 ¶ 27 with Walters Depo. Tr at 445:8 to 446:20; ECF 114 ¶¶ 15, 36 with Walters Depo. at 351:19-22; ECF 114 ¶18, 34 with Walters Depo. Tr. at 151:4-6 to 158:4, 417:7-9; 336:9-17; 340:7 to 344:6-14; 359:1-6; 391:20 to 392:7; 398:13-19; 522:1 to 524:13.

- Pyle (ECF 110) ¶ 27 with Pyle Depo. Tr. at 137:10-14, 152:3 to 154:12; 268:19 to 269:7, 450:20 to 451:9.  As to documents reviewed by Pyle, compare, e.g., ECF 110 ¶ 27, with Pyle Depo. Tr. at 264:22 to 265:10, *see also* 125:22 to 126:8; 203:5-22; 285:3 to 286:14.

---

[4] The tape begins with Smith apologizing because of the poor internet connection, see ECF 109-5, at 45, and then has Smith referring to their call before they got cut-off.  See *id.*, at 45 (Smith saying "did you catch what I was saying"), 46 (Smith referring to earlier comments by Malabwe).

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

Executive Editor Rosenthal similarly claimed that he had done a line-by-line review of the articles, and was "very familiar with documentary sources and individuals interviewed for the stories, see ECF 113, ¶¶ 6,7, but had virtually no recollection of either documents or individuals interviewed.  See, e.g., Rosenthal Depo. Tr. 152:1 to154:1; 272:2-9, 315:17 to 318:11.

Evidence offered by Defendants is also irrelevant, hearsay, more unduly prejudicial than probative, and involves material as to which Defendants have refused discovery as either not essential to Plaintiffs' opposition, or because it involved sources subject to a confidential source privilege.  As to Smith (see ECF 125), ¶ 4-6, p. 3:18 to p.4:5. p.4:10-18; ¶ 10-11; 12; p.8:22:24; ¶14; p.7:15-26; ¶18-19; ¶ 21, p. 9:8-13; ¶ 24,  p.10:19-24, p.11:20-22, p. 17:8-17; ¶42, ¶ 44. As to Walters (see ECF 114), see ¶¶ 5, 7, 8, 9, 11, 25, 29, 31-34; ECF 120. As to Mtimbuka, (see ECF 120), see ¶5, 7, 12, 13, 17 (hearsay conversations throughout).  Boilerplate allegations that sources told Defendants information contained in their respective declarations, see, e.g., ECF 120, ¶11, should be excluded.  It is impossible for any juror to ascertain which information was imparted to Defendants, or the context in which those disclosures were made.

## C. **Plaintiffs Have Established A Prima Facie Case As To Falsity of the Stories.**

Defendants ignore almost entirely the standards applicable in judging falsity.  First, "the test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text. . . ." *Masson v. New Yorker Magazine,* 501 U.S. 496, 510 (1991).  Second, "if any material part be not proved true, the plaintiff is entitled to damages in respect to that part." *Bently Reserve LP v. Papaliolios,* 218 Cal. App. 4th 418, 434 (2013). Third, defendants are liable for what is insinuated, as well as for what is stated explicitly. *Overstock.com, Inc. v. Gradient Analytics,* 151 Cal. App. 4th 688, 693-696 (2007) (challenged reports could reasonably be understood as implying plaintiff manipulated accounting procedures and was "cooking the books").  Defendants' motion ignores all of these rules while contending that this action lacks minimal merit.

### 1. **Plaintiffs Properly Used Funds Obtained by the USDA, Contrary to Allegations in the Stories.**

The core allegation by Defendants in the stories was that Plaintiffs stole or diverted 50% to 70% of over $130 million (or between $65-90 million) from USDA funding. Podcast at 39, 44.  This is clearly defamatory.  Defendants knew that Planet Aid never received $130 million, see SR Decl.

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

6(n), at CIR 36597, *see also infra* at 23.  As explained below, the amount stolen would have equaled or exceeded the total obtained by Planet Aid, namely $70 million.  See Meehan Decl., ¶ 8.

Defendants cannot ask the Court to ignore their own blatantly false statements about the amount received by Planet Aid because they alleged elsewhere that $130 million was "allocated" to Planet Aid.  ECF 78-5 at 7.  "[I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he may be held responsible for the defamatory implication, . . . even though the particular facts are correct." *Weller v. American Broadcasting Companies,* 232 Cal. App. 3d 991, 1003, n. 10 (1991); *see also Montandon v. Triangle Publications,* 45 Cal. App. 3d 938, 945-949 (1975).

Here, Defendants and readers alike acknowledged that defamatory implication.  Readers construed Defendants' statements as showing that Planet Aid had "received" the entire $130 million, *see* SR Decl. Ex. 18(b)-(d), which Walters retweeted.  SR Decl. Ex 18(b).  Walters herself acknowledged that readers would reasonably conclude from one of her own tweets that Plaintiffs had stolen between $65 and $90 million from the USDA.  Walters Depo. Tr. at 481:10-19.

A *prima facie* case of falsity also exists as to claims that Defendants stole or diverted *any* money from these aid programs, much less $65 to $90 million.  See, e.g., L. Thomsen Decl., ¶3; Holm Decl. ¶2; 17-20, 22-23; Meehan Decl. ¶¶ 5, 7; Danckert Decl. ¶ 2; 9; B. Phiri Decl. ¶¶ 5, 7, 13.  The Court does not weigh evidence on an anti-SLAPP motion. *See Baral*, *supra.*  Even such an improper exercise, however, would find, at best, disputed issues of fact requiring denial of the motion. The above declarations are supported by abundant independent evidence, see Hayes, Ex. B-2, consisting of (l) a host of audits by independent auditors finding no fraud or other deficiencies, see Meehan Decl., ¶¶ 21-54; Phiri Decl., ¶¶13-15; Holm Decl., ¶¶ 19-20; (2) reviews and audits by the USDA itself, finding, for instance, that Planet Aid "[f]ulfilled its financial and administrative responsibilities, . . . [p]rovided adequate support for the use of monetized funds," and "[p]rovided adequate support for program outputs," *see*, SR Decl. Ex. 2(d); (3) field visits by USDA personnel, *see, e.g*., *id.* 2(c); (4) reports by consultants retained to evaluate the USDA programs, *see* Mambo, Kaluba, Kajumi  Decls.,   and (5) conclusions by those overseeing the programs, who found

"significant benefit to small-scale farmers," and that the "programs were a tremendous success." SR Decl. Ex. 14(h).

Defendants' evidence discussed *infra* cannot overcome a *prima facie* case of falsity. Such evidence is not even weighed against Plaintiffs' evidence at this juncture, and would be found by a jury to be deficient in any event. As discussed below, Defendants themselves confessed that they lacked basic information needed to support their allegations. *See infra* at 23-24. Nor will inuendo suffice. In lieu of evidence that any amount of money was stolen from the USDA, Defendants urged readers to infer such facts from a fourteen -year old request by Danish prosecutors to extradite Amdi Petersen to Denmark, *see* May 2016 Article at 7, even though neither Plaintiff was implicated in that case, see Korso Decl., and Defendants themselves conceded that the case had nothing to do with the USDA Program. See Salladay Depo. Tr. at 97:15-20. The USDA program did not even exist when that request was made.

Defendant Smith himself acknowledged that Defendants had no evidence to support the allegation that $65 to 90 million had been siphoned away, diverted or stolen, confessing:

> "we have the files from inside the computers of Planet Aid and looking at every last document again and again, there's plenty of strategizing on how to network with, say, the Clinton Foundation or other outfits to induce government agencies to give them money. There's quotas, there's all this documentation of the activities to get money, but there's no smoking gun as to what they're doing with the money."

See SR Decl. Ex. 4(r), at CIR 45871. Indeed, ample evidence exists establishing a *prima facie* case of falsity, and showing where the money went; Defendants simply ignored it.

### a. No Evidence is Offered by Defendants as to Mozambique

It was an important part of the story that the USDA's funds for both Mozambique and Malawi had been misused by Plaintiffs. Salladay Depo. Tr. at 77:9-17. Because two-thirds of the USDA's funds were actually used in Mozambique, Holm Decl., ¶9; 14, ECF 78-4 at 4, it would be impossible for even half of the USDA money to have been siphoned away or stolen unless there were evidence that funds were diverted from programs in that country. But all program goals in Mozambique were met and the accounting found accurate. See Holm Decl. ¶8, 18-22; Meehan Decl., ¶¶ 7, 43-47; SR Decl. Ex. 2(d). Based on its 27-year experience with ADPP Mozambique, the Government of Mozambique strongly endorsed that entity. SR Decl. Ex. 14(r).

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

In fact, Mozambique is not mentioned even once in the Defendants' motion, even though it is mentioned 28 times in the stories attached to the FAC.  See FAC Ex. A-U.  Not a single document is attached to any of the 20 declarations evidencing any fraud – large or small – involving the USDA in Mozambique.  Answers to interrogatories specifically identifying the "several insiders [who allegedly] told [Defendants] that 50 to 70% of US grant money was being siphoned away" include no one who had any contact with the USDA Program in Mozambique.  *See* Holm Decl., ¶¶ 28-33.  Neither Walters nor Smith were even able to offer any percentage of funds siphoned away from programs in Mozambique, *see* Walters Depo. Tr. at 494:10-19; Smith Depo. Tr. 353:5-12, and Walters could not even say how it would have been possible to carry out that fraud.  *Id.*   There is not even a shred of dispute on this point; no misuse of funds whatsoever occurred in Mozambique.

### b.    *Allegations about Misuse of Funds in Malawi are False.*

As far as Malawi, Defendants' evasive Answer to the original complaint creates a binding admission that they lacked "knowledge or information" as to the specific accomplishments in Malawi set forth in that Complaint.  ECF 34, ¶¶ 42-47.  But without that knowledge or information, they were in no position to allege that 50-70% of all funds had been fraudulently siphoned-away.

Moreover, evidence relating to the implementation of programs in Malawi unequivocally refutes Defendants' allegations of any fraud, including the massive fraud alleged by Defendants.  *See* L. Thomsen, Danckert, Phiri Decls*., supra.*  Those declarations are supported by independent evidence consisting of accounting records, audits, reviews, field visits and consultant reports for Malawi.  See B. Phiri Dec., ¶ 5:19-22; ¶ 7-9; Ex A; Meehan Dec., ¶¶, 30-33, 48-54.  Such evidence more than establishes a *prima facie* case as to falsity.

Nor can Defendants defeat a *prima facie* case based on the implausible theory that Plaintiffs were able to siphon-away or steal $65-90 million through "fabricated invoices" or "bills for expert consultants, book translation, travel, medical care and training."  See May 2016 Article at 22.  Given the magnitude of the alleged fraud, one would expect hundreds of examples of fraudulent or fabricated invoices.  When asked to identify any of the bills referenced above, the only documents specifically identified by Defendants were audit reports showing no fraudulent billing. S*ee infra* at 32-33.  The same is true of fabricated invoices, which they identified as invoices for "training."

11

1   *See* SR Decl. Ex. 15 (Interrog. Answ. 17).  Those too turned out to be audit reports affirmatively

2   refuting allegations of fraudulent or suspicious billing.  *Id*.

3       Defendants do not even mention in their motion the allegedly fraudulent invoices relied

4   upon in the stories.  One involved a purchase from a Hong Kong company called MERE.  See May

5   2016 Article at 22.  As it turns out, Defendants' key source, Longwe, had personally approved the

6   purchase of equipment from MERE because: "[t]hey offer competitive prices," "have readily

7   available stocks. . . ," "offer quality and durable thin clients," and "have a built in program that

8   conforms with our requirements and specifications as compared to the other suppliers."  B. Phiri

9   Dec., ¶ 40.  There was nothing fraudulent or suspicious about the transaction.  *Id.*  And as far as

10  allegations of double billing based on two invoices for computers purchased on behalf of DAPP

11  Malawi, see May 2016 Article at 22,  Defendants' motion abandoned any such claims, which was

12  shown to be false in any event. *See* B. Phiri Decl., ¶ 56.

13      Plaintiffs have similarly offered more than ample evidence to establish the falsity of each

14  of Defendants' other specific allegations. *See, e.g*., B. Phiri Decl., ¶¶ 36 et seq. (addressing

15  allegations by Longwe, Munthali and Goteka); Danckert Decl., ¶¶ 38-48 (addressing allegations by

16  Goteka and Munthali); Jensen Decl. (as to Gade's allegations).  "Accept[ing Plaintiffs'] evidence

17  as true, and evaluat[ing] the defendant's showing only to determine if it defeats the plaintiff's claim

18  as a matter of law," *Baral*, *supra*, it is clear that a *prima facie* case exists as to falsity of allegations

19  that Plaintiffs had misused the USDA's funds.

20      **2.  Defendants Falsely Alleged that Funds Were Stolen by Thomsen and Were Going to Petersen.**

21          ***a. Allegations that Thomsen was stealing the money***.

22      Defendants accused Thomsen both in their articles and at an AIDS/HIV conference of

23  stealing, saying "Your own people.  The people in charge of your money said you're stealing

24  money."  Podcast at 41.  In light of Plaintiffs' *prima facie* case that no money was stolen, it

25  necessarily follows that Thomsen had not stolen the USDA's funds.  In any event, Thomsen's

26  declaration alone establishes *prima facie* proof of falsity, *see* L. Thomsen Decl., ¶ 77, which is

27  supported by independent evidence discussed above.  *See supra*.  An even greater flaw in

28  Defendants' allegation is that no source even told Defendants that Thomsen was personally

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

"stealing money."  Mtimbuka, unequivocally denied it.  Mtimbuka Decl., 8/28/17 at ¶ 9.  In fact, none of the declarants named in interrogatory answers, see SR Decl. Ex. 16 (Interrog. Answ. 7) made that statement, even though attributed to them.[5]  Nor do Defendants even defend their allegation in their motion.

> **b.**  ***Defendants' false allegation that USDA funds were going to satisfy Petersen's expensive tastes.***

Being unable to support their claim that Plaintiffs were stealing money, Defendants resort to accusing both Plaintiffs and Petersen of being involved in a "cult."  See ECF 107, at 1.  But Defendants were not sued over that demeaning label.  They were sued because they had falsely alleged that according to "Teacher's Group bosses the money from the USDA was going straight to Mexico;" where Petersen was located, and that Mtimbuka, "knew where the money was going all along."  FAC ¶ 200.  Mtimbuka, the sole source for this assertion, flatly denied such allegations, stating: "I am not aware that money from the USDA was sent to Mexico," and that he was never told by any boss or superior" that this was true, and never told Defendants otherwise.  Mtimbuka Decl. (8/25/17) in opposition to the motion, ¶ 7.  His declaration suffices to establish falsity.

Also defamatory are allegations that Petersen was responsible for misuse of USDA funds, as shown by the catchy title that he was "playing a shell game" with those funds and that his desire for a condo and yacht was the answer to the question what happened to the money stolen from the USDA programs? Podcast at 44.  Multiple declarations establish the falsity of those allegations.  See L. Thomsen Decl., ¶¶ 89-90; Holm Decl. ¶ 47-48.  Defendants have not offered a shred of evidence that any money from the USDA program went to Petersen.  As for the condos and yacht, neither had anything to do with Plaintiffs or the USDA Programs.  And as Defendants well knew, those items were referenced in documents years before the USDA program, as shown by Defendants' own story.  See May 2106 Article at 7.

---

[5] Defendants cannot argue that they were only talking about DAPP Malawi, where Thomsen worked.  Defendants intentionally repeated her statement, "I'm definitely not stealing any money," Dkt. No. 78-17, at 5-6, making clear that they were accusing her personally.  The closest they came to any source accusing Thomsen of wrongdoing in declarations submitted by those allegedly supporting the allegation was a statement by Goteka that Thomsen had directed that payments be deducted from his salary, see ECF 126, ¶ 34, which was false.  See L. Thomsen Decl., ¶ 82.

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

### 3.   Defendants Falsely Alleged Farmers Received No Benefit from the Program

Another core allegation in the stories was that farmers had been cheated. Defendants' reported that they had been told by Farmers that "it was a lie" to say that farmers benefitted from the USDA Farmers' Club program.  Podcast at 41.

This also is false, as shown by the declarations both of individuals responsible for administering the programs, see Holm, ¶¶ 2, 17-22; L. Thomsen Decl., ¶¶ 42, 45-55; Danckert, ¶¶ 12-31, and beneficiaries.  One "farmer" identified in five different interrogatory answers, SR Decl. Ex. 16 (Interrog. Answ. 3, 9, 11, 12, 18) literally does not exist. *See* Walters Depo. Tr. at 557:3 to 8.  Defendants nevertheless continue to rely on that interrogatory answer and have not amended it. As to those farmers who actually exist, every single one of them has directly refuted what was published. See Kuchara, Chibwana, Chikaonda; Molande, Samson, Kamwendo Declarations  in opposition to the motion. Walters herself summed up one interview by stating that the young woman thought that the Farmers' Club program was "the best thing that ever happened to her family" as her young son and family members stopped getting sick after receiving well pumps. See Walters Depo. Tr. at 288:17 to 289:9.   Other declarants from areas visited by Defendants similarly refute Defendants' allegations.  *See* Machiwalala, Chatha, Gomani Decls. in Opposition.

#### a.       *The stories falsely alleged that Farmers' Clubs failed to receive equipment.*

The centerpiece of the story was that Plaintiffs failed to deliver 25 well pumps to each village, and instead had supplied each village, including the village of Njuli, with only one pump. See May 2016 Article at 29. Declarations submitted by Plaintiffs establish that farmers clubs received all pumps reported to the USDA. See Danckert Decl., ¶¶ 13-22; L. Thomsen Decl., ¶59. Those figures are also contained in official USDA reports.  See SR Decl., Ex. 6(i) and (j).  As far as allegations that anyone paid anything for a pump which was to have been provided for free as part of the USDA Program, that too is refuted in the declarations offered by Plaintiffs from the very same farmers falsely alleged to have been forced to buy the pumps.  See Chibwana, ¶3; Chikaonda, ¶5; Mwachilala Dec., ¶ 5; Kachara Decl.¶ 4.  As shown below, even Defendants admitted that they were unable to reconcile documents in their possession and information as to which they were aware with what was published. *See infra* at 25.

14

1

*b.  Defendants' falsely alleged that Farmers' Clubs had not been given livestock.*

2

Defendants alleged that "[f]armers said they had not received the livestock . . . that had been

3

reported to the USDA" ( ECF 78-16, at 5).  That allegation is also false.  Each farmers club was to

4

have received approximately six animals.  See Danckert Decl., ¶22.  Clubs received what was

5

reported, which is confirmed by the Log-Mon reports in Defendants possession.  See *id.*, ¶ 24.

6

Defendants claim was based on Mataka, where farmers allegedly received one goat and one

7

pig, both of which had died.  See Podcast at 26.  But Mataka had nothing to do with the USDA

8

Program, and any livestock provided to farmers in Mataka had been provided at DAPP's own cost,

9

as part of DAPP's charitable goals. L. Thomsen Decl., ¶60.  Defendants couldn't even truthfully

10

say that they believed that Planet Aid had given away only one goat and pig.  See Walters Depo.

11

Tr. at 391:6-9. In fact, Defendants saw that in the only villages visited by them actually participating

12

in the USDA program (Njuli, Dowa and Zomba) farmers received all livestock reported to the

13

USDA. *See* ECF 121¶ 8 (Chikaonda Decl.); ECF 114, ¶ 18 (Walters Decl.), Gomani Decl., ¶¶ 4-5.

14
15

**4.  Defendants' Falsely Alleged that Employees Didn't Receive Salaries Reported to the USDA and that Every "African Member of the Teachers Group" Interviewed by Them Was Forced to Contribute "everything they earned" to the Group.**

16

The third category of false statements relates to Defendants' allegations that 70% of over

17

$130 million was "stripped from employee salaries" by paying them less than what was reported

18

to the USDA, and then forcing them to contribute 20-100% of their salaries, or "everything they

19

earned" to the Teachers Group.  Podcast at 37, 44.  Plaintiffs have established a *prima facie* case

20

as to falsity of these allegations as to Mozambique, see Hayes Decl. Ex. B-3; Holm Decl., ¶¶35-37,

21

and Malawi, see L. Thomsen Decl., ¶¶91-94; B. Phiri Decl., ¶¶ 64-68; C. Danckert Decl. ¶ 34-37;

22

O. Thomsen Decl., ¶ 3.  Those declarations suffice to demonstrate a *prima facie* case of falsity.

23

Notably, Defendants have abandoned their allegation that the government was deceived as

24

to "paychecks . . . reported to the USDA." [6]  They admit that they were relying solely on the

25

statement of a confidential source who never shared with them any USDA "report of paychecks,"

26

*see* SR Decl. Ex. 16 (Interrog Answ 14), forgetting that they had previously represented to

27

28

[6]  *See* May 2016 Article at 19 ("[f]unds [we]re extracted by writing paychecks much smaller than reported to the USDA . . . It was written 350, but she's getting $100 per month").

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

Magistrate Judge Corley that they were not relying on any confidential sources.  See ECF 155 at 8. As a poor substitute, they have instead asked the Court to settle for a budget for a program from Finland, see ECF 116, ¶ 9(q):2-4, which is no substitute for what they published, and is irrelevant. Nor has the budget for that program ever surfaced.

Equally baseless is the claim that by having Teachers Group employees contribute money to that group, "Money from U.S. grants, over $130 million, up to 70% was allegedly taken from the projects it was meant for and stripped from employee salaries."  Podcast at 44.  Nowhere in Defendants' Memorandum do they offer – even now – any admissible evidence supporting that allegation, or how this could have even been possible as Defendants knew that more money would have had to have been "stripped" from salaries than the entire amount received for both countries.

None of the people Defendants interviewed contributed amounts reported, and many contributed nothing.  See, e.g., Mtimbuka Decl. (8/28/17), ¶ 6; Ole Thomsen Decl., ¶ 6; Kossamu Decl., ¶ 26; Machaka Decl. ¶¶ 3, 4, 6.[7]  Moreover, the very people relied upon for the stories had received more money than they had contributed based on the generosity of Lisbeth Thomsen and others.  See Ole Thomsen Decl., ¶ 12; Kossamu Decl. ¶ 20.  Others listed in interrogatory answers as being those referenced in the stories, see Rosenthal Decl. Ex. 15 (Interrog. Answ. 6), were never members of the group and/or never contributed a dime.  See L. Thomsen Decl., ¶ 93.  Others contacted by Ngwira contributed a dollar or so, which was used for members of the group for activities; one actually received many times the modest amount contributed by her, rather than the other way around.  *See, e.g.*, Wandale Dec., ¶ 4, 7; *see also* Kumwenda Dec. ¶ 3, 6; Butao, ¶ 4.

Finally, Defendants falsely alleged that Zebiah had no idea what use was made of the money which he collected, *see* Podcast at 27, even though he was one of two signatories to the account where contributions for his groups were kept, which was being supplemented. See Machaka Decl., ¶ 10; Ole Thomsen Decl., ¶¶ 8-11.  As with Mtimubka and his group, Lisbeth Thomsen and others had been giving away their salaries to Zebiah and others.  *See id*., Mtimbuka Decl. (8/25/17), ¶ 6.

---

[7] Defendants even had a payroll record which reflects that those individuals interviewed by them who were still employed by DAPP Malawi had not contributed 20-100% of their salaries, and some contributed nothing.  See B. Phiri Decl., ¶ 67.

16

**D.  The "Substantial Truth" Defense Cannot Immunize Defendants.**

Defendants fail to deal with any of the facts set forth above.  They argue that even if their reporting was literally false it was somehow substantially true. To establish a substantial truth defense, a defendant must establish that only a "slight inaccuracy" exists, *see Masson*, 501 U.S. at 516-517, **and if so**, that the published statement would not "have a different effect on the mind of the reader from that which the … truth would have produced.' " *Carver v. Bonds*, 135 Cal. App. 4th 328, 344-45 (2005) (quoting *Masson,* 501 U.S. at 516–517).  At this stage of the proceedings, once Plaintiffs have established that there is a *prima facie* case establishing, for instance, that no fraudulent diversion of USDA funds occurred, the substantial truth doctrine cannot save the allegation.  Any reader would see the difference between a statement that no diversion of funds had occurred, and claims that Plaintiffs had stolen tens of millions of dollars.

Moreover, the substantial truth doctrine is not a license to embellish or exaggerate. Defendants brashly claim that if they could show any misconduct by Plaintiffs,  no matter how trivial and whether involving the USDA programs, then their reporting was substantially true.  ECF 107 at 27.  That is not the law. "As in other jurisdictions, California law permits the defense of substantial truth even if a defendant cannot 'justify every word of the alleged defamatory matter; it is sufficient "if the substance of the charge be proved true, irrespective of ***slight*** inaccuracy in the details.'" (*Masson, supra*) (emphasis added).  ""Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Id*. at 517.  The doctrine only applies to a "slight discrepancy" of facts, *Gilbert v. Sykes* 147 Cal.App.4th 13, 28 (2007) or a "semantic hypertechnicality." *James v. San Jose Mercury News, Inc*. 17 Cal.App.4th 1, 17 (1993).

Finally, whether a statement is substantially true is a jury question.  See *Maheu v. Hughes Tool Co*., 569 F.2d 459, 465-66 (9th Cir. 1977); see also *Hughes v. Hughes*, 122 Cal. App. 4th 931, 936-37 (2004); *Bently Res. LP v. Papalioli*os, 218 Cal. App. 4th 418, 435 (2013).  Ample evidence exists for a jury to find that Defendants' statements were neither true nor substantially true.

This case is not about slight or or "minor" inaccuracies.  Defendants' challenged statements are false, and Defendants disavowed any ability to say that what was published would have had the same impact on readers' minds as a truthful statement.  *See* Walters Depo. Tr. at 284:11 to 285:6.

17

### E.  Plaintiffs Have Established A *Prima Facie* Case as to Malice.

In addition to demonstrating that Defendants' publications were false, Plaintiffs can also show that Defendants acted with the requisite fault to establish defamation. Generally, the Constitution only requires a showing of negligence. *See Gertz v. Robert Welch*, 418 U.S. 323 (1974).  Defendants make no attempt to dispute that Plaintiffs can satisfy a negligence standard, abandoning any argument that dismissal is appropriate if that standard applies. Instead, Defendants insist that Plaintiffs are public figures, who must show constitutional malice or "actual malice." Defendants are wrong, but the evidence is more than sufficient under either standard.

### 1.   Malice is Only Required for Public Figure Plaintiffs, which Plaintiffs Are Not.

"[M]alice" must be shown only if the plaintiff is a "public figure." *New York Times v. Sullivan*, 376 U.S. 254 (1964). Public figures must show that a defamatory statement was made knowing that it was false, or that the speaker acted recklessly or doubted the truthfulness of the statement.  *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 265  (9th Cir. 2013).

Defendants do not argue that Plaintiffs are general public figures, which would require "clear evidence of general fame or notoriety in the community, *and* pervasive involvement in the affairs of society." *Id.*  Instead, Defendants argue that they can sustain their burden of showing that Plaintiffs are "limited public figures" "for purposes of statements about their use of public funds for charitable causes." ECF 107 at 12:18-19.  But the limited public figure doctrine requires a showing that:  "(i) a public controversy existed *when the statements were made*, (ii) the alleged defamation is related to the plaintiff's participation in the controversy, and (iii)  the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution," *Makeoff*, 715 F.3d at 266 (emphasis added)..   Even then, to be a limited purpose public figure the plaintiff must have "regular and continuing access to the media." *Hutchinson v. Proxmire*, 443 U.S. 111, 136 (1979); *Time, Inc. v. Firestone*, 424 U.S. 448,  454 (1976) (high-profile "cause-celebre" divorce does not convert plaintiff into public figure).  "Media access that becomes available only "'after and in response to" damaging publicity does not make someone a public figure.' "  *LaLiberte v. Reid.* 966 F.3d 79, 91 (2d Cir. July 15, 2020) (quoting *Khawar*, at 266). Similarly, "those charged with defamation cannot, by their own conduct, create

18

their own defense by making the claimant a public figure." *Hutchinson*, 443 U.S. at 135; *see also Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 167-68 (1979).

As shown below, Plaintiffs here did not "thrust themselves to the forefront," *Gertz*, 418 U.S. at 346, of "the particular controversy giving rise to the defamation," *Makeoff*, 715 F.3d at 266, "in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 346.

### a.   No "Public Controversy" Existed.

"First, the court must identify the relevant controversy and determine whether it is a public controversy." *Jankovic v. International Crisis Group*, 822 F.3d 576, 585 (D.C. Cir. 2016).  There must be an actual controversy debated by the public with "foreseeable and substantial ramifications for nonparticipants" that exists prior to and at the time of the alleged defamatory statements. *Id.* at 1297. "The courts must look to what already were disputes," *id.* (citing *Hutchinson v. Proxmire*, 443 U.S. at 135), and whether "the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Id.*

Here, Defendants themselves identified the controversy when deciding to proceed with the stories.  As framed by Defendants themselves, the issue addressed in the stories was the USDA funding of Planet Aid. *See* SR Decl. Ex. 17(f).  Smith conceded that this topic "had not received public scrutiny."  Dkt. No. 125, ¶ 7.  Both Walters and Editor-in-Chief Pyle concurred that no one had reported on the issue of USDA funding before and that the story was "new."  See Pyle Depo. Tr. at 368:15-18; Rice Decl. Ex. A.  As the Editor-in-Chief put it, no one wanted to work on a story that would "feel old," *id.* at 368:8-11, and distinguished the story they wanted to pursue – USDA funding of Planet Aid – from stories about whether Petersen led a Danish cult, *see* SR Decl. Ex. 17(f), or blogs attacking the Teachers Group as a "cult."  Not a single article cited by Defendants deals with the topic of whether Plaintiffs had stolen from the USDA.

The argument as to Thomsen is even weaker.  Defendants rely on an article from 2002, fourteen years before their story,  (Ngwira Dec., Ex. A), another nine years later, in 2011, *id.*, Ex. B, and the last one in 2016, which merely repeated Defendants' reporting.  *Id*, Ex. D.  Defendants cannot build a "public controversy" over two articles, nine years apart, and having nothing to do with the "public controversy" they identified, relating to the USDA Programs at issue.

### b.    The defamation did not relate to Plaintiffs' participation in any controversy.

Since no public controversy existed, the Court need not even reach the second and third prongs.  But even if a controversy could be found to exist, Defendants fail to allege how they satisfy those prongs.

Defendants do not even argue that their defamatory statements had anything to do with the sparse public statements they can identify.  For instance, the defamation had nothing to do with the fact that a television show referred to Planet Aid bins used to recycle clothing, *see* Dkt. No. 107, at 12.  Similarly, none of their defamatory statements relate to any statement by either Plaintiff in any of the articles they cite, or social media they mention.   See ECF 107, at 12.

### c.    Neither Plaintiff "*voluntarily injected itself into any controversy, if one could be found, in order to influence the controversy's ultimate resolution.*"

Finally, neither Plaintiff did anything to "thrust themselves" into any controversy. "Trivial or tangential participation [in a controversy] is not enough," instead, plaintiffs must have "achieved special prominence" and "'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution." *Makeoff*, *supra*, (quoting *Gertz*, 418 U.S. at 345). The plaintiff is required to be "purposely trying to influence the outcome" of the debate, or be "realistically . . . expected, because of his [especially prominent] position," to impact the controversy's resolution beyond that of any general commentator.

Merely being "very high-profile" within one's own industry does not thrust oneself into a public controversy surrounding that industry, or one's own financial practices. *Carver*, 37 Cal. Rptr. 3d at 500.   A plaintiff does not thrust itself into a public controversy when it denies the press' statement or takes the newspaper to court as "the only redress available." *Time, Inc. v. Firestone*, 424 U.S. at 457; *see also Wolston*, 443 U.S. at 167-68. In that case, the plaintiffs have been "drawn into a public forum largely against their will." *Time*, 424 U.S. at 457. "Merely doing business with parties to a public controversy does not elevate one to public figure status."   *Vegod Corp. v. American Broadcasting,* 25 Cal.3d 763, 769 (1979). Similarly, a "private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." *Khawar*, at 267 (quoting *Wolston, at* 167).

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

Planet Aid similarly did not thrust itself into any controversy by having three social media channels with less than 9,000 followers worldwide.  Dkt No. 107 at 12:21-23.  That does not constitute a "massive" advertising campaign, and there is no showing any of the social media even relates to any "controversy," much less Defendants' defamatory statements.  And to put the number of followers in perspective, one of the three Defendants, CIR, has 52,700 twitter followers using the handle @reveal, and 49,600 twitter followers using the handle @CIRonline.  See twitter.com. Defendants disputed that this constitutes a "massive advertising campaign," or even any advertising at all.  ECF. 11-11, ¶ 11.  As far as Thomsen, she does not even have a social media account. *See* Thomsen Decl., ¶ 6.

Neither Plaintiff is like the one in *Resolute Forest Products v. Greenpeace*, 302 F. Supp. 3d 1005, 1006 (N.D. Cal 2017)), who generated "large scale demonstrations and signed petitions" prior to the alleged defamatory statements, or the plaintiff in *Chapin v. Knight-Ridder, Inc.*, 993 F. 2d 1087, 1092 n.4 (4th Cir. 1993), which based on that Circuit's precedent, "'thrust[] itself into the public eye' through 'massive solicitation efforts.'"  *Id.* (quoting from *National Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.*, 705 F.2d 98, 101 (4th Cir. 1983).

Here, neither Plaintiff even rises to the level of the plaintiff in *Hutchinson, supra,* who was held not to be a limited purpose public figure even though he had: (l) led a charity obtaining federal funds, (2) been mentioned in newspapers, (3) published writings in his field, (4) won an award for his use of the funds, and (5) responded to news reports. 443 U.S. at 134-35.  The Court held that a "concern about general public expenditures . . . is shared by most and relates to most public expenditures; it is not sufficient to make [a plaintiff] a public figure." *Id.*  The Court held that allowing a concern for public expenditures to suffice would turn "everyone who received or benefitted from the myriad public grants for research [into] . . . a public figure." *Id.*

Consequently, Defendants fail all three tests: (l) no public controversy existed; (2) Defendants were not reporting about Plaintiffs' public participation in that particular controversy, and (3) neither Plaintiff voluntarily thrust themselves into any alleged controversy.  Plaintiffs may prove their case on a mere showing of negligence, a showing which Defendants do not dispute.

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

## 2.   There is ample evidence from which a jury could find malice.

Even if a showing of malice were required, it is easily met.  Defendants frivolously contend that Plaintiffs fail to plead malice.  See ECF 107, at 13.  The FAC pleads malice throughout.  See, e.g., ECF 78, ¶¶ 193, 196, 210 etc. Constitutional malice can be shown if the publisher of a statement "in fact entertained serious doubts as to the truth of the publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Likewise, recklessness exists where there are "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant,* at 732.

In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 157-158 (1967), for example, the Supreme Court upheld a verdict in favor of a coach falsely accused of fixing a college football game.  The Court found that multiple factors supported a finding of actual malice including: the story was in no sense hot news, the seriousness of the charge required a thorough investigation, elementary precautions were ignored, sources had credibility problems while others were not even interviewed, and the defendant was anxious to portray the image of a "sophisticated muckraker." *Id.*[8]

There are many parallels between the evidence proving actual malice in this case and the proof found to establish actual malice in *Curtis Publishing*. Defendants' stories were not "hot news"; Defendants understood the possible resulting harm and the need for a thorough investigation; careless utilization of slipshod and sketchy investigative techniques were used; Defendants persisted in their reporting despite warnings from their own editors as to certain facts; they ignored contrary information from reputable sources; and they relied on biased sources.

Even beyond the facts in *Curtis Publishing,* a juror here could easily find that it was reckless to hire and give Ngwira free reign, even though he had been convicted of trying to use his position as a journalist to extort the subject of a story, especially when Ngwira tried to bribe sources and told others they could profit from information given Defendants.  See Hayes Decl. ¶¶ 21-40.  It was

---

[8] See also *Goldwater v. Ginzburg*, 414 F.2d 324, 3439-340 (2nd Cir. 1969) (evidence of a preconceived plan to attack plaintiff shows malice); *Overstock.com, Inc. v. Gradient Analytics*, 151 Cal. App. 4th 688, 711 (2007) (evidence defendant "relied on information from biased sources, made statements in its reports without doing the necessary investigation and due diligence, and made statements with defamatory implication to achieve a preconceived result"); *Harte-Hanks Communications, Inc. v. Connaughton* (1989) 491 U.S. 657, 688-692 (recklessness shown where defendant purposefully avoided the truth); *Khawar, supra,* at 267-268 (malice based on obvious reasons to doubt accuracy of charge).

particularly reckless to keep Ngwira's criminal record a secret from those working on the story, *id.*, ¶ 20, and to leave fact-checking to the reporters who candidly admitted being unable to reconcile their reporting with documents in their possession. *Id.*, ¶¶ 61-68. *See also infra* at 24-25, 33.

### a. Defendants' own statements are sufficient to show malice.

Defendants have acknowledged facts which provided "obvious reasons to doubt" what they were alleging, and beyond that, they had actual knowledge that some of their allegations were false. Defendants' own statements are sufficient to sustain a finding of malice on both scores.

Most outrageous is Defendants' assertion that Planet Aid received and then diverted most of over $130 million. Aware that the USDA paid numerous vendors directly, Defendants were told by their own editor that they needed to "be clear and not confusing that dollar amount of grants [totaling over $130 million] is not actually what Planet Aid got." SR Decl. Ex. 6(n); *id.*, Rosenthal Depo. Tr. at 222:22 to 223:8. Defendants nevertheless used that $130 or $133 million figure 63 times in the publications attached to the FAC alone, *see* ECF 78, as well as in additional social media. See SR Decl. Ex. 6(e)(Smith tweet). They knew their statements were false. Referring to Walters' "tweet that Planet Aid had gotten "$133M from the U.S. Government," Dkt. No. 78-22, at 5, which was siphoned away, ECF 78-22 at 33, CIR's Executive Director testified that Walters should have known that her tweet was incorrect. Rosenthal Depo. Tr. at 246:7 to 247:12.

Additionally, "[a] triable issue of malice . . .exists if [a defendant] made a statement . . . [which they] did not believe to be true." *McGrory v. Applied Signal Technology, Inc*., Cal.App.4th 1510, 1540 (2013). Defendants refused to testify that they even believed what they had alleged, namely that 50-70% of the USDA's funds had been fraudulently siphoned away. *See* Rosenthal Depo. Tr. at 284:4 to 286:17; Walters Depo. Tr. at 481:22 to 483:22. They similarly refused to say that they believed that any money had been siphoned away from Mozambique, *see* Walters Depo. Tr. at 481:10 to 494:19; Smith Depo. Tr. at 352:14 to 353:12, or that they could dispute achievements in Malawi. *See supra* at 2.

Even without those admissions by Defendants, evidence of recklessness is overwhelming. Defendants knew that it was a mathematical impossibility for Planet Aid to have diverted or stolen $65-90 million, without depleting the entire $70 million obtained for use in both Malawi and

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

Mozambique. The statement was so "inherently improbable" that it should not have been published. *Christian Research Institute v. Alnor*, 55 Cal. Rptr. 3d 600, 612 (Cal. Ct. App. 2007).

As to Mozambique, Defendants had more than "reason to doubt" what they were publishing since none of their sources who purportedly told them that 50-70% of USDA funds had been fraudulently siphoned away had anything to do with the USDA program in Mozambique or ADPP Mozambique. *See* Holm Decl., ¶¶ 28-33, 36, 37. Defendants' allegation went from "inherently improbable" to ludicrous in light of their admission that Mozambique accounted for two thirds of the USDA grant money. See ECF 78-4 at 4. On top of that, Defendants candidly admitted having no knowledge how money could have been siphoned from programs in Mozambique, *see infra*, or anything about programs there. *Se*e Pyle Depo. Tr. at. 207:9-15; Rosenthal Depo. Tr. at 284:13-18.

Nor can Defendants argue that they believed that Plaintiffs had stolen approximately $65-90 million (50-70% of over $130 million) from the program in Malawi when all programs in that country combined totaled *less than $25 million*, much of which went to subcontractors, and Defendants admitted lacking information whether two schools had been constructed, a third substantially expanded, over 2,000 teachers trained, and over three-quarter of a million people educated about the AIDS/HIV epidemic and how to deal with it, none of which is even remotely disputed. *See supra*, at 2. CIR's Executive Editor who was responsible for doing a "line-by-line" review of the May 23, 2016 Article admitted his own serious doubts about what they had published when he denied being able to testify that he had seen evidence that even a fraction of what was alleged had been fraudulent siphoned away. See Rosenthal Depo. Tr. at 284:4 to 286:17.

Additionally, Defendants denied knowledge of facts required for them to have believed other specific allegations. They denied, for instance, knowing: (1) how many pumps should have been delivered to farmers or how many they got, Walters at 328:7 to 329:1; Smith at 189:21 to 190:17, despite alleging that farmers "did not receive all of the  . . . water pumps  . . described in official USDA reports," ECF 78-8, at 4; (2) how many livestock farmers' clubs were to have received or what they actually got,  Smith at 190:18 to 191:12; Walters Depo. Tr. at 391:6 to 392:7, despite alleging that they had been deprived of all livestock described in the same official reports, ECF 78-8 at 4; and (3) amounts contributed by individuals interviewed by Defendants, Smith Depo.

24

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

Tr. at 433:1 to 435:12, despite alleging that everyone interviewed had contributed "20-100% of their salaries" to the Teachers Group, "everything they earned." Podcast at 37.

Defendants knew also that $65-90 million had not been fraudulently diverted from the USDA and did not go "directly to Mexico" to build a facility for the Teachers Group, or headed "to Zimbabwe, one transaction at a time." See Podcast at 39. Defendants admitted having serious doubts about the truth or falsity of their statements when, after going through thousands of pages from inside Planet Aid's computers, thousands more pages from the USDA, they could find "no smoking gun as to what [Plaintiffs] are doing with the money." *See* Smith Depo. Tr. at 176:3 to 177:11; SR Decl. Ex. 17(r), at CIR 45871. Editor-in-Chief Pyle again admitted having serious doubts about what they were publishing when she told others that they shouldn't "tease" readers into thinking that they were able to show what had been done with the money. *See* SR Decl. Ex. 17(b) (CIR 37915). They did exactly that, even though they admitted after publication that they still knew "very little" about what happened to the USDA funds. See SR Decl. Ex. 4(e).

In their depositions, Defendants could not even reconcile declarations submitted in support of the motion with published allegations that villages had been cheated out of pumps. See Walters Depo. Tr. at 346:1-7; Rosenthal Depo Tr., at 372:6 to 373:10. The same is true of allegations that each village was supposed to have received 25 pumps, *see* May 2016 Article at 25, which Walters acknowledged was not true when telling another news organization, "[i]t turns out, no, they were only supposed to get one." Waters Depo. Tr. at 386:9 to 387:12. Nothing could be more direct evidence of malice than publishing a known falsehood.

Yet another allegation which is directly refuted by Defendants' own statements is the allegation that "we've visited Farmers' Clubs and that at every instance the Farmers themselves told us that was a lie" to say that farmers lives had changed or that they benefitted from the program. See, e.g., Dkt. No. 78-17, at 26. Walters summed up one interview by stating: "So, she couldn't stop smiling. She kept smiling the whole time. She says that they eat three times a day. That she's able to keep her baby healthy. They don't have diarrhea. They haven't had it since the pump [given by Planet Aid] went in. I mean she literally thinks that - I don't know, it just seems like it's the best thing that's happened for this family." Walters Depo. Tr. at 288:17 to 289:9.

Defendants' admissions also show their awareness of the falsity in alleging that the USDA had continued funding Planet Aid while under investigation by the FBI and IRS for "fraud, tax evasion or pilfering of humanitarian funds." See May 2016 Article at 30.  Smith himself admitted knowing that any FBI investigation had "fizzled," as he put it, two years before the USDA Programs began.  SR Decl. Ex. 17(l).  Defendants had been told just a month before the release of the May, 2016 article that DOJ reported: "[Defendants] claim to be seeking justice – but it sounds like they really just want to smear people and then allege that no one is following up," *id.*, Ex. 17(m), hardly an endorsement of Defendants' allegation that the FBI had found a massive fraud.  And the same source who was quoted in the story, see May 2016 Article at 33, had told Smith how the "bozos," referring to the FBI, had given her the brush-off and had done nothing.  See SR Decl. Ex. 17(e).

Defendants also alleged that a foreign bank account was used to divert money to a Hong Kong company named MERE for the purchase of equipment, *see* May 2016 Article at 22, but abandon that issue in their motion.  Defendants admitted privately their own serious doubts about their allegations when Smith described MERE as nothing more than a "mystery we would like to solve," and that they could not "corroborate the information with financial records that allow us to describe in a story where the money is going, what the entity is used for precisely, or how it fits in the larger picture of the Teachers Group financial network." SR Decl. Ex. 4(d).

### b.  *Misrepresenting what sources had said, relying on others known to lack a basis for what was being published, or those openly hostile to Plaintiffs, shows malice.*

Defendants excuse their publication of facts known to be false by arguing that they had a right to rely on anything sources told them.  See ECF 107 at 22.  That is not the law.  Malice exists where "there [were] obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Khawar*, at 276 (citing *Harte-Hanks Comm. v. Connaughton*, 491 U.S. 657, 682 (1989). *See also Fisher v. Larsen*, 138 Cal. App. 3d 627, 639-640 (1982) (defamation shown by defendant's unjustified acceptance of hearsay version from known hostile source and without investigation or contacting other known sources); *Grewal v. Jammu* (2011) 191 Cal. App. 4th 977, 994 (2011).

Sources who allegedly told Defendants that at least half the US government grant money had been fraudulently siphoned away, see Podcast 39, made no such statement.  See Holm Decl.,

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

¶¶ 28-33 (as to Mozambique).  As to Malawi, Defendants offer declarations by four sources who were not named in the stories, but who were alleged to have made the statement.  See SR Decl. Ex. 15 (Interrog. Answ. 2, 4).  None did.  See ECF 108; 120; 126 and 127.  The mere fabrication of statements by sources can alone establish malice.  See *Price v. Stossel*, 620 F.2d 992, 1002 (9ᵗʰ Cir. 2010) ("Even if a fabricated quotation asserts something that is ***true*** as a factual matter," the statement may be defamatory).  It is patently frivolous to allege that if the allegations by those insiders didn't pan out, at least "the percentages [alleged to have been fraudulently siphoned away from the USDA's funds] were stated as alleged by sources."  ECF 107 at 10.  None of the four sources providing declarations offered any such percentage. See ECF 108, 120, 126, 127.

Nor would it have even been a defense if the sources had offered such percentages. "Liability for repetition of a libel may not be avoided by the mere expedient of adding the truthful caveat that one heard the statement from somebody else."  *Flowers v. Carville,* 310 F.3d 1118, 1131 (9th Cir. 2002).  Defendants knew that none of the sources allegedly relied upon for their blockbuster allegation were in a position to have made such accusations.

Defendants' constantly changing position as to sources failed to reveal any in a position to have made the published statement.  Editor-in-Chief Pyle, who did a line-by-line review, see ECF 125, ¶38, acknowledged: "of course, they're not talking about the 133 million. They're talking about whatever portion of the grant they oversaw."  Pyle Depo. Tr. 99:5-17.  Three of those cited in their motion, (Munthali, Chitosi and Gade), *see* ECF 107 at 26, had no involvement whatsoever in the USDA program, explaining why the USDA or any percentage of funds siphoned away is nowhere mentioned in their declarations. See ECF 108, 119, 126.  The Executive Producer who shared fact-checking responsibility was not even aware that Munthali lacked all knowledge that a USDA program even existed.  *See* Sullivan Tr. at 214:11 to 216:17.

Three others alleged to support the statement that at least half the USDA's funds were siphoned away were Malawi farmers who never worked for Planet Aid, DAPP Malawi or the USDA, see ECF 107 at 26, and have denied the truth of what was reported and recount instead that they were offered equipment for helping Defendants with the story.  See  Chibwana Decl.¶ 9; Chikaonda Decl., ¶¶ 4; Molande Decl., ¶ 11.  A seventh named insider, Mtimbuka, was fired for

trying to embezzle funds from the USDA Program, see L. Thomsen Decl., ¶ 43, and even so, flatly refuted what was published. See Mtimbuka Decl., (8/25/17), in opposition to the motion, ¶¶ 4-5.

In discovery, Defendants came up with new "sources" to justify their story. See SR Decl. Ex. 15, (Interrog Answ. 2, 4): Emmanuel Phiri and Rikke Viholm.  *See supra*.  Both flatly deny making any such statement or holding any such belief.  See E. Phiri Decl., Viholm Decl. Defendants concede they never even spoke to Viholm, *see* Smith Depo. at Tr. at 330:2-7. [9]  Phiri contends that Defendants tried to bribe him.  E. Phiri Decl., ¶ 3.

The only named "insiders" left, whose statements are offered in support of Defendants' motion, are Goteka and Malabwe.  Nothing in either statement could possibly be construed as alleging that at least half the USDA' funds had been fraudulently siphoned away.  Malabwe didn't mention the USDA at all – not one word.   See ECF 109-6 at 45-72. As for Goteka, he uttered the word "USDA" a single time in his twenty page declaration when stating that DAPP Malawi was funded by donors, "including government donors such as USDA."  See ECF 126 at 15.

The only individual who mentioned the USDA Program was Harrison Longwe, who had begun a six-month probationary period at DAPP Malawi in September, 2013, as the USDA Program was ending.  See L. Thomsen Decl., ¶84.  It would be enough under *Khawar*, 19 Cal 4th at 275-76, if only one of the editors expressed serious doubts about relying on Longwe. Here, three of them, along with Smith himself, did so, as explained below.

One editor stated that Longwe's published statement that 70% of the USDA's funds had been siphoned away was "problematic." SR Decl. Ex. 8(c).  A second editor reviewing Longwe's statement stated:  "oof this is pretty weak."  See  SR Decl. Ex. 12(e), at CIR 25610.  A third editor warned against publishing Longwe's statement as a flat statement of fact, and without the "important" qualification that it was only what he "believed," not anything he "knew," or else readers would get the "wrong impression."  Rosenthal Depo. Tr. *at* 270:20 to 271:13; 288:14 to 289:5. Smith stated that Longwe was like a "blind person trying to describe the leg of an elephant," and "only knew so much."  SR Decl,. Ex. 4(l) at CIR 45786.  Another news outlet refused to join

---

[9] Smith conceded that there was no justification for CIR listing Viholm in its answer. CIR, on the other hand, has never amended its answers and continues to rely on them.

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

in Defendants' article without concrete information or even an estimate from Longwe how much money was missing, or evidence US law or USDA regulations were violated.  SR Decl. Ex. 17(e).

On top of all of that, Defendants did not even correctly report Longwe's statement, but altered it to fit their pre-conceived script.  In his interview, Longwe gave his understanding of amounts to have been spent in Malawi.  *See* SR Decl. 6(e).  He overstated by ten times the actual amount received for the Farmers' Club Program and over three times the total amount for all Malawi programs combined.  *See* B. Phiri Decl., ¶ 26. [10]  Defendants' alteration of Longwe's statement in the Podcast to delete that error, see Podcast at 39, precludes relying on Longwe to defeat a claim of malice.  *See Goldwater*, 414 F.2d at 337 ("One cannot fairly argue his good faith or avoid liability by claiming that he is relying on the reports of another if the latter's statements or observations are altered. . . .").  The Executive Editor recognized that because Longwe was not presented with the correct figure, it is impossible to know how it would have changed his statement.  Rosenthal Depo. Tr. at 322:3-11.

Nor can Defendants argue that Longwe's statement was merely his own opinion, which immunized them from liability.  See ECF 107 at 21.  "[A]n opinion loses its constitutional protection and becomes actionable when it is incorrectly reported," or is "'based on implied, undisclosed facts' and 'the speaker has no factual basis for the opinion.' " *Piping Rock Partners, Inc. v. David Lerner Associates, Inc.*,  946 F.Supp.2d 957, 972  (N.D. Cal. 2013).

The alteration of Longwe's taped interview was not the only time Defendants resorted to manipulating evidence.  In an interview on a show called Press Play, Smith and Walters purported to play two clips of farmers cheated in the USDA Program. See ECF 78-19.  One was Jackson Mtimbuka, who Smith and Walters knew was not a farmer, but someone who had been fired for stealing from the USDA program.  L. Thomsen Decl., ¶¶72-73.  The other was Johnnie Kamwendo, who told them that he had nothing to do with the USDA Program and who was told "to say the things he said during the interview."  Kamwendo Decl., 1/29/19, ¶ 6.

---

[10] Longwe stated during his interview:  "So with the $80 million the impact . . .  was suppose [] to be huge."  SR Decl., Ex. 6(e). After Longwe was told that his initial $80 million figure was incorrect, he again got it wrong when he tried to correct himself by saying that the grant had been split evenly between Malawi and Mozambique. *Id.* It wasn't. *See* 78-4 at 4 (chart showing grants).

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

It was also unreasonable to rely on sources when it came to other allegations about the USDA program.  Defendants claim, for instance, that it was reasonable to take the statements of their sources at face value regarding fraudulent invoices since multiple sources had made similar claims, see ECF 107 at 14, no matter how outlandish the claims.  That flouts settled precedent.  See *Flowers v. Carville*, *supra*.  As shown below, Defendants had no right to rely on sources who cited documents flatly refuting their allegations, s*ee infra* at 31-34, particularly in light of evidence that sources were improperly induced to make statements.  *See infra* at 37-38.

When it came to the Farmers Club Program, every single farmer interviewed by Defendants disputed the accuracy of what was published. See Chibwana, Chikaonda, Molande, Kachara, Samson Decls. One village, Mataka, had nothing to do with the USDA Program, L. Thomsen Decl., ¶60.  The individual there expressly told Defendants that he knew nothing about the USDA program and that any livestock or plantings had been provided by students at a nearby vocational school, but he was told to "say the things he said in the interview." Kamwendo Decl. (1/29/19), ¶ 7.

Nor can Defendants argue that Plaintiffs are relying on farmers who signed declarations after the stories were published.  Every single declaration recounts statements made to Defendants while being interviewed.  *See supra*.  Moreover, they explained how Defendants used unethical methods to make negative comments, including lying to them about having been cheated and offering money or well pumps in return for helping to expose those who had cheated them. See Chibwana Decl. ¶ 9; Kachara Decl., ¶ 2; Molande Decl., 11; Samson Decl. ¶ 4.  A reasonable juror could conclude that even if Defendants were not flatly told by farmers that their stories were false, Defendants' own tactics established "reason to doubt" what they were publishing.

Defendants again misrepresented sources when alleging that "about a dozen African members of the Teachers  Group" told Defendants that they had been forced to kickback to the group 20-100% [of their salaries], everything they earned."  Podcast at 37.  Not one did so, as evidenced by Documents shown to Defendants by their source.  *See infra* at 34-35.   Four individuals cited as the "African members of the Teachers Group" relied upon for the story (Munthali, Chitosi, Junge and Mvula), see SR Decl. Ex. 15 (Interrog. Answ. No. 6), were never "African members" of the group and/or never contributed any money. See L. Thomsen Decl., ¶93.

Finally, *New York Times Co. v. Sullivan*, 376 U.S. at 287, eschewed relying on a "failure to thoroughly investigate when relying on the statements of those with good reputations." Here, Defendants relied on Mtimbuka, fired for embezzlement, Malabwe, fired for fraud, see L.Thomsen Decl., ¶¶ 43, 78, and Ngwira convicted of extortion. *See supra.* As to others, "[r]eliance solely on 'a source known to be hostile' toward the plaintiff may provide reason to doubt the source's veracity, and hence constitutional malice." *Evans v. Unkow*, 45 Cal. Rptr. 624, 628 (lst Dept. 2019). Defendants strung together a list of allegations supported by a single hostile source. These included: (l) Chiku Malabwe, fired for fraud and who tried to extort money from DAPP Malawi by threatening to talk with Defendants unless he was paid; *see* SR Decl. Ex. 16 (Interrog. Answ.17) (cited as sole source); (2) Jackson Mtimbuka, fired for trying to embezzle funds from the USDA Program; see Interrog. Answ. 4 and 13 (sole source); (3) Mbachi Munthali, fired by DAPP Malawi and suing for wrongful termination; see ECF 119, ¶¶ 3-5 (sole source regarding lack of procurement policies); (4) Patrick Goteka, who twice filed claims for benefits, see ECF 126, ¶¶31, 32, 42-46. (sole source as to Amalika, Jacaranda and money deducted from his salary). Malice can be inferred also from editors' admission that they "open themselves up" by failing to disclose facts bearing on sources' credibility. See SR Decl. Ex. 4(g).

### c.   *Defendants misled readers about key documents which disproved their allegations, and then defended their reporting by claiming that had never really looked at them.*

Malice is also established where a journalist fails to consult material conflicting with what was being published. See *Khawar,* 19 Cal. 4th at 276 (citing *Harte-Hanks*, at 682); *Palin v. New York Times*; 940 F.3d 804 (2nd Cir. 2019). Defendants falsely allege that Plaintiffs have not challenged that they paid "dubious expenses and fabricated invoices," or challenged the financial records referenced in the stories. ECF 107, at 24-25. That is simply false. See Bruce Phiri Decl., ¶¶ 55-57, 70-73, directly addressing the issue. As shown below, each of the key documents relied upon by Defendants for their stories actually demonstrates their knowing or utterly reckless conduct. The Court must accept at this stage that such documentation discussed below, all of which Defendants had in their possession, demonstrated the falsity of their allegations. *See Baral, supra.*

**Spreadsheets from 2013 and 2014**. One set of documents relied upon by Defendants in three stories involves 2013 and 2014 spreadsheets reflecting invoices paid by DAPP Malawi.

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

Readers were told that these documents reflected "millions of dollars" being fraudulently siphoned away from the USDA's funds, see Podcast at 30, later saying that they reflected $2.7 million being fraudulently siphoned-away. *See* May 2016 Article at 22. *See also* ECF 78-9 at 4 (again relying on the spreadsheets). Contrary to those representations, the two spreadsheets combined reflected a single proper *invoice totaling $4,073.37* paid out of USDA funds, *see* B. Phiri Decl., ¶ 23-35, which Smith admitted he would have known when publishing statements about the spreadsheets. See Smith Depo. Tr. at 157:6-13. Defendants were also unable to identify any fraudulent or suspicious transactions on the spreadsheets. See Smith Depo. Tr. at 148:21 to 150:15. And even though the spreadsheets constituted the basic building block on which the entire allegation of fraud rested, Defendants exhibited blatant recklessness since those responsible for fact-checking the stories were unable to recall even seeing the spreadsheets. Hayes, Ex. B-2, Pt. 132 (Pyle Depo. Tr. at 279:8 to 280:1; 288:5-17; R. Rosenthal Depo. Tr. at 387:7 to 392:8; Salladay Depo. Tr. at 139:6-21; 140:16 to 141:5; Sullivan Depo. Tr. at 68:7-16). An alleged failure of recollection is not enough to avoid liability. *See Palin v. New York Times,* 940 F.3d at 814.

Despite affirmatively misleading readers about the spreadsheets, Defendants argue that their statements cannot be defamatory because they "disclosed the underlying facts to readers." See ECF 107 at 30. Falsely describing documents hardly constitutes adequate disclosure. Nor is hyperlinking them to their stories a cure for their fatal deficiency, and may actually give rise to an inference of malice. *See Palin v. New York Times*, 940 F.3d at 815. ("inclusion of the hyperlinked article gives rise to more than one plausible inference, and any inference to be drawn from the inclusion of the hyperlinked article was for the jury—not the court").

***Bills paid by DAPP Malawi***. A second key category of documents relied upon by Defendants to show that funds were being fraudulently siphoned away were "[b]ills for expert consultants, book translation, travel, medical care and training." *See* May 2016 Article at 22. But when asked to identify any of those bills, the only documents Defendants could specifically identify were audit reports. *See* SR Decl. Ex. 16 (Interrog. Answ. 16). Yet those were the very documents which proved that their allegations were completely false. *See* Phiri Decl. ¶¶ 15-17.

As with the spreadsheets, it is no defense that there was adequate disclosure of the "underlying facts to readers." ECF 107 at 29-30. The only "audit" discussed in the May 2016 Article appeared to be a trip inspection by the foreign agricultural service, ("FAS"), May 2016 Article at 5, which was discounted by speculating that the individual sent by the USDA lacked experience to perform inspections. *See id*. at 33. The oblique reference to an FAS "audit" was not a license to make false statements about expenses. *See Palin*, *supra*. In fact, it was not even enough to satisfy the editor responsible for the lead story, who testified, specifically, that the KPMG financial audits were sufficiently important that they needed to be discussed *and* hyperlinked to the May 2016 Article for the story to be "complete." *See* Salladay Depo. Tr. at 29:3-12. A second editor stated that it could be "weighty evidence" for a reader. Rosenthal Depo. Tr. at 383:13-17.

No article told readers that the very documents identified as constituting the specific bills claimed to show tens of millions of dollars being diverted were actually audit documents disproving those claims, or that those audits were backed up with internal accounting records, none of which is claimed to be inaccurate. See B. Phiri Decl. ¶¶ 53-55. Because none of the editors responsible for fact-checking even looked at the audits, *see* Hayes Ex. B-2, Pt. 21, 40, 105-6 (Sullivan Depo. Tr. at 113:16 to 116:11; Salladay Tr at 145:17 to 146:22; Pyle Depo. Tr. at 161:22 to 162:9; Rosenthal Depo. Tr. at 380:9-20), none could evaluate the claims regarding any of those expenses.

Both financial audits and internal accounting records were significant also because they refuted specific claims, including that "millions" of dollars had been spent translating the same book over and over again. *See* SR Decl. Ex. 4(s)*;* ECF 116, ¶ 9(j). When asked in discovery to identify documents showing such expenses, Defendants again identified the audit reports, s*ee* SR Decl. Ex. 16, *supra,* which nowhere reflected those millions of dollars for translations. The same is true of "training" expense, which supposedly accounted for allegations that Plaintiffs "fabricated" invoices for work that was never performed. *Id.* Both allegations were affirmatively disproved by the audits and internal accounting records in Defendants' possession. B. Phiri Decl., ¶¶ 16-17.

Similarly, accounting records in Defendants' possession refuted allegations that invoices were fabricated for upcoming audits. See ECF 116, ¶ 9(l). Although Defendants could have easily contacted the Finance Director who would have confirmed that their allegations were disproved by

internal accounting documents, *see* B. Phiri Decl., ¶¶ 10-12, they didn't even have to make that call since they had interviewed a DAPP Malawi accountant, Mary Bokosi, see Bokosi Decl., ¶ 4, who, together with their own source, confirmed the accuracy of accounting records, see ECF 116, ¶ 9(h).

***Bank statements and invoices created in 2014.*** Defendants also had knowledge of facts that demonstrated knowledge of "probable falsity" when alleging that a third set of documents showed money being fraudulent siphoned away from the USDA. Bank statements and invoices generated in 2014, *see* May 2016 Article at 22, failed to show anything fraudulent, see B. Phiri Dec., ¶ 34-56, *and* were all dated in 2014, after all funds from the USDA had been expended. *See id.* , ¶¶ 22, 34, Ex. C. Again, there was no effort by those fact-checking the stories to even look at those documents. See Hayes Ex. B-2, at 140-42 (Salladay Depo. Tr. at 146:17-22). Pyle couldn't even interpret the story relating to expenses, Pyle Depo. Tr. at 265:12-22, and Walters admitted that the document referenced in the story "raises more questions than it answers." SR Decl. Ex. 2(i).

***Log-Mon reports***. A fourth set of documents flatly refuted Defendants' allegations: the Logistic and Monetization ("Log-Mon") Reports submitted to the USDA, which were actually hyperlinked to the stories. See SR Decl., Ex. 6(i) and (6(j). They similarly proved the falsity of allegations that Plaintiffs had failed to provide farmers with livestock, material and well pumps reported to the USDA, see Danckert Decl. ¶¶ 12-31; L. Thomsen Decl., ¶38; B. Phiri Decl., ¶ 12. Once again, Defendants cannot claim that it was appropriate to rely on those reports, which were cited in the stories themselves, see, e.g., May 2016 Article at 25, when Defendants could not even recall having reviewed them, *see* Walters Depo. Tr. at 370:16 to 372:20, or whether they were consistent with what they had alleged. See Walters Depo. Tr. at 365:8-19; 372:16 to 373:15. Nor did those responsible for fact-checking even look at them. *See* Hayes Dep. Ex. B-3, Pt. 16.

***Zebiah's deposit slips.*** Documents relied upon for the stories also refuted allegations that Marko Zebiah and others were paid less than the amount "reported" to the USDA and were forced to contribute 20-100% of their salaries to the Teacher' Group. *See* Podcast at 37; May 2016 Article at 19. Editors had no recollection of even looking at the bank deposit slips provided by Zebiah, even though they relied on them in the stories, Hayes Ex. B-4, Pt. 14 (Sullivan Depo. Tr. at 55:4-7: Salladay Depo. Tr. at 116:2-117:6; Pyle Depo. Tr. at 425:12-22). Yet those documents reflected

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

that none of the individuals mentioned on the documents had contributed any such sums. *See* O. Thomsen Decl., ¶¶ 8-11; Machaka Decl., ¶ 3.  As to false reports issued to the USDA, see May 2016 Article at 19, Defendants now claim that their allegation was based solely on a confidential source who failed to identify any document, see SR Decl. Ex. 16 (Interrog. Answ. 14),  while admitting that no anonymous or confidential sources are appropriately considered.  See ECF 155 at 8.  Documents obtained by Defendants through FOIA show no false reports reflecting employee paychecks or salaries.  See Meehan Decl. ¶ 67.  The same is true of "budgets" reflecting salaries, and Defendants now claim that maybe it related to Finland.  *See* ECF 116, ¶ 9(q).

***USDA audits and review***.  Finally, a trove of documents in Defendants' possession undermined allegations that there was no audit or reviews of the program.  See May 2016 Article at 32 et seq.  Those responsible for fact-checking, *see* Walters Depo. at 552:10-15, admitted that they never even looked at documents describing extensive oversight.  *See* Sullivan Depo. Tr. at 181:11 to 182:19; Salladay Depo. Tr. at 134:16 to 137:21; 152:2 to 157:12. It was reckless to tell readers that the USDA had falsely stated that it had no concerns about Planet Aid, see ECF 78-9, when those fact-checking the stories never looked at any of the documents.

The "failure to investigate, which was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges will support a finding of actual malice." *See  Antonovich v. Superior Court*, 285 Cal. Rptr. 863, 867-69 (Cal. Ct. App. 1991).  Too many examples of Defendants' failure to reconcile or even review documents exist to find that it was mere negligence.  Defendants obviously looked for anything that could be used to tell a tale of corruption, bent on ignoring anything that contradicted their allegations.

> **d.    *Malice can also be inferred from the failure to consider critical sources and material disproving Defendants' allegations.***

"[C]ourts have required investigation as to truth or falsity of statements which were not hot news," where, as where, there are "factual stories about actual people." *Bindrim v. Mitchell*, 92 Cal. App. 3d 61, 73 (2nd App. 1979).  Defendants confessed to having done no investigation in Mozambique because they could not speak Portuguese, ECF 125, ¶20.  Walters admitted that they "just wandered over the border from Malawi for 10 mins so I could visit 51 countries."  SR Decl., Ex. 18(f).  Recognizing that Defendants lacked any basis for writing about Mozambique, one editor

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

wrote: "if it does not say DAPP Malawi IN STORY, it should since there are multiple DAPP organizations."   SR Decl. Ex. 17(o) (emphasis in original).   When nevertheless referring to Mozambique 28 times in their stories attached to the FAC alone, *see, e.g*., FAC, Ex. A-U; Holm Decl. ¶¶11-12, Defendants were on notice of the probable falsity of what they were reporting.

Defendants failure to contact individuals known to be critical to their "investigation" about Malawi again provides evidence of malice..   *See Harte Hanks*, *supra*.   Smith admitted that one expert had given a "swimmingly positive" assessment of the USDA Program, and they were  "gong [sic] to need an answer to the statement Mkajumi [sic] said the projects were good and he's an independent professional who researched them first hand."  See SR Decl. Ex. 4(t). Smith's failure to contact Kajumi after recognizing the need to do so, *see* Smith Depo. Tr. at 431:9-19, made it patently improper to rely on sources making outlandish claims that $65-90 million had been stolen from USDA programs.   As held in *Flowers v. Carville*, at 1131, a defendant cannot "claim immunity if he has conflicting information from another source and recklessly disregards it."

Defendants also make scurrilous allegations about DAPP Malawi employee, Charlotte Danckert, see ECF 126 at ¶¶ 31, 33, 34, 37, failing to explain why they didn't ask her about those allegations when on the phone with her asking where they could find Lisbeth Thomsen.  See ECF 125, ¶ 37.   Nor did Smith or Walters interview Bruce Phiri and Mary Bokosi, two accountants at DAPP Malawi, which is inexplicable after Bokosi told Ngwira that she was unaware of anything fraudulent or suspicious.   Bokosi Decl., ¶ 4.   Nor did anyone interview Birgit Holm, the Director at ADPP Mozambique, who would have confirmed the accuracy of USDA reports demonstrating that all funds had been properly spent on projects in Mozambique.   See Holm Decl., ¶ 2.

Defendants also admitted that they needed to obtain specific documents needed to corroborate other allegations, but then ignored those documents.   *See Harte Hanks, supra*. The allegation that invoices were fabricated to cover up for charity work that was never performed, *see* ECF 78-7 at 3, rested on the absurd claim that "millions of dollars" had been spent having the same book translated quarter after quarter.   SR Decl. Ex.4(s); ECF 116 (Longwe Decl. ¶9(i)).   Obviously aware that internal accounting records and audit reports disproved such allegations, *see* B. Phiri Decl., ¶ 44, Defendants had more than sufficient reason to doubt those allegations.  Smith confessed

36

to such doubts when he stated that to "use that information" they would need detailed information as to the title of the book, the author, the amount spent on translations, etc.  SR Decl. Ex. 4(s).  Smith admitted that they had gotten none of that information, see Smith Depo. Tr. at 411:4 to 412:11, but published the allegation anyway.

### e.  Malice is shown by violations of norms, including the use of cash or other inducements.

Malice can also be inferred from Defendants' unprofessional conduct.  See *Aghmane v. Bank of Am., N.A.*, 696 F. App'x 175, 176 (9th Cir. 2017).  Because the Court must accept Plaintiffs' evidence as true, Defendants cannot rest on their mere denials to overcome Plaintiffs' evidence. *See St. Amant, Baral*, *supra*.

As detailed in the declaration of Arthur Hayes, Defendants violated numerous norms of journalistic ethics when dealing with purported witnesses.  See Hayes Decl.  One unquestionable violation of journalistic norms which is sufficient, without more, to find malice was offering cash or other valuable inducements to sources for information.  See Hayes Ex. ¶¶ 21-40. As CIR's Executive Editor admitted, any one of several declarations offered by Plaintiffs, if true, would undermine Defendants' reporting generally. See Rosenthal Depo. Tr. at 130:9 to 131:19; 136:7-16; 161:5-11.  But instead of one such incident, there were seventeen of them, revealed so far through limited discovery.

The evidence shows  the use of offers or actual payments of cash to (l) Emmanuel Phiri, *see* E. Phiri Decl., ¶¶ 3-4 (offered cash and told others had been paid also); (2) Kamwendo (given cash), *see* Walters Depo. Tr. at 531:17 to 532:3; (3) Goteka, *see* SR Decl. Ex. 17(d) (paid $800 to relocate); (4) Mvula ($100), and (5) Munthali ($25), see SR Decl., Ex. 4(m) at CIR 42470, with the last two showing the falsity in Defendants' allegation in support of the motion that Mvula and Munthali were paid nothing "whatsoever," see ECF 115, ¶ 20; (6) Mpeta (paid the equivalent of two months' salary), see B. Phiri Decl. ¶¶ 91-92; (7) Makwemba (paid the equivalent of three weeks salary), *id.*, ¶¶ 94-95, see SR Decl. Ex. 4(m)(n),(p), despite false allegations Mpeta and Makwemba were paid only "strictly upon presentation of receipts," ECF 115, ¶ 20; offers of a "good paying job" to (8) Matiki in return for information, *see* Matiki Decl., ¶ 3; promises of farming material and supplies to (9) Chibwana, (10) Chikaonda, (11) Molande and (12) Kachara, in return for information, *see*

Chibwana, Chikaonda and Molande, Kachara Decls.; holding out the hope of life-changing rewards to (13) Junge, *see* SR Decl. Ex. 17(n), and (14) Malabwe, as whistleblowers, see SR Decl. Ex. 17(c); telling (15) Mpeta that he needed to come on strong to be a whistleblower, *see* Sullivan Depo. Tr. at 208:11 to 210:17; and telling (16) Kumwenda and (17) Wandale, that they could profit from their information by filing claims against DAPP Malawi, *see* Kumwenda Decl., ¶ 3; Wandale Decl., ¶ 2. That doesn't even include paying Mtimbuka for meals, knowing he was destitute, see Mtimbuka Decl. (8/25/17), in opposition to the motion, ¶ 8.

"Paying for information immediately calls into question the credibility of the information. Readers or viewers have a legitimate right to wonder whether the source is disclosing this information because the information is important or because the source is getting paid for it." SR Dec., Ex. 6(c); Hayes Decl., ¶ 21 et seq. Payments to sources alone warrants denying the motion.

### f.   Defendants intentionally misrepresented facts to sources.

Defendants also openly lied to sources about their identities, telling famers that they "had been cheated in the Farmers Club program, and . . . needed to help [Defendants] expose those who had stolen from the village." Chibwana Decl., ¶¶ 8-9: Molande Decl., ¶ 9. They also falsely told farmers they were cheated out of motorbikes, see Samson Decl. ¶ 4, or "millions" from the USDA, *see* Kamwendo Decl. (1/29/19), ¶ 6, and how Defendants could help farmers with equipment, see Molande Decl., ¶ 11; Kachara, ¶ 2. Using hidden microphones, Defendants lied to others, telling them they were opening a computer shop and investing in land. *See* Musanzikwa Decl. ¶¶ 2-3.

All such conduct was prohibited by CIR's own Ethics Guide, *see* SR Decl. Ex. 6(b), and adds to an already compelling inference of malice.

### g.   Defendants shockingly wrote their stories before "investigating."

Defendants' Editor-in-Chief tweeted that they "live for impact . . . Our donors count on it and so do we." SR Decl. Ex. 2(k). Smith explained how he hoped that impact would come down: "like a large load of bricks" on Plaintiffs' heads. Smith Depo. at 87:6 to 87:22. *See Khawar*, at 275 (ill-will relevant to finding of malice). As has been shown, that imperative framed an investigation where Defendants ignored sources and information contradicting their storyline.

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

As early as January, 2015, Defendants decided to make the story a "major piece" that year. SR Decl. Ex. 2(n). The Editor-in-Chief made that decision but was unable to recall anything that had been done at that point. *See* Pyle Depo. Tr. at 383:19 to 384:6. No source had been interviewed in Africa. See, e.g., ECF 125, ¶17. Neither Ngwira nor Walters had become involved. *Id.* And when the Senior Radio Editor complained that she was "perturbed' by having a script drafted before the investigation, she was told: "this is apparently how they do it here for print pieces.... they seem to write a draft of the story before all the reporting is done." SR Decl. Ex. 10(a).

As reflected in various holdings, such as *Curtis Publishing* and *Goldwater, supra,* a Defendants' predetermined agenda is further evidence of malice. See also Hayes Decl., ¶¶ 15-20.

### h. Defendants' reporting cannot be justified under the "fair and true" report privilege.

Defendants argue that they never alleged that Amdi Petersen was "directly" involved with the USDA Programs. See ECF 107 at 24. What they alleged was far worse, namely that Petersen was responsible for stealing the money, and that it was siphoned away for his use. *See supra at 13.* Defendants asked the rhetorical question -- what had been done with the USDA funds, and then answered by telling listeners that they "don't know all of it," but that Petersen had "expensive tastes" and bought a condo and yacht. See Podcast at 44. Defendants knew that the condo and yacht were mentioned in a 2001 document, years before the USDA program had commenced. *See supra* at 13.

Grasping for some justification for that comment, Defendants cling to the "fair and true" comment" doctrine. ECF 107 at 24. But that doctrine offers no excuse for reporting facts known to conflict with information in Defendants' possession, or allegations nowhere alleged in any official proceeding, namely that Petersen had stolen money from the USDA. Claims that their reporting was "fair and true" also conflicts with Editorial Director Salladay's admission that the Danish case had nothing to do with the USDA program. *See* Salladay Depo. Tr. at 97:15-20.

At bottom, even the preliminary discovery to date reveals substantial evidence of constitutional malice, even if such were required instead of the ordinary negligence standard.

## IV.   ADDITIONAL GROUNDS FOR DENYING THE MOTION.

Defendants ignore the language of the FAC in arguing that it alleges conspiracy as a "freestanding count." See ECF 107 at 33. Also, tortious interference can survive even if defamation

fails.  See, e.g., *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 733 (9th Cir. 1999) ("The claim for tortious interference accordingly may survive even in the absence of statements violative of . . . state defamation law.").

Defendants also argue that some unspecified claims are barred by the statute of limitations. The suit was filed in August, 2016, a short five months after the first Podcast in March, 2016, and the FAC well within the limitations period.  See also Fed.R.Civ.P. 15(c)(2) (relation back). *See, e.g.*, *Wyatt v. Union Mortgage Co.*, 24 Cal.3d 773 (the statute begins running "on any part of a plaintiff's claims" after the "'last overt act' pursuant to the conspiracy has been completed.").

Finally, and recognizing that this Court is bound by Circuit precedent, Plaintiffs preserve an objection to the California anti-SLAPP statute. The anti-SLAPP statute as applied would violate Plaintiffs' constitutional rights to petition the Government and to free speech through access to the courts, and due process and the right to a jury trial, *see, e.g.*,  *NACCP v. Button,* 371 U.S. 415 (1963). The First Amendment expressly forbids any law "abridging" those rights, which is how Defendants seek to use the anti-SLAPP statute here.  The Ninth Circuit's application of the anti-SLAPP statute to federal cases, see *Planned Parenthood*, *supra*, is contrary to the weight of national authority.  See *LaLiberte v. Reid*, 966 F.3d at 87.  That holding applies also to the request for attorneys' fees.  Further, if the Motion is granted, leave to amend is proper as to each cause of action, including defamation and tortious interference. See *Verizon Delaware Inc. v. Covad Comm.*, 373 F.3d 1081, 1091 (9th Cir. 2004) (granting an anti-SLAPP motion "without giving Plaintiff leave to amend would directly collide with Fed.R.Civ.P. 15(a)'s policy favoring liberal amendment").

## CONCLUSION

As held in *Gertz v. Robert Welch,* 418 U.S. at 341, "the individual's right to the protection of his own good name reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty."  Plaintiffs seek only to exercise those rights.  Defendants' special motion should be denied.

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

Respectfully submitted,

NELSON, MULLINS, SCARBOROUGH & RILEY

By: /s/ Samuel Rosenthal (pro hac vice)
Attorneys for Plaintiffs Planet Aid, Inc. and
Lisbeth Thomsen

NELSON, MULLINS, RILEY & SCARBOROUGH, LLP

41

4827-1595-5146 v.6