1

2

3

4             IN THE UNITED STATES DISTRICT COURT

5           FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    PLANET AID, INC., et al.,                Case No.  17-cv-03695-MMC

8                    Plaintiffs,

                                              **ORDER GRANTING DEFENDANTS'**
9          v.                                 **MOTION TO STRIKE; DISMISSING**
                                              **ACTION WITH PREJUDICE**
10   REVEAL, CENTER FOR
     INVESTIGATIVE REPORTING, et al.,
11
                     Defendants.
12

13        Before the Court is defendants Reveal, Center for Investigative Reporting

14   ("Reveal"), Matt Smith ("Smith"), and Amy Walters' ("Walters") Motion, filed July 2, 2018,

15   "to Strike Plaintiffs' Complaint."  Plaintiffs Planet Aid, Inc. ("Planet Aid") and Lisbeth

16   Thomsen ("Thomsen") have filed opposition, to which defendants have replied.  Having

17   read and considered the papers filed in support of and in opposition to the motion, the

18   Court rules as follows.[1]

19                          **BACKGROUND[2]**

20        Planet Aid is a non-profit organization whose stated "mission is to contribute to a

21   more healthy and sustainable global environment and to serve people in impoverished

22   parts of the world."  (See FAC ¶ 2.)  In connection therewith, Planet Aid "has contributed

23   . . . to charitable purposes in 16 countries" and worked with a "variety of other

24   organizations . . . that have employees on the ground who are best suited to carry out the

25

26        _____
          [1] By order filed January 11, 2021, the Court took the matter under submission.

27        [2] The following facts are taken from the operative complaint, the First Amended
     Complaint ("FAC").
28

United States District Court
Northern District of California

United States District Court
Northern District of California

charitable mission of Planet Aid in impoverished locations."  (See id. ¶¶ 14-15.)

In June 2005, Planet Aid applied for, and was later awarded, a grant offered by the U.S. Department of Agriculture ("USDA"), pursuant to its "Food for Progress Program," to "assist the poor and needy in Malawi by obtaining wheat purchased by the U.S. [g]overnment that could then be monetized and used for various purposes in Malawi[,] . . . includ[ing] assisting farmers by providing much needed education in agricultural methods (the 'Farmers Club Program'); developing schools to train teachers to alleviate severe overcrowding in classrooms (the 'Teacher Training College Program'); educating the population . . . as to the HIV/AIDS epidemic; and providing nutritional information." (See FAC ¶¶ 34-35.)  Pursuant to such grant, Planet Aid raised over $10 million.  (See id. ¶ 36.)  In June 2009, the USDA awarded Planet Aid a second grant, pursuant to which Planet Aid raised approximately $13 million, which funds were to be used for the same purposes as set forth above.  (See id. ¶¶ 34, 37.)  To assist with carrying out the charitable goals of both USDA grants, Planet Aid contracted with DAPP Malawi, an entity at which Thomsen, at all relevant times, was employed as the Country Director and, as such, responsible for "supervising activities by . . . DAPP Malawi . . . under the Food for Progress Program."  (See id. ¶¶ 17-18.)  After the Food for Progress Program in Malawi concluded, the USDA conducted an audit of said program and "found no material deficiencies" or "weaknesses."  (See id. ¶ 38.)

Plaintiffs allege that defendants, beginning in March 2016, "repeatedly published stories and aired broadcasts that painted false and misleading pictures of [p]laintiffs relating to, among other subjects, the involvement of Planet Aid and Thomsen, as well as Thomsen's employer, DAPP Malawi, in [USDA] programs in Africa."  (See FAC ¶¶ 3; see also id. ¶¶ 55, 57, 60, 64.)  "More specifically," plaintiffs allege, defendants "published statements that [p]laintiffs had engaged in 'systematic fraud,' 'stealing' and 'siphoning off of funds' from the USDA programs, and 'stripp[ed]' tens of millions of dollars from employee salaries that were then used as part of a 'money laundering' scheme."  (See id. ¶ 4 (alteration in original).)  According to plaintiffs, when defendants published those

statements, they "knew, or were reckless in not knowing, that those statements were contrary to documents in their possession and directly misstated what they had been told by the same 'sources' they had interviewed." (See id.)  Plaintiffs further allege that defendants made such statements "using various unlawful and improper tactics," such as "using a convicted felon in Malawi to offer bribes or other inducements to potential sources in return for negative information about [p]laintiffs" and "relying on other sources known to lack credibility." (See id. ¶ 5.)

Based on the above allegations, plaintiffs assert five Causes of Action, titled, respectively, "Defamation," "Negligence," "Tortious Interference with Prospective Economic Advantage," "Placing Plaintiffs in a False Light," and "Unjust Enrichment."

By the instant motion, defendants seek, pursuant to section 425.16 of the California Code of Civil Procedure, an order dismissing the FAC in its entirety.

## LEGAL STANDARD

Section 425.16 of the California Code of Civil Procedure, California's "anti-SLAPP" statute,[3] is intended "to protect individuals from meritless, harassing lawsuits whose purpose is to chill protected expression." See Metabolife Int'l, Inc., 264 F.3d at 837 n.7. The statute provides, in relevant part:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

See Cal. Code Civ. Proc. § 425.16(b)(1).

To prevail on an anti-SLAPP motion, "the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." See Makaeff v. Trump Univ., LLC, 715 F.3d 254, 261

---

[3] "Anti-SLAPP" is an acronym for "Anti-Strategic Lawsuit Against Public Participation." See Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832, 837 n.7 (9th Cir. 2001).

United States District Court
Northern District of California

United States District Court
Northern District of California

(9th Cir. 2013).  "The burden then shifts to the plaintiff . . . to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal."  Id. To show a reasonable probability of prevailing, the plaintiff "must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."  See Metabolife Int'l, 264 F.3d at 840 (internal quotation and citation omitted).  In determining whether the plaintiff has met such burden, the court "considers the pleadings and evidentiary submissions of both the plaintiff and the defendant," and, "[a]lthough the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim."  See Christian Rsch. Inst. v. Alnor, 148 Cal. App. 4th 71, 80 (2007) (emphasis omitted) (internal quotations and citations omitted).

## DISCUSSION

## I.   First Cause of Action: Defamation

In their First Cause of Action, plaintiffs allege that over fifty statements regarding Planet Aid, Thomsen, and DAPP Malawi's involvement with USDA-funded programs in Malawi, made by defendants in a number of publications from March 2016 to August 2017, are defamatory.[4]

Under California law, to plead a claim for defamation, the plaintiff must show, "by a preponderance of the evidence," see Rattray v. City of Nat'l City, 51 F.3d 793, 801 (9th Cir. 1994), there was an "intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage," see Smith v. Maldonado, 72 Cal. App. 4th 637, 645 (1999).  In addition, if the plaintiff is a public figure, the plaintiff must demonstrate, "by clear and convincing evidence," that the

---

[4] Although DAPP Malawi is not a plaintiff in the instant action, plaintiffs contend the allegedly defamatory statements referencing DAPP Malawi could be, when read in context, perceived as "targeting" Thomsen.  (See Doc. No. 237 at 11.)

allegedly defamatory statements were made with actual malice, meaning, "with knowledge of [their] falsity or with reckless disregard for the truth." See Makaeff, 715 F.3d at 265 (alteration in original) (internal quotation and citation omitted). Reckless disregard, in turn, means the defendant "must have made the false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of his publication." See Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 667 (1989) (alteration in original) (internal quotations and citations omitted).

Here, defendants argue, plaintiffs have failed to establish a reasonable probability that they will prevail on their defamation claim.[5]  Specifically, defendants contend, plaintiffs have failed to show the allegedly defamatory statements are false and that defendants made the statements with actual malice.[6]

### A.    Evidence of Falsity

As noted, plaintiffs, to survive an anti-SLAPP motion, "must meet [their] burden of proving prima facie falsity with admissible evidence." See Metabolic Int'l, 264 F.3d at 840.  In considering whether plaintiffs have met such burden, the Court has grouped, by general topic, the statements here at issue.[7]

_____

[5] There is no dispute that the instant action arises from conduct covered under California's anti-SLAPP statute.

[6] Plaintiffs argue the instant motion should be denied pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, based on their asserted inability to depose, thus far, five of defendants' sources, namely, Patrick Goteka, Marko Zebiah, Harrison Longwe, Mbachi Munthali, and Kandani Ngwira.  Plaintiffs fail, however, to cite any authority to support denial of an anti-SLAPP motion under such or similar circumstances, and, in any event, plaintiffs fail to show the sought-after discovery is "essential to justify [their] opposition," see Fed. R. Civ. P. 56(d), as the "facts" they expect to establish thereby (see Decl. of Samuel Rosenthal ("Rosenthal Decl.") ¶¶ 26-31), are already in evidence through other witnesses and/or any such expectation is, in essence, speculation.

[7] Defendants contend the Court should strike any allegedly defamatory statements "not addressed in Plaintiffs' brief" or addressed only by "general paraphrases" therein. (See Reply at 3:5-7.)  The case on which defendants rely, however, is readily distinguishable on its facts, as the plaintiff therein never identified the assertedly defamatory statements in either its complaint or its briefing.  See ComputerXpress, Inc. v. Jackson, 93 Cal. App. 4th 993, 1011-12 (2001).  Consequently, the Court has considered herein any statement that has been adequately identified in the FAC (see FAC ¶¶ 197-

### 1.   Diversion of USDA Funds

According to plaintiffs, defendants' "core allegation" in the publications at issue is that plaintiffs "stole or diverted" USDA funds, and, in particular, 50% to 70% of such funds.  (See Opp. at 8:26-27.)  In that regard, plaintiffs allege the following statements are defamatory:

- "Alleged cult leader plays shell game with US foreign aid."  (FAC Ex. A (Reveal podcast, dated Mar. 19, 2016) at 2.)[8]

- "The money was not used on the intended purpose."  (FAC Ex. B (Reveal article, dated May 23, 2016) at 4 (quoting Jackson Mtimbuka, "a former USDA Planet Aid farmers program manager").)

- "While the purpose of the transactions is unclear, Longwe and others say they added up to fraud intended to reroute aid money to other purposes."  (FAC Ex. B at 24.)

- "UNICEF has cut its ties with an organization that coordinates U.S. humanitarian programs in Malawi, following an investigation by Reveal . . . showing that the group diverted money intended to alleviate hunger and disease."  (FAC Ex. D (Reveal article, dated Aug. 1, 2016) at 1.)

- "It's blatant to me this group is stealing; it's money laundering, and they're keeping the money for themselves."  (FAC Ex. F (MinnPost article produced by Reveal, dated Aug. 18, 2016) at 3-4 (quoting Kris Alonge, "[a] Kansas whistleblower").)

- "Current and former DAPP employees told Reveal that the U.S.-funded Planet Aid/DAPP operation was part of a systematic fraud." (FAC Ex. G (Reveal article, dated Aug. 30, 2016) at 4.)[9]

---

206) and thereafter identified by general substance in plaintiffs' Opposition, see Scott v. Solano Cnty. Health & Soc. Servs. Dep't, 459 F. Supp. 2d 959, 973 (E.D. Cal. 2006) (holding, "[u]nder California law, the defamatory statement must be specifically identified" in the complaint).

[8] As used herein, the page numbers for exhibits that do not themselves contain page numbers are those affixed to the top of each page by this district's electronic filing program.

[9] Defendants point out that plaintiffs, in amending the original complaint, now allege, for the first time, three publications, see FAC Exs. C, G, H, containing various defamatory statements.  As plaintiffs' claims based thereon "ar[i]se out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading," however, those claims are not, contrary to defendants' argument, time-barred.  See Fed. R. Civ. P. 15(c)(1)(B).

United States District Court
Northern District of California

- "The United States people, I think they should know the Teachers Group has used their money in a way that was not the intended purpose . . . .  They're helping somebody who is in Mexico building mansions."  (FAC Ex. O (Reveal article, dated Aug. 21, 2017) at 5 (quoting Kambani Kufandiko, former DAPP Malawi employee).)[10]

- "A lot of the funding . . . is not used to help the livelihood of poor Malawians.  Fifty to 60 percent of the benefits of the Teachers Group are for the owners who are in Mexico."  (FAC Ex. O at 3-4 (quoting Andrew Chalamanda, former DAPP Malawi employee).)

- "Harrison is one of several insiders who told us 50% to 70% of the US government grant money was being siphoned away, one transaction at a time and most of them was headed to the Teacher's Group African headquarters in Zimbabwe."  (FAC Ex. P (transcript of Reveal podcast, dated Mar. 19, 2016) at 22.)

- "[P]eople inside your organization . . . say individually, one by one as we've interviewed them is that your organization is scheming US government funds.  Your own people.  The people in charge of your money said you're stealing money."  (FAC Ex. P at 24 (quoting Smith's conversation with Thomsen).)

- "Harrison, DAPP's former financial controller, was one of the people who said he also saw fraud. . . . Now he says the money was stolen."  (FAC Ex. P at 25.)

- "[M]oney from USDA grants, over $130 million, up to 70% was allegedly taken from the projects it was meant for and stripped from employees salaries."  (FAC Ex. P at 31.)

- "Jackson, the employee working on the Planet Aid farmer's project in Malawi, he was told by his Teacher's Group bosses, the money from the USDA was going straight to Mexico."  (FAC Ex. P at 32.)

- "Jackson knew where the money was going all along."  (FAC Ex. P at 8.)

- "[W]e did speak to the comptroller of the Malawi projects . . . . He said within 15% [sic] to 70% of the money was ending up somewhere else."  (FAC Ex. Q (transcript of Rising Up With Sonali's interview of Walters, dated May 31, 2016) at 7.)

- "[Reveal] follows a surreal criminal scheme involving used clothing."  (FAC Ex. U at 2 (Smith's tweet, dated May 23, 2016).)

- "[R]eputed money-laundering cult . . . raises money via @ClintonGlobal."  (FAC Ex. U at 3 (Smith's tweet, dated May 23,

---

[10] According to plaintiffs, "[t]he Teachers Group was initially conceived by a group of teachers who believed that by joining together they could improve their lives, as well as the lives of those around them" (see FAC ¶ 129), and some Planet Aid and DAPP Malawi employees were also members of the Teachers Group when the allegedly defamatory statements were published (see id. ¶ 130).

2016).)

- "#TeachersGroup insiders report siphoning 50-70% of $133m in US Grants."  (FAC Ex. U at 32 (Walters's tweet, dated Mar. 24, 2016).)

(See generally FAC ¶¶ 197, 199-201, 206.)  Additionally, plaintiffs allege, defendants reported that plaintiffs had engaged in the diversion of funds by, among other things, paying "what appears to be multiple bills for the same purpose" and money to a Hong Kong-registered trading company.  (See FAC ¶ 197 (quoting FAC Ex. B at 25).)[11]

Defendants argue plaintiffs have failed to show falsity as to the above-listed statements because, aside from the "substantial truth" of those statements, defendants "disclosed the underlying facts to readers," thereby, according to defendants, rendering their "conclusions constitutionally protected."  (See Mot. at 21:26-22:2.)[12]

Although, as defendants point out, "when a speaker outlines the factual basis for his conclusion, his statement is protected," the Ninth Circuit has clarified that "[t]his assumes . . . that the factual basis itself is true."  See Flowers v. Carville, 310 F.3d 1118, 1129 (9th Cir. 2002) (internal quotation and citation omitted).  Here, plaintiffs have challenged the truth of the facts underlying defendants' published statements.  See id. (finding statement "capable of defamatory meaning" where plaintiff disputed truth of underlying facts; noting "a defamatory statement isn't rendered nondefamatory merely because it relies on another defamatory statement").

Further, the Court finds plaintiffs have sufficiently demonstrated the statements are false.  Specifically, to show there was no diversion, plaintiffs have submitted numerous sworn declarations, as well as supporting exhibits, from individuals involved with Planet Aid, DAPP Malawi, and/or the USDA-funded programs.  (See, e.g., Decl. of Bruce Phiri (DAPP Malawi's former financial controller and current finance director) ("Phiri Decl.") ¶¶ 1-2, 13-15 (stating USDA funds were used appropriately; further stating appropriate

---

[11] Where an allegedly defamatory statement addresses more than one general topic, the Court has included it under each applicable heading.

[12] To the extent defendants raise this argument in connection with other groups of allegedly defamatory statements, the Court does not further address it herein.

United States District Court
Northern District of California

1   use was confirmed by audit reports prepared by "DAPP Malawi's outside independent

2   auditing firm"); Phiri Decl. Ex. A-7 (Financial Statements for USDA – Planet Aid Food for

3   Progress Program 2, for year ending Dec. 31, 2011) at 13 (reporting audit of Planet Aid's

4   financial statements regarding USDA grants "disclosed no instances of non-compliance

5   that are required to be reported"); Decl. of Lisbeth Thomsen ("Thomsen Decl.") ¶¶ 3, 16,

6   32-34, 89 (stating no USDA funds were diverted from intended purposes; further stating

7   no such funds went to Mexico).)

8   　　　　Given plaintiffs' evidence, defendants' submission of evidence to the contrary

9   "does not demonstrate that plaintiff[s] cannot prevail as a matter of law."  See Christian

10  Rsch. Inst., 148 Cal. App. 4th at 84.[13]

### 2.   Failure to Provide Promised Livestock, Agricultural Inputs, and Water Pumps

13  　　　　Plaintiffs contend it was defamatory for defendants to report the Farmers Club

14  program did not benefit local Malawian farmers, and that plaintiffs "had deprived farmers

15  of promised livestock, agricultural inputs and water pumps needed to improve conditions

16  in Malawi."  (See FAC ¶¶ 201-02.)  In that regard, plaintiffs allege the following

17  statements are defamatory:

18  　　　•　　"In Njuli, Reveal reporters found the village had only two pumps.
           One was given to the village.  The chief bought his, he said, with a
19           $100 loan that took him two years to pay off. . . . Enock Chikaonda,
           a village leader and Farmers' Club member, was the only villager
20           given a pump by Planet Aid."  (FAC Ex. B at 28.)

21  　　　•　　"Planet Aid said it installed 576 water pumps throughout Malawi.
           Mtimbuka, the Farmers' Club manager, said he had thought 25 of
22           those pumps were targeted for Njuli."  (FAC Ex. B at 27.)

23  　　　•　　"Impoverished farmers in Malawi, who were supposed to benefit,
           also told Reveal they did not receive water pumps, fertilizer, and
24           farm animals promised by Planet Aid."  (FAC Ex. F at 2.)

25

26  　　　　　　[13] Each party has filed various objections to evidence submitted by the opposing
27  party.  To the extent the Court has relied on any such evidence herein, the objection(s)
    thereto are overruled.  To the extent the Court has not relied on such evidence, the Court
28  does not reach the objection(s) thereto.

United States District Court
Northern District of California

- "When Reveal visited USDA projects in Malawi in 2015, however, farmers still were impoverished, and project staff said the money had been misused."  (FAC Ex. K (Reveal article, dated Apr. 11, 2017) at 2.)

- "Planet Aid promised water pumps too so farmers were no longer dependent on the seasonal rains to grow food, but in the village of Anjuli [sic], they only gave away one pump.  They were actually selling the rest.  Out of 300 families, only the village chief bought one."  (FAC Ex. P at 6.)

- "[The village chief] took out a loan to buy the hundred-dollar pump. That money could have paid for a year of school for one of his children.  It took him two years to pay it off."  (FAC Ex. P at 6.)

- "It was cheating. . . . The reality is, it was . . . the farmers were not benefiting from farmers' club.  That is the reality."  (FAC Ex. P at 7 (quoting Mtimbuka).)

- "We've gone to Farmer's Clubs all over Malawi and they say their live [sic] changed not at all from when you arrived and from when you left. . . . [W]e've visited Farmer's Clubs and that at every instance the Farmer's [sic] themselves told us that was a lie."  (FAC Ex. P at 25.)

- "We spoke to the project managers, we spoke with farmers.  One farmer we spoke to said he had received a goat and pig. . . . Of course they died."  (FAC Ex. Q at 6.)

- "[T]he village chief there, he was so adamant that he needed a rope pump that . . . he asked DAPP Malawi for his own rope pump, and they said – fine, they would give it to him, but he had to pay $100.  And it turns out, that cost him two years to pay off."  (FAC Ex. Q at 6-7 (internal quotation omitted).)

- "What little livestock was there had died."  (FAC Ex. S (News4 article, dated May 23, 2016) at 4 (quoting Smith, who "interviewed some of the same people featured in Planet Aid's reports and promotional videos").)[14]

- "Villagers told Smith Planet Aid only provided a single, substandard pump to each community and made them buy the rest at prices they could not afford."  (FAC Ex. S at 4.)

(See generally id. ¶¶ 197, 201-02.)  Additionally, plaintiffs allege, defendants, in broadcasting an earlier interview, falsely described as a "farmer" one interviewee who stated crops were not given "adequate" agricultural inputs under the USDA programs,

---

[14] As Exhibit S comprises two separately numbered articles, the page numbers used herein for said exhibit are those affixed to the top of each page by this district's electronic filing program.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  and falsely described as a "farmer," and by false implication, a participant in a Farmers

2  Club, another interviewee who stated "we do not have any pig and goat in our homes."

3  (See FAC Ex. R at 2; see also FAC ¶ 201.)

4       The Court finds plaintiffs have submitted sufficient evidence to show the

5  statements are false.  (See, e.g., Thomsen Decl. ¶¶ 54, 60 (stating DAPP Malawi

6  "exceeded the contractual requirements" as to delivery of free water pumps, livestock,

7  and other benefits to Farmers Clubs; further stating "no farmer or villager was charged for

8  a pump," and "[a]ll pumps provided to villages as part of the USDA Program were

9  provided for free"); Decl. of [Village] Chief Chibwana ("Chibwana Decl.") ¶¶ 3, 10 (stating

10  his village in Njuli received four free water pumps through Farmers Club program); Decl.

11  of Vekeleni Samson ("Samson Decl.") ¶¶ 2, 4 (stating he told Smith and Walters Farmers

12  Club program "was very beneficial")).

### 3. Kickbacks from Employee Salaries, False Reporting of Salaries to USDA, Employees' Lawsuit for Backpay

15       Plaintiffs assert it was defamatory for defendants to report that plaintiffs "had

16  extracted kickbacks of 20-100% from [the] salaries" of DAPP Malawi employees who

17  were members of the Teachers Group.  (See FAC ¶ 203.)  In that regard, plaintiffs allege

18  the following statements are defamatory:

19  - "Zebiah said he was among the Africans who upon joining the
20  Teachers Group was pressured to sign a contract, often called a
   'deed of contribution.'  In it, members agree to donate a portion of
21  their salary – anywhere from 20 to 100 percent."  (FAC Ex. B at 20.)

22  - "Former and current Teachers Group members in Africa told Reveal
   that they were forced to kick back portions of their USDA-funded
23  salaries to a bank account controlled by their Teachers Group
   overseers."  (FAC Ex. F at 2.)

24  - "While researching the story we spoke to about a dozen African
25  members of the Teacher's Group.  All of them gave a portion of their
   salary to the group.  From 20% to 100%, everything they earned."
26  (FAC Ex. P at 20.)

27  - "Smith said employees paid by Planet Aid showed him 'Deeds of
   Contribution' and other types of contracts they said they were
28  required to sign if they wanted to keep their jobs, promising to
   donate 20 to 100 percent of their salaries to Teachers Group."  (FAC

Ex. S at 9.)

- "The techniques that they were using were all about moving money from technical services contracts to Teachers Group entities outside the country. . . . Supervisors[] hire them, pay them their salaries, and then somebody comes around and makes them give up a portion of their salaries and deposit it into bank accounts, controlled by that same Teachers Group." (FAC Ex. T (Television broadcast, dated Aug. 31, 2016) at 2.)

(See generally id. ¶ 203.)  Additionally, as to kickbacks, plaintiffs allege, defendants falsely reported money was kicked back by employees to an account held by Ibn Petersen and Ula Thomsen, and that Zebiah, a former employee, "said that the money he was collecting went into the personal bank accounts of two Teacher's Group bosses[,] Ibn Petersen and Ula Thomsen, and Ula is the husband of Lisbeth Thomsen." (See FAC ¶ 203 (quoting FAC Ex. P at 19-20)).)

Further, plaintiffs contend, it was defamatory for defendants to report that plaintiffs, as part of their "fraud, theft and money laundering scheme," had "lied to the USDA about employee salaries." (See FAC ¶ 204.)  In that regard, plaintiffs allege the following statements are defamatory:

- "Even before the Teachers Group pressures members to hand over money to their bosses, funds are extracted by writing paychecks much smaller than reported to the USDA.  In this way, her employers were siphoning $250 from her $350-per-month salary, she said, and then applying pressure to kick back even more. Zebiah said the DAPP project manager's story conforms with DAPP policy in Malawi." (FAC Ex. B at 21.)

- "Those money which they took from our salaries went straight to the Teacher's Group. . . . They gave the organization $350 but what I'm getting from DAPP is $100. . . . It's like slavery." (FAC Ex. P at 21 (quoting anonymous "USDA Farmer's Club manager")).)

- "[The salary] was written, 350, but she's getting $100 per month in salary.  It's a tricky way of doing it." (FAC Ex. P at 21 (quoting Zebiah)).)

(See generally id. ¶¶ 203-04.)

As to both of the above-referenced two sets of statements, plaintiffs have made a sufficient showing as to falsity.  (See, e.g., Decl. of Precious Kossamu ¶¶ 4, 8, 23, 25, 27 (stating, as individual responsible for handling contributions from Teachers Group

1    members, such contributions were voluntary, were used to solely benefit members, and

2    were not sent out of country; further stating Deeds of Contribution did not require

3    members to contribute 20 to 100% of salaries); Decl. of Thomas Meehan ("Meehan

4    Decl.") ¶¶ 66-69 (stating, as Planet Aid's chief financial officer, no reports falsely reporting

5    paychecks or salaries exist); Thomsen Decl. ¶¶ 90-93 (stating, with regard to individuals

6    reportedly interviewed by defendants and purportedly forced to contribute portions of their

7    salaries to Teachers Group, three were not members of Teachers Group, one never

8    contributed money to Teachers Group, and remaining individuals contributed only small

9    amounts and nothing near 20% to 100% of their salaries).)

10        Lastly, although plaintiffs assert it was defamatory for defendants to report

11   "[w]orkers suing for back pay also bolster previous allegations of an illicit scheme to

12   misuse foreign aid funds" (see FAC Ex. O at 4; see also id. ¶¶ 197, 204), without

13   informing readers that "the individual contributing to the article, Ngwira, had told

14   employees that they could get a lot of money by filing that suit" (see id. ¶ 204), plaintiffs,

15   in opposing the instant motion, have failed to address the statement in any manner, let

16   alone submit any evidence as to the alleged remark by Ngwira, and, consequently, have

17   failed to show the statement is false.

18            **4.    Falsification of Invoices and Payment of Dubious Expenses**

19        Plaintiffs contend it was defamatory for defendants to report that plaintiffs

20   fabricated invoices and paid "[d]ubious expenses" to offshore organizations controlled by

21   the Teachers Group.  (See FAC ¶ 197 (internal quotation and citation omitted).)  In that

22   regard, plaintiffs allege the following statements are defamatory:

23       •    "Dubious 'expenses' . . . for aid projects funded by the United States
            were paid to offshore organizations . . . controlled by the Teachers
24          Group."  (FAC Ex. E (Reveal article, dated Aug. 17, 2016) at 2.)

25       •    "Accountants and managers working on those projects said these
            invoices were fabricated to cover up for charity work that was never
26          performed."  (FAC Ex. E at 2.)

27       •    "[I]nvoices were fabricated to cover up for charity work that was
            never performed."  (FAC Ex. F at 2.)
28

1   (See generally id. ¶ 197.)  Additionally, plaintiffs allege, defendants falsely reported that

2   plaintiffs had engaged in the diversion of funds by, among other things, paying "what

3   appears to be multiple bills for the same purpose" and money to a Hong Kong-registered

4   trading company.  (See FAC ¶ 197 (quoting FAC Ex. B at 25).)

5          The Court finds plaintiffs have made a sufficient showing as to falsity.  (See, e.g.,

6   Phiri Decl. ¶¶ 55, 59 (stating no invoices were fabricated; further stating independent

7   auditors, who had access to DAPP Malawi's bank account records, did not identify any

8   fabricated invoices).)

9              **5.       Government Investigations**

10         Plaintiffs contend the following statements discussing the United States

11   government's investigation of the Teachers Group, Planet Aid, and Amdi Mogens

12   Petersen, an individual who, according to plaintiffs, "authorities in Denmark . . . claimed

13   [was] a leader in the Teachers Group and had committed tax offenses in Denmark dating

14   back to twenty-five years ago" (see FAC ¶¶ 163-64), are defamatory:

15   •      "Our investigation finds that the U.S. government knew an
        international fugitive was linked to the projects, but kept the money
16       flowing."  (FAC Ex. A at 3.)

17   •      "In a 2001 report, the FBI concluded that Teachers Group leaders
        diverted funds raised by its network of organizations 'for personal
18       use.  Little, to no money goes to the charities.'"  (FAC Ex. B at 9.)

19   •      "You don't give millions of dollars to a group that is being
        investigated for fraud, tax evasion and pilfering of humanitarian
20       funds, . . .  [b]ut that is precisely what the USDA did."  (FAC Ex. B at
        32 (quoting Alonge).)
21

22   (See generally id. ¶¶ 205-06.)  Additionally, plaintiffs allege, defendants falsely reported

23   Planet Aid was included in a network that "was part of what prosecutors call a global

24   charities fraud scheme."  (See FAC ¶ 206 (quoting FAC Ex. O at 3).)

25         As to all but one of the above statements, however, plaintiffs fail to address, let

26   alone rebut, the veracity thereof.  As to the one statement plaintiffs do address,

27   specifically, "[y]ou don't give millions of dollars to a group that is being investigated for

28   fraud, tax evasion and pilfering of humanitarian funds, . . . [b]ut that is precisely what the

1  USDA did" (see FAC ¶ 205 (quoting FAC Ex. B at 32)), plaintiffs do not deny that the

2  government had investigated Planet Aid; rather, they contend any such investigation had

3  "fizzled" before Planet Aid received either of the two USDA grants (see Opp. at 26:3-10).

4  Any such difference as to the timing of the investigation, however, goes to the validity of

5  defendants' criticism of the USDA, not to the truth of the statement that an investigation

6  was conducted, and consequently, such "slight inaccuracy in the details" does not

7  constitute falsity.  See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516-17

8  (1991) (internal quotation and citation omitted) (holding "[m]inor inaccuracies do not

9  amount to falsity so long as the substance, the gist, the sting, of the libelous charge be

10  justified" (internal quotation and citation omitted)).

### 6.  Conclusion: Falsity

12  With the exception of the one statement regarding the lawsuit for backpay and the

13  four statements regarding government investigations, plaintiffs have met their burden to

14  show falsity.

### B.  Actual Malice

16  Defendants next argue plaintiffs, as public figures "for purposes of statements

17  about their use of public funds for charitable causes" (see Mot. at 12:18-19), were

18  required, but failed, to sufficiently demonstrate the allegedly defamatory statements were

19  made with actual malice.  The Court first considers whether plaintiffs are, as defendants

20  argue, public figures.

### 1.  Limited Purpose Public Figures

22  Public figures "assume special prominence in the resolution of public questions,"

23  and, thus, "are subject to the heightened burden of proof in defamation cases";

24  specifically, public figure plaintiffs must show, by clear and convincing evidence, that the

25  allegedly defamatory statements were made with actual malice.  See Makaeff, 715 F.3d

26  at 265 (internal quotation and citation omitted).  The Supreme Court has identified two

27  types of public figures: (1) "all purpose public figures, who occupy 'positions of such

28  persuasive power and influence that they are deemed public figures for all purposes,'"

United States District Court
Northern District of California

1   and (2) "limited purpose public figures, who achieve their status by 'thrust[ing] themselves

2   to the forefront of particular public controversies in order to influence the resolution of the

3   issues involved.'" See id. (alteration in original) (quoting Gertz v. Robert Welch, Inc., 418

4   U.S. 323, 345 (1974)).  To determine whether a plaintiff is a limited purpose public figure,

5   courts consider whether (1) "a public controversy existed when the statements were

6   made," (2) "whether the alleged defamation is related to the plaintiff's participation in the

7   controversy," and (3) "whether the plaintiff voluntarily injected itself into the controversy

8   for the purpose of influencing the controversy's ultimate resolution."  See id. at 266.

9                                a.    **Planet Aid**

10          As noted, defendants contend Planet Aid is a public figure with respect to its use

11   of charitable funds.  As set forth below, the Court agrees.

12          Planet Aid's use of charitable funds was a matter of public controversy that existed

13   prior to defendants' allegedly defamatory statements.  In particular, for many years before

14   the allegedly defamatory statements were made, Planet Aid had been conducting an

15   extensive public campaign to raise funds.  (See, e.g., Decl. of Brendan Charney

16   ("Charney Decl.") Ex. C (Berlingske article, dated Feb. 13, 2000) (reporting Planet Aid

17   "has . . . been very successful with aggressive fund raising, going from door to door as

18   well as setting up collection boxes"); Charney Decl. Ex. G (Boston Globe article, dated

19   Apr. 7, 2002) (reporting Planet Aid, in 2000, "brought in more than $3.6 million in clothes

20   and cash, much of it from people who had been told in a brochure that half of their

21   clothes would be donated to the needy in Africa").)[15]

22          Planet Aid's fundraising efforts, in turn, "invited public attention, comment, and

23   criticism" about whether its funds were being properly used, see Makaeff, 715 F.3d at

24   269 (internal quotation and citation omitted), particularly given Planet Aid's ties, according

25   _____

26          [15] Defendants' unopposed request for judicial notice of various news articles and
     press reports is hereby GRANTED.  See Von Saher v. Norton Simon Museum of Art at

27   Pasadena, 592 F.3d 954, 960 (9th Cir. 2010) ("Courts may take judicial notice of
     publications introduced to indicate what was in the public realm at the time." (internal

28   quotation and citation omitted)).

United States District Court
Northern District of California

to a number of news organizations, with Petersen and the organization he founded, called the Teachers Group, or "Tvind" (see, e.g., Charney Decl. Ex. I (Chicago Tribune article, dated Feb. 13, 2004) (reporting "Tvind's U.S. operations" include Planet Aid; further reporting Tvind's U.S. operations "share officers and funds with each other"); Charney Decl. Ex. M (Chicago Tribune article, dated May 15, 2011) (reporting American Institute of Philanthropy gave "Tvind-related group Planet Aid" an "F" grade for "lack of transparency, insufficient spending on program services (11 to 44 percent) and too much spending on fundraising"); Charney Decl. Ex. N (Los Angeles Times article, dated Aug. 14, 2015) (reporting "philanthropy watchdog Charity Watch" calculated Planet Aid "spends only about 29% on charity"; further reporting, "Planet Aid has been linked by numerous media outlets in the United States and abroad to Danish fugitive Mogens Amdi Petersen, 76, who is wanted in Denmark on tax-evasion and embezzlement charges")).

In response to such criticism, Planet Aid, prior to defendants' publication of the allegedly defamatory statements, publicly denied any improper use of funds or links to Petersen and/or the Teachers Group and continued its fundraising efforts.  (See, e.g., Charney Decl. Ex. K (The IRE Journal, Jan. 1, 2010) (reporting Planet Aid's statement that it has no relationship with Petersen); Charney Decl. Ex. N (reporting Planet Aid "dispute[d] Charity Watch's analysis" that it spends only 29% of funds on charity; further reporting Planet Aid stated, "[t]here is no organizational or financial connection between Planet Aid and Tvind" (internal quotation omitted)).)

Although, as plaintiffs note, none of the above-cited articles, a number of which predate the USDA grants, make specific reference to Planet Aid's use of USDA funds, the relevant public controversy need not, contrary to plaintiffs' assertion, be narrowly defined to encompass only the use of USDA funding.  See Jankovic v. Int'l Crisis Grp., 822 F.3d 576, 586 (D.C. Cir. 2016) (rejecting plaintiff's argument that relevant controversy therein should be restricted to narrower time period; noting, "courts often define the public controversy in expansive terms"); see also Gilbert v. Sykes, 147 Cal. App. 4th 13, 18, 25-26 (2007) (holding prominent plastic surgeon, who alleged former

United States District Court
Northern District of California

1    patient made defamatory statements as to her surgery, was limited purpose public figure

2    with respect to his "surgical practice"; rejecting surgeon's argument that relevant

3    controversy was limited to particular patient's treatment).

4         Consequently, the first element, specifically, whether "a public controversy existed

5    when the statements were made," see Makaeff, 715 F.3d at 266, is met.

6         Next, as discussed above, all of the allegedly defamatory statements here at issue

7    concern plaintiffs' misuse of charitable funds, and Planet Aid, before those statements

8    were published, had, in response to public inquiries regarding the propriety of its use of

9    funds, not only asserted those funds were being properly used but also continued

10   soliciting additional funds.  Consequently, the second element, specifically, "whether the

11   alleged defamation is related to the plaintiff's participation in the controversy," see

12   Makaeff, 715 F.3d at 266, is met.

13        Lastly, as discussed above, Planet Aid, before the allegedly defamatory

14   statements were published, voluntarily "thrust itself" into the relevant public controversy

15   through both its "massive solicitation efforts" and public responses to reported criticisms

16   about the organization.  See Nat'l Found. for Cancer Rsch., Inc. v. Council of Better Bus.

17   Bureaus, Inc., 705 F.2d 98, 101-02 (4th Cir. 1983) (holding charitable institution "had

18   thrust itself into the public eye" by soliciting funds and "extoll[ing] its judicious use of

19   donated funds"); see also Makaeff, 715 F.3d at 268-69 (holding, "aggressive advertising

20   can inject a person or entity into a public controversy that arises from the subject of that

21   advertising"; finding for-profit educational entity, which had conducted advertising

22   campaign and publicly denied "engag[ing] in the practices that were the target of [the]

23   allegedly defamatory statements," was limited public figure "for purposes of the

24   controversy that arose about the legitimacy of its educational practices").  Such actions

25   demonstrate Planet Aid "did not unwittingly become the subject of publicity" with respect

26   to its use of charitable funds; rather, it attempted to influence the public's perception as to

27   that use.  See Nat'l Found. for Cancer Rsch., 705 F.2d at 102.  Consequently, the third

28   element, specifically, "whether the plaintiff voluntarily injected itself into the controversy

18

1    for the purpose of influencing the controversy's ultimate resolution," see Makaeff, 715

2    F.3d at 266, is met.

3        Accordingly, Planet Aid is a limited purpose public figure with respect to its use of

4    charitable funds.

5                            b.    Thomsen

6        Defendants contend Thomsen, as the Country Director of DAPP Malawi, is a

7    limited purpose public figure with respect to DAPP Malawi's use of charitable funds.  As

8    set forth below, the Court, again, agrees.

9        A public controversy regarding DAPP Malawi's use of its funds, including its

10   possible misuse of funds, existed before defendants published the allegedly defamatory

11   statements.  In particular, before those statements were made, DAPP Malawi, with

12   Thomsen serving as the public face of the organization, publicly solicited funds while

13   simultaneously touting its charitable efforts and goals.  (See, e.g., Decl. of Kandani

14   Ngwira ("Ngwira Decl.") Ex. A (Malawi News article, dated Dec. 6, 2002) (reporting DAPP

15   Malawi "uses its second hands [sic] clothes shops to raise funds"); Ngwira Decl. Ex. G

16   (Nation Newspapers Limited article, dated Sept. 23, 1998) (reporting Boc Malawi

17   Limited's[16] donation of K30,000 worth of items to DAPP Malawi; further reporting

18   Thomsen's statement that "her organisation's objective is to promote a better life for the

19   underprivileged," and, pursuant thereto, DAPP Malawi "ha[d] already established five pre-

20   schools"); Ngwira Decl. Ex. J (Nation Newspapers Limited article, dated June 24, 2000)

21   (reporting Thomsen's statement during interview that DAPP Malawi had "helped improve

22   lives of 10,000 people in its current areas of operation"); Ngwira Decl. Ex. N (Nation

23   Newspapers Limited article, dated May 23, 2013) (reporting Standard Bank Malawi's

24   donation to DAPP Malawi; further reporting Thomsen stated bank's donation

25   demonstrates private sector's interest in "contribut[ing] towards [the] training of

26

27   _____

28       [16] The Court understands Boc Malawi Limited to be an industrial gas producer.

United States District Court
Northern District of California

teachers").)[17]

DAPP Malawi's fundraising efforts gave rise to media inquiries into the propriety of its use of funds, and Thomsen continued to publicly speak on DAPP Malawi's behalf. (See Ngwira Decl. Ex. A (Malawi News article, dated Dec. 6, 2002) (reporting anonymous complainant "said that Dapp Malawi uses its second hands [sic] clothes shops to raise funds which are later transferred back to Denmark through what he claimed was a dubious scholarship scheme"; further reporting Thomsen "distanced her organisation from Petersen's activities and Tvind," described DAPP Malawi as "an independent charitable organisation with the sole aim to benefit Malawians," and stated Petersen "is not part of the organisation"); Ngwira Decl. Ex. B (Nyasa Times article, dated Mar. 1, 2011) (reporting DAPP Malawi employees "have turned against their employers" and "accus[ed] them of secretly swindling money for unknown activities"); Ngwira Decl. Ex. C (allAfrica.com article, dated Dec. 22, 2003) (reporting "Tvind . . . runs lucrative commercial operations under its cover name Development Aid from People to People ('DAPP')," and "DAPP's schools and centres allegedly produce neat revenues for [Petersen]"); Thomsen Decl. ¶ 5 (stating she had public speaking engagements on DAPP Malawi's behalf on "approximately nine occasions over a four year period prior to publication of [d]efendants' stories").)

Plaintiffs first contend the articles submitted by defendants are too few and too far apart to "build a 'public controversy.'" (See Opp. at 19:26-28.)[18]  Plaintiffs, however, cite to no authority supporting their assertion that additional media coverage is necessary to

_____

[17] Plaintiffs move, pursuant to Rule 56(c)(4) of the Federal Rules of Civil Procedure, to exclude declarations and other evidence from Goteka, Zebiah, Longwe, Munthali, and Ngwira because, as noted, plaintiffs thus far have been unable to depose those individuals.  The Court, however, has not relied herein on declarations of any of those individuals, other than to consider exhibits, attached to the declarations of Ngwira and Longwe, for which the foundation appears capable of being laid by other witnesses, making it "reasonably possible [such] proffered evidence . . . will be admissible at trial." See Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co., 6 Cal. 5th 931, 949 (2019).

[18] Although plaintiffs, in making that argument, point to only two of the above articles, the Court assumes their argument would not change had they included the third.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  create a public controversy.  Indeed, "whether a matter is a public controversy is not

2  determined solely by the number of articles published," but, rather, by "whether the

3  controversy was a 'real dispute, the outcome of which affects the general public or some

4  segment of it.'"  See Unsworth v. Musk, No. 2:18-CV-08048-SVW-JC, 2019 WL 8220721,

5  at *5 (C.D. Cal. Nov. 18, 2019) (quoting Makaeff, 715 F.3d at 267).  Here, the above-cited

6  articles demonstrate that, at the time the allegedly defamatory statements were

7  published, a dispute had arisen over whether DAPP Malawi was properly using its

8  charitable funds, and resolution of that dispute undoubtedly would affect the population

9  DAPP Malawi purports to serve, i.e., Malawians.  Further, to the extent plaintiffs may be

10  contending any public controversy regarding DAPP Malawi's use of funds no longer

11  existed at the time defendants published those allegedly defamatory statements, any

12  reliance on such contention is unavailing.  See Partington v. Bugliosi, 56 F.3d 1147, 1152

13  n.8 (9th Cir. 1995) (observing, "it appears that every court of appeals that has specifically

14  decided this question has concluded that the passage of time does not alter an

15  individual's status as a limited purpose public figure").

16      Next, plaintiffs again point out that none of the above-cited news articles regarding

17  DAPP Malawi's use of funds specifically reference USDA funding.  As discussed above,

18  however, the relevant public controversy need not be defined as narrowly as plaintiffs

19  contend.  See, e.g., Gilbert, 147 Cal. App. 4th at 18, 25-26.

20      Consequently, the first element, specifically, whether "a public controversy existed

21  when the statements were made," see Makaeff, 715 F.3d at 266, is met.

22      As to the second element, all of the allegedly defamatory statements, as

23  discussed above, concern DAPP Malawi's misuse of charitable funds and, before those

24  statements were published, Thomsen, like Planet Aid, had, in response to public inquiries

25  regarding the propriety of DAPP Malawi's use of funds, not only publicly asserted those

26  funds were being properly used but also continued broadcasting its charitable

27  achievements.  Consequently, the second element, specifically, "whether the alleged

28  defamation is related to the plaintiff's participation in the controversy," see Makaeff, 715

F.3d at 266, is met.

Lastly, like Planet Aid, Thomsen, through her above-described acts, voluntarily injected herself into the relevant public controversy. In particular, although, as plaintiffs point out, "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention," Thomsen was more than simply "involved in" or "associated with" DAPP Malawi's use of funds. See Khawar v. Globe Int'l, Inc., 19 Cal. 4th 254, 267 (1998) (alternation in original) (internal quotation and citation omitted). Rather, the evidence shows she "undertook important efforts to influence" the media's portrayal of DAPP Malawi's use of funds and had a "prominent role" in the organization. See Trotter v. Jack Anderson Enters., Inc., 818 F.2d 431, 435 (5th Cir. 1987) (holding company's president, who had "primary responsibility for general overall policy," was limited public figure with respect to controversy concerning company's labor policy and anti-union violence at company plant); Contemporary Mission, Inc. v. New York Times Co., 842 F.2d 612, 618, 620-21 (2d Cir. 1988) (finding priests were limited purpose public figures with respect to controversies surrounding religious organization's business practices; noting priests "participated in efforts to gain media attention for [the organization] and . . . each bore responsibility for the business activities [thereof]"); (see, e.g., Decl. of Innocent Chitosi (former information officer of DAPP Malawi) ¶¶ 1, 4, 8-9 (describing efforts undertaken at Thomsen's direction, in 2001, "to voluntarily seek out public attention in Malawi for Ms. Thomsen and DAPP Malawi, and to use [DAPP Malawi's] access to the press and public communications in responding to any negative statements about DAPP Malawi or . . . Thomsen")).

As the Supreme Court has observed, such "regular and continuing access to the media . . . is one of the accoutrements of having become a public figure." See Hutchinson v. Proxmire, 443 U.S. 111, 136 (1979). Consequently, the third element, specifically, "whether the plaintiff voluntarily injected [herself] into the controversy for the purpose of influencing the controversy's ultimate resolution," see Makaeff, 715 F.3d at

United States District Court
Northern District of California

266, is met.

Accordingly, the Court finds Thomsen is a limited purpose public figure with respect to DAPP Malawi's use of charitable funds.[19]

Having found both Planet Aid and Thomsen are limited purpose public figures, the Court next addresses whether plaintiffs have sufficiently shown defendants made the allegedly defamatory statements with actual malice.

## 2.   Evidence of Actual Malice

As noted, to survive an anti-SLAPP motion, limited purpose public figures, such as plaintiffs here, must show the allegedly defamatory statements were made with actual malice; specifically, plaintiffs "must establish a probability that they can produce clear and convincing evidence that the allegedly defamatory statements were made with knowledge of their falsity or with reckless disregard of their truth or falsity."  See Overstock.com, Inc. v. Gradient Analytics, Inc., 151 Cal. App. 4th 688, 709 (2007) (internal quotation and citation omitted); see also Christian Rsch. Inst., 148 Cal. App. 4th at 84 (describing clear and convincing evidence standard as "heavy burden, far in excess of the preponderance sufficient for most civil litigation" (internal quotation and citation omitted)).  To establish actual malice, a plaintiff may rely on circumstantial or direct evidence.  See Overstock.com, 151 Cal. App. 4th at 709.  For example, "[a] failure to investigate, anger and hostility toward the plaintiff, reliance upon sources known to be unreliable, or known to be biased against the plaintiff . . . may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication."  See Reader's Digest Ass'n v. Superior Court, 37 Cal. 3d 244, 258 (1984) (internal citations omitted).  Such evidence, however, "is relevant only to the extent it reflects on the subjective attitude of the publisher."  See id.  It does not itself suffice to prove actual malice.  See id. (noting "[t]he failure to conduct a thorough and objective

_____

[19] In light of such finding, the Court does not address herein defendants' alternative argument that Thomsen is a limited purpose public figure based on her role as a "public official."  (See Mot. at 13 n.3.)

1    investigation, standing alone, does not prove actual malice, nor even necessarily raise a

2    triable issue of fact on that controversy").

3        Here, plaintiffs contend there is "ample evidence" indicating defendants published

4    the allegedly defamatory statements with actual malice.  (See Opp. at 22:1.)  The Court

5    next considers that evidence and addresses, in turn, each group of allegedly defamatory

6    statements as to which plaintiffs have made a sufficient showing of falsity.

a.        **Diversion of USDA Funds**

(1)        **Knowledge of Falsity**

9        With respect to the allegedly defamatory statements concerning the diversion of

10    USDA funds, plaintiffs first contend defendants, prior to publishing those statements,

11    knew such statements were false.  Specifically, plaintiffs argue, defendants knew Planet

12    Aid and DAPP Malawi received only approximately $23 million from the USDA to be used

13    in Malawi, rather than the $130 or $133 million figure referenced in several of the

14    allegedly defamatory statements, thereby making it a "mathematical impossibility" for

15    Planet Aid to have diverted approximately 50% to 70% of over $130 million.  (See Opp. at

16    23:27-24:1.)  In support of such argument, plaintiffs point to an article published by

17    defendants, wherein the foregoing approximately $110 million differential is explained.

18    (See FAC Ex. C (Reveal article, dated May 23, 2016) (explaining two-thirds of $133

19    million grant allocation was to be used in Mozambique, with remaining one-third to be

20    used in Malawi; further explaining basis for "gap" between amount allocated and amount

21    actually received).)

22        The cited article, however, was published two months after the one podcast and

23    one tweet in which the total amount of initial grant allocation was referenced (see FAC

24    Ex. P at 31, FAC Ex. U at 32), and plaintiffs have submitted no evidence showing that, at

25    the time of either of those publications, defendants understood Planet Aid did not actually

26    receive the full allocation.  Consequently, the cited article, rather than demonstrating

27    actual malice, indicates defendants endeavored to accurately report the details

28    concerning the amount of funding Planet Aid received pursuant to what defendants

United States District Court
Northern District of California

1   characterized as the USDA's "byzantine relief programs."  (See FAC Ex. C at 4; see also

2   Rosenthal Decl. Ex. 6(n) (internal Reveal e-mail, dated May 19, 2016) (expressing need

3   for report to be "clear and not confusing that dollar amount of grants is not actually what

4   Planet Aid got"; suggesting explanation be provided in "sidebar or as stand alone"

5   article).)

6           Further, as defendants point out, for actual malice, the known falsity must be

7   "material," meaning, it "would have a different effect on the mind of the reader from that

8   which the pleaded truth would have produced."  See Air Wisconsin Airlines Corp. v.

9   Hoeper, 571 U.S. 237, 247 (2014) (internal quotation and citation omitted); see also

10  Masson, 501 U.S. at 517 (finding deliberate or reckless falsification insufficient for actual

11  malice unless such falsification "results in a material change in the meaning conveyed by

12  the statement").  Here, read in the context of defendants' publications, the precise

13  amount of USDA funding assertedly diverted is not material.  In particular, even assuming

14  defendants were aware Planet Aid ultimately received $23 million, rather than $133

15  million, for use in Malawi, the former amount is so large that the average reader would

16  view a charitable organization's diversion of 50% to 70% thereof in the same negative

17  light as it would such percentage of the latter.  See Turner v. KTRK Television, Inc., 38

18  S.W.3d 103, 123 (Tex. 2000) (characterizing as "substantially true" defendant's broadcast

19  falsely reporting amount "swindle[d]" in insurance scheme as $6.5 million, rather than

20  $1.7 million; finding, "[a]n average viewer . . . would not view a 1.7 million dollar

21  insurance swindle—or even an $875,000 insurance swindle—with any less opprobrium

22  than a 6.5 million dollar swindle"); Turnbull v. Herald Co., 459 S.W.2d 516, 519 (Mo. App.

23  Ct. 1970) (characterizing as "substantially accurate" defendant's publication falsely

24  reporting plaintiff was arrested for stealing items worth "thousands of dollars," rather than

25  $500; finding, "in an arrest for burglary it would make no great difference what value the

26  items bore" given "[t]he sting of the article is the arrest . . . for [suspected] burglary").

27          Plaintiffs next contend statements made by defendants and Reveal's executive

28  editor, Robert Rosenthal, during the course of the instant action demonstrate defendants'

United States District Court
Northern District of California

United States District Court
Northern District of California

knowledge of falsity at the time the allegedly defamatory statements were made.  In particular, according to plaintiffs, both Walters and Rosenthal, during their depositions, "refused to testify that they even believed . . . 50-70% of the USDA's funds had been fraudulently siphoned away" (see Opp. at 23:20-21), and Rosenthal "denied being able to testify that he had seen evidence" of siphoning (see Opp. at 24:17-20).  Contrary to plaintiffs' characterization of defendants' testimony, however, both Walters and Rosenthal did testify they believed, based on the information they had received, the reported 50% to 70% range was accurate.  (See Rosenthal Decl. Ex. 5 (Dep. of Amy Walters (hereinafter, "Walters Dep.")) at 487:1-9 (testifying she believed "50 to 70% of 133 million in US grants" had been siphoned based on information from sources); Rosenthal Decl. Ex. 7 (Dep. of Robert Rosenthal (hereinafter, "Rosenthal Dep.")) at 286:15-287:5 (testifying 50% to 70% of money Planet Aid received was allegedly siphoned away based on information received from sources).)

Plaintiffs also argue defendants were aware, at the time of publication, their statements regarding diversion of USDA funds to Mexico were false.  In support of such argument, plaintiffs point to comments made by defendants during the course of their investigation, specifically, Smith's statement that "there's no smoking gun as to what [plaintiffs are] doing with the money" (see Rosenthal Decl. Ex. 3 (Dep. of Matt Smith) (hereinafter, "Smith Dep.") at 176:16-177:11), and his statement that "presently we know very little about what happens to specifically the US/British government money once it is under Teachers Group control" (see Rosenthal Decl. Ex. 4(e) (internal Reveal email, dated Apr. 14, 2016)).

The cited statements, however, are not inconsistent with defendants' published statements about Mexico, as those statements reported only where the diverted funds were sent, i.e., to Mexico, not what they were used for once they got there.  (See FAC Ex. P at 32; FAC Ex. O at 2-5.)

Accordingly, plaintiffs' evidence, purportedly demonstrating defendants were aware the allegedly defamatory statements are false, fails to demonstrate actual malice.

26

United States District Court
Northern District of California

1

**(2)      Reckless Disregard of Truth or Falsity**

2

**(i)      Use of Sources**

3      Plaintiffs argue defendants' use of sources demonstrates reckless disregard for

4   the truth.

5      First, plaintiffs contend the sources on which defendants relied did not, contrary to

6   what defendants reported, inform them that 50% to 70% of the USDA funds were being

7   diverted.

8      As defendants point out, however, the source of the 50% to 70% estimate was

9   Harrison Longwe, the "financial controller of DAPP Malawi" in 2014 and 2015 (see FAC

10  Ex. B at 23; see also FAC Ex. P at 22), and additional sources who had worked for DAPP

11  Malawi or been involved with USDA-funded programs in Malawi had provided information

12  consistent with Longwe's information that USDA funds were being diverted from their

13  intended purpose.  (See, e.g., Charney Decl. Ex. HH (transcript of Smith's interview of

14  Chiku Malabwe on Oct. 26, 2015) at 9-10 (stating Malabwe, DAPP Malawi's former chief

15  purchasing agent, was "100% sure" DAPP Malawi's USDA-funded projects were

16  "crooked" and "those guys were taking money");[20] Decl. of Jackson Mtimbuka, filed July

17  2, 2018 ("Mtimbuka 2018 Decl.") ¶¶ 5-7 (describing, inter alia, how Danish member of

18  Teachers Group "said that because of the USDA grant, the Teachers' Group

19  headquarters in Mexico w[ould] be made to look nice");[21] Decl. of Amy Walters, dated

20

21      [20] Plaintiffs contend the Court should exclude the audio recording and transcript of
    the above-referenced interview, because the transcript was created after the allegedly
22  defamatory statements were published and because the recording, due to a technical
    problem, did not begin at the outset of the interview.  There is no dispute, however, that
23  the interview, which was conducted in English, took place before the publication of the
    allegedly defamatory statements, and there is no indication the recorded portion of the
24  interview is not "sufficiently trustworthy."  See United States v. Wilkinson, 53 F.3d 757,
    761 (6th Cir. 1995) (affirming finding of admissibility although recording "not of the best
25  quality" and had "gaps and unintelligible portions," where portions introduced at trial were
    "discern[able]").

26      [21] Although plaintiffs contend Mtimbuka, in a later-filed declaration, refuted what
    defendants published (see Decl. of Jackson Mtimbuka, filed Sept. 22, 2020 ("Mtimbuka
27  2020 Decl.")), he did not, with one exception, deny that, at the time he was interviewed by
    defendants, he made the statements they attributed to him.  Indeed, the only statement
28  Mtimbuka now claims defendants falsely attributed to him is that his "boss[es]" told him

United States District Court
Northern District of California

1   June 28, 2018 ("Walters 2018 Decl.") ¶ 34 (stating defendants' "reporting about the

2   diversion of foreign aid funds by Planet Aid" was based on information from four sources

3   associated with DAPP Malawi; summarizing information).)  Further, even if, as plaintiffs

4   point out, Longwe is the only source defendants have identified as to the reported

5   percentage of diversion, and defendants knew or were reckless in falsely reporting

6   Longwe was "one of several insiders" who provided that percentage (see FAC Ex. P at

7   22), plaintiffs, for purposes of showing actual malice, must, as discussed above, show the

8   known falsity was material, and, here, the "sting" of the challenged publications, see

9   Masson, 501 U.S. at 517, is the multiple reports, by insiders, that defendants were

10   diverting charitable funds. [22]

11          Second, plaintiffs contend defendants acted with actual malice in relying on

12   Longwe generally, because he "had begun a six-month probationary period at DAPP

13   Malawi" at a time when "the USDA Program was ending," and because Reveal editors

14   "expressed serious doubts about relying on [him]."  (See Opp. at 28:14-17.)

15          Even assuming, however, the USDA-funded programs ended, as plaintiffs'

16   evidence shows, a few months after Longwe was hired by DAPP Malawi, plaintiffs'

17   reliance on such circumstance is unavailing, as there is no evidence suggesting Longwe

18   did not have access to DAPP Malawi's financial records or was unable to observe its

19   financial practices during the time he was there.  (See FAC Ex. B at 23-24 (reporting

20

21   ───────────────

22   USDA funds were "going straight to Mexico," whereas in his recent declaration he says
     he told defendants he had his own "suspicions about where the money from the USDA
23   program was used."  (See Mtimbuka 2020 Decl. ¶ 7.)  Moreover, Mtimbuka does not
     dispute his having informed defendants that, at an event he attended, an individual
24   associated with the Teachers Group announced that "because of the USDA grant, the
     Teachers' Group headquarters in Mexico will be made to look nice."  (See Mtimbuka
     2018 Decl. ¶¶ 7i-j, 11.)

25          [22] To the extent plaintiffs contend defendants acted with actual malice by reporting
26   Thomsen personally diverted USDA funds, the Court finds defendants' use of the word
     "you're" in the reported interview on which plaintiffs rely is, when read in context, a
27   reference to DAPP Malawi, not Thomsen personally.  (See FAC Ex. P at 24; see also id.
     at 26 (summarizing interview; stating "Thompson [sic] would not acknowledge any
28   wrongdoing by her organization").)

Longwe "became suspicious of his employer's financial activities after seeing unusual payments flowing from Malawi relief projects to accounts outside the country").)

Although plaintiffs have submitted evidence to show defendants had questions as to Longwe's information, that evidence is, as discussed below, likewise unavailing.  (See Rosenthal Decl. Ex. 4(l) (undated transcript excerpt of Smith and Walters' interview of Knut Haargaard) (stating Longwe "only knew so much" and did not know what allegedly siphoned funds were ultimately used for); Rosenthal Decl. Ex. 8(c) (internal Reveal email, dated Mar. 4, 2016) (stating Longwe's estimate that 70% of USDA funds was "being siphoned away" was "problematic since he is guessing, we believe"; further stating Smith and "Rosey," another Reveal employee, were "discussing" that percentage "further"); Rosenthal Decl. Ex. 12(e) (draft Reveal article with comments from Reveal employees) (commenting, with respect to draft language describing Longwe's belief that "up to 70%" of USDA funds were being siphoned, "Oof, this is pretty weak"); Rosenthal Dep. at 270:20-271:13, 288:14-289:5 (stating he felt it was important for defendants to report Longwe "believe[d]," rather than knew for a fact, USDA funds were being siphoned).)

In particular, "[a]n equally reasonable inference" to be drawn from the above-cited remarks is that defendants were engaged in the typical editorial process of fact-checking and revising drafts of their articles prior to publication, after which they confirmed the reliability of that information.  See Christian Rsch. Inst., 148 Cal. App. 4th at 89 (finding, where two equally plausible interpretations of same evidence exist, such evidence is not clear and convincing evidence of actual malice); (see also Rosenthal Decl. Ex. 1 (Dep. of Amy Pyle) at 106:6-107:14 (testifying, as to defendants' reported 50% to 70% estimate, "I know when we finished the story, that we were confident in the numbers that we used because we had done a lot of additional fact-checking on those numbers")).[23]

_____

[23] Although, as plaintiffs point out, defendants, in one of their publications, omitted a portion of Longwe's interview in which he incorrectly stated defendants received $80 million from the USDA, the Court is not persuaded by plaintiffs' argument that such omission "precludes rel[iance] on Longwe to defeat a claim of malice" as to the percentage diverted (see Opp. at 29:7-9); in particular, in that same interview, Longwe thereafter conceded his error as to the amount, but continued to affirm his belief that 50%

United States District Court
Northern District of California

1    Third, plaintiffs contend defendants acted with actual malice by relying on sources

2  known to be hostile to plaintiffs, specifically, two individuals whose employment was

3  terminated by DAPP Malawi, namely, Mtimbuka and Malabwe.[24]  Even assuming those

4  two sources were biased, however, defendants received from other sources information

5  that corroborated or was consistent with the statements made by the two assertedly

6  hostile sources.  (See Decl. of Matt Smith ("Smith Decl.") ¶¶ 44-46 (identifying additional

7  sources who described, inter alia, "diversion of foreign aid funds by Planet Aid," how

8  "salaries were skimmed or reduced by DAPP Malawi," forced "contributions" from DAPP

9  Malawi employees' salaries, and how "Planet Aid did not provide services that were

10  promised").)  Given those additional sources, defendants' reliance on Mtimbuka and

11  Malabwe fails to demonstrate actual malice.  Cf. Evans v. Unkow, 38 Cal. App. 4th 1490,

12  1497 (1995) (noting, "reliance solely on a source known to be hostile toward the plaintiff

13  may support a finding of reason to doubt the source's veracity" (internal quotation and

14  citation omitted)).

15                              **(ii)      Hiring of Ngwira**

16    Plaintiffs argue defendants acted with reckless disregard by hiring Kandani

17  Ngwira, a Malawian reporter who had been convicted of extortion,[25] to assist them in their

18  investigations.  The record, however, does not support the inference plaintiffs seek to

19  draw.  In particular, defendants, who were aware of Ngwira's criminal record, have

20  _____

21  to 70% of USDA funds had been siphoned and, as discussed above, Longwe was not the
    only source that recounted to defendants DAPP Malawi's siphoning activities.

22    [24] Plaintiffs contend malice also can be inferred from the following statement by a
23  Reveal editor: "[W]e need to say [DAPP Malawi] accused [Malabwe] of stealing or we
    open ourselves up."  (See Rosenthal Decl. Ex. 4(g).)  Contrary to plaintiffs' argument,
24  however, the statement does not suffice to demonstrate defendants doubted the truth of
    what Malabwe told them, but, rather, their effort to accurately convey relevant
25  information, which they subsequently did.  (See Decl. of Ethan Forrest Ex. B (Reveal
    article, dated May 23, 2016) at 23 (reporting Malabwe "left DAPP in 2014 after his
26  employers accused him of misusing the organization's tax-free nonprofit status").)

27    [25] The particular allegation was that Ngwira threatened to publish an unfavorable
    article unless the individual named therein paid him a sum of money, an accusation
28  Ngwira denies.

United States District Court
Northern District of California

submitted undisputed evidence that they investigated and assessed Ngwira's

professional qualifications, and based thereon, resolved any concerns they initially may

have had.  In that regard, Smith sought information about Ngwira and his criminal record

from the managing editor of the Malawi Daily Times, Brian Ligomeka, who was aware of

the details concerning Ngwira's criminal record, had supervised Ngwira's work as a

journalist, and recommended him to Smith "without any reservation."  (See Decl. of Brian

Ligomeka ("Ligomeka Decl.") ¶¶ 5-7, 10.)  Ligomeka further informed Smith that he had

"the highest regard for [Ngwira's] journalistic competence, veracity, judgement, and

ethics," and explained that he and the management of the Malawi Daily Times viewed

Ngwira's criminal record as "one of the costs of doing business as a journalist in Malawi[,]

because journalists are often targeted with false accusations by those seeking to silence

the press," an explanation that comported with Smith's own understanding of how

journalists are treated in Malawi.  (See Ligomeka Decl. ¶¶ 7, 10, 12; see also Smith Decl.

¶ 17.)

### (iii)     Reliance on Key Documents

Plaintiffs argue reckless disregard is also demonstrated by the "key documents" on

which defendants relied as evidence of diversion, namely, "2013 and 2014 spreadsheets

reflecting invoices paid by DAPP Malawi," bills paid by DAPP Malawi, and bank

statements and invoices generated in 2014 (see Opp. at 31:27-28; see also Opp. at

32:22-24, 34:4-8), all of which, according to plaintiffs, demonstrate there was no

diversion.

As defendants correctly note, however, the documents are "complex" and "often

ambiguous" (see Reply at 20:18; see also Rosenthal Decl. Ex. 2(a) at 48-74 (DAPP

Malawi financial documents); Rosenthal Decl. Ex. 4(a)-(b) (2013 and 2014

spreadsheets); Longwe Decl. Ex. B (spreadsheet of "DAPP MALAWI EXPENSES");

Longwe Decl. Ex. C (DAPP Malawi's 2008 "Trial Balance")), and the Court finds

defendants' interpretation thereof was "one of a number of possible rational

interpretations," see Time, Inc. v. Pape, 401 U.S. 279, 290 (1971); (see also, e.g., FAC

Ex. P at 22-23 (reporting "DAPP Malawi invoices and financial spreadsheets from 2013 and 2014" showed "large numbers [of] unidentified transfers . . . moving from DAPP Malawi's account to the Teachers' Groups African headquarters in Zimbabwe")), particularly given the information regarding diversion they had received from a number of sources, as described above.  Under such circumstances, defendants' interpretation of the documents is "not enough to create a jury issue of malice."  See Time, Inc., 401 U.S. at 290 (internal quotation omitted).

Moreover, in their publications, defendants reported that individuals with whom they spoke were shown DAPP Malawi financial documents and either corroborated defendants' interpretation or provided information consistent therewith, and plaintiffs have not disputed that defendants received such affirmation nor have they identified defendants' published reports thereof as defamatory.  (See, e.g., FAC Ex. P at 22 (reporting Smith and Walters showed "DAPP Malawi invoices and financial spreadsheets from 2013 to 2014" to Longwe; playing clip from recorded interview in which Longwe states those documents showed "systematic fraud"); id. at 23 (reporting Smith and Walters showed "financial data from inside DAPP Malawi" to Stephan Casella, former chief of money laundering section at Maryland U.S. attorney's office; playing clip from recorded interview in which Casella states, "[i]t's something that an investigator would look at," and asks, "[w]hy are these tens of millions of dollars in government funds[] going to" the Teachers Group, "an umbrella organization").)[26]

### (iv)     Failure to Consider Contrary Sources and Documents

Plaintiffs argue defendants' reckless disregard is demonstrated by (1) their failure to interview particular individuals who defendants knew were knowledgeable about

_____

[26] Although, as plaintiffs point out, defendants and other Reveal employees responsible for fact-checking the publications at issue, were, in some instances, unable to recall, at the time of their depositions, whether they had reviewed a specific document, any such lack of recollection, more than two years after the last publication at issue, fails to show reckless disregard at the relevant time.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Planet Aid, DAPP Malawi, and the USDA funds, e.g., an individual described by

2  defendants as a "consultant" retained by DAPP Malawi who audited the two USDA grants

3  and gave those grants, in defendants' words, a "swimmingly positive evaluation" (see

4  Rosenthal Decl. Ex. 4(t)), and (2) their failure to obtain and/or consider various

5  documents, e.g., the audit completed by that consultant.

6       A defendant's failure to conduct any such additional investigation, however, is

7  insufficient to demonstrate actual malice.  See Harte-Hanks Commc'ns, Inc., 491 U.S. at

8  688 (holding, "failure to investigate before publishing, even when a reasonably prudent

9  person would have done so, is not sufficient to establish reckless disregard").  Moreover,

10  based on information they obtained from their own visit to Malawi, as well as information

11  they received from sources apparently not interviewed by any auditor, including the

12  above-described consultant, defendants have shown they had reason to believe the

13  audits were inaccurate.

14       In that regard, defendants observed that the Farmers Clubs they visited did not

15  appear to have received any lasting benefits from DAPP Malawi, and there is no

16  evidence suggesting defendants did not observe what they claimed to have seen.  For

17  example, at one of those Farmers Clubs, although they saw a maize mill provided by

18  DAPP Malawi, the mill was in "obvious disrepair" and had "rusted through," and the

19  chairman of the Farmers Club explained that the mill stopped working because DAPP

20  Malawi had not provided the diesel fuel necessary to power it and the villagers were

21  unable to afford diesel fuel (see Walters 2018 Decl. ¶ 17); at another Farmers Club,

22  although they saw some livestock and two water pumps that had been provided by DAPP

23  Malawi, one of the water pumps required constant adjustment in order to function, and

24  the villagers at that location explained they still lacked fertilizer and implements to grow

25  crops (see Smith Decl. ¶ 31; see also Walters 2018 Decl. ¶ 15).  In addition, defendants

26  were informed by sources, in a position to obtain the information they provided, that

27  plaintiffs had fabricated financial documents in preparation for upcoming audits of the

28  USDA grants (see Walters 2018 Decl. ¶ 34; Charney Decl. Ex. HH at 13-14), and

1  plaintiffs, as discussed earlier herein, have failed to submit evidence sufficient to show

2  defendants were reckless in relying on those sources.

3       Thus, although, as plaintiffs point out, defendants cannot "claim immunity if [they]

4  ha[ve] conflicting information from another source and recklessly disregard[] it," see

5  Flowers, 310 F.3d at 1130, plaintiffs fail to show defendants recklessly disregarded

6  conflicting information; indeed, defendants, in their publications, acknowledged the

7  existence of audits and, in essence, questioned their results (see FAC Ex. B at 6; FAC

8  Ex. P. at 34).

9                      **(v)    Unprofessional Conduct**

10      Plaintiffs contend reckless disregard can be inferred from defendants'

11  unprofessional conduct, namely, offering cash or other inducements to sources in an

12  effort to obtain information, not disclosing their identities as reporters to sources, and,

13  according to plaintiffs, falsely telling sources those sources had been cheated by

14  plaintiffs.  (See Opp. at 38:13-18.)

15      "[E]ven an extreme departure from accepted professional standards of journalism,"

16  however, "will not suffice to establish actual malice."  See Newton v. Nat'l Broad. Co., 930

17  F.2d 662, 669 (9th Cir. 1990); see also Harte-Hanks Commc'ns, 491 U.S. at 665 (noting

18  courts cannot "substitute the professional standards rule for the actual malice

19  requirement").  Further, for each of the above-listed general categories of allegedly

20  defamatory statements, defendants, as noted herein, have identified sources, namely,

21  Andrew Chalamanda, Innocent Chitosi, Patrick Goteka, Kambani Kufandiko, Harrison

22  Longwe, Jackson Mtimbuka, and Marko Zebiah, as to whom plaintiffs offer no evidence

23  of any assertedly unprofessional conduct by defendants.[27]  Consequently, even if

24  defendants did engage in unprofessional conduct as to some of their sources, such

25  _____

26      [27] Although, as plaintiffs point out, Mtimbuka was reimbursed for the costs of his
    meals and transportation incurred in connection with his interview, and Goteka, after his
27  interview and given his concerns for his safety, received from defendants a portion of his
    relocation costs, none of those payments, contrary to plaintiffs' assertion, constitute the
28  type of arguably unprofessional conduct described by plaintiffs.

conduct fails to support plaintiffs' allegation that defendants "subjectively entertained serious doubt[s] as to the truth of [their] publication[s]."  See Newton, 930 F.2d at 668 (internal quotation and citation omitted).

### (vi)    Motive

Plaintiffs assert actual malice is demonstrated by defendants' desire to "impact" readers for financial gain.  (See Opp. at 38:23-24 (quoting Rosenthal Decl. Ex. 2(k) (Reveal editor's tweet, dated July 30, 2015) (stating, "[w]e live for impact here")).) Plaintiffs also contend defendants, based on such goals, decided, prior to having interviewed any sources in Africa, to make the story about plaintiffs a "major piece" that year (see Opp. at 39:1-2 (citing Rosenthal Decl. Ex. 2(n) (internal Reveal email, dated Jan. 30, 2015) (stating story about plaintiffs "will be one of our major projects this year"))), and, prior to the completion of their investigation, to prepare a draft "storyline summary" (see Rosenthal Decl. Ex. 10(a) (internal Reveal email, dated July 16, 2015)).

As defendants point out, however, the Supreme Court has held that "a newspaper's motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice."  See Harte-Hanks Comm'cns, Inc., 491 U.S. at 665.  Further, the undisputed evidence shows Smith had conducted research relevant to the story prior to defendants' decision to make the story a "major piece" (see Smith Decl. ¶¶ 4-7), and that defendants conducted additional research and received a taped interview of a source in Africa before deciding to prepare a draft storyline (see Rosenthal Decl. Ex. 10(a)).[28]

### (3)    Conclusion: Diversion of USDA Funds

In sum, whether viewed separately or collectively, plaintiffs' evidence is insufficient to support, by clear and convincing evidence, a finding that the allegedly defamatory statements regarding the diversion of USDA funds were made with actual malice.

---

[28] As to each of the general topics that follow, plaintiffs raise the same arguments predicated on motive, as well as biased sources, the hiring of Ngwira, and unprofessional conduct, as they raise with regard to diversion of funds.  The Court, having addressed those arguments above, does not address them again herein.

**b.      Failure to Provide Promised Livestock, Agricultural Inputs, and Water Pumps**

**(1)      Knowledge of Falsity**

Plaintiffs contend defendants were aware it was false to report that "every" farmer with whom they spoke said it would be a "lie" to say their lives had benefited from the Farmers Club program (see Opp. at 25:21-24; FAC Ex. P at 25 (reporting Farmers Club members told defendants their lives "changed not at all," despite implementation of Farmers Club program, and that in "every instance" defendants were told it was "a lie" to say they benefitted from the program)) because one individual, who was interviewed by Walters, described the benefits she and her family experienced after receiving a pump (see Walters Dep. at 288:17-289:9).  As Walters explained in her deposition, however, that individual "wasn't a farmer."  (See id. at 292:1-2.)

Plaintiffs next contend defendants, who, as noted, broadcast an interview wherein two interviewees made negative comments about the Farmers Club program in general not delivering to villages the promised benefits, were aware it was false to describe those two interviewees as "farmers" and, by implication, members of the program (see FAC Ex. R at 2), when, in fact, one interviewee, Mtimbuka, was not a farmer, and the other, Kamwendo, was not a member of a Farmers Club.[29]  Plaintiffs fail, however, to point to evidence showing defendants, when broadcasting the above-described interview, were aware Mtimbuka was not a farmer.  In any event, defendants' inaccurate description of Mtimbuka and Kamwendo as farmers in the Farmers Club program is not material, as the "sting" of the publication is that Malawian farmers as a group did not receive lasting benefits from the Farmers Club program and, as discussed below, plaintiffs have not offered evidence challenging defendants' report that they received similar information from other villagers, who were in the Farmers Club program.  See Masson, 501 U.S. at

---

[29] Plaintiffs also contend Kamwendo provided a declaration in which he stated he was "told to say the things he said during the interview."  (See Opp. at 29:23-25 (internal quotation and citation omitted).)  The declaration plaintiffs have submitted, however, contains no such statement.  (See Decl. of John Kamwendo ("Kamwendo Decl.") ¶ 4.)

517.

### (2)     Reckless Disregard of Truth or Falsity

### (i)     Use of Sources

Plaintiffs contend farmers on whom defendants relied in publishing the allegedly defamatory statements have submitted declarations in which they dispute the accuracy of the information attributed to them in defendants' publications, which declarations, according to plaintiffs, thus show defendants acted with reckless disregard.  As defendants point out, however, the majority of those declarants do not dispute that, at the time they were interviewed by defendants, they provided the information that was published (see Decl. of Charles Kachera; Decl. of Paul Molande, dated Aug. 8, 2018; Samson Decl.) and, to the extent two declarants, namely, Enock Chikaonda and Chief Chibwana, do state they did not provide the information attributed to them in defendants' publications, their declarations, as discussed below, do not constitute clear or convincing evidence of actual malice.

In particular, although Chikaonda now states that, contrary to what defendants reported, he never informed them his village in Njuli only received one pump, he does not state how many pumps he told defendants the village did receive, and the difference between one pump and the number of pumps he now claims his village received, four pumps, is not great enough to be "material," given, as discussed below, the twenty-five pumps reportedly promised.  See Air Wisconsin Airlines Corp., 571 U.S. at 247 (2014) (citation omitted).  Further, Chikaonda acknowledges that Walters and Smith, when visiting his village, saw it was "difficult" for village members to access water and that they "did not receive enough pumps from DAPP."  (See Decl. of Enock Chikaonda, dated Aug. 24, 2017, at ¶ 4.)

Plaintiffs' reliance on the declaration submitted by Chief Chibwana likewise is unavailing.  Although, in that declaration, he states, contrary to what defendants reported, he never told anyone he had to borrow money to pay for a pump, and, instead, obtained a pump for free (see Chibwana Decl. ¶¶ 3, 10), defendants have submitted a transcript of

37

United States District Court
Northern District of California

1    his interview, in which he told defendants, as translated for defendants at that time, he

2    had to take out a loan to purchase a pump from DAPP Malawi and that it took him two

3    years to pay it off (see Decl. of Amy Walters, dated Oct. 26, 2020, Ex. B (transcript of

4    Smith and Walters's interview of Chief Chibwana on Sept. 5, 2015) at 26-27 (Chief

5    Chibwana stating pump he received from DAPP Malawi was "not just for free"; further

6    stating he took out a loan of K14,000 for the pump).[30]

7                              **(ii)      Failure to Consider Contrary Documents**

8          Plaintiffs contend defendants possessed reports, submitted by Planet Aid to the

9    USDA (see Rosenthal Decl. Exs. 4(i)-(j) (Logistics & Monetization Reports)), that show

10   plaintiffs had provided farmers with all of the livestock and equipment they were

11   promised, and, consequently, that defendants' reports to the contrary were made with

12   reckless disregard for the truth.  Those reports, however, only contained the total number

13   of items for the entire program and thus do not provide any detail as to the amounts

14   plaintiffs promised to deliver to specific Farmers Clubs, or as to whether those promises

15   were fulfilled, whether farmers believed they benefitted from the program, or whether

16   plaintiffs were selling equipment to farmers.  In short, the reports do not indicate the

17   information defendants received from their sources was false.

18                              **(iii)     Lack of Knowledge**

19         Citing to depositions in which Smith and Walters were unable to recount the

20   specific number as to the discrepancy between the livestock and materials promised and

21   delivered, plaintiffs first contend defendants acted with reckless disregard of the truth

22   when they reported generally that Malawian farmers did not receive all of the livestock,

23

24         [30] Plaintiffs' objection to the above-referenced transcript is overruled.  The exhibit,
25   although submitted with the Reply, is consistent with the evidence defendants initially
     submitted in support of the motion (see Walters 2018 Decl. ¶ 16 (describing interview
26   with Chief Chibwana)), and constitutes a "reasonable response to the opposition."  See
     Applied Materials, Inc. v. Demaray LLC, No. 5:20-CV-05676-EJD, 2020 WL 7642869, at
27   *1 n.1 (N.D. Cal. Dec. 23, 2020).  To the extent the transcript continues with an interview
     of an individual named "Timothy," a witness not disclosed to plaintiffs in discovery, the
28   Court has not considered herein that portion of the transcript.

United States District Court
Northern District of California

1   inputs, and pumps they were promised.  In those depositions, however, Smith and

2   Walters only testified they were unable at that time, i.e., more than two years after the

3   last publication here at issue, to recall those details, not that they lacked that information

4   at the time of publication.  (See Walters Dep. at 328:7-329:1, 391:6-18; Smith Dep. at

5   190:13-17, 191:9-12.)

6          Next, plaintiffs contend defendants acted with reckless disregard when, on some

7   occasions, as noted above, defendants, in their publications, included specific numbers

8   as to equipment promised and received that, according to plaintiffs, was incorrect.  In

9   particular, in a declaration submitted by defendants, Chikaonda states he informed

10  defendants the village of Njuli received seven pumps; defendants, however, reported the

11  village only received two pumps.  Additionally, in the same publication, defendants

12  reported they were told by Mtimbuka the village was promised twenty-five pumps, but, in

13  a later publication reported, the village, as "[i]t turns out," was only supposed to get one

14  pump.  (See FAC Ex. Q at 6.)  Plaintiffs, however, fail to submit evidence showing

15  defendants, at the time of publication of the twenty-five pump promise, had any

16  information conflicting with that reported figure,[31] and, consequently, as to the number of

17  pumps received, the difference between what they were told by Chikaonda and what they

18  reported is not of sufficient significance to be deemed "material," both figures being

19  markedly lower than twenty-five.  See Air Wisconsin Airlines Corp., 571 U.S. at 247

20  (2014) (citation omitted).

21         Under such circumstances, plaintiffs fail to show defendants acted with reckless

22  disregard.

23  //

24  //

25

26  ───────────────

27  [31] Indeed, they had confirming information, as not only Mtimbuka, to whom they
    attributed the figure in their publication, but also Chikaonda had told them the promised
    number of pumps was twenty-five.  (See Decl. of Enock Chikaonda, dated Dec. 27, 2017,
28  at ¶ 9.)

### (3) Conclusion: Failure to Provide Promised Livestock, Agricultural Inputs, and Water Pumps

In sum, whether viewed separately or collectively, plaintiffs' evidence is insufficient to support, by clear and convincing evidence, a finding that the allegedly defamatory statements regarding plaintiffs' failure to provide promised livestock, agricultural inputs, and water pumps were made with actual malice.

### c. Kickbacks from Employee Salaries and False Reporting of Salaries to USDA

Plaintiffs, citing to bank deposit slips and payroll records shown to defendants before publication, argue defendants acted with reckless disregard in reporting that plaintiffs had extracted "20% to 100%" of some employees' salaries by requiring contributions to the Teachers Group. (See, e.g., FAC Ex. P at 20 (reporting, "[w]hile researching the story we spoke to about a dozen African members of the Teacher's Group"; further reporting, "[a]ll of them gave a portion of their salary to the group[,] [f]rom 20% to 100%, everything they earned").)[32]

As defendants point out, however, the cited bank deposit slips and payroll records are "ambiguous." See Time, Inc., 401 U.S. at 290. In particular, the deposit slips pertain only to a limited time frame and the period to which the payroll records pertain is unclear. Thus, contrary to plaintiffs' assertion, the deposit slips and payroll records do not show the amount of the reported contributions was false, and consequently, do not constitute evidence from which a reasonable inference can be drawn that defendants entertained serious doubts as to the truth of the information provided by their sources.

Plaintiffs next argue defendants acted with actual malice in reporting DAPP Malawi employees received smaller paychecks than the amounts plaintiffs reported to the USDA; specifically, according to plaintiffs, documents defendants received from the USDA do not reflect any such differential. (See Meehan Decl. ¶ 68 (stating plaintiffs "presented the

---

[32] Plaintiffs acknowledge the documents do show contributions were made, and those contributions were not only from the salaries of some of defendants' sources but from the salaries of other employees as well. (See Phiri Decl. ¶ 67.)

United States District Court
Northern District of California

USDA with copies of actual [employee] contracts"; further stating he is "unaware of any documents showing that employee salaries differed").)  In making the allegedly defamatory statement, however, defendants relied on several sources, which sources included a "confidential source," who, as set forth earlier herein, stated, in a taped interview, she was only receiving $100 from the $350 salary "they gave the organization" (see FAC Ex. P at 21; Rosenthal Decl. Ex. 16 (Reveal's "Objections and Responses to Lisbeth Thomsen's Second Set of Interrogatories") at 20:1-17 (stating defendants interviewed "confidential source" who provided information that "funds are extracted by writing paychecks much smaller than reported to the USDA")), as well as Zebiah, who had been an employee of DAPP Malawi and manager of a Farmers Club (see FAC Ex. P at 21 (reporting Zebiah confirmed confidential source's information regarding her salary); Walters 2018 Decl. ¶ 35 (stating Zebiah informed her DAPP Malawi employees received "less than one third of the salary that DAPP Malawi had budgeted")), and Longwe, a former financial controller for DAPP Malawi, who likewise stated DAPP Malawi paid some of its employees less than what was listed in budgets (see Walters 2018 Decl. ¶ 35). Plaintiffs have not shown defendants knew the information from those sources was false, or that defendants "in fact entertained serious doubts as to the truth" of such information, see Reader's Digest Ass'n, 37 Cal. 3d at 256-57, nor would one expect plaintiffs, in submitting documents to the USDA, to acknowledge, in those documents, any falsity contained therein.

### d.   Falsification of Invoices and Payment of Dubious Expenses

As to the earlier-quoted allegedly defamatory statements regarding the falsification of invoices and payment of dubious expenses, plaintiffs first argue defendants acted with reckless disregard because they had in their possession audits, along with invoices, bank statements, and internal accounting records, showing no such impropriety.  Defendants, however, have submitted evidence supporting a reason to question the reliability of those documents, namely, the reports they received from Longwe and Malabwe, two sources in

United States District Court
Northern District of California

a position to have personal knowledge of the fabrications they described (see Walters 2018 Decl. ¶ 34; Charney Decl. Ex. HH at 13-14), and, as discussed earlier herein, plaintiffs fail to make a sufficient showing that defendants, in relying thereon, were reckless.  Additionally, defendants had obtained invoices they reasonably interpreted as corroborating the information they received from those sources.  (See FAC Ex. B at 25 (discussing "what appear to be multiple bills for the same purchase" of computers; providing link to bills obtained).)[33]

Plaintiffs next contend defendants had privately admitted their own doubts about reporting plaintiffs' improper transfer of funding to a Hong Kong-registered trading company with ties to Planet Aid.  (See FAC Ex. B at 24.)  Specifically, plaintiffs rely on an internal e-mail, authored by Smith, in which he described DAPP Malawi's arrangement with the Hong Kong-registered company as "the type of mystery we would like to solve" and acknowledged defendants could not determine "where the money is going, what the entity is used for precisely, or how it fits into the larger picture of the Teachers Group financial network."  (See Rosenthal Decl. Ex. 4(e).)  The cited email, however, does not express a doubt as to the impropriety of the transfer, but only a question as to what the Hong Kong company ultimately did with those funds, a question defendants did not purport to answer in their publications.

### 3. Conclusion: Actual Malice

In sum, as to the allegedly defamatory statements for which plaintiffs have sufficiently shown falsity, plaintiffs have failed to show defendants made those statements with actual malice, and, consequently, their defamation claim is subject to dismissal.[34]

---

[33] To the extent plaintiffs contend defendants should have obtained other documents in order to corroborate the reports they received as to assertedly falsified invoices, such argument is, as noted earlier herein, unavailing.  See Harte-Hanks Commc'ns, Inc., 491 U.S. at 688.

[34] In light of this finding, the Court does not address, herein, defendants' additional argument that plaintiffs "will be unable to prove damages."  (See Mot. at 2:24-26.)

42

United States District Court
Northern District of California

1  **II.   Remaining Causes of Action**

2       Defendants contend plaintiffs' remaining causes of action are subject to dismissal

3  for the same reasons their defamation claim is subject to dismissal.  In response,

4  plaintiffs, focusing on their tortious interference claim, contend such claim can survive

5  even in the absence of a viable defamation claim.

6       In the context of an anti-SLAPP motion, however, "the collapse of [plaintiffs']

7  defamation claim spells the demise of all other causes of action" where, as here, all such

8  claims "arise from the same [allegedly defamatory] publications."  See Gilbert, 147 Cal.

9  App. 4th at 34 (finding, where defamation claim subject to dismissal under anti-SLAPP

10  statute, claims for intentional and negligent interference with economic advantage and

11  intentional infliction of emotional distress arising from same allegedly defamatory

12  publication likewise subject to dismissal).

13       Accordingly, plaintiffs' remaining causes of action are, for the reasons set forth

14  above as to plaintiffs' defamation claim, subject to dismissal.

15  **III.   Leave to Amend**

16       Plaintiffs seek leave to amend in the event defendants' motion is granted, and, in

17  support of such request, cite to Verizon Delaware Inc. v. Covad Communications, 377

18  F.3d 1081 (9th Cir. 2004), wherein the Ninth Circuit observed that "granting a defendant's

19  anti-SLAPP motion to strike a plaintiff's initial complaint without granting the plaintiff leave

20  to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal

21  amendment."  See Verizon, 377 F.3d at 1091; see also Fed. R. Civ. P. 15(a)(2) (providing

22  courts "should freely give leave [to amend] when justice so requires").

23       Plaintiffs' reliance on Verizon, however, is misplaced, as Verizon was decided

24  before Planned Parenthood Federation of America, Inc. v. Center for Medical Progress,

25  890 F.3d 828 (9th Cir. 2018), wherein the Ninth Circuit recognized different procedural

26  rules are to be applied to anti-SLAPP motions, depending on the type of challenges being

27  raised therein.

28       In particular, when a defendant brings an anti-SLAPP motion "based on alleged

United States District Court
Northern District of California

1  deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as

2  a motion under Rule 12(b)(6)," see Planned Parenthood, 890 F.3d at 834 (internal

3  quotation and citation omitted), under which circumstances the "liberal amendment

4  standards of Rule 15(a)(2) apply," see Todd v. Lovecruft, No. 19-cv-01751-DMR, 2020

5  WL 60199, at *22 (N.D. Cal. Jan. 6, 2020).  By contrast, where, as here, a defendant

6  brings an anti-SLAPP motion based on a factual challenge to the allegations in the

7  complaint, such motion "must be treated as though it were a motion for summary

8  judgment," see Planned Parenthood, 890 F.3d at 834, and courts "ordinarily will be

9  reluctant to allow leave to amend to a party against whom summary judgment has been

10  entered," see Nguyen v. United States, 792 F.2d 1500, 1503 (9th Cir. 1986) (internal

11  quotation and citation omitted).

12       Further, the "underlying purpose" of Rule 15 is "to facilitate decision on the merits

13  rather than on pleadings or technicalities," see Eldridge v. Block, 832 F.2d 1132, 1135

14  (9th Cir. 1987) (internal quotation and citation omitted), and, here, in resolving the instant

15  motion, the Court has gone well beyond reviewing the pleadings and has considered the

16  extensive evidentiary record compiled after more than two years of discovery, see Todd,

17  2020 WL 60199, at *21-22 (granting motion to strike without leave to amend given court's

18  "thorough review of the current evidentiary record").  Under such circumstances, plaintiffs

19  have not shown leave to amend is warranted.

20                                    **CONCLUSION**

21       For the reasons stated above, defendants' Motion to Strike is hereby GRANTED,

22  and the FAC is hereby DISMISSED.

23       **IT IS SO ORDERED.**

24

25  Dated: March 23, 2021

26                                              MAXINE M. CHESNEY
                                               United States District Judge

27

28

                                        44