# EXHIBIT A

| Case name | Fees awarded |
|---|---|
| *Mullan v. Daniels*, Case No. 19-cv-04058-KAW (N.D. Cal., Apr. 7, 2021) | $45,955 |
| *CoreCivic, Inc. v. Candide Group LLC*, Case C-20-03792-WHA (N.D. Cal., Apr. 6, 2021) | no award in light of decision have calculation await a Ninth Circuit ruling on applicability of anti-SLAPP in federal court. |
| *Wong v. Wong*, Case No. A159009 (1st Dist., Div. 5 Mar. 3, 2021) | $8,050 |
| *Opperwall v. Stone*, Case No. A156200 (1st Dist., Div. 5 June 24, 2020) | $13,100 |
| *Peak Health Center v. Dorfman*, 2020 WL 3254337 (N.D. Cal., June 16, 2020). | $61,699 |
| Alonso v. Chahal, Case No. A151250 (1st Dist., Div. 3, June 15, 2020). | $36,014 |
| *Zhou v. OutFront Media*, Case No. 3:19-cv-07269-WHO (N.D. Cal, May 26, 2020) | $22,000 |
| *Herring Networks, Inc. v. Rachel Maddow, et al.*, Case No. 3:19-cv-01713-BAS-AHG (N.D. Cal., May 22, 2020) | $323,965 |
| *Resolute Forest Products, Inc. v. Greenpeace International*, Case No. 17-cv-028024-JST (N.D. Cal., April 22, 2020)(Award as to Greenpeace Defendants). | $545,572 |
| *Resolute Forest Products, Inc. v. Greenpeace International*, Case No. 17-cv-028024-JST (N.D. Cal., April 22, 2020)*(awad as to Greenpeace Fund)* | $249,296 |
| *Resolute Forest Products, Inc., 2019 WL 8377690, at *9 (N.D. Cal. 9/24/19) (Fee awarded Stand Defendants)* | $37,015 |
| *Astre v. McQuaid*, Case No. A154945 (1st Dist., Div. 2, Oct. 30, 2019). | $5,320 |
| *GemCap Lending I, LLC v. Unity Bank Minnesota*, Case No. 18-cv-05979-YGR (N.D. Cal., Oct. 14, 2019). | $55,691 |
| *J.B.B. Investment Partners Ltd. V. Fair*, Case No. A152877 (1st Dist., Div. 2, June 4, 2019) | $44,654 |
| *Huynh v. Farmers Insurance Exchange*, No. A149577 (1st Dist., Div. 3, Mar. 27, 2019) | $25,950 |
| *Richmond Compassionate Care Collective v. 7 Star Holistic Foundation*, Case No. A154581 (1st Dist., Div. 2, Mar. 15, 2019) | $23,120 |
| *Dean v. Friends of Pine Meadow*, Case No. A151256 (1st Dist., Div. 4, Sept. 27, 2018) | $69,500 |
| *Nicosia Consulting Int'l, LLC v. Rees*, Case No. A149278 (1st Dist., 4th Div., July 23, 2018) | $33,759 |
| *Open Source Security, Inc. v. Perens*, Case No. 17-cv-04002-LB (N.D. Cal., June 9, 2018) | $259,901 |
| *Adams v. Galli*, Case No. A141791 (1st Dist., Div. 4, Feb. 16, 2018) | $2,264 |
| *Pecot v. Wong*, Case No. A139566 (1st Dist., Div. 4, Jan. 18, 2018) | $20,000 |
| *Fitbit, Inc. v. Laguna 2, LLC*, Case No. 17-cv-00079-EMC (N.D. Cal., Jan. 5, 2018). | $10,000 |
| | |
| **AVERAGE AWARD** | **$90,134** |
| | |
| **NUMBER OF AWARDS EXCEEDING $100,000** | **4** |

# EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3          Before The Honorable Jacqueline Scott Corley, Judge

4

5    PLANET AID, INC., et al.,        )
                                      )
6              Plaintiffs,            )
                                      )
7    vs.                              )   No. C 17-03695-MMC
                                      )
8    REVEAL, CENTER FOR               )
     INVESTIGATIVE REPORTING,         )
9    et al.,                          )
                                      )
10             Defendants.            )
     _____)

11                                        San Francisco, California
12                                        Friday, November 9, 2018

13
       TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
14              RECORDING 1:37 - 3:41 = 124 MINUTES

15   APPEARANCES:

16   For Plaintiffs:
                                  Nelson, Mullins, Riley &
17                                  Scarborough, LLP
                                  101 Constitution Avenue NW
18                                Suite 900
                                  Washington, D.C. 20001
19                          BY:   SAMUEL ROSENTHAL, ESQ.

20   For Defendants:
                                  Davis, Wright, Tremaine, LLP
21                                1201 Third Avenue
                                  Suite 2200
22                                Seattle, Washington 98101
                            BY:   AMBIKA K. DORAN, ESQ.
23

24

25            (APPEARANCES CONTINUED ON NEXT PAGE)

2

```
 1  APPEARANCES:  (Cont'd.)

 2  For Defendants:
                              Davis, Wright, Tremaine, LLP
 3                            505 Montgomery Street
                              Suite 800
 4                            San Francisco, California
                               94111
 5                     BY:   THOMAS R. BURKE, ESQ.

 6
    Transcribed by:          Echo Reporting, Inc.
 7                            Contracted Court Reporter/
                              Transcriber
 8                            echoreporting@yahoo.com

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

27

1  that was false and he also had been fired for trying to

2  steal money.  He was involved in a big fraud.  Presumably,

3  there's a document there where the editors are saying

4  "Should we really be using this guy?"  It's not in that

5  line.  It's not in the draft.  It's not in the script.  It's

6  not in an email concerning them.  It's simply an email

7  concerning is this guy reliable or not, and there's a number

8  of characters who are like that.

9      We do see -- you've already gotten earlier some

10  documents that talk about sources.  Again, no script, no

11  outline, no draft, but very very valuable and very very

12  helpful.

13          THE COURT:  Okay.  So now we're talking really

14  about emails?

15          MR. ROSENTHAL:  We're talking about emails or it

16  could be a correspondence.  It could be notes.  It could be

17  a memo of a conversation.  It could be a memo from an editor

18  to a reporter.

19          THE COURT:  Okay.  And are there particular

20  sources in particular?

21          MR. ROSENTHAL:  Yes.  Your Honor, there are 15

22  sources that we had identified.  And, actually, I can even

23  drop one into a lower level, Inosin Chitozi (phonetic), who

24  I think is marginally relevant, and I don't know why they

25  submitted a declaration, but those are the individuals.

28

1  Those are ones that submitted declarations.

2          THE COURT:  In the case?

3          MR. ROSENTHAL:  In the case.

4          THE COURT:  Yeah.  Okay.  So what about that?

5          MS. DORAN:  It's not -- it's not clear to me

6  exactly what that request is for.  Is it any document that

7  mentions a name of one of these people or is it

8  communications about the reliability and credibility of a

9  particular source?

10          THE COURT:  Well, it probably is the former,

11  right, because they don't want you --

12          MS. DORAN:  Deciding.

13          THE COURT:  -- deciding if it goes to the

14  credibility or not.

15          MS. DORAN:  I think, you know, part of the problem

16  in looking at this the way that we are is that we are

17  talking about it in sort of a piecemeal way.  And the

18  reality is is that this was a very long investigation.  It

19  generated tons of documents, tons of recordings.  We have

20  offered to produce quite a bit of information, and, you

21  know, if we -- we'll go through this I know, you know, one

22  by one, but we're going to get to a point where you're

23  chipping away -- chipping away to the point that he has

24  every -- they have all of our documents, and that's --

25  again, that's incredibly burdensome for us to produce, and a

1  lot of it's privileged.  Some things he's asking --

2          THE COURT:  Well, we'll deal with privilege, and I

3  understand it's burdensome, and --

4          MS. DORAN:  Yeah.

5          THE COURT:  -- and that may be the case.  The

6  question is you submitted declarations from all these

7  people.  I don't know how you could then withhold --

8          MS. DORAN:  Well, we produced recordings with --

9  or notes with all of those sources -- I mean, all of

10 those --

11         THE COURT:  Right.  But a lot of it is -- and you

12 said, well, it's not really about actual knowledge, but then

13 I read your anti-SLAPP motion in which the first argument

14 was actual knowledge.

15         MS. DORAN:  Yeah.

16         THE COURT:  So you put your state of mind at issue

17 in the motion.  Now, I was going to say if you want to

18 withdraw that argument from the anti-SLAPP motion, then I

19 think that would narrow it considerably.

20         MS. DORAN:  I don't think that's something that

21 we're prepared to do.

22         THE COURT:  I get it.  So then I think -- then --

23 then you've essentially made the anti-SLAPP motion the case,

24 to a large extent the whole case.  You've really truncated

25 it and moved it up, and so there's a lot of discovery that

30

1  has to -- I mean, you did it.  You made that choice.  That's

2  okay, but then that's more discovery than you might

3  otherwise get on an anti-SLAPP motion because the actual

4  malice is what really opens it up.

5          MS. DORAN:  And that's why we didn't say "No,

6  we're not giving you any discovery."

7          THE COURT:  No, and why you decided to do on the

8  retraction, because that goes to -- it doesn't go to

9  falsity, but it goes to actual knowledge, right?

10          MS. DORAN:  Right.

11          THE COURT:  So now he's saying "So I want your

12  emails, your notes, anything about those 15 sources who

13  submitted declarations."

14          MS. DORAN:  I think, you know, we can go back and

15  see what we have.

16          THE COURT:  Okay.

17          MS. DORAN:  I can tell you I have a -- not right

18  in front of me, but I do have a list.  You know, he's made

19  the comments about not sharing the hit list, but the -- the

20  documents that I'm telling you that we have, the 150,000,

21  that is after the search terms were run, search terms that

22  we picked and search terms that he added.

23          THE COURT:  Yes.

24          MS. DORAN:  So it's -- it's -- I'd like to go back

25  and see the volume, for example, of like a particular

31

1  source's name before making a commitment, unless, of course,

2  you order us to do it regardless, in the sense that, you

3  know, if there are -- if there's a common name, for example,

4  among these sources.

5          THE COURT:  Well, sure, there might have been a --

6  you don't need to come back to me.  You can come back to Mr.

7  Rosenthal and just say, "Look, if we do it, we get all these

8  other people who aren't them."  He doesn't want those.

9          MS. DORAN:  Okay.  But --

10         THE COURT:  He wants that particular -- documents

11 as to that particular person.

12         MS. DORAN:  And --

13         THE COURT:  There may be ways you could work out

14 the search terms or something.

15         MR. ROSENTHAL:  Your Honor, I've said from the

16 beginning -- and she's absolutely right -- it's a hit list.

17 If Nikki Luca (phonetic) is such a common name that you have

18 10,000 documents, we'll talk about that, or Chitozi.

19         THE COURT:  You're saying that you know they

20 won't.

21         MR. ROSENTHAL:  They won't.  That's why it's not

22 burdensome, your Honor.

23         MS. DORAN:  So that sounds perfectly reasonable,

24 but let me just give you an example of what's happened so

25 far.

36

there's no other recording.  We take it from counsel's
representation that there's no follow-up recordings or
others that they're withholding.  It appears that something
wasn't recorded, but if they say it wasn't recorded, it
wasn't recorded.

So we're okay on that.  We have not received any notice
whatsoever except for attached to the Matt Smith declaration
that was recently filed, and so the notes would be very
important to us.

THE COURT:  And, Ms. Doran, you're shaking your
head.

MS. DORAN:  Well --

THE COURT:  You're producing the notes?

MS. DORAN:  Yes.

THE COURT:  Okay.

MR. ROSENTHAL:  When we get to outlines, drafts
and scripts and documents concerning it, I think I've
outlined there are lots of documents.  In the core group is
about 15 people.  I think it's exactly 15 people.  There's
one we could even take off the list if we can get a
representation from counsel that he knows nothing about the
USDA, and that's Inosin Chitozi.  He -- he stopped working
for DAPP Malawi, which, as you know, is a subcontractor of
Planet Aid, five years before the USDA program.  If they
tell us they have nothing for Mr. Chitozi relating to the

37

1  USDA program, well, now we're down to 14.

2          MS. DORAN:  We're not going to make that

3  representation.

4          THE COURT:  Okay.

5          MR. ROSENTHAL:  Then give us everything relating

6  to the USDA program.  When --

7          THE COURT:  Mr. --

8          MS. DORAN:  Whoa --

9          THE COURT:  Mr. -- Mr. Chitozi --

10         MS. DORAN:  Chitozi.

11         MR. ROSENTHAL:  Chitozi.

12         THE COURT:  -- Chitozi.  That's what we're doing

13  now.  We're taking it one by one.  Okay.  All right.  So --

14         MR. ROSENTHAL:  But I will say we have a lot of

15  recordings that they produced to us, and we're not looking a

16  gift horse in the mouth, but there's a huge number that have

17  nothing to do with the USDA program.  For example, they've

18  given us 21 that post-date the two articles that they've

19  said it should be limited to and 54 that have nothing to do

20  with the USDA program whatsoever, 19 from somebody in

21  Denmark who left working for any -- anything relating to the

22  teacher's group, 20 or 30 years ago.

23      So if they could focus on the material that's related

24  to the USDA as a priority, we would very much appreciate it.

25  I'm sure it took them a long time to go through literally 19

38

1  tapes of Britta Yunga (phonetic), but it truly was

2  irrelevant to the case.  Yes, she was someone who was quoted

3  but had nothing to do with the USDA.  That's what our case

4  is about.  So I'd ask them to focus up front on the material

5  that's USDA related.

6          MS. DORAN:  Well --

7          THE COURT:  No, go --

8          MS. DORAN:  No, go ahead.

9          THE COURT:  Well --

10         MS. DORAN:  I interrupted you.  I didn't mean to.

11         THE COURT:  No, no, no, but I mean, do you have a

12  response to that?

13         MS. DORAN:  Yeah, I do, which is that we are --

14  we're operating on the scope of the complaint, not the scope

15  of what's being told to us right now, and --

16         THE COURT:  Okay.  No, no, no, but now I think

17  we're just talking about priority.

18         MS. DORAN:  Yes.

19         THE COURT:  And -- and what you're saying is what

20  you're really interested in is the USDA program and really

21  the allegation that they stole money?

22         MS. DORAN:  Yes.  That -- that is the defamation

23  is that they stole money from the USDA program, and that's

24  really what our focus is.  And -- and while I understand Ms.

25  Doran to be saying that's the focus of the complaint, the

39

 1 focus of the complaint is on the USDA program and theft of

 2 that.  And so that's -- that's really what we are looking

 3 for.

 4           THE COURT:  I mean, even the four -- in your --

 5 your SLAPP motion -- anti-SLAPP motion, you -- you identify

 6 four sort of areas.

 7           MS. DORAN:  Premises --

 8           THE COURT:  Those are all related to that premise.

 9           MS. DORAN:  Well, they -- they roll up to, you

10 know, that conclusion.

11           THE COURT:  Right.

12           MS. DORAN:  But they are -- I mean, what I -- what

13 I hear -- I mean, saying anything that relates to the USDA,

14 if they're going to include all of those premises, those

15 four, you know, sets of facts, then we're talking about,

16 again, the entire thing.

17           THE COURT:  The whole thing.  Yeah.

18           MR. ROSENTHAL:  When we talk about outlines,

19 drafts and scripts, they have asked to limit it to the first

20 two publications, one in March of 2016 in the form of a

21 radio podcast, and the second was a written article in May

22 of 2016.

23     So they don't want to produce any scripts, any

24 articles, any drafts or emails after that, although --

25           THE COURT:  So but that -- we'll go through that.

74

1          THE COURT:  Paragraph?

2          MR. ROSENTHAL:  Oh, if I may.

3          THE COURT:  Sure.

4          MR. BURKE:  This is the first amended, Judge, not

5  the original.

6          MR. ROSENTHAL:  No, no, it's in the original.

7          MS. DORAN:  Well --

8          THE COURT:  Yeah, it would have to be the

9  original, right?

10          MR. ROSENTHAL:  And I -- your Honor, I apologize.

11  I did not bring the original complaint.

12          THE COURT:  That's okay.

13          MR. ROSENTHAL:  But it very definitely said the

14  allegation was false and the money ended up in Marco

15  Zavilla's account.  And I think if -- if we wanted to kind

16  of streamline the discovery process, I would be happy to go

17  through the complaint and identify those which I think put

18  them on notice and therefore an obligation to -- to do some

19  truly thorough fact checking.

20          MS. DORAN:  I don't -- I mean, one issue is that I

21  don't know how we would look for things that -- I mean, we

22  -- we've already talked about producing for the sources that

23  we've -- you know, the Court has already said "I want you to

24  go back and" --

25          THE COURT:  Is he one of the 15 sources?

1          MS. DORAN:  He is.

2          THE COURT:  So that you're already going to get --

3          MS. DORAN:  I'm pretty sure he is, right?  He's

4  one of those 14 people?

5          MR. ROSENTHAL:  He is.  He is.

6          THE COURT:  So you're already going to get any

7  emails, notes, or whatever regarding him.  So that would --

8  that would sweep that up.

9          MR. ROSENTHAL:  If your Honor's ruled in favor of

10 me getting all the documents relating to the 15, then, yes,

11 I agree.

12         THE COURT:  Yeah.  Okay.

13         MR. ROSENTHAL:  And I can go through the complaint

14 and see if there's anything that would not be in competition

15 with the 15, but I think there aren't.  I think that would

16 actually --

17         THE COURT:  Okay.  So I think it's already taken

18 care of.  And, again, I think it goes to that if you wanted

19 to withdraw the actual malice, but I mean, I've done these

20 before where I brought the SLAPP motion and we -- we -- it

21 was strictly, you know --

22         MS. DORAN:  Yeah.

23         THE COURT:  -- reporter's privilege or --

24         MR. BURKE:  You know, another compromise, your

25 Honor, is if Plaintiffs' complaint is now just about the

76

1   USDA, everything else is out, and you want to focus only on

2   producing documents that have to do with the USDA.  That's

3   another way to go about this too because counsel has

4   represented in court that --

5           MR. ROSENTHAL:  Well, let me --

6           MR. BURKE:  -- his lawsuit, which was spanning 90

7   pages and 80 statements, the amended complaint was equally

8   broad, is just about the USDA.  This is startling headline

9   news to us, and if we want to just narrow this down to USDA

10  related documents in that statement as opposed to the 79

11  other statements, this would be a much shorter process, far

12  less discovery, and a very tiny SLAPP motion.

13          MR. ROSENTHAL:  So let me say it shouldn't come as

14  headline news because I put it in the -- one of the letters

15  that we were not asking for all this other stuff about cults

16  and, you know, all this other, you know, material.  But I've

17  offered to counsel, and they are considering it, going back

18  and trying to streamline the complaint and picking out one

19  defamatory sentence from each of the categories, and they

20  said they would consider it.  I'm happy to do that as long

21  as they don't come back and say "Now you owe us fees for" --

22          MS. DORAN:  I don't -- it's not reasonable to ask

23  us to give up our fees if you're going to take allegations

24  out of your complaint that you allege were defamatory.  But,

25  setting that aside, even if you go and take one statement

77

1  from every category, you're still going to go well beyond

2  the USDA investigation.  So, I mean, you know, we had talked

3  about this and about what you -- your clients are really

4  upset about, and this is one of the things, and if it's the

5  only thing, then, again, it would be easy to streamline this

6  entire process.

7            THE COURT:  Okay.  But if you want him to do that

8  -- to be fair to him, if you want the Plaintiffs to do that,

9  to narrow it to the discovery, then it's perfectly fair to

10 say that you're not -- they're not going to ask for your

11 fees on the other because basically it's a matter of

12 compromise in order to narrow it for you and to streamline

13 the case.  That's not an unfair -- and if I were sitting

14 here being your settlement attorney, I'd be -- I mean, you

15 know that.  Anyway, in any event, so but I'm not going to

16 get involved in that.  I think you're all here and you

17 should continue the discussion, but I have -- we have a

18 motion that's sitting in front of me.  That's certainly --

19 my goodness, Judge Chesney would love you all if you could

20 do that, right?  And you'll get a more reasoned -- you'll

21 get a better decision.  You'll get something that every --

22 you know, that makes more sense if you could really focus on

23 that.  So I would encourage you to figure out if you can do

24 that, and if you want some help in doing that, I could refer

25 -- you know, talk to Judge Chesney, get a referral on help.

78

1 But, on the other hand, I know that Plaintiffs are concerned
2 too about timing.  So none of this is going to keep moving
3 on parallel track, but we should really think about it.  It
4 enables everyone's presentation of the case to be so much
5 more understandable the more narrow it is.
6          MR. ROSENTHAL:  I'm happy to, as I said, limit it
7 to the USDA and, two, limit it to the first two articles, as
8 long as they don't come back as they have and say we've got
9 all these other things.  And if their answer is, "Well, we
10 had to because it's in the complaint," I'm happy to deal
11 with that.  Happy to work out some --
12          THE COURT:  Okay.  Well, I suggest you guys talk
13 because --
14          MS. DORAN:  Okay.
15          THE COURT:  And it may be that you can get back
16 your fees if you win in the end, but in the meantime, it
17 will save you fees, right, for your client.  So you may want
18 to think about that.
19          MS. DORAN:  Fees that we think we're ultimately
20 entitled to.
21          MR. ROSENTHAL:  So there's one -- there's one
22 category --
23          THE COURT:  It's just a matter of -- it's
24 compromise.
25          MS. DORAN:  I understand.

79

1          THE COURT:  It's a compromise.

2          MS. DORAN:  Understood.

3          THE COURT:  Yeah.

4          MR. ROSENTHAL:  There's one category that may not

5   be included within the 15, and that is the statement that

6   everybody was forced to make kickbacks 20 to 100 percent of

7   their salary.  What happened was -- and I think Ms. Doran

8   said "We told Mr. Rosenthal who the 12 people are."  They

9   did in the context of a settlement conference, and so I -- I

10  haven't used that unless they tell me it's perfectly okay to

11  do that.

12         MS. DORAN:  I have -- I have put it in a --

13         THE COURT:  Oh, that's right.  You already saw

14  Judge Ryu.

15         MS. DORAN:  Yes, but Judge Kim.

16         THE COURT:  Oh, Judge Kim.  You  could easily --

17  if you want help with sort of the -- not a settlement, but

18  narrowing the case, just call her up.  She'd be happy to see

19  you.

20         MR. ROSENTHAL:  I would be perfectly happy to do

21  that.  But -- but when it comes to the 12 employees -- this

22  goes to our stipulation.  It's not just confidential sources

23  -- we need to know what they are relying on when they

24  generically refer to people, and some of them may not be

25  within the 15.  Like, for example, 12 people gave 20 percent

116

1  now understand that argument, which is it goes to actual

2  malice, which is if there was something in particular that

3  you identified as being false and you want to know what did

4  you do, if anything, in response to being told that that's

5  false.  It's the same as their retraction request I think.

6          MR. ROSENTHAL:  And one thing, in terms of their

7  entire search, I would again ask if they could give me a hit

8  list, I would appreciate it, but there is one word that

9  stands out that I don't think they wanted to include, and

10 that is the word "cult," because they call their stories

11 "The Cults."  So I don't know what the reluctance is to

12 putting in that search term.  They haven't told me how many

13 document it produces, but --

14         THE COURT:  You don't mean cult by itself.

15         MS. DORAN:  Yes, he does.

16         MR. ROSENTHAL:  That's how they phrased -- the re

17 line --

18         THE COURT:  Well, cult -- cult and Planet Aid.

19         MR. ROSENTHAL:  No.  They often said "The Cults."

20 That's how they called the story they were working on.

21         THE COURT:  Right, right, right, but you mean

22 their entire -- everything that they have, just put in the

23 word "cult"?

24         MR. ROSENTHAL:  I don't know how much they're

25 going to get.

118

1  documents or something else, right?  Because --

2          MR. ROSENTHAL:  And it's the right time period and

3  it's an email from Matt Smith to -- to an editor or --

4          THE COURT:  Well, that's limiting it then.

5          MR. ROSENTHAL:  But they can look at the

6  documents, and they can --

7          THE COURT:  Well, if you want them to look at just

8  Matt Smith's emails for the word "cult", maybe that's

9  something they can do.

10         MR. ROSENTHAL:  What about just looking for "cult"

11 and seeing how burdensome is it?

12         THE COURT:  But looking where?  Looking

13 everywhere?

14         MR. ROSENTHAL:  No, no, no.  I think we have a

15 time period, and I don't know whether they're working on

16 another article.  If Ms. Doran is going to tell me they've

17 already done it and she has a number, I'm glad to hear it.

18         MS. DORAN:  I don't know that I do.

19         MR. ROSENTHAL:  Oh, okay.  But how can you argue

20 burdensome if you won't say what the burden is?

21         THE COURT:  Well, the -- well --

22         MR. ROSENTHAL:  It may be burdensome.  I don't

23 know.  I haven't been told it is, which is why, again, if

24 you give me a hit list, I'm happy to go through it with you

25 and try and narrow it.

# EXHIBIT C

Pages 1-21

1                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF CALIFORNIA
2                       SAN FRANCISCO DIVISION

3

4    PLANET AID, INC., and        )  Case No.  17-cv-03695-MMC
     LISBETH THOMSEN,             )
5                                 )  Courtroom F, 15th Floor
                 Plaintiffs,      )  San Francisco, California
6                                 )  Thursday, January 17, 2019
          vs.                     )
7                                 )
     REVEAL, CENTER FOR           )
8    INVESTIGATIVE REPORTING,     )
     MATT SMITH, and AMY WALTERS, )
9                                 )
                 Defendants.      )
10   _____)

11

12                   TRANSCRIPT OF DISCOVERY HEARING
              BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY
13                 UNITED STATES MAGISTRATE JUDGE

     APPEARANCES:
14

15   For Plaintiffs:             SAMUEL ROSENTHAL, ESQ.
                                 Nelson Mullins Riley & Scarborough LLP
16                               101 Constitution Avenue, N.W.
                                 Washington, D.C. 20001
17                               (202) 689-2915

18   For Defendants:             ETHAN FORREST, ESQ.
                                 SIMON J. FRANKEL, ESQ.
19                               ABIGAIL P. BARNES, ESQ.
                                 Covington @ Burling LLP
20                               One Front Street, 34th and 35th Floors
                                 San Francisco, California 94111
21                               (415) 591-6000

22   Transcription Service:      Peggy Schuerger
                                 Ad Hoc Reporting
23                               2220 Otay Lakes Road, Suite 502-85
                                 Chula Vista, California 91915
24                               (619) 236-9325

25   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.

2

1   SAN FRANCISCO, CALIFORNIA  THURSDAY, JANUARY 17, 2019  2:01 P.M.

2                              --oOo--

3            THE CLERK:  Calling Civil Action 17-36960, Planet Aid v.

4   Reveal.

5            MR.  ROSENTHAL:   Good  afternoon,  Your  Honor.   Sam

6   Rosenthal, Nelson Mullins, for the Plaintiffs.

7            THE COURT:  Good afternoon.

8            MR.  FORREST:   Good  afternoon,  Your  Honor.   Ethan

9   Forrest, Covington & Burling, for the Defendants.

10           THE COURT:  Good afternoon, Mr. Forrest.

11           MR. FORREST:  Good afternoon.

12           THE COURT:  And you're just here to observe?  Okay.

13           MR. FORREST:  With me at counsel table are my colleagues

14   Abby Barnes and Simon Frankel.

15           THE  COURT:   Okay.   All  right.   So  are  we  all  here

16   because there were depos now or --

17           MR. ROSENTHAL:  No.

18           THE COURT:  Oh.

19           MR.  ROSENTHAL:   We're  here  on  a  status  conference.

20   There is one issue that we both agree that we wanted to get some

21   guidance --

22           THE COURT:  Oh, okay.

23           MR.  ROSENTHAL:   --  to  see  how  Your  Honor  wanted  to

24   handle it.

25           THE COURT:  I just meant because you're here in person

1   as opposed to by phone.  That's all.

2          MR. ROSENTHAL:  Well, because we also have a hearing

3   tomorrow.

4          THE COURT:  That's it.  Right.  I just wanted to make

5   sure you didn't come just for this.

6          MR. ROSENTHAL:  Your Honor, as I said last time, any

7   excuse to come to San Francisco.

8          THE COURT:  Not right now.  We're in this big storm.

9   Anyway, okay.  Go ahead.  Tell me what's up.

10         MR. ROSENTHAL:  We wanted to give you a status

11  conference.  There's several issues that we just wanted to tell

12  you where we are on those and get your guidance on how to proceed.

13         THE COURT:  Okay.

14         MR. ROSENTHAL:  One issue that I raised prematurely last

15  time, you said talk to opposing counsel, see if you can come to an

16  agreement.  We have not been able to.  And that relates to

17  redactions on the transcript of Harrison Longwe.

18         THE COURT:  Okay.

19         MR. ROSENTHAL:  We can address that here.  It's a

20  discreet issue.  I think it's an up or a down issue.  We can do it

21  by letter.  But I can also give Your Honor the transcript and give

22  you an idea of what that issue is and you may be able to either

23  resolve it now or give us some guidance how you'd like to resolve

24  it.

25         THE COURT:  All right.  Mr. Forrest, how would you like

4

1  to proceed?

2         MR. FORREST:  Your Honor, we think it's premature at

3  this point.  This relates to a qualified privilege that Your Honor

4  said at the November hearing is not likely to be resolvable until

5  the Plaintiffs have more discovery.

6      In  this  case,  with  the  transcript  of  Mr.  Longwe's

7  conversation,  we  have  stood  on  the  unpublished  editorial

8  objection; namely, I reviewed the material that's redacted from

9  that and established that it's not related to or it was never

10 published  as  far  as  the  actual  articles  in  this  case  are

11 concerned.  And so we don't think that the Plaintiffs are entitled

12 to it, nor do we think that they can pierce the privilege at this

13 point, in particular because, as Your Honor noted in November,

14 they haven't finished the main part of the discovery process.  And

15 even  more  particularly,  we're  currently  reviewing  a  trunk  of

16 documents,  several  thousand  pages,  specifically  concerning  Mr.

17 Longwe.   We're  about  a  week  away  from  producing  those,  but

18 Plaintiffs don't have that yet, and we don't see in particular as

19 to a transcript of an interview with Mr. Longwe how Plaintiffs

20 could  possibly  pierce  the  qualified  unpublished  editorial

21 privilege at this time.

22         MR. ROSENTHAL:  Your Honor, one way we could do that is

23 by arguing -- and I think successfully -- they haven't sustained

24 their burden.  And it is their burden when they assert privilege.

25 The only thing they've done is to redact the portion that says UE.

5

1   That's it.  I've asked, for example, does it relate to Planet Aid?

2   Does it relate to DAPP?  Does it relate to the USDA?  And they

3   won't say anything.

4       And so I think it's quite easily resolved by saying they had

5   the burden of sustaining the privilege and they didn't do it.

6       Now, in this particular case, the transcripts of the

7   interview for Mr. Longwe have been completely produced.  There's

8   nothing more to produce.  What we have is a call that occurs after

9   the lawsuit was filed.  This call was in October -- October 20th,

10  2016.  The lawsuit was filed in August.

11      What happens is Mr. Matt Smith, the Defendant, calls up

12  Harrison Longwe to bolster him.  He says, "I was just telling you

13  where things stood with the fact we've been sued and that the

14  attorneys feel pretty comfortable about it."  That's why he's

15  calling -- is to make Mr. Longwe comfortable that even though

16  there's a lawsuit, don't worry.  The attorneys feel comfortable.

17      What then follows is the redaction.  There's no indication

18  that Mr. Smith is talking to Mr. Longwe to get information for a

19  future article.  There's no indication that Mr. Longwe has

20  information relating to anything other than the subjects.  And I

21  noted just now that counsel began to say "not related to" -- and

22  then he caught himself.  They haven't even said this isn't related

23  to the very subject of this lawsuit.

24      Now, in addition --

25          THE COURT:  Can I just -- because it -- usually, when I

6

1    -- well, (a), I'll just tell you, I'm not that familiar -- really

2    familiar at all -- with the privilege.  So I do feel like I need

3    some explanation of the privilege, like some cite or whatever

4    because I haven't had it come up.

5         And, two, would the defense have an objection -- often, what

6    I do is I review things in camera.

7              MR. FORREST:  No objection to that, Your Honor.

8              THE COURT:  What about that?

9              MR. ROSENTHAL:  Well, we appreciate the offer and we

10   think that's probably a last resort.  The reason that I say it's

11   a last resort is this case has lots of complexity to it, and there

12   are many things that Your Honor just doesn't -- it doesn't click

13   simply because you're not aware of something else that Mr.

14   Longwe --

15             THE COURT:  That is true.  That is true.  But that's

16   going to be the case no matter what, no matter at what point I

17   decide whether they -- the privilege has been asserted.  But I

18   don't know how there's any way I could really decide it without --

19   it seems what they're saying -- and I'm not saying it's not true,

20   but the characterization is true -- without my having reviewed it.

21        It's true that -- that is true.  That is true.  But I guess

22   as a long-winded way of saying I think this is going to need to be

23   submitted in a joint letter brief.  I'm just not familiar with the

24   privilege, to be honest.

25             MR. ROSENTHAL:  Both sides are agreeable to that.

7

1          THE COURT:  Okay.

2          MR. ROSENTHAL:  We'll prepare one of the under-ten-page

3   letters.

4          THE COURT:  Sure.

5          MR. ROSENTHAL:  And we hope it's not ten pages.

6          MR. FORREST:  We'll try to keep it short, Your Honor.

7          THE COURT:  Yeah.  That's fine.

8          MR. FORREST:  Is there a deadline when you'd like to see

9   that?

10          THE COURT:  Well, the deadline is whatever the parties

11   want it to be, given that we're working on a deadline.  Do we have

12   a deadline for this discovery?

13          MR. ROSENTHAL:  No.

14          THE COURT:  No.

15          MR. ROSENTHAL:  We don't.

16          THE COURT:  Well, so we should -- we should make a

17   deadline; right?  Otherwise, --

18          MR. ROSENTHAL:  And I will tell Your Honor, to be

19   candid, there are lots of other UE disputes that are going to come

20   up.  This one, though, could clearly be segregated as distinct

21   because the other ones relate to things that may relate to a

22   future publication.

23          THE COURT:  Yeah.

24          MR. ROSENTHAL:  This relates to one of the key

25   witnesses --

8

1          THE COURT:  Yeah.

2          MR. ROSENTHAL:  -- and the interchange that's going on

3   between them.

4          THE COURT:  So given, though, as you're correct that I

5   don't have at all the full story, if you want to -- you're not

6   limited in the number of attachments you can make.  For example,

7   you're going to want me to read -- and I know it's already in the

8   record, but I don't want to dig through it, so -- the record, I

9   mean.  So attach the articles.  Right?

10      What you're going to want me to do, because you're going to

11  say it's not related or -- or I don't even know.  In other words,

12  attach whatever you think I need to review -- both sides -- to the

13  best I can understand the issue.

14          MR. ROSENTHAL:  Okay.  The only hesitation I have is the

15  articles, there's I think almost 20 articles -- there's 19 or 20

16  articles.  We're happy to give those to you.

17          THE COURT:  But isn't it true, if I recall, that there

18  really are two and everything else is just sort of mostly

19  repeating what was in the first two?

20          MR. ROSENTHAL:  No.  And that -- and that's the second

21  thing I'd like to address today.  There are two main publications.

22  There's a podcast in March of 2016 and there's an article in May

23  of 2016.  There's lots of things that come up.

24      For example, in the transcript I gave you, there's a

25  discussion -- Matt Smith again trying to bolster Harrison, make

9

1    him feel good about the lawsuit -- and he says, "Oh, yeah, I spoke

2    to this Brazilian prosecutor."   That is an entirely separate

3    article, one that's published and so I assume they're not relying

4    on that.   But there are articles that deal with different things

5    that come up.   If it were the same articles, I think one would

6    say, Why are you publishing 20 articles that all just repeat

7    what's in the first two?

8              THE COURT:   Well, let's do it this way because it will

9    help you to hear what they say first; right?

10             MR. ROSENTHAL:   Yes.

11             THE COURT:   So I think they should do their portion of

12   the letter brief first because it's your burden, in any event,

13   isn't it, Mr. Forrest, to show that the privilege applies?

14             MR. FORREST:   Yes, Your Honor.   And just to be clear,

15   though, are we talking about the UE letter brief or are we talking

16   about Planet's position that the facts stated in later articles

17   are materially different in the earlier --

18             THE COURT:   No, no, no.   I'm just -- I'm talking about

19   the redaction here of this transcript.   So you should give your

20   portion of the letter brief first to Plaintiff.   Then you can

21   review it and then you'll have a better understanding of what you

22   want me to understand --

23             MR. ROSENTHAL:   Perfect.

24             THE COURT:   -- to understand their position, right,

25   because you say you're kind of in the dark now.

1          MR. ROSENTHAL:  Perfect.

2          THE COURT:  The thing about the letter briefs, it brings

3  everything to a head.

4          MR. ROSENTHAL:  I think it does.

5          THE COURT:  So -- but should we set like a schedule for

6  that?

7          MR. FORREST:  A schedule for the letter brief?

8          THE COURT:  Uh-huh -- like when you're going to provide

9  them their portion and when he'll provide you his response and

10  when you file it with the Court.  How much time would you like?

11          MR. FORREST:  I think by next Friday we can get you

12  ours.

13          THE COURT:  That would be the 25th.

14          MR. ROSENTHAL:  I am scheduled to be away the 27th

15  through the 30th.  Could we set it February 7th?

16          THE COURT:  Thursday.

17          MR. ROSENTHAL:  That's a -- how about the 8th?  How

18  about the 8th?

19          THE COURT:  Friday.

20          MR. ROSENTHAL:  Friday.

21          THE COURT:  So you want two weeks?

22          MR. ROSENTHAL:  If I could.

23          THE COURT:  Is that all right with us?

24          MR. FORREST:  That's all right with us.

25          THE COURT:  Okay.  The 8th.  And then why don't you file

11

1    it with me by the 15th.

2            MR. FORREST:  Yes, Your Honor.

3            THE COURT:  Because essentially we're doing it actually

4    kind of on a regular motion schedule.

5            MR. FORREST:  Okay.

6            THE COURT:  But you don't have to do it on pretty

7    pleading paper.

8            MR. FORREST:  Okay.

9            MR. ROSENTHAL:  Okay.  And it's the same form as before

10   where once we see each other's side, we can revise our

11   respective --

12           THE COURT:  Well, he -- they get to revise -- well, what

13   they should do is really -- yeah, they get to revise once they see

14   yours because it's like a re-plot.  Well, they shouldn't revise.

15   Probably the best way to do it, to be fair, would be your section

16   you send to them, they send you a response, and then you send in

17   your reply, so leave some space for your reply.

18           MR. FORREST:  Your Honor, I believe the way we did it in

19   the past was that the receiving party actually did get to revise.

20           THE COURT:  Yeah.

21           MR. FORREST:  I believe both sides did so.

22           MR. ROSENTHAL:  It gets confusing.  I think the reply is

23   better if --

24           THE COURT:  Well, the only problem is they don't know

25   how much space to reserve or things like that.  But I would say

12

1    this:  To the extent whatever you reserve for your reply is not

2    enough space, just talk to Mr. Rosenthal and he'll agree that's

3    okay.  Whatever.  I just want you guys to be comfortable that

4    everyone has been heard, but we have to put an end to it and we

5    don't do surreplies, so --

6             MR. ROSENTHAL:  The next issue that we've alluded to

7    already is the first two articles.  There was a statement that I

8    made on the record two sessions ago that I think might have been

9    misperceived or misconstrued.  I did not say that we thought we

10   should be limited to the podcast and the May article.  What I said

11   was this case is about the USDA and if they would limit the -- the

12   issues to what's really in the case, we could take out some of the

13   allegations and we've had some discussions about doing that.

14      We think that the other articles really are in the case.

15   We've pled them.  We've alleged things from those articles.  And

16   so I just want to correct the record that the Plaintiffs' position

17   is the other articles are indeed very relevant.  We're happy to

18   continue talking with defense counsel if there's an effort to take

19   out redundancies or other issues and thereby narrow discovery.

20   We're happy to do that.  But our position -- I don't want the

21   record to be misconstrued as to, yes, we think we're only entitled

22   to the first two articles, the podcast and the May --

23             THE COURT:  Okay.

24             MR. ROSENTHAL:  -- article.  One of the things that you

25   had asked was could we identify things in those additional

1  articles that we felt was relevant.  And we were talking about

2  that and we both think it might make sense to do that in writing.

3  I -- this is one area where I think that defense counsel may be

4  correct that as we get additional discovery, it becomes clear why

5  those articles are relevant.  And so I would -- I would be willing

6  to put that issue off.

7       And we've had some discussions and defense counsel, to their

8  credit, has said, We are not gonna take the position that if you

9  prioritize and you put things off, we're then going to come in and

10 say, Oh, it's now too burdensome or too cumbersome to go back and

11 do the discovery the right way.  With that agreement, I'm willing

12 to put off the issue of should it be -- should discovery be

13 limited to the first two publications.

14          THE COURT:  All right.  Are you in agreement, Mr.

15 Forrest?

16          MR. FORREST:  Yes, Your Honor.

17          THE COURT:  Okay.  Makes a ton of sense; right?  Because

18 they're hopeful -- the reason they're willing to do that, they're

19 hopeful that once you review that, you won't need the additional

20 discovery and it's better for the environment.

21          MR. ROSENTHAL:  And I have my hopes, too.

22          THE COURT:  Yeah.

23          MR. ROSENTHAL:  Your Honor, we wanted some guidance from

24 you as to where we are in production.  And I -- and I understand

25 and I feel defense counsel's pain that they really don't know what

14

1   they'll have to produce.  But certainly at this point, we can get

2   some guidance of are we halfway through, are we three quarters of

3   the way through, is there a million documents to review, are there

4   a half million?  And I ask virtually every time we've had a

5   session for some guidance because it helps the Court and it helps

6   the parties to get a sense of when are we gonna be in discovery --

7   in depositions?  You know, what's the likelihood that this thing

8   is gonna come to closure soon?  And I again ask at this hearing if

9   we can get some guidance from defense counsel as to where we are

10  at least to the document production.

11          MR. FORREST:  Your Honor, as I've told Plaintiffs'

12  counsel, part of it will depend on what they ask for next and what

13  they seek in the future.  They might change their minds about

14  certain requests when they see what we provide.  With that said,

15  it typically takes us a couple of weeks to get through issue areas

16  that Plaintiffs have prioritized because we certainly want to get

17  discovery out the door as quickly as possible.  Nobody wants to do

18  this stuff forever.  But we also have obligations to our clients

19  to protect their confidences and their confidential sources and

20  their privileged and protected material which does take several

21  attorneys quite a bit of time to comb through these -- these

22  scripts and drafts and outlines and emails and many thousands of

23  pages.

24      We're going as quickly as we can, but we don't think we'll be

25  done with document review within a couple of months, assuming that

1  we continue with the same types of requests.

2         THE COURT:  So based on what's already been requested

3  and discussed, you believe it will take two more months?

4         MR. FORREST:  I think it would take more than two

5  months, Your Honor, and I would also note that very soon we're

6  going to be propounding our own affirmative discovery on

7  Plaintiffs which is going to add some work for both of us, I would

8  assume.  So we think it would be inappropriate to rush that

9  procedurally before Plaintiffs have an opportunity to see our

10  discovery and consider where that burden is going to fall on their

11  side.

12         THE COURT:  Okay.  But why don't you give me -- we've

13  done this before -- sort of just an update on what -- where things

14  are.

15         MR. FORREST:  Sure, Your Honor.  The next trunk of

16  documents that Plaintiffs have prioritized concern Harrison

17  Longwe, and essentially that would encompass any document that

18  names him or references him or discusses him even without using

19  his name.  We think we have about a week left on that one.

20     We've already produced about -- over 20,000 pages of scripts,

21  outlines, documents constituting communications between Matt Smith

22  and Kandani Ngwira.  We're finished producing all of the

23  recordings in this case.  We're reviewing some video and some

24  other multimedia that -- we're going to finish that as soon as we

25  can.

16

1     We've responded to Plaintiffs' first interrogatories.  We
2  have one that Plaintiffs' counsel and I have discussed that we're
3  supplementing in short order.

4     And I understand that the next category of documents that
5  Plaintiffs view as a priority -- at least the last time we talked
6  -- concern a witness call Kris Alonge, and I imagine that will
7  take another week to two weeks to review.

8     And after that, I believe we have about 11 more witnesses
9  that Plaintiffs have described as priorities whose documents we
10  would need to review.  And of course some of those will have been
11  swept up into prior production, so we would think that the sets
12  get successively smaller because documents mention more than one
13  person.  But I don't have a great sense of exactly how many those
14  all are.

15     And if Plaintiffs say, for example, that they do intend to
16  seek discovery into all of those individual witnesses, I think it
17  would be feasible for us to run a search and get a rough estimate
18  on that.  For example, I don't know off the top of my head whether
19  it's two thousand or ten thousand or fifty thousand, but that
20  would inform our calculations.  It would also I think be helpful
21  to get Plaintiffs on the same page as us in terms of what is going
22  to be priorities going forward.

23     And I think that would kind of be the best way for us to hash
24  out a road map for when exactly at least document production is
25  going to be done.

17

1          MR. ROSENTHAL:  I'm not sure what that means.  Again, I
2   don't know whether we're talking -- I know it's not less than two
3   months, but are we talking six months, a year?
4          THE COURT:  Well, it depends.  It sounds to me like if
5   there's going to be additional requests once you review what you
6   review -- you now have all the scripts; is that right?
7          MR. ROSENTHAL:  We have -- well --
8          THE COURT:  All the recordings.
9          MR. ROSENTHAL:  I believe so.
10          THE COURT:  Yeah.
11          MR. ROSENTHAL:  Okay.  Then we have all the recordings.
12   Yes.
13          THE COURT:  Yeah.  So that's -- that's a big start;
14   right?  I mean --
15          MR. ROSENTHAL:  That is a big start.  Yes, it is.
16          THE COURT:  Yeah, yeah.  So, I mean, it seems to me
17   everyone's working in good faith and --
18          MR. ROSENTHAL:  I don't -- I'm not disputing that.
19          THE COURT:  When you have big investors, there's going
20   to be a lot of discovery.
21          MR. ROSENTHAL:  There's a lot of discovery.  I'm not
22   disputing good faith.  But I will say there are First Amendment
23   reasons of Plaintiffs -- that is, they have a right to get their
24   case heard.  They have a right to be heard in court.  And the
25   longer it takes, the less -- the less those rights are -- are able

1  to be exercised.

2           THE COURT:  All right.  Well, you can at any time say,

3  I have enough and say I have enough; right?  So this is sort of

4  getting you the discovery.  So, you know --

5           MR. ROSENTHAL:  Yes, but as -- as we get the material,

6  it's certainly material that -- it's not borderline.  It's really

7  stuff that is quite essential.

8       You know, as far as the -- the issue of interrogatories, if

9  we do have a dispute -- and I fear we will -- do you want us to

10  again do a letter on that?

11          THE COURT:  Well, I want you to meet and confer, right,

12  and see if you can work it out and not just by email -- at least

13  by telephone, or in personal preferably, but I know that's not

14  always possible.  And then you can do it by joint letter.  If you

15  -- if it's just like a small issue that you think speaking to me

16  informally could help the parties decide how to resolve it, you

17  can set up a phone call with Ms. Means and that you would get sort

18  of an informal -- you -- I think you were here, Mr. Rosenthal.

19          MR. ROSENTHAL:  I was.

20          THE COURT:  You heard me say.  But some things that's

21  not appropriate for and then you should just do a joint letter.

22          MR. ROSENTHAL:  I'm happy to flag the issue with an

23  understanding that neither of us are prepared to argue it but just

24  to inform Your Honor as to what the issue is.  That's more than --

25          MR. FORREST:  But, Your Honor, to be clear, we have not

19

1  discussed what the --

2          THE COURT:   Yeah, yeah, yeah.   You know, I don't

3  actually -- I'll just tell you.  I have a defendant who's about to

4  be sentenced upstairs who is gonna get a sentence of probation

5  instead of a five-year mandatory minimum because he completed our

6  Conviction Alternative Program over the past 12 months and really

7  turned his life around and I would love to -- because I'm one of

8  the judges for the program.  I would love to get up there and see

9  that, so --

10          MR. ROSENTHAL:   Your Honor, I only have one very

11  brief --

12          THE COURT:  Sure.

13          MR. ROSENTHAL:  -- issue and that is there is a third

14  party witness named Kris Alonge.  There is a motion to quash.  And

15  I was just wondering if -- there's been no decision on it --

16  whether you're waiting for something from the Plaintiffs.

17          THE COURT:  Yes -- no, I am waiting because, of course,

18  the third party subpoena is only if you need the information

19  because you can't get what you need from them.

20          MR. ROSENTHAL:  Well, we've now put that on the docket

21  for production.

22          THE COURT:  Right.

23          MR. ROSENTHAL:  So --

24          THE COURT:  So that's what I'm waiting on.

25          MR. ROSENTHAL:  Oh, I see.

1          THE COURT:  Because under Rule 45, you first need to

2    seek to get it from the party, right, Defendant.  Once you get

3    everything from the Defendant, if you think there's still things

4    missing, --

5          MR. ROSENTHAL:  I see.

6          THE COURT:  -- frankly, you should probably just do a

7    new subpoena -- is it Mr. or Ms.?

8          MR. ROSENTHAL:  It's Ms.

9          THE COURT:  Ms. -- narrowly because presumably I think

10   it's even the next person, right, on your priority list?

11         MR. ROSENTHAL:  Yes.

12         THE COURT:  Until the next person, yeah.  So, actually,

13   I'll probably just terminate it without prejudice.

14         MR. ROSENTHAL:  So you want us to issue a new subpoena

15   to Ms. Alonge?

16         THE COURT:  After you've reviewed the documents that

17   they've produced.

18         MR. ROSENTHAL:  Okay.

19         THE COURT:  In other words, maybe you won't need it at

20   all.

21         MR. ROSENTHAL:  Okay.

22         THE COURT:  Because you'll get everything -- you'll look

23   and you will review production and there's nothing that she would

24   have that you don't already have from them.

25         MR. ROSENTHAL:  Well -- all right.  We'll proceed in

21

1  that --

2          THE COURT:  Yeah, yeah.  Because that's what you're

3  required to do anyway in a Rule 45 is first seek it from a party

4  so we don't burden the non-parties.

5          MR. ROSENTHAL:  I don't think I have anything further.

6          MR. FORREST:  Nothing else, Your Honor.

7          THE COURT:  Okay.

8          MR. FORREST:  Thank you.

9          THE COURT:  Thank you.

10          MR. ROSENTHAL:  Thank you, Your Honor.

11          MR. FRANKEL:  Thank you, Your Honor.

12      (Proceedings adjourned at 2:24 p.m.)

13

14          I, Peggy Schuerger, certify that the foregoing is a

15  correct transcript from the official electronic sound recording

16  provided to me of the proceedings in the above-entitled matter.

17

18  _____/S/ Peggy Schuerger_____    January 20, 2019_____
    Signature of Approved Transcriber      Date

19
    Peggy Schuerger_____
20  Typed or Printed Name
    *Ad Hoc Reporting*
21  Approved Transcription Provider
    for the U.S. District Court,
22  Northern District of California

23

24

25

**EXHIBIT D**

## Leslie Freeman

| | |
|---|---|
| **From:** | Sam Rosenthal |
| **Sent:** | Wednesday, August 28, 2019 1:41 PM |
| **To:** | 'Forrest, Ethan C'; 'Burke, Thomas (THOMASBURKE@dwt.com)'; 'Doran, Ambika (AmbikaDoran@dwt.com)' |
| **Cc:** | Phil Busman |
| **Subject:** | confidential settlement discussions inadmissible under Fed.R.Civ.P. |
| **Attachments:** | Document1.docx |

All,

I thought we had a productive conversation relating to possible efforts to streamline this case, and make clear that the case is about the USDA Program.  To that end, I was going to send you a redline deleting paragraphs which you may have felt could be misconstrued to show that the case is about more than the USDA programs, and allegations of theft and misuse of funds from those programs.

Nevertheless, I am sending you a revised introductory statement which I think goes very far in establishing what you are looking for.  Let me know if that makes sense to you, and then we can talk about deleting particular paragraphs form the FAC if you think they deal with other irrelevant issues.

I look forward to talking tomorrow.

Best

Sam

"money laundering" scheme relating to projects funded by the USDA. When they published those statements, Defendants knew, or were reckless in not knowing, that those statements were contrary to documents in their possession and directly misstated what they had been told by the same "sources" they had interviewed, who were falsely claimed to have verified the statements by Defendants in their false and defamatory publications.

5.    Defendants published stories about Plaintiffs using various unlawful and improper tactics including, among other things: (1) using a convicted felon in Malawi to offer bribes or other inducements to potential sources about the USDA program in return for negative information about Plaintiffs; (2) falsely identifying two alleged "farmers" in Malawi allegedly cheated by Plaintiffs under the USDA program, when one farmer had nothing to do with the USDA Programs and the other was not even a farmer, (3) relying on other sources known to lack credibility, including those who Defendants knew, or should have known, were engaged in criminal conduct, (4) making up claims about the USDA projects that were so preposterous that Defendants themselves could not have possibly believed them to be true; (5) drafting their stories before even interviewing sources or obtaining credible information to support their claims; (6) reporting as "fact" statements that directly contradicted either documents shown to them or statements provided by claimed "sources" discussing the USDA projects; and (7) telling readers and sources that they had engaged in a thorough investigation that had uncovered wrongdoing about the USDA projects, when they knew that their so-called "investigation" was so inept that Defendant Walters quipped that their entire investigation of a USDA program in Mozambique responsible for feeding tens of thousands of children per day had lasted "ten minutes," and that they had gone to Mozambique so that they could "check off another country."

6.    The paragraphs that follow describe with more particularity the scheme and conduct by Defendants relating to Planet Aid and Thomsen's involvement in programs funded by the USDA.

**PRELIMINARY STATEMENT**

1.      This action concerns a news reporting agency and its reporters who violated their professional duty to honestly and fairly investigate and report events, and who instead engaged in a scheme to smear Plaintiffs' reputations, and create false and misleading images of both Plaintiffs by accusing them of having engaged in a massive scheme to steal money from projects funded by the United States Department of Agriculture "the USDA"). This scheme involved directly trying to convince individuals, groups, and the public-at-large to stop doing business with Plaintiffs. The goal of this scheme was ultimately to drive Planet Aid out of its charitable businesses, and destroy Thomsen's reputation – all so that Defendants could falsely claim credit for having uncovered fraud, corruption and abuse in the USDA government foreign aid program, and thereby attract additional donors to Defendants' news organization and so that Defendants Smith and Walters could also secure their jobs.

2.      Planet Aid, one of the two targets of the scheme, is a non-profit that has been in existence for twenty years, and has spent tens of millions of dollars of its own money for charitable purposes. Planet Aid's mission is to contribute to a more healthy and sustainable global environment and to serve people in impoverished parts of the world. Another target of the scheme, Thomsen, is employed by Planet Aid's subcontractor, non-profit Development Aid from People to People Malawi ("DAPP Malawi"), and has spent her adult life working on projects delivering much needed aid in Malawi.

3.      To further their scheme, Defendants repeatedly published stories and aired broadcasts that painted false and misleading pictures of Plaintiffs relating to the involvement of Planet Aid and Thomsen, as well as Thomsen's employer, DAPP Malawi, in United States Department of Agriculture ("USDA") programs in Africa.

4.      More specifically, Defendants published statements that Plaintiffs had engaged in "systematic fraud," "stealing" and "siphoning off of funds" from the USDA programs, and "stripp[ed]" tens of millions of dollars from employee salaries that were then used as part of a

# EXHIBIT E

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Ethan Forrest

Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T   +1 415 591 7008
eforrest@cov.com

**By Electronic Service**                                    October 24, 2019

Hon. Jacqueline Scott Corley
U.S. District Court for the Northern District of California
450 Golden Gate Ave.
15th Floor
San Francisco, CA 94102

**Re:  Planet Aid, Inc. v. Reveal, No. 3:17-cv-03695-MMC**

Dear Hon. Corley:

The parties to the above-captioned case submit this letter brief per the Court's October 9, 2019 order.  Dkt. 234.  This letter brief addresses three proposals Defendants have offered to Plaintiffs, in an effort to focus and expedite discovery for the parties and for the Court.  Plaintiffs have rejected all three, so Defendants respectfully request that the Court assist the parties to resolve these matters, including entering appropriate orders.

As a threshold point, as the Court will recall, discovery in this case at this posture is limited to what is necessary to resolve Defendants' anti-SLAPP motion (Dkt. 107).  *See* Nov. 9, 2018 Hr'g Tr. at 8:8–9:21.  Defendants have in turn served targeted discovery on Plaintiffs, in January of this year, focusing on issues raised in Defendants' anti-SLAPP motion.  Forrest Decl. ¶ 2.  So far, Plaintiffs have produced only (a) what appears to be documents that Plaintiffs or someone else obtained by submitting a FOIA request to the U.S. Department of Agriculture, and (b) PDF copies of Planet Aid's website.  *Id.* ¶ 6.  Defendants reserve rights to challenge the adequacy of Plaintiffs' discovery responses, so the requests below are designed to focus the issues for both sides, as opposed to nitpicking through Plaintiffs' discovery to date.  *Cf.* Jan. 18, 2019 Hr'g. Tr. at 39:15–18 (in which Judge Chesney states, "Nevertheless, your whole point, [Plaintiffs' counsel], is everything ought to be a two-way street, except when it's up to something that you don't want to go both ways.  And I'm not sure that's fair either.").  Defendants believe their requests will expedite this litigation by focusing on the core issues, which the Court has repeatedly stressed the parties should do.

As another threshold point, Defendants object to Plaintiffs' claim that Defendants are trying to delay discovery to avoid having Mr. Smith and Ms. Walters' depositions taken.  Defendants have always maintained that those witnesses' depositions would be both likely and appropriate in this case—Defendants are not afraid of having their witnesses deposed.  But Plaintiffs should not be allowed to take depositions while simultaneously contending that their claims are narrower than their complaint alleges.  Defendants also submit that, per Judge Chesney's suggestion and discussed further below, focusing on Plaintiffs' public figure status would substantially narrow the issues for all.

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 2

    **1. Plaintiffs' public figure status.**  Defendants ask for the Court, in consultation with Judge Chesney, to order briefing as to what standard applies to Plaintiffs' defamation claim with respect to Defendants' actions.  *See* Dkt. 107 at 11–19 (discussing this issue).  Determining which standard applies depends on whether Plaintiffs are limited purpose public figures or not. Specifically, if Plaintiffs are limited purpose public figures, then in order to prevail on their defamation claims, they must show that Defendants acted with actual malice in reporting about Plaintiffs—*i.e.*, that Defendants knew the statements they were making were false when the statements were made, or that Defendants acted with reckless disregard of those statements' truth or falsity.  *Reader's Digest Ass'n v. Super. Ct.*, 37 Cal. 3d 244, 256 (1983).  If Plaintiffs are private figures, they must prove only that Defendants acted negligently.  *See New York Times v. Sullivan*, 376 U.S. 254, 287–88 (1964).  Given these different burdens, a ruling as to whether Plaintiffs are limited purpose public figures will significantly focus the scope of the ultimate dispute as well as the scope of discovery, especially as the parties focus on depositions.

    Judge Chesney recognized the importance of Plaintiffs' limited purpose public figure status in January of this year, suggesting that the parties might focus the case by engaging in some limited discovery on Plaintiffs' limited purpose public figure status, and then making cross motions for summary judgment on that issue.  *See* Jan. 18, 2019 Hr'g Tr. at 33:20–34:5; 35:7–36:25.  As Judge Chesney noted, "Mightn't it shorten things up if it would—if, for example, I rule on [such a motion] and find that actual malice doesn't have to be shown, it would save you a lot of discovery.  It would put this case in a much different posture."  *Id.* at 33:1–4.

    Defendants agree with Judge Chesney.  Plaintiffs, however, refuse to engage on this topic.  Defendants propose that the parties file cross motions for a determination as to whether Plaintiffs are limited purpose public figures, and as a corollary, what standard applies to the defamation claims.  In response, Plaintiffs contend that Defendants are only trying to delay the case and avoid depositions; that Defendants' argument is weak on this issue; and that resolving the public figure issue is immaterial.  None is true.

    *First*, as noted above, depositions are not appropriate while the scope of Plaintiffs' complaint remains unclear.  Plaintiffs cannot be allowed to sandbag Defendants on this issue.

    *Second*, although these arguments would be clearer with discovery, it is indisputable that before Defendants' reporting, there was a public controversy surrounding Plaintiffs—of their own making—into which Plaintiffs had voluntarily thrust themselves.  *See Reader's Digest Ass'n v. Super. Ct.*, 37 Cal. 3d 244, 256 (1984).

    Also, contrary to Plaintiffs' letter, Defendants' argument on the limited purpose public figure issue is not that Plaintiffs are limited purpose public figures merely because they receive government grants.  *Cf. Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) (rejecting argument that scientist's pursuit of public grants rendered him a public figure as to statements about those grants).  Rather, Defendants' argument—as set out in their anti-SLAPP motion—is that Planet Aid not only seeks government grants, but publicizes its grant-related work, and Ms. Thomsen frequently appears in the media (assisted by public relations professionals) as the public face of DAPP Malawi.  Dkt. 107 at 12–13; *see also, e.g.*, *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1016-17 (N.D. Cal. 2017) (holding non-profit limited purpose public figure because of statements about its world-wide reach and influence, and its work being public); *Art*

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 3

*of Living Found. v. Does*, No. 10-CV-05022, 2011 WL 2441898, at \*9 (N.D. Cal. June 15, 2011) (Koh, J.) ("Plaintiff [non-profit corporation] is likely a limited public figure because it is part of a relatively well-known international organization and voluntarily solicits media attention."). Indeed, Thomson only challenges CIR's reporting regarding her activities on behalf of DAPP Malawi and Planet Aid.

Before Reveal's investigation, many other news outlets have also investigated Planet Aid's use of government funds and connections to the international fugitive Mogens Amdi Petersen and his purported cult, Tvind or The Teachers Group. Forrest Decl. Exs. G–M. These articles show that for *more than a decade* before Defendants published their own reporting, media outlets ranging from The Boston Globe (which gave Planet Aid front-page billing), The Chicago Tribune, and The Guardian—as well as smaller papers such as The Berkshire Eagle, The Scranton Times Tribune, and The Philadelphia Daily News—had questioned Planet Aid's public actions. *Id.* As such, Plaintiffs can hardly contend they were not in the spotlight before Defendants' reporting. They have been for many years, and they put themselves there.

Defendants' own stories and incorporated material, published well into a decades-long controversy about Planet Aid, detail how public attention has been focused on Planet Aid's use of government funds for decades—as in a 2001 FBI memo stating that Planet Aid, DAPP Malawi, and other related entities had used bogus invoices to send public money to private offshore accounts: "In each of these organizations [including Planet Aid and DAPP Malawi] the funds are ultimately controlled by captioned [*sic*] subjects who divert the money for personal use. Little, to no money goes to the charities." *E.g.*, Dkt. 78-3 at p.9. Defendants' reporting focuses mainly on Planet Aid, and on Ms. Thomsen only to the extent that she was voluntarily and consistently the public face of DAPP Malawi. *See, e.g.*, *Harkonen v. Fleming*, 880 F. Supp. 2d 1071, 1080-81 (N.D. Cal. 2012) (holding CEO of biotechnology company limited purpose public figure because of his publicity of the company's activities).

*Third*, and finally, Plaintiffs make the nonsensical argument that focusing on this limited purpose public figure issue would not narrow discovery, since the parties will ultimately have to litigate state of mind regardless (whether malice or negligence). *Infra*. That misses the point: determining what standard applies, up front, will focus what the parties still need to investigate and streamline this litigation, as Judge Chesney earlier recognized.

Defendants submit that such a focused discovery and motion process could be resolved efficiently, and would greatly narrow the issues for the parties and for the Court. To that end, Defendants propose that the Court enter an order pausing discovery except for what is necessary to investigate Plaintiffs' limited purpose public figure status—the scope of which Defendants submit would be relatively minimal, and limited to what efforts Plaintiffs undertook to publicize their use of public funds for charitable causes. *See* Dkt. 107 at 12. Defendants further request that the Court, with Judge Chesney's approval, order the efficient briefing of this issue.

**2. Plaintiffs' refusal to memorialize their position on what claims are at issue.** Defendants ask for the Court's assistance in crystallizing the scope of the statements about which Plaintiffs are allegedly seeking relief. Plaintiffs have repeatedly stated, in hearings and in correspondence—and in their letter below—that this case is now *only* about statements concerning the USDA. That is, Plaintiffs have stated that they are only seeking to impose

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 4

liability on Defendants for statements related to the USDA, and they have sought to use this position as a basis for narrowing the discovery Defendants can take of them.

Nevertheless, Plaintiffs have repeatedly refused to amend their complaint or enter into a formal stipulation confirming this position. This is problematic, as the operative 65-page complaint (with 22 exhibits) includes allegations about statements by Plaintiffs concerning third-party funders, such as UNICEF, USAID, and the Clinton Global Foundation. Dkt. 78 ¶¶ 55, 65, 67, 73–74, 186, 196–97, 210, 234. Defendants have produced documents concerning such entities, in response to Plaintiffs' requests made under the Court's order that the parties would proceed with "essential" document production. *See* Nov. 9, 2018 Hr'g Tr. at 8:14–18. In short, Plaintiffs are seeking to use their statements about their case's scope as a basis for limiting the discovery Defendants can take, but Plaintiffs refuse to formalize any limits.

Plaintiffs' vacillation prejudices Defendants. It is impractical for Plaintiffs to state in correspondence and at hearings that the case is limited to statements about the USDA, while refusing to amend their complaint or otherwise formalize their position. Plaintiffs leave Defendants in the untenable position of not knowing the scope of the complaint, the scope of appropriate discovery, or how to prepare deponents. Nor do Defendants have any guarantee that Plaintiffs will later assert that statements about other entities are fair game after all.

The Court has already proposed a solution to this issue. During the November 2018 hearing, in response to comments by Plaintiffs that this case was solely about the USDA-related statements, the Court suggested that Plaintiffs could amend their complaint again or otherwise find a way to memorialize their position that their claims only concern the USDA, and Defendants could agree not to seek fees for unrelated claims. *Id.* at 77:7–78:18. In an effort to facilitate this result, on December 31, 2018, Defendants submitted to Plaintiffs a proposed amended complaint and stipulation memorializing this offer to narrow the complaint. To date, Plaintiffs only have proposed amending the introduction to the complaint, while leaving the actual allegations and counts untouched. They have not responded to further requests to formalize the supposed limitations on their claims.

Plaintiffs' response includes three points on this topic, none of which alters the bottom line discussed above. *First*, Plaintiffs claim that their complaint's references to non-USDA entities are not keyed to their defamation claim, but rather to their tortious interference claim. That contention is news to Defendants—and is another reason why they need to amend and clarify their complaint. Plaintiffs lump all of Defendants' publications together—including those discussing UNICEF and the Clinton Foundation, for example (*e.g.*, Dkt. 78 Exs. D, I, U)—and allege them to be defamatory. Dkt. 78 at ¶¶ 192–214. Indeed, Plaintiffs' defamation count specifically and repeatedly asserts that Defendants' publications harmed Plaintiffs' reputations with possible funders, "including the USDA and/or UNICEF." *Id.* ¶¶ 196, 210. In any event, Defendants' anti-SLAPP motion specifically targets Plaintiffs' tortious interference and other non-defamation claims, which fail for the same reasons as its defamation claim does. Dkt. 107 at 25. So Plaintiffs' arguments as to which claim involves non-USDA entities are immaterial.

*Second*, Plaintiffs are wrong that Defendants' anti-SLAPP motion itself is only about statements concerning the USDA. In terms of the anti-SLAPP motion's focus on articles specifically about the USDA, Defendants' position has always been consistent that the two main

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 5

publications—Exhibits A and B to Plaintiffs' complaint—include the facts underpinning the rest of the publications.  *See* Dkt. 107 at 23; *see also* Nov. 9, 2018 Hr'g Tr. at 55:15–22 (noting one example of Defendants' position that the first two publications include all necessary facts to decide Defendants' motion as to other publications in the complaint).  For instance, Defendants' statements about UNICEF and the Clinton Foundation arise from and in relation to Defendants' publications about Plaintiffs' purported misuse of USDA funds.  *See* Dkt. 78 Exs. D, I, U.

*Finally*, Plaintiffs' "agreement" to submit a revised introduction to their complaint does nothing but exacerbate confusion, as Defendants have told Plaintiffs.  Even if the introduction says that every paragraph following the introduction relates to the USDA program, Defendants would still not be able to determine how Plaintiffs intend to approach the allegations concerning non-USDA entities, which would all remain in the complaint according to Plaintiffs' edits.

It isn't unusual, after discovery has progressed, for a party to decide to limit its claims based on the facts.  But it is very unusual for a party to represent that limitation is warranted—and refuse to do anything about it.  If Plaintiffs truly seek to limit the complaint (and therefore discovery) solely to issues concerning the USDA, Defendants ask that the Court order Plaintiffs to submit a formalized pleading that amends and narrows their complaint to focus on the USDA, or, as the Court sees fit, to provide other formal assurances as to the scope of issues Plaintiffs intend to pursue.  Doing so would focus and narrow the issues substantially.  It would also help to resolve the parties' impasse as to depositions, discussed in a separate joint letter.

**3.  Plaintiffs' inconsistent positions on DAPP Malawi.**  Defendants also ask that the Court compel discovery from Plaintiffs for information and documents held by DAPP Malawi, or otherwise compel Plaintiffs to amend their complaint to exclude statements about DAPP Malawi.  Plaintiffs refuse to provide *any* discovery from DAPP Malawi on the grounds that DAPP Malawi is an "independent contractor" and that "Planet Aid does not exert control over DAPP Malawi *for discovery purposes*."  Forrest Decl. ¶ 5 & Ex. F.  (emphasis added).

This position is flatly inconsistent with the positions Plaintiffs have previously taken.  Indeed, Plaintiffs' complaint repeatedly refers to Ms. Thomsen's employer DAPP Malawi as a "subcontractor" for Planet Aid.  Dkt. 78 ¶¶ 2, 16–18, 27, 62, 77, 79, 198.  Plaintiffs have also affirmed to the Court that DAPP Malawi is a subcontractor for Planet Aid.  *See, e.g.*, Jan. 18, 2019 Hr'g Tr. at 21:2–22:16.  And Planet Aid's website calls DAPP Malawi its "sister organization."  Planet Aid, Countries – Malawi, https://www.planetaid.org/countries/malawi.

Further, Plaintiffs' complaint specifically asserts that Defendants are liable *to the named Plaintiffs* for statements *concerning DAPP Malawi*—which is not a party to this case.  For example, Section F of the complaint is titled, "Defendants Falsely Accused Planet Aid/DAPP Malawi of Having 'Siphoned Off 50–70% of USDA Funds' through Employee Salaries."  Dkt. 78 at p.31.  As another example, Plaintiffs cite a specific statement from one of Defendants' stories concerning DAPP Malawi, as support for Plaintiffs' theory that Defendants are liable to them for defamation.  *Id.* ¶ 202.  And as to all of Plaintiffs' claims, they allege that Defendants distributed purportedly false information with "potential partners or entities with whom Planet Aid and/or DAPP Malawi had either existing or prospective business dealings."  *Id.* ¶ 190.  Both Planet Aid and Ms. Thomsen have put their relationships with DAPP Malawi directly at issue in their claims against Defendants, which are subject to Defendants' pending anti-SLAPP motion.

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 6

At a minimum, given Planet Aid's representations, they should at least provide discovery about Plaintiffs' relationship with DAPP Malawi, including any contracts between the organizations. After all, if Plaintiffs represent that Planet Aid does not control DAPP Malawi "for discovery purposes," Defendants should be able to investigate and understand exactly what Planet Aid means by that. *Cf. In re Citric Acid Litig.*, 191 F.3d 1090, 1107-1108 (9th Cir. 1999) ("Control is defined as the legal right to obtain documents upon demand.").

Plaintiffs' counter-arguments about DAPP Malawi are non-sequiturs at best, and undermine Plaintiffs' arguments at worst. Defendants' argument is that Plaintiffs have put their relationships with DAPP Malawi at issue in the complaint, but have been inconsistent about what information about DAPP Malawi they must turn over, and have made the bizarre statement that Planet Aid does not control DAPP Malawi "for discovery purposes" (without explaining what that means or the extent of Planet Aid's control over DAPP Malawi as its subcontractor). As to Plaintiffs' statement that they are entitled to claim that statements about Ms. Thomsen are really about DAPP Malawi, that is a big part of Defendants' argument about why Ms. Thomsen is a limited purpose public figure—she is the face of DAPP Malawi.

The parties are available at the Court's convenience to discuss any of the above issues in greater depth.

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Ethan Forrest

Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T  +1 415 591 7008
eforrest@cov.com

## PLAINTIFFS' POSITION

Defendants' proposed options for going forward are part of a coordinated strategy to delay, not expedite, this case.  Defendants propounded substantially overbroad discovery requests, and then refused to negotiate, narrow or tailor any of those requests.  See Protec. Order Ltr. Even a cursory review of these requests makes clear that Defendants' primary purpose was not to obtain responses to any question needed to resolve the pending anti-SLAPP motion, which as Defendants concede is the only basis for discovery at this juncture.  *See supra* at p. 1 ("discovery in this case at this posture is limited to what is necessary to resolve Defendants' anti-SLAPP motion (Dkt. 107)").   Rather, Defendants have attempted to employ and leverage this onerous and disproportional discovery to preclude Plaintiffs from deposing Defendants Matt Smith and Amy Walters.  When faced with overwhelming caselaw holding that Defendants lacked a valid basis for unilaterally refusing to comply with those deposition notices, *see* Plaintiffs' letter addressing Defendants' refusal to attend depositions (cases collected), Defendants shifted course, and now argue for a stay of all discovery and briefing other than that supporting *their case* under the guise of narrowing the issues.   We address below why the suggested approach is a recipe for delay.

## I.      **The Bifurcated Approach**

In January, 2019,  Plaintiffs raised the issue of a possible bifurcated approach in which the parties would brief whether either Plaintiff was a public figure.  At that time, the case had been pending for over 2 ½ years, and Defendants were refusing to provide any indication as to when they would complete document production, which itself had been going on for 1 ½ years since Plaintiffs had first served their requests.  As Defendants note, Judge Chesney thought that this might be a logical approach for the parties to consider.

But in the ten-month period since Judge Chesney offered that approach for consideration, Defendants ignored it entirely.  Instead, Defendants dragged their feet on discovery, even now refusing to say whether they have completed all production.  *See* Ltr. addressed to depositions and discovery.  Only now, when document production from Defendants is coming to an end and they face depositions of two key Defendants, Matt Smith and Amy Walters, do Defendants seek to resurrect the bifurcated approach, all the while claiming that they should be allowed to proceed with their own abusive discovery.

### A.  **Given the Lack of Allegations that Would Allow Defendants to Sustain Their Burden of Showing that Either Plaintiff is a Limited Public Figure, It Is Particularly Inappropriate to Stay Discovery from Defendants.**

As a threshold matter, the Court may wish to consider whether the weak showing made by Defendants as to either Plaintiffs' status as limited public figures even warrants staying further discovery from Defendants.   As for Planet Aid, the mere fact that it has applied for, and received, public funding is insufficient to make it a limited public figure.  *See Hutchinson v. Proxmire*, 443

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 8

U.S. 111, 135 (1979). Lisbeth Thomsen's status as a limited public figure is even more dubious. Even if Defendants could identify a "public controversy," "[m]erely doing business with parties to a public controversy does not elevate one to public figure status*." Vegod Corp. v. Am. Broad. Companies, Inc.*, 603 P.2d 14, 17 (Cal. 1979).

Even under their own analysis, Defendants concede that in order to show that either party is a limited public figure they must show, first, that "there is a public controversy, i.e., where the issue was being debated publicly [prior to the defamatory statements] and . . . had foreseeable and substantial ramifications for nonparticipants," Dkt. No. 107, at 11. Second, Plaintiffs must have voluntarily injected or thrust themselves into that public controversy, and, third, "the alleged defamation was 'germane to the plaintiff's participation in the controversy,'" all of which elements Defendants concede must be shown. See *id.*, at 12 (internal citations omitted). When it comes to identifying the public controversy, the closest that Defendants come to that requirement is that a controversy existed about "use of public funds for charitable purposes," see *id.*, at 12. That vague description is almost exactly what has been found inadequate to trigger a malice standard. *Hutchinson*, 443 U.S. at 135 ("[A]t most, they point to concern about general public expenditures. But that concern is shared by most and relates to most public expenditures; it is not sufficient to make Hutchinson a public figure. If it were, everyone who received or benefitted from the myriad of public grants for research could be classified as a public figure—a conclusion that our previous opinions have rejected.").

And when it comes to showing that either Plaintiff "voluntarily injected" themselves into that "public controversy," Defendants are even more vague, relying on anything that either Plaintiff has done to promote their work, even work that has nothing to do with the USDA program or the sole charitable program identified in the anti-SLAPP motion, namely, the Food for Progress Program. See, e.g., Dkt. No. 107, at 12 (referring to the fact that Planet Aid has received 6,000 "likes" on its Twitter page). Not surprisingly, having been unable to focus on a single public statement by either Plaintiff which shows that they "voluntarily injected" or "thrust" themselves into some articulate "public controversy," Defendants have now propounded discovery requests seeking every public statement ever made by Planet Aid in trying to find one that would qualify. See Protec. Order Ltr.

**B. The Bifurcated Approach Will Not Avoid Discovery Disputes Raised in Plaintiffs' Motion for a Protective Order, But Rather, Is Intended as an Excuse for Refusing to Produce Matt Smith and Amy Walters for Depositions.**

Defendants also err in arguing that bifurcation would expedite the case by focusing on whether either Plaintiff is a limited public figure and halting all discovery other than that served on Plaintiffs. Defendants' real motive in this one-sided approach, however, is not to expedite the case, but to avoid depositions of two key Defendants. Defendants have not even explained why a stay of depositions of those key Defendants is required even if the Court were to entertain an early resolution of this discrete issue.

When bifurcation was first raised ten months ago, the bulk of discovery was still forthcoming from Defendants; at that time, it made sense to try and explore ways to expedite the

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 9

case, an opportunity which Defendants chose to ignore. Now that the parties are approaching the tail end of Defendants' document production, and starting depositions, Defendants are looking for every roadblock available to forestall such depositions. Based on their approach, even if the Court were to adopt a bifurcated approach, and unless Defendants withdraw their discovery requests, the Court would have to address what can only be described as an abusive set of discovery demands that would call for the production of documents disproportionate to the needs of the case, including: (l) all documents relating to hundreds of charitable programs in which Planet Aid has ever been involved over a 13-year period, despite the fact that the anti-SLAPP motion does not even make mention any program other than the USDA Program in Malawi; (2) every donor with whom Planet Aid has ever dealt, despite the fact that the only donor mentioned in the anti-SLAPP motion is the USDA; (3) every property owner who allowed any of the 15,000 recycle bins used by Planet Aid to be placed on their property, despite the fact that this has no bearing on any issue raised in the anti-SLAPP motion; (4) every public appearance, newsletter, press release, lobbying effort or other public involvement over a 13-year period, despite the fact that all information to which an objection has been lodged is (1) already available to Defendants and/or (2) irrelevant to whether either Defendant is a public figure, as discussed below.

Accordingly, given the completely disproportionate and burdensome nature of all discovery sought by Defendants, the Court will still be required to address a significant number of discovery disputes. Particularly in light of Defendants' stated refusal to narrow or withdraw any of their overbroad and disproportionate requests, see Protec. Order Ltr., Ex. A-2, A-3, it is apparent that the bifurcated approach suggested by Defendants will not significantly narrow any of the discovery disputes, but is simply offered to avoid depositions of key Defendants.

## C. **The Bifurcated Approach Would Likely Delay, Not Expedite, a Decision on The Anti-SLAPP Motion.**

Moreover, it is also a false hope that bifurcation of the issues will make it easier for the parties to brief, and for the Court to decide, whether Plaintiffs have established a *prima facie* case concerning Defendants' conduct. Defendants entire approach assumes that under a malice standard, Plaintiffs will be unable to show that Defendants knew what they were reporting was incorrect, or at a bare minimum, acted recklessly as to what was being reported. *See supra*, citing *Readers Digest.* Contrary to the notion that reliance on a malice standard would end or curtail the case, it will do neither. If the Court agrees with Plaintiffs that they are not limited public figures, the parties will have to litigate the case under a negligence standard; if, on the other hand, it agrees with Defendants, the parties will still have to litigate the remainder of the case under a malice standard.

Defendants' bifurcated approach also ignores the possibility that the Court may not even have to reach the issue of whether either Plaintiff is a limited public figure. Defendants fail to consider the fact that in response to the anti-SLAPP motion, Plaintiffs will be offering substantial evidence of malice, a slice of which is set forth in the letter requesting a protective order. See Ltr. Protec. Order. That evidence consists of statements by Defendants' own sources disavowing, one after another, what was reported, or alternatively, stating how they were misled into making false statements, as well as evidence, inter alia, that bribes and other inducements were used to

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 10

manufacture evidence, and that Defendants themselves questioned what was being reported. Accordingly, the Court may ultimately decide that it does not even have to reach the issue of whether either Plaintiff is a limited public figure since there is sufficient evidence at the anti-SLAPP stage to find that Defendants acted knowingly or recklessly.

## II. Plaintiffs Have Consistently Taken the Position that This Case is About False and Defamatory Allegations that Over $130 Million was Stolen From the USDA Programs.

Defendants next argue that Plaintiffs have waffled over whether this case is about the theft of funds from the USDA or whether it relates to some other donors, such as DifD, UNICEF, etc. There is no confusion.

The FAC makes clear that it focuses on defamatory statements alleging that Plaintiffs stole, diverted or siphoned away funds was *from the USDA programs.* Every single paragraph framing the statements alleged to be defamatory relate to the alleged theft of funds from the USDA – not some other donor. See, e.g., Dkt. No. 78, at ¶ 197 ("False and defamatory statements by Defendants included reports that Plaintiffs had engaged in fraud, money laundering, and other criminal conduct that included diverting, siphoning away or stealing funds *from USDA funded projects*"); *id.*, at ¶ *198* (statements that money was stolen "*from the USDA Programs*"); *id.*, ¶ 199 (statements about the amount obtained "*from the USDA*"); *id.*, ¶ 200 (statements about diversion of money "intended for *the USDA Programs*"); *id.*, at ¶ 201 (statements about farmers "*in the USDA Program*"); *id.*, at ¶ 202 (statements about equipment to have been provided "*under the USDA Programs*"); *id.*, at ¶¶ 203-04 (statements about employee kickbacks and that Plaintiffs had *lied to the USDA* about employee salaries); *id*., at ¶ 205 (statements about what "*the USDA* did."); *id.*, at ¶¶ 206, 207 (statements about involvement by a "cult leader" in "*the USDA Programs*")(emphasis added in above quotations).

Defendants, by contrast, have tried to create confusion by claiming that the FAC refers also to the UK DifD, Clinton Fundation and UNICEF. See *supra* at pp. 2-3. The cited paragraphs, however, are not offered by Plaintiffs in the FAC to show that Defendants made any false or defamatory statements regarding those donors. Quite the contrary. To the extent that Defendants issued publications boasting that their articles caused those donors to withdraw funding, see, e.g., Planet Aid believes that those statements are actually truthful, and that donors did in fact withdraw from programs based on Defendants' publications. Compare, e.g., Dkt. No. 78, at ¶¶ 73-74 (alleging that following publication of Defendants' articles, UNICEF terminated the program), with Dkt. No. 78-5, at 2 (Defendants publication stating "UNICEF has cut its ties with an organization that coordinates U.S. humanitarian programs in Malawi, following an investigation . . . by Reveal"). Accordingly, Plaintiffs are not alleging that any statement regarding those donor programs are defamatory, but rather, are offered solely as evidence of Defendants' use of its reporting to tortiously interfere with business opportunities.

Of course, none of this comes as a surprise to Defendants. As reflected in their anti-SLAPP motion, Defendants failed to refer even once to DifD, UNICEF or Clinton Foundation. Obviously, Defendants were fully aware that Plaintiffs were not claiming that Defendants defamed Plaintiffs

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 11

regarding those programs, but only that Defendants were responsible for those donors withdrawing funding.

In any event, Plaintiffs have agreed to clear up any feigned confusion. Defendants have consented to a revised introduction that would be filed stating that all the the "paragraphs that follow" relate to the USDA Program.

### III.     Plaintiffs Have Taken Consistent Positions Regarding DAPP Malawi.

Defendants next argue that Defendants have taken inconsistent positions regarding DAPP Malawi. Any such position is meritless.

Further, this argument underscores the completely arbitrary nature of the discovery limitations and disputes raised by Defendants. Planet Aid's contractual relationship with DAPP Malawi cannot establish that either party is a limited public figure. See *Masson v. New Yorker Magazine, Inc.*, 832 F. Supp. 1350, 1370 (N.D. Cal. 1993) ("The Court finds that general agency rules do not apply in the constitutional context."); *Murray v. Bailey*, 613 F. Supp. 1276, 1281 (N.D. Cal. 1985) ("The stringent standards required by the First Amendment make application of an agency theory inappropriate."). Similarly, and as explained above, even if DAPP Malawi were a full-fledged subcontractor today to the USDA itself, which it is not, that hardly shows that DAPP Malawi or Ms. Thomsen are limited public figures. *See supra.*

As far as any confusion over whether DAPP Malawi is seeking damages based on Defendants' conduct, the answer should be clear: Plaintiffs are not alleging that DAPP Malawi is entitled to recover for any defamatory statements. Defendants themselves correctly point out above that DAPP Malawi is not a party to this action. It remains a non-party. It is an entirely different, matter, however, to argue that a reasonable jury could not construe defamatory statements about alleged fraud at DAPP Malawi as intending to refer to Ms. Thomsen specifically. In fact, Defendants themselves made sure to provide that linkage when they reported in the same breath that "your organization is scheming US government funds" and that "[t]he people in charge of your money said you're stealing money," together with her reply: "I'm definitely not stealing any money." Dkt. No. 78-17, at 25-26. And if it were not enough to actually use the word "stealing" when addressing Thomsen and her role, Defendants immediately went on in the next sentence to tie their allegation about Thomsen stealing money to the massive fraud reported throughout the story. *Id.* Thomsen has every right to have the jury determine whether statements throughout all the publications about fraud at DAPP Malawi were actually targeting her.

Finally, Plaintiffs previously pointed out that Defendants have repeatedly sought discovery which is already in their possession. See, e.g., Protec. Order. Ltr. That is the situation confronting Plaintiffs when it comes to Defendants' complaint that it cannot proceed without a copy of Planet Aid's contract with DAPP Malawi regarding the USDA Program. Defendants already had in their possession a draft of that contract. See CIR 39512. While we have no objection to working cooperatively with Defendants if there are other documents reasonably needed by them, their absolute refusal to even narrow or withdraw a single request makes any such process impossible. See Protec. Order Ltr., Ex. A-2, 3.

**COVINGTON**

Hon. Jacqueline Scott Corley
October 24, 2019
Page 12

Consequently, the Court should reject the bifurcated approach suggested by Defendants.

\*        \*        \*

I submit this joint letter brief on behalf of both Plaintiffs and Defendants.

Sincerely,

*/s/Ethan Forrest*
Ethan Forrest

**EXHIBIT F**



Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045

**Ambika Kumar Doran**
(206) 757-8030 tel
(206) 757-7030 fax

ambikadoran@dwt.com

August 27, 2018

*Via Email*

Sam Rosenthal
sam.rosenthal@nelsonmullins.com
101 Constitution Avenue, NW, Suite 900
Washington, DC 20001

Re:     Meet-and-confer efforts

Dear Sam:

This letter summarizes the disputes between the parties regarding Defendants' responses to Plaintiffs' three sets of discovery responses (i.e., Planet Aid's first and second document requests, and Ms. Thomsen's first document requests) and Defendants' position on those disputes. Once you have reviewed this letter, let's discuss what remains outstanding, and if needed, Defendants will file a motion for protective order.

**First Document Requests from Planet Aid and Lisbeth Thomsen**

You have taken the position that Defendants have waived their objections with respect to these requests. We disagree. During a June 7, 2018, email exchange, the parties agreed to put off discovery until after the June 26, 2018, settlement conference. More particularly, we agreed that, should settlement not occur, Defendants would "work with you to voluntarily produce discovery you think you need to oppose the SLAPP motion," and that Defendants "need not provide written responses to the discovery requests until we are able to meet and confer." On July 12, I committed that Defendants would produce the following categories of documents voluntarily:

1.      Recordings of interviews with non-confidential sources we quoted or referred to in the radio piece and first online article.

2.      Prior versions of scripts for the radio piece and first online article.

3.      Notes from interviews with non-confidential sources we quoted or referred to in the radio piece and first online article, where we do not have a recording but we do have notes.

On July 17, 2018, Planet Aid propounded a second set of document requests. On July 24, 2018, I sent you an email indicating that Defendants would respond to the requests, except for requests

Anchorage
Bellevue
Los Angeles

New York
Portland
San Francisco

Seattle
Shanghai
Washington, D.C.

www.dwt.com

August 27, 2018
Page 2

for production 2, 10, and 12-15, as outlined in our forthcoming responses. On July 27, 2018, I asked whether you intended to meet and confer, as our agreement anticipated. For the first time, that day, you indicated your position Defendants had waived any objections to the first two sets of discovery requests. I explained our disagreement and did not hear from you again on that subject until August 20. In the August 21, 2018 Joint Stipulation, you agreed that "[b]y agreement of the parties, Defendants' deadlines to object or otherwise respond to the first set of requests has been stayed."[1]

In sum, your position that Defendants have waived their objections is inconsistent with our agreement, and your statements to the Court. Despite this, we will later today provide you objections and responses to the first two sets of discovery requests. If you believe those responses are insufficient, we should again meet and confer, as required by Local Civil Rule 37.

## Second Document Requests from Planet Aid

During our phone call, you indicated you would prefer to discuss Plaintiffs' concerns about Defendants' proposed document production in categories, rather than by specific request, although we did ultimately discuss specific requests. More recently, on August 23 and 27, you sent two emails that identify specific alleged deficiencies, but those emails are not consistent with our phone call. Thus, at this point, the scope of our disputes is unclear.

Despite this, I have attempted to create what I believe to be a list of requests on which we have disagreed. If there are additional requests that I have missed, please let me know, as I want to be sure that we meet and confer about any disagreements before troubling the Court.

***Recordings and Notes of Interviews.*** As outlined above, we agreed to produce recordings of interviews with sources referred to or quoted in the March 19, 2016 broadcast and May 23, 2016 article ("Relevant Publications"), or for such sources for whom we did not have recordings, notes of interviews. During our call, you asked me for a list of those individuals. They are as follows:

> *Recordings*: Jackson Mtimbuka, Knud Haargaard, T. Patrick Hynes, Marko Zebiah, Britta Junge, Harrison Longwe, Chiku Malabwe, Stefan Cassella, Lisbeth Thomsen, Marie Lichtenberg, Chief Witness Chibwana, Enmock Chikaonda, Farai Nyamuranga, Kris Alonge, Edward Monster, Kate Snipes, Sally Klusaritz, Carston Ringsmose, Eva Sorensen, Walter Hansen, Patrick Goteka, Derrick Mpeta, Donnex Makwemba, Yona Banda, Christopher Banda, Kambani Kufandiko, Andrew Chalamanda, Innocent Chitosi, Mbachi Munthali, Paul Molande

---

[1] Copies of the emails referenced in this section are attached as Exhibit A.

August 27, 2018
Page 3

       *Notes*: Poul Gade, Naila Ahmed, Akim Mvula, Charles Rush, Ron Croushorn, Chris Thurlow

Your August 23, 2018, email seeks recordings with all sources. Defendants decline this request. Defendants conducted more than two hundred interviews, meaning there are potentially thousands of hours of recordings and/or notes that Defendants would have to review and produce. That is not proportional to the needs of this case, nor, more particularly, is it necessary for Plaintiffs to be able to respond to the SLAPP motion.

**RFP 1**: This request seeks all "outlines, radio-scripts, story drafts, rough drafts, final drafts, updates, critiques, comments, edits, as well as any other documents or correspondence, concerning or relating to the editing, review, analysis, revision, rewriting, and/or reworking of the Publications and/or Planet Aid Subjects." In response, Defendants agreed to produce non-privileged documents from January 1, 2014, to August 21, 2017 ("Relevant Time Period") that comprise outlines, drafts, or scripts of the March 19 broadcast or May 23 article. Defendants did so because, as written, this request would call for anything and everything relating to the allegedly defamatory stories. Given the volume of documents related to those stories—we have more than 160,000 documents in our database—this is disproportional to Plaintiffs' needs to respond to Defendants' SLAPP motion.

To be sure, Defendants are already agreeing to produce a significant amount of discovery that will require considerable time to be produced on a rolling basis. As detailed in our written discovery responses and the remainder of this letter, this includes (1) recordings of interviews with sources referred to or quoted in the Relevant Publications, (2) notes of interviews with those sources for which there is no recording, (3) outlines, drafts, or scripts concerning the Relevant Publications, (4) correspondence about those outlines, drafts, or scripts, (5) documentary evidence on which Defendants relied from Relevant Time Period, (6) photographs and video recordings in connection with visits to other places for the stories, (7) documents concerning the hiring of Kandani Ngwira, (8) documents sufficient to show the reasons Defendants focused on Planet Aid, (9) documents concerning retraction demands, (10) communications with specified government entities, and (11) documents created in preparation for the reporters' October 2015 trip to Denmark and Malawi. This is more than sufficient for Plaintiffs to respond to the pending SLAPP motion. Although you have expressed concern that this might exclude documents which "comment, critique, analyze, or offer observations about the stories," we believe the majority of such documents would fall within correspondence about outlines, drafts, or scripts, which we have agreed to produce.

**RFP 2**: This seeks documents or communications regarding "confidential and/or unnamed sources." As you know, we object to providing any documents or information that would reveal the identities of confidential sources. I understand that is an issue you intend to raise with the Court. During our call, you also raised the question of unnamed, but not confidential, sources.

August 27, 2018
Page 4

For the same reasons described in "recordings of interviews notes" above—i.e., the sheer number of individuals interviewed—Defendants cannot agree to produce these documents.

*RFP 3*: This request seeks all "descriptions, write-ups, snapshot-in-times, mock-ups, outlines, and itineraries as well as any other documents or correspondence in preparation for any trip in connection" with Planet Aid or the stories. Our response committed to provide outlines, drafts, or scripts for the Publications. You objected to this limitation. We have reconsidered our position. We will review the documents we have from February 2015 (when Defendants began seriously considering international trips to conduct reporting) through August 24, 2015, the date the trip began, and produce "descriptions, write-ups, snapshot-in-times, mock-ups, outlines, itineraries, and any other correspondence or documents" created in preparation for the August 2015 trip.

*RFP 9*: A portion of this request seeks documents concerning "payments to any source for any reason." In response, Defendants committed to produce accounting records showing expenditures in connection with the Relevant Publications, including "payments to any source." During our phone call, and in your August 23, 2018 email, you claimed that you are entitled to any documents showing *promises* to pay sources. Although it is not clear that such promises are within the scope of RFP 9, Defendants will amend their responses to state that there are no documents evidencing promises to pay sources for anything other than costs sources incurred to meet with and speak to CIR reporters, including costs for travel, food, and drink, and CIR-branded paraphernalia (e.g., T-shirts or buttons). Defendants will abide by their agreement to provide accounting records that reflect such costs.

*RFP 10*: This request seeks documents concerning meetings with legal counsel. We objected on grounds of the attorney-client privilege and the work product doctrine. You contend Defendants have waived those protections by referring to the fact that the Publications were vetted by legal counsel. We disagree. I understand you intend to raise this with the Court.

*RFP 12*: This request seeks all documents relating to the allegedly defamatory publications or Planet Aid relating to a list of seven individuals. As I explained on the phone and reflected Defendants' objections, this request is entirely overbroad. Although Defendants will produce documents responsive to this request—because they are subsumed by other requests—Defendants will not independently seek out additional, responsive documents.

*RFP 13*: This request, which we did not discuss but which is raised in your August 27 email, seeks "all" communications or documents concerning any Source Material, including those concerning 14 individuals as well as any other individual listed on Defendants' initial disclosures. Again this request, too, is overbroad. Although Defendants will produce documents responsive to this request—because they are subsumed by other requests—Defendants will not independently seek out additional, responsive documents.

August 27, 2018
Page 5

*RFP 14/Request to Add Search Terms*.  RFP 14 seeks communications with other news organizations, including the BBC and NBC.  Defendants objected to this request and indicated they would not provide responsive documents.  You have also proposed adding search terms to a comprehensive set of terms we sent you, primarily to add generic locations (e.g. "Maryland" or "DC") and the names of individual reporters with the BBC and NBC.  We do not believe documents related to the BBC and NBC are needed to oppose Defendants' SLAPP motion, which focuses primarily on the March 19 and May 23 stories.  If the Court agrees with Defendants that those stories are not defamatory, it will necessarily find that the remaining stories are also not defamatory, obviating the need for this discovery.

*RFP 15*:  This request seeks "all documents or communications concerning any donor organization having any connection with Planet Aid, ADPP Mozambique, DAPP Malawi, and/or the Federation for Humana People to People, including but not limited to" the USDA, USAID, UNICEF, UNESCO, and DfID.  Defendants objected to providing any responsive documents, given the breadth of the request.  During our call, you offered to narrow this request to seek only communications between Defendants and any of the named government entities concerning the named Planet Aid entities.  With this restriction, Defendants are willing to produce documents, i.e., communications concerning Planet Aid, ADPP Mozambique, DAPP Malawi, and/or the Federation for Humana People to People that are between Defendants and one of the following: USDA, USAID, UNICEF, UNESCO, DfID.

Again, I believe I have covered all requests about which we have a dispute.  Please let me know if you have a different understanding.

Finally, your August 23, email suggests that if you do not receive all recordings of interviews by August 29, you will file a motion to compel.  As I have explained, we have some recordings ready to produce, and will do so as soon as a protective order is in place.  We do not, however, have all of them ready, and respectfully ask that you do not adhere to what appears to be an arbitrary deadline.  We are not going to ask the Court to set a deadline for Plaintiffs to respond to the SLAPP motion until you have received the promised discovery, and that will necessarily take time.  We are, of course, willing to discuss deadlines for specific categories of documents, at your convenience.

Once you have reviewed this letter, let's set a time to talk through what disputes remain.  If we cannot reach agreement, Defendants will, per our agreement, file a motion for protective order.

August 27, 2018
Page 6


Sincerely

Davis Wright Tremaine LLP

Ambika Kumar Doran



cc:  Thomas R. Burke
     Victoria Baranetsky

**EXHIBIT G**

1   (2) making the above false statements about Plaintiffs, including in published articles, broadcasts,

2   podcasts and social media; (3) meeting with individuals in the village of Njuli in Malawi; (4)

3   meeting with villagers in another village in Malawi; (5) distributing the same false information to

4   third parties, including potential donors to Planet Aid and Thomsen's employer, as well as to

5   potential partners or entities with whom Planet Aid and/or DAPP Malawi had either existing or

6   prospective business dealings; (6) transmitting the same false information to third parties so that

7   they would re-publish the statements; (7) encouraging other news sources to join with them in

8   publishing the false and defamatory statements; and (8) placing the same information on social

9   media so that it would be republished to the public at large.

10          191.    As a result of the conspiracy and agreement detailed above, Planet Aid and

11   Thomsen have both suffered substantial damage.

### FIRST CAUSE OF ACTION

### DEFAMATION

### (Against All Defendants)

15          192.    Plaintiffs Planet Aid and Thomsen restate and incorporate herein paragraphs 1

16   through 191 above.

17          193.    Defendants CIR, Smith and Walters knowingly, intentionally and maliciously

18   made false and defamatory statements concerning Plaintiffs Planet Aid and Thomsen.  Each of

19   the statements set forth below, were made by Defendants either knowing that they were false, or

20   alternatively, while acting with reckless disregard for the truth or falsity of the statements.

21          194.    The same subject false and defamatory statements were made orally, in writing,

22   and by way of electronic and social media, such as audio and visual recordings that were aired on

23   public radio and the internet.  Consistent with its stated goal of wide and even world-wide

24   distribution of its newscasts and reports, Defendants intentionally made sure that their defamatory

25   statements were widely and repeatedly published to third parties, including government agencies

26   in areas in which Planet Aid and Thomsen have been active, including but not limited to Malawi,

27   non-government agencies, and existing and prospective partners.

28          195.    Such false and defamatory statements were made knowingly, and in a calculated

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

47

effort to cause harm to Plaintiffs' reputations and standing in the community, and indeed world-wide and are not privileged.   Defendants' false and defamatory statements are libelous, slanderous and defamatory on their face.

196.   Defendants' publication of such knowingly, intentionally and maliciously false and defamatory statements has negatively affected, and will continue to negatively affect Plaintiffs Planet Aid and Thomsen in connection with their businesses and professions, including but not limited to the current and prospective relationships with partnerships, including the USDA and/or UNICEF and other governmental and non-governmental donors and sponsors of programs.

197.   False and defamatory statements by Defendants included reports that Plaintiffs had engaged in fraud, money laundering, and other criminal conduct that included diverting, siphoning away or stealing funds from USDA funded projects.   It was therefore false and defamatory for Defendants to have reported that Plaintiffs had engaged in fraud, theft and/or money laundering in connection with the USDA Programs in Africa.   These statements included the following:

- Claiming that CIR was involved in reporting on a "surreal criminal scheme involving used clothing," and a "reputed money-laundering cult" that "raises money via @Clinton Global," referring to the Clinton Global Foundation. Ex. U-2-3.
- Claiming that a part of the job of a former farming instructor was "cheating," and "that the farmers were not benefitting from farmers clubs." Ex. B.
- 'Harrison, DAPP's former financial controller, was one of the people who said he also saw fraud. . . . Now he says the money was stolen." Ex. P.
- DAPP former employee and "others say they added up to fraud intended to reroute aid money to other purposes." Ex. B.
- Confronting Thomson during a public event by telling her: "people inside your organization . . . say individually, one by one as we've interviewed them is that your organization is scheming US government funds.   Your own people.   The people in charge of your money said you're stealing money." Ex. P.
- A former employee was "saying the "money [from the USDA grant] was not used [for] the intended purpose." Ex. B.
- Citing someone for the proposition: "It's blatant to me this group is stealing, it's money laundering and they're keeping the money for themselves." Ex. F.
- "[I]nvoices were fabricated to cover up for charity work that was never performed." Ex. F.

48

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

- "Dubious expenses . . . for aid projects funded by the United States were paid to offshore organizations controlled by the Teachers Group." Ex. E.

- "Accountants and managers working on those projects said these invoices were fabricated to cover up for charity work that was never performed." *Id.*

- Plaintiffs engaged in the diversion of funds by, among other things, paying "what appears to be multiple bills for the same purpose," and money to a Hong Kong-registered trading company. *Id.*

- "Current and former DAPP employees told Reveal that the U.S.-funded Planet Aid/DAPP operation was part of a systematic fraud." Ex. G.

- "Workers suing for back pay also bolster previous allegations of an illicit scheme to misuse foreign aid funds." Ex. O.

198.    Further, Defendants made false and defamatory statements representing that Planet Aid and its subcontractor, DAPP Malwai, stole or siphoned away 50-70% of the over $130 million received by them from the USDA Programs in Malawi and Mozambique.   In making these false and defamatory statement, Defendant repeatedly reported that:

- Planet Aid was a "charity that got $133M from the U.S. Government," Ex. U-4.

- "[I]n . . . 2004 . . . the USDA started sending multi-million dollar grants to Planet Aid, and that "now the total tops $130 million and the US government is continuing to send more money today," Ex. P, while nevertheless reporting that Planet Aid had received approximately two-thirds of that amount.

- $133m tax dollars spent on @PlanetAid.  Ex. U-5.

- "@USDA grants to @PlanetAid top $133m." Ex. U-21.

- @PlanetAid . . . Given $133m @USDA grants.  Ex. U-27.

- "over $130m that the @USDA continues to give @PlanetAid @DappMaawi." Ex. U-29.

- "@reveal investigates @PlanetAid  . . receiving $133m @USDA grants."  Ex. U-30.

199.    Defendants knew that Plaintiffs had never received this amount, and that it was therefore false and defamatory to report that Plaintiffs had "diverted," "siphoned away" or "stolen" 50-70% of that amount.  It was, accordingly, false and defamatory, to report:

- "Harrison [Longwe] is one of several insiders who told us 50% to 70% of the US government grant money was being siphoned away, one transaction at a time and most of them was headed to the Teacher's group African headquarters in Zimbabwe." Ex. P.

49

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

- "[I]nsiders report siphoning 50-70% of $133m in US grants." Ex. U-32.

- "[M]oney from USDA grants, over $130 million, up to 70% was allegedly taken from the projects it was meant for and stripped from employees' salaries." Ex. P.

- "50-70% of the money [from the USDA Food for Progress Program] was ending up somewhere else." Ex. Q.

200.   Further, Defendants made false and defamatory statements that Plaintiffs had engaged in illegal conduct by diverting USDA funds "straight to Mexico," rather than being used as intended for the USDA Programs.  These statements included, among others, the following:

- "[T]he employee working on the Planet Aid farmer's project in Malawi, he was told by his Teacher's Group bosses, the money from the USDA was going straight to Mexico." Ex. P.

- "[That same employee] knew where the money was going all along." *Id.*

- DAPP former employee and "others say they added up to fraud intended to reroute aid money to other purposes." *Id.*

- "A lot of the funding ... is not used to help the livelihood of poor Malawians. Fifty to 60 percent of the benefits of the Teachers Group are for the owners who are in Mexico . . ." Ex. O.

- "' The United States people, I think they should know the Teachers Group has used their money in a way that was not the intended  purpose. . .  They're helping somebody who is in Mexico building mansions." *Id.*

201.   Using fabricated farmers participating in the USDA Program, among other false sources, Defendants made false and defamatory statements that Plaintiffs had deprived farmers of promised livestock, agricultural inputs and water pumps needed to improve conditions in Malawi, in particular.  False and defamatory statements included:

- Funds were cut off to Plaintiffs "following an investigation . . .  by CIR  . . . showing that the group diverted money [intended to purchase agricultural inputs] intended to alleviate hunger and disease." Ex. D.

- Defendants "visited Farmers Clubs and that at every instance the Farmers themselves told us that was a lie" to say that farmers benefitted from the food for Progress Program.  Ex. O.

- Fabricating the voice of one alleged "farmer" on radio station KCRW who was allegedly cheated out of  agricultural "inputs" to which he was entitled under the USDA Programs, knowing that this individual was not a "farmer," but someone who had been terminated for diverting money from farmers under the USDA Program in Malawi. Ex. R.

- Playing a tape recording of a farmer who had nothing to do with the USDA

1   Farmers Club Program, while claiming that he was deprived of livestock under
2   that Program since his village had received only one goat and one pig, which had
    died, and that they had no "pig or goat in [their] homes" because of any donations.
3   *Id.*

4   • (Referring to the same farmer), "We spoke to the project managers, we spoke with
      farmers.  One farmer we spoke to said he had received a goat and pig.  . . . Of
5     course they died."  Ex. Q.

6   • "What little livestock was there had died."  Ex. S.

7   • "Impoverished farmers in Malawi, who were supposed to benefit, . . . also told
      Reveal they did not receive water pumps, fertilizer, and farm animals promised by
8     Planet Aid."  Ex. F.

9   • "When Reveal visited USDA projects in Malawi in 2015, however, farmers still
      were impoverished, and project staff said the money had been misused."  Ex. K.

10  202.   Further, Defendants statements were false and defamatory in reporting that farmers
11  had been deprived of water pumps to have been provided under the USDA Programs.  Defendants
12  knew that it was false and defamatory to report:

13  • "Planet Aid promised water pumps too so farmers were no longer dependent on
      the season rains to grow food, but in the village of [Njuli] they only gave away one
14    pump.  They were actually selling the rest."  Ex. P.

15  • [Defendant Walters]:  "Out of 300 families, only the village chief [in Njuli] bought
      one."  *Id.*
16
17  • [Defendant Smith]:  "[The Chief] took out a loan to buy the hundred-dollar pump.
      That money could have paid for a year of school for one of his children.  It took
18    him two years to pay it off."  Ex. P.

19  • "Planet Aid said it installed 576 water pumps throughout Malawi.  . . .  [T]he
      Farmers' Club manager, said he had thought 25 of those pumps were targeted for
20    Njuli," Ex. B, but that "in the village of [Njuli], they only gave away one pump.
      They were actually selling the rest."  Ex. Q.

21  • "[T]he village chief [in Njuli], he was so adamant that he needed a rope pump"
      that he "asked DAPP Malawi for his own rope pump, and they said – fine – they
22    would give it to him, but he had to pay $100.  And it turns out, that cost him two
      years to pay off."  Ex. Q.
23
24  • "In Njuli, Reveal reporters found the village had only two pumps.  On was given
      to the village.  The chief bought his, he said, with a $100 loan that took him two
25    years to pay off.  [. . . Enock Chikaonda, a village leader and Farmers Club
      member, was the only villager given a pump by Planet Aid."  Ex. B.
26
27  • "The village chief in Njuli was forced to pay for a Planet Aid pump with a $100
      loan which took him two years to pay off, when the village was supposed to
      receive pumps free of charge."  Ex. B.
28
    • Planet Aid and DAPP Malawi "only provided a single substandard pump to each

                                    51

Nelson Mullins Riley & Scarborough LLP
Attorneys At Law
Los Angeles

community and made them buy the rest at prices they could not afford." Ex. S and television I-Team Program.

203.   Defendants also made false and fraudulent statements asserting that as part of their fraud, theft and money laundering scheme, Plaintiffs had extracted kickbacks of 20-100% from employee salaries.  These statements, which were false and fraudulent, included the following:

- "While researching this story we spoke to about a dozen African members of the Teacher's Group.  All of them gave a portion of their salary to the group.  From 20% to 100%, everything they earned."  Ex. P.

- "Zebiah said he was among the Africans who upon joining the Teachers Group were pressured to sign a contract, often called a 'deed of contribution.'  In it, members agree to donate a portion of their salary - anywhere from 20 to 100 percent."  Ex. B.

- Forced contributions was "slavery."  Ex. P, U-13, 14, 17, 18, 19, 24, 26.

- "Money was kicked back by employees to an account of Ibn Petersen and Ula Thomsen, and those contributing the money "don't know what they can use, because we deposit in their accounts.  . . . He said the money went into the personal bank accounts of two Teacher's Group bosses.  Ibn Petersen and Ula Thomsen, and Ula is the husband of Lisbeth Thomsen."  Ex. P.

- In the "deed of contribution" signed by employees "members [of The Teachers Group] agree to donate a portion of their salary – anywhere from 20 to 100 percent."  Ex. B.

- Referring to Defendant Smith, "Smith said employees paid by Planet Aid showed him 'Deeds of Contribution' and other types of contract they said they were required to sign if they wanted to keep their jobs, promising to donate 20 to 100% of their salaries to Teachers Group."  Ex. S, and television I-Team program.

- "Former and current Teachers Group members in Africa told Reveal that they were forced to kick back . . . portions of their USDA-funded salaries to a bank account controlled by their Teachers Group overseers."  Ex. F.

- "One group in Africa that received U.S. government funds compelled employees to kick back portions of their salaries to a bank account controlled by their Teachers Group overseers."  Ex. E.

- "The techniques that they were using were all about moving money from technical services contracts to teachers group entities outside the country.  . . .  Supervisors hire them, pay them their salaries, and then somebody comes around and makes them give up a portion of their salaries and deposit it into a bank account controlled by the same teachers group."  Ex. T.

204.   Defendants also falsely claimed that Plaintiffs had lied to the USDA about employee salaries.  Such false and defamatory statements included:

- Reporting that employees were suing over back pay, Ex. O, without telling readers that the individual contributing to the article, Ngwira, had told

52

1   employees that they could get a lot money by filing that suit.  Ex. __

2  &bull; "Funds are extracted by writing purchases much smaller than reported to

3   the USDA . . ."  "It was written [salary], 350, but she's getting $100 per month in salary. It's a tricky way of doing it."  Ex. B.

4  &bull; "Even before the Teachers Group pressures members to hand over money

5   to their bosses, funds are extracted by writing paychecks much smaller

6   than reported to the USDA.  In this way, [one employee said] employers were siphoning $250 from her $350 per month salary, she said, and then applying pressure to kick back even more.  Zebiah said the DAPP project

7   manager's story conforms with DAPP policy in Malawi."  Ex. B.

8  205. Defendants falsely claimed that "You don't give millions of dollars to a group that

9 is being investigated for fraud, tax evasion and pilfering of humanitarian funds, . . .  [b]ut that is

10 precisely what the USDA did."  Ex. B.

11  206. Defendants then went even further and claimed that government officials had

12 concluded that Planet Aid had been diverting funds, and was part of a fraudulent or global money

13 laundering operation, and that a leader of the Teachers Group had been shown to have been

14 involved with the USDA Programs.  These statements included, among others, the following:

15  &bull; "In a 2001 report, the FBI concluded that Teachers Group leaders diverted funds

16   raised by its network of organizations 'for personal use.  Little, to no money goes to the charities."  Ex. B.

17  &bull; "The FBI says, using information from Danish investigators, that Planet Aid is part

18   of a fraud and global money laundering ring."  Id.

19  &bull; Planet Aid was included in a network that "was part of what prosecutors call a global charities fraud scheme."  Ex. O.

20  &bull; "[S]eized Teaches Group computers contained records allegedly showing illicit

21   money transfers involving Planet Aid and an anti-AIDS program that has over the years received US funds."  Ex. B.

22  &bull; "Our investigation finds that the U.S. government knew an international fugitive

23   was linked to the projects, but kept the money flowing."  Ex. A.

24  &bull; "Alleged cult leader plays shell game with US foreign aid," Ex. A.

25  207. Defendants knew, or were reckless in not knowing, that the above statements were

26 false as Defendants were aware, or were reckless in not knowing, that the "alleged cult leader"

27 had no involvement with the USDA Programs.

28  208. These statements appearing in the Articles and Broadcasts annexed as exhibits to

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

53

this FAC and incorporated herein, together with radio and television programs, and in social media described above, were intended to, and did have the result of holding Planet Aid and Thomsen up to ridicule, hatred, scorn, contempt and disgrace.  Defendants' false statements discredited and disparaged Planet Aid and Thomsen in their respective business communities and discouraged others from associating with, or engaging in, projects or business opportunities with Planet Aid and Thomsen.

209.   In addition, Thomsen has not only been embarrassed, humiliated and ridiculed, but she has suffered emotionally as a result of being accused to be a money-launderer, thief, and insider abusing DAPP Malawi employees, as well as the people of Malawi whom she has faithfully attempted to assist for many years.

210.   Further, by knowingly, intentionally and maliciously publishing such false and defamatory statements about Planet Aid and Thomsen, Defendants intended to, and did defame Planet Aid and Thomsen, and caused substantial damage and harm to Planet Aid and Thomsen's reputation and standing in the community, particularly with government agencies, individuals and other not-for profits who might wish to participate with Planet Aid and/or Thomsen in programs to serve needy individuals and communities, including the USDA and/or UNICEF.

211.   Defendants' false and defamatory statements were made orally, in writing, and by way of electronic and social media, such as audio and visual recordings that were aired on public radio, and the internet.  Consistent with its stated goal of wide and even world-wide distribution of its newscasts and reports, Defendants intentionally made sure that their defamatory statements were widely and repeatedly published to third parties, including government agencies in areas in which Planet Aid and Thomsen have been active, including but not limited to within Malawi and to non-government agencies and existing and prospective partners.

212.   Defendants uttered, repeated and published these false and defamatory statements in a calculated effort to cause harm to Plaintiffs' reputations and standing in the community, and indeed world-wide, and are not privileged, and have damaged Plaintiffs.  As a result, Plaintiffs have been damaged.  Defendants' false and defamatory statements are libelous, slanderous and defamatory on their face.

54

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

213.   Defendants knew, or were reckless in not knowing, that the above statements were false. Further, Defendants were placed on notice that their publications contained false and defamatory statement when Defendants were sued by Plaintiffs in this action in August, 2016. Notwithstanding notice in that complaint that specific allegations in their publications were false and defamatory, Defendants failed to issue a retraction or take any action to ensure that Plaintiffs were not damaged as a result of their actions. Defendants were repeatedly requested also to issue a retraction and/or correction.  Notwithstanding a demand for either a retraction or correction, Defendants failed to issue any such retraction or correction, and instead, continued to publish false and defamatory materials.  Instead, Defendants continued to repeat false and defamatory materials, and further, to issue new stories containing new and additional false and defamatory statements.

214.   Defendants are liable to Planet Aid and Thomsen for defamation, including libel and slander, in an amount to be determined by the trier of fact.

**SECOND CAUSE OF ACTION**

**NEGLIGENCE**

**(Against all Defendants)**

215.   Planet Aid and Thomsen restate and adopt paragraphs 1 through 214 above.

216.   If it is ultimately determined that Defendants did not act with knowledge that what they were reporting was false, or alternatively did not do so with reckless disregard for the truth of the matters they were reporting, then all three Defendants were at least negligent in their researching and investigating, reporting and publishing their stories, and more specifically, the statements appearing in the First Cause of Action.  This negligence included making allegations without an adequate investigation; without proof or reliable source material; fabricating sources or the qualifications of sources to make statements reported by Defendants; utilizing an unfair tone that was accusatory in nature notwithstanding the lack of proof of allegations; making factual errors and taking events or anecdotes out of context; switching between topics and events so as to unfairly blend together facts and events; providing a lack of critical context for their stories and claims; and failing to conform their Articles, Broadcasts and social media to minimum

Nelson Mullins Riley & Scarborough llp
Attorneys at Law
Los Angeles

55

1    journalistic standards, including CIR's own code of ethics.

2         217.    With respect to their investigation, unless Defendants were actually aware of such

3    facts and chose to intentionally disregard them, Defendants failed to conduct even the most

4    cursory review of the bias, prejudice or ulterior motives of those who were named in the Articles,

5    Broadcasts and social media.   As a result of this failure, Defendants reported information

6    obtained from one source who had been arrested for fraud and was being pursued for restitution

7    by his former employer, DAPP Malawi, as to whom he had made disparaging statements.  And if

8    they had not acted willfully, Defendants at least acted negligently in misrepresenting the

9    experience of Harrison Longwe in using him as a source for allegations about Plaintiff Planet

10   Aid; in relying on another source who had been terminated as a result of his handling expenses

11   under the Food for Progress Program; and in reporting statements from two other individuals who

12   had made compensation demands from their former employer and had a motive for claiming that

13   DAPP Malawi had cheated former employees.

14        218.    Another failure by Defendants was that they were negligent in failing to adhere to

15   any standard of journalism by, among other things, offering bribes or other financial inducements,

16   either directly or through their employee and agent (himself a convicted felon), to those who

17   would provide information that could be used in their stories.  If not acting willfully in an effort to

18   obtain false and misleading information based on financial inducements, Defendants were at least

19   negligent in not realizing that such financial inducements would influence sources' willingness to

20   offer false or misleading statements.   Defendants were negligent also in failing to disclose such

21   bribes and inducements in their articles so that readers could assess for themselves the credibility

22   of Defendants' sources.

23        219.    Defendants were also negligent in their reporting in that they failed to report facts

24   in anything approaching a fair manner, instead omitting, hiding or burying, if not intentionally

25   then at least negligently, those facts that would undercut or diminish the impact of their stories.

26   More particularly, Defendants intentionally failed to disclose important and material facts in their

27   stories, sometimes leaving them out completely while at other times burying them in documents

28   that were merely hyperlinked to their stories, and which Defendants knew, or should have known,

56

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

1    that the average reader would not find for themselves.

2       220.    Defendants also failed to provide an opportunity for those they knew would be
3    adversely impacted to respond to serious allegations of wrongdoing and used "ambush"
4    interviewing techniques.   By way of example, instead of providing accurate information to
5    Plaintiff Thomsen as to what they intended to report, Defendants knowingly approached Plaintiff
6    Thomsen in the middle of a conference where they knew she would be unable to respond, and
7    then accosted her with allegations that "your own people say you are stealing," knowing that such
8    allegations would encourage any reasonable person to refuse to cooperate with a reporter.

9       221.    Defendants were also negligent in reporting what their investigation had allegedly
10   uncovered.   If not intentionally trying to mislead readers, Defendants were at least negligent in
11   their use of language, notwithstanding that the basic skill of a journalist is in the use of language
12   and the required skill of a journalist is in communicating facts and concepts.   By way of example,
13   by changing the verbiage from the past tense to the present tense, and  misreporting what had
14   occurred, the Defendants gave the false impression that stale or outdated facts were occurring at
15   or about the time the story was written and were indicative of current activities.   In this way,
16   Defendants reported that "Planet Aid and DAPP Malawi have been identified by the FBI . . . as
17   fronts for the Teachers Group, a Danish cult whose leaders . . . are on the run . . . from fraud and
18   tax evasion charges."  Ex. L.  Defendants also reported that Planet Aid was included in a network
19   that "was part of what prosecutors call a global charities fraud scheme."  Ex. O.  Defendants
20   should have known that it was negligent to have reported these allegations as "fact."

21       222.    Another failing was that Defendants reporting was heavily dependent on
22   anonymous or unnamed sources, in violation of journalistic standards, including CIR's own code
23   of ethics.   While Defendants were obviously aware that no reader could assess the reliability or
24   veracity of anonymous or unnamed sources, Defendants also knew that they had failed to conduct
25   even a cursory check of the background of those sources, and therefore had no basis for
26   determining whether they were reliable.   Defendants also failed to report that sources had some
27   bias, prejudice or ulterior motive for advancing false or defamatory statements.

28       223.    Defendants were negligent also in failing to provide context for their statements, if

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

57

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

not intentionally then negligently, skipping from one topic to another in an effort to blur facts and events, and claim "links" that existed only through their failure to accurately differentiate facts, events or circumstances from each other. This occurred, for instance, when they wrote in their article dated May 11, 2017 that Petersen, the "reputed leader of the Teachers Group," "set up a global network of fake charities and offshore shell firms as part of a fraud conspiracy," and then immediately followed that statement with one directed at Planet Aid's international partnership director, and how she was "persistent in befriending foreign aid officials, according to former USDA officials . . . " Ex. L.

224.     Defendants also were negligent, if not acting intentionally or recklessly, in reporting claimed "facts" that were contradicted by documents, sources or information already in their possession or which they had been shown. As a result of such actions, Defendants reported facts that they could have known with minimal effort were contrary to documents in their possession, contrary to statements made by them elsewhere in their stories, or even contrary to common sense.

225.     Further, if not done intentionally or recklessly, Defendants specifically directed tweets or other social media to individuals while knowing that these posts included inflammatory headlines or statements likely to adversely impact the recipients relationship with Plaintiffs, and knowing that the tweets or other social media would likely be misleading as to the true facts.

226.     Defendants were placed on notice that their publications contained false and defamatory statement when they were sued in this action in August, 2016.  Notwithstanding notice in that complaint that specific allegations in their publications were false and defamatory, Defendants failed to issue a retraction or take any action to ensure that Plaintiffs were not damaged as a result of their actions. Defendants were repeatedly requested also to issue a retraction and/or correction.  Notwithstanding a demand for either a retraction or correction, Defendants failed to issue any such retraction or correction, or take any other corrective action, and instead, continued to publish false and defamatory materials.  If Defendants did not act maliciously in failing to issue a retraction and/or correction, or failing to take any further curative action, then they were at least negligent in failing to take such action.

227.    The foregoing failures on the part of Defendants resulted in their publishing a series of false and defamatory statements set forth above in the First Cause of Action, which Plaintiffs incorporate as if set forth in full herein.

228.    Plaintiffs have suffered damages as a result of the foregoing negligence.

### THIRD CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against All Defendants)

229.    Planet Aid and Thomsen restate and adopt paragraphs 1 through 228 above.

230.    The false and defamatory statements made by Defendants, detailed above, were made for the express purpose, among other things, of inciting "action" on the part of donors, partners or businesses with whom Planet Aid and/or Thomsen were doing or were prospectively doing business, and government agencies who had previously dealt with Planet Aid and/or Thomsen, and who were considering, or might consider, doing business with Planet Aid and/or Thomsen in the future.

231.    In order to ensure that such false and defamatory action would spark adverse consequences for Planet Aid and Thomsen, Defendants sent various false and defamatory statements contained in the Articles and Broadcasts, as well as in social media, to business partners, donors, competitors and government agencies.

232.    Defendants took such actions for the express purpose of causing program partners and government or other donors to cease dealing with Planet Aid and Thomsen, and in doing so, Defendants intended to, and actually did, interfere with the prospective economic advantage of Planet Aid and Thomsen.

233.    As a direct and proximate result of Defendants' actions, property owners at the following properties have demanded that Planet Aid remove its bins:

| | | |
|---|---|---|
| 600 Main St. | Baltimore | MD |
| 10500 Rockville Pike | Rockville | MD |
| 6545 Little River Turnpike | Alexandria | VA |
| 4600 Waverly Ave. | Garrett Park | MD |
| 7251 Bell Creek Rd. | Mechanicsville | VA |

59

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

| | | |
|---|---|---|
| 13890 Nobelwood Plaza (Minnieville Plaza) | Dale City | VA |
| 2495 Prince William Parkway | Woodbridge | VA |
| 13313 Occoquan Rd. | Woodbridge | VA |
| 2919 Gallows Rd. | Falls Church | VA |
| 3216 Jefferson Davis Hwy. | Alexandria | VA |
| 6451 Edsall Rd. | Alexandria | VA |
| 10800 Fairfax Blvd. | Fairfax | VA |
| 6546 Edsall Rd. | Alexandria | VA |
| 7206 Little River Turnpike | Annandale | VA |
| 630 W Race St. | Martinsburg | WV |
| 4109 Duke St. | Alexandria | VA |
| 4154 S. Four Mile Run Dr. | Arlington | VA |
| 13990 Georgia Ave. | Aspen Hill | MD |
| 43675 Greenway Corporate Dr | Ashburn | VA |
| 1001 G St., SE | Washington | DC |
| 5580 Backlick Rd. | Springfield | VA |
| 5671 Western Avenue., NW | Washington | DC |
| 3293 Solomans Island Rd. | Edgewater | MD |
| 3401 Idaho Ave. NW | Washington | DC |
| 8124 Old Dominion Dr. | McLean | VA |
| 6411 Riggs Rd. | Hyattsville | MD |
| 3426 Georgia Ave NW | Washington | DC |
| 6255 Little River Turn Pike | Alexandria | VA |
| 9300 Lottsford Rd. | Upper Marlboro | MD |
| 4411 Connecticut Ave. NW | Washington | DC |
| 5815 Lakeside Ave. | Richmond | VA |
| 800 Florida Ave, NE | Wash, DC | DC |
| 401 Holland Lane | Alexandria | VA |
| 1701 16th Street, NW | Wash, DC | DC |
| 9430 Annapolis Rd. | Lanham | MD |
| 6210 Coventry Way | Clinton | MD |
| 9101 Rockville Pike | Bethesda | MD |
| 6101 Uitland Rd. | Morningside | MD |
| 811 Bestgate Rd. | Annapolis | MD |

234.    Additionally, Plaintiffs have suffered the loss of prospective economic advantages relating to contracts, agreements or relationships with the DofD, Unicef, Clinton Global Foundation and/or other groups or organizations.

235.    Planet Aid intended to use those relationships and dealings and advantages with, inter alia, business partners, donors and/or government agencies for work associated with its not-

60

for profit activities.   As a result of Defendants' actions, Planet Aid and Thomsen have been deprived of the opportunity to engage in such activities, and have been damaged by Defendants' conduct.

## FOURTH CAUSE OF ACTION

## PLACING PLAINTIFFS IN A FALSE LIGHT

### (Against all Defendants)

236.   Planet Aid and Thomsen restate and adopt paragraphs 1 through 235 above.

237.   Defendants gave publicity to matters concerning Planet Aid and Thomsen that placed them in a false light.

238.   The false light in which Planet Aid and Thomsen was placed would be highly offensive to a reasonable person.

239.   Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which they placed Plaintiffs through the Articles and Publications, as well as in social media.   Defendants also declined and refused to issue a retraction notwithstanding multiple requests for them to do so, thereby ensuring that the defamatory publications would continue to cast Plaintiffs in a false light.

240.   As a result of the foregoing actions by Defendants placing Plaintiffs in a false light, Planet Aid and Thomsen have both been damaged.

## FIFTH CAUSE OF ACTION

## UNJUST ENRICHMENT

### (Against All Defendants)

241.   Planet Aid and Thomsen restate and adopt herein paragraphs 1 through 240, above.

242.   As a direct result of the above detailed tortious, inequitable and unlawful conduct, Defendants have been unjustly enriched at Planet Aid and Thomsen's expense.

243.   Equity requires that Defendants make restitution to Planet Aid and Thomsen for all property and benefits unjustly received, including but not limited to all donations received as a result of the Articles and Broadcasts, or income derived from the Articles and Broadcasts, and

61

any additional articles, broadcasts or social media published containing the false and defamatory statements detailed herein, and/or any subsidiary or ancillary rights to sales.

244.    Equity requires also that any donations received by Defendants in response to, stemming from, or generated as a result of the Articles and Broadcasts be paid to Plaintiffs as restitution.

**WHEREFORE,** the Planet Aid and Thomsen pray that the Court:

(a)    Enter judgment in Plaintiffs' favor and against Defendants CIR, Smith and Walters in an amount in excess of $75,000, representing compensatory damages; and

(b)    Enter judgment for punitive damages in Plaintiffs' favor in an amount in excess of $25 million;

(c)    Enter judgment in Plaintiffs' favor and against Defendants CIR, Smith and Walters on Count V of the FAC for Unjust Enrichment and order restitution for all property and benefits unjustly received by each of them;

(d)    Award their costs and disbursements and attorney's fees incurred herein; and

(e)    Award all other relief which the Court deems to be just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all issues triable to a jury.

Dated: March 16, 2018             Respectfully submitted,

NELSON MULLINS RILEY &
SCARBOROUGH LLP


*/s/ Cory E. Manning*
CORY E. MANNING

Attorneys for Plaintiffs
Planet Aid Inc. and Lisbeth Thomsen

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

1

## CERTIFICATE OF SERVICE

2    This is to certify that I have this day electronically filed the foregoing **FIRST**

3    **AMENDED COMPLAINT** using the CM/ECF system and served upon counsel of record by

4    electronic filing.

5

6    Dated:  March 16, 2018                                   Respectfully submitted,

7                                                             NELSON MULLINS RILEY &
                                                              SCARBOROUGH LLP

8

9                                                             */s/ Crispin L. Collins*

10                                                            Crispin L. Collins

11                                                            Attorneys for Plaintiffs
                                                              Planet Aid Inc. and Lisbeth Thomsen

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AT LAW
LOS ANGELES

FIRST AMENDED COMPLAINT
17-cv-03695-MMC

# EXHIBIT H

## Sam Rosenthal

| | |
|---|---|
| **From:** | Forrest, Ethan C <EForrest@Cov.com> |
| **Sent:** | Monday, December 31, 2018 3:21 PM |
| **To:** | Sam Rosenthal; AmbikaDoran@dwt.com; THOMASBURKE@dwt.com |
| **Cc:** | Hansen, Alexa; Frankel, Simon |
| **Subject:** | RE: pursuant to privileged settlement discussion |
| **Attachments:** | Planet Aid v. CIR - Stipulation re Second Amended Complaint.DOCX; 2018.3.16 [ECF 78] FAC with redactions + Defs Responses.pdf |

Sam,

Thank you for sharing your proposal to narrow the claims at issue in Planet Aid's case.  It has taken us a while to get back to you due to the intervening holidays.

As we previewed on our last call with the Court, we do not think Plaintiffs' proposal materially or appropriately narrows the issues in dispute.  Specifically, Plaintiffs' redactions seem to remove examples of allegedly defamatory statements while leaving intact allegations about broader subject matter areas.  For instance, see Paragraph 200 of the redactions Plaintiffs proposed, which takes out examples of statements about a narrative Plaintiffs contend is defamatory, but do not take that narrative out of the case altogether.  Our concern here is that although some specific statements might no longer be at issue, the broader subject matter—and any relevant statements under that umbrella—would still be in the case.  So in our view, these redactions arguably would not narrow Defendants' discovery obligations or the scope of Plaintiff's claims.

As an alternative, we propose more substantial redactions, aimed at removing any allegations that go to only (a) any statements in any publications by defendants that are not about USDA, and (b) any publications by defendants other than "the first two articles," as you stated at the November 9 hearing. *See* Nov. 9, 2018 Hr'g Tr. 78:6–79:19 ("I'm happy to, as I said, limit it to the USDA and, two, limit it to the first two articles"), as well as the tweets specified during the hearing.  Please see attached, and note that there are a few comments in the doc, so please review those as well.  We also propose filing a stipulation—draft attached—that specifies the amended complaint's scope, includes our agreement to limit any fees or costs we might seek, and addresses some logistics.

Please let us know if you are amenable to this proposal.  If not, we would like to seek assistance from the Court in narrowing the case, as Judge Corley suggested at the November 9 hearing.

Happy New Year,
Ethan


## Ethan Forrest

Covington & Burling LLP
One Front Street, San Francisco, CA 94111-5356
T +1 415 591 7008 | eforrest@cov.com
www.cov.com

# COVINGTON

---

**From:** Sam Rosenthal <sam.rosenthal@nelsonmullins.com>
**Sent:** Monday, November 26, 2018 8:58 AM

**To:** AmbikaDoran@dwt.com; THOMASBURKE@dwt.com; Forrest, Ethan C <EForrest@Cov.com>
**Subject:** pursuant to privileged settlement discussion

All,

At the conference we discussed limiting the FAC.   I am attaching a proposed revised FAC pursuant to your agreement that it be considered privileged settlement discussions.  Please let me know whether you are agreeable.

Best

Sam

Confidentiality Notice

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

# EXHIBIT I

## Sam Rosenthal

| | |
|---|---|
| **From:** | Sam Rosenthal |
| **Sent:** | Tuesday, November 5, 2019 3:59 PM |
| **To:** | Forrest, Ethan C; Burke, Thomas (THOMASBURKE@dwt.com); Doran, Ambika (AmbikaDoran@dwt.com) |
| **Subject:** | Change-Pro Redline - FAC Final filed 4839-2504-6444 v.1 and Draft Second Amended Complaint (11.5.19) 4835-8832-2476 v.1 4838-0367-3772 v.1.docx |
| **Attachments:** | Change-Pro Redline - FAC Final filed 4839-2504-6444 v.1 and Draft Second Amended Complaint (11.5.19) 4835-8832-2476 v.1 4838-0367-3772 v.1.docx; Draft Second Amended Complaint (11.5.19) 4835-8832-2476 v.1.docx |

Ethan,

In order to move this issue forward of trying to narrow the FAC to the USDA program, we are attaching a clean and redlined version of the proposed SAC.  We will send you a proposed stipulation shortly which similarly makes clear that we are limiting the case to the USDA.  As you can see, we have shortened the SAC quite considerably.

Best

Sam

**EXHIBIT J**

## Sam Rosenthal

| | |
|---|---|
| **From:** | Forrest, Ethan C <EForrest@Cov.com> |
| **Sent:** | Tuesday, November 12, 2019 7:51 PM |
| **To:** | Sam Rosenthal; Burke, Thomas (THOMASBURKE@dwt.com); Doran, Ambika (AmbikaDoran@dwt.com); Phil Busman |
| **Cc:** | CIR-PlanetAID |
| **Subject:** | RE: Planet Aid - discuss discovery |
| **Attachments:** | Planet Aid - Stipulation re Facts.DOCX; 2019.11.12 - E. Forrest Letter to S. Rosenthal.pdf |

Sam,

Thanks for these.  Please consider this an omnibus message, which includes (a) our response on the stip, (b) our letter regarding Plaintiffs' additional discovery, and (c) additional clarification for our own requests.  We agree a pre-November 19 discussion would be helpful after we each have had the opportunity to review these various documents.  Wednesday and Thursday afternoons PT are currently open for me, as is Friday between 10–12:30 PT and after 2 PT.

**Stipulation**
Per the Court's discovery order, we've amended Plaintiffs' draft stipulation.  We appreciate the additional proposals and do not mind lack of redline, but we still maintain that Plaintiffs' draft overreaches beyond what the Court directed Plaintiffs to do.  Specifically, the Court ordered Plaintiffs to provide a stipulation reflecting Plaintiffs' representations as to (a) the case being limited to statements concerning the USDA, and (b) Plaintiffs not seeking damages on DAPP Malawi's behalf.  Plaintiffs' draft exceeds these points in ways that we believe would prejudice Defendants, particularly in its confusing language on discovery and the anti-SLAPP motion itself.

Further, we will not agree to waive fees and costs related to claims that Plaintiffs now say are no longer at issue.  As mentioned yesterday, we offered such an arrangement a year ago, before discovery had proceeded at length, as a way to expedite the case.  But as described in our letter (Dkt. 237) and as you know, Plaintiffs declined to amend their complaint early in the discovery process and instead advanced through many thousands of pages of discovery and hours of audio-visual material.  The parties have also undertaken extensive settlement talks regarding fees, costs, and the case's scope.  These talks all failed, too.  At this point, our prior offer to limit fees and costs is no longer on the table.  What matters now is Plaintiffs conforming their pleadings to what they say this case is about, so that the parties can finish discovery and litigate the dispute to resolution.  To that end, we reserve all rights, and we intend to seek all fees and costs to which we are entitled by law.

**Plaintiffs' Requests**
A letter regarding Plaintiffs' requests is attached.  As one point of clarification, regarding our requests for depositions of Plaintiffs' witnesses—we stated that we aren't setting dates until we have obtained more meaningful discovery from Plaintiffs.  I think we all understand that, but wanted to be sure.

**Defendants' Requests**
We are considering Plaintiffs' responses to our own Requests and reserve all rights.  Per our conversation yesterday, we agreed to take a shot at narrowing/clarifying certain requests.  To that end, we would agree that the following requests—copied from our November 5, 2019 letter, which was in turn adapted from pending RFPs—are limited at this posture to documents referring to or relating to all USDA programs or projects that Plaintiffs contend were the subjects of any statements by Defendants that Plaintiffs' operative complaint (or stipulation, depending on how Plaintiffs narrow their claims) asserts are actionable.

- All documents, things, and communications sent to or from, or referring to, the USDA, to whom Planet Aid or DAPP Malawi has applied for funding.
- All documents, things, and communications evidencing, reflecting, or referring to Planet Aid or DAPP Malawi's (a) delivery or planned delivery of livestock, agricultural inputs (such as seeds and fertilizer), or rope-operated water pumps, or (b) provision or planned provision of veterinary care to animals, so far as any such delivery, planned delivery, provision, or planned provision was in any way connected to the USDA.
- All documents, things, and communications evidencing, reflecting, or referring to audits of Planet Aid or DAPP Malawi that were requested or undertaken by the USDA, the Foreign Agricultural Service, or any other government agency, department, body, or representative, including but not limited to all documents shown to, made available to, viewed by, or requested by auditors.
- All documents, things, and communications evidencing, reflecting, or referring to salaries or other compensation paid to any person or entity by Planet Aid or DAPP Malawi, including but not limited to paystubs, copies of paychecks, tax returns, or budgeted salaries or other budgeted compensation, using funds associated with any project budgets submitted to or received from the USDA.  Such documents, things, and communications may include but are not limited to:
  - Salary records for staff and workers whose services were charged to the USDA as "Salaries - Project Leaders," "Salaries & Core Expenses," "Extension Workers," "Project Leaders," "Experienced Staff," or any similar description.
- All documents, things, and communications constituting, evidencing, reflecting, or referring to agreements with subcontractors or firms that otherwise provided services on behalf of Planet Aid or DAPP Malawi, including but not limited to the International Humana People to People Movement, FAIHPP, Humana People to People Federation, The Federation, Humana, Zimbabwe Humana Federation, and Development Aid People to People ("DAPP") Mozambique.  Without in any way limiting the definition of "services" as used in this request, the word "services" includes financial services, such as making or receiving loans, accepting deposits, creating or offering credit, or issuing securities.  Such documents, things, and communications may include but are not limited to:
  - Agreements, contracts, or other documents with subcontractors or firms related to any USDA project.
  - Requests for proposals, proposals, change orders, check records, bank deposit records, bank statements, bills, receipts, and invoices sent to or from subcontractors or firms, as well as journals and accounts containing this information, related to the USDA project.
  - Compliance records relating to such agreements with subcontractors or firms.
  - USDA project records pertaining to "Services by DAPP Director."
  - Records pertaining to payments made to Millennium Educational Research Enterprise (MERE), Honest Ocean, Sterling, Den Selvejende Institution Fælleseje, Jacaranda Ltd., and other Teachers Group-affiliated entities.
  - Records pertaining to consulting fees for any USDA project (e.g., "consultant Per Jensen," "Technical Assistance HHP HQ," "HPP SMS Farmers Club Receivables," "Frontline Institute," "Technical Assistance from HQ," etc.).
  - Membership fees or dues incurred in relation to any USDA project, as well as agreements, contracts, or other documents containing this information.
  - All materials documenting, during the duration of USDA agreements, Planet Aid or DAPP's payments of a "membership fee" to the Federation.
  - All documentation of Federation's services to USDA funded projects.
- All communications and records of communications, not limited by time period, between, on the one hand, (1) Mogens Amdi Petersen, Kristen Larsen, Christie Pipps (a.k.a. Kristen Fuglsbjerg), Sten Byrner, Malene Gunst, Poul Jørgensen (a.k.a. Poul Joergensen), Maria Susanne Thorlund, Lars Pendrup, Trond Narvestad, Themba Duze, Chimwemwe Jere, Anne Marie Hansen, Yeshey Wangmo, Lone Bjerre, Lackshard Shangwa, Dorthe Pia Jensen, Ulrike Stosch, or Rikke Viholm, the employees, agents, or representatives of any of the foregoing, and any other persons acting under the control or on the behalf of any of the foregoing; and, on the other hand, (2) Planet Aid or Planet Aid / DAPP Malawi Representatives, including but not limited to

Marie Lichtenberg, Mikael Norling, and Maria Darsbo (a.k.a. Maria Gunvo Darsbo), referring to or relating to the USDA.

**Ethan Forrest**

Covington & Burling LLP
Salesforce Tower, 415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T +1 415 591 7008 | eforrest@cov.com
www.cov.com

# COVINGTON

**From:** Sam Rosenthal <sam.rosenthal@nelsonmullins.com>
**Sent:** Tuesday, November 12, 2019 3:59 PM
**To:** Forrest, Ethan C <EForrest@Cov.com>; Burke, Thomas (THOMASBURKE@dwt.com) <THOMASBURKE@dwt.com>; Doran, Ambika (AmbikaDoran@dwt.com) <AmbikaDoran@dwt.com>; Phil Busman <phil.busman@nelsonmullins.com>
**Subject:** RE: Planet Aid - discuss discovery

[EXTERNAL]
Ethan,

Please find our letter responding to your discovery requests, as well as a revised stipulation.   As indicated in our letter we hope that our revised stipulation takes care of two objections you had to the proposed stipulation. We also tried to narrow the language referencing Plaintiffs' allegations.  I apologize for not sending you a redline, but I don't think it will be difficult to determine what has been changed in the stipulation. Let me know if you want to discuss it further.   As far as Plaintiffs own requests, based on our meet and confer we have tried to narrow the requests.  Because you indicated that you were going to get back to us on a number of our requests, to see what documents may exist, I think it may be worth having another meet and confer prior to our Nov. 19th submission to the Court.

One last point.   As far as our own document requests, we have tried to clarify our position articulated on the record previously, that the case relates to statements by defendants relating to the USDA programs.   If Defendants take the position that the case should not be narrowed, and extends beyond those areas, then we reserve the right to ask for documents that bear on those areas.   Obviously, the whole spirit of the SAC is to avoid such arguments.

Best

Sam

-----Original Appointment-----
**From:** Sam Rosenthal
**Sent:** Monday, November 11, 2019 12:12 PM
**To:** Forrest, Ethan C
**Subject:** Meeting Forward Notification: Planet Aid - discuss discovery
**When:** Monday, November 11, 2019 12:30 PM-1:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:**

## Your meeting was forwarded

Sam Rosenthal  has forwarded your meeting request to additional people.

   Meeting

Planet Aid - discuss discovery

**Meeting Time**

Monday, November 11, 2019 2:00 PM - Monday, November 11, 2019 2:30 PM

**Recipients**

Phil Busman

All times listed are in the following time zone:  (UTC-05:00) Eastern Time (US & Canada)

Confidentiality Notice

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

**EXHIBIT K**

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3  Before The Honorable Jacqueline S. Corley, Magistrate Judge

4

5  PLANET AID, INC., et al.,    )
                             )

6        Plaintiffs,    )
                             )

7  vs.                   )  No. C 17-03695-SVK
                             )

8  REVEAL, CENTER FOR      )
  INVESTIGATIVE REPORTING,   )

9  et al.,             )
                             )

10       Defendants    )
  _____)

11

12                    San Francisco, California
                    Thursday, November 21, 2019

13

14   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
     RECORDING 9:01 - 9:05 and 1:39 - 2:22 = 47 MINUTES

15

16  APPEARANCES:

17  For Plaintiffs:
                         Nelson, Mullins, Riley &
18                          Scarborough, LLP
                        101 Constitution Avenue NW
19                        Suite900
                        Washington, D.C. 20001
20                BY:  SAMUEL ROSENTHAL, ESQ.

21  For Defendants:
                         Covington & Burling, LLP
22                        415 Mission Street, Suite 5400
                        San Francisco, California
23                        94105
                BY:  ALEXA R. HANSEN, ESQ.
                        ETHAN C. FORREST, ESQ.
24

25        (APPEARANCES CONTINUED ON NEXT PAGE)

2

```
1  APPEARANCES:  (Cont'd.)

2  For Defendants:
                              Davis, Wright, Tremaine, LLP
3                             505 Montgomery Street
                              Suite 800
4                             San Francisco, California
                                94111
5                       BY:   THOMAS R. BURKE, ESQ.

6  Transcribed by:            Echo Reporting, Inc.
                              Contracted Court Reporter/
7                             Transcriber
                              echoreporting@yahoo.com
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1   Thursday, November 21, 2019                    9:01 a.m.

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4          THE CLERK:  Calling Civil Action C 17-3695, Planet

5   Aid, Inc. versus Reveal.

6          THE COURT:  Okay.  Let's make appearances.

7          MR. ROSENTHAL:  Good morning.  Sam Rosenthal from

8   Nelson Mullins representing the Plaintiffs.

9          THE COURT:  Good morning.

10         MR. FORREST:  Ethan Forrest, Covington and

11  Burling, for the Defendants.

12         THE COURT:  With some colleagues?

13         MR. FORREST:  Yes, your Honor.  Tom Burke from

14  Davis Wright Tremaine.

15         MR. BURKE:  Good morning, your Honor.

16         THE COURT:  Good morning, Mr. Burke.  Nice to see

17  you again.

18         MR. FORREST:  And Alexa Hansen also from Covington

19  and Burling.

20         THE COURT:  Good morning.

21         MS. HANSEN:  Good morning, your Honor.

22         THE COURT:  All right.  So my first question,

23  because it wasn't clear to me, so the parties have dates for

24  Mr. Smith and Ms. Walters?

25         MR. ROSENTHAL:  We do, your Honor.

4

1   THE COURT:  Okay.  Great.

2   MR. ROSENTHAL:  I might as well put them on the

3   record.  December 11th and 12th in San Francisco for Mr.

4   Smith and December 30th in D.C. for Ms. Walters.

5   THE COURT:  Somebody wants to spend New Year's Eve

6   in D.C.  Okay.

7   All right.  And the stipulation is worked out?

8   MR. ROSENTHAL:  It is not, your Honor.  We had --

9   initially we had done what I thought your Honor had

10  suggested.  We sent in a -- a proposed second amended

11  complaint that had about 20 pages taken out.  I think Mr.

12  Forrest said that's pretty much what we thought, but we

13  would now ask for costs.  So we scrapped that stipulation.

14  We then sent another stipulation and had a series of

15  conversations.

16  Finally, we sent him a proposed stipulation.  He sent

17  me a note that said he didn't -- he never received it, but I

18  do have emails transmitting it and him thanking me for

19  transmitting it.  I think he objects to it, and I'll leave

20  it to him to say why it's inadequate.

21  THE COURT:  Well, what was submitted and actually

22  was filed on the docket is missing the second page that has

23  all the substance.  In any event -- and I didn't get

24  anything from you.

25  MR. FORREST:  That's right, your Honor.  We had

5

1 worked to negotiate what would be a stipulation. Our
2 position was that it didn't make very much sense for it to
3 be a joint stipulation because we can't really stipulate to
4 what the Plaintiffs mean in their own complaint.
5          THE COURT:  Okay.  Whatever.  This will be number
6 one on your agenda upstairs.  All right.
7          MR. FORREST:  Okay.  Yes, your Honor.
8          THE COURT:  That's not the way it was supposed to
9 be today, but that will be number one on your agenda
10 upstairs.  All right.
11          MR. ROSENTHAL:  Your Honor, may I hand up a full
12 copy of --
13          THE COURT:  No.  You can do that when we come
14 back.
15          MR. ROSENTHAL:  Okay.
16          THE COURT:  Okay.  Because I'm not -- I'm not
17 going to deal with it, because you guys are going to go meet
18 in person for a while.
19     All right.  And then you have your discovery request
20 back and forth.
21          MR. ROSENTHAL:  Yes.
22          THE COURT:  So what you need to do is you'll go to
23 the 18th floor to the attorney lounge.  You're now all in
24 one room in one place.  Start with the stipulation or in
25 whatever form it -- it's your issue.  The only reason I did

6

1  it is because you were claiming that you weren't comfortable
2  that what was being represented on the record was the case.
3  So just figure it out.  Just figure it out, all right.  And
4  then you're going to meet and confer in person on these
5  discovery requests very precisely, right.  Don't talk about
6  this is what the document request says.  This is what I
7  want, how I think you can get it, and why it's not so
8  burdensome, and none of it should be all, right?  All
9  documents, that's not -- we're like very specific.

10       When you are done and you have something to put on the
11  record or you've reached impasse on everything else -- so I
12  expect it will be a few hours -- you can contact Ms. Means,
13  and then I'll see you again.  I'm essentially on the bench
14  all day today until 2:30.  There will be a break for lunch,
15  but -- so I'm here, but I'm not available after 3:00.  So,
16  in any event, no later than 2:30.

17       MR. FORREST:  Sounds good, your Honor.  We'll take
18  any remaining disputes upstairs, and anything we can't
19  resolve, we'll bring back down for your --

20       THE COURT:  Okay.  And then if you want to then --
21  what you can resolve, we can put it on the record at that
22  time as well.

23       MR. FORREST:  Perfect.  Thank you.

24       MR. ROSENTHAL:  Thank you, your Honor.

25       THE COURT:  All right.  Thank you.

7

1      (Portion recessed while the Court heard other matters.)

2           THE CLERK:  Recalling Civil Action C 17-3695,

3  Planet Aid versus Reveal.

4           THE COURT:  What's the good word?

5           MR. ROSENTHAL:  The good word is, your Honor, the

6  exercise upstairs did produce some agreement.  I'll wait

7  until Mr. Forrest is at the table.  Unfortunately, there are

8  some issues left to resolve.  I think what we agreed to

9  start with was the good news, and that is on the

10 stipulation, the changes that we would make to the one

11 -- and I apologize.  Page two evidently was left off the one

12 that was filed.  On page two, the first paragraph would

13 remain as is, the first whereas clause.

14      The second whereas clause, we would simply insert one

15 word on line 11, and that is "allegedly" in front of "false

16 and defamatory."

17      The next whereas clause, number three, the third one,

18 we would change to read "The parties dispute the scope of

19 the FAC as pled, and offer this stipulation in order to

20 resolve that issue."

21      The next whereas clause would stay the same.  The first

22 stipulated and agree clause would -- the first two lines

23 would read, "Stipulated and agreed that Plaintiffs take the

24 position that the allegations in the FAC relating to false

25 and defamatory" -- oh, I'm sorry -- "take the position that

8

1  the focus of the FAC is on the involvement of Planet Aid

2  and/or Lisbeth Thomsen and the USDA programs," and then

3  continue on with what we have.

4      The next and the last paragraph on that page, we would

5  change the last two lines to read "Donors or organizations,

6  who withdrew support or declined additional programs or

7  opportunities, or impacted their dealings with either

8  Plaintiff, as alleged in the FAC."

9          THE COURT:  Okay.  You --

10         MR. ROSENTHAL:  And then --

11         THE COURT:  Oh.

12         MR. ROSENTHAL:  Oh, and then the last change would

13  be to the last paragraph of the stipulation on page three,

14  line four.  We would specify the phrase in parentheses "as

15  specified in the FAC" after the first two words "Dat

16  Malawi," and we would strike "and Defendant's statements in

17  the publications referring to Ms. Thompson."

18      Otherwise, it would be a joint stipulation.

19         THE COURT:  All right.  In agreement?

20         MR. ROSENTHAL:  Yes, your Honor.

21         THE COURT:  All right.  And when will the parties

22  filed that by?  Monday?

23         MR. ROSENTHAL:  Oh, sure.

24         THE COURT:  Yeah.

25         MR. ROSENTHAL:  Monday at the latest I think, your

9

1  Honor.

2          THE COURT:  By Monday at the latest, but we have

3  it now on the record because we are recording.

4          MR. ROSENTHAL:  Yes.

5          THE COURT:  Okay.

6          MR. ROSENTHAL:  So then we have the bad news, and

7  that is we do have some agreements, but what I think might

8  make sense would be to go through the paragraphs in the

9  order in our letter rather than the ones as to which there

10  is agreement, because I think it might just be easier for

11  your Honor to follow if we're looking at the letter, and we

12  did start with Plaintiffs' requests.  We can start with

13  either Plaintiffs' or Defendants' as your Honor --

14          THE COURT:  Let's start with Plaintiffs'.

15          MR. ROSENTHAL:  Okay.  So as to the first one --

16  Mr. Forrest will correct me if I'm wrong, but what we had

17  agreed -- and it's rather long.  So I'll -- I'll read it --

18  as to the first request (a):

19                  "No interview memos, notes, or

20          other documents exist relating to Mary

21          Bacosi (phonetic) that they are

22          withholding or redacting."

23      And this will be statements by the Defendants.

24      Next:

25                  "As to villagers in Malawi visited

10

1          by Defendants and/or Kandani Nawira

2          (phonetic), Defendants have no documents

3          that have been withheld.  To the extent

4          that other documents exist or Defendants

5          learn about additional documents

6          relating to such villages or visits,

7          Defendants will produce such materials

8          subject to any privilege."

9     The next paragraph would be:

10          "To the extent that anything was

11          gathered, generated, or relied upon

12          relating to communications with the

13          USDA, Defendants will produce it.

14          Defendants have no information that

15          there was any such communications which

16          has not been produced."

17     And the final paragraph as to (a) would be:

18          "To the extent that there might

19          exist any statements that contradict or

20          undermine Defendants' statements alleged

21          to be false or defamatory in the FAC,

22          Defendants have produced all such

23          material."

24     And I think that is an agreement that would resolve our

25 first category.

1  -- there's a -- you know, a question about what time period
2  we're talking about.  It's got to be a preexisting public
3  controversy, and the point that we made in our letter brief
4  is it's very unclear what the public controversy is.  They
5  defined it only as a controversy over the -- over the use of
6  public funds for charitable purposes, and Planet Aid and
7  Lisbeth Thomsen in her individual and professional capacity
8  has been involved in charitable programs for a long long
9  time.  It would be incredibly burdensome.

10      I would suggest that, first of all, as to Lisbeth
11  Thomsen, if it was a reasonable period of time, for example,
12  if they talked about, you know, give us, you know,
13  everything she'd done in the four-year period prior to the
14  article's publication, it's got to be a preexisting public
15  controversy.  We would agree to that.  That would
16  be --

17          THE COURT:  All right.  They would agree to that
18  one.

19          MR. ROSENTHAL:  Okay.

20          MR. FORREST:  Well, what we -- what we need
21  specifically, that was -- that was actually Plaintiffs
22  narrowing what we had asked for.  So the preexisting public
23  controversy is one factor in the Ninth Circuit.

24          THE COURT:  So let me just cut through this then
25  and actually do this.

42

1          MR. FORREST:  Okay.

2          THE COURT:  Which is can you give me a case where

3    the Defendant moving -- filing the anti-SLAPP motion gets

4    discovery?  Because I couldn't find it because basically,

5    under Planned Parenthood, you do it like a summary judgment,

6    and normally Defendant can't put in new evidence on a reply,

7    which is essentially all you would be doing.  You filed --

8    this is not a summary -- if it is relevant, it's relevant,

9    and if you move to the next stage, you'll get it for summary

10   judgment, but this is an anti-SLAPP motion, which you then

11   would get your fees.  And the idea is that you have enough

12   and they don't to -- to file your motion, which you did,

13   based on them being -- so do you have a case?  Because I

14   looked.  I could not find anything.

15         MR. FORREST:  The analogous cases are in the Rule

16   56 category, your Honor, and they concern responding to

17   evidence raised in the opposition.

18         THE COURT:  Well, you haven't even seen their

19   opposition.

20         MR. FORREST:  That's true.  However --

21         THE COURT:  So that's premature then.

22         MR. FORREST:  Well --

23         THE COURT:  So but do you have an anti-SLAPP

24   motion?

25         MR. FORREST:  We do.

43

1        THE COURT:  No, case.

2        MR. FORREST:  I'm not aware of --

3        THE COURT:  Yeah, me neither.  See, I just think

4   it makes -- it just -- it doesn't make any sense because

5   that's the whole thing with anti-SLAPP is you filed it.  I

6   mean, this one is a factual attack.  So you use summary

7   judgment standard.  That's for the judge.  And all the cases

8   talk about the need to get the Plaintiff discovery to

9   oppose.

10       MR. FORREST:  Which we have done for the last

11  year, your Honor.  And, for their credit, Plaintiffs agreed

12  to respond to our requests earlier this year and have

13  already provided some sliver of that, and so to -- to turn

14  that on a dime now seems kind of prejudicial to us.

15       THE COURT:  Well, whatever he agreed to upstairs,

16  I think he -- he agreed to it.  He should give it to you.

17       MR. FORREST:  Okay.

18       THE COURT:  But I'm not going to order any more

19  because I actually -- this is why we're cutting it.  You get

20  past this, of course, it's relevant, and the Plaintiffs are

21  going to have to produce a lot, no question about it.  And,

22  frankly, it will be more one way because you've already

23  produced everything, but -- right?

24       MR. FORREST:  Yes, your Honor.

25       THE COURT:  And they're going to have to do it.

**EXHIBIT L**

## Sam Rosenthal

| | |
|---|---|
| **From:** | Hansen, Alexa <ahansen@cov.com> |
| **Sent:** | Tuesday, November 26, 2019 9:48 PM |
| **To:** | Sam Rosenthal; Forrest, Ethan C; Burke; Thomas (THOMASBURKE@dwt.com); Doran; Ambika (AmbikaDoran@dwt.com); CIR-PlanetAID |
| **Cc:** | Phil Busman |
| **Subject:** | RE: Planet Aid - Draft Stipulation Final.docx |

Sam,

We are sure that the Court would not mind if we included edits to clarify and embrace the spirit of what was read into the record. If you disagree with the substance of our edits, please let us know the basis for your objections so that we can resolve this issue promptly.

We look forward to hearing from you.

Regards,
Alexa

**Alexa Hansen**
T +1 415 591 7035 | **COVINGTON**

**From:** Sam Rosenthal <sam.rosenthal@nelsonmullins.com>
**Sent:** Tuesday, November 26, 2019 11:16 AM
**To:** Hansen, Alexa <ahansen@cov.com>; Forrest, Ethan C <EForrest@Cov.com>; Burke; Thomas (THOMASBURKE@dwt.com) <THOMASBURKE@dwt.com>; Doran; Ambika (AmbikaDoran@dwt.com) <AmbikaDoran@dwt.com>; CIR-PlanetAID <CIR-PlanetAID@cov.com>
**Cc:** Phil Busman <phil.busman@nelsonmullins.com>
**Subject:** RE: Planet Aid - Draft Stipulation Final.docx

**[EXTERNAL]**
The changes to the next to last paragraph were not included in the statement which we read into the record.  I believe we are confined to what was agreed upon and read into the record.

Please let me know if we can filed as stipulated in court.

**From:** Hansen, Alexa <ahansen@cov.com>
**Sent:** Monday, November 25, 2019 8:25 PM
**To:** Sam Rosenthal <sam.rosenthal@nelsonmullins.com>; Forrest, Ethan C <EForrest@Cov.com>; Burke; Thomas (THOMASBURKE@dwt.com) <THOMASBURKE@dwt.com>; Doran; Ambika (AmbikaDoran@dwt.com) <AmbikaDoran@dwt.com>; CIR-PlanetAID <CIR-PlanetAID@cov.com>
**Cc:** Phil Busman <phil.busman@nelsonmullins.com>
**Subject:** RE: Planet Aid - Draft Stipulation Final.docx

Sam,

A few clarifying edits in the attached to conform the structure of the second "stipulated and agreed" clause to the first, remove an errant comma, add Tom's law firm to the signature block, and to replace Ethan's name with my name to the signature block.

With those edits, you have my permission to add my electronic signature and file.

Regards,
Alexa


**Alexa Hansen**
T +1 415 591 7035 | **COVINGTON**

**From:** Sam Rosenthal <sam.rosenthal@nelsonmullins.com>
**Sent:** Monday, November 25, 2019 5:15 PM
**To:** Forrest, Ethan C <EForrest@Cov.com>; Burke; Thomas (THOMASBURKE@dwt.com) <THOMASBURKE@dwt.com>; Doran; Ambika (AmbikaDoran@dwt.com) <AmbikaDoran@dwt.com>; CIR-PlanetAID <CIR-PlanetAID@cov.com>
**Cc:** Phil Busman <phil.busman@nelsonmullins.com>
**Subject:** Re: Planet Aid - Draft Stipulation Final.docx

[EXTERNAL]
All, please confirm this can be filed.  Sam

On Nov 24, 2019 12:37 PM, Sam Rosenthal <sam.rosenthal@nelsonmullins.com> wrote:

> Ethan,
>
>
> Please take a look and let me know if this accurately reflects the agreed stip.  I added your full firm name, and corrected the footer on page one also.
>
>
> Best
>
>
> Sam

Confidentiality Notice

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

# EXHIBIT M

Approved



**PEPFAR**

# Namibia

# Operational Plan Report

# FY 2013

Note: Italicized sections of narrative text indicate that the content was not submitted in the Lite COP year, but was derived from the previous Full COP year. This includes data in Technical Area Narratives, and Mechanism Overview and Budget Code narratives from continued mechanisms.

CIR0072781

# Stay Healthy

## A Gender-Transformative HIV Prevention Curriculum for Youth in Namibia

*Prototype, September 2011*

     

CIR0002588

# WORLD DEVELOPMENT INDICATORS

# 2015



 WORLD BANK GROUP

CIR0074023

# MID-TERM ASSESSMENT
# OF THE
# ZAMBIA INTEGRATED HEALTH
# PROGRAM (ZIHP)

## MARCH 5 - 23, 2001

## PREPARED FOR USAID/ZAMBIA, LUSAKA

**ASSESSMENT TEAM:**

**Dr. Godfrey Biemba**
**Mr. Davies Chimfwembe**
**Mr. Alan Foose (Team Leader)**
**Ms. Alix Grubel**
**Ms. Janet Hayman**
**Dr. Simon Miti**
**Dr. Jim Sarn**

## FINAL REPORT: MAY 7, 2001

CIR0001415





# EVALUATION

## PERFORMANCE EVALUATION OF THE USAID/MOZAMBIQUE AGRICULTURE PORTFOLIO

**January, 2013**

This publication was produced at the request of the United States Agency for International Development. It was prepared independently by Mendez, England & Associates.

CIR0001528

EVALUATION PERFORMANCE EVALUATION OF THE USAID/MOZAMBIQUE AGRICULTURE PORTFOLIO January, 2013 This publication was produced at the request of the United States Agency for International Development. It was prepared independently by Mendez, England & Associates. EVALUATION PERFORMANCE EVALUATION OF THE USAID/MOZAMBIQUE AGRICULTURE PORTFOLIO Final Report Prepared under Task Order No: AID-656-TO-12-00003 Submitted to: USAID/Mozambique Submitted by: Tom Easterling (Team Leader) Tatiana Mata (Agricultural Specialist) Tunisio Camba (Survey Manager) Carlos Creva (Data Analyst) Jorge Tinga (Rural Development Specialist) Contractor: Mendez England & Associates 4300 Montgomery Avenue, Suite 103 Bethesda, MD 20814 Tel: 301- 652 -4334 www.mendezengland.com DISCLAIMER The authors' views expressed in this publication do not necessarily reflect the views of the United States Agency for International Development or the United States Government  ACRONYMS ADIPSA Support for Private Sector Agriculture Development ADPP People to People Development ADRA Adventist Development and Relief Agency International AIMS Agri-Input Market Strengthening Project ASCs Agricultural Service Clusters ATB USAID/Mozambique Office of Agriculture, Trade and Business BOM Banco Oportunidade Mozambique BT Banco Terra CEPPAG Agricultural Policy Research Center CESE Center for Socio-Economic Studies CIMMYT International Maize and Wheat Improvement Center CAADP Comprehensive African Agricultural Development Program CAP National Agricultural Census CAS Country Assistance Strategy CIP International Potato Center CGIAR Consultative Group on International Agricultural Research CLUSA Cooperative League of the USA CTA Confederation of Business Associations DAP Policy Analysis Department at MINAG DCA Development Credit Authority DE Directorate of Economics at the Ministry of Agriculture DPA MINAG Provincial Agricultural Offices DPG Development Partners Group DSP Provincial Department of Public Health DVMs Decentralized Vine Multipliers EAs Enumeration Areas FtF Feed the Future FH Food for the Hungry FOSCs Farmer Owned Service Centers FY Fiscal Year FGDs Focus Group Discussions  GOM Government of Mozambique Ha Hectare HACCP Hazard Analysis and Critical Control Point HHS Household Survey HHR Household Respondents IARCs International Agricultural Research Centers IFDC International Fertilizer Development Center IFPRI International Food Policyn Research Instutute IIAM Agriculture Research Institute of Mozambique IITA International Institute for Tropical Agriculture IRs Intermediate Results IRRI International Rice Research Institute INE National Statistics Institute of Mozambique Kg Kilogram ISPM Agricultural Research Institute of Mozambique LGP Authority Loan Guarantee Program MADD Mozambique Agro-dealer Development Project ME&A Mendez, England & Associates MINAG Ministry of Agriculture MOU Memorandum of Understanding Mt Mozambique Metical (currency) MSU Michigan State University MYAP Multi-year Assistance Program NGOs Non-government Organizations OFSP Orange-flesh Sweet Potato P4P Purchases for Progress (World Food Program) PARTI Platform for Agricultural Research and Technology Innovation PMP Performance Monitoring Plan PMU Platform Management Unit PPPs Public Private Partnerships PROAGRI National Program for Agricultural Development in Mozambique SANA Food Security Through Nutrition and Agriculture SC Save the Children SCIP Strengthening Communities through Integrated Programming  SIDA Swedish Development Agency SIMA National Market Information System SO Strategic Objective SOW Scope of Work SPSS Statistical Package for Social Sciences SPEED Support Program for Economic and Enterprise Development TNS TechnoServe TIA National Agricultural Household Survey UCODIN Provincial Governor's Unit for Integrated Development Coordination USDA United States Department of Agriculture UEM Eduardo Mondlane University USAID United States Agency for International Development US United States VAT Value Added Tax WASH Water and sanitation for health WFP World Food Program WVMoz World Vision Mozambique  PERFORMANCE EVALUATION OF ATB PORTFOLIO 1 CONTENTS ACRONYMS

.................................................................................................. 1 EXECUTIVE SUMMARY ........................................................................................... 1 Evaluation Purpose and Evaluation Questions ............................................................. 1 Project Background .................................................................................................. 1 Evaluation Design, Methods and Limitations ................................................................. 1 Major Findings and Conclusions per Evaluation Questions ...................................................... 2 1.0 EVALUATION PURPOSE & EVALUATION QUESTIONS ........................... 1 1.1 Evaluation Purpose ............................................................................................. 1 1.2 Evaluation Questions ........................................................................................... 2 2.0 PROJECT BACKGROUND ........................................................................................ 2 2.1 ATB's Targeted Locations .................................................................... 2

3978 613-690-A-00-05-00023-00 20041029 20081130 20130331 2013 2 2013 1 Cooperative Agreement NULL Direct Appropriation 1037 USAID AFR ZIMBABWE 0 -11253.02 Democracy, Human Rights, and Governance Political Competition and Consensus-Building 2.3.2 GOVERNING JUSTLY & DEMOCRATICALLY - Political Competition and Consensus-Building Zimbabwe ODA NULL P OBLG_UNI Economic Support Fund ES-07 2006 2007 US Non Profit NULL 3979 613-690-A-00-98-00252-00 20030926 20090930 20130630 2013 3 2013 2 Cooperative Agreement NULL Direct Appropriation 1037 USAID AFR ZIMBABWE -221753.86 0 Democracy, Human Rights, and Governance Civil Society 2.4.1 GOVERNING JUSTLY & DEMOCRATICALLY - Civil Society Zimbabwe ODA NULL P OBLG_UNI Economic Support Fund ES-SUP 2009 NULL US Non Profit NULL 3980 613-690-A-00-99-00032-00 Contract Conversion 20051001 20080930 20130630 2013 3 2013 2 Cooperative Agreement NULL Direct Appropriation 1014 USAID AFR ZIMBABWE -22344.7 0 Democracy, Human Rights, and Governance Civil Society 2.4.1 GOVERNING JUSTLY & DEMOCRATICALLY - Civil Society Civic Participation - Zimbabwe ODA NULL P OBLG_UNI Development Fund for Africa SS-X 2007 NULL State University of New York US Educ Inst NULL NULL 3981 613-690-A-00-99-00032-00 Contract Conversion 20051001 20080930 20130630 2013 3 2013 2 Cooperative Agreement NULL Direct Appropriation 1021 USAID AFR ZIMBABWE -80331.32 0 Democracy, Human Rights, and Governance Good Governance 2.2.1 GOVERNING JUSTLY & DEMOCRATICALLY - Good Governance Legislative Function and Processes - Zimbabwe ODA NULL P OBLG_UNI Development Assistance Fund DV 2007 2008 State University of New York US Educ Inst NULL NULL 3982 613-G-00-01-00244 20020927 20121231 20130331 2013 2 2013 1 Grant NULL Direct Appropriation 1021 USAID AFR ZIMBABWE 0 853.91 Program Management Direct Administrative Costs pre-Framework pre-Framework Zimbabwe ODA NULL P OBLG_UNI Development Assistance Fund DV 2003 2004 Non US Non Profit NULL 3983 613-G-00-01-00244 20020927 20121231 20130331 2013 2 2013 1 Grant NULL Direct Appropriation



**SIGAR** | Office of the Special Inspector General
for Afghanistan Reconstruction

June 9, 2014

The Honorable Tom Vilsack
Secretary
U.S. Department of Agriculture

Dear Mr. Secretary:

Thank you for your response to my inquiry letter dated April 17, 2014, concerning the Soybeans for Agricultural Renewal in Afghanistan Initiative (SARAI) funded by the U.S. Department of Agriculture (USDA). After examining the materials that you provided, I'm concerned about the viability of the project and the apparent lack of analysis and planning performed prior to the project's initiation. I'm most troubled by the following issues:

- The USDA confirmed that soybean production in Afghanistan has not met expectations and that there are doubts concerning the long-term sustainability of a soybean processing factory built as part of the project.

- The project's implementer, the American Soybean Association, did not conduct feasibility or value-chain studies prior to initiation of the project in 2010.

- Scientific research conducted for the UK Department for International Development between 2005 and 2008 concluded that soybeans were inappropriate for conditions and farming practices in northern Afghanistan, where the program was implemented.

- Despite the lack of prior planning and analysis, and despite evidence that may have put the success of the program in doubt, USDA provided $34.4 million in commodities, transportation, and administrative funds to ASA for SARAI.

I understand that Afghanistan's operating environment poses daunting challenges for reconstruction and development programs, and that any project in the country is bound to meet its fair share of difficulties. However, what is troubling about this particular project is that it appears that many of these problems could reasonably have been foreseen and, therefore, possibly avoided. Moving forward, I recommend that you take the following actions prior to any further investment of U.S. government funding in SARAI:

- Implement a thorough and comprehensive evaluation of the project's future sustainability, including a review of existing research on the economic viability of growing soybeans in Afghanistan. If a viable business case cannot be supported, withhold further investment.

- Develop an in-depth plan to address the deficiencies and challenges already identified.

Additionally, I recommend that USDA thoroughly review the process by which the Food for Progress program evaluates project proposals and makes its final selections.

CIR0074439



# BEST ANALYSIS – MALAWI
## BELLMON ESTIMATION STUDIES FOR TITLE II (BEST) PROJECT



**DECEMBER 2008**
This publication was produced for review by the United States Agency for International Development. It was prepared by Fintrac Inc.

CIR0071181



# OFFICE OF INSPECTOR GENERAL

# AUDIT OF USAID/MOZAMBIQUE'S TUBERCULOSIS ACTIVITIES

AUDIT REPORT NO. 4-656-12-012-P
AUGUST 7, 2012

PRETORIA, SOUTH AFRICA

CIR0002533

**EXHIBIT N**

**2. De tiltaltes forklaringer om organisation og beslutningsprocesser**

2.1 De tiltaltes baggrund og position

---

**2.1 De tiltaltes baggrund og position:**

---

Tiltalte Bodil Ross Sørensen har forklaret, at hun blev student i 1970 fra Odense Katedralskole. Tiltaltes far var præst i Odense ved blandt andet domkirken, og tiltalte blev umiddelbart efter sin studentereksamen tilknyttet Den rejsende Højskole. Hun havde allerede, medens hun gik i 3 g, deltaget i et møde og tilmeldt sig dette kursus. Tiltalte Ruth Sejerøe-Olsen var også deltager, og tiltalte Mogens Amdi Petersen og tiltalte Poul Jørgensen var der ligeledes. De mødtes den 1. juli blot en uge efter, at tiltalte var blevet student, og der var 40 deltagere og 6 lærere, der deltog i en rejse, hvorunder de ville lære forholdene at kende for folk i den tredje verden. De gennemrejste et antal lande i Asien, og det skete på et tidspunkt, hvor det jo ikke var almindeligt at rejse disse steder, og det var en stor oplevelse for dem. Efter denne rejse, der varede i 4 måneder, var der et 2 må-neders bearbejdningskursus, og de var nok omkring ca. 12 af deltagerne, der herefter be-stemte sig for, at de ville medvirke til at få denne højskole til at blive til noget. Gruppen, der startede, søgte om statsstøtte, og det fik de i slutningen af december 1970. Tiltalte blev lærer på skolens martshold, der startede i marts 1971. Der var også andre tanker om skoler i den gruppe, der tog initiativet, men det var denne rejsende skole, man samledes om, og det var denne skole, som tiltalte tilsluttede sig. Selv betalte hun 4.700 kr. for at deltage i dette første kursus, medens hun var elev. Eleverne betaler stadig for deltagel-sen, og beløbet er nok efterhånden sat noget op. Den første skole, der blev købt, blev an-skaffet for private midler, men da de blev statsstøttet, fik de at vide af undervisningsmini-steriet, at dem, der drev skolen, ikke selv skulle eje den, og de fik derfor lavet selskabet Estate, der skulle eje skolebygningerne. De var 6 - 8 stykker, der startede skolen, hvortil kom de 10 - 12 stykker, der tilsluttede sig efter det første hold, hvorved de fik denne rul-lende højskole til at fungere. Herefter kom yderligere Det nødvendige Seminarium i 1972 og efterskolen i Bustrup i 1976, der var den første skole, der ikke lå i Tvind. Det var på dette tidspunkt selskabet Estate, der ejede bygningerne. Herefter kom der to efterskoler til i hvert af de følgende år, og samtidig kom arbejdet med møllen i gang igennem 1975 til 1978. Tiltalte var i 1971 til 1974 højskolelærer, og i et tidsrum mellem 1975 og 1977 var hun efterskolelærer, men blev herefter igen højskolelærer, og hun var fra 1977 for-stander på Den rejsende Højskole, der var blevet etableret i Juelsminde.

Tiltalte Poul Jørgensen har forklaret, at tiltaltes arbejde inden for Lærergruppen opstod på baggrund af et mangeårigt bekendtskab med Mogens Amdi Petersen, hvilket bekendtskab begyndte i 1963, hvor de var en kreds af mennesker, der var med i et slags kulturcenter, der kaldtes "Huset" i Odense, hvor de boede. De afholdt forskellige arrangementer, og i 1966 rejste de rundt om jorden. Udover tiltalte deltog Mogens Amdi Petersen, og der deltog også flere andre mennesker, der dog ikke er mellem dem, der er omfattet af nærværende sag. Tiltalte var herefter i 1968 lærer i Ribe, og Mogens Amdi Petersen og Ruth Sejerøe-Olsen blev lærere på en ungdomsskole. Da Mogens Amdi Petersen arbejdede lige nord for grænsen, mødtes de en del og arbejdede med planerne om at stifte Den Rejsende Højskole. I 1970 var man først på en rejse, hvorefter arbejdet i denne skole begyndte. Man havde købt Fanø Strandhotel, og Mogens Amdi Petersen blev forstander for Den rejsende Højskole. Senere blev han forstander for Det nødven-dige Seminarium, der begyndte i 1972, hvorefter tiltalte blev forstander for Den rejsende Højskole. I arbejdsfordelingen har tiltalte navnlig taget sig af de administrative opgaver i

CIR0012266

6.1 Stiftelsen af Fonden til støtte for humanitære formål ............
6.1.1 Selve stiftelsesproceduren

---

**6.1 Stiftelsen af "Fonden til støtte for humanitære formål, til fremme af forskning og til beskyttelse af naturmiljøet":**

---

**6.1.1 Selve stiftelsesproceduren:**

---

Tiltalte Mogens Amdi Petersen har forklaret, at fonden blev stiftet af flere årsager. En af årsagerne var, at en tidligere fond blev lukket igennem lovgivningen, og der kom samtidig en ny lovgivning med nye momenter i sig. Den nye lov opererede med 15 % af gavegiverens løn i stedet for 80 % som det, der måtte disponeres over ved gavebrev for skattefrit at kunne fradrages. Det andet element var afgrænsningen af formålene, således som tiltalte dengang fik det forklaret. I Lærergruppen var der diskussioner herom, og tiltalte deltog i disse. Der deltog flere hundrede mennesker, og det skete over flere møder i Danmark, idet der ikke var overensstemmende holdninger. Det var vist kun lærergruppemedlemmer, der deltog, og problemet var, om de midler, der kom ind i fonden, var tilstrækkeligt store til at opfylde de formål, der kunne komme i betragtning. Det andet var, om de formål, der kunne gives til, var de formål, som Lærergruppen kunne være interesseret i at støtte. Resultatet blev, at de syntes, at man skulle oprette fonden. Det var på dagsorden til disse møder, men tiltalte kan ikke sige, om tiltalte deltog i alle møderne. Man har under et politiforhør vist tiltalte, at der var to bestemte personer, der stiftede fonden, men tiltalte var gået ud fra, at det var Poul Jørgensen, der stiftede den. Såvidt tiltalte husker, mente Poul Jørgensen, at en sådan fond ville være "for mager", og tiltaltes holdning var, at når det nu var organiseret på denne måde af staten, skulle samarbejdet med staten ske på dette grundlag. Tiltalte har ikke været involveret i fondens daglige drift, men Lærergruppen har organiseret et antal selskaber og organisationer, som de arbejder i. De består af lærergruppeselskaber og på den anden side af de juridiske enheder i andre lande. Disse grupper vil naturligt påvirke hinanden, og det ville være en illusion at tro, at de på nogen måde skulle kunne undgå at gøre dette. Det er faktisk netop en af de gode egenskaber, at man påvirker hinanden. Tiltalte husker ikke at have været med i drøftelser om, hvem det skulle sidde i fondens bestyrelse.

I en politirapport af 20. november 2002 vedrørende en afhøring af tiltalte Mogens Amdi Petersen hedder det blandt andet:

> "Fonden blev stiftet af lærergruppen. Beslutningen blev truffet efter at der i lærergruppen havde været en stor og bred drøftelse.
> ......
> Foreholdt at Fonden gennem perioden ikke har ydet støtte til andre projekter end lærergruppen projekter forklarede afhørte, at han ikke var bekendt med dette. Han havde ikke været med til beslutninger herom og var personligt af den holdning, at det var bedst hvis fonden støttede bredt. Han mente, at det var med som en følge af det oplæg de indledningsvis drøftelser i lærergruppen."

Foreholdt dette har tiltalte forklaret, at det, der er gengivet heri, svarer til det, tiltalte her forklarer. Man drøftede kun generelt, om den indsnævring, der var kommet, kom på tværs af de områder, som de havde interesse i at støtte. Der var under drøftelserne stemning for at støtte naturmiljø og forskning. Tiltalte husker, ikke om der blev talt om,

CIR0058393

---

| **7.1 Igangsætningen af projektet Global Research:** |
|---|

Tiltalte Poul Jørgensen har på forklaret, at tiltalte ikke har været med til at træffe beslutningen om at sætte projektet Global Research i gang. Initiativer til sådanne projekter kunne i princippet godt opstå i fællesmøder, men tiltalte ved ikke, hvordan initiativet er kommet, og det er efter tiltaltes opfattelse mere sandsynligt, at det er sket i noget, man kunne kalde for nogle "lokale kredse". Tiltalte ved imidlertid ikke, hvorledes ansøgningen om projektet er fremkommet, og tiltalte har ikke haft med dette at gøre.

Det fremgår af en skrivelse, der er stilet til IFAS - Institute for Scientific Research and Applied Sciences, at den som overskrift bærer betegnelsen "ansøgningsskema", at den angiver den 20. april 1987 som dato og angiver, at ansøgeren er IFAS, Institute for Scientific Research and Applied Sciences med adressen Skorkærvej 8, Ulfborg. Som sagfører er i ansøgningen anført Poul Jørgensen.

Anklagemyndigheden har forevist tiltalte Sten Byrner ansøgningen og spurgt, hvorledes Poul Jørgensens rolle var således, at der var anledning til at anføre ham som sagfører for ansøgeren.

Tiltalte har hertil erklæret, at tiltalte ikke ved, hvad der her har været tænkt på, men tiltalte husker det således, som Poul Jørgensen også selv har forklaret, at Poul fik en række specifikke opgaver stillet ved konkrete henvendelser, og tiltalte har også selv rettet henvendelser til ham om bestemte spørgsmål.

Anklagemyndigheden har forevist vidnet Else Jensen ansøgningen og spurgt, hvordan IFAS kunne ansøge IFAS om noget.

Vidnet har forklaret, at det følger af formålet, at institutionen kan udføre forskningsprojekter på den måde, at de udføres af andre på institutionens anmodning. Ved dette ene projekt har vidnet skrevet ansøgningen, og det var et projekt, vidnet udarbejdede i samarbejde med bestyrelsen. Vidnet talte også med Thomas Væth om det. Vidnet vil sige, at ideen til dette projekt nærmest kom ud af formålet med IFAS, idet bestyrelsen diskuterede, hvilke projekter man kunne forestille sig, der vil komme, og man diskuterede teoretisk, hvordan man ville komme til at arbejde. Derfor kom ideen til, at man gerne ville eftervise dette behov og mængden af det igennem projektet Global Research.

Vidnet Birgitte Hector Nielsen har forklaret, at det var bestyrelsesmedlemmerne og Else Jensen, der sammen fik ideen til det første projekt Global Research, og projektet gik ud på at eftervise, at IFAS formål var på sin plads, idet man ville vise, at der i forvejen forelå stor viden og teknologi, der blot ikke blev udnyttet i den tredje verden. Man ville derfor opsøge en række mennesker i den tredje verden og udarbejde ansøgninger, der skulle eftervise de hypoteser, der herom blev opstillet. Det var generelt således, at ansøgningskemaet altid kom først. Det var altid udarbejdet af ansøgerne, og i nogle tilfælde var det sket i samarbejde mellem ansøgeren og Else Jensen. Den første ansøgning adskilte sig herfra ved, at det var en ansøgning fra IFAS til IFAS, og vidnet lavede selv denne ansøgning. Ifølge vedtægterne kunne man også iværksætte projekter på egen for-

CIR0058563

**13. The Voice of the Third World**

13.1 Igangsætningen af projektet ..........

---

## 13.1 Igangsætningen af projektet The Voice of the Third World:

Anklagemyndigheden har bedt tiltalte Mogens Amdi Petersen om at gøre rede for sit kendskab til projektet "Voice of the Third World".

Tiltalte har forklaret, at dette er et forskningsprojekt, der skal forske i, om det er muligt at løse det problem, der går ud på følgende: På et tidligt tidspunkt omkring vist 1984 begyndte de at eksperimentere med integrerede undervisningsmidler. De byggede endog klasseværelser med PC ere, der var de såkaldte 64 ere samt båndspillere, og de satte en ældre lastvogn i stand til nogen, der kørte rundt og optog undervisning, der kunne afspilles på 64 erens skærm. Man ville sprede kendskabet til Den Rejsende Højskoles problematik i de 3 måneders efterarbejder, der fulgte, når medarbejderne vendte hjem. Man ville informere så meget som muligt om den tredje verden og få kontakt med de teknologisk mest avancerede forevisningsmidler. Dette medførte, at Øjvind Wistrøm og "vort kontor" førte drøftelser om også at tage ud til den tredje verdens TV stationer for at få programmer derfra. Det mislykkedes på den måde, at det ikke var muligt at få dem til at betale, idet de jo er fattige, men det lykkedes på den måde, at de gerne ville vise deres programmer. Samtidig blev satellit TV omkring dette tidspunkt muligt, idet det nu blev tilladt at opstille sådanne i Danmark, således at muligheden for at formidle oplysninger herved fik en ny dimension. Det, der var forskningsorienteret, var at løse det problem, som forskningen stod over for. Der er mange forskningsgrene, men her var det den anvendte forskning, der var tale om, og det var dette, man fik på benene. Der var to formål, nemlig for det første at indsamle den tredje verdens TV programmer, og for det andet at bruge skolens rejsende tradition og få begge dele kanaliseret ind i en TV kanal. På et tidspunkt blev skibet "Store Klaus" omdøbt til "Return of Marco Polo". Til at begynde med blev programmerne produceret på skibet, og senere var det råmaterialet, der blev samlet på skibet og sendt videre til forarbejdning og udsendelse.

Tiltalte Bodil Ross Sørensen har forklaret, at tanken til dette projekt opstod som en kombination af, at det nu faktisk viste sig at være teknisk muligt at sende fjernsyn til hele verden, og af, at man også tidligere i undervisningen havde arbejdet med ideen om at vise udsendelser, naturligvis mest til undervisningsmæssig brug, men også af mere underholdningsmæssig karakter. Dengang var det helt utroligt, at man nu kunne sende noget ud, som kunne ses af en hel verden, og man så det som en mulighed, der her opstod for at sende udsendelser, der også kom fra den tredje verdens lande. Beslutningen om at påbegynde det blev nok truffet af mange forskellige parter, og den blev navnlig truffet af de mennesker, som i forvejen havde interesseret sig for ideen. Disse mennesker havde en del erfaringer med sådanne projekter, og for eksempel havde Henrik arbejdet med det fra begyndelsen af firserne, og Øyvind havde også tydeligt interesseret sig for det. Hertil kom også Hans la Cour, der havde arbejdet med noget, der hed Radio Tvind, der blev sendt ud til skolerne. Tiltalte husker ikke noget med et fællesmøde, der skulle have vedtaget noget vedrørende projektet.

Anklagemyndigheden har spurgt tiltalte Kirsten Ambrosius Larsen om denne tiltaltes forbindelse med projektet The Voice of the Third World.

CIR0059085

**23. Udvikling i 1999**

23.1   Aktiviteter i januar - februar fra personer, der var udtrådt af
       Lærergruppen

---

**23.1 Aktiviteter i januar - februar fra personer, der var udtrådt af Lærergruppen:**

Vidnet Steen Verner Thomsen har forklaret, at vidnet skrev sammen med Hans la Cour Andersen, efter at vidnet havde forladt Lærergruppen, og medens Hans boede i New Zealand. Det var naturligt, at de skrev sammen, idet de var gamle venner. Vidnet har ikke besøgt Hans i New Zealand. Vidnet tror, at de har skrevet et par gange sammen, efter at vidnet forlod Lærergruppen, og vidnet mener, at vidnet skrev til Hans i 1998.

I en e-mail af 7. januar 1999 fra Hans la Cour Andersen hedder det blandt andet:

> "Hej Stig,
> ................
>
> Jeg har sagt til Steen at jeg vil sende mit materiale afsted, han har presset voldsomt for det og jeg har sagt OK. Jeg har ogsaa sagt at jeg goer det modstraebende, og at jeg helst saa mig selv blandet helt uden om hele denne affaere. Men det ser ud til ikke at kunne lade sig goere."

Foreholdt dette har vidnet Steen Verner Thomsen forklaret, at det materiale, der her omtales, er materiale fra det projekt, Hans havde deltaget i. Vidnet mener ikke, at vidnet havde presset meget på for at få materialet, men Hans kan godt have opfattet det således, idet vidnet naturligvis var interesseret i, at han medvirkede.

I en e-mail af 10. januar 1999 fra Hans la Cour Andersen hedder det blandt andet:

> "Hej Stig
> Meget interessant. Specielt fordi jeg har alle de "braendte" documenter.
> Jeg sender dig nu en email med reference til dokumenterne. Vil saa proeve at scanne dem ind imorgen. Elles maa jeg fotokopiere og sende med posten.
> Sagen er bare at disse dokumenter ville vaere meget nyttige paa dit moede med ministeriet d. 14.
> Ikke mere nu, kl er snart 3 om morgenen her."

Foreholdt, at man her omtaler de brændte dokumenter, har vidnet Stig Hardbo Jørgensen erklæret, at det er rigtigt, at man her for første gang taler om de brændte dokumenter. Det kommer noget bag på vidnet, at det først var på dette tidspunkt, de talte om dette, men der var udleveret meget materiale som følge af aktindsigten, og her går det op for vidnet, at Hans har de dokumenter, der er oplyst at være blevet brændt. Det må have været omtalt i en e-mail lige forinden, og vidnet er ikke i besiddelse af denne e-mail.

I en e-mail af 11. januar 1999 fra Hans la Cour Andersen hedder det blandt andet:

> "Hej Stig,
> Hermed foelger i GIF format det saakaldte "forarbejdningsskema" eller "skema for forarbejdere".
> Dette navn er opfundet af Amdi og findes ikke i det danske sprog.

CIR0012700

24.1   Aktiviteter hos myndighederne i februar - april, korrespondance med disse,
resultatet af undersøgelser i Brasilien, henvendelser om Kontoforeningen

---

**24.1   Aktiviteter hos myndighederne i februar - april, korrespondance med disse, resultatet af undersøgelser i Brasilien, henvendelser om Kontoforeningen:**

---

I en skrivelse med overskriften "Tvind-undersøgelsen", der angives at være udfærdiget den 3. februar 2000, hedder det:

"Sammenstilling af dansk rapport af en skattemæssig undersøgelse i Vitoria da Conquista, Brasilien maj 1999, bekræftet ved udarbejdet fællesrapport af 28. maj 1999 af de to skattemyndigheder, med det den 8. november 1999 fremkomme brasilianske svar og dokumentation vedr. spørgsmål Told- og Skattestyrelsen som kompetent myndighed efter dobbeltbeskatningsaftalen havde fremsendt som anmodning af 11. juni.1998 - vedrørende aktiviteter og indkomstforhold i det brasilianske selskab Floryl, Florestadora, som efter det oplyste via franske foreninger har modtaget midler fra fonden til Humanitære Formål tilhørende Skolesamvirket Tvind.

Fra dansk side deltog:
Finn Høpner, Told- og Skattestyrelsen
Jørgen H. Petersen og Poul Rasmussen, Told- og Skatteregion Holstebro

Sammenstillingen foretages på grundlag af de rejste spørgsmål til det brasilianske finansministerium af 11. juni 1998.(Oversat til dansk).

Spørgsmål 1:
Udøver Floryl Florestadora YPE S.A. aktiviteter på ejendommen i Correntina som er i overensstemmelse med det angivne formål?

Dansk kommentar:
Ved undersøgelsen af materialet i Vitoria da Conquista kan vi bekræfte, at det foreliggende materiale peger på samme vurdering som det brasilianske svar.
Dog udtalte de brasilianske myndigheder, at planen om at plante citrustræer ikke er ført ud i livet.
Dette var et af hovedformålene ved virksomhedens start i 1992, og anvendt som begrundelse i deres ansøgning om midler fra den danske fond.
Undersøgelsen i Conquista blev gennemført i samarbejde med de personer som havde foretaget den fysiske kontrol på ejendommen i Correntina.

Spørgsmål 2:
Hvilken skattemæssig status har selskabet? Er det skattepligtig af opgjort overskud? Eller har det en Non profit Organization (NGO) - status?

Dansk kommentar:
Det blev oplyst ved den skattemæssige undersøgelse, at selskabet er underlagt de arbejdsretlige og sociale regler.
Selskabet har dog ikke betalt skat i de pågældende år, men dette skyldes at selskabet har haft underskud.

CIR0012056

25.1 Politiets efterforskning i januar - marts

---

| **25.1 Politiets efterforskning i januar - marts:** |
| --- |

Anklagemyndigheden har spurgt vidnet kriminalkommissær Knud Haargaard, hvorledes kontakt mellem politiet og Frede Farmand opstod.

Vidnet har forklaret, at den første henvendelse skete ved vicekriminalkommissær Finn Olesen, der henvendte sig til Frede Farmand og fik materialet med. Herefter var det vidnet der stod for den følgende kontakt til Frede Farmand. Denne kontakt var kun af afgørende interesse for efterforskningen under den indledende fase, hvorunder det drejede sig om at fremskaffe dokumentmateriale, idet man vidste, at Frede Farmand kun havde oplysningerne på anden hånd. Det viste sig, at det meste af det materiale, han havde, stammede fra Hans la Cour.

Anklagemyndigheden har forevist vidnet en kosterrapport af 19. januar 2001 og har foreholdt vidnet, at denne kosterrapport omtaler materiale, der blev udleveret af Frede Farmand. Anklagemyndigheden har spurgt vidnet, hvorledes man fik dette materiale udleveret.

Vidnet har forklaret, at det typisk foregik på den måde, at man fik lov til at komme forbi Frede Farmand, når medarbejderne var på vej til Holstebro, således at man hos Frede Farmand havde lejlighed til at se materialet igennem og udpege det materiale, man ønskede at kopiere. Man tog da dette materiale med og kopierede det, hvorefter man sendte materialet tilbage til Frede Farmand.

Anklagemyndigheden har spurgt vidnet, om det undertiden var andre end vidnet, der kom forbi og fik udleveret sådant materiale.

Vidnet har erklæret, at det også har været kriminalassistent Peter Hejlesen og kriminalassistent Henrik Kleffel, der har fået udleveret materiale på denne måde.

Anklagemyndigheden har spurgt vidnet, om der derudover også har været telefonisk kontakt mellem vidnet og Frede Farmand.

Vidnet har erklæret, at der også har været en sådan kontakt, og i sådanne tilfælde var det normalt Frede Farmand, der ringede vidnet op, idet man ikke efter gennemførelsen af ransagningen længere fra politiets side havde den store interesse i at lede efter yderligere materiale hos Frede Farmand. Det skete dog, at Frede Farmand ringede og spurgte vidnet, om man havde interesse i det og det materiale.

Anklagemyndigheden har forevist vidnet en rapport af 29. januar 2001, hvori det hedder:

> "Frede Farmandthir Rasmussen, Auning har i forbindelse med afhøring foretaget af vkk. Knud Haargaard, SØK overdraget forskellige digitale billeder, der alle vedr. Tvind eller personer omkring samme, til politiet.
>
> Billederne er alle optaget af Rasmussen forud for afhøringen og uden tilskyndelse

2/12/16, 3:57 PM

3711                          **25. Development in 2001**                          3711

25.1 The police investigation in January-March

**25.1 The police investigation in January-March:**

The prosecution asked the witness Superintendent Knud Haargaard how
contact between the police and Frede Farmand occurred.

The witness explained that the first contact was by Deputy Superintendent Finn
Olesen, who turned to Frede Daddy and got the material with. Then it was
the witness who was responsible for the following contact Frede Daddy. This contact was only of
vital interest of the investigation during the preliminary phase, during which the
was about to obtain documentary material, as it was known that Frede Farmand only
had information on the other hand. It was found that most of the material he
had originated from Hans la Cour.

Prosecutors have presented him a costing report of 19 January 2001,
accused testified that this cost report refers to material that was handed over by Frede
Daddy. The prosecution asked the witness how was this material
handed.

The witness explained that it typically took place in the way that you were allowed to get past
Frede Daddy, when employees were going to Holstebro, so that by Frede
Daddy had the opportunity to see the material through and identify the material you desired
the copying. It then took this material and copied it, after which you sent
the material back to Frede Daddy.

The prosecution asked the witness whether it was sometimes other than the witness who
came by and was handed such material.

The witness has stated that it has also been Detective Peter Hejlesen and crime
nalassistent Henrik Kleffel who have been given material this way.

The prosecution asked the witness whether, in addition, also has telephone
contact between the witness and Frede Daddy.

The witness has stated that there has been such a contact, and in such cases it was
usually Frede Daddy, who called the witness up since it is impossible for the implementation of

CIR0075016

**29. Rettens bemærkninger og konklusioner**

29.1   Rettens bemærkninger om organisation og beslutningsprocesser

---

**29.1 Rettens bemærkninger om organisation og beslutningsprocesser:**

---

Retten lægger til grund, at begrebet "Lærergruppen" betegner et antal på i dag ca. 850 mennesker, der har tilsluttet sig tre principper om fælles tid, fælles fordeling og fælles økonomi. De har hertil accepteret, at de ikke kan stille betingelser for deres tilslutning til gruppen. De tiltalte har gjort gældende, at Lærergruppen er en samlivsform og ikke en juridisk person, der som sådan kan påtage sig retlige forpligtelser eller få rettigheder. Anklagemyndigheden har over for dette gjort gældende, at deltagerne i Lærergruppen også i fællesskab driver erhvervsmæssig virksomhed og andre aktiviteter, og at der da objektivt set er tale om et interessentskab eller en forening, der udøver erhvervsmæssig virksomhed igennem et net af tilsyneladende uafhængige selskaber, men som overordnet set er styret centralt. Anklagemyndigheden har gjort gældende, at der ved siden af de egentlige selskaber, foreninger, fonde m.v., der har formel beslutningsret, findes en uformel og reel ledelsesstruktur, der på tværs af selskabsstrukturen træffer de egentlige afgørelser, og at den reelle ledelse udøves af tiltalte Mogens Amdi Petersen og tiltalte Kirsten Ambrosius Larsen, der reelt træffer beslutning vedrørende alle forhold i Lærer-gruppen.

Retten finder over for dette, at spørgsmålet om, hvorledes den opbyggede struktur og de stedfundne aktiviteter juridisk skal vurderes, ikke skal afgøres efter, om man vælger at benytte sådanne værdiladede udtryk. Begreber som "styret centralt" og "reel ledelse" er afhængige af, hvilken værdi man lægger i disse udtryk. Der findes en vis grænse for, hvil-ke værdier man kan indlægge i begreberne. Hvis der ikke i selve de selskabsretlige orga-ner har været noget, der kan kaldes ledelse, og man entydigt kan pege på en enhed, der i stedet styrer disse organer, kan man med rimelig sikkerhed tale om central styring og om, at der findes en anden reel ledelse. Såfremt dette ikke er tilfældet, er anvendelsen af disse begreber afhængig af den værdi, man indlægger i begreberne. De faktiske omstændigheder kan i sig selv have en sandhedsværdi i det omfang, disse kan belyses på grundlag af bevisførelsen, og retten kan udlede retlige konsekvenser heraf, hvis de har ju-ridisk relevans. Retten kan lade en vis holdningsmæssig værdi indgå i sin vurdering af, hvilke retlige konsekvenser de konstaterede faktiske forhold må medføre, men denne holdningsmæssige værdi skal være præget af en retlig metode, der gør en afgørelse fra domstolene konsekvent. Det er efter det anførte ikke afgørende, om retten vil betegne visse forhold som ledelse. Retten må i stedet vurdere, i hvilken henseende og i hvilket omfang retten finder, at der findes noget, der ville kunne betegnes som en fælles ledelse i Lærergruppen som sådan.

Selve organisationsopbygningen må tillægges betydning, når retten skal vurdere, om de forskellig enheder fungerer som selvstændige retssubjekter, der kan udøve ejendomsret og indgå retshandler. Der står over for denne organisationsopbygning en mulighed for, at det er Lærergruppen som sådan, der samlet udøver hele ejendomsretten. Deltagerne i Lærergruppen har etableret et antal selvejende institutioner, fonde, selskaber, foreninger og andre selskabsretlige organer, hvorigennem de driver mange forskellige aktiviteter, der både omfatter skoledrift, erhvervsmæssig virksomhed og godgørende virksomhed. Der er et stærkt samarbejde mellem deltagerne i Lærergruppen under disse aktiviteter. Retten lægger til grund, at midler, der er optjent og anvendt under de anførte aktiviteter, indgår i og bestyres af forskellige selskabsretlige organer, herunder udenlandske truster, der ejer og bestyrer det, der ofte af deltagerne i gruppen er betegnet som Lærergruppens

Den selvejende institution Fælleseje
Skorkærvej 8
Madum
6990 Ulfborg

16. januar 2006

Sag 05-287.953

/lhj

Att.: Poul Jørgensen

### Fællesejes muligheder for at foretage udlån m.v.

Indledning
Den 12. december 2005 blev der på Den selvejende institution Fælles-
ejes (herefter fonden) foranledning afholdt møde mellem repræsentan-
ter fra fonden og repræsentanter fra Erhvervs- og Selskabsstyrelsen.

Fonden var repræsenteret ved bestyrelsesformand Kaj Egon Hansen og
direktør Poul Jørgensen. Styrelsen var repræsenteret ved vicedirektør
Victor Kjær og fuldmægtig Lars Hammer-Jespersen.

Fondens repræsentanter oplyste, at bestyrelsen ønsker en soliditetsgrad
i fonden på mellem 40 og 60 %. Det blev endvidere oplyst, at fonden i
perioder har fri likviditet, som fondens ledelse ønsker at forrente bedst
muligt, jf. vedtægternes § 2, stk. 5.

Fondens repræsentanter ønskede på denne baggrund en generel tilken-
degivelse fra styrelsen om:

1. Hvilke begrænsninger styrelsen ser for fondens muligheder for
   at foretage udlån af overskydende likviditet.

Endvidere ønskede fondens repræsentanter styrelsens holdning til:

2. Muligheden for at fonden foretager uddelinger til modtagere
   omfattet af fondens formål, som allerede har afholdt de om-
   kostninger, der er søgt støtte til.

Fondens formål (sammenskrevet uddrag)
Det er fondens formål, at erhverve og udleje fast ejendom, skibe og
løsøre til anvendelse for nærmere angivne typer af institutioner og per-
soner listet i vedtægternes § 2, stk. 1, punkt A-E, primært private, selv-
ejende undervisnings- og uddannelsesinstitutioner og personer, der ar-
bejder med projekter inden for dette område, samt personer m.v. der
arbejder for alle menneskers ubetingede ligeberettigelse, jf. vedtægter-
nes § 2, stk. 1.

Endvidere kan fonden på andre måder støtte de i stk. 1, A-E, nævnte
formål, jf. vedtægternes § 2, stk. 2.

ERHVERVS- OG
SELSKABSSTYRELSEN

Kampmannsgade 1
1780 København V

Tlf.      33 30 77 00
Fax       33 30 77 99
CVR-nr    10 15 08 17
eogs@eogs.dk
www.eogs.dk

ØKONOMI- OG
ERHVERVSMINISTERIET

CIR0076670

**Christian Dysted**

| | |
|---|---|
| **Fra:** | Carsten Ingerslev (EOGS) |
| **Sendt:** | 26. januar 2005 09:17 |
| **Til:** | Victor Kjær (EOGS); Lars Hammer-Jespersen (EOGS) |
| **Emne:** | Tvind |

Kaj Egon Hansen har netop telefonisk bedt om tilladelse til, at Tvind i kvartalsrapporterne til styrelsen ikke omtaler deres deres drøftelser i bestyrelsen fsva deres startegi ift retssagen vedr. betalingen af granskningshonoraret.

Jeg gav Kaj Egon Hansen den ønskede tilladelse, da det aldrig har været hensigten med omtalte kvartalsrapporter, at styrelsen skulle opnå indsigt i fondens strategi ift. Retssager mellem fonden og styrelsen.

Carsten Ingerslev

PS til Lars: Vil du være venlig at sørge for at denne mail journaliseres på sagen.

1

CIR0083249





**ERHVERVS- OG SELSKABSSTYRELSEN**

0 9 JAN. 2009

000080

**JOHAN SCHLÜTER**

Erhvervs- og Selskabsstyrelsen
Kampmannsgade 1
1780 København V

WWW JSLAW DK

København
Højbro Plads 10
1200 København K
Telefon +45 32 71 20 00
Fax +45 32 71 21 00

Århus
Skovvejen 2B
Post Boks 37
8000 Århus C
Telefon +45 32 71 20 00
Fax +45 32 71 21 00

København, den 8 januar 2009

Deres ref
Vores ref   04425-0003 hec/kac

Advokat Henrik Christrup ((H)
Direkte telefon 32 71 20 56
kac@jslaw dk

Deres J.nr · Sag 08-311 457

Vedr. Fællesejes anmodning om samtykke til lån til 2 amerikanske selskaber: U'SA-
gain LLC og U'SAgain (2000) LLC

Under henvisning til Styrelsens skrivelse af 4. december 2008 til bestyrelsen for Den
Selvejende Institution Fælleseje skal jeg på bestyrelsens vegne bemærke følgende.

I Styrelsens skrivelse udtales der på flere punkter kritik af bestyrelsen, og til de en-
kelte kritikpunkter skal jeg fremkomme med følgende, idet de nedenfor angivne side-
tal og afsnit henviser til Styrelsens skrivelse af 4. december 2008:

A.   Side 2. fjerdesidste afsnit:

I dette afsnit anfører Styrelsen, at "Fondsbestyrelsen har oplyst, at dens svar
er baseret på grundlag af oplysninger indhentet fra selskaberne selv, da ingen
af Fondens egne bestyrelsesmedlemmer selv har et nærmere kendskab til for-
holdene i de 2 amerikanske selskaber. En sådan praksis i bestyrelsen i forbin-

Interessentskab af advokatselskaber
CVR nr 2646 8426

CIR0084588

**Christian Dysted**

| | |
|---|---|
| **Fra:** | Lars Hammer-Jespersen (EOGS) |
| **Sendt:** | 30. januar 2008 11:01 |
| **Til:** | 'nutid@attglobal.net' |
| **Cc:** | 'kajegon@hotmail.com' |
| **Emne:** | Bestyrelsens redegørelse for 2. kvartal 2007 |



## ERHVERVS- OG SELSKABSSTYRELSEN

30. januar 2008
**ERHVERVS- OG**
**SELSKABSSTYRELSEN**
Kampmannsgade 1
1780 København V

DSI Fælleseje
Skorkærvej 8
6990 Ulfborg

Att.: Bestyrelsen

**Kvartalsredegørelsen for 2. kvartal 2007 vedr. Den Selvejende Institution Fælleseje, CVR-nr. 67061217**

Erhvervs- og Selskabsstyrelsen har ingen bemærkninger til Fællesejes kvartalsredegørelse for 2. kvartal 2007.

Med venlig hilsen

Lars Hammer-Jespersen
Specialkonsulent
Tlf. direkte 33 30 77 07
E-post lhj@eogs.dk

1

CIR0083399

# Foreword

Tvind.

The word makes a series of thoughts of most Danes. But what builds the associations in? Danish media have theorized scan-daliseret and spun on the rumors about Tvind since the late 1970s. Many have gone with half wind and never examined the cases or-be rare. Former Tvind teachers - including myself - have been inter-viewet and used to shed some light on the phenomenon, which no sta-you seem to understand, but rarely has there been a time and place for the in-depth questions. At the same time Tvind contributed to the mystique with a completely hopeless attitude towards the media. For over 20 years it has been hung up in the middle of conversations, simply refused to answer, or have come with excuses when questions went too near.

I was assigned to Tvind for 18 years, from 1972 to 1990, of which the last 13 years as a member of the governing Teacher Group. With this book I have tried to describe what it was that made me, a young 18-year-old young graduate to thrilled to join the Tvind movement; why I chose to stay there so long; and the number of incidents that made me go my way.

This is my personal story. Just as I must take responsibility for my time in Tvind, I must also now emphasize that I do not speak on behalf of others, and that the views expressed in this book are my hero and hol-dent.

Writing has been a long and sometimes painful personal opdagdlsesrejse, filled with contradictions.

I was part of an often corrupt system, but also take part in a very rich community with almost limitless power. I worker-operated schools that gave their students exceptional and rich experiences, but also showed a vicious contempt for dissent and rime-equal criticism. I participated in the building of organizations that helped people around the world, but also reel a stranger ideo-lodgings down the throats of the recipients of the aid. And I learned that I could solve even the most impossible task - something I support myself on this day - but that just it in & has cost more than anything else in terms of human and material losses.

5

CIR0060242

Den Selvejende Institution 'Fælleseje'
Skorkærvej 8
Madum
6990 Ulfborg

25. januar 2007
Sag 07-57.291
/jls

Att. Bestyrelsen

**Den Selvejende Institution 'Fælleseje', CVR-nr. 67061217.**

Erhvervs- og Selskabsstyrelsen har som fondsmyndighed for fonden
gennemgået fondens årsrapport for 2005. Gennemgangen af årsrappor-
ten kan ikke anses for udtømmende.

I forbindelse med gennemgangen har vi bemærket, at der er en uover-
ensstemmelse mellem grundkapitalen i fondens vedtægter og den i års-
rapporten oplyste grundkapital.

Af lov om erhvervsdrivende fonde § 10, stk. 5, og § 11, stk. 1, fremgår,
at ændringer i grundkapitalen skal anmeldes til Erhvervs- og Selskabs-
styrelsen. Da der er uoverensstemmelse mellem den registrerede og den
oplyste grundkapital formoder vi, at det skyldes, at fonden ikke har fået
anmeldt en kapitalforhøjelse.

Bestyrelsen skal beslutte, hvorvidt den ønsker ændringen af den regi-
strerede kapital, eller om årsrapporten skal tilpasses de registrerede op-
lysninger. Dette skal ske senest i forbindelse med godkendelsen af den
følgende årsrapport.

Hvis kapitalen ønskes ændret, skal dette ske i overensstemmelse med
reglerne herom i lov om erhvervsdrivende fonde.

Styrelsen vil i forbindelse med modtagelsen af den kommende årsrap-
port kontrollere, at forholdet er bragt i overensstemmelse med loven, jf.
lov om erhvervsdrivende fonde § 7, stk. 1, nr. 5.

Hvis du har spørgsmål, er du velkommen til at kontakte mig.

Med venlig hilsen

Johan Leonhard Svendsen
Tlf. direkte 3330 7593
E-post jls@eogs.dk

**ERHVERVS- OG
SELSKABSSTYRELSEN**
Kampmannsgade 1
1780 København V

Tlf.    33 30 77 00
Fax     33 30 77 99
CVR-nr  10 15 08 17
eogs@eogs.dk
www.eogs.dk

**ØKONOMI- OG
ERHVERVSMINISTERIET**

CIR0084239

1   Robert L. Shapiro, State Bar No. 043693
    Sara Caplan, State Bar No. 147271
2   CHRISTENSEN, MILLER, FINK, JACOBS,
      GLASER, WEIL & SHAPIRO, LLP
3   2121 Avenue of the Stars, 18th Floor
    Los Angeles, California 90067
4   Telephone: (310) 553-3000
    Facsimile: (310) 556-2920
5
    Attorneys for MOGENS AMDI PETERSEN
6

7                    UNITED STATES DISTRICT COURT
8              FOR THE CENTRAL DISTRICT OF CALIFORNIA
9

10  IN THE MATTER OF THE              )   Case No. 02-0315M
    EXTRADITION OF                    )
11                                    )   PETITION FOR CRIMINAL DUTY JUDGE TO
                                      )   PERMIT FILING OF PETITION FOR JUDICIAL
12  MOGENS AMDI PETERSEN,             )   REVIEW OF MAGISTRATE'S DENIAL OF
                                      )   BAIL; MEMORANDUM OF POINTS AND
13  A Fugitive From the Kingdom       )   AUTHORITIES AND DECLARATION OF
    of Denmark                        )   ROBERT L. SHAPIRO IN SUPPORT THEREOF
14                                    )
                                      )   Date and Time: To be set by the Criminal Duty Judge,
15                                    )   if Permission for Review is Granted
                                      )
16                                    )
                                      )   The United States District Court, Central District of
17                                    )   California, Criminal Duty Judge
18

19

20  **TO THE UNITED STATED ATTORNEY AND TO ALL INTERESTED PARTIES:**

21      **PLEASE TAKE NOTICE** that on a date and at a time to be set by the Court, Petitioner

22  MOGENS AMDI PETERSEN, by and through his counsel ROBERT L. SHAPIRO, will petition the

23  Criminal Duty Judge to permit filing of a petition for judicial review of United States District Court

24  Magistrate Stephen J. Hillman's Denial of Petitioner's Bail. The proposed petition for judicial

25  review is being filed contemporaneously herewith.

26      This Petition for Criminal Duty Judge to Permit Filing of Petition for Judicial Review of

27  Magistrate's Denial of Bail is based on the grounds that the Magistrate refused to consider or make

28  findings on any of the significant constitutional issues raised by Petitioner, which are of major

CIR0014224

# SR6

Job : document

Host : DCA-L-PF1QGQ42

Date : 2021/06/01

Time : 09:40

1  Robert L. Shapiro, State Bar No. 043693
   Sara Caplan, State Bar No. 147271
2  CHRISTENSEN, MILLER, FINK, JACOBS,
     GLASER, WEIL & SHAPIRO, LLP
3  2121 Avenue of the Stars, 18th Floor
   Los Angeles, California 90067
4  Telephone: (310) 553-3000
   Facsimile:  (310) 556-2920
5
   Attorneys for MOGENS AMDI PETERSEN
6

7                    UNITED STATES DISTRICT COURT
8              FOR THE CENTRAL DISTRICT OF CALIFORNIA
9

10 IN THE MATTER OF THE            )   Case No. 02-0313M
   EXTRADITION OF                  )   02-2220 GHK-(VBK)
11                                 )
   MOGENS AMDI PETERSEN,           )   PETITION FOR REHEARING; DECLARATION
12                                 )   OF ROBERT L. SHAPIRO IN SUPPORT
   A Fugitive From the Kingdom     )   THEREOF
13 of Denmark                      )
                                   )
14                                 )   Date and Time: To be set by the Court
                                   )
15                                 )        The Honorable Stephen J. Hillman
                                   )        U.S. Magistrate Judge
16                                 )
                                   )
17 ─────────────────────────────  )

18

19

20      TO THE UNITED STATES ATTORNEY AND ALL INTERESTED PARTIES:

21      PLEASE TAKE NOTICE that on a date and at a time to be set by the Court,

22 MOGENS AMDI PETERSEN,  by and through his attorneys , ROBERT L. SHAPIRO, and

23 SARA L. CAPLAN, requests that the Court re-hear and reconsider its ruling of February 22, 2002

24 and the Order Denying Bail issued February 20, 2002 (Certified copy of Transcript attached as

25 Exhibit "A"; copy of Order attached as Exhibit "B").

26      This Petition is based on the grounds that Petitioner has obtained new evidence which shows

27 that the Magistrate's ruling is factually and legally incorrect.

28 ///

CIR0013901

# SR6

Job  :  document

Host  :  DCA-L-PF1QGQ42

Date  :  2021/06/01

Time  :  09:41

CIVIL COVER SHEET                                    **ORIGINAL**

**I(a) PLAINTIFFS**

UNITED STATES OF AMERICA

**DEFENDANT**

MOGENS AMDI PEDERSEN

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
( EXCEPT IN U.S. PLAINTIFF CASES )

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT **ZIMBABWE, AFRICA**
(IN U.S. PLAINTIFF CASES ONLY)

(c) ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)

MATTHEW E. SLOAN, AUSA
UNITED STATES ATTORNEY'S OFFICE
312 NORTH SPRING STREET – 11TH FLOOR
LOS ANGELES, CALIFORNIA 90012

ATTORNEYS (IF KNOWN)

ROBERT L. SHAPIRO
CHRISTENSEN, MILLER, FINK, JACOBS,
GLASER, WEIL & SHAPIRO, LLP
2121 AVENUE OF THE STARS – 18TH FLOOR
LOS ANGELES, CALIFORNIA 90067

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

| | |
|---|---|
| X 1  U.S. Government Plaintiff | ☐ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE FOR DEFENDANT)
(For Diversity Cases Only)   **N/A**

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN**          (PLACE AN x IN ONE BOX ONLY)

X 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. REQUESTED IN COMPLAINT:**   CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23   **N/A**   **DEMAND $**   Check YES only if demanded in complaint   **JURY DEMAND:** ☐ YES   ☐ NO

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

INTERNATIONAL EXTRADITION MATTER UNDER 18 U.S.C. § 3184

**VII. NATURE OF SUIT**   (PLACE AN x IN ONE BOX ONLY)

| OTHER STATUTES | CONTRACT | TORTS | | FORFEITURE / PENALTY | BANKRUPTCY |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | | **PROPERTY RIGHTS** |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 630 Liquor Laws | ☐ 820 Copyrights |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 830 Patent |
| ☐ 810 Selective Service | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs | ☐ 840 Trademark |
| ☐ 850 Securities/Commodities/ Exchange | | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 153 Recovery of Overpayment Of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 190 Other Contract | | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Information Act | ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS–Third Party 26 USC 7609 |
| ☐ 890 Other Statutory Actions | ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | |
| | ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | |
| | ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | | |

**VIII(a). IDENTICAL CASES:** Has this action been previously filed and dismissed, remanded or closed?   No   X Yes

If yes, list case number(s):   CR MISCELLANEOUS NO. 02-0315M

CV71 (8/96)          CIVIL COVER SHEET - Continued on Reverse          **02 – 02220**          Page 1 of 2

FOR OFFICE USE ONLY:   ☐ Pro Hac Vice fee.   ☐ paid   ☐ not paid

Applying IFP _____   Judge _____   Mag. Judge _____

1  Robert L. Shapiro, State Bar No. 043693
   Sara Caplan, State Bar No. 147271
2  CHRISTENSEN, MILLER, FINK, JACOBS,
    GLASER, WEIL & SHAPIRO, LLP
3  2121 Avenue of the Stars, 18th Floor
   Los Angeles, California 90067
4  Telephone: (310) 553-3000
   Facsimile:  (310) 556-2920
5
   Attorneys for MOGENS AMDI PEDERSEN
6

7

8              UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11 IN THE MATTER OF THE              )  Case No. CV 02-02220-GHK (VBK)
   EXTRADITION OF                    )
12                                   )  The Honorable Victor B. Kenton
   MOGENS AMDI PEDERSEN,             )  U.S. Magistrate Judge
13                                   )
   A Fugitive From the Kingdom       )
14 of Denmark                        )  **MOGENS AMDI PETERSEN'S SUBMISSION OF**
                                     )  **DECLARATIONS IN SUPPORT OF**
15                                   )  **MEMORANDUM OF POINTS AND**
                                     )  **AUTHORITIES RE: EXTRADITION HEARING;**
16                                   )  **DECLARATION OF ROBERT L. SHAPIRO IN**
                                     )  **SUPPORT THEREOF, VOLUME II**
17 _____  )

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

277544.1

CIR0014797

47

1       LOS ANGELES, CALIFORNIA; THURSDAY, FEBRUARY 21, 2002

2               THE CLERK:  THIS IS IN THE MATTER OF 02-315M, IN

3   THE MATTER OF THE EXTRADITION OF PETERSON.

4               MR. SLOAN:  GOOD AFTERNOON, YOUR HONOR.

5               MATTHEW SLOAN FOR THE UNITED STATES.

6               THE COURT:  THANK YOU.

7               MR. SHAPIRO:  GOOD AFTERNOON.

8               ROBERT SHAPIRO AND SARA CAPLAN FOR MR. PETERSON.

9               THE COURT:  ALL RIGHT.  WHAT ARE YOUR THOUGHTS,

10  COUNSEL?

11              MR. SLOAN:  YOUR HONOR, I JUST TEN MINUTES AGO OR

12  SO DELIVERED TO MR. SHAPIRO A COPY OF A LETTER FROM THE

13  MINISTRY OF JUSTICE IN DENMARK WHICH WAS DELIVERED BY THE

14  DANISH FOREIGN MINISTRY TO THE AMERICAN EMBASSY IN

15  COPENHAGEN YESTERDAY, FEBRUARY 20TH.  AND IN THAT LETTER,

16  AND I WOULD PROFFER A COPY TO THE COURT -- BUT I ONLY HAD

17  TWO, AND I GAVE MY OTHER COPY TO MR. SHAPIRO.  BUT I DO HAVE

18  OTHERS COMING.  THE MINISTRY OF JUSTICE --

19              MR. SHAPIRO:  HERE.  THE COURT CAN REVIEW MY COPY.

20              THE COURT:  THANK YOU.

21              MR. SHAPIRO:  YOU'RE WELCOME.

22              MR. SLOAN:  JACOB SHARF SAYS ON PAGE 2 OF THIS

23  DOCUMENT, YOUR HONOR, THE THIRD PARAGRAPH DOWN, INDICATED

24  THAT BY THIS LETTER THE DANISH MINISTRY OF JUSTICE IS

25  REQUESTING THE EXTRADITION OF MR. PETERSON FOR PURPOSES OF

Robert L. Shapiro, State Bar No. 043693
Sara Caplan, State Bar No. 147271
CHRISTENSEN, MILLER, FINK, JACOBS,
GLASER, WEIL & SHAPIRO, LLP
2121 Avenue of the Stars, 18th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Attorneys for MOGENS AMDI PETERSEN

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF<br><br>MOGENS AMDI PETERSEN,<br><br>A Fugitive From the Kingdom of Denmark | Case No. CV 02-02220 GHK (VBK)<br><br>**DECLARATION OF TOVE BIRKØ IN SUPPORT OF PETERSEN'S MEMORANDUM OF POINTS AND AUTHORITIES** |

LAW OFFICES
Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP
2121 AVENUE OF THE STARS
18TH FLOOR
LOS ANGELES, CALIFORNIA 90067
(310) 553-3000

Tove Birko.wpd

1

DECLARATION IN SUPPORT OF PETERSEN'S MEMORANDUM OF POINTS AND AUTHORITIES

CIR0014975

1  Robert L. Shapiro, State Bar No. 043693
   Sara Caplan, State Bar No. 147271
2  CHRISTENSEN, MILLER, FINK, JACOBS,
     GLASER, WEIL & SHAPIRO, LLP
3  2121 Avenue of the Stars, 18th Floor
   Los Angeles, California 90067
4  Telephone: (310) 553-3000
   Facsimile: (310) 556-2920
5
   Attorneys for MOGENS AMDI PEDERSEN
6
7

FILED
CLERK, U.S. DISTRICT COURT

MAY 24 2002

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

8              UNITED STATES DISTRICT COURT

9           FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11  IN THE MATTER OF THE                ) Case No. CV 02-02220-GHK (VBK)
    EXTRADITION OF                      )
12                                      ) The Honorable Victor B. Kenton
    MOGENS AMDI PEDERSEN,               ) U.S. Magistrate Judge
13                                      )
    A Fugitive From the Kingdom         )
14  of Denmark                          ) MOGENS AMDI PETERSEN'S SUBMISSION OF
                                        ) DECLARATIONS IN SUPPORT OF
15                                      ) MEMORANDUM OF POINTS AND
                                        ) AUTHORITIES RE: EXTRADITION HEARING;
16                                      ) DECLARATION OF ROBERT L. SHAPIRO IN
                                        ) SUPPORT THEREOF, VOLUME IV
17  _____ )

18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

ENTERED ON JMS

MAY 29 ---

CV

277544.1

LAW OFFICES
CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO, LLP
2121 AVENUE OF THE STARS
EIGHTEENTH FLOOR
LOS ANGELES, CALIFORNIA 90067
(310) 553-3000

CIR0017979

1  JOHN S. GORDON
   United States Attorney
2  RONALD L. CHENG
   Assistant United States Attorney
3  Acting Chief, Criminal Division
   MATTHEW E. SLOAN (Cal. State Bar No. 165165)
4  Assistant United States Attorney
5  General Crimes Section
        1100 United States Courthouse
6        312 North Spring Street
        Los Angeles, CA  90012
7        Telephone:  (213) 894-5416
        Facsimile:  (213) 894-6269
8
9  Attorneys for Complainant
   UNITED STATES OF AMERICA
10
11              UNITED STATES DISTRICT COURT

12          FOR THE CENTRAL DISTRICT OF CALIFORNIA

13  IN THE MATTER OF THE          )   No. CV 02-02220-GHK (VBK)
    EXTRADITION OF                )
14                                )
                                  )   UNITED STATES' MEMORANDUM OF
15  MOGENS AMDI PEDERSEN          )   POINTS AND AUTHORITIES RE
                                  )   EXTRADITION; DECLARATION OF
16  A Fugitive from the           )   MATTHEW E. SLOAN; SUPPLEMENTAL
    Kingdom of Denmark.           )   DECLARATION OF POUL GADE
17                                )
                                  )
18                                )   DATE: August 19, 2002
                                  )   TIME: 10:00 a.m.
19  _____)

20

21       Complainant United States of America, by and through its

22  counsel of record, the United States Attorney for the Central

23  District of California, hereby submits the following Memorandum

24  of Points and Authorities and supplemental exhibits in support of

25  //

26  //

27  //

28  //

ENTER ON ICMS

APR 24 '02

# EXHIBIT O

| | |
|---|---|
| **From:** | Matt Smith <msmith@cironline.org> |
| **Sent:** | Tuesday, September 15, 2015 3:45 PM |
| **To:** | Foster, Rochelle - FAS; Amy Walters; Kandani Ngwira |
| **Subject:** | FOIA Request |

Dear Ms. Foster,

I'm writing you with a request under applicable laws to review records under your agency's purview.

These records include:

All work product emanating from FAS FY15 Compliance Review - Agreement #FCC-612-2009/008-00

All work product from all other reviews of Planet Aid/DAPP Malawi agreements with the US Department of Agriculture.

All records of program expenses submitted to USDA by DAPP Malawi and affiliated organizations.
All records of program expenses submitted to USDA by Planet Aid and affiliated organizations concerning program expenses relating to Malawi.
This includes, but it not limited to:
All records of program expenses submitted to USDA concerning programs in Malawi by Planet Aid, DAPP Malawi, Humana People to People, Federation for Associations Connected to the InternationalHumana People to People Movement and affiliated organizations.
All records of USDA-program-related deposits, transfers, withdrawals, or similar transactions, concerning bank accounts affiliated with DAPP, Planet Aid, Humana People to People, and affiliated organizations. This includes accounts with names such as *DAPP Malawi Expenses*.
All invoices submitted to USDA by DAPP Malawi.
All invoices submitted to USDA by Planet Aid concerning program expenses relating to Malawi.
All receipts submitted to USDA by DAPP Malawi
All receipts submitted to USDA by Planet Aid concerning program expenses relating to Malawi.
Al ledgers submitted to USDA by DAPP Malawi.
All ledgers submitted to USDA by Planet Aid concerning program expenses relating to Malawi.
All expense spreadsheets submitted to USDA by DAPP Malawi
All expense spreadsheets submitted to USDA by Planet Aid concerning program expenses relating to Malawi.

I would like to receive the information in electronic format.

The Center for Investigative Reporting is America's largest and oldest nonprofit producing investigative journalism, providing articles, documentaries, interactive media productions, and other content for more than 300 publication, broadcast and Internet partners.

As a representative of the news media I am only required to pay for the direct cost of duplication after the first 100 pages. Through this request, I am gathering information that is of current interest to the

1

CIR0039231

public because the performance of government contractors and the
effectiveness of U.S. foreign aid is a topic of public debate.

 This information is being sought on behalf of Center for
Investigative Reporting for dissemination to the general public.

Please waive any applicable fees. Release of the information is in the
public interest because it will contribute significantly to public
understanding of government operations and activities.

If this request is denied in whole or part, we ask that you justify
deletions by reference to specific exemptions of applicable law. We
also request that you release all distinct portions of otherwise
exempt material. We reserve the right to appeal your decision to
withhold any information or to deny a waiver of fees.

I am making this request as a journalist and this information is of
timely value, I would appreciate your communicating with me via email
or telephone if you have questions regarding this request.

**Please provide expedited processing** of this request, which concerns a
matter of urgency. This involves a matter of urgent public concern because the requested documents relate to
the alleged misuse of tens of millions of dollars in US public funds. Any delay in providing the requested
information -- and related hindering of The Center for Investigative Reporting's ability to publish timely
information about these matters of vital public concern -- could result in additional misuse of public funds by
other U.S. agencies doing business with the above mentioned organizations.

If there are ways I could simplify my request, or otherwise modify it
in order to make it easier to fulfill, while still producing the
information I seek, please contact me at msmith@cironline or 510-982-2873.

I look forward to your reply within 20 business days, as the statute
requires.

Thank you for your assistance.


Sincerely,


Matt Smith


Reveal + The Center for Investigative Reporting
revealnews.org @rls
Matt Smith, staff journalist

2

Desk: 510-982-2873
Cell: 415-685-9704

*The Center for Investigative Reporting, and its nationally-syndicated radio show Reveal News are part of the nation's oldest nonprofit investigative news organization, producing unique, high-quality articles, documentaries, radio features, multimedia presentations and other types of media. The organization's stories appear in hundreds of news outlets, including NPR News, PBS Frontline, PBS NewsHour, NBC News, CNN, the Los Angeles Times, The New York Times, The Washington Post, the San Francisco Chronicle, The Sacramento Bee, Newsweek/The Daily Beast, MinnPost and American Public Media's Marketplace. CIR stories have received numerous journalism awards, including the Alfred I. duPont-Columbia University Silver Baton, George Polk Award, Emmy Award, Investigative Reporters and Editors Award, and the MacArthur Award for Creative and Effective Institutions. Its reports have sparked state and federal hearings and legislation, United Nations resolutions, public-interest lawsuits and changes in corporate policies.*

CIR0039233



United States
Department of
Agriculture

Farm and Foreign
Agricultural
Services

Foreign
Agricultural
Service

1400 Independence
Ave, SW
Stop 1040
Washington, DC
20250-1040

September 9, 2015

Delivered via First Class Mail and Electronic Mail
Mr. Matt Smith
Staff Journalist
Center for Investigative Reporting
1400 65th Street
Suite 200
Emeryville, California  94608

**Re:  Freedom of Information Act Request FOIA Request No. 7-2015 Final Response**

Dear Mr. Smith:

This is the final response to your December 16, 2014 Freedom of Information Act (FOIA)
request to the U.S. Department of Agriculture (USDA) Foreign Agricultural Service (FAS).
You requested:

\*All USDA/FAS correspondence concerning records requests from Kristine Alonge
(k.alonge@sbcglobal.net).

\*All records provided to Ms. Alonge in response to her requests. These FOIA records
include but are not limited to FAS FOIA 35-2012 and FAS FOIA 10-2013.
To be clear: I wish to review the material provided in connection with FAS FOIA 35-2012
and FAS FOIA 10-2013, along with any other requests and corresponding reply
documents involving the same requestor.

\*All records showing FOIA requests, information requests from the public or journalistic
Interview requests on these inter-related topics: "Planet Aid" +"Teachers Group", "DAPP,"
"ADPP," "Humana People to People," Ajuda de Desenvolvimento de Povo para Povo,"
"Tvind."

\*Organizational charts -- or documents/files/communications that could reasonably be
interpreted as fulfilling the role of an organizational chart/list/directory -- for the Food
Assistance Division (FAD) of the Office of Capacity Building and Development (OCBD),
Foreign Agricultural Service (FAS), of the U.S. Department of Agriculture
(USDA) for the following years: 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007,
2008, 2009, 2010, 2011, 2012, 2013 and 2014.

\*All memos, emails, calendar entries and other records and communications involving correspondence concerning Marie Lichtenberg. Ms. Lichtenberg's email addresses include but might possibly not be limited to the following: mariel@chembada.co.zw .

\* All memos, emails, calendar entries and other records and communications mentioning the term "Marie Lichtenberg."

\* All memos, emails, calendar entries and other records and communications' mentioning the term "Planet Aid."

\* All memos, emails, calendar entries and other records and communications mentioning the term "Ester Neltrup."

\* All memos, emails, calendar entries and other records and communications mentioning the term "Fred Olsson" or "Frede Olsson."

Your request was received in this office on December 16, 2014.

Your request has been processed under the FOIA, 5 U.S.C § 552.

For this final response, we have reviewed the final three thousand seven hundred and ninety-nine (3,799) pages responsive to your request. After the review, the FAS has determined that three thousand seven hundred and sixty-three (3,763) pages are being released in their entirety. Portions of thirty-six (36) pages are exempt from release, pursuant to FOIA Exemption (b)(4) and FOIA Exemption (b)(6).

The following information provides the basis for our withholding of information under the applicable FOIA exemptions (b)(4) and (b)(6) as described below:

FOIA Exemption 4 protects trade secrets and commercial or financial information obtained from a person that is privileged or confidential. The courts have held that this subsection protects (a) confidential commercial information, the disclosure of which is likely to cause substantial harm to the competitive position of the person who submitted the information and (b) information that was voluntarily submitted to the government if it is the kind of information that the provider would not customarily make available to the public. We reviewed the responsive documents, and relevant case law, and we determined that portions of the records is exempt from disclosure under subsection (b)(4) of the FOIA and must be withheld in order to protect the submitter's proprietary interests.

FOIA Exemption 6 exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy. This requires a balancing of the public's right to disclosure against the individuals' right privacy.

CIR0055636

The types of documents and/or information that we have withheld may consist of birth certificates, naturalization certificates, driver license, social security numbers, home addresses, dates of birth, or various other documents and/or information belonging to a third party that are considered personal. The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Any private interest you may have in that information does not factor into the aforementioned balancing test.

You have the right to appeal this determination. Should you wish to do so, the appeal must be received within 45 days of the date of the response letter. The written appeal must clearly indicate that a FOIA appeal is being made and should be sent to: Administrator, Foreign Agricultural Service, U.S. Department of Agriculture, 1400 Independence Avenue, S.W., Mail Stop 1001, Washington, D. C. 20250-1004, ATTN: FOIA Appeal. Your appeal should include a copy of the original request, the response to the request, and a statement of your reason for the appeal. To facilitate the processing of an appeal, the phrase "FOIA APPEAL" in capital letters should be placed on the front of the envelope.

Provisions of the FOIA allow us to recover part of the cost of complying with your request. As a courtesy, USDA will not charge the fees incurred in the processing of this request.

If you have any questions regarding the processing of this request, please contact FOIA Officer, Ms. Rochelle Foster at (202) 720-2936 or electronically at rochelle.foster@fas.usda.gov. Please reference FOIA Case No. 7-2015.

We appreciate the opportunity to assist you in this matter.

Sincerely,

/s/

Jocelyn Brown
Deputy Administrator
Office of Capacity Building and Development

Enclosure(s): Responsive Documents on CD (3,799) pages

```
FEDERAL BUREAU OF INVESTIGATION
FOI/PA
DELETED PAGE INFORMATION SHEET
FOI/PA# 1317356-0

Total Deleted Page(s) = 171
Page 9 ~ b6; b7C; b7D;
Page 10 ~ b6; b7C; b7D;
Page 11 ~ b6; b7C; b7D;
Page 12 ~ b6; b7C; b7D;
Page 13 ~ b6; b7C; b7D;
Page 14 ~ b6; b7C; b7D;
Page 15 ~ b6; b7C; b7D;
Page 16 ~ b6; b7C; b7D;
Page 17 ~ b6; b7C; b7D;
Page 18 ~ b7D;
Page 19 ~ b7D;
Page 20 ~ b7D;
Page 21 ~ b7D;
Page 22 ~ b7D;
Page 23 ~ b7D;
Page 24 ~ b7D;
Page 25 ~ b7D;
Page 26 ~ b6; b7C; b7D;
Page 27 ~ b6; b7C; b7D;
Page 28 ~ b6; b7C; b7D;
Page 29 ~ b6; b7C; b7D;
Page 31 ~ b6; b7C; b7D;
Page 32 ~ b6; b7C; b7D;
Page 33 ~ b6; b7C; b7D;
Page 34 ~ b6; b7C; b7D;
Page 37 ~ b6; b7C; b7D;
Page 38 ~ b6; b7C; b7D;
Page 40 ~ b6; b7C;
Page 41 ~ b6; b7C;
Page 42 ~ b6; b7C; b7E;
Page 43 ~ b6; b7C; b7E;
Page 44 ~ b6; b7C; b7E;
Page 45 ~ b6; b7C; b7E;
Page 46 ~ b6; b7C; b7E;
Page 47 ~ b6; b7C; b7E;
Page 48 ~ b6; b7C; b7E;
Page 49 ~ b6; b7C; b7E;
Page 50 ~ b6; b7C; b7E;
Page 51 ~ b6; b7C; b7E;
Page 52 ~ b6; b7C; b7E;
Page 53 ~ b6; b7C; b7E;
Page 54 ~ b6; b7C; b7E;
Page 55 ~ b6; b7C;
Page 56 ~ b6; b7C; b7E;
Page 57 ~ b6; b7C;
Page 58 ~ b6; b7C;
Page 59 ~ b6; b7C;
Page 60 ~ b6; b7C;
```

```
Page 61 ~ b6; b7C;
Page 62 ~ b6; b7C;
Page 63 ~ b6; b7C;
Page 64 ~ b6; b7C;
Page 65 ~ b6; b7C;
Page 70 ~ b6; b7C; b7D;
Page 71 ~ b6; b7C; b7D;
Page 72 ~ b6; b7C; b7D;
Page 73 ~ b6; b7C; b7D;
Page 74 ~ b6; b7C; b7D;
Page 75 ~ b6; b7C; b7D;
Page 76 ~ b6; b7C; b7D;
Page 77 ~ b6; b7C; b7D;
Page 78 ~ b6; b7C; b7D;
Page 79 ~ b6; b7C; b7D;
Page 80 ~ b6; b7C; b7D;
Page 81 ~ b6; b7C; b7D;
Page 82 ~ b6; b7C; b7D;
Page 84 ~ Duplicate;
Page 85 ~ Duplicate;
Page 86 ~ Duplicate;
Page 87 ~ Duplicate;
Page 89 ~ b6; b7C; b7D;
Page 90 ~ b6; b7C; b7D;
Page 91 ~ b6; b7C; b7D;
Page 92 ~ b6; b7C; b7D;
Page 93 ~ b6; b7C; b7D;
Page 97 ~ b6; b7C;
Page 98 ~ b6; b7C;
Page 103 ~ b6; b7C; b7D;
Page 104 ~ b6; b7C; b7D;
Page 105 ~ b6; b7C; b7D;
Page 106 ~ b6; b7C;
Page 107 ~ b6; b7C;
Page 108 ~ b6; b7C;
Page 109 ~ b6; b7C;
Page 110 ~ b6; b7C;
Page 111 ~ b6; b7C;
Page 112 ~ b6; b7C;
Page 113 ~ b6; b7C;
Page 114 ~ b6; b7C;
Page 115 ~ b6; b7C;
Page 116 ~ b6; b7C;
Page 117 ~ b6; b7C;
Page 118 ~ b6; b7C;
Page 119 ~ b6; b7C;
Page 120 ~ b6; b7C;
Page 121 ~ b6; b7C;
Page 122 ~ b6; b7C;
Page 123 ~ b6; b7C;
Page 124 ~ b6; b7C;
Page 125 ~ b6; b7C;
Page 126 ~ b6; b7C;
Page 127 ~ b6; b7C;
```

CIR0055814

```
Page 128 ~ b6; b7C;
Page 133 ~ b6; b7C;
Page 135 ~ Duplicate;
Page 136 ~ Duplicate;
Page 137 ~ Duplicate;
Page 138 ~ b6; b7C; b7D;
Page 139 ~ b6; b7C; b7D;
Page 142 ~ b6; b7C;
Page 143 ~ b6; b7C;
Page 144 ~ b6; b7C;
Page 145 ~ b6; b7C;
Page 146 ~ b6; b7C;
Page 147 ~ b6; b7C;
Page 148 ~ b6; b7C;
Page 149 ~ b6; b7C;
Page 150 ~ b6; b7C;
Page 151 ~ b6; b7C;
Page 152 ~ b6; b7C;
Page 153 ~ b6; b7C;
Page 154 ~ b6; b7C;
Page 155 ~ b6; b7C;
Page 156 ~ b6; b7C;
Page 157 ~ b6; b7C;
Page 158 ~ b6; b7C;
Page 159 ~ b6; b7C;
Page 160 ~ b6; b7C;
Page 161 ~ b6; b7C;
Page 162 ~ b6; b7C;
Page 163 ~ b6; b7C;
Page 164 ~ b6; b7C;
Page 165 ~ b6; b7C;
Page 166 ~ b6; b7C;
Page 167 ~ b6; b7C;
Page 168 ~ b6; b7C;
Page 169 ~ b6; b7C;
Page 184 ~ b6; b7C;
Page 185 ~ b6; b7C;
Page 186 ~ b6; b7C;
Page 187 ~ b6; b7C; b7D;
Page 188 ~ b6; b7C; b7D;
Page 189 ~ b6; b7C; b7D;
Page 190 ~ b6; b7C; b7D;
Page 191 ~ b6; b7C; b7D;
Page 192 ~ b6; b7C; b7D;
Page 193 ~ b6; b7C; b7D;
Page 194 ~ b6; b7C;
Page 195 ~ b6; b7C;
Page 196 ~ b6; b7C;
Page 198 ~ b6; b7C;
Page 200 ~ b6; b7C;
Page 202 ~ b6; b7C;
Page 205 ~ b6; b7C;
Page 206 ~ b6; b7C;
Page 207 ~ b6; b7C;
```

CIR0055815

```
Page 209 ~ b6; b7C;
Page 210 ~ b6; b7C;
Page 211 ~ b6; b7C;
Page 212 ~ b6; b7C;
Page 213 ~ b6; b7C;
Page 214 ~ b6; b7C;
Page 215 ~ b6; b7C;
Page 226 ~ b6; b7C; b7D;
Page 227 ~ b6; b7C; b7D;
Page 228 ~ b6; b7C;
Page 229 ~ b6; b7C; b7D;
Page 230 ~ b6; b7C; b7D;
Page 231 ~ b6; b7C; b7D;
Page 232 ~ b6; b7C; b7D;
Page 233 ~ b6; b7C; b7D;
```

```
XXXXXXXXXXXXXXXXXXXXXXXX
X    Deleted Page(s)     X
X    No Duplication Fee X
X    For this Page       X
XXXXXXXXXXXXXXXXXXXXXXXX
```

**Message**

| | |
|---|---|
| **From:** | Matt Smith [msmith@cironline.org] |
| **Sent:** | 12/16/2014 7:18:23 PM |
| **To:** | asillah@usaid.gov |
| **Subject:** | FOIA request |

I hope this message finds you well.

I'm writing you with a request under applicable laws to review records under your agency's purview.

These records include:

*All correspondence concerning records requests from Kristine Alonge (k.alonge@sbcglobal.net).

*All records provided to Ms. Alonge in response to her requests.

*All records showing FOIA requests, information requests from the public or journalistic interview requests on these inter-related topics: "Planet Aid", "Teachers Group", "DAPP," "ADPP," "Humana People to People," Ajuda de Desenvolvimento de Povo para Povo," "Tvind."

* All materials submitted to USAID by Planet Aid, a private voluntary organization.

* All contracts/agreements involving USAID and Planet Aid.

* All records submitted by Planet Aid memorializing its fulfillment of contracts/agreements with USAID. These include reports, invoices, ledgers and related records.

* All records of audits, inquiry, or related oversight of projects/contracts/agreements involving Planet Aid and USAID.

*All memos, emails, calendar entries and other records and communications involving correspondence concerning Planet Aid representative Marie Lichtenberg. Ms. Lichtenberg's email addresses include but might possibly not be limited to the following: mariel@chembada.co.zw .

* All memos, emails, calendar entries and other records and communications mentioning the term "Marie Lichtenberg".

* All memos, emails, calendar entries and other records and communications mentioning the term "Planet Aid".

* All memos, emails, calendar entries and other records and communications mentioning the term "Ester Neltrup".

* All memos, emails, calendar entries and other records and communications mentioning the term "Fred Olsson" or "Frede Olsson".

* All materials submitted to USAID by Ajuda de Desenvolvimento de Povo para Povo/ADPP

* All contracts/agreements involving USAID and Ajuda de Desenvolvimento de Povo para Povo/ADPP.

* All records submitted by Ajuda de Desenvolvimento de Povo para Povo/ADPP memorializing its fulfillment of contracts/agreements with USAID. These include reports, invoices, ledgers and related records.

* All materials submitted to USAID by Development Aid People to People/DAPP.

* All contracts/agreements involving USAID and Development Aid People to People/DAPP.

* All records submitted by Development Aid People to People/DAPP memorializing its fulfillment of contracts/agreements with USAID. These include reports, invoices, ledgers and related records.



I would like to receive the information in electronic format.

The Center for Investigative Reporting is America's largest and oldest nonprofit producing investigative journalism, providing articles, documentaries, interactive media productions, and other content for more than 200 publication, broadcast and Internet partners.

As a representative of the news media I am only required to pay for the direct cost of duplication after the first 100 pages. Through this request, I am gathering information that is of current interest to the public because the performance of government contractors and the effectiveness of U.S. foreign aid is a topic of public debate.

This information is being sought on behalf of Center for Investigative Reporting for dissemination to the general public.

Please waive any applicable fees. Release of the information is in the public interest because it will contribute significantly to public understanding of government operations and activities.

If this request is denied in whole or part, we ask that you justify deletions by reference to specific exemptions of applicable law. We also request that you release all distinct portions of otherwise exempt material. We reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

I am making this request as a journalist and this information is of timely value, I would appreciate your communicating with me via email or telephone if you have questions regarding this request.

Please provide expedited processing of this request, which concerns a pressing matter.

If there are ways I can simplify my request, or otherwise modify it in order to make it easier to fulfill while still producing the information I seek, please contact me at msmith@cironline or 510-982-2873.

If fulfilling my request entails producing substantial duplicate records, to the degree practical please avoid duplication. Please contact me if avoiding such duplication requires substantially altering my request.

I look forward to your reply within 20 business days, as the statute requires.

Thank you for your assistance.


Sincerely,

Matt Smith


cell: 415-685-9704

desk: 510-982-2873

- --

Matt Smith, staff journalist

Desk: 510-809-3160 xt. 373
Cell: 415-685-9704

--

Matt Smith, staff journalist
Desk: 510-809-3160 xt. 373
Cell: 415-685-9704

*The Center for Investigative Reporting is the nation's oldest nonprofit investigative news organization, producing unique, high-quality articles, documentaries, radio features, multimedia presentations and other types of media. The organization's stories appear in hundreds of news outlets, including NPR News, PBS Frontline, PBS NewsHour, NBC News, CNN, the Los Angeles Times, The New York Times, The Washington Post, the San Francisco Chronicle, The Sacramento Bee, Newsweek/The Daily Beast, MinnPost and American Public Media's Marketplace. CIR stories have received numerous journalism awards, including the Alfred I. duPont-Columbia University Silver Baton, George Polk Award, Emmy Award, Investigative Reporters and Editors Award, and the MacArthur Award for Creative and Effective Institutions. Its reports have sparked state and federal hearings and legislation, United Nations resolutions, public-interest lawsuits and changes in corporate policies.*

CIR0056383

| | |
|---|---|
| **From:** | Matt Smith <msmith@cironline.org> |
| **Sent:** | Monday, December 15, 2014 9:52 PM |
| **To:** | Henry.Noland@fas.usda.gov |
| **Subject:** | FOIA request |

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

Dear Mr. Noland,

I hope this message finds you well.

I'm writing you with a request under applicable laws to review records under your agency's purview.

These records include:

*All USDA/FAS correspondence concerning records requests from Kristine Alonge (k.alonge@sbcglobal.net).

*All records provided to Ms. Alonge in response to her requests. These FOIA records include but are not limited to FAS FOIA 35-2012 and FAS FOIA 10-2013.
To be clear: I wish to review the material provided in connection with FAS FOIA 35-2012 and FAS FOIA 10-2013, along with any other requests and corresponding reply documents involving the same requestor.

*All records showing FOIA requests, information requests from the public or journalistic interview requests on these inter-related
topics: "Planet Aid" +"Teachers Group", "DAPP," "ADPP," "Humana People to People," Ajuda de Desenvolvimento de Povo para Povo," "Tvind."

*Organizational charts -- or documents/files/communications that could reasonably be interpreted as fulfilling the role of an organizational chart/list/directory -- for the Food Assistance Division (FAD) of the Office of Capacity Building and Development (OCBD), Foreign Agricultural Service (FAS), of the U.S. Department of Agriculture
(USDA) for the following years: 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014

*All memos, emails, calendar entries and other records and communications involving correspondence concerning Marie Lichtenberg.
Ms. Lichtenberg's email addresses include but might possibly not be limited to the following: mariel@chembada.co.zw .

* All memos, emails, calendar entries and other records and communications mentioning the term "Marie Lichtenberg".

* All memos, emails, calendar entries and other records and communications mentioning the term "Planet Aid".

* All memos, emails, calendar entries and other records and communications mentioning the term "Ester Neltrup".

* All memos, emails, calendar entries and other records and communications mentioning the term "Fred Olsson" or "Frede Olsson".

I would like to receive the information in electronic format.

1

CIR0056384

The Center for Investigative Reporting is America's largest and oldest nonprofit producing investigative journalism, providing articles, documentaries, interactive media productions, and other content for more than 200 publication, broadcast and Internet partners.

As a representative of the news media I am only required to pay for the direct cost of duplication after the first 100 pages. Through this request, I am gathering information that is of current interest to the public because the performance of government contractors and the effectiveness of U.S. foreign aid is a topic of public debate.

This information is being sought on behalf of Center for Investigative Reporting for dissemination to the general public.

Please waive any applicable fees. Release of the information is in the public interest because it will contribute significantly to public understanding of government operations and activities.

If this request is denied in whole or part, we ask that you justify deletions by reference to specific exemptions of applicable law. We also request that you release all distinct portions of otherwise exempt material. We reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

I am making this request as a journalist and this information is of timely value, I would appreciate your communicating with me via email or telephone if you have questions regarding this request.

Please provide expedited processing of this request, which concerns a matter of urgency.

If there are ways I could simplify my request, or otherwise modify it in order to make it easier to fulfill, while still producing the information I seek, please contact me at msmith@cironline or 510-982-2873.

I look forward to your reply within 20 business days, as the statute requires.

Thank you for your assistance.


Sincerely,


Matt Smith


cell: 415-685-9704

desk: 510-982-2873

- --

Matt Smith, staff journalist
Desk: 510-809-3160 xt. 373
Cell: 415-685-9704

*The Center for Investigative Reporting is the nation's oldest nonprofit investigative news organization, producing unique, high-quality articles, documentaries, radio features, multimedia presentations and other types of media. The organization's stories appear in hundreds of news outlets, including NPR News, PBS Frontline, PBS NewsHour, NBC News, CNN, the Los Angeles Times, The New York Times, The Washington Post, the San Francisco Chronicle, The Sacramento Bee, Newsweek/The Daily Beast, MinnPost and American Public Media's Marketplace. CIR stories have

2

CIR0056385

received numerous journalism awards, including the Alfred I. duPont-Columbia University Silver Baton, George Polk Award, Emmy Award, Investigative Reporters and Editors Award, and the MacArthur Award for Creative and Effective Institutions. Its reports have sparked state and federal hearings and legislation, United Nations resolutions, public-interest lawsuits and changes in corporate policies.*

-----BEGIN PGP SIGNATURE-----
Version: GnuPG/MacGPG2 v2.0.22 (Darwin)
Comment: GPGTools - https://gpgtools.org

iQEcBAEBCgAGBQJUj8iFAAoJEl61K9O8Bxcp38gH/jNPC7J1GfE9rt6zevLdPOBu
fivmYZqZMP6UPZmIeV1EEkILxztMq2lP8CcO2gCp8I4Soa2Yfzkk3T54WjXk5ICW
6PBDSSxfcA2jz/VTSz1cturFD0DH13X9CDKgwLtj2feeWznIVEhnN/rC9WfSKn6j
X6UsYK1rpwlaIqBx0+E5gj2agOMV3c2rIPf6UJI1Hq1sN8XXpT2yYLTa73fuycru
UV4pfKzyF6Shev8IaICcVsL12119m8xmr6xsyMEH/eC+HIyNIfkhqBj5vFpaiNcR
wQVdQpNI+rCsqE+xZX3GlYSuyJcn0sxoajGyN2T/sp5F07NnRvgOzonovvsnLg0=
=f1V+
-----END PGP SIGNATURE-----

CIR0056386



DEC **1 2** 2013

Ms. Kristine Alonge
23604 Cantrell Road
Tonganoxie, Kansas 66086-3315

    **RE: F-00068-13**

Dear Ms. Alonge:

    The United States Agency for International Development (USAID) regrets the delay in responding to your Freedom of Information Act (FOIA) request. Unfortunately, USAID is experiencing a backlog of FOIA requests. Please know that USAID management is very committed to providing responses to FOIA request and remedying the FOIA backlog.

    This is our final response to your FOIA request dated December 16, 2012 in which you requested Planet Aid Incorporated's application for PVO for 2006-2012. You also request the amounts reported for the years not available through the USAID Profile Report with the following information: mission statement, amount of government grants received, expenditures for foreign programs and expenditures for domestic programs.

    The FOIA excludes certain records from the requirements of the FOIA. This response addresses only those records that are the subject to the FOIA.

    Out of 138 pages, 133 pages are released in full and 5 pages are released in part. Planet Aid Incorporated offered no objections to release of its information. However, we have identified information that should be withheld pursuant to FOIA Exemption 6. Exemption 6, 5 U.S.C. §552, permits the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy". Therefore, we have withheld personal home addresses.

    As requested, we have enclosed Attachment 1 as supporting information for Planet Aid Incorporated's applications for 2006 and 2007 because these records are not maintained beyond three years.

F-00068-13
Page -2 –

You have the right to appeal the above withholdings. Your appeal must be received by our Agency no later than 30 days from the date of this letter. To be considered an official appeal, please address and send directly to the FOIA Appeals Officer:

Director, Office of Management Services
U.S. Agency for International Development
1300 Pennsylvania Avenue, N.W.
Room 2.12-010, Ronald Reagan Building
Washington, D.C. 20523

If you wish to fax your appeal, the fax number is (202) 216-3369. Both the appeal letter and envelope must be plainly marked **"FOIA Appeal"**. Please include your tracking number, **F-00068-13**, in your letter.

As this concludes the processing of your request, we are closing your case.

Sincerely,

Alecia S. Sillah
Team Lead, Government Information Specialist
Bureau for Management
Office of Management Services
Information and Records Division

Enclosures: a/s



FROM THE AMERICAN PEOPLE

MAY 20 2015

TRANSMITTED VIA EMAIL
msmith@cironline.org

Mr. Matt Smith
Staff Journalist
Center for Investigative Reporting

RE:  FOIA Request No. F-00083-15
     Final Response

Dear Mr. Smith:

The United States Agency for International Development (USAID) regrets the delay in responding to your Freedom of Information Act (FOIA) request. Unfortunately, USAID is experiencing a backlog of FOIA requests. Please know that USAID management is very committed to providing responses to FOIA requests and remedying the FOIA backlog.

This is USAID's final response to your FOIA request dated January 6, 2015. You requested the Private Voluntary Organization (PVO) annual submissions for Planet Aid for 2013, 2014, and all years prior to 2010.

For your information, Congress excluded three (3) discrete categories of law enforcement and national security records from the FOIA. See FOIA, 5 U.S.C. § 552(c) (2006 & Supp. IV (2010)). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all of our requesters and should not be construed as an indication that excluded records do, or do not exist.

USAID conducted a comprehensive search of the Bureau for Economic Growth, Education, and Environment (E3) for the documents responsive to your request. The search produced a total of 173 pages. These pages cover the years 2008, 2009, and 2013. We have determined that the 173 pages are releasable in their entirety. Planet Aid's submission for fiscal year 2014 is not due until September 30, 2015. Please note that no records prior to 2008 were identified as responsive to your request.

You have the right to appeal this No Records response. Your appeal must be received by USAID no later than 30 days from the date of this letter. In order for it to be considered an official appeal, please address and send directly to the FOIA Appeal Officer:

F-00083-15
2

Director, Office of Management Services
U.S. Agency for International Development
1300 Pennsylvania Avenue, NW
Ronald Reagan Building, Room 2.12.010
Washington, DC 20523

If you wish to fax your appeal, the fax number is (202) 216-3369. Both the appeal and envelope should be marked "**FOIA APPEAL.**" Please include your tracking number F-00083-15 in your letter.

There is no charge for this FOIA request. As this concludes the processing of your request, it will be closed.

If you need to contact our office again about this request, please refer to the tracking number cited above. You may contact Sylvia Lankford on (202) 712-0879 or at slankford@usaid.gov.

Thank you for your interest in USAID and continued patience.

Sincerely,

S. Lankford/for

Lynn P. Winston
FOIA Officer/Agency Record Officer
Bureau for Management
Office of Management Services
Information and Records Division

Enclosures: Responsive Records (173 pages)



**U.S. Department of Justice**

Office of Information Policy
*Suite 11050*
*1425 New York Avenue, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

Mr. Matthew Smith
Center for Investigative Reporting
Suite 200
1400 65th Street
Emerville, CA 94608
msmith@cironline.org

Re:    Appeal No. AP-2015-01303
        Request No. 1318212
        SRO:MTC

**VIA:  Appeal Portal**

Dear Mr. Smith:

    This is to advise you that your administrative appeal from the action of the Federal Bureau of Investigation was received in this Office on January 9, 2015. You appealed from the FBI's denial of your request for expedited treatment of your request.

    The FBI responded to your request by letter dated December 23, 2014 (copy enclosed). Because the FBI responded to your request, your appeal from the FBI's failure to grant expedited processing of your request is moot. Accordingly, I am closing your appeal file in this Office.

            Sincerely,

                              1/28/2015

            X _____

              Sean R. O'Neil
              Chief, Administrative Appeals Staff
              Signed by: Sean O'Neil

Enclosure



U.S. Department of Justice

Federal Bureau of Investigation
*Washington, D.C. 20535*

December 23, 2014

MR. MATT SMITH
THE CENTER FOR INVESTIGATIVE REPORTING
SUITE 200
1400 65TH STREET
EMERYVILLE, CA 94608

FOIPA Request No.: 1318212-000
Subject: PETERSEN, MOGENS AMID
(SPECIFIC ORGANIZATIONS)

Dear Mr. Smith:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to the FBI.  The FOIPA number listed above has been assigned to your request.

You have requested records concerning one or more third party individuals.  Because you have requested information about a third party and the FBI recognizes an important privacy interest in that information, to help us process your request we ask that you provide one of the following: (1) an authorization and consent from the individual(s) (*i.e.*, express authorization and consent of the third party); (2) proof of death (*i.e.*, proof that your subject is deceased); or (3) a justification that the public interest in disclosure outweighs personal privacy (*i.e.*, a clear demonstration that the public interest in disclosure outweighs personal privacy interests).  In the absence of such information, the FBI can neither confirm nor deny the existence of any records responsive to your request, which, if they were to exist, would be exempt from disclosure pursuant to FOIA Exemptions (b)(6) and (b)(7)(C), 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C).

Express authorization and consent.  If you seek disclosure of any existing records on this basis, enclosed is a Certification of Identity form.  You may make additional copies of this form if you are requesting information on more than one individual.  The subject of your request should complete this form and then sign it.  Alternatively, the subject may prepare a document containing the required descriptive data and have it notarized.  The original certification of identity or notarized authorization with the descriptive information must contain a legible, original signature before FBI can conduct an accurate search of our records.

Proof of death.  If you seek disclosure of any existing records on this basis, proof of death can be a copy of a death certificate, Social Security Death Index, obituary, or another recognized reference source.  Death is presumed if the birth date of the subject is more than 100 years ago.

Public Interest Disclosure.  If you seek disclosure of any existing records on this basis, you must demonstrate that the public interest in disclosure outweighs personal privacy interests.  In this regard, you must show that the public interest sought is a significant one, and that the requested information is likely to advance that interest.

Fax your request to the Work Process Unit at (540) 868-4997, or mail to 170 Marcel Drive, Winchester, VA 22602.  If we do not receive a response from you within 30 days from the date of this letter, your request will be closed.  You must include the FOIPA request number with any communication regarding this matter.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c).  As such, this response is limited to those records, if any exist, that are subject to the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's eFOIA portal at http://www.justice.gov/oip/efoia-portal.html.  Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely.  The envelope and the letter should be clearly marked "Freedom of Information Appeal."  Please cite the FOIPA Request Number in any correspondence to us for proper identification of your request.

CIR0062100

Enclosed for your information is a copy of the FBI Fact Sheet and a copy of the Explanation of Exemptions.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
 Dissemination Section
Records Management Division

Enclosure(s)

**From:**          Matt Smith <msmith@cironline.org>
**Sent:**          Tuesday, December 16, 2014 10:54 AM
**To:**            Henry.Noland@fas.usda.gov
**Subject:**       Fwd: FOIA request

Dear Mr. Noland,

This was sent yesterday with encryption: I'm resending it without to make sure you received it properly.

Kindly,
Matt

**To wit:**

From: **Matt Smith** <msmith@cironline.org>
Date: Mon, Dec 15, 2014 at 9:52 PM
Subject: FOIA request
To: Henry.Noland@fas.usda.gov

-----BEGIN PGP SIGNED MESSAGE-----
Hash: SHA512

Dear Mr. Noland,

I hope this message finds you well.

I'm writing you with a request under applicable laws to review records
under your agency's purview.

These records include:

*All USDA/FAS correspondence concerning records requests from Kristine
Alonge (k.alonge@sbcglobal.net).

*All records provided to Ms. Alonge in response to her requests. These
FOIA records include but are not limited to FAS FOIA 35-2012 and FAS
FOIA 10-2013.
To be clear: I wish to review the material provided in connection with
FAS FOIA 35-2012 and FAS FOIA 10-2013, along with any other requests
and corresponding reply documents involving the same requestor.

*All records showing FOIA requests, information requests from the
public or journalistic interview requests on these inter-related
topics: "Planet Aid" +"Teachers Group", "DAPP," "ADPP," "Humana People
to People," Ajuda de Desenvolvimento de Povo para Povo," "Tvind."

*Organizational charts -- or documents/files/communications that could

1

reasonably be interpreted as fulfilling the role of an organizational chart/list/directory -- for the Food Assistance Division (FAD) of the Office of Capacity Building and Development (OCBD), Foreign Agricultural Service (FAS), of the U.S. Department of Agriculture (USDA) for the following years: 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013 and 2014

*All memos, emails, calendar entries and other records and communications involving correspondence concerning Marie Lichtenberg. Ms. Lichtenberg's email addresses include but might possibly not be limited to the following: mariel@chembada.co.zw .

* All memos, emails, calendar entries and other records and communications mentioning the term "Marie Lichtenberg".

* All memos, emails, calendar entries and other records and communications mentioning the term "Planet Aid".

* All memos, emails, calendar entries and other records and communications mentioning the term "Ester Neltrup".

* All memos, emails, calendar entries and other records and communications mentioning the term "Fred Olsson" or "Frede Olsson".

I would like to receive the information in electronic format.

The Center for Investigative Reporting is America's largest and oldest nonprofit producing investigative journalism, providing articles, documentaries, interactive media productions, and other content for more than 200 publication, broadcast and Internet partners.

As a representative of the news media I am only required to pay for the direct cost of duplication after the first 100 pages. Through this request, I am gathering information that is of current interest to the public because the performance of government contractors and the effectiveness of U.S. foreign aid is a topic of public debate.

 This information is being sought on behalf of Center for Investigative Reporting for dissemination to the general public.

Please waive any applicable fees. Release of the information is in the public interest because it will contribute significantly to public understanding of government operations and activities.

If this request is denied in whole or part, we ask that you justify deletions by reference to specific exemptions of applicable law. We also request that you release all distinct portions of otherwise exempt material. We reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

I am making this request as a journalist and this information is of

2

timely value, I would appreciate your communicating with me via email
or telephone if you have questions regarding this request.

Please provide expedited processing of this request, which concerns a
matter of urgency.

If there are ways I could simplify my request, or otherwise modify it
in order to make it easier to fulfill, while still producing the
information I seek, please contact me at msmith@cironline or 510-982-2873.

I look forward to your reply within 20 business days, as the statute
requires.

Thank you for your assistance.


Sincerely,


Matt Smith


cell: 415-685-9704

desk: 510-982-2873

- --

Matt Smith, staff journalist
Desk: 510-809-3160 xt. 373
Cell: 415-685-9704

*The Center for Investigative Reporting is the nation's oldest
nonprofit investigative news organization, producing unique,
high-quality articles, documentaries, radio features, multimedia
presentations and other types of media. The organization's stories
appear in hundreds of news outlets, including NPR News, PBS Frontline,
PBS NewsHour, NBC News, CNN, the Los Angeles Times, The New York
Times, The Washington Post, the San Francisco Chronicle, The
Sacramento Bee, Newsweek/The Daily Beast, MinnPost and American Public
Media's Marketplace. CIR stories have received numerous journalism
awards, including the Alfred I. duPont-Columbia University Silver
Baton, George Polk Award, Emmy Award, Investigative Reporters and
Editors Award, and the MacArthur Award for Creative and Effective
Institutions. Its reports have sparked state and federal hearings and
legislation, United Nations resolutions, public-interest lawsuits and
changes in corporate policies.*


-----BEGIN PGP SIGNATURE-----

CIR0062203

Version: GnuPG/MacGPG2 v2.0.22 (Darwin)
Comment: GPGTools - https://gpgtools.org

iQEcBAEBCgAGBQJUj8iFAAoJEI61K9O8Bxcp38gH/jNPC7J1GfE9rt6zevLdPOBu
fivmYZqZMP6UPZmIeV1EEklLxztMq2lP8CcO2gCp8I4Soa2Yfzkk3T54WjXk5ICW
6PBDSSxfcA2jz/VTSz1cturFD0DH13X9CDKgwLtj2feeWznlVEhnN/rC9WfSKn6j
X6UsYK1rpwlaIqBx0+E5gj2agOMV3c2rIPf6UJI1Hq1sN8XXpT2yYLTa73fuycru
UV4pfKzyF6Shev8IaICcVsL12119m8xmr6xsyMEH/eC+HIyNIfkhqBj5vFpaiNcR
wQVdQpNl+rCsqE+xZX3GlYSuyJcn0sxoajGyN2T/sp5F07NnRvgOzonovvsnLg0=
=f1V+
-----END PGP SIGNATURE-----

--



Matt Smith, staff journalist
Desk: 510-809-3160 xt. 373
Cell: 415-685-9704

*The Center for Investigative Reporting is the nation's oldest nonprofit investigative news organization, producing unique, high-quality articles, documentaries, radio features, multimedia presentations and other types of media. The organization's stories appear in hundreds of news outlets, including NPR News, PBS Frontline, PBS NewsHour, NBC News, CNN, the Los Angeles Times, The New York Times, The Washington Post, the San Francisco Chronicle, The Sacramento Bee, Newsweek/The Daily Beast, MinnPost and American Public Media's Marketplace. CIR stories have received numerous journalism awards, including the Alfred I. duPont-Columbia University Silver Baton, George Polk Award, Emmy Award, Investigative Reporters and Editors Award, and the MacArthur Award for Creative and Effective Institutions. Its reports have sparked state and federal hearings and legislation, United Nations resolutions, public-interest lawsuits and changes in corporate policies.*

CIR0062204

**EXHIBIT P**

| | |
|---|---|
| **From:** | Fritzler <mafritzler@yahoo.com> |
| **Sent:** | Friday, May 29, 2015 6:32 PM |
| **To:** | Matt Smith |
| **Subject:** | Fw: Request for public records search (IICD MA) |
| **Attachments:** | 2015-05-27 Blank ltr to Fritzler (w enclosures).pdf |

Unbelievable!

And that I should have to pay over $100 for probably more garbage.

----- Forwarded Message -----
**From:** Fritzler <mafritzler@yahoo.com>
**To:** Fritzler <mafritzler@yahoo.com>
**Sent:** Wednesday, May 27, 2015 10:36 AM
**Subject:** Fw: Request for public records search

----- Forwarded Message -----
**From:** "Blank, Brett (AGO)" <brett.blank@state.ma.us>
**To:** Fritzler <mafritzler@yahoo.com>
**Sent:** Wednesday, May 27, 2015 10:15 AM
**Subject:** RE: Request for public records search

Ms. Fritzler –

Please see the attached correspondence.

**Brett J. Blank**
Assistant Attorney General
Office of the Attorney General
Non-Profit Organizations/Public Charities Division
One Ashburton Place
Boston, MA 02108
Phone: 617-963-2346

**From:** Blank, Brett (AGO)
**Sent:** Monday, April 06, 2015 3:36 PM
**To:** 'Fritzler'
**Subject:** RE: Request for public records search

Ms. Fritzler –

Please see the attached correspondence.

Best,

**Brett J. Blank**

1

CIR0061194

Assistant Attorney General
Office of the Attorney General
Non-Profit Organizations/Public Charities Division
One Ashburton Place
Boston, MA 02108
Phone: 617-963-2346

**From:** Fritzler [mailto:mafritzler@yahoo.com]
**Sent:** Friday, March 27, 2015 9:09 AM
**To:** Blank, Brett (AGO)
**Subject:** Re: Request for public records search

Dear Mr. Blank,

A very belated thank you for your prompt reply to my FOIA request.

It is very unfortunate that the records I requested are no longer available.  Frankly, I am surprised that a special file doesn't exist somewhere in the charity division of the AGO which may contain at least some notes on who the listed board officers were for IICD during the period in question.  A very detailed complaint was sent to the AGO in 1991 concerning this school.  Here is a link to that complaint:  http://www.humana-alert.org.uk/iicd_complaint_1991.htm

IICD MA, as you perhaps know, is is part of a network of schools and other so-called charitable entities that were set up in the USA by the Danish-born cult known as the Tvind Teachers Group (TG).  This is not the place nor time to go into the complex details; suffice now to say that five top leaders, including supreme leader, Amdi Petersen, of this tainted group are fugitives currently wanted by Danish authorities and Interpol.  Please see the Interpol links at the end of this email.  All five are *significantly* associated with the past and current officers and key directors of IICD MA (and of IICD Michigan, as well; together IICD MA and IICD Michigan are now known as One World Center) and other organizations in the network, including Planet Aid Inc.

Planet Aid Inc. was incorporated in Massachusetts, and is chaired by Mikael Norling.  (Note in the 1991 complaint about IICD MA, Mikael Norling is mentioned.)  Your office should have on file (since the information was sent to Eric Carriker) the FBI file on Tvind and Amdi Petersen per the lead up to first fraud trial in Denmark against Amdi Petersen and seven top TG leaders, as well the case summary (Exhibit C) from the trial.  In these documents, IICD and Planet Aid are mentioned by name.  There is a vast body of evidence available to prove that Mikael Norling is the head of TG activities in the USA and that he presides over an organized racket that is involved in self dealing, excess benefit transactions, false claims and much more.

There *should* be an active file open on both Planet Aid and IICD in your office.  My research associate, Kris Alonge, and I sent Eric Carriker a great deal of information (but only a fraction of what we have compiled) which should have raised alarm within the charity div of the MA AGO.   None of our emails were even acknowledged.

Most recently, Kris Alonge sent your office a copy of a complaint she sent to the IRS regarding IICA MA.  It is worth a read.  For your convenience, I have attached this complaint.

Again, thank you for your assistance.

Pamela Fritzler

CIR0061195

Interpol Links:

Amdi Petersen: http://tinyurl.com/mgyvqt7
Kirsten Larsen: http://tinyurl.com/lrmtvjf
Marlene Gunst: http://tinyurl.com/k9p288s
Christie Pipps: http://tinyurl.com/mwqltw2
Sten Byrner: http://tinyurl.com/m2d3mgm

---

**From:** "Blank, Brett (AGO)" <brett.blank@state.ma.us>
**To:** "mafritzler@yahoo.com" <mafritzler@yahoo.com>
**Sent:** Thursday, February 12, 2015 2:51 PM
**Subject:** RE: Request for public records search

Ms. Fritzler –

Please see the attached correspondence.

Best,

**Brett J. Blank**
Assistant Attorney General
Office of the Attorney General
Non-Profit Organizations/Public Charities Division
One Ashburton Place
Boston, MA 02108
Phone: 617-963-2346

---

**From:** Fritzler [mailto:mafritzler@yahoo.com]
**Sent:** Monday, February 09, 2015 2:26 PM
**To:** Charities (AGO)
**Cc:** Kristine Alonge
**Subject:** Fw: Request for public records search

To Whom It May Concern:

My email bounced obviously because Vanessa Carvalho is no longer with the Charities division.

Please see email below addressed to Vanessa.

I would appreciate a reply at your earliest convenience.

Sincerely,

Pamela Fritzler

3

----- Forwarded Message -----
**From:** Fritzler <mafritzler@yahoo.com>
**To:** "vanessa.carvalho@state.ma.us" <vanessa.carvalho@state.ma.us>
**Cc:** Kristine Alonge <k.alonge@sbcglobal.net>
**Sent:** Monday, February 9, 2015 12:37 PM
**Subject:** Request for public records search

Dear Ms. Carvalho,

I reached out to you over a year ago regarding my need to access some key information on a non-profit (501c3) corporation by the name of **Institute for International Cooperation and Development (IICD).** The AG number is **021875,** and the FEIN is **22-2778876.**

At the time, you informed me that it may be difficult and expensive to unearth the annual reports for this entity for the **years 1988-1997**, so I put my request on hold.  However, in view of a formal complaint that I and others are filing about this entity, is now vitally important that I persist in trying to find out at least who the officers were for some or all of the years 1988 - 1997.

Please, can you advise?  I am a private citizen, not a member of the media, and am requesting these records in the public interest.  I would hope that you could bear this in mind per costs that may be involved in this search.

Thank you for your consideration.

Sincerely,

Pamela Fritzler

4

CIR0061197

# EXHIBIT Q

# USDA/CCC FINANCIAL REPORT

| | This report authorized by the Director, Program Planning, Development and Evaluation Division |
|---|---|

| | 1. Agreement Number | 2. Budget Number | 3. Report Number (#1, #2, etc.) |
|---|---|---|---|
| (To be submitted semi-annually with the logistics & monetization reports) | FCC-612-2006/092-00-A | 2006 - 105 | # 8 |
| 4. Recipient Organization Name: | Planet Aid, Inc. | Ester Neltrup | 5. PERIOD COVERED BY THIS REPORT |
| Street Address: | | | FROM (month/day/year) 10/1/2009 / TO (month/day/year) 3/31/2010 |
| | One Cross Street, | | 6. Funds Advanced from CCC During This Reporting Period: $0.00 |
| City, State | Holliston, MA | | 7. USDA/CCC CASH ON HAND |
| and Zip Code: | 1746 | | Beginning of Period: $0.00 / End of Period: $0.00 |
| | | 9. Federal Tax Identification #: 04-3348171 | 8. Interest Earned This Period: 0 |

| Line # | Category | Sub-Category | Line Item | Approved Monetization Budget | YOUR DATA! Monetization Budget Expenditures | Approved USDA/CCC Budget | YOUR DATA! USDA/CCC Budget Expenditures | USDA/CCC Funds Remaining | USDA/CCC Funds % Remaining |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Admin | Salaries | ManagementStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 2 | Admin | Salaries | SupportStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 3 | Admin | Salaries | US HQ Staff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 4 | Admin | Benefits | ManagementStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 5 | Admin | Benefits | SupportStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 6 | Admin | Benefits | US HQ Staff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 7 | Admin | Benefits | Training | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 8 | Admin | Prof. Services | World Vision monetization fee | 318798 | 343127 | 0 | 0 | -24329 | -8% |
| 9 | Admin | Prof. Services | NICRA | 0 | 0 | 595795.2 | 1011554 | -115758.8 | -70% |
| 10 | Admin | Prof. Services | Lawyer | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 11 | Admin | Prof. Services | Other | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 12 | Admin | Travel | International | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 13 | Admin | Travel | In Country | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 14 | Admin | Office | Rent | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 15 | Admin | Office | Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 16 | Admin | Office | General Expenses | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 17 | Admin | Office | Services & Fees | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 18 | Admin | Office | Cap. Improve. | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 19 | Admin | Office - US HQ | Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 20 | Admin | Equipment | Maint & repairs | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 21 | Admin | Equip. Leases | Truck/4WD | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 22 | Admin | Equip. Leases | Auto | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 23 | Admin | Equip. Leases | Office Equipment | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 24 | Admin | Equip. Purchases | Computer w/Monitor | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 25 | Admin | Equip. Purchases | Printer | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 26 | Admin | Equip. Purchases | Fax | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 27 | Admin | Equip. Purchases | Copier | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 28 | Admin | Equip. Purchases | Phone Systems | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 29 | Admin | Equip. Purchases | Truck/4WD | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 30 | Admin | Equip. Purchases | Auto | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 31 | Admin | Equip. Purchases | Field Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 32 | Admin | ICR | (Incl. ICR on ITSH) | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| TT01 | Admin | TOTAL | | 318798 | 343127 | 595795.2 | 1011554 | -140087.8 | -4% |
| 33 | ITSH | Warehouse | Rent | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 34 | ITSH | Warehouse | Casual Labor | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 35 | ITSH | Internal Transportation | Vehicles/Drivers | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 36 | ITSH | Internal Transportation | Rail | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 37 | ITSH | Internal Transportation | Barge/Boat | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 38 | ITSH | Handling | Repack/Load/Unload | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 39 | ITSH | Warehouse | Repairs & Improvement | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 40 | ITSH | Warehouse | Miscellaneous | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| TT02 | ITSH | TOTAL ITSH | | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| TT03 | ALL | GRAND TOTAL | | 318798 | 343127 | 595795.2 | 1011554 | -140087.8 | -48% |

| 12. | CERTIFICATION |
|---|---|
| I certify to the best of my knowledge that this report is true in all respects and that all disbursements have been made for the purpose of the contract. | |

| | AUTHORIZED OFFICIAL | DATE SUBMITTED May 16 2010 |
|---|---|---|
| | | TELEPHONE ( 410 ) 309-1002 |

**USDA/CCC FINANCIAL REPORT**

This report authorized by the Director, Program Planning, Development and Evaluation Division

(To be submitted semi-annually with the logistics & monetization report)

| | | |
|---|---|---|
| 1. Agreement Number FCC-612-2006/092-00 | 2. Budget Number 2006 - 105 | 3. Report Number (#1, #2, etc.) # 1 |

4. Recipient Organization
Name: Planet Aid, Inc.
Street Address: Marie Lichtenberg
One Cross Street,
City, State: Holliston, MA
and Zip Code: 1746

| 5. PERIOD COVERED BY THIS REPORT | |
|---|---|
| FROM (month/day/year) 6/6/06 | TO (month/day/year) 9/30/06 |

| 6. Funds Advanced from CCC During This Reporting Period: |
|---|

7. USDA/CCC CASH ON HAND   $158,790.00
Beginning of Period: $0.00   End of Period: $16,123.00

8. Interest Earned This Period: 0

9. Federal Tax Identification #: 04-3348171

| Line # | Category | Sub-Category | Line Item | YOUR DATA Approved Monetization Budget | Monetization Budget Expenditures | YOUR DATA Approved USDA/CCC Budget | USDA/CCC Budget Expenditures | USDA/CCC Funds Remaining | USDA/CCC Funds: % Remaining |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Admin | Salaries | ManagementStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 2 | Admin | Salaries | SupportStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 3 | Admin | Salaries | US HQ Staff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 4 | Admin | Benefits | ManagementStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 5 | Admin | Benefits | SupportStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 6 | Admin | Benefits | US HQ Staff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 7 | Admin | Benefits | Training | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 8 | Admin | Prof. Services | World Vision monetization fe | 180000 | 0 | 0 | 0 | 180000 | 100% |
| 9 | Admin | Prof. Services | NICRA | 0 | 0 | 595795.2 | 142667 | 453128.2 | 76% |
| 10 | Admin | Prof. Services | Lawyer | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 11 | Admin | Prof. Services | Other | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 12 | Admin | Travel | International | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 13 | Admin | Travel | In Country | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 14 | Admin | Office | Rent | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 15 | Admin | Office | Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 16 | Admin | Office | General Expenses | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 17 | Admin | Office | Services & Fees | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 18 | Admin | Office | Cap. Improve. | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 19 | Admin | Office - US HQ | Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 20 | Admin | Equipment | Maint & repairs | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 21 | Admin | Equip. Leases | Truck/4WD | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 22 | Admin | Equip. Leases | Auto | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 23 | Admin | Equip. Leases | Office Equipment | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 24 | Admin | Equip. Purchases | Computer w/Monitor | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 25 | Admin | Equip. Purchases | Printer | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 26 | Admin | Equip. Purchases | Fax | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 27 | Admin | Equip. Purchases | Copier | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 28 | Admin | Equip. Purchases | Phone Systems | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 29 | Admin | Equip. Purchases | Truck/4WD | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 30 | Admin | Equip. Purchases | Auto | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 31 | Admin | Equip. Purchases | Field Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 32 | Admin | ICR | (Incl. ICR on ITSH) | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| TT01 | Admin | TOTAL | | 180000 | 0 | 595795.2 | 142667 | 633128.2 | 82% |
| 33 | ITSH | Warehouse | Rent | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 34 | ITSH | Warehouse | Casual Labor | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 35 | ITSH | Internal Transportation | Vehicles/Drivers | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 36 | ITSH | Internal Transportation | Rail | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 37 | ITSH | Internal Transportation | Barge/Boat | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 38 | ITSH | Handling | Repack/Load/Unload | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 39 | ITSH | Warehouse | Repairs & Improvement | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 40 | ITSH | Warehouse | Miscellaneous | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| TT02 | ITSH | TOTAL ITSH | | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| TT03 | ALL | GRAND TOTAL | | 180000 | 0 | 595795.2 | 142667 | 633128.2 | 82% |

12.
CERTIFICATION

I certify to the best of my knowledge that this report is true in all respects and that all disbursements have been made for the purpose of the contract.

AUTHORIZED OFFICIAL

DATE SUBMITTED

TELEPHONE ( )

## USDA/CCC FINANCIAL REPORT

| | |
|---|---|
| (To be submitted semi-annually with the logistics & monetization r | This report authorized by the Director, Program Planning, Development and Evaluation Division |

| | |
|---|---|
| 4. Recipient Organization Name: | Planet Aid, Inc. |
| | Marie Lichtenberg |
| Street Address: | One Cross Street, |
| City, State | Holliston, MA |
| and Zip Code: | 1746 |

| 1. Agreement Number | 2. Budget Number | 3. Report Number (#1, #2, etc.) |
|---|---|---|
| FCC-656-2004/087-00 | 2004-23 | # 8 |

| 5. PERIOD COVERED BY THIS REPORT | | 6. Funds Advanced from CCC During This Reporting Period: |
|---|---|---|
| FROM (month/day/year) 10/1/07 | TO (month/day/year) 12/31/07 | 0 |

| 7. USDA/CCC CASH ON HAND | | 8. Interest Earned This Period: |
|---|---|---|
| Beginning of Period: N/A | End of Period: N/A | N/A |

9. Federal Tax Identification #:   [omitted by USDA]

| Line # | Category | Sub-Category | Line Item | YOUR DATA! Approved Monetization Budget | YOUR DATA! Monetization Budget Expenditures | Approved USDA/CCC Budget | USDA/CCC Budget Expenditures | USDA/CCC Funds Remaining | USDA/CCC Funds % Remaining |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Admin | Salaries | ManagementStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 2 | Admin | Salaries | SupportStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 3 | Admin | Salaries | US HQ Staff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 4 | Admin | Benefits | ManagementStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 5 | Admin | Benefits | SupportStaff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 6 | Admin | Benefits | US HQ Staff | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 7 | Admin | Benefits | Training | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 8 | Admin | Prof. Services | Consultant(s) | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 9 | Admin | Prof. Services | Accountant(s) | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 10 | Admin | Prof. Services | Lawyer | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 11 | Admin | Prof. Services | Audit | 45000 | 22192 | 0 | 0 | 22808 | 51% |
| 12 | Admin | Travel | International | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 13 | Admin | Travel | In Country | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 14 | Admin | Office | Rent | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 15 | Admin | Office | Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 16 | Admin | Office | General Expenses | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 17 | Admin | Office | Services & Fees | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 18 | Admin | Office | Cap. Improve. | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 19 | Admin | Office - US HQ | Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 20 | Admin | Equipment | Maint & repairs | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 21 | Admin | Equip. Leases | Truck/4WD | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 22 | Admin | Equip. Leases | Auto | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 23 | Admin | Equip. Leases | Office Equipment | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 24 | Admin | Equip. Purchases | Computer w/Monitor | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 25 | Admin | Equip. Purchases | Printer | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 26 | Admin | Equip. Purchases | Fax | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 27 | Admin | Equip. Purchases | Copier | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 28 | Admin | Equip. Purchases | Phone Systems | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 29 | Admin | Equip. Purchases | Truck/4WD | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 30 | Admin | Equip. Purchases | Auto | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 31 | Admin | Equip. Purchases | Field Communications | 0 | 0 | 0 | 0 | 0 | #DIV/0! |
| 32 | Admin | ICR | (Incl. ICR on ITSH) | 21443 | 15009 | 0 | 0 | 6434 | 30% |
| TT01 | Admin | TOTAL | | 66443 | 37201 | 0 | 0 | 29242 | 44% |
| 33 | ITSH | Warehouse | Rent | 66000 | 43151 | 0 | 0 | 22849 | 35% |
| 34 | ITSH | Warehouse | Casual Labor **) | 24390 | 17788 | 0 | 0 | 6602 | 27% |
| 35 | ITSH | Internal Transportation | Vehicles/Drivers | 39420 | 73100 | 0 | 0 | -33680 | -85% |
| 36 | ITSH | Internal Transportation | Rail | 0 | | 0 | 0 | 0 | #DIV/0! |
| 37 | ITSH | Internal Transportation | Barge/Boat | 0 | | 0 | 0 | 0 | #DIV/0! |
| 38 | ITSH | Handling | Repack/Load/Unload | 0 | 44890 | 0 | 0 | -44890 | #DIV/0! |
| 39 | ITSH | Warehouse | Repairs & Improvement | 0 | | 0 | 0 | 0 | #DIV/0! |
| 40 | ITSH | Warehouse | Miscellaneous | 39624 | 6847 | 0 | 0 | 32777 | 83% |
| TT02 | ITSH | TOTAL ITSH | | 169434 | 185776 | 0 | 0 | -16342 | -10% |
| TT03 | ALL | GRAND TOTAL | | 235877 | 222977 | 0 | 0 | 12900 | 5% |

**) The amount for casual labor has been adjusted downwards with $2.118 since last report, based on the final reconciled accounts.

**EXHIBIT R**



NGWIRA001581



NGWIRA001493



02/03/2012

NGWIRA001456



02/03/2012

NGWIRA001416



02/28/2011

NGWIRA001311

NGWIRA000939



06/03/2012

NGWIRA000906



01/01/2001

NGWIRA000864



CIR0020733





CIR0022825



CIR0022783



CIR0022191

**EXHIBIT S**



NGWIRA000837



CIR0022007



NGWIRA001357





CIR0022047



CIR0022041



CIR0022064



CIR0038916



CIR0023416

**EXHIBIT T**



CIR0020601



CIR0020604



CIR0020618



CIR0020628



CIR0020649



CIR0020659



CIR0020665



CIR0020667



CIR0020701



CIR0020727



CIR0020784



CIR0022461

**EXHIBIT U**



02/11/2012

NGWIRA000882



02/11/2012

NGWIRA000881



02/11/2012

NGWIRA000880



02/11/2012



02/11/2012

NGWIRA000878



02/04/2012

NGWIRA000848



NGWIRA001383



02/01/2012

NGWIRA001382



CIR0023796



CIR0023816



CIR0038844

# EXHIBIT V

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Ethan Forrest

Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T  +1 415 591 7008
eforrest@cov.com

**Via ECF**                                                                 March 19, 2020

Hon. Jacqueline Scott Corley
U.S. District Court for the Northern District of California
450 Golden Gate Ave.
15th Floor
San Francisco, CA 94102

### Re: Planet Aid, Inc. v. Reveal, No. 3:17-cv-03695-MMC

Dear Judge Corley:

As the Court requested on March 5, 2020, Defendants write to supplement the parties' letter on discovery related to key sources.  Dkt. 267.  In Plaintiffs' original letter on this topic and their "supplemental" declaration, Plaintiffs claim that they learned during depositions that Defendants purportedly did not comply with discovery.

Plaintiffs' accusations are baseless, and the Court should reject them.  The record shows that either (a) Plaintiffs severely and incomprehensibly misunderstood the discovery process agreed to and followed by the parties in this matter, or (b) Plaintiffs are trying to exploit the Court's discovery process to harass Defendants and seek litigation advantage.  As explained below, the first option cannot be true because Plaintiffs, for over a year, dictated precisely the discovery they needed from Defendants  at a granular level, and the second is unacceptable.

***Plaintiffs and Defendants followed a clear, mutually understood process for document discovery in this case.***  For over a year, the parties cooperated in discovery through an efficient, Court-approved process:  Plaintiffs identified what was essential for their opposition to Defendants' anti-SLAPP motion, and Defendants produced the requested documents (or explained why Defendants would not produce them).

For instance, in November and December 2018, the parties clearly communicated with each other about what Plaintiffs' priorities were at that time:  First, all of Defendants' story scripts, drafts, outlines, and related communications; and then, on a rolling basis, people from the list of 15 witnesses about whom Plaintiffs sought discovery.  Dkt. 267-02 at 4 (Dec. 14, 2018 Email from E. Forrest to S. Rosenthal, et al.); Dkt. 274-01 (Nov. 13, 2018 Email from S.

**COVINGTON**

Hon. Jacqueline Scott Corley
March 19, 2020
Page 2

Rosenthal to A. Doran, et al.).[1]  As an example of how the parties worked through this process, Plaintiffs told Defendants in November 2018 that Defendants did not need to review or produce documents pertaining to Innocent Chitosi, one of the people on the list of 15 witnesses. Dkt. 274-01.

To ensure clarity and avoid wasting time on topics Plaintiffs decided they did not need, Defendants reiterated to Plaintiffs that it was important for Plaintiffs to continue prioritizing topics and witnesses in order to ensure that discovery could proceed efficiently.  For example, Defendants wrote to Plaintiffs in December 2018:  "So that Defendants can fulfill their discovery obligations as efficiently as reasonably possible, we ask Plaintiffs to prioritize what documents they seek next, then meet and confer with us to discuss feasible timelines for those priorities. . . . Last, we note that we are always open to discussing any of Plaintiffs' suggestions to prioritize certain items in discovery, or to narrow the topics at issue, in order to streamline this case." Dkt. 267-02 at 4 (Dec. 14, 2018 Email from E. Forrest to S. Rosenthal, et al.).

Plaintiffs understood this process.  For example, in January 2019, the parties agreed that Defendants were to prioritize documents pertaining to Harrison Longwe, Kandani Ngwira, and Kris Alonge.  Forrest Decl. Ex. A (Jan. 25, 2019 Email from E. Forrest to S. Rosenthal, et al.). After Defendants finished producing the Longwe documents, Plaintiffs dropped Kris Alonge from that list, and then prioritized "documents concerning payments," *i.e.*, all documents concerning payments, compensation, or expenses related to Defendants' reporting.  *Id.*  Later, in March 2019, Defendants moved on to a subset of documents from Susanne Reber, then back to Mr. Ngwira.  *Id.* Ex. B (Mar. 6, 2019 Email from E. Forrest to S. Rosenthal).

***By April 2019, Plaintiffs* knew *they had not requested all of the people on the list of 15***.  In April 2019, Plaintiffs' priority was Defendants' communications with the BBC. Forrest Decl. Ex. C (Apr. 17, 2019 Email from S. Rosenthal to E. Forrest, et al.).  Defendants declined to comply, writing, "Meanwhile, what is Plaintiffs' next priority?  If you have no preference we will move to another of the named story sources listed in the 2nd RFPs [*i.e.*, the list of 15 people]."  *Id.*

Plaintiffs did not ask any further questions about these sources—instead, they asked for documents about NBC's I-Team, then went back to Kris Alonge.  *Id.*  Once the parties reached an impasse on the BBC and NBC documents, Plaintiffs asked for documents related to UNESCO, UNICEF, and DFID.  Forrest Decl. Ex. D (May 15, 2019 Email from. S. Rosenthal to E. Forrest, et al.).  After that, the parties resumed settlement talks from late May 2019 to September 2019 (Dkts. 217, 227); Plaintiffs tried and failed to move their case to Maryland again, ending in September 2019 (Dkt. 226); and then Plaintiffs resumed discovery dispute mode (*see* Dkt. 233).

---

[1] Contrary to Plaintiffs' argument, Defendants have never represented that our discovery obligations were limited to the sources listed in Defendants' December 14, 2018 email.  Dkt. 267-02 at 4 (Dec. 14, 2018 Email from E. Forrest to S. Rosenthal, et al.).  Defendants offer this email simply as an example of how the parties cooperated in the discovery process.[1]  Plaintiffs' own exhibit provides another example.  Rosenthal Decl. Ex. A (Nov. 13, 2018 Email from S. Rosenthal to A. Doran, et al.) ("[Defendants] can hold up on [C]hitosi.  Will let you know if we need him.").

**COVINGTON**

Hon. Jacqueline Scott Corley
March 19, 2020
Page 3

By late 2019, Defendants had produced approximately 90,000 pages of documents and 80 hours of audiovisual material. *See* Dkt. 235 at 8 & n.7. At that point, Plaintiffs' requests slowed, and Defendants repeatedly asked if Plaintiffs had any further requests for specific materials. Dkt. 267-02 at 11 (Oct. 14, 2019 Email from E. Forrest to S. Rosenthal, et al.) ("What other documents, if any, are essential for Plaintiffs in order to respond to our anti-SLAPP motion?"); Dkt. 235 at 8 ("There are no outstanding document requests at this time.").

Further, at the November 2019 hearing where all outstanding discovery issues were to be raised, Plaintiffs did not identify as essential "all" documents related to "all" sources.[2] *See* Nov. 21, 2019 Hr'g Tr. 6:5–9. Even if Plaintiffs believed they had outstanding requests to Defendants for "all" 15 people, notwithstanding Plaintiffs' own decision to focus only on a subset of those people, Plaintiffs had every opportunity to clarify any perceived omissions with Defendants and the Court. There is no excuse for Plaintiffs' present behavior.

Plaintiffs' discovery into Defendants' work has been broad and thorough. Plaintiffs have propounded written discovery, taken four depositions, and received an enormous quantity of documents and audio recordings. They have received all documents that Defendants gathered, generated, or relied upon for the published statements. Nov. 9, 2018 Hr'g Tr. at 5:5–24. They have received all statements that contradict or undermine Defendants' published statements.[3] Nov. 21, 2019 Hr'g Tr. 10:18–23. The parties have also briefed specific issues related to sources, such as the False Claims Act. Dkt. 263; 268. Plaintiffs therefore have no legitimate reason to reopen discovery.

At this point, Defendants can see no rationale behind Plaintiffs' continued discovery disputes except harassment and attempts to forestall a ruling on the anti-SLAPP motion—which could lead to Plaintiffs paying Defendants' attorney's fees and facing the court of public opinion as to Defendants' accurate, truthful reporting. As shown by the sheer volume of discovery Defendants have provided, Defendants have consistently responded to Plaintiffs' every discovery request. Defendants are not hiding the ball from Plaintiffs or the Court—Plaintiffs are trying to game the system. The Court should put a stop to this and let Defendants' anti-SLAPP motion be heard.

Sincerely,

/s/ *Ethan Forrest*

---

[2] Defendants object to Plaintiffs' argument that Defendants *knew* to produce documents related to "all" sources because some productions contain certain sources' names. Dkt. 274 ¶ 12. Those documents were captured by another request. Defendants were not cherry picking.

[3] Defendants also object to Plaintiffs' claim that Defendants are withholding any contradictory information based on confidentiality. Defendants objected and instructed witnesses not to answer in order to protect CIR's confidential sources, not to withhold contradictory information, a topic on which Defendants have already complied with Plaintiffs' requests.

# EXHIBIT W

**Sam Rosenthal**

---

| | |
|---|---|
| **From:** | Dan Bender <dbender@digitalevidencegroup.com> |
| **Sent:** | Thursday, May 13, 2021 10:16 AM |
| **To:** | Sam Rosenthal; David Wiseman |
| **Cc:** | Marguerite Stevenson |
| **Subject:** | RE: Planet Aid v. Reveal |
| **Attachments:** | Planet Aid v. Reveal Errata.zip |

Hi Sam. It's nice to hear from you. Below are the run times. Also, I have attached the errata sheets. What's happening with the case? Also, I saw that Mike left the firm. I reached out but have not heard back from him. Did he bring his cases and clients with him? Do you need assistance? Dan

- Pyle 03/30/20 – 5:56:00
- Rosenthal 03/02/20 – 6:01:00
- Salladay 07/27/20 – 3:46:00
- Smith total – 7:01:00 (01/27/20 – 3:19:00 & 01/28/20 – 3:42:00)
- Sullivan 07/31/20 – 3:42:00
- Walters 12/30/19 – 6:56:00

**Daniel J. Bender, Esq.**

**DIGITAL EVIDENCE GROUP**
COURT REPORTING • HYPERLINKED BRIEFS
LEGAL GRAPHICS • TRIAL PRESENTATION
1730 M St., NW, 8th Floor
Washington, D.C. 20036
202.706.6007 Office
202.486.0126 Mobile
dbender@digitalevidencegroup.com
company website: digitalevidencegroup.com
graphics ReDUX: linkedin.com/showcase/deg-redux
graphics book: thevisuallawyer.com